1  ROBERT A. NAEVE (CA SBN 106095)
   RNaeve@mofo.com
2  MORRISON & FOERSTER LLP
   19900 MacArthur Boulevard
3  Irvine, California 92612-2445
   Telephone: (949) 251-7500
4  Facsimile: (949) 251-0900

5  DAVID F. MCDOWELL (CA SBN 125806)
   MICHAEL J. BOSTROM (CA SBN 211778)
6  DMcDowell@mofo.com
   MBostrom@mofo.com
7  MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
8  Los Angeles, California 90013-1024
   Telephone: (213) 892-5200
9  Facsimile: (213) 892-5454

10 Attorneys for Defendant
   TARGET CORPORATION

11

12                      UNITED STATES DISTRICT COURT

13                     NORTHERN DISTRICT OF CALIFORNIA

14

15 NATIONAL FEDERATION OF THE BLIND,      Case No.   C06-01802 MHP
   the NATIONAL FEDERATION OF THE BLIND
16 OF CALIFORNIA, on behalf of their members,
   and Bruce F. Sexton, on behalf of himself and all
17 others similarly situated,                   **DEFENDANT TARGET
                                                CORPORATION'S NOTICE OF
18                Plaintiffs,                    MOTION AND MOTION TO
                                                DISMISS AMENDED
19        v.                                    COMPLAINT OR, IN THE
                                                ALTERNATIVE, MOTION TO
20 TARGET CORPORATION and DOES                  STRIKE; MEMORANDUM OF
   ONE-TEN,                                     POINTS AND AUTHORITIES;
21                                              [PROPOSED] ORDER**
                  Defendant.
22                                              **[Fed. R. Civ. P. 12(b)(6), (f)]**

23                                              Hearing Date:   June 5, 2006
                                                Time:           2:00 p.m.
24

25

26

27

28

   TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)
   la-854596

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................. 1

STATEMENT OF FACTS ........................................................................................................ 2

ARGUMENT ......................................................................................................................... 3

I.   NEITHER TITLE III OF THE ADA NOR CALIFORNIA'S PUBLIC
     ACCOMMODATIONS LAWS HAVE BEEN AMENDED TO APPLY TO
     INTERNET WEBSITES ................................................................................................ 3

     A.   Congress Has Not Amended Title III Of The ADA To Apply To Public
          Accommodations' Websites ................................................................................ 4

          1.   In 1998, Congress Amended The Rehabilitation Act To Require
               Websites Maintained By Federal Agencies And Contractors To Be
               Accessible to Individuals With Disabilities ............................................. 4

          2.   Congress, However, Has Not Taken Similar Steps To Amend
               Title III Of The ADA To Apply To Public Accommodations'
               Websites .............................................................................................. 5

     B.   The Legislature Has Not Amended California's Public Accommodations
          Laws To Apply to Internet Websites ................................................................. 6

          1.   In 2002, The Legislature Amended Government Code
               Section 11135 To Require State Government Websites To
               Be Accessible To Individuals With Disabilities ...................................... 6

          2.   The Legislature, However, Has Not Taken Similar Steps To Amend
               Either The Unruh Or The Disabled Persons Act To Apply with
               Internet Websites ................................................................................. 6

II.  NFB'S THIRD CLAIM FOR RELIEF FOR ALLEGED VIOLATION OF TITLE
     III OF THE ADA FAILS TO STATE A CLAIM FOR RELIEF BECAUSE THE
     ADA DOES NOT APPLY TO TARGET'S WEBSITE .................................................... 7

     A.   Title III Of The ADA Prohibits Covered "Public Accommodations" From
          Discriminating In Physical "Places of Public Accommodation" ........................... 8

     B.   NFB Has Not Alleged, And Cannot Establish, That Target.com Is A
          Physical "Place Of Public Accommodation" ....................................................... 8

III. NFB CANNOT STATE A CLAIM FOR RELIEF UNDER THE UNRUH ACT ........... 11

     A.   The Unruh Act Does Not Apply to Target's Website ......................................... 11

          1.   The Internet Is Far Afield From The Traditional Scope of the Unruh
               Act, Which Encompasses Only Places of Public Accommodation ............ 13

          2.   Interpreting the Unruh Act to Apply to the Internet Would Raise
               Serious Constitutional Concerns ............................................................ 14

     B.   NFB Has Not Alleged, And Cannot Allege Intentional Discrimination
          Under The Unruh Act ..................................................................................... 15

          1.   Intentional Discrimination Is Required to Support An Unruh Act
               Violation That Cannot Be Predicated On An ADA Violation .................. 15

          2.   NFB Has Not And Cannot Allege Intentional Discrimination Under
               the Unruh Act .................................................................................... 16

1

2

**TABLE OF CONTENTS**
**(continued)**

Page

3

    C.    The Unruh Act Does Not Require Public Accommodations To Construct, Alter, Repair Or Modify Covered Facilities............................................................ 18

4

IV.   NFB CANNOT STATE A CLAIM FOR RELIEF UNDER THE DISABLED PERSONS ACT ...................................................................................................... 19

5

V.    CALIFORNIA'S ACCESS STATUTES WOULD VIOLATE THE COMMERCE CLAUSE IF THEY WERE INTERPRETED AS APPLYING TO THE INTERNET ...................................................................................................................... 21

6

7

    A.    California May Not Project Its Laws Into Conduct Occurring Entirely Outside Its Borders............................................................................................. 21

8

    B.    Any Regulation of the Internet Must Be Instituted At the  National Level ......... 23

9

VI.   NFB'S CLAIM FOR DECLARATORY RELIEF FAILS BECAUSE NFB CANNOT SHOW TARGET'S WEBSITE VIOLATES THE ADA OR CALIFORNIA'S ACCESS STATUTES ................................................................... 24

10

11

VII.  CONCLUSION ...................................................................................................... 24

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Access Now v. Southwest Airlines, Co.*,
   227 F. Supp. 2d 1312 (S.D. Fla. 2002) ..................................................................... 10

5

*American Booksellers Foundation v. Dean*,
   42 F.3d 96 (2d Cir. 2003) ........................................................................................ 22

6

*American Civil Liberties Union v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ............................................................................... 22

7

*American Library Ass'n v. Pataki*,
    969 F. Supp. 160 (S.D.N.Y. 1997) .......................................................................... 22

8

*Arnold v. United Artists Theatre Cir., Inc.*,
   158 F.R.D. 439 (N.D. Cal. 1994) ............................................................................ 20

9

*BMW of North America, Inc. v. Gore*,
   517 U.S. 559 (1996) ........................................................................................... 21, 22

10

11

*Burks v. Poppy Construction Co.*,
   57 Cal. 2d 463 (1962) ............................................................................................. 13

12

*Center for Democracy & Tech. v. Pappert*,
   337 F. Supp. 2d 606 (E.D. Pa. 2004) ....................................................................... 22

13

*Chabner v. United of Omaha Life Ins. Co.*,
   225 F.3d 1042 (9th Cir. 2000) ................................................................................. 11

14

*Curran v. Mount Diablo Council of the Boy Scouts of America*,
   17 Cal. 4th 670 (1998) ............................................................................. 11, 12, 13, 14

15

16

*Ford v. Schering-Plough Corp.*,
   145 F.3d 601 (3d Cir. 1998) ...................................................................................... 9

17

*Green v. The Graduate Theological Union*,
   2000 U.S. Dist. LEXIS 15937 .................................................................................... 5

18

*Hankins v. El Torito Restaurants, Inc.*,
   63 Cal. App. 4th 510 (1998) ............................................................................... 20, 21

19

*Harris v. Capital Growth Investors XIV*,
   52 Cal. 3d 1142 (1991) ......................................................................... 15, 16, 17, 18, 19

20

21

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989) ......................................................................................... 2, 14, 21, 22

22

*Ingels v. Westwood One Broadcasting Services, Inc.*,
    129 Cal. App. 4th 1050 (2005) ........................................................................... 12, 14

23

*Isbister v. Boys' Club of Santa Cruz, Inc.*,
   40 Cal. 3d 72 (1985) ............................................................................................... 11

24

*Koebke v. Bernardo Heights Country Club*,
   36 Cal. 4th 824 (2005) .......................................................................... 15, 16, 17, 18

25

26

*Lentini v. California Center For The Arts*,
   370 F. 3d 837 (9th Cir. 2004) ................................................................................. 15

27

28

# TABLE OF AUTHORITIES
## (continued)

Page

*Marsh v. Edwards Theatres Circuit, Inc.*,
   64 Cal. App. 3d 881 (1976) ...............................................................2, 19, 20

*Psinet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ..................................................................22

*Reno v. ACLU*,
   521 U.S. 844 (1997) ............................................................................1, 7, 13

*Southeast Booksellers Ass'n v. McMaster*,
   371 F. Supp. 2d 773 (D.S.C. 2005) ........................................................22

*Southern Pac. Co. v. Arizona ex rel. Sullivan*,
   325 U.S. 761 (1945) .............................................................................2, 15

*Torres v. AT&T Broadband, LLC*,
   158 F. Supp. 2d 1035 (N.D. Cal. 2001) ..................................................11

*United States v. Carter*,
   421 F.3d 909 (9th Cir. 2005) ...................................................................7

*Warfield v. Peninsula Golf & Country Club*,
   10 Cal. 4th 594 (1995) ...........................................................................13

*Western Mining Council v. Watt*,
   643 F.2d 618, 624 (9th Cir. 1981) ............................................................3

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) ..............................................................9, 10

*Zukle v. Regents of the Univ. of Cal.*,
   166 F.3d 1041 (9th Cir 1999) ...................................................................5

## CONSTITUTIONS, STATUTES AND REGULATIONS

Commerce Clause of the United States Constitution,
   U.S. Const. art. I, § 8, cl. 3. ...............................................................2, 14

28 C.F.R. § 36.104 ....................................................................................1, 9

29 U.S.C. § 701
   Rehabilitation Act of 1973 ..................................................................4, 6

29 U.S.C. § 794(a)....................................................................................4

29 U.S.C. § 794d(a)(1)(A)(i)-(ii)................................................................4

29 U.S.C. § 794d(a)(2)(A).........................................................................4

36 C.F.R. § 1194.22 ..................................................................................4

42 U.S.C. § 12101
   Americans with Disabilities Act.............................................................1

42 U.S.C. § 12181(1)................................................................................9

42 U.S.C. § 12181(7)................................................................................8

42 U.S.C. § 12182(a)................................................................................8

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   United States Dep't of Justice, Nondiscrimination on the Basis of Disability by
       Public Accommodations and in Commercial Facilities,
4      56 Fed. Reg. 35544, 35551 (1991) .......................................................................... 8

5   Workforce Investment Act of 1998,
       Pub. L. No. 105-220, 112 Stat. 936 (1998) ............................................................ 4

6   Cal. Civ. Code § 51
       Unruh Civil Rights Act.................................................................................... 1, 18

7   Cal. Civ. Code § 51(a) ................................................................................................ 11

8   Cal. Civ. Code § 51(d).................................................................................................. 1

9   Cal. Civ. Code § 52 .................................................................................................... 16

    Cal. Civ. Code § 54.1 ............................................................................................. 2, 20
10
    Cal. Civ. Code § 54.1(a)(1) ....................................................................................... 19
11
    Cal. Civ. Code §§ 51 and 54.1 .................................................................................... 3
12
    Cal. Civ. Code §51(f) ................................................................................................. 15

13  California Government Code § 4450 ......................................................................... 20

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3          NOTICE IS HEREBY GIVEN that on June 5, 2006 at 2:00 p.m., or as soon thereafter as

4    the matter may be heard by the above-entitled Court located at 450 Golden Gate Avenue,

5    San Francisco, California 94102, Courtroom 15, defendant Target Corporation ("Target") will

6    and hereby does move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

7    Procedure, to dismiss plaintiffs National Federation of the Blind, the National Federation of the

8    Blind of California and Bruce F. Sexton's ("NFB") first, second, third and fourth claims for relief.

9    In the alternative, Target moves the Court, pursuant to Rule 12(f), to strike NFB's claims under

10   Title III of the Americans with Disabilities Act, California's Unruh Civil Rights Act, and

11   California's Blind and Other Physically Disabled Persons Act.  This Motion is brought on the

12   ground that NFB has not stated a claim for relief under any of these acts.  This Motion is based on

13   this Notice of Motion and Motion and Supporting Memorandum of Points and Authorities, and

14   on such further written and oral argument as may be presented at or before the time the Court

15   takes this motion under submission.

16

17   Dated: April 27, 2006                ROBERT A. NAEVE
                                          DAVID F. MCDOWELL
18                                        MICHAEL J. BOSTROM
                                          MORRISON & FOERSTER LLP
19

20                                        By:    /s/ Robert A. Naeve
21                                              Robert A. Naeve

22                                        Attorneys for Defendant
                                          TARGET CORPORATION
23

24

25

26

27

28

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                                    1

1

**INTRODUCTION AND SUMMARY OF ARGUMENT**

2      Plaintiffs National Federation of the Blind, the National Federation of the Blind of

3   California and Bruce F. Sexton ("NFB") claim in this action that federal and state laws that

4   prohibit disability discrimination in *places* of public accommodations somehow apply to Internet

5   websites, even though such websites are "located in no particular geographical location but

6   available to anyone, anywhere in the world, with access to the Internet."  *E.g., Reno v. ACLU*, 521

7   U.S. 844, 851 (1997).  In particular, NFB alleges that Defendant Target Corporation's ("Target")

8   website at www.target.com violates Title III of the Americans with Disabilities Act, 42 U.S.C.

9   § 12101, *et seq.* ("Title III" or "Title III of the ADA"), California's Unruh Civil Rights Act,

10   California Civil Code section 51 *et seq.* ("Unruh Act"), and California's Blind and Other

11   Physically Disabled Persons Act, California Civil Code section 54, *et seq.* ("Disabled Persons

12   Act"), because it is "difficult if not impossible" for blind customers to use (Am. Compl., ¶ 1).

13   Even assuming the truth of the factual allegations, NFB's claims under Title III, the Unruh Act,

14   and Disabled Persons Act should be dismissed or, in the alternative, stricken, for at least the

15   following reasons:

16      1.     Title III of the ADA does *not* apply to websites.  As we explain in detail below, the

17           prohibitions of Title III are restricted to physical "*places* of public

18           accommodation," which include only "facilities," such as "buildings, structures,

19           sites, complexes, equipment, rolling stock or other conveyances, roads, walks,

20           passageways, parking lots, or other real or personal property . . . ."  28 C.F.R.

21           § 36.104.  Internet websites are *not* actual physical places or facilities, and fall

22           outside Title III's regulatory purview.

23      2.     NFB cannot state a claim under the Unruh Act because:  (a) the Unruh Act does

24           not apply to websites; (b) NFB has not alleged and cannot allege the intentional

25           discrimination required to support an Unruh Act claim; and (c) the Unruh Act does

26           not by its terms require public accommodations to construct, alter, repair or

27           modify covered facilities, Cal. Civ. Code § 51(d).

28

3.    NFB cannot state a claim under the Disabled Persons Act because: (a) the Disabled Persons Act only applies to physical places, not to websites, Cal. Civ. Code § 54.1; and (b) NFB must prove Target's website violates California's building codes, which they cannot do.  *Marsh v. Edwards Theatres Circuit, Inc.*, 64 Cal. App. 3d 881, 892 (1976).

4.    Even if the Unruh Act and Disabled Persons Act could somehow be interpreted as requiring Target to modify its website, applying those statutes to Target's website would amount to a *per se* violation of the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3.  First, by requiring Target to modify its website, California would be impermissibly regulating conduct occurring outside its borders because Target's website is accessible to consumers all around the country, not just those in California.  *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  Second, regulation of the Internet is exclusively reserved for Congress because otherwise Target, and all other Internet users, could be subjected to inconsistent and contradictory state law standards.  *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945).

5.    NFB's fourth claim for a declaration that Target's website violates the ADA and California's access statutes fails for all the reasons listed above.

### STATEMENT OF FACTS

On February 7, 2006, NFB filed the action captioned above in the Superior Court of California, County of Alameda.  NFB's original complaint generally alleged that Target's website, located at www.target.com, cannot be accessed by blind individuals in violation of the Unruh Act and the Disabled Persons Act.

On March 8, 2006, Target removed this action from the Superior Court of California, County of Alameda to this Court.  Thereafter, on March 15, 2006, Target filed and served a motion to dismiss all claims in NFB's Complaint.

1    On March 30, 2006, before Target's motion was heard, NFB filed its Amended Complaint

2    in this action.  On April 13, 2006, this Court granted Target leave under its Standing Order and

3    relief from the stay imposed by General Order 56 to file this Motion to Dismiss.

4    In its Amended Complaint, NFB does not allege that Target in any way impedes blind

5    individuals' access to Target's brick and mortar stores.  NFB's claims are limited solely to

6    Target's website.  NFB generally alleges Target's website is inaccessible and is "difficult if not

7    impossible for blind customers to use." (Am Compl., ¶ 1, ¶ 29.)

8    Based on these allegations, NFB asserts four purported claims for relief.  In its first and

9    second claims for relief, NFB alleges Target's website is inaccessible to blind individuals in

10   violation of the Unruh Act, and the Disabled Persons Act, respectively.  NFB bases both its

11   Unruh Act claim and its Disabled Persons Act claim, at least in part, on allegations that Target's

12   website also violates Title III of the ADA.  (Am. Compl., ¶¶ 42, 50.)  (A Title III violation

13   amounts to an automatic Unruh Act and Disabled Persons Act violation.  *See* Cal. Civ. Code

14   §§ 51 and 54.1.)  In its third claim for relief, NFB purports to assert an independent claim under

15   Title III, not tied to California's access statutes.  Finally, in its fourth claim for relief, NFB repeats

16   its Title III, Unruh Act and Disabled Persons Act claims by seeking a declaration that Target's

17   website violates all of these statutes.  (Am. Compl., ¶ 62.)

18   For purposes of this Motion only, we assume the truth of NFB's factual allegations.

19   *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) (on a motion to dismiss,

20   courts will "generally assume the factual allegations to be true").  As explained below, even

21   assuming NFB's factual allegations are true, NFB has not stated, and cannot state, a claim under

22   Title III, the Unruh Act, or the Disabled Persons Act.  NFB's claims under those statutes should

23   be dismissed or, in the alternative, stricken without leave to amend.

**ARGUMENT**

24

25   **I.    NEITHER TITLE III OF THE ADA NOR CALIFORNIA'S PUBLIC
         ACCOMMODATIONS LAWS HAVE BEEN AMENDED TO APPLY TO
26       INTERNET WEBSITES**

27   Before analyzing the specific statutes relating to NFB's complaint in this action, we begin

28   by noting that the issues about which NFB complains *have* been the subject of legislative study.

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                                3

la-854596

A.      **Congress Has Not Amended Title III Of The ADA To Apply To Public Accommodations' Websites**

Congress enacted the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* to "develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living[.]" 29 U.S.C. § 701 (1988 ed.).  Section 503 of the Rehabilitation Act generally requires parties contracting with the federal government to take affirmative action to employ and advance qualified individuals with handicaps.  29 U.S.C. § 793.  Section 504 of the Rehabilitation Act generally prohibits discrimination against otherwise qualified individuals with handicaps by any programs or activities receiving federal financial assistance, and by programs or activities conducted by any Executive agency or the United States Postal Service.  29 U.S.C. § 794(a).

1.      **In 1998, Congress Amended The Rehabilitation Act To Require Websites Maintained By Federal Agencies And Contractors To Be Accessible to Individuals With Disabilities**

Significantly, the Rehabilitation Act in its original form did *not* purport to apply to Internet websites.  It was for this reason that Congress enacted the Workforce Investment Act of 1998, Pub. L. No. 105-220, 112 Stat. 936 (1998).  Among other things, the Workforce InvestmenT Act amended section 508 of the Rehabilitation Act to require that electronic and information technology be accessible to and useable by federal employees with disabilities, as well as individuals with disabilities who are members of the public who seek information or services from a federal agency.  *See* 29 U.S.C. § 794d (a)(1)(A)(i)-(ii).  Congress further directed the federal Architectural and Transportation Barriers Compliance Board (the "Access Board") to develop regulations implementing amended section 508.  29 U.S.C. § 794d (a)(2)(A).  The Access Board complied with this directive by publishing its Final Rule on Electronic and Information Technology Accessibility Standards in December of 2000.  *See* 36 C.F.R. Part 1194.22, 65 Fed. Reg. 80500 (2000).  As is relevant to our discussion here, the Access Board's regulations contain specific rules that describe how websites maintained by Federal agencies are to be made accessible.  *See* 36 C.F.R. § 1194.22.

1    To be clear: Section 508, as well as the Access Board's website accessibility standards do

2    not apply in this case, because NFB does not, and cannot, allege that Target is a federal agency.

3
        **2.    Congress, However, Has *Not* Taken Similar Steps To Amend**
4            **Title III Of The ADA To Apply To Public Accommodations' Websites**

5    Congress enacted the Americans with Disabilities Act in 1990. *See* Pub. L. 101-336. 104

6    Stat. 328 (1990) ("ADA"). In general, the ADA is modeled upon the Rehabilitation Act. *Zukle v.*

7    *Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir 1999) ("There is no significant

8    difference in analysis of the rights and obligations created by the ADA and the Rehabilitation

9    Act"); *Green v. Graduate Theological Union*, 2000 U.S. Dist. LEXIS 15937 (N.D. Cal. 2000). It

10   is for at least this reason that the ADA provides in part that "nothing in this Act shall be construed

11   to apply a lesser standard than the standards applied under" the Rehabilitation Act (42 U.S.C.

12   § 12201(a)), and that courts routinely look to Rehabilitation Act case law to interpret the rights

13   and obligations created by the ADA (*Zukle* at 1045 n.11).

14   Like the Rehabilitation Act, prior to its amendment by the Workforce Investment Act, the

15   ADA does *not* by its terms mention, let alone attempt expressly to regulate, electronic and

16   information technology. Indeed, in February 2000, some two years *after* Congress amended

17   section 508 to *require* federal websites to be accessible to individuals with disabilities, Congress

18   held public hearings to consider *whether* to extend Title III of the ADA to Internet websites

19   operated by public accommodations. *See Applicability of the Americans with Disabilities Act*

20   *(ADA) to Private Internet Sites: Hearing Before the Subcomm. on the Constitution of the House*

21   *Comm. on the Judiciary*, 106th Cong. 2nd Sess. 65-010 (2000).

22   Significantly, Congress has *not* amended the ADA to require accessibility to electronic

23   and information technology maintained by private businesses like Target.

24

25

26

27

28

**B.    The Legislature Has Not Amended California's Public Accommodations Laws To Apply to Internet Websites**

Much the same can be said of California law.

**1.    In 2002, The Legislature Amended Government Code Section 11135 To Require State Government Websites To Be Accessible To Individuals With Disabilities**

We are not aware of any state statute that by its terms purports to require that Internet websites maintained by public accommodations or other business enterprises be made accessible to and useable by individuals with disabilities. In 2002, however, the California Legislature adopeted its own version of the Workforce Investment Act by adding new subdivision (d) to Government Code section 11135. As amended, section 11135(d) provides as follows:

(1)    The Legislature finds and declares that the ability to utilize electronic or information technology is often an essential function for successful employment in the current work world.

(2)    In order to improve accessibility of existing technology, and therefore increase the successful employment of individuals with disabilities, particularly blind and visually impaired and deaf and hard-of-hearing persons, state governmental entities, in developing, procuring, maintaining, or using electronic or information technology, either indirectly or through the use of state funds by other entities, shall comply with the accessibility requirements of Section 508 of the Rehabilitation Act of 1973, as amended (29 U.S.C. Sec. 794d), and regulations implementing that act as set forth in Part 1194 of Title 36 of the Federal Code of Regulations.

(3)    Any entity that contracts with a state or local entity subject to this section for the provision of electronic or information technology or for the provision of related services shall agree to respond to, and resolve any complaint regarding accessibility of its products or services that is brought to the attention of the entity.

**2.    The Legislature, However, Has *Not* Taken Similar Steps To Amend Either The Unruh Or The Disabled Persons Act To Apply with Internet Websites**

As this Court knows, the Unruh Act, and the Disabled Persons Act generally prohibit private businesses in California from discriminating against individuals with disabilities. As we explain in greater detail below, no court has held that either of these acts applies to Internet

1   websites.  Nonetheless, the California Legislature has chosen *not* to amend either statute to cover

2   Internet websites as it did in section 11135(d)(2) for the State's own websites.

3       It is in this legislative vacuum that NFB's complaint must be evaluated. In the sections

4   that follow, we demonstrate that, in the absence of specific legislation, Title III of the ADA, as

5   well as the Unruh and Disabled Persons Act, simply *cannot* be extended to cover Internet

6   websites maintained by private businesses.

7   **II.    NFB'S THIRD CLAIM FOR RELIEF FOR ALLEGED VIOLATION OF**
        **TITLE III OF THE ADA FAILS TO STATE A CLAIM FOR RELIEF**
8       **BECAUSE THE ADA DOES NOT APPLY TO TARGET'S WEBSITE**

9       Congress enacted the ADA to provide "a clear and comprehensive national mandate for

10  the elimination of discrimination against qualified individuals with disabilities."  *See* 42 U.S.C. §

11  12101.  However, as a matter of statutory interpretation, the scope of this national mandate is

12  necessarily defined and limited by the terms of the Act itself.  *United States v. Carter*, 421 F.3d

13  909, 911 (9th Cir. 2005) ("It is well settled that, in a statutory construction case, analysis must

14  begin with the language of the statute itself; when the statute is clear, judicial inquiry into its

15  meaning, in all but the most extraordinary circumstance, is finished.") (citations and quotations

16  omitted).  *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1010 (6th Cir. 1997) ("To

17  determine whether a benefit plan provided by an employer falls within the prohibitions of Title

18  III, we must begin by examining the statutory text"), *cert. denied*, 522 U.S. 1084 (1998).  In this

19  action, NFB's third claim for relief is predicated upon the contention that Title III of the ADA,

20  which prohibits discrimination in *places* of public accommodations, somehow applies to Internet

21  websites that, by definition, have no *place* at all.  *See Reno v. ACLU*, 521 U.S. 844, 851 (1997).

22      The legal question addressed by NFB's third claim for relief is whether Internet websites

23  like www.target.com fall within Title III's definition of "*place* of public accommodation."  We

24  demonstrate in the paragraphs below that, as a matter of statutory construction, this term refers to

25  only *physical places and facilities,* and *not* to intangible places like Internet websites.

26

27

28

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                    7
la-854596

**A.** **Title III Of The ADA Prohibits Covered "Public Accommodations" From Discriminating In Physical "Places of Public Accommodation"**

The starting place for this Court's analysis is Title III itself. As this Court is well aware, Title III's general rule against discrimination provides as follows:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of <u>any place of public accommodation</u> by any person who owns, leases (or leases to), or operates <u>a place of public accommodation</u>.

42 U.S.C. § 12182(a) (emphasis added).

Under the Act, a private entity is considered a "public accommodation" if its operations affect commerce, and fall within one of 12 enumerated categories. 42 U.S.C. § 12181(7). One of these enumerated categories is "sales or rental establishment." 42 U.S.C. § 12181(7)(E).

In this case, NFB alleges that Target operates "approximately 1,400 stores in 47 States, including 205 stores in California," and that these stores provide "important goods such as clothing, pharmaceuticals, and household items" for sale to the public. (Am. Compl., ¶ 11.) Hence, for purposes of this Motion to Dismiss, NFB has adequately alleged that Target itself is a public accommodation as defined in 42 U.S.C. § 12181(7)(E).

**B.** **NFB Has Not Alleged, And Cannot Establish, That Target.com Is A Physical "Place Of Public Accommodation"**

But being a covered "public accommodation" is not by itself sufficient for purposes of establishing a claim for relief under Title III. Instead, as we have attempted to demonstrate graphically through the use of single and double underlining of section 12182(a) above, Title III liability can only be established *if* a covered public accommodation engages in a prohibited act of discrimination with respect to any *place* of public accommodation. 42 U.S.C. § 12182(a); *see* United States Dep't of Justice, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35551 (1991) ("The final rule defines 'place of public accommodation' as a facility, operated by a private entity, whose

1   operations affect commerce and fall within at least one of 12 specified categories.  The term

2   'public accommodation,' on the other hand, is reserved by the final rule for the private entity that

3   owns, leases (or leases to), or operates a place of public accommodation.  It is the public

4   accommodation, and not the place of public accommodation, that is subject to the regulation's

5   nondiscrimination requirements.")

6          It is here that NFB's Title III claim for relief falters.  The term "place" as used in the

7   phrase "*place* of public accommodation" is defined to mean "a *facility*, operated by a private

8   entity, whose operations affect commerce and fall within at least one of the" twelve "public

9   accommodation" categories.  28 C.F.R. § 36.104 (emphasis added).  The term "facility," is further

10  defined to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling

11  stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal

12  property, including the site where the building, property, structure, or equipment is located."  *Id.*

13  The plain meaning of these provisions is that the term "*place* of public accommodation" refers to

14  actual physical places, and not to websites that can be accessed from anywhere, without any

15  reference to a physical building or facility.  *E.g., Stoutenborough v. National Football League,*

16  *Inc.,* 59 F.3d 580, 583 (6 Cir. 1995) ("Also the prohibitions of Title III are restricted to 'places' of

17  public accommodation, disqualifying the National Football League, its member clubs, and the

18  media defendants"), *cert. denied*, 516 U.S. 1028 (1995); *Ford v. Schering-Plough Corp.*, 145

19  F.3d 601, 612-13 (3d Cir. 1998) (holding that "the plain meaning of Title III is that a public

20  accommodation is a [physical] place").

21         The Ninth Circuit has long since recognized that, as a matter of statutory construction,

22  Title III of the ADA only applies to cases in which the plaintiff claims to have been denied access

23  to an actual physical place.  In *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114

24  (9th Cir. 2000), the Ninth Circuit considered the question of whether an insurance company that

25  administers an employer-provided disability plan was a place of public accommodation under

26  Title III of the ADA.  The court began its analysis by recognizing that Title III provides an

27  extensive list of public accommodations in 42 U.S.C. § 12181(1), including an inn, a restaurant, a

28  theater, an auditorium, a bakery, a laundromat, a depot, a museum, a zoo, a nursery, a day care

1   center, and a gymnasium.  The court then noted that all of the items on the list have something in

2   common:  "They are actual, physical places where goods or services are open to the public, and

3   places where the public gets those goods or services."  *Weyer* at 1114.  The court found that the

4   principle of *noscitur a sociis* (know it from its associates) requires that the term, "place of public

5   accommodation," be interpreted "within the context of the accompanying words, and this context

6   suggests that some connection between the good or service complained of and actual physical

7   place is required."  *Id.*  Based on this reasoning, the court found that plaintiff's claim, which *was*

8   *not centered on the accessibility of an actual physical place*, was not cognizable under Title III of

9   the ADA:

> The question then is whether an insurance company, like UNUM,
> that administers an employer-provided disability plan is a 'place of
> public accommodation.'  *Certainly, an insurance office is a place*
> *where the public generally has access.  But this case is not about*
> *such matters as ramps and elevators so that disabled people can*
> *get to the office.  The disputes in this case, over the terms of a*
> *contract that the insurer markets through an employer, is not what*
> *Congress addressed in the public accommodations provisions.*

*Id.* (emphasis added).

        The same reasoning applies here.  Target itself may be a "public accommodation."  Its

brick and mortar stores may be "*places* of public accommodation."  However, NFB does *not*

allege in this action that individuals with vision impairments are denied access to one of Target's

brick and mortar stores or the goods they contain.  Instead, NFB alleges in its third claim for relief

that individuals with vision impairments cannot gain "access" to Target's *Internet* website, which

by definition does *not* exist in any physical place.  NFB's third claim for relief*,* therefore, is *not*

cognizable under Title III of the ADA because it does *not* allege denial of access to a physical,

concrete structure.  *Access Now v. Southwest Airlines*, *Co.*, 227 F. Supp. 2d 1312, 1318 (S.D. Fla.

2002) ("to fall within the scope of the ADA as presently drafted, a public accommodation must be

a physical, concrete structure.  To expand the ADA to cover 'virtual' spaces would be to create

new rights without well-defined standards.") *app. dismissed*, 385 F.3d 1324 (11th Cir. 2004);

NFB's third claim for relief should be dismissed without leave to amend accordingly.  *See also*

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                                    10
la-854596

1   *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1047 (9th Cir. 2000) (under the ADA

2   "an insurance office must be physically accessible to the disabled but need not provide insurance

3   that treats the disabled equally with the non-disabled."); *Torres v. AT&T Broadband, LLC*, 158 F.

4   Supp. 2d 1035, 1038 (N.D. Cal. 2001) (dismissing Title III claim that cable service provider must

5   make a list of available programs accessible to the visually impaired, and holding that "neither the

6   digital cable system nor its on-screen channel menu can be considered a place of public

7   accommodation within the meaning of the ADA.").

8   **III.    NFB CANNOT STATE A CLAIM FOR RELIEF UNDER THE UNRUH ACT**

9           The Unruh Act in general, prohibits "business establishments of every kind whatsoever,"

10  from discriminating on the basis of a disability. Cal. Civ. Code §51(b)

11          Here, NFB cannot state a claim for relief under the Unruh Act because: (1) the Unruh Act

12  does not apply to Target's website; (2) NFB has not alleged, and cannot allege, intentional

13  discrimination cognizable under the Unruh Act; and (3) the Unruh Act is plain on its face that it

14  does not require Target to alter, repair or modify its website as NFB requests.

15          **A.    The Unruh Act Does Not Apply to Target's Website**

16          The Unruh Act prohibits discrimination in "all business establishments of every kind

17  whatsoever."  Cal. Civ. Code § 51(b).  The threshold issue on NFB's first claim for relief is,

18  therefore, one of first impression in California:  Does the term "business establishment" include a

19  retailer's website?  Answering this question is not easy.  The California Supreme Court has

20  recognized that the term "business establishment" is at best "ambiguous" (*Curran v. Mount

21  Diablo Council of the Boy Scouts of America*, 17 Cal. 4th 670, 723 (1998) (Kennard, J.,

22  concurring)) and that the law interpreting the term "is a mess" (*Id.* at 733 (Brown, J.,

23  concurring)).

24          NFB will undoubtedly argue that the Internet should easily be found to fall within the

25  Unruh Act's gambit because the term "business establishment" is to be interpreted in "the

26  broadest sense *reasonably* possible."  *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 78

27  (1985) (emphasis added).  But the California Supreme Court has made clear that the reach of the

28  Unruh Act is not limitless, and that the term "reasonable" does have teeth.  *See Curran*, 17 Cal.

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                    11

1  4th at 701 ("the existing language of the Unruh Civil Rights Act -- applicable to 'all business

2  establishments of every kind whatsoever' -- cannot reasonably be interpreted to bring the

3  membership decisions of the Boy Scouts within the reach of the Act.").

4      Moreover, California courts recognize a dichotomy similar to that created by the terms

5  "public accommodation" and "*place* of public accommodation" by recognizing that the Unruh

6  Act may be applicable to *some* aspects of an entity's operations but *not* others.  In *Curran*, the

7  court concluded:

8          Although we have no doubt that the Unruh Civil Rights Act would
           apply to, and would prohibit discrimination in, the actual business

9          transactions with nonmembers engaged in by the Boy Scouts in its
           retail stores and elsewhere . . . we conclude that such transactions

10         do not render the Boy Scouts a business establishment so as to
           bring its membership policies or decisions within the reach of the

11         Unruh Civil Rights Act.

12

13 *Curran* at 700.  Similarly, in *Ingels v. Westwood One Broadcasting Services, Inc.*, the court found

14 that certain aspects of operating and publishing a commercially syndicated talk show may qualify

15 for treatment under the Unruh Act:  "for example, when addressing issues of discrimination in

16 advertising or denial of access to facilities."  129 Cal. App. 4th 1050, 1072 (2005).  The *Ingels*

17 court nonetheless found that decisions regarding which callers to air on the show are not subject

18 to the Unruh Act.  *Id.* at 1074 (finding plaintiff's complaint that radio show host berated him for

19 addressing the issue of age when he got on the air did not qualify for treatment under the Unruh

20 Act).

21     Thus, while the broad reach of the term "business establishment" may encompass Target's

22 brick and mortar stores, this does not mean that Target's website also constitutes a "business

23 establishment" under the Unruh Act.  In fact, as we demonstrate below, two of the California

24 Supreme Court's touchstones for determining whether an entity's operations constitute a

25 "business establishment" — (1) whether the operations constitute a traditional *place* of public

26 accommodation, and (2) whether the proposed extension of the Unruh Act would raise serious

27 constitutional concerns — militate *against* finding the Unruh Act applies to Target's website.

28

1    **1.    The Internet Is Far Afield From The Traditional Scope of the Unruh**
           **Act, Which Encompasses Only *Places* of Public Accommodation**

2

3    In determining whether the defendant's operations at issue constitute a "business

4    establishment" under the Unruh Act, courts look, at least in part, to see whether the operations at

5    issue constitute a traditional place of public accommodation or amusement that was subject to the

6    California public accommodation statute that preceded the Unruh Act. *See Warfield v. Peninsula*

7    *Golf & Country Club*, 10 Cal. 4th 594, 616-17 (1995) (acknowledging that "the reach of section

8    51 cannot be determined invariably by reference to the apparent 'plain meaning' of the term

9    'business establishment'" and looking from a historical perspective whether "statutes prohibiting

10   discrimination in places of public accommodation" have been applied to membership policies of

11   private social clubs); *Curran*, 17 Cal. 4th at 698 (declining to extend the Unruh Act's reach to the

12   Boy Scouts at least in part because "Plaintiff has cited no authority, and we are aware of none,

13   that suggests an organization like the Boy Scouts would have been considered a place of public

14   accommodation or amusement under California's earlier public accommodation law . . . .").

15   Here, of course, Target's website does not fall within the traditional scope of places of

16   public accommodation because the Internet is a modern invention that does not exist in any *place*

17   at all. *E.g., Reno v. ACLU*, 521 U.S. 844, 851 (1997) (websites are "located in no particular

18   geographical location but available to anyone, anywhere in the world, with access to the

19   Internet."). Target acknowledges that California courts have not limited the Unruh Act's reach to

20   entities with a "fixed location." *Burks v. Poppy Construction Co.*, 57 Cal. 2d 463, 468-69 (1962)

21   (finding defendant real estate developer's sales activities were covered by the Unruh Act even

22   though those activities had no fixed location.). But neither California's legislature, nor its courts

23   have ever extended the Unruh Act to business operations, like Target's website, that have no

24   location at all.

25   Moreover, fundamental due process suggests that a decision extending the reach of the

26   Unruh Act to the Internet is one that should come, if at all, from the legislature, not the courts.

27   Here, NFB seeks statutory minimum damages under Civil Code section 52 amounting to $4,000

28   for each blind Californian who has allegedly been unable to access Target's website. (Am.

TARGET'S MOTION TO DISMISS (CASE NO. C06-01802 MHP)                    13

1    Compl., ¶ 44.)  As we explained in our Notice of Removal, the National Eye Institute estimates

2    that more than 356,000 blind and visually impaired individuals over the age of 40 reside in

3    California.[1]  Due process and traditional notions of fairness demand that Target and other retailers

4    be provided with reasonable clarity on whether the Unruh Act applies to their websites before

5    they can be saddled with the magnitude of liability NFB seeks to establish here.  *See Curran*, 17

6    Cal. 4th at 729 ("Organizations, and the people they affect, are entitled to know with a fair degree

7    of certainty whether the law applies to them or not.") (Werdeger, J., concurring).

8
9
           **2.    Interpreting the Unruh Act to Apply to the Internet Would Raise
                   Serious Constitutional Concerns**

10           Another test California courts employ to determine if a defendant's specific operations

11   constitute a "business establishment" under the Unruh Act is whether the proposed application of

12   the Act will raise serious questions regarding its constitutionality.  "An ambiguous statutory term

13   should be construed, if possible, to avoid constitutional difficulties."  *Curran*, 17 Cal. 4th at 722

14   (Kennard, J. concurring in judgment that Boy Scouts' membership and policy decision do not fall

15   within the reach of the Unruh Act because holding otherwise would conflict with the First

16   Amendment to the federal Constitution); *Ingels*, 129 Cal. App. 4th at 1074 (access to a public

17   radio show does not fall within the scope of the Unruh Act because of the First Amendment

18   issues implicated).

19           Here, as we explain in greater detail in section IV below, interpreting the Unruh Act to

20   apply to the Internet would amount to a *per se* violation of the Commerce Clause of the United

21   States Constitution, U.S. Const. art. I, § 8, cl. 3.  First, by requiring Target to modify its website,

22   California would be impermissibly regulating conduct occurring outside its borders because

23   Target's website is accessible to consumers all around the country, not just those in California.

24   *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  Second, regulation of the Internet is exclusively

25   reserved for Congress because otherwise Target, and all other Internet users, could be subjected

26   _____

27           [1] The National Eye Institute is a component of the National Institutes of Health, which is a
     Federal government agency, and a part of the U.S. Department of Health and Human Services.

28

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                                    14

1   to inconsistent and contradictory state law standards.  *Southern Pac. Co. v. Arizona ex rel.*

2   *Sullivan*, 325 U.S. 761 (1945).[2]

3   

4   **B.     NFB Has Not Alleged, And Cannot Allege Intentional Discrimination Under The Unruh Act**

5   Even assuming *arguendo* that Target's website is a "business establishment" under the

6   Unruh Act, NFB's claim would still fail because NFB has not alleged, and cannot allege the type

7   of *intentional* discrimination required to support an Unruh Act violation.

8   **1.     Intentional Discrimination Is Required to Support An Unruh Act Violation That Cannot Be Predicated On An ADA Violation**

9   

10  The California Supreme Court has long held that "a plaintiff seeking to establish a case

11  under the Unruh Act must plead and prove intentional discrimination in public accommodations

12  in violation of the terms of the Act."  *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142,

13  1175 (1991).  In 1992, the Unruh Act was amended to provide that "[a] violation of the right of

14  any individual under the Americans with Disabilities Act of 1990 . . . shall also constitute a

15  violation of this section."  Cal. Civ. Code § 51(f).  We acknowledge for purposes of this motion

16  only that a plaintiff need not show intentional discrimination in order to make out a violation of

17  the ADA and for that reason, the Ninth Circuit has held that "no showing of intentional

18  discrimination is required where the Unruh Act violation is premised on an ADA violation."

19  *Lentini v. California Center For The Arts*, 370 F.3d 837, 847 (9th Cir. 2004).  However, a

20  plaintiff is still required to plead and prove intention discrimination where, as here, the alleged

21  Unruh Act violation cannot be premised on an ADA violation.  *Koebke v. Bernardo Heights*

22  *Country Club*, 36 Cal. 4th 824, 854 (2005) (holding in a non-ADA case that "a plaintiff seeking

23  to establish a case under the Unruh Act must plead and prove intentional discrimination in public

24  accommodations in violation of the terms of the Act.").

25  

26  _____

[2] Target believes the Commerce Clause is dispositive of NFB's Unruh Act and Disabled
Persons Act claims.  If, however, NFB's claims were to survive the pleading stage, the First
27  Amendment issues raised by NFB's claims would have to be litigated.

28  

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                    15

la-854596

**2.    NFB Has Not And Cannot Allege Intentional Discrimination Under the Unruh Act**

The California Supreme Court has held that to satisfy the intentional discrimination requirement of the Unruh Act, a plaintiff must allege and prove "willful, affirmative misconduct" that is "morally offensive."  *Harris*, 52 Cal. 3d 1142, 1172.  A plaintiff cannot satisfy the intentional discrimination requirement merely by alleging that a defendant's conduct, while equally applicable to all patrons of the business establishment, has a negative effect on a specific group protected by the Unruh Act.  *Koebke*, 36 Cal. 4th 824, 854.

In *Harris*, plaintiffs alleged defendant apartment managers discriminated against women by requiring a monthly income of three times the monthly rent in order to qualify for a lease. Plaintiffs alleged that a disproportionate number of families receiving public assistance are headed by females; that women generally have lower average income than males; and that defendant's income policy disparately impacted women in violation of the Unruh Act.  The *Harris* court rejected plaintiffs' disparate impact theory for three reasons:

- *First*, section 52 of the Act states:  "Whoever *denies*, or who *aids*, or *incites* such denial, or whoever *makes any discrimination*, distinction, or restriction" contrary to the provisions of section 51 "is liable for each such *offense . . . up to a maximum of three times the amount of actual damages . . . .*"  Cal. Civ. Code § 52.  The "references to 'aiding' and 'inciting' denial of access to public accommodations, to making discriminations and restrictions, and to the commission of an 'offense' imply willful, <u>affirmative misconduct</u> on the part of those who violate the Act." *Harris* at 1172 (emphasis added).

- <u>Second</u>, the damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount "reveals a desire to punish intentional and morally offensive conduct." *Id.*

- <u>Third</u>, "the Act explicitly exempts standards that are 'applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability." *Id.* If the Legislature had intended to include adverse impact

1     claims, "it would have omitted or at least qualified this language in section 51."

2              *Id.*

3          The California Supreme Court has also held that a plaintiff may not avoid the bar on

4     disparate impact claims by recasting them as "disparate treatment" claims.  *Koebke v. Bernardo*

5     *Heights Country Club*, 36 Cal. 4th 824, 854 (2005).  In *Koebke*, plaintiffs, a lesbian couple,

6     alleged defendant country club intentionally discriminated against gays and lesbians by adopting

7     a policy that allowed a spouse unlimited access to the Club, but denied the same benefits to

8     committed gay couples who cannot marry.  Recognizing the bar on disparate impact claims

9     *Harris* established, plaintiffs alleged their claim was for "disparate treatment," not disparate

10    impact:

11              Plaintiffs argue that, unlike disparate impact, in which the

12              disproportionate impact of a facially neutral policy on a protected
                  class is a substitute for discriminatory intent, their claim is that

13              BHCC's [the club] discriminatory intent was established by its
                  adoption of marriage as the criterion by which to extend benefits to

14              some of its members, but not others, because gay and lesbian
                  couples cannot marry in this state.  Thus, according to plaintiffs,

15              BHCC's adoption of the spousal benefit policy amounted to
                  intentional sexual orientation discrimination.

16

17    *Koebke* at 854.

18          The *Koebke* Court, however, rejected plaintiffs' claim because "plaintiffs' argument, like

19    disparate impact analysis, relies on the *effects* of a facially neutral policy on a particular group

20    and would require us to infer *solely* from such effects a discriminatory intent.  Accordingly, the

21    reasons we gave for rejecting disparate impact in *Harris* would seem to apply with equal force to

22    plaintiffs' theory."  *Id.* (emphasis in original).

23          Here, NFB has not alleged any "affirmative misconduct" on Target's part that is

24    "intentional and morally offensive."  *Harris*, 52 Cal. 3d at 1172.  NFB only alleges Target's

25    actions constitute intentional discrimination against the blind "in that: Target has constructed a

26    website that is inaccessible to class members; maintains the website in this inaccessible form; and

27    has failed to take actions to correct these barriers even after being notified of the discrimination

28    that such barriers cause."  (Am. Compl., ¶ 41.)  In other words, NFB relies solely on the alleged

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)       17

1  "effects" of Target's website "on a particular group" — here, blind individuals — and would

2  require this Court "to infer *solely* from such effects a discriminatory intent." *Koebke* at 854.

3  Under *Harris* and *Koebke*, however, this Court may not do so.

4      Indeed, NFB's claim raises the precise concerns at issue in *Harris*. There, the court was

5  concerned with applying the Unruh Act, which contains damages provisions allowing for an

6  exemplary award of up to treble the actual damages suffered with a stated minimum amount,

7  without a showing of "willful, affirmative misconduct" that is "intentional and morally

8  offensive[.]" *Harris*, 52 Cal. 3d at 1172. Here, NFB seeks to impose statutory minimum

9  damages under Civil Code section 52 amounting to $4,000 for each blind Californian who has

10  allegedly been unable to access Target's website, not because Target committed some willful,

11  affirmative misconduct that was intentional and morally offensive, but because Target allegedly

12  failed to modify its website after NFB told Target it should. (Am. Compl., ¶ 44.)

13      In this case, NFB's Unruh Act claim could not be saved by a further amendment to the

14  complaint. By the very nature of the Internet, Target's website is available to all consumers who

15  log onto www.target.com, regardless of their race, sex, sexual orientation, or disability. Thus, as

16  a matter of law, Target's website falls within Civil Code section 51(c), which "explicitly exempts

17  standards that are 'applicable alike to persons of every sex, color, race, religion, ancestry, national

18  origin, or blindness or other physical disability." *Harris*, 52 Cal. 3d at 1172 *citing* Cal. Civ. Code

19  § 51(c).

20  **C.    The Unruh Act Does Not Require Public Accommodations To Construct,
       Alter, Repair Or Modify Covered Facilities**

21

22      Even if the Unruh Act did apply to websites, and even if NFB's complaint could somehow

23  be construed as alleging intentional discrimination under the Unruh Act, Target still could not be

24  held in violation of the Unruh Act because, contrary to NFB's allegations, the Unruh Act does not

25  require Target to modify its website.

26

27

28

Civil Code section 51(d) specifically provides:

> Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law . . . .

Here, NFB alleges Target violated the Unruh Act by failing to add "Alternative text," "image maps," "prompting information," "navigation links," and keyboard enabled functions to its website. (Am. Compl., ¶¶ 30-34.) Yet NFB has cited to no "provisions of law" requiring Target to make these modifications to its website. As such, NFB's Unruh Act claim must fail.

## IV.  NFB CANNOT STATE A CLAIM FOR RELIEF UNDER THE DISABLED PERSONS ACT

California Civil Code section 54.1 provides:

> Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including <u>hospitals</u>, <u>clinics</u>, and <u>physicians' offices</u>, and privileges of all common carriers, airplanes, motor vehicles, railroad trains, motorbuses, streetcars, boats, or any other public conveyances or modes of transportation (whether private, public, franchised, licensed, contracted, or otherwise provided), telephone facilities, adoption agencies, <u>private schools</u>, <u>hotels</u>, <u>lodging places</u>, <u>places of public accommodation</u>, <u>amusement, or resort</u>, and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.

Cal. Civ. Code § 54.1(a)(1) (emphasis added).

The alleged access barriers in Target's website cannot give rise to a Disabled Persons Act violation because the Disabled Persons Act, by its terms, does not apply to websites. As the language quoted above demonstrates, the Disabled Persons Act only applies to physical places such as hospitals, airplanes, schools, hotels, and amusement parks. Target's website is not a physical place. *Cf. Harris*, 52 Cal. 3d at 1160 (the legal maxim *nocitur a sociis* (know it from its associates) should be used in construing the reach of California's access laws).

Furthermore, because the Disabled Persons Act only applies to physical places, a Disabled Persons Act claim must be premised on a California building code violation. *See*, *e.g.*, *Marsh,* 64

1  Cal. App. 3d at 892 ("[w]e conclude that the operator of a business of a type enumerated in Civil

2  Code section 54.1 is not required by the force of that section *alone* to modify its facilities to allow

3  for their use by handicapped persons.  That statute requires only that the operator open its doors

4  on an equal basis to all that can avail themselves of the facilities without violation of other valid

5  laws and regulations.") (emphasis in original; superseded by statute on other grounds); *Arnold v.*

6  *United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 446 (N.D. Cal. 1994) ("The degree of 'full and

7  equal access' to places of public accommodation guaranteed to disabled persons under § 54.1(a) is

8  defined by building code standards that are imposed under California Government Code

9  § 4450."). Here, NFB has not alleged Target's website is in violation of any California building

10  code.

11      The California Court of Appeal for the First Appellate District has declined to follow

12  *Marsh's* requirement that a Disabled Persons Act claim be based on a building code violation, in

13  a single, limited instance.  *See Hankins v. El Torito Restaurants, Inc.*, 63 Cal. App. 4th 510, 522

14  (1998).  The *Hankins* court held that a discriminatory policy that precludes access to a physical

15  place may also violate the Disabled Persons Act.  *Hankins* at 522-24 (holding El Torito's policy

16  prohibiting disabled patrons from using the employee restroom on the first floor of the restaurant

17  violated the Disabled Persons Act where the only restroom for customer use was on the second

18  floor of the restaurant, which was out of reach for disabled customers).  This narrow exception,

19  however, cannot save NFB's Disabled Persons Act claim for two reasons.

20      First, the *Hankins* Court's decision was based on its observation that discriminatory

21  policies may violate the ADA, and that Civil Code section 54.1 was amended in 1996 to make a

22  violation of the ADA an automatic violation of the Disabled Persons Act.  *Hankins* at 524.

23  Indeed, the *Hankins* Court pointed to a specific example from the United States Department of

24  Justice's ADA Manual which indicated that a public accommodation would be required to

25  modify a policy designating a restroom for one sex only where an individual requires assistance

26  to use toilet facilities and his only companion is a person of the opposite sex.  *Id.*  As the *Hankins*

27  Court stated, "[t]his example strongly suggests that a *policy* of denying disabled individuals

28  access to the employee restroom may well violate the ADA and, therefore, Civil Code

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)          20

la-854596

1   section 54.1." *Id.* Here, however, the ADA does not apply to Target's website. As a result,

2   there is no basis for finding that any alleged policy pertaining to Target's website could support a

3   Disabled Persons Act violation.

4       Second, as noted above, *Hankins* only held that a policy precluding access to a <u>physical</u>

5   <u>place</u> may violate the Disabled Persons Act. Thus, even if this Court were inclined to follow

6   *Hankins*, NFB's Disabled Persons Act claim would still fail because NFB has not alleged that

7   Target has any discriminatory policy that prevents blind individuals from accessing a physical

8   place.

9   **V.     CALIFORNIA'S ACCESS STATUTES WOULD VIOLATE THE COMMERCE**

10  **        CLAUSE IF THEY WERE INTERPRETED AS APPLYING TO THE INTERNET**

11      Even if the Unruh Act and Disabled Persons Act could somehow be interpreted as

12  applying to Target's website as NFB claims, applying those statutes to Target's website would

13  amount to a *per se* Commerce Clause violation. First, if California applied the Unruh Act and

14  Disabled Persons Act to the Internet, California would be impermissibly applying its laws to

15  conduct occurring outside its borders. Second, the Internet is an area of commerce for which

16  regulation, if any, falls within Congress' exclusive purview.

17      **A.     California May Not Project Its Laws Into Conduct Occurring**

18  **             Entirely Outside Its Borders**

19      The Supreme Court has long held "a statute that directly controls commerce occurring

20  wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's

21  authority and is invalid regardless of whether the statute's extraterritorial reach was intended by

22  the legislature. The critical inquiry is whether the practical effect of the regulation is to control

23  conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336 (striking a Connecticut

24  statute that required out-of-state beer shippers to affirm their prices were no higher than the prices

25  charged in the bordering states at the time of the affirmation). *See also BMW of North America,*

26  *Inc. v. Gore*, 517 U.S. 559 (1996) (holding the Commerce Clause precludes a single state from

27  imposing a nationwide policy requiring full disclosure of presale repairs to an automobile).

28

1    Relying on *Healy*, *Gore*, and similar Supreme Court decisions, the court in *American*

2  *Library Ass'n v. Pataki,* 969 F. Supp. 160 (S.D.N.Y. 1997), found a New York statute making it

3  unlawful to disseminate communications harmful to minors over the Internet constituted a *per se*

4  Commerce Clause violation.  *Pataki* at 177.  As the court explained,

5

6           The nature of the Internet makes it impossible to restrict the effects
            of the New York Act to conduct occurring within New York.  An
            Internet user may not intend that a message be accessible to New
7           Yorkers, but lacks the ability to prevent New Yorkers from visiting
            a particular Website or viewing a particular newsgroup posting or
8           receiving a particular mail exploder.  Thus, conduct that may be
            legal in the state in which the user acts can subject the user to
9           prosecution in New York and thus subordinate the user's home
            state's policy -- perhaps favoring freedom of expression over a
10          more protective stance -- to New York's local concerns.

11 *Pataki* at 177.

12    The reasoning in *Pataki* has been widely adopted.  *See American Booksellers Foundation*

13 *v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (enjoining enforcement of a Vermont statute prohibiting

14 the distribution over the internet of sexually explicit materials that are "harmful to minors" on

15 Commerce Clause grounds); *Psinet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (same);

16 *American Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (same); *Southeast*

17 *Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773 (D.S.C. 2005) (same); *Center for Democracy*

18 *& Tech. v. Pappert*, 337 F. Supp. 2d 606, 610 (E.D. Pa. 2004) (enjoining enforcement of

19 Pennsylvania law requiring an Internet Service Provider to remove or disable access to child

20 pornography items "residing on or accessible through its service" after notification by the

21 Pennsylvania Attorney General on Commerce Clause grounds).

22    The same result should be reached here.  By virtue of the Internet's unrestricted reach,

23 Target's website is accessible to consumers all around the country, not just consumers in

24 California.  Thus, if this Court were to construe the Unruh Act and Disabled Persons Act as

25 applying to Target's website, as NFB requests, then California would be impermissibly applying

26 its laws beyond its borders, such as when a consumer in Colorado or New Mexico purchases a

27 good or service through Target's website.

28

1

**B.    Any Regulation of the Internet Must Be Instituted At the National Level**

2

3    The Supreme Court has also long held that the Commerce Clause bars states from

4   regulating "those phases of the national commerce which, because of the need of national

5   uniformity, demand that their regulation, if any, be prescribed by a single authority." *Southern*

6   *Pacific*, 325 U.S. at 761.  In *Southern Pacific*, the Court struck down an Arizona statute limiting

7   the length of trains within the state to fourteen passenger and seventy freight cars.  The Arizona

8   law had the effect of forcing interstate railroads to decouple their trains in Texas or New Mexico

9   and reform the train at full length in California.  Thus, the practical impact of the Arizona law

10   was to control the length of trains "all the way from Los Angeles to El Paso." *Southern Pacific* at

11   775.  In striking the Arizona law as violative of the Commerce Clause, the Court noted:

12

> With such laws in force in states which are interspersed with those
> having no limit on train lengths, the confusion and difficulty with
13   > which interstate operations would be burdened under the varied
> system of state regulation and the unsatisfied need for uniformity
14   > in such regulation, if any, are evident.

15   *Southern Pacific* at 773-74.

16    Relying on *Southern Pacific*, and similar decisions, the *Pataki* court found New York's

17   statute making it unlawful to disseminate communications harmful to minors over the Internet

18   also constituted a *per se* Commerce Clause violation because the Internet, like the railroad, is an

19   area of commerce exclusively reserved for national regulation.  *Pataki*, 969 F. Supp. at 183.  As

20   the *Pataki* court explained, "[t]he Internet, like the rail and highway traffic at issue in the cited

21   cases, requires a cohesive national scheme of regulation so that users are reasonably able to

22   determine their obligations.  Regulation on a local level, by contrast, will leave users lost in a

23   welter of inconsistent laws, imposed by different states with different priorities." *Pataki,* 969 F.

24   Supp. at 182.

25    Moreover, as the *Pataki* court recognized, Internet users, like Target, are in a worse

26   position than the train engineer in *Southern Pacific*.  The train engineer can steer around Arizona,

27   or reconfigure the train at the state line.  Internet users, however, "cannot foreclose access to

28   [their] work from certain states or send differing versions of [their] communication to different

1   jurisdictions." *Pataki* at 183.  The users must "thus comply with the regulation imposed by the

2   state with the most stringent standard or forego Internet communication of the message that might

3   or might not subject her to prosecution." *Id.*

4        The same analysis applies here.  Target cannot foreclose access to its website from

5   residents in California, nor can Target design differing website versions for different jurisdictions.

6   Thus, if states are permitted to regulate the Internet, Target, and all other on-line retailers, will be

7   forced to comply with the regulation imposed by the state with the most stringent standards, or

8   forego Internet commerce altogether.  Regulation of the Internet, if any, is most clearly reserved

9   for Congress.

10  **VI.    NFB'S CLAIM FOR DECLARATORY RELIEF FAILS BECAUSE NFB CANNOT**
        **SHOW TARGET'S WEBSITE VIOLATES THE ADA OR CALIFORNIA'S**
11      **ACCESS STATUTES**

12        In its fourth claim for relief, NFB alleges it is entitled to a declaration that Target's

13  website violates the ADA, Unruh Act and the Disabled Persons Act.  (Am. Compl., ¶ 62.)  NFB

14  cannot state a claim under the ADA, Unruh Act or the Disabled Persons Act for all of the reasons

15  stated above.  Thus, NFB's fourth claim for relief should also be dismissed without leave to

16  amend.

17  **VII.   CONCLUSION**

18        For all the foregoing reasons, Target respectfully requests that the Court dismiss or, in the

19  alternative, strike NFB's ADA, Unruh Act, and Disabled Persons Act claims.

20  Dated: April 27, 2006                     ROBERT A. NAEVE
                                             DAVID F. MCDOWELL
21                                           MICHAEL J. BOSTROM
                                             MORRISON & FOERSTER LLP
22

23

24                                     By:   /s/ Robert A. Naeve
                                                  Robert A. Naeve
25
                                             Attorneys for Defendant
26                                           TARGET CORPORATION

27

28

TARGET'S MOTION TO DISMISS (CASE NO.  C06-01802 MHP)                          24

la-854596