# EXHIBIT B

Dockets.Justia.com

No. 99-50891

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

HAROLD R. HOOKS,
Plaintiff-Appellant

v.

OKBRIDGE, INC.,
Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BRIEF OF THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF APPELLANT

BILL LANN LEE
Acting Assistant Attorney General

JESSICA DUNSAY SILVER
KEVIN K. RUSSELL
Attorneys
Department of Justice
P.O. Box 66078
Washington, D.C. 20035-6078
(202) 305-4584

**TABLE OF CONTENTS**

**PAGE**

INTEREST OF THE UNITED STATES 1

STATEMENT OF THE ISSUES 1

STATEMENT OF THE CASE 2

SUMMARY OF ARGUMENT 4

ARGUMENT:

I. A COMMERCIAL BUSINESS PROVIDING SERVICES
SOLELY OVER THE INTERNET IS SUBJECT TO THE
ADA'S PROHIBITION AGAINST DISCRIMINATION ON
THE BASIS OF DISABILITY 6

A. The Language Of The Statute Does Not
Limit Title III To Services Provided
At A Company's Physical Facility 7

1. The Services "Of" A Place Of
Public Accommodation Need Not
Be Provided "At" The Place Of
Public Accommodation 8

2. Definition Of "Public Accommodation"
Is Not Limited To Entities Providing
Services At Their Physical Premises 11

3. The Absence Of Specific Mention Of
Services Provided Over The Internet
Does Not Restrict The Statute's
Coverage 16

B. This Court Has Already Rejected The View
That Title III Is Limited To Services
Performed At A Physical Place 18

II. OKBRIDGE IS NOT A PRIVATE CLUB 20

CONCLUSION 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

- i -

**TABLE OF AUTHORITIES**

**CASES: PAGE**

Anderson v. Pass Christian Isles Golf Club, Inc.,

488 F.2d 855 (1974) 23

Carparts Distribution Ctr., Inc. v. Automotive

Wholesaler's Ass'n, 37 F.3d 12 (1st Cir. 1994) 7, 10

Clegg v. Cult Awareness Network, 18 F.3d 752

(9th Cir. 1994) 7

Daniel v. Paul, 395 U.S. 298 (1969) 15, 20-21, 22

Dean v. Ashling, 409 F.2d 754 (5th Cir. 1969) 17

Doe v. Mutual of Omaha Ins. Co., 179 F.3d 557

(7th Cir. 1999), cert. denied, 120 S. Ct.

845 (2000) 7, 8

Ford v. Schering-Plough Corp., 145 F.3d 601 (3d Cir. 1998),

cert. denied, 525 U.S. 1093 (1999) 7, 13

Hooks v. OKBridge, No. 99-214 (W.D. Tex. June 28,

1999) 3, 4

Hooks v. OKBridge, No. 99-214 (W.D. Tex. Aug. 4,

1999) 4, 6, 9, 22

Katz v. United States, 389 U.S. 347 (1967) 18

Louisiana Debating & Literary Ass'n v. City of New

Orleans, 42 F.3d 1483 (5th Cir. 1995) 21

McNeil v. Time Ins. Co., 205 F.3d 179

(5th Cir. 2000) passim

Miller v. Amusement Enters. Inc., 394 F.2d 342

(5th Cir. 1968) 15-16

Olmstead v. United States, 277 U.S. 438 (1928) 18

Pallozzi v. Allstate Life Ins. Co., 198 F.3d 28 (1999),

amended on denial of reh'g en banc, 204 F.3d 392

(2d Cir. 2000) 7, 9

Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006

(6th Cir. 1997) 7, 12

- ii -

**CASES (continued): PAGE**

Pennsylvania Dep't of Corrections v. Yeskey, 524

U.S. 206 (1998) 17

Quijano v. University Fed. Credit Union, 617 F.2d

129 (5th Cir. 1980) 21

Reno v. ACLU, 521 U.S. 844 (1997) 8, 17

Smith v. YMCA, 462 F.2d 634 (5th Cir. 1972) 22

Stoutenborough v. National Football League, Inc.,

59 F.3d 580 (6th Cir. 1995) 7

Sullivan v. Little Hunting Park, Inc., 396 U.S. 229

(1969) 21

United States v. Richberg, 398 F.2d 523

(5th Cir. 1968) 21, 22

Welsh v. Boy Scouts of Am., 993 F.2d 1267

(7th Cir. 1993) 7

Weyer v. Twentieth Century Fox Film Corp., 198 F.3d

1104 (9th Cir. 2000) 7, 12, 13, 20

**CONSTITUTIONS AND STATUTES:**

United States Constitution:

Fourth Amendment 17

Americans With Disabilities Act (ADA),

Pub. L. No. 101-336, 104 Stat. 327 (1990) 16

42 U.S.C. 12101(a)(5) 14

42 U.S.C. 12101(b)(4) 11

Title III:

42 U.S.C. 12181 et seq. 1

42 U.S.C. 12181(7) 3, 7

42 U.S.C. 12181(7)(B) 10

42 U.S.C. 12181(7)(C) 4, 8, 22

42 U.S.C. 12181(7)(E) 10, 13

42 U.S.C. 12181(7)(F) 4, 8, 10, 13

42 U.S.C. 12181(7)(H) 22

42 U.S.C. 12181(7)(I) 22

42 U.S.C. 12181(7)(J) 10

42 U.S.C. 12181(7)(K) 13

42 U.S.C. 12181(7)(L) 4, 8, 22, 23

42 U.S.C. 12182 2

42 U.S.C. 12182(a) passim

- iii -

**STATUTES (continued): PAGE**

42 U.S.C. 12182(b)(2)(A)(iv) 14

42 U.S.C. 12186(b) 1

42 U.S.C. 12187 4, 6, 20

42 U.S.C. 12188(b) 1

Civil Rights Act of 1964,

Title II:

42 U.S.C. 2000a(b)(3) 16

42 U.S.C. 2000a(e) 20

**REGULATIONS:**

28 C.F.R. Pt. 36 1

**LEGISLATIVE HISTORY:**

S. Rep. No. 116, 101st Cong., 1st Sess. (1989) 15

H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. (1990) 14, 17

H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. (1990) 14, 15

**MISCELLANEOUS:**

PBS, Life on the Internet Timeline (visited June 30, 2000)

<www.pbs.org/internet/timeline/timeline-txt.html> 16

U.S. Dep't of Commerce, Digital Economy (June 2000) 9

- iv -

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 99-50891

HAROLD R. HOOKS,
Plaintiff-Appellant

v.

OKBRIDGE, INC.,
Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BRIEF OF THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF APPELLANT

INTEREST OF THE UNITED STATES

This case poses questions regarding the proper interpretation and application of Title III of the Americans With Disabilities Act (ADA), 42 U.S.C. 12181 et seq., to a company that operates solely on the internet. The Department of Justice has primary enforcement authority for the Title III and promulgates regulations interpreting the ADA. See 42 U.S.C. 12186(b), 12188(b); 28 C.F.R. Pt. 36.

STATEMENT OF THE ISSUES

1. Whether a company that offers services solely on the internet is subject to the public accommodations provision of Title III of the ADA.

2. Whether a for-profit company operating a web site that enables users to play in electronic bridge tournaments for a fee is a "private club" exempted from the non-discrimination requirements of Title III of the ADA.[1]

STATEMENT OF THE CASE

    1. Title III of the ADA provides that:

    No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. 12182. The statute's definition section provides:

    The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce--

    (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

    (B) a restaurant, bar, or other establishment serving food or drink;

    (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

    (D) an auditorium, convention center, lecture hall, or other place of public gathering;

    (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

   (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

   (G) a terminal, depot, or other station used for specified public transportation;

   (H) a museum, library, gallery, or other place of public display or collection;

   (I) a park, zoo, amusement park, or other place of recreation;

   (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

   (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

   (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. 12181(7).

2. Defendant OKBridge, Inc., operates a web site that allows those who purchase a membership to play in various bridge tournaments on the internet and to participate in on-line discussion groups regarding the game. Hooks v. OKBridge, No. 99-214 (W.D. Tex. June 28, 1999), slip op. 2 (Hooks I). To join, a member must pay a $99 annual fee and agree to abide by certain rules. See ibid; R1-46-65;[(2)] Appellee Br. 20. The site currently has more than 18,000 members in over 90 countries (Appellee Br. 20).

Appellant Hooks filed suit against OKBridge after it terminated his membership. Hooks I, slip op. 1-2. OKBridge claimed that it terminated Hooks because of his persistent posting of obscene and abusive messages on the site's discussion forum and because he cheated during a bridge tournament. Id. at 3. Hooks claimed that these allegations were false and a pretext for terminating him because he suffers from Bi-Polar disorder and other disabilities. Id. at 2-3.

3. The district court entered summary judgment against Hooks on numerous alternative theories. Hooks I, slip op. 4-8; Hooks v. OKBridge, No. 99-214 (W.D. Tex. Aug. 4, 1999) (Hooks II). Among other things, the court held that Title III did not apply to OKBridge because Defendant provides its services over the internet rather than at a physical place. Hooks II, slip op. 7. The court also held that even if Title III applied, OKBridge is an exempt "private club" under 42 U.S.C. 12187 because by not offering lessons in playing this rather complicated game, Defendant effectively limits its membership to those who know how to play bridge. Hooks II, slip op. 7-8. Hooks appealed, challenging both rulings and raising additional arguments not addressed in this amicus brief.

SUMMARY OF ARGUMENT

Defendant is a commercial business offering services for a fee to the general public and easily falls within the ADA's definition of a public accommodation as a "private entity" that operates a "service establishment," place of "entertainment," or place of "recreation." 42 U.S.C. 12181(7)(C), (F), (L). It delivers those services from its place of business in San Diego, California, through the internet to its customers. Its computerized bridge tournaments are the "services * * * of [that] place of public accommodation."

The district court concluded that these services were not covered because they were provided not at the company's facilities, but in the customers' homes. This reasoning would render a wide range of ordinary service establishments outside the coverage of the Act whenever their services are provided over the

telephone, through the mail, via the internet, or at some location outside the premises of the business. For example, catalog merchants, furniture delivery companies, courtroom lawyers, plumbers, and food delivery services would be able to refuse to serve patrons with HIV, mental illness or other disabilities. Moreover, a company that offers services both on-site and through other means (such as a travel service that arranges reservations both over the phone and at a walk-in office) would be required to offer non-discriminatory services on-site, but be free to discriminate over the phone or the internet.

Neither the language of the statute, nor the underlying purposes of the Act, require or permit such an absurd result. The statute covers the services "of" a place of public accommodation, not "at" the place public accommodation. The definition of a "public accommodation" is intentionally broad and is not limited to those entities providing on-site services. Moreover, this Court has previously rejected the same interpretation of Title III in a case involving application of the Act to the services of insurance companies. See McNeil v. Time Ins. Co., 205 F.3d 179 (5th Cir. 2000).

The district court was also wrong to conclude that Defendant was an exempt "private club" under 42 U.S.C. 12187 because its membership is limited, as a practical matter, to those who know how to play bridge. This conclusion, if accepted, would be a sufficient reason to render most commercial businesses "private clubs." OKBridge is no different than any other commercial business. It is open to any member of the general public willing to pay for Defendants' services. Like any other business, it is operated by, and for the financial benefit of, its owners, not its members. That its services do not appeal to everyone hardly distinguishes it from other quintessential public accommodations, such as golf courses or bowling alleys, that appeal to only the subset of the population that is interested in the services and knows how to use them.

## ARGUMENT

### I. A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY

The district court concluded that because Defendant does not provide its commercial services to its customers in a physical building, it is not covered by Title III. Hooks II, slip op. 7. In doing so, the court relied upon a line of cases suggesting that the "services * * * of any place of public accommodation," 42 U.S.C. 12182(a), can only be the services provided on the entity's physical premises and that the statutory definition of a "public accommodation," 42 U.S.C. 12181(7), limits the statute to entities that provide such on-site services.[3] This restrictive interpretation of Title III is inconsistent with the statutory language and creates an arbitrary and irrational limitation on coverage that conflicts with the clear and important purposes of the Act.

Moreover, it is an interpretation that has been properly rejected by a number of courts,[4] including this one. See McNeil v. Time Ins. Co., 205 F.3d 179 (5th Cir. 2000).

### A. The Language Of The Statute Does Not Limit Title III To Services Provided At A Company's Physical Facility

Title III prohibits discrimination on the basis of disability in the provision of the "services * * * of any place of public accommodation." 42 U.S.C. 12182(a). In relevant part, the statute defines a "public accommodation" as a "private entit[y]" that falls within one or more of twelve categories, including a "place of exhibition or entertainment," "other service establishment," or "other place of exercise or recreation." 42 U.S.C. 12181(7)(C), (F), (L).

This case involves allegations of discrimination in the provision of a "service," namely computerized bridge tournaments and other bridge-related services. OKBridge is, under any ordinary understanding of the terms, a "service establishment," or an entity offering "entertainment" or "recreation." It offers its services to its

customers via the internet from a place in San Diego, California (R1-46-47).[5] Its services would, therefore, seem easily to qualify as the "services * * * of [a] place of public accommodation." 42 U.S.C. 12182(a).

1. The Services "Of" A Place Of Public Accommodation
Need Not Be Provided "At" The Place Of Public
Accommodation

This Court need not decide whether a web site on the internet can be a "place" within the meaning of the statute,[6] for OKBridge has a physical facility in San Diego, California, where it houses its computers and personnel. The bridge tournaments it runs on its computers are "services * * * of" that place.

The district court, however, apparently thought that the word "place" in Section 12182(a) restricts the provision's application to services provided on the premises of a place of public accommodation. See Hooks II, slip op. 7. It does not. The Act covers the services "of" a place of public accommodation, not the services "at" or "in" a place of public accommodation. If Congress had intended to limit Title III to services provided at a business's physical premises, it presumably would have used the words "at" or "in" rather than "of." See Pallozzi v. Allstate Life Ins. Co., 198 F.3d 28, 33 (1999), as amended on denial of reh'g en banc, 204 F.3d 392 (2d Cir. 2000).

As this Court has observed, while the ADA surely has limitations in coverage, "the language of the statute can only reasonably be interpreted to have * * * practical, common sense boundaries." McNeil, 205 F.3d at 187. The boundary suggested by the district court is neither practical nor supported by common sense. Most obviously, the district court's interpretation excludes from coverage the wide, and growing, range of services provided over the internet -- from shopping to online banking and brokerage services to university degree courses -- at a time when such modes of commerce are beginning to replace reliance on physical business locations. See U.S. Dep't of Commerce, Digital Economy 2000 9-15 (June 2000). It also permits discrimination by more traditional businesses that provide services in locations other than their premises. For example, many businesses provide services over the telephone or through the mail, including travel agencies, banks, insurance companies, catalog merchants, and pharmacies. Many other businesses provide services in the homes or offices of their customers, such as plumbers, pizza delivery and moving companies, cleaning services, business consulting firms, and auditors from accounting firms. Under the district court's reading of the statute, all the above firms would be free to refuse service to individuals with disabilities whenever the service was offered off-site, even though Congress specifically included such businesses as examples of covered public accommodations in the statute. See 42 U.S.C. 12181(7)(B), (E), (F). As the First Circuit observed, "[i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not." Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n, 37 F.3d 12, 19 (1994).

Even if the district court's holding were somehow restricted to companies that provide services solely outside the context of their physical buildings, this would still leave a significant array of service providers free to discriminate. For example, those selling car insurance over the telephone would be free to hang up on blind customers, Publisher's Clearing House could refuse to sell magazines through the mail to people with HIV, and colleges could refuse to enroll the deaf in their correspondence courses. Again, these are businesses Congress clearly intended to cover. See 42 U.S.C. 12181(7)(E), (F), (J).

Defendant offers no plausible explanation of why Congress would have wanted to draw such arbitrary boundaries in the scope of an Act intended to "invoke the sweep of congressional authority * * * in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. 12101(b)(4). The point of the statute is to require a company that provides a service to the public at large, to provide that service in a non-discriminatory manner to those with disabilities as well. See McNeil, 205 F.3d at 188. That is, the statute protects the individuals with disabilities' "full and equal enjoyment of the goods

[and] services * * * of any place of public accommodation." 42 U.S.C. 12182(a). Being offered access to only those services of a public accommodation that are offered on-site, when the public at large is given access to additional services off-site, is hardly "full and equal enjoyment" of the accommodations' services. And narrowly construing the statute to exclude major areas of discrimination faced by people with disabilities in their day-to-day encounters with commercial services providers -- including services provided in a person's home, over the telephone, through the mail, or via the internet -- is inconsistent with Congress's clearly expressed intent.

2. Definition Of "Public Accommodation" Is Not
Limited To Entities Providing Services At Their
<u>Physical Premises</u>

Thus, Section 12182(a) itself does not exclude the services of a public accommodation offered outside the business's physical premises. Some courts have suggested, however, that the definition of a "public accommodation" does. These courts have concluded that the examples in the definition are all "actual, physical places where goods or services are open to the public, and places where the public gets those goods or services." <u>Weyer</u> v. <u>Twentieth Century Fox Film Corp.</u>, 198 F.3d 1104, 1114 (9th Cir. 2000). See also <u>Parker</u> v. <u>Metropolitan Life Ins. Co.</u>, 121 F.3d 1006, 1011 (6th Cir. 1997). They suggest, therefore, that Congress intended to limit Title III to similar businesses and exclude all others. <u>Weyer</u>, 198 F.3d at 1114 ("[T]his context suggests that some connection between the good or service complained of and an actual physical place is required."); <u>Parker</u>, 121 F.3d at 1011.

This argument is unconvincing. As discussed above, there is no reasonable explanation of why Congress would have intended to draw such a boundary or why it would have chosen such an indirect way of expressing its intent to do so. The language of the definition contains no explicit limitation supporting this interpretation. In fact, the catchall phrases Congress used, such as "other service establishment," are plainly broad enough to encompass establishments that provide services in their clients' homes, over the telephone, or through the internet.

An on-site limitation cannot be inferred indirectly from the specific examples either. Congress included in that list numerous businesses that traditionally provide services off-site. For example, department stores receive catalog orders through the mail or over the telephone. They deliver products from their stores to customers through the mail or by special delivery of certain items, such as appliances. Plumbing companies only provide services at a customer's home or office. Many lawyers provide their most significant services in a courtroom, rather than in their offices. A senior citizen center will often perform its services outside the physical center itself. For example, the drive clients to doctors' appointments, deliver meals, lead field trips, etc. A travel service ordinarily conducts its business over the telephone and through the mail. Yet Congress clearly intended to cover the services of a "sales * * * establishment" like a department store, a "service * * * establishment" like a plumbing company, the "office of an accountant or lawyer," a "senior citizen center," and a "travel agency." 42 U.S.C. 12181(7)(E), (F), (K).

Some courts have suggested, however, that "[p]ursuant to the doctrine of <u>noscitur a sociis</u>, * * * [any ambiguous terms] should be interpreted by reference to the accompanying words of the statute to avoid the giving of unintended breadth to the Acts of Congress." <u>Ford</u> v. <u>Schering-Plough Corp.</u>, 145 F.3d 601, 614 (3d Cir. 1998), cert. denied, 525 U.S. 1093 (1999) (citation and quotation marks omitted). See also <u>Weyer</u>, 198 F.3d at 1114. They reason that because the definition refers to some businesses that provide on-site services, the definition must be interpreted to cover only entities that are so limited. <u>Ford</u>, 145 F.3d at 614; <u>Weyer</u>, 198 F.3d at 1114.

As noted above, terms like "other service establishment" are broad, but they are not particularly ambiguous with respect to covering businesses providing off-site services. Moreover, there is no danger that giving the statutory language a natural reading will give "unintended breadth" to the Act. The breadth a natural reading

entails is clearly intended. It is true that the statute often focuses on physical access to buildings, but that is not surprising. One of the major purposes of the Act was to require the removal of architectural barriers that prevented many people with disabilities from gaining access to services. See, e.g., 42 U.S.C. 12182(b)(2)(A)(iv). But the statute just as clearly recognizes that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and "relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5) (emphasis added); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "the major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").[7]

For that reason, the definition of "public accommodation" is intentionally broad. The House Report explains that the list of examples in the definition of "public accommodations" is not meant to be a limitation on the more general catchall categories:

> A person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples listed in the definition. Rather, the person must show that the entity falls within the overall category. For example, it is not necessary to show that a jewelry store is like a clothing store. It is sufficient that the jewelry store sells items to the public.

H.R. Rep. No. 485, Pt. 3, supra, at 54. The Senate Report similarly states that

> within each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase "other similar" entities. The Committee intends that the "other similar" terminology should be construed liberally consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities.

S. Rep. No. 116, 101st Cong., 1st Sess. 59 (1989).

As this Court has explained in an analogous context:

> [a]lthough we recognize that ejusdem generis is an old and accepted rule of statutory construction, we do not believe that it compels us to accord words and phrases embodied in the statute a definition or interpretation different from their common and ordinary meaning; or that the rule requires us to interpret the statute in such a narrow fashion as to defeat what we conceive to be its obvious and dominating general purpose.

Miller v. Amusement Enters. Inc., 394 F.2d 342, 350 (5th Cir. 1968).[8] Similarly, in this case, any tension between the list of examples Congress used and the ordinary meaning of the broad catchall phrases it included should be resolved in light of Congress's "obvious and dominating general purpose" and in favor of including public accommodations that provide services outside of their physical premises.

3. The Absence Of Specific Mention Of Services
Provided Over The Internet Does Not Restrict The
Statute's Coverage

The absence in the statute of any specific mention of web sites or the internet is not a reason to exclude services provided by this medium. When Congress enacted the statute, the World Wide Web had not yet been invented and commercial traffic on the nascent internet was prohibited. See Pub. L. No. 101-336, 104 Stat.

327 (ADA passed on July 26, 1990); PBS, Life on the Internet Timeline (visited June 30, 2000) <www.pbs.org/internet/ timeline/timeline-txt.html> (first web browser invented, and first commercial use of the internet permitted, in 1991). That Congress did not specifically envision the application of Title III to services provided over the internet does not mean that such services are excluded from coverage. See, e.g., Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 211 (1998) (ADA applies to prisons, even if "Congress did not envision that the ADA would be applied to state prisoners") (citation and internal punctuation omitted); Dean v. Ashling, 409 F.2d 754, 755 (5th Cir. 1969) (Title II of the Civil Rights Act of 1964 applies to rental space in a trailer park, even though "[n]othing in the legislative history suggests that anyone considered trailer parks").

The language of the statute is broad enough to cover services provided over this new medium[9] and courts are not reluctant to apply old words to new technology in a way that is consistent with modern usage and legislative intent. The Supreme Court has, for example, applied the First Amendment's protection of free "speech" and "the press" to electronic communication over the internet. See Reno v. ACLU, 521 U.S. 844 (1997).

In another example, the Fourth Amendment's protection of the "right of the people to be secure in their persons, houses, papers, and effects," U.S. Const. Amend. IV, has been applied to electronic documents and communications. At one time, the Supreme Court concluded that the language of this Amendment could not reach searches of new electronic media, such as telephone communications, for reasons very similar to those urged by Defendant in this case:

> The amendment itself shows that the search is to be of material things -- the person, the house, his papers, or his effects. The description of the warrant necessary to make the proceeding lawful is that it must specify the place to be search and the person or things to be seized. * * * * * The language of the Amendment cannot be extended and expanded to include telephone wires, reaching to the whole world from the defendant's house or office.

Olmstead v. United States, 277 U.S. 438, 464-465 (1928) (emphasis in original). However, the Supreme Court later rejected this restrictive interpretation and applied the Fourth Amendment to searches of electronic media, acknowledging the need to avoid restrictive interpretations that leave new technologies outside the protection of pre-existing law:

> To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication. * * * * [O]nce it is recognized that the Fourth Amendment protects people -- and not simply "areas" -- against unreasonable searches and seizures it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

Katz v. United States, 389 U.S. 347, 352-353 (1967). Just as the Fourth Amendment's textual focus on physical intrusions does not exclude the Constitution's application to electronic media, neither does a similar textual focus in the ADA on services provided at a physical place of business exclude Title III from application to commercial services provided over the internet.

B. This Court Has Already Rejected The View That Title III
Is Limited To Services Performed At A Physical Place

The district court's decision in this case not only ignores the plain language of the statute and the obvious purposes of Congress, but also conflicts with this Court's recent decision in McNeil v. Time Insurance Co., 205 F.3d 179 (5th Cir. 2000). In McNeil, this Court reviewed the decision of a district court that had concluded, like the district court in this case, "that Title III of that Act only applied to physical use of the services of a place of public accommodation." Id. at 182. The district court had granted summary judgment

against a plaintiff who claimed that a cap on AIDS coverage in his deceased son's insurance policy violated Title III. The district court held that the defendant's "provision of insurance did not constitute a 'public accommodation' under the ADA" because it did not involve physical access," siding with cases like Weyer, Parker, and Ford. Ibid.

Had this Court agreed with the district court and sided with the Circuits inferring a "physical place" requirement in Title III, this Court would have affirmed the dismissal of the plaintiff's claim on the ground that the insurance policy was not a "service * * * of [a] place of public accommodation." Instead, this Court interpreted and applied Title III to the case, concluding that

> [t]he "good" in this case is the insurance policy that Time offered to the members of the Texas Optometric Association. To establish a Title III violation, Mr. McNeil is required to demonstrate that Time denied his son access to that good or interfered with his son's enjoyment of it.

Id. at 188. Thus, while this Court ultimately concluded that Title III does not govern the content of insurance policies (because, as a general matter, Title III does not "regulate the content of goods and services that are offered," 205 F.3d at 186)[10] it nonetheless held that Title III "assures that the disabled have access to all goods and services offered by the business," even when that business offers goods or services, like insurance policies, that are provided outside the company's offices. Id. at 188 (emphasis added).

In this case, this Court should similarly conclude that Title III requires that businesses like Defendant offer non-discriminatory access to all their services, whether they be provided in a building or over the internet.

II. OKBRIDGE IS NOT A PRIVATE CLUB

The district court also held that even if OKBridge is a public accommodation, it is exempt from Title III under 42 U.S.C 12187, which provides that "[t]he provisions of this subchapter shall not apply to private clubs * * * exempted from coverage under title II of the Civil Rights Act of 1964." The public accommodations provision of Title II, in turn, states that "[t]he provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons [of a covered] establishment." 42 U.S.C. 2000a(e).

An ordinary business open to all members of the public willing to pay for its services is not a "private club or other establishment not in fact open to the public." See Daniel v. Paul, 395 U.S. 298, 301 (1969); United States v. Richberg, 398 F.2d 523, 527-528 (5th Cir. 1968); see also Louisiana Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1494 & n.16 (5th Cir. 1995); cf. Quijano v. University Fed. Credit Union, 617 F.2d 129, 133 (5th Cir. 1980). But an ordinary business is exactly what OKBridge is.

Like any profit-seeking business, OKBridge offers its services to anyone willing to pay the required fee (see Appellee Br. 22-23).[11] There is no evidence that OKBridge has ever declined an applicant for membership if accompanied by the required fee (see Appellee Br. 22-23). As a result, it has an enormous "membership" of more than 18,000 "members" in more than 90 countries on five continents (see Appellee Br. 20, 23). OKBridge does not allege that it has placed any limit on its membership. In fact, it admits (Appellee Br. 25) to seeking additional members through advertisements in bridge-related publications and on the internet. And Defendant does not allege that it has any formal selection process or any defined standards for selective admission, other than payment of the fee (see Appellee Br. 20-23). See Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 236 (1969) (private club must have a "plan or purpose of exclusiveness").

Moreover, like any other business, OKBridge is owned and operated by, and for the profit of, its owners, not its members (see Appellee Br. 25). That Defendant calls its customers "members" is irrelevant. See Daniel, 395 U.S. at 301-302. What matters is that OKBridge has "none of the attributes of self-government and

member-ownership traditionally associated with private clubs." Id. at 301. That is, its "members" have no ownership stake or control over the business (see Appellee Br. 23-25).[12] See Smith v. YMCA, 462 F.2d 634, 648 (5th Cir. 1972) (no private club where the YMCA "is neither owned nor governed by its members"); Richberg, 398 F.2d at 527-528 (no private club where restaurant was run by the owner).

The only reason the district court gave for concluding that Defendant was a private club was that Defendant's services only appeal to those who know how to play bridge. Hooks II, slip op. 8. If this were a sufficient reason to exempt Defendant, few public accommodations would be covered by the Act. Hardly any business offers a service that appeals to everyone. Many quintessential public accommodations provide services that, as a practical matter, will only be of benefit to a subset of the general population, such as those who know how to play golf, bowl, or swim. Yet golf clubs, bowling alleys, and swimming pools are all entities Congress specifically intended to cover. See 42 U.S.C. 12181(7)(L).

"Defendant had the burden in the proceedings below of demonstrating its truly 'private' character." Anderson v. Pass Christian Isles Golf Club, Inc., 488 F.2d 855, 857 (5th Cir. 1974). Defendant in this case failed to sustain that burden.

## CONCLUSION

This Court should reverse the district court's holding that Title III of the ADA does not apply to a commercial business providing services on the internet and its holding that OKBridge is exempt from the Act as a private club.

Respectfully submitted,

BILL LANN LEE
Acting Assistant Attorney General

JESSICA DUNSAY SILVER
KEVIN K. RUSSELL
Attorneys
Department of Justice
P.O. Box 66078
Washington, D.C. 20035-6078
(202) 305-0025

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2 and .3, the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1. Exclusive of the exempted portions in 5th Cir. R. 32.2, the brief contains 5944 words and 701 lines of monospaced text.

2. The brief has been prepared in monospaced Courier Regular typeface using WordPerfect for Windows version 7, with 10 characters per inch (12 point type).

3. The undersigned understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7), may result in the court's striking the brief and imposing sanctions against the person signing the brief.

Kevin Russell

Attorney  
Department of Justice  
P.O. Box 66078  
Washington, D.C. 20035-6078  
(202) 305-0025

CERTIFICATE OF SERVICE

I certify that two paper copies, and one electronic copy, of the foregoing Brief of the United States as Amicus Curiae in Support of Appellant were sent by overnight mail this 30th day of June, 2000, to the following counsel of record:

Juanita C. Hernandez  
Eric J. Werner  
Jenkens & Gilchrist  
1400 Frost Bank Tower  
San Antonio, TX 78205

Harold R. Hooks  
10502 Arbor Bluff  
San Antonio, TX 78240

Kevin K. Russell  
Attorney

1. The United States takes no position on the other issues raised in this appeal.

2. References to "R__-__-__" are to the volume number and page number or page range of the record on appeal.

3. See, e.g., Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1114-1115 (9th Cir. 2000); Ford v. Schering-Plough Corp., 145 F.3d 601, 612-614 (3d Cir. 1998), cert. denied, 525 U.S. 1093 (1999); Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1010-1014 (6th Cir. 1997); Stoutenborough v. National Football League, Inc., 59 F.3d 580, 582-583 (6th Cir. 1995); see also Clegg v. Cult Awareness Network, 18 F.3d 752 (9th Cir. 1994) (application of Title II of the Civil Rights Act of 1964 to a membership group); Welsh v. Boy Scouts of Am., 993 F.2d 1267 (7th Cir. 1993) (same).

4. See Pallozzi v. Allstate Life Ins. Co., 198 F.3d 28, 32-33 (1999), as amended on denial of reh'g en banc, 204 F.3d 392 (2d Cir. 2000); Doe v. Mutual of Omaha Ins. Co., 179 F.3d 557 (7th Cir. 1999), cert. denied, 120 S. Ct. 845 (2000); Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n, 37 F.3d 12, 19 (1st Cir. 1994).

5. A web site like Defendant's operates through the company's computers that connect via the internet to the computers of its customers. See generally Reno v. ACLU, 521 U.S. 844, 849-853 (1997).

6. Cf. Doe, 179 F.3d at 559 (7th Cir. 1999) (Posner, C.J.) ("The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.") (citations omitted) (emphasis added).

7. Moreover, even if physical access were the main concern of Congress in enacting the statute, "it does not follow that the scope of [the provision] should be restricted to the primary objects of Congress' concern when

a natural reading of its language would call for broader coverage." <u>Daniel</u> v. <u>Paul</u>, 395 U.S. 298, 307 (1969).

8. In <u>Miller</u>, the district court had concluded that an amusement park was not a "place of exhibition or entertainment" under Title II of the Civil Rights Act of 1964. See 42 U.S.C. 2000a(b)(3) (covering "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment"). Relying on the same arguments presented in some of the ADA Title III cases, the district court reasoned that because all of the specific examples in that provision referred to businesses providing spectator, not participatory, entertainment, a place of recreation could not be a "place of * * * entertainment." This Court reversed, concluding that a broader construction was required by the language of the statute and the purposes of the Act. 394 F.2d at 350.

9. Cf. H.R. Rep. No. 485, Pt. 2, <u>supra</u>, at 108 ("Indeed, the Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.").

10. On this point, this Court did agree with the alternative holdings in <u>Weyer</u>, <u>Parker</u>, and <u>Ford</u>. See <u>McNeil</u>, 205 F.3d at 188; <u>Weyer</u>, 198 F.3d at 1115.

11. And like any commercial service provider, such as a golf course or movie theater, OKBridge requires its customers to abide by basic rules of conduct and reserves the right to exclude those who do not. This fact does not render OKBridge a selective, private club; if it did, no business would be subject to Title III.

12. That the web site's customers can complain about the behavior of other patrons and, thereby, indirectly enforce the basic rules of the web site, does not mean the members exercise the sort of control over the business required to make it an exempt private club. Patrons of movie theaters, golf courses, bowling alleys, libraries, amusement parks, etc., can all complain about disruptive customers and often succeed in having the perpetrator removed or excluded from the facility. Yet Congress clearly considered that, as a general rule, each of these types of public accommodations would be covered by Title III. See 42 U.S.C. 12181(7)(C), (H), (I), (L).