1   ROBERT A. NAEVE (CA SBN 106095)
    RNaeve@mofo.com
2   MORRISON & FOERSTER LLP
    19900 MacArthur Blvd.
3   Irvine, California  92612-2445
    Telephone: (949) 251-7500
4   Facsimile: (949) 251-0900

5   DAVID F. MCDOWELL (CA SBN 125806)
    SARVENAZ BAHAR (CA SBN 171556)
6   MICHAEL J. BOSTROM (CA SBN 211778)
    DMcDowell@mofo.com
7   SBahar@mofo.com
    MBostrom@mofo.com
8   MORRISON & FOERSTER LLP
    555 West Fifth Street, Suite 3500
9   Los Angeles, California  90013-1024
    Telephone: (213) 892-5200
10  Facsimile: (213) 892-5454

11  STUART C. PLUNKETT (CA SBN 187971)
    SPlunkett@mofo.com
12  MORRISON & FOERSTER LLP
    425 Market Street
13  San Francisco, California 94105-2482
    Telephone: (415) 268-7000
14  Facsimile: (415) 268-7522

15  Attorneys for Defendant
    TARGET CORPORATION
16

17                  UNITED STATES DISTRICT COURT

18                NORTHERN DISTRICT OF CALIFORNIA

19                   SAN FRANCISCO DIVISION

20

21  NATIONAL FEDERATION OF THE BLIND,        Case No.    C06-01802 MHP
    the NATIONAL FEDERATION OF THE
22  BLIND OF CALIFORNIA, on behalf of their   **TARGET CORPORATION'S**
    members, and Bruce F. Sexton, on behalf of  **OPPOSITION TO PLAINTIFFS'**
23  himself and all others similarly situated,  **MOTION FOR PRELIMINARY**
                                               **INJUNCTION**
24                  Plaintiffs,
                                               Date:    July 24, 2006
25        v.                                   Time:    2:00 p.m.
                                               Judge:   The Honorable Marilyn Hall Patel
26  TARGET CORPORATION,

27                  Defendant.

28

Dockets.Justia.com

1

**TABLE OF CONTENTS**

2

INTRODUCTION AND SUMMARY OF ARGUMENT....................................................1

3

STATEMENT OF FACTS................................................................................................4

4  I.    NFB FAILS TO MAKE A FACTUAL SHOWING THAT TARGET.COM'S
        GOODS AND SERVICES ARE INACCESSIBLE TO BLIND PERSONS ...................4

5
        A.    Blind Persons Can, In Fact, Access Target.com's Goods And Services
6             With Screen Readers ...............................................................................................5

7       B.    NFB's Declarations From Blind Users Of Target.com Do Not Establish
              That The Website's Design Makes It Inaccessible.................................................6

8       C.    No One Contests That The Goods And Services Of Target.com Are
              Accessible Using Target.com's 1-800 Number.......................................................8

9       D.    NFB's Expert Declaration Is Irrelevant To The Question Of Whether
              Target.com Is Accessible .......................................................................................8

10 II.   NFB FAILS TO IDENTIFY THE STANDARDS IT WOULD HAVE THE
        COURT IMPOSE UPON TARGET CORPORATION IN THE REQUESTED
11      MANDATORY INJUNCTION ...................................................................................9

12 ARGUMENT ...................................................................................................................12

13 I.    NFB'S REQUEST FOR A MANDATORY INJUNCTION IS SUBJECT TO A
        HEIGHTENED STANDARD.....................................................................................12

14 II.   NFB FAILS TO DEMONSTRATE A CLEAR LIKELIHOOD OF SUCCESS ON
        ITS CLAIM UNDER TITLE III OF THE ADA AS A MATTER OF LAW .................13

15
        A.    Title III Of The ADA Prohibits Persons Who Own Or Operate Places Of
16            Public Accommodation From Discriminating With Respect To The Goods
              And Services "Of Any Place Of Public Accommodation" ...................................13

17      B.    The Parties Agree That Defendant Target Corporation "Owns And
              Operates" Places Of Public Accommodation.......................................................13

18      C.    NFB Claims That Target's Bricks And Mortar Retail Stores – And Not The
              Target.com Website Itself - Constitute "Places Of Public Accommodation".......14
19
        D.    NFB Cannot Establish Discrimination With Respect To The Goods And
20            Services "Of Any Place Of Public Accommodation" ...........................................14

21            1.    NFB Cannot Establish The Required Nexus Between Allegedly
                    Inaccessible Features Of The Target.com Website And Target's
22                  Bricks And Mortar Retail Stores ...............................................................15

23            2.    NFB Cannot Rely Upon The Eleventh Circuit's Holding In Rendon
                    To Support Its Claims.................................................................................16

24 III.  NFB CANNOT DEMONSTRATE AS A MATTER OF FACT THAT
        TARGET.COM IS A "SERVICE OF" TARGET'S RETAIL STORES .........................18

25 IV.   EVEN IF NFB COULD ESTABLISH THAT TITLE III OF THE ADA APPLIED
        TO TARGET.COM, IT CANNOT ESTABLISH THAT THE FACTS
26      "CLEARLY FAVOR" A JUDGMENT IN ITS FAVOR ..............................................19

27      A.    NFB Fails To Demonstrate That Target.com Is Inaccessible To Blind
              Persons Using Screen Readers .............................................................................19

28

|   |   | B. | NFB Has Not Established That Target Violated Section 12182(b)(2)(A)'s "Specific Prohibitions" | 21 |

V.   NFB FAILS TO ESTABLISH A CLEAR LIKELIHOOD OF SUCCESS ON ITS STATE LAW CLAIMS ......... 23

    A.   Interpreting California's Access Statutes As Applying To The Internet Would Violate The Commerce Clause ......... 23

        1.   If The Unruh Act And Disabled Persons Act Applied To Internet Websites, California Would Be Impermissibly Regulating Conduct Occurring Outside Of Its Borders ......... 24

        2.   Any Regulation Of The Internet Must Be Instituted At The National Level ......... 26

    B.   Even If California's Access Statutes Did Apply To The Internet, They Do Not Require Target Corporation To Alter Or Modify Its Website ......... 28

        1.   The Unruh Act Does Not Require Target Corporation To Alter Or Modify Its Website ......... 28

        2.   The Disabled Persons Act Does Not Require Target Corporation to Alter or Modify Its Website ......... 30

VI.   NFB HAS NOT DEMONSTRATED IRREPARABLE HARM OR THAT THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR ......... 32

VII.   NFB HAS PROVIDED INSUFFICIENT DETAIL TO SATISFY THE SPECIFICITY REQUIREMENT OF RULE 65(D) ......... 33

VIII.   IF THE INJUNCTION IS GRANTED, THE COURT SHOULD REQUIRE A BOND THAT COVERS TARGET CORPORATION'S COMPLIANCE COSTS ......... 34

CONCLUSION ......... 35

1

**CASES**

2    *ACLU v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999) ............................................................25

3    *Am. Booksellers Found.* v. *Dean,*
4    342 F.3d 96, 103 (2d Cir. 2003) .......................................................24, 25

*Am. Libraries Ass'n v. Pataki,*
5    969 F. Supp. 160 (S.D.N.Y. 1997) ................................................25, 27

6    *Arnold v. United Artists Theatre Cir., Inc.,*
    158 F.R.D. 439, 446 (N.D. Cal. 1994) ................................................30

7    *BMW of N. Am., Inc. v. Gore,*
8    517 U.S. 559 (1996) ...........................................................................24

*Colin ex rel. Colin v. Orange Unified Sch. Dist.,*
9    83 F. Supp. 2d 1135 (C.D. Cal. 2000) .................................................34

10    *Ctr. for Democracy & Tech. v. Pappert,*
    337 F. Supp. 2d 606 (E.D. Pa. 2004) .................................................25

11    *D'Lil v. Stardust Vacation Club,*
    No. Civ-S-00-1496 DFL-PAN 2001 U.S. Dist. LEXIS 23309, *15 (E.D. Cal.
12    Dec. 20, 2001) ....................................................................................21

13    *Dahl v. HEM Pharm. Corp.,*
    7 F.3d 1399, 1403 (9th Cir. 1993) ......................................................12

14    *Diamond Multimedia Sys., Inc.* v. *Super. Ct.,*
    19 Cal. 4th 1036, 1059-60 (1999) .......................................................25

15    *Dobard v. San Francisco Bay Area Rapid Transit Dist.,*
    No. C-92-3563-DLJ 1993 U.S. Dist. LEXIS 13677, *10 (N.D. Cal. Sept. 7,
16    1993) ...................................................................................................22

17    *Ford v Schering-Plough Corp.,*
    145 F.3d 601 (3d Cir. 1998) ...............................................................15

18    *Fortyune v. Am. Multi-Cinema, Inc.,*
19    364 F.3d 1075 (9th Cir. 2004) .......................................................22, 33

*Hankins* v. *El Torito Restaurants, Inc.,*
20    63 Cal. App. 4th 510 (1998) ...............................................................31

21    *Hart v. Cult Awareness Network,*
    13 Cal. App. 4th 777 (1993) ...............................................................26

22    *Healy v. Beer Inst.,*
    491 U.S. 324 (1989) ......................................................................24, 26

23    *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
24    174 F.3d 411 (4th Cir. 1999) ..............................................................34

*Jorgensen v. Cassiday,*
25    320 F.3d 906 (9th Cir. 2003) ..............................................................34

26    *Marina Point, Ltd. v. Wolfson,*
    30 Cal. 3d 721, 734 (1982) .................................................................31

27    *Marsh v. Edwards Theatres Cir., Inc.,*
    64 Cal. App. 3d 881, 890 (1976) ...............................................29, 30, 31

28

*Martin v. Int'l Olympic Comm.*,
   740 F.2d 670, 675 (9th Cir. 1984) ........................................................................... 1

*Nintendo of Am. v. Lewis Galoob Toys*,
   16 F.3d 1032 (9th Cir. 1994) ................................................................................. 34

*Parker v. Metro. Life Ins. Co.*,
   121 F.3d 1006, 1010 (6th Cir. 1997) .............................................................. 13, 19

*PGA Tour Inc. v. Martin*,
   532 U.S. 661 (2001) ............................................................................................. 22

*Rendon v. Valleycrest Prods., Ltd.*,
   294 F.3d 1279 (11th Cir. 2002) ................................................................... passim

*Reno v. ACLU*,
   521 U.S. 844 (1997) ............................................................................................. 16

*S. Pac. v. Ariz.*,
   325 U.S. 761, 767 (1945) ............................................................................... 26, 27

*Se. Booksellers Ass'n. v. McMaster*,
   371 F. Supp. 2d 773 (D.S.C. 2005) ..................................................................... 25

*Silver Sage Partners, LTD. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) ............................................................................... 32

*Stanley v. Univ. of S. Cal.*,
   13 F.3d 1313, 1320 (9th Cir. 1994) ................................................................. 1, 12

*Stoutenborough v. Nat'l Football League*,
   59 F.3d 580, 583 (6th Cir. 1995) .................................................................. 15, 19

*United States v. Carter*,
   421 F.3d 909, 911 (9th Cir. 2005) ....................................................................... 13

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) ...................................................................... 14, 19

*Wilson v. Pier 1 Imports (US), Inc.*,
   No. Civ. S-04-633 LKK/CMK 2006 U.S. Dist. LEXIS 21216 (E.D. Cal. Apr.
   12, 2006) .............................................................................................................. 20

**CONSTITUTIONS, STATUTES AND REGULATIONS**

28 C.F.R. § 36.303(a) ............................................................................................... 22

29 U.S.C. § 701,
   Rehabilitation Act of 1973, ................................................................................. 10

29 U.S.C. § 794d(a)(1)(A)(i)-(ii) .............................................................................. 10

29 U.S.C. § 794d(a)(2)(A) ........................................................................................ 10

36 C.F.R. § 1194.22 .................................................................................................. 10

42 U.S.C. § 12101
   Title III of the Americans with Disabilities Act, ................................................. 1

42 U.S.C. § 12181(7)(E) ........................................................................................... 13

42 U.S.C. § 12182(a) ................................................................................................. 13

42 U.S.C. § 12182(b)(2)(A) ...................................................................................... 21

42 U.S.C. § 12182(b)(2)(A)(ii) ................................................................................. 21

42 U.S.C. § 12182(b)(2)(A)(iii) ................................................................. 22

42 U.S.C. § 12812(a) ............................................................................... 19

42 U.S.C. § 2182(b)(2)(A)(iv) ................................................................. 21

56 Fed. Reg. 35544, 35566 ...................................................................... 22

Cal. Civ. Code § 51
    Unruh Civil Rights Act, ....................................................................... 2

Cal. Civ. Code § 51(d) ............................................................................. 28

Cal. Civ. Code § 54,
    Blind and Other Physically Disabled Persons Act ................................ 2

California Government Code § 4450 .......................................................... 30

Fed. R. Civ. P. 65 Adv. Comm. Notes ...................................................... 33

Fed. R. Civ. P. 65(d) ............................................................................... 32

**INTRODUCTION AND SUMMARY OF ARGUMENT**

NFB's motion for a preliminary injunction requiring Target Corporation to modify its website to make it "accessible" to blind persons using screen access software fails on a number of grounds and should be denied.  As a preliminary matter, NFB cites the wrong standard for the relief it seeks and improperly glosses over the distinction between injunctions that seek to preserve the status quo and those that require affirmative conduct.  In the Ninth Circuit, mandatory preliminary relief — which is what NFB seeks — "is *subject to a higher degree of scrutiny* because such relief is *particularly disfavored . . . .*"  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (emphasis added).  District courts "should be extremely cautious about issuing" mandatory injunctions, *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984), and they may only be granted if "the law and the facts *clearly favor*" the moving party, *Stanley*, 13 F.3d at 1320 (emphasis added).

NFB fails to satisfy the ordinary standard for preliminary relief, and comes no where near meeting the added burden of demonstrating that the law and facts "clearly favor" issuance of an injunction.  Target Corporation is sensitive to the needs of its blind customers, and NFB acknowledges that Target Corporation has engaged in a "structured negotiation" in an attempt to hear and resolve NFB's concerns.  But at issue here is whether NFB has justified the extraordinary and, in the context of website design, highly problematic remedy of mandatory preliminary relief.  Such relief is not justified.  In summary, NFB's motion should be denied because:

1.     NFB cannot demonstrate a clear likelihood that it will succeed on its claim under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (sometimes referred to as "Title III") because, as shown in Target Corporation's motion to dismiss, that claim is legally barred.  Title III does not apply to websites.  Title III applies to "*places* of public accommodation," which includes only physical "facilities," such as "buildings, structures, sites, complexes" and the like.  The Ninth Circuit has squarely held that "place of public accommodation" means a physical place, which would not include a website.  In the face

1    of this authority, NFB does not even attempt to argue in its motion that Target.com is a "place of

2    public accommodation."

3           2.    To avoid arguing that Target.com is a "place of public accommodation," NFB

4    claims in these proceedings that Target's brick-and-mortar retail stores are the "places of public

5    accommodation." NFB then claims that Target.com is a "service of" these stores, and that

6    deficient programming makes Target.com's web pages inaccessible. Target Corporation agrees

7    that its retail stores are *places* of public accommodation. Nonetheless, this argument fails both

8    legally and factually. As a legal matter, NFB can only prevail on a "service of a place of public

9    accommodation" claim by demonstrating that the "service" makes the physical place of public

10   accommodation inaccessible. NFB cannot do so here, because the allegedly deficient

11   programming of Target's web pages does *not* exist within Target's retail stores, and does not

12   prevent anyone from shopping these retail stores. As a factual matter, the declarations submitted

13   herewith demonstrate Target.com is not a service of Target's retail stores at all. Instead, it is a

14   separate merchandising channel of Target Corporation, whose operations are independent of

15   Target's retail stores.

16          3.    NFB cannot demonstrate a clear likelihood that it will succeed on its state law

17   claims because, as shown in Target Corporation's motion to dismiss, those claims are barred on

18   multiple legal grounds. NFB entirely ignores two of those grounds in its motion. First, the Court

19   cannot construe the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.* ("Unruh Act"), and the

20   Blind and Other Physically Disabled Persons Act, Cal. Civ. Code § 54 *et seq.* ("Disabled Persons

21   Act"), as applying to the Internet, because doing so would render those statutes unconstitutional.

22   If these California access statutes are interpreted to regulate the Internet, they would violate the

23   Dormant Commerce Clause because they would impermissibly regulate conduct occurring

24   outside of California's borders. Second, assuming that NFB can establish that California's access

25   statutes even apply to websites, neither statute would require Target Corporation to modify its

26   website. The Unruh Act expressly states that it does not require modification that is not otherwise

27   required by other provisions of law. California courts have held that the Disabled Persons Act

28   requires no affirmative conduct at all.

1    4.    Even if NFB convinces the Court that there is no legal bar to its claims, NFB

2 cannot demonstrate a clear likelihood of success on the most fundamental element of its

3 complaint: that Target.com is, in fact, "inaccessible" to blind users with screen readers. NFB

4 submits the declaration of eight blind users of Target.com, each of whom declares — using the

5 identical boilerplate language — that Target.com was "impossible" to use. But when deposed,

6 several of these individuals admitted either that they had used Target.com successfully or that

7 they visited Target.com for only a few minutes before concluding that the website was unusable.

8 Furthermore, *there can be no dispute that blind users can, in fact, use Target.com*. Submitted

9 herewith are the declarations of four such users. The very different results achieved by these

10 users establishes that a blind person's experience on Target.com (and on any website) will vary

11 based on a host of factors, including the user's technical abilities, the technology they are

12 employing, and the amount of time they spend on the site.

13    NFB also suggests that this Court should order Target.com to make unspecified

14 affirmative changes to its web pages because Dr. James Thatcher believes that Target.com is

15 "inaccessible." However, Dr. Thatcher's opinion is entitled to no weight for at least three

16 interrelated reasons. First, Dr. Thatcher concluded that Target.com was "inaccessible" because it

17 failed to comply with a "combination" of standards that only he uses, and that no court has ever

18 applied to privately-owned Internet websites. Second, Dr. Thatcher admits that, even if a website

19 were to comply with his personally-chosen standards, such a website could still be inaccessible

20 and unusable to blind persons. Finally, and perhaps most importantly, Dr. Thatcher *never tested*

21 *whether a blind user can, in fact, use the website to access Target.com's goods and services*.

22    5.    NFB has failed to provide information that would enable the Court to craft a

23 preliminary injunction that satisfies the specificity requirement of Federal Rule of Civil Procedure

24 65(d). NFB seeks an injunction requiring Target Corporation to modify its website so that it will

25 be "readily accessible to and usable by blind people who use screen access software." But NFB

26 identifies no standards that would tell Target Corporation what it needs to do to make the site

27 "readily accessible" and "usable." Dr. Thatcher acknowledges that there are many sources of

28 guidelines for designing "accessible" websites, and that these guidelines are (a) inconsistent,

1    (b) subjective, and (c) insufficient to ensure that a website is usable by blind persons.  Implicitly

2    acknowledging that it seeks a vague, standardless injunction, NFB proposes to have the Court

3    oversee an on-going "meet and confer" process in which Target Corporation will meet with NFB

4    whenever there is a disagreement on a website design issue, with the Court acting as referee every

5    time a dispute arises.  There is no authority to support the use of this process as a substitute for

6    complying with Rule 65(d)'s specificity requirement.

7        The motion for preliminary injunction should be denied.

8                                    <u>**STATEMENT OF FACTS**</u>

9    **I.    NFB FAILS TO MAKE A FACTUAL SHOWING THAT TARGET.COM'S
         GOODS AND SERVICES ARE INACCESSIBLE TO BLIND PERSONS**
10

11        In the introduction to its motion, NFB characterizes the injunction it seeks as one that will

12    "prevent" Target Corporation "from continuing to deny blind individuals full and equal access to"

13    its website, Target.com.  (Mot. at 1.)  What NFB actually seeks is an injunction mandating that

14    Target Corporation take affirmative steps to redesign its website so that it is "readily accessible"

15    and "usable" by blind people using screen access software — an assistive technology that

16    vocalizes the contents of a computer screen, often called "screen readers."  NFB supports its

17    request for a mandatory injunction with the declarations of eight blind individuals who declared

18    that they were unable to use Target.com, and with an expert declaration from Dr. Thatcher, who

19    reviewed Target.com and concluded that it "is virtually unusable by a visitor who is blind."

20    (Thatcher Decl. ¶ 60.)

21        The parties agreed to conduct discovery in advance of the preliminary injunction hearing.

22    Accordingly, Target Corporation deposed NFB's blind declarants and Dr. Thatcher.[1]  Target

23    Corporation also had the opportunity to ask other blind persons to test Target.com to determine if

24    their experiences on the website would differ from the experiences of NFB's declarants.  The

25    _____

26        [1] Relevant portions of the transcripts from these depositions are attached as exhibits to the
     Declaration of Michael J. Bostrom ("Bostrom Decl.") as follows:  Volonte (Ex. A); Uttermohlen
27    (Ex. B); Ayala (Ex. C); Sexton (Ex. D); Jacobson (Ex. E); Thomas (Ex. F); Stigile (Ex. G); Elder
     (Ex. H); and Thatcher (Ex. I).

28

1   testimony of all these individuals is now before the Court, and the result is clear:  NFB has not

2   met its burden with respect to the most fundamental element of its claims, namely, demonstrating

3   that Target.com is inaccessible to blind users.  Although there are several legal barriers outlined

4   in this brief (and in Target Corporation's motion to dismiss) that should prevent the question of

5   Target.com's accessibility from ever being the operative issue in this case, NFB's failure to

6   provide the Court with a factual record that could support the requested injunction is reason

7   enough to deny it.

8            **A.      Blind Persons Can, In Fact, Access Target.com's Goods And Services
                      With Screen Readers**
9

10          Target Corporation submits herewith the declarations of blind persons who accessed

11  Target.com using a screen reading program called JAWS for Windows ("JAWS").  (*See*

12  Declaration of Dawn Wilkinson ("Dawn Wilkinson Decl.") ¶¶ 1, 5; Declaration of Dave

13  Wilkinson ("Dave Wilkinson Decl.") ¶¶ 1, 4; Declaration of Suzanne Tritten ("Tritten Decl.")

14  ¶¶ 1, 3; Declaration of Chris Polk ("Polk Decl.") ¶¶ 1, 3.)  All of these individuals successfully

15  navigated the website and purchased products.  The following is typical of their experiences:

16              I accessed Target.com with the intention of navigating the web site
                and purchasing merchandise.  I conducted my online shopping
17              excursion using JAWS version 7.0.  I was able to access
                Target.com, navigate the various links on the site, and search for
18              specific products.  I was also able to find the specific products I was
                shopping for, and browse through the various departments within
19              Target.com.  I conducted searches on Target.com by category and
                department.  Specifically, I looked at products in the music, toys
20              and games, and "Target Exclusive" departments.  I was able to add
                merchandise to my virtual shopping cart, and remove items I chose
21              not to purchase.  At the end of my shopping experience, I was able
                to complete my purchase using a credit card, and I received
22              verification of my purchase from Target.com.  The products I
                purchased were delivered to my home on May 25, 2006.
23

24  (Dawn Wilkinson Decl. ¶ 5; *see also* Dave Wilkinson Decl. ¶ 4; Tritten Decl. ¶¶ 4-6; Polk Decl. ¶

25  5.)

26          While none of these declarants have said that their screen readers worked seamlessly on

27  Target.com, they all testify that they were able to work around any difficulties they encountered

28  and that they had an enjoyable experience on the website.  For example:

- "I was able to navigate and use the features on the site with little or no difficulty. When I did encounter an obstacle, or when a process was unclear, I was able to figure out how to work my way around the obstacle using my screen reader." (Dawn Wilkinson Decl. ¶ 7.)

- "I found my shopping experience on Target.com to be enjoyable and fun. I intend to shop on Target.com again. I also intend to recommend Target.com to my friends, both sighted and sight-impaired." (*Id.* ¶ 8.)

- "During my visit to Target.com, I was able to navigate and use the features on the site with little or no difficulty. When I did encounter an obstacle, or when a process was unclear, I was able to work my way around the obstacle without any significant difficulty." (Dave Wilkinson Decl. ¶ 5.)

- "I thought using Target.com was fun. I enjoyed browsing the products sold on Target.com, and playing around with the 'Gift Finder' feature. It was not difficult to access or navigate the site. I was able to access different departments, review products, and find out all sorts of details on product availability and return options. I usually have to do some groping around the first time I visit a new website, but I did not have many difficulties at all on Target.com. I believe Target.com is usable by sight-impaired individuals who have a basic to intermediate competency with screen reader Assistive Technology like JAWS." (Tritten Decl. ¶ 8.)

- "I had little or no difficulty navigating and using the features of the site. When I did encounter an obstacle, or when a process was unclear, I was able to work around the obstacle using my screen reader. . . . I will use Target.com again. I would also recommend Target.com to my sight-impaired friends as I believe the site is easy to use and helpful." (Polk Decl. ¶¶ 6-7.)

## B.    NFB's Declarations From Blind Users Of Target.com Do Not Establish That The Website's Design Makes It Inaccessible

NFB's declarants, who also used JAWS to access Target.com, tell a different story. However, while NFB's declarations all include boilerplate language regarding the difficulty and impossibility of using Target.com, the deposition testimony of many of these individuals calls into question the weight these statements should receive, even whether the declarations should have been submitted at all. Three of the declarants admitted that they only had the patience to use Target.com for a matter of minutes before concluding the site was unusable and leaving. (Volonte Depo. at 23:19-23 ("I've never spent more than a few minutes on the website."); *Id.* at 26:15-20 (exited site because "life's too short"); Uttermohlen Depo. at 26:9-11, 28:6-18 (left site immediately upon encountering any difficulty and never spent more than 5 to 15 minutes on the site because she is a "busy person" and prefers to do "something else that would be more productive"); Ayala Depo. at 44:22-45-45:18 (left site in less than 15 minutes because "if I can

tell it's not friendly, I just – I don't have the time to fiddle with it, so I move on")[2].)  Another user who had declared it was "impossible" to navigate the site admitted that the difficulties he encountered on Target.com only made "the learning curve longer" and "add[ed] a whole level of unnecessary complexity."  (Jacobson Depo. at 53:19-54:11.)  Far from finding the site "impossible" to use, as he had declared, Mr. Jacobson admitted that he *regularly uses Target.com to conduct product research.*  (*Id.* at 48:12-51:12.)  Bruce Sexton, a plaintiff in this case, said he considers a website "acceptably accessible" only if it allows him to make purchases "*with ease.*"  (Sexton Depo. at 46:13-16.)

At most, NFB's submission demonstrates that a blind user's ability to access Target.com, or any website, will vary based on a number of factors *unrelated to the design of the website* — a point that Dr. Thatcher concedes[3] and that is supported by Target Corporation's expert, Chuck Letourneau.  (Letourneau Decl. ¶ 13.)  NFB's declarants admit that their ability to access websites has improved as screen reading technology has improved, demonstrating that users employing older technology will have greater difficulties with accessibility.  (Sexton Depo. at 35:18-36:2, 37:14-16; Uttermohlen Depo. at 12:12-19; Jacobson Depo. at 15:15-17:3; Thomas Depo. at 17:20-18:10.)  The particular Internet browser, and the version of the browser, used will also affect accessibility.  (Jacobson Depo. at 25:20-26:9, 27:12-28:20, 29:17-30:7, 32:14-33:4.)  NFB's declarants testified that they had an easier time using screen readers after taking classes, demonstrating that a user's own experience and technical skills will affect accessibility.  (Volonte Depo. at 16:12-18; Thomas Depo. at 16:18-17:6.)

Given these variables that have nothing to do with a website's design, it is not surprising that NFB's declarants achieved very different results on Target.com.  For example, one user said

---

[2] Furthermore, Mr. Ayala admitted that he attempted to access Target.com with JAWS version 4.51 — a technology that is indisputably out of date (the current version is 7.0).  (Ayala Depo. at 12:10-14; *see also* Letourneau Decl. ¶ 7.)

[3] Dr. Thatcher admits that these variables include the user's strategy for accessing particular web pages (Thatcher Depo. at 112:17-113:13), the user's experience with computers (*id.* at 113:14-16), the type of computer being used (*id.* at 113:17-21), the user's experience with the screen reader (*id.* at 113:22-24), the particular Internet browser being used (*id.* at 114:11-17), and the particular screen reader and version being used (*id.* at 114:18-115:15, 116:12-20).

1    he was unable to find even a single product on Target.com (Stigile Depo. at 34:1-3), while

2    another user said he uses the site regularly for product research (Jacobson Depo. at 48:12-51:12).

3    And while some users found it impossible at times to navigate past the home page (Uttermohlen

4    Depo. at 26:9011, 28:6-18; Ayala Depo. at 44:22-45:18, Stigile Depo. at 29:11-31:15), others had

5    no difficulty doing so (Sexton Depo. at 72:21-73:5; Volonte Depo. at 21:19-21; Elder Depo. at

6    32:20-33:24; Jacobson Depo. at 54:12-56:2).   Some users had no difficulty accessing the

7    website's search function to locate products (Uttermohlen Depo. at 27:25-28:18; Jacobson Depo.

8    at 48:12-51:12; Thomas Depo. at 31:6-32:22), but others said they could not find the search

9    function (Volonte Depo. at 26:15-20) or could find it but could not enter text (Volonte Depo. at

10   25:6-16).   Some users had no problem finding items and adding items to their virtual shopping

11   cart (Sexton Depo. at 72:21-73:5; Elder Depo. at 32:20-33:24, Jacobson Depo. at 54:12-56:2;

12   Thomas Depo. at 31:6-32:22), but one user said she could not add items to the cart (Uttermohlen

13   Depo. at 27:25-28:18).   Of the users who entered the checkout phase, one was unable to locate a

14   checkout button (Sexton Depo. at 78:10-16), two were able to locate it but unable to activate it

15   (Elder Depo. at 32:20-33:24; Thomas Depo. at 31:6-32:22), and another said he was able to

16   activate it on one occasion (Jacobson Depo. at 57:11-58:11).

17          **C.    No One Contests That The Goods And Services Of Target.com Are
                    Accessible Using Target.com's 1-800 Number**
18

19          Target.com's goods and services are also accessible to blind customers through a 1-800

20   number that is staffed 24 hours a day, every day of the year.  (Declaration of Trish Perry ("Perry

21   Decl.") ¶¶ 7-8.)  None of NFB's witnesses claimed they could not access Target.com's goods and

22   services via the 1-800 number.  None of them even attempted to do so.  The plaintiff, Mr. Sexton,

23   testified that he is "confident" he could have found a way to contact Target.com if he had wanted

24   to do so.  (Sexton Depo. at 95:9-18; *See also* Tritten Decl. ¶7 (stating that she found a 1-800

25   telephone number on Target.com she could call if she had problems).)

26

27

28

**D.    NFB's Expert Declaration Is Irrelevant To The Question Of Whether Target.com Is Accessible**

NFB submitted Dr. Thatcher's declaration to further demonstrate that Target.com is inaccessible, but Dr. Thatcher's admissions at his deposition negate his opinion on this issue. Dr. Thatcher admitted that he only evaluated whether Target.com complied with his own chosen "combination" of website accessibility guidelines, and that he *did not evaluate whether non-compliance with his chosen guidelines rendered the website inaccessible*. (Thatcher Depo. at 100:21-101:7.) Indeed, he admitted that his opinion that Target.com is "inaccessible" is based *solely* on his determination that certain elements on Target.com are "non-compliant" with his guidelines. (*Id.* at 106:13-107:14; *see also id.* at 108:14-109:1 (admitting he did not consider "how important" a particular non-compliant element of the website was to a blind person's ability to use the website).)[4] Significantly, Dr. Thatcher also admitted that a website can be "non-compliant" yet *still be accessible to a blind user*. (*Id.* at 100:14-19.) His testimony thus does not assist NFB in establishing that Target.com is inaccessible.

Moreover, Dr. Thatcher's speculative statements that "I am as close to certain as I can be that no blind person has ever made a purchase on … Target.com" (*Id.* at 135:14-22) and that Target.com "is virtually unusable by a visitor who is blind" (Thatcher Decl. ¶ 60) are plainly contradicted by the declarations submitted herewith.

---

[4] Dr. Thatcher further admitted that he considers Target.com inaccessible even though there may be alternatives that will allow a blind user to navigate the site with a screen reader: "The fact that there are alternative technique[s] that[] you might be able to find doesn't forgive the process of doing it right in these other cases." (Thatcher Depo. at 123:25-124:9.) Furthermore, when asked about specific "problems" he identified on Target.com, Dr. Thatcher admitted either that they would not prevent a user from accessing the website's goods and services or that he did not evaluate usability. (*Id.* at 71:14-22 (checkout button can be activated with screen reader); *id.* at 104:11-25 (user can access search button and department links on home page despite "annoying" problem with some of the links); *id.* at 96:14-97:21 (did not consider whether mislabeling of "checkout progress bar" would affect usability); *id.* at 128:17-129:1 (did not determine whether forms could actually be completed by a blind user); *id.* at 131:4-14 (navigation issues do not prevent a blind user from accessing pages on the site, but makes it "much more difficult"); *id.* at 134:8-21 (screen readers include functions that assist in navigation even when a site does not comply with his navigation guidelines).

1

2

## II.    NFB FAILS TO IDENTIFY THE STANDARDS IT WOULD HAVE THE COURT IMPOSE UPON TARGET CORPORATION IN THE REQUESTED MANDATORY INJUNCTION

3       NFB does not identify the standards that it claims Target Corporation must follow to make

4  its website "readily accessible to and usable by blind people." (Mot. at 18.)  Instead, NFB says

5  there are "several readily achievable ways Target.com can accomplish this" and cites as its only

6  example the Web Content Accessibility Guidelines ("WCAG") written by the World Wide Web

7  Consortium, a standards organization. (*Id.*)  Strangely, NFB's own expert did not use the WCAG

8  in his evaluation of Target.com. Rather, Dr. Thatcher testified that he used his own

9  "combination" of guidelines, some of which came from the WCAG and others from the standards

10 applied to federal agency websites, known as the "Section 508 standards." (Thatcher Decl. ¶ 16;

11 Thatcher Depo. at 34:1-16.)

12      In 1998, Congress amended section 508 of the Rehabilitation Act of 1973, 29 U.S.C.

13 § 701 *et seq.*, to require federal contractors to take affirmative action to make electronic and

14 information technology accessible to and useable by federal employees with disabilities, as well

15 as individuals with disabilities who are members of the public who seek information or services

16 from a federal agency. *See* 29 U.S.C. § 794d (a)(1)(A)(i)-(ii).  Congress directed the federal

17 Architectural and Transportation Barriers Compliance Board (the "Access Board") to develop

18 regulations implementing amended section 508.  29 U.S.C. § 794d (a)(2)(A).  The Access

19 Board's regulations contain specific rules that describe how websites maintained by federal

20 agencies are to be made accessible. *See* 36 C.F.R. § 1194.22.

21      NFB omits several key facts about the WCAG and Section 508 standards, all of which

22 were later admitted to by Dr. Thatcher.  Perhaps most importantly, both the WCAG and Section

23 508 standards are many years out of date and are currently under revision due to changes in

24 technology. (Thatcher Depo. at 34:21-36:21, 39:20-40:16, 40:22-25, 43:19-44:1, 45:9-22.)[5]

25

26      [5] Web accessibility guidelines typically require periodic revisions.  When Dr. Thatcher was involved in creating web accessibility guidelines at IBM, he had to revise the guidelines

27 about every six months due to "changing technology" and "changing standards in the community." (Thatcher Depo. at 27:5-22.)

28

1    Also, Section 508, as well as the Access Board's website accessibility standards, do not apply in

2    this case, because Target Corporation is not a federal agency.[6]

3        Furthermore, the WCAG and Section 508 standards, which are plainly outdated, are not

4    the only sources for web accessibility guidelines.  There are many others, including

5    organizational standards, state standards, and international standards.  (Thatcher Depo. at 79:10-

6    80:5, 80:20-81:18; Letourneau Decl. ¶ 8.)  These various guidelines and standards are not

7    consistent.  Indeed, Dr. Thatcher admits that just the WCAG and Section 508 standards are

8    "different in wording," "different in organization," "different in intention," and contain

9    "substantive differences."  (Thatcher Depo. at 90:24-91:14; *see also* Letourneau Decl. ¶ 10-11.)[7]

10       The problems that the lack of a single set of generally accepted guidelines causes for

11   mandating web accessibility is compounded by the fact that compliance with a set of guidelines

12   *does not equate to accessibility*.  Dr. Thatcher admits that a website can comply with existing

13   guidelines, yet still be inaccessible.  (*Id.* at 38:6-10; *see also* Letourneau Decl. ¶ 9.)  As

14   Dr. Thatcher explains, "there is more to accessibility than just the standards," because web

15   designers must have an understanding of the "alternatives" that are permitted by a particular

16   guideline.  (Thatcher Decl. ¶¶ 17-18.)  The reason for this is that the process for making a website

17   accessible pursuant to guidelines is inherently "subjective."  (Thatcher Depo. at 37:10-38:5; *see*

18   *also id.* at 84:16-85:19 (the process for making a website accessible pursuant to guidelines is

19   "subject to debate").)  As Mr. Letourneau explains, "[e]ven when a web designer relies upon

20   accessibility guidelines, he or she must nonetheless exercise a great deal of discretion.  Indeed, a

21

22   ─────────────────

23   [6] To the extent there is any consensus about the "correct" set of guidelines to make
     websites accessible (and Dr. Thatcher admits that he does not know what guidelines other website
     evaluators use), he thinks the consensus will be reflected in the revised WCAG, which will not be
24   out until later this year.  (Thatcher Depo. at 46:14-47:1, 82:12-85:19.)

25       [7] Dr. Thatcher has a comparison chart which shows that that these two sets of guidelines
     are different.  (Bostrom Decl., Ex. J; Thatcher Depo. 86:24- 89:10.)  Dr. Thatcher also admits that
26   one "crucial issue" for website accessibility — page navigation — is not addressed in the W3C
     guidelines (*id.* at 91:6-14), and his report shows that he evaluated Target.com on standards that do
27   not appear in *any* guidelines.  (Report at 7 (chart showing "n/a"); Thatcher Depo. at 110:21-25
     ("n/a" means there is no corresponding guideline).)

28

1    designer must exercise discretion in organizing the content layout, choosing the most desirable

2    headings, and implementing the appropriate content mark ups."  (Letourneau Decl. ¶ 11.)

3         For these reasons, NFB's generalized assertion that there are "established guidelines and

4    readily available protocols" to allow the Court to "craft" a mandatory injunction requiring

5    modifications to Target.com (Mot. at 2) is substantially misleading.

6                                              **ARGUMENT**

7    **I.     NFB'S REQUEST FOR A MANDATORY INJUNCTION IS SUBJECT TO
             A HEIGHTENED STANDARD**
8

9         NFB fails to acknowledge that its motion is subject to a heightened standard because it

10   seeks a mandatory injunction.  Indeed, in reciting the standard, NFB paraphrases language from

11   the Ninth Circuit in an apparent attempt to obscure the settled rule that a heightened standard

12   applies to requests for mandatory injunctions.[8]  (Mot. at 7.)  The case NFB paraphrases clearly

13   states that mandatory injunctions are subject to a heightened standard and that courts are

14   "reluctant" to grant them unless "extreme or very serious damage will result," and the case is not

15   otherwise "doubtful."  *Anderson*, 612 F.2d at 1115 (citation omitted).  More recent Ninth Circuit

16   cases hold that mandatory preliminary injunctions are "particularly disfavored."  *Stanley*, 13 F.3d

17   at 1320.  They "should not be issued unless the facts and law clearly favor the moving party."

18   *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

19

20

21        [8] NFB incorrectly states that "[w]hether the sought-after injunction is 'mandatory' or
     'prohibitive,' relief will issue 'where the injury complained of is [not] capable of compensation in
22   damages."  (Mot. at 7 (quoting *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979).)
     NFB's insertion of "not" in brackets within its partial quotation from *Anderson* completely alters
23   the meaning of the full quote:

24              Courts are more reluctant to grant a mandatory injunction than a
                prohibitory one and . . . generally an injunction will not lie except
25              in prohibitory form.  Such mandatory injunctions, however, are not
                granted unless extreme or very serious damage will result and are
26              not issued in doubtful cases or where the injury complained of is
                capable of compensation in damages.

27   *Anderson*, 612 F.2d at 1115 (citation omitted).

28

1    Thus, in addition to meeting the traditional standard for preliminary relief, NFB must

2    further demonstrate that the facts and the law "clearly favor" issuance of the injunction.  As

3    demonstrated in the following sections, NFB has failed to meet even the minimum standard.

4    **II.    NFB FAILS TO DEMONSTRATE A CLEAR LIKELIHOOD OF SUCCESS
      ON ITS CLAIM UNDER TITLE III OF THE ADA AS A MATTER OF**

5    **LAW**

6    **A.    Title III Of The ADA Prohibits Persons Who Own Or Operate Places
      Of Public Accommodation From Discriminating With Respect To The**

7    **Goods And Services "Of Any Place Of Public Accommodation"**

8    The scope of Title III is necessarily defined and limited by the terms of the Act itself.

9    *United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005); *Parker v. Metro. Life Ins. Co.*, 121

10    F.3d 1006, 1010 (6th Cir. 1997), *cert. denied*, 522 U.S. 1084 (1998).  Title III's general rule

11    against discrimination provides:

12    No individual shall be discriminated against on the basis of disability in
      the full and equal enjoyment of the goods, services, facilities, privileges,

13    advantages, or accommodations **of** any place of public accommodation **by**
      any person who owns, leases (or leases to), or operates a place of public

14    accommodation.

15    42 U.S.C. § 12182(a) (emphasis added).

16    In evaluating NFB's claims in these proceedings, the Court should:  (a) identify who

17    "owns and operates" the place(s) of public accommodation; (b) identify the "place of public

18    accommodation" that is subject to Title III's general rule against discrimination in these

19    proceedings; and (c) evaluate whether NFB has demonstrated discrimination with respect to the

20    goods and services "of" that place of public accommodation.  These inquiries are addressed

21    separately in the following sections.

22    **B.    The Parties Agree That Defendant Target Corporation "Owns And
      Operates" Places Of Public Accommodation**

23

24    Target Corporation concedes, as it did in the motion to dismiss, that it is a "person who

25    owns . . . or operates" a place of public accommodation.  *See* 42 U.S.C. § 12181(7)(E) (defining

26    "public accommodation") & 12182(a); *see also* Am. Compl. ¶¶ 1 & 11.

27

28

TARGET CORPORATION'S OPP. TO PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 06-01802 MHP                                                                    13

C.    **NFB Claims That Target's Bricks And Mortar Retail Stores – And *Not* The Target.com Website Itself - Constitute "Places Of Public Accommodation"**

NFB does *not* claim in these proceedings that the Target.com website itself is a "place of public accommodation." (Mot. at 2 & 16 n.82.)[9] Instead, NFB's sole theory is - and Target Corporation concedes - that Target's retail stores *are* places of public accommodation. (Mot. at 1-2 & 12.)

D.    **NFB Cannot Establish Discrimination With Respect To The Goods And Services "Of Any Place Of Public Accommodation"**

To establish liability under Title III, a plaintiff must demonstrate that the person who owns or operates a covered place of public accommodation has engaged in a prohibited act of discrimination that occurs in, or has some type of nexus to, the place of public accommodation. As the Ninth Circuit explained in *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000):

> Title III provides an extensive list of "public accommodations" in § 12181(7), including such a wide variety of things as an inn, a restaurant, a theater, an auditorium, a bakery, a laundromat, a depot, a museum, a zoo, a nursery, a day care center, and a gymnasium. All the items on this list, however, have something in common. *They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services.* The principle of noscitur a sociis requires that the term, "place of public accommodation," be interpreted within the context of the accompanying words, and *this context suggests that some connection between the good or service complained of and an actual physical place is required.*

*Id.* at 1114 (emphasis added).

_____

[9] NFB's decision not to claim that Internet websites like Target.com are "places of public accommodation" comes as no surprise. As explained in the motion to dismiss, federal courts have held in a variety of contexts that Internet websites and the like are *not* "places of public accommodation" because they do not exist in a physical place, and they can be accessed from anywhere. *See, e.g., Access Now Inc. v. Southwest Airlines*, 227 F. Supp. 2d 1312, 1318 (S.D. Fla. 2002), *app. dismissed*, 385 F.3d 1324 (11th Cir. 2004); *Noah v. AOL Time Warner*, 261 F. Supp. 2d 532, 544-45 (E.D. Va. 2003) (AOL chat rooms and other online services); *Torres v. AT&T Broadband, LLC*, 158 F. Supp. 2d 1035, 1037-38 (N.D. Cal. 2001) (digital cable system is not a "place of public accommodation" because "in no way does viewing the system's images require the plaintiff to gain access to any actual physical public place"); *Access Now, Inc. v. Claire's Stores, Inc.* No. 00-14017-CIV, 2002 WL 1162422 (S.D. Fla. May 7, 2002) (defendant was a retail store that operated a website); *Hooks v. OKbridge*, SA-99-CA-214-EP (W.D. Tex. 1999) (defendant operated an on-line bridge game and website) (Bostrom Decl., Ex. K.).

1    Hence, it is *not* sufficient for a plaintiff to complain about services offered by a public

2    accommodation from a non-physical place.  *See, e.g.*, *Stoutenborough v. Nat'l Football League*,

3    59 F.3d 580, 583 (6th Cir. 1995) (place of public accommodation must be a "facility").  Instead,

4    the plaintiff must demonstrate a nexus between the allegedly discriminatory service and the place

5    of public accommodation, by showing that services were offered in, or precluded access to, a

6    place of public accommodation.  *See, e.g.*, *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279,

7    1284 (11th Cir. 2002) (Title III applies to both tangible and intangible barriers that prevent

8    disabled person from entering, accessing or enjoying facility's goods, services and privileges

9    offered by place of public accommodation); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613

10   (3d Cir. 1998) ("goods, services, facilities, privileges, advantages, or accommodations" to which

11   Title III ensures access should *not* be treated as "free-standing concepts but rather all refer to the

12   statutory term 'public accommodation' and thus to what these places of public accommodation

13   provide").[10]

14
              1.       **NFB Cannot Establish The Required Nexus Between Allegedly**
                       **Inaccessible Features Of The Target.com Website And Target's**
15                     **Bricks And Mortar Retail Stores**

16       NFB claims that Target.com discriminates against individuals with vision impairments

17   because the web pages of Target.com itself cannot be read by screen readers, and because they:

18   (a) do not use invisible "alt-tags"; (b) contain links that cannot be activated by a keyboard; (c)

19

20   _____
              [10] *See also Parker*, 121 F.3d at 1010 (en banc) (rejecting plaintiff's claim because there
     was "no nexus between the disparity in benefits and the services which [the insurance company]
21   offered to the public from its insurance office"); *Southwest Airlines*, 227 F. Supp. 2d at 1318 ("to
     fall within the scope of the ADA as presently drafted, a public accommodation must be a
22   physical, concrete structure"); *Pappas v. Bethesda Hosp. Ass'n.*, 861 F. Supp. 616, 620 (S.D.
     Ohio 1994) (Title III is limited to discrimination in "the physical use of a place of public
23   accommodation").  Only the First Circuit in *Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n*,
     37 F.3d 12 (1st Cir. 1994), has held that a "place of public accommodation" does not need to be a
24   physical place.  This ruling has been roundly rejected and criticized by other federal courts for its
     disregard for accepted canons of statutory construction.  *See, e.g.*, *Southwest Airlines*, 227 F.
25   Supp. 2d at 1318; *Parker*, 121 F.3d at 1013-14.  The law in the Seventh Circuit is muddled.
     *Compare Morgan v. Joint. Admin. Bd.*, 268 F.3d 456, 459 (7th Cir. 2001) ("place of public
26   accommodation" does not need to be a physical place) *and Doe v. Mut. of Omaha*, 179 F.3d 557,
     559 (7th Cir. 1999) (same) *with Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1269-76 (7th Cir.
27   1993) ("place of public accommodation" in Title II of Civil Rights Act of 1964, which is
     analogous to Title III of ADA, was limited to physical places).

28

1   contain improperly labeled forms; and (d) lack invisible headings to assist blind users navigate

2   the site.  (Mot. at 5.)  As noted above, NFB's does not claim that Target.com itself is a place of

3   public accommodation.  Hence, the question this Court must evaluate is *not* whether these alleged

4   programming deficiencies preclude access to Target.com itself.  Rather, NFB must establish a

5   nexus between these programming deficiencies and Target's retail stores themselves.

6        NFB simply cannot make that showing here.  In particular, NFB cannot claim that

7   Target.com's services are offered in any Target retail store.  *See Reno v. ACLU*, 521 U.S. 844,

8   851 (1997) (Internet websites are "a unique medium - - known to its users as cyberspace - -

9   located in no particular geographical location but available to anyone, anywhere in the world,

10  with access to the Internet").  Similarly, NFB cannot claim that individuals with vision

11  impairments use screen readers to shop at Target's retail stores, or that the lack of alt-tags,

12  keyboard-activated links, properly labeled forms, or invisible navigation links somehow preclude

13  anyone from shopping at Target's retail stores, or that these alleged deficiencies make the goods

14  and services offered within Target's retail stores inaccessible.

15       In short, NFB cannot establish the required nexus between the alleged programming

16  deficiencies contained within Target.com's web pages and Target's retail stores:  these alleged

17  deficiencies do not exist within a Target retail store, and do not prevent anyone from shopping in

18  any of Target's retail stores.

19       **2.    NFB Cannot Rely Upon The Eleventh Circuit's Holding In**
            ***Rendon* To Support Its Claims**

20

21       The legal flaw inherent in NFB's claims can best be exposed by evaluating the Eleventh

22  Circuit's holding in *Rendon*.  In that case, individuals competed to become contestants on the

23  "Who Wants To Be A Millionaire" television quiz show by dialing into a toll-free contestant

24  hotline and pressing keys on their telephone keypads to answer a series of automated questions.

25  *Rendon*, 294 F.3d at 1280.  The plaintiffs claimed that use of this selection process violated Title

26  III because individuals with hearing and upper-body-mobility impairments could not use a

27  telephone.  *Id.* at 1280-81.  In evaluating whether the plaintiffs stated a claim under Title III, the

28  Eleventh Circuit found that the plaintiffs had adequately alleged that the contestant hotline

imposed "unnecessary eligibility criteria [that] screened them out or tended to screen them out from accessing a privilege or advantage of Defendants' public accommodation." *Id.* at 1283.

Target Corporation acknowledges that *Rendon* stands for the unremarkable proposition that Title III of the ADA applies to both tangible and intangible barriers. *Id.* at 1284. However, the issue in this case is *not* whether Target.com constitutes a tangible or intangible barrier. Instead, the issue is whether the alleged barrier denies access to a place of public accommodation — that is, to Target's retail stores. In *Rendon*, the Eleventh Circuit found that the contestant hotline violated Title III because it *prevented* disabled contestants from accessing a public accommodation — *the quiz show itself. Id.* ("Plaintiffs in the present case, however, are not suing merely to observe a television show; rather, they seek the privilege of competing in a contest held in a concrete space, a contest they have been screened out of because of their disabilities."); *see Southwest Airlines*, 227 F. Supp. 2d at 1319-20 ("Most significantly, the Eleventh Circuit [in *Rendon*] noted that the plaintiffs stated a claim under Title III because they demonstrated 'a nexus between the challenged service and the premises of the public accommodation,' namely the concrete television studio.").

NFB cannot make the same type of showing here. As noted above, NFB does not claim that the alleged deficiencies in the programming of Target.com made the physical spaces occupied by Target's retail stores inaccessible. Indeed, NFB argues the precise opposite by alleging in its complaint that, "[d]ue to Target.com's inaccessibility, blind Target customers must in turn spend time, energy, and/or money to make their purchases at a Target store." (Am. Compl. ¶ 35.) NFB thus cannot establish the required nexus between the alleged programming deficiencies within the Target.com website and the accessibility of any of Target's bricks and mortar retail stores. *See Southwest Airlines*, 227 F. Supp. at 1320 ("Whereas . . . the game show [in *Rendon*] took place at a physical, public accommodation (a concrete television studio), and that the fast finger telephone selection process used to select contestants tended to screen out disabled individuals*, the Internet' website at issue here is neither a physical, public accommodation itself as defined by the ADA, nor a means to accessing a concrete space such as*

*the specific television studio in Rendon*.") (emphasis added).  NFB's claims, and request for preliminary injunction, must fail accordingly.

### III.    NFB CANNOT DEMONSTRATE AS A MATTER OF FACT THAT TARGET.COM IS A "SERVICE OF" TARGET'S RETAIL STORES

NFB asserts that Target.com must be a "service of" Target's retail stores because the website "is related to and highly integrated with Target's brick-and-mortar stores," and because website visitors can use an on-line store locator to find nearby stores; order merchandise to be picked up at local Target retail stores; use the website's online pharmacy, photo shop, deli and wedding and baby registries; and obtain discount coupons, all of which can be picked up or used in local Target retail stores.  (Mot. at 13-14.)  However, these facts do *not* establish that Target.com is "a service of" Target's retail stores for several reasons.

First and foremost, the accompanying declarations conclusively demonstrate that Target.com is *not* a "service" of Target's retail stores.  Instead, Target.com and Target's retail stores are separate and independent merchandising channels of Target Corporation.  In particular:

- Target.com has its own president and management team who do not make any decisions for Target's retail stores.  (Declaration of Trish Perry ("Perry Decl.") ¶ 5.)

- Target Corporation employs approximately 400 employees who work exclusively for Target.com, and who do *not* provide any services for Target's retail stores.  (*Id.*)

- Target.com has its own human resources department and its own employee incentive plan.  (*Id.*)

- Target.com has its own buyers, who are different than the buyers for Target's retail stores.  (*Id.* ¶ 6.)

- Target.com has its own logistics system (*i.e.,* a system for receiving, storing, packaging, and shipping out merchandise), which is different than the one used by Target's retail stores.  (Declaration of Paul Schutz ("Schutz Decl.") ¶ 3.)

- Target.com and Target's retail stores do not carry identical merchandise.  (Perry Decl. ¶ 6.)

- The decisions regarding what to sell on Target.com are made by Target.com, *not* Target's retail stores.  (*Id.*)

- Although the various Target.com web pages have the same Target look and feel, they are administered and hosted by numerous third parties, including

Amazon.com, and *not* by Target's retail stores.  (Declaration of Gregg Bodnar ("Bodnar Decl.") ¶ 4.)

Second, the facts that Target.com offers services to the public and that Target's retail stores are places of public accommodation do not compel the conclusion that Target.com and Target's retail stores are somehow linked for purposes of Title III.  As noted above, Target's retail stores do *not* have any control over what is and is not placed on Target.com.  NFB's "service" claim thus fails.  *See*, *e.g.*, *Rendon*, 294 F.3d at 1284 n.8 ("to the extent that plaintiff intends to raise a claim of disability discrimination based on the [services] offered, the plaintiff must demonstrate that the [service] was offered to the plaintiff directly by the insurance company and was connected with its offices"); *Stoutenborough*, 59 F.3d at 582-83 ("The discrimination against which the statute is directed is based on the practices or procedures of the public accommodation itself which may deny the handicapped equal access to a service which that accommodation offers.  The televised broadcast of football games is certainly offered through defendants, but not as a service of public accommodation.  It is all of the services which the public accommodation offers, not all services which the lessor of the public accommodation offers which fall within the scope of Title III."); *Weyer*, 198 F.3d at 1114-15 (same); *Parker*, 121 F.3d at 1011-12 (same).

### IV.    EVEN IF NFB COULD ESTABLISH THAT TITLE III OF THE ADA APPLIED TO TARGET.COM, IT CANNOT ESTABLISH THAT THE FACTS "CLEARLY FAVOR" A JUDGMENT IN ITS FAVOR

Even if NFB could establish as a matter of law and fact that Target.com is a "service of" Target's retail stores, NFB has not established that the facts "clearly favor" a finding of liability upon which an injunction may be entered.

#### A.    NFB Fails To Demonstrate That Target.com Is Inaccessible To Blind Persons Using Screen Readers

NFB could only succeed on a Title III claim regarding access to Target.com by demonstrating that the website is, in fact, inaccessible to blind persons using screen readers.  *See* 42 U.S.C. § 12812(a).  NFB has failed to make this basic showing.  First, the declarations submitted by NFB do not establish that blind persons are unable to access Target.com.  While the

1   declarations all include boilerplate language regarding inaccessibility, the testimony of many of

2   these declarants calls into question the proper weight to give these statements.  (*See supra* Stmt.

3   of Facts, pt. I.B.)  Furthermore, the declarations submitted by Target Corporation demonstrate

4   that *blind users can in fact access the goods and services on Target.com*.  (*See supra* Stmt. of

5   Facts, Pt. I.A.)

6        Second, the record — including the testimony of NFB's declarants, NFB's expert, and

7   Target Corporation's expert — establishes that there are numerous reasons why a blind user

8   might have difficulty accessing a website like Target.com *other* than the design of the website.

9   These factors include (1) the user's strategy for accessing particular web pages; (2) the user's

10  experience with computers; (3) the type of computer being used; (4) the user's experience with

11  the screen reader; (5) the Internet browser being used; and (6) the particular screen reader and

12  version being used.  (*See supra* Stmt. of Facts, pt. I.B.)[11]

13       Third, Dr. Thatcher's opinion that Target.com is inaccessible is entitled to no weight,

14  because Dr. Thatcher admitted, among other things, that he did not test whether the website was,

15  in fact, inaccessible by blind people using screen readers.    Instead, Dr. Thatcher concluded that

16  Target.com does not comply with his own "combination" of standards derived from the WCAG

17  and Section 508 standards.  (*See supra* Stmt. of Facts, pt. I.D.)  This is insufficient to state a Title

18  III claim.  Courts hold that failure to comply with accessibility standards is not enough to

19  establish a Title III violation where the disabled person is *in fact* able to access the place of public

20  accommodation.  *See*, *e.g.*, *Wilson v. Pier 1 Imports (US), Inc.*, No. Civ. S-04-633 LKK/CMK

21  2006 U.S. Dist. LEXIS 21216 (E.D. Cal. Apr. 12, 2006) (non-compliance with Title III's

22  construction standards, known as the "ADAAGs," is not enough to establish violation of Title III

23  in absence of evidence that "alleged barrier is … actually hindering equal access by the

24  

25  _____

    [11] The ADA does not require that Target provide blind persons with the proper software or
    training to use the proper software.  "A public accommodation is not required to provide

26  individuals with disabilities with personal or individually prescribed devices, such as wheelchairs,
    prescription eyeglasses, or hearing aids, or to provide services of a personal nature, such as

27  assistance in eating, toileting or dressing."  Title III Technical Assistance Manual, § III-4.2600.
    *See*, *also*, 28 C.F.R. § 36.306; 56 Fed. Reg. at 35,571.

28

1   plaintiff"); *D'Lil v. Stardust Vacation Club*, No. Civ-S-00-1496 DFL-PAN 2001 U.S. Dist.

2   LEXIS 23309, *15 (E.D. Cal. Dec. 20, 2001) ("at trial, [plaintiff] must still prove that Room 138

3   contained actual barriers that hindered her access to the room; she cannot rely solely on the

4   [defendant's] deviation from ADAAG to establish her Title III claim").  Consistent with this

5   authority, Dr. Thatcher concedes that "the final test has to be whether a web page can be used by

6   a person with disabilities."  (Thatcher Decl. ¶ 19.)

7       Finally, it is undisputed that Target.com's goods and services are available to blind

8   persons via Target.com's 1-800 number.  (*See supra* Stmt. of Facts, pt. I.D.)

9   **B.    NFB Has Not Established That Target Violated Section**
          **12182(b)(2)(A)'s "Specific Prohibitions"**
10

11      NFB suggests in a single paragraph in its motion that Target.com also violates several of

12   Title III's "specific prohibitions," which are codified in 42 U.S.C. § 12182(b)(2)(A).  (Mot. at

13   13.)  Little more needs be said of these specific prohibitions, because Title III does not apply to

14   Target.com as a "service of" Target's retail stores, and because  NFB has not established that

15   Target.com is inaccessible.  Nonetheless, following are several additional observations with

16   respect to these specific prohibitions.

17      Communications Barriers.  NFB's first claim, that Target.com violates the

18   communications barrier provisions of 42 U.S.C. § 2182(b)(2)(A)(iv), is entirely misplaced.  This

19   specific prohibition only requires covered public accommodations to remove "architectural

20   barriers, and *communication barriers that are structural in nature*, in existing facilities . . . where

21   such removal is readily achievable."  Subdivision 2182(b)(2)(A)(iv) does not apply here because

22   the term "communication barriers that are structural in nature" refers to "barriers that are an

23   integral part of the *physical structure of a facility*."  56 Fed. Reg. 35544, 35568.

24      Modification of Policies and Procedures.  NFB's next claim, that Target Corporation

25   failed to modify its alleged policy of maintaining an inaccessible website in violation of 42

26   U.S.C. § 12182(b)(2)(A)(ii), fares no better.  NFB has the burden of showing that it requested a

27   reasonable modification to a policy or practice, that the modification was "necessary," and that

28   Target Corporation failed to make that modification.  *See PGA Tour Inc. v. Martin*, 532 U.S. 661,

683 n.38 (2001); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004). NFB

fails to meet this burden because, as explained above, no single set of standards applies to non-

governmental websites, and those standards that do exist are, for the most part, out-of-date and

inconsistent. *See Southwest Airlines*, 227 F. Supp. 2d at 1214-15 & n.1 (noting absence of

generally accepted standards for programming assistive software and websites so as to make them

uniformly compatible). In addition, NFB has not identified with particularity in its motion with

what standards it expects Target to comply.

    Auxiliary Aids and Services. NFB's final claim, that Target Corporation failed to provide

auxiliary aids and services as required by 42 U.S.C. § 12182(b)(2)(A)(iii), deserves a slightly

more detailed discussion. Subdivision 12182(b)(2)(A)(iii) generally requires public

accommodations "to take such steps as may be necessary to ensure that no individual with a

disability is excluded, denied services, segregated or otherwise treated differently than other

individuals *because of the absence of auxiliary aids and services*" unless doing so results in an

undue burden. 42 U.S.C. § 12182(b)(2)(A)(iii). The duty to provide auxiliary aids and services

pursuant to this specific prohibition "is a flexible one. A public accommodation can choose

among various alternatives as long as the result is effective communication." 56 Fed. Reg.

35544, 35566; *see also Dobard v. San Francisco Bay Area Rapid Transit Dist.*, No. C-92-3563-

DLJ 1993 U.S. Dist. LEXIS 13677, *10 (N.D. Cal. Sept. 7, 1993) (public accommodation need

not provide auxiliary aid or service requested by plaintiff).

    NFB cannot establish that Target Corporation violated Title III's auxiliary aid and

services standard merely by asserting that Target.com contains programming deficiencies. This is

because Target.com's allegedly deficient web pages do not exclude blind individuals from

shopping, communicating or obtaining any other service of Target's retail stores. *See* 28 C.F.R. §

36.303(a).

    In addition, Target Corporation provides a 1-800 number to provide assistance to users of

Target.com who experience difficulties in using the website. (Perry Decl. ¶ 7.) Target.com's 1-

800 number constitutes an effective auxiliary aid and service because, among other things it is

staffed 24 hours a day, 7 days a week, 365 days a year by Target.com representatives who can

1    provide whatever assistance the caller requires.  (*Id.* ¶ 7.)  In addition, Target.com representatives

2    can also assist guests to obtain and use other features of the website.  For example, if asked, the 1-

3    800 number representative would run a search on the wedding or baby registry, and assist the

4    guest in purchasing an item listed in the registry, if the item is sold through Target.com.  (*Id.* ¶ 8.)

5    Target.com's 1-800 number also has an automated store locator, which also provides store hours

6    and telephone numbers.  (*Id.* ¶ 9.)  Using these telephone numbers, the guest can call his or her

7    local store to place a refill prescription request with the pharmacy, or to place an order with the

8    service deli for in-store pick up.  (*Id.*)

9    **V.    NFB FAILS TO ESTABLISH A CLEAR LIKELIHOOD OF SUCCESS ON
           ITS STATE LAW CLAIMS**

10

11        As demonstrated in Target Corporation's motion to dismiss, NFB's Unruh Act and

12    Disabled Persons Act claims are barred on several legal grounds.  NFB failed to address two of

13    those grounds in its preliminary injunction motion:  first, that interpreting California's access

14    statutes to apply to the Internet would violate the Commerce Clause of the United States

15    Constitution; and second, that California's access statutes do not require Target Corporation to

16    alter or modify its website.  NFB's failure to address these issues demonstrates that it has not

17    established a clear likelihood of success on either of its state law claims.

18        **A.    Interpreting California's Access Statutes As Applying To The Internet
               Would Violate The Commerce Clause**

19

20        Neither the Unruh Act nor the Disabled Persons Act contains a provision explicitly

21    bringing Internet websites within their reach.[12]  Nor has any California court interpreted either

22    statute as applying to the Internet.  Thus, the issue of whether these statutes can be interpreted as

23    applying to the Internet is one of first impression.  Such an interpretation would amount to a

24    *per se* Commerce Clause violation.

25        ————————————
        [12] The Unruh Act entitles disabled persons "full and equal accommodations, advantages,
26    facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal.
      Civ. Code § 51(b).  The Disabled Persons Act guarantees disabled persons "full and equal access
27    to accommodations, advantages, [and] facilities . . . of all common carriers . . . private schools,
      hotels, lodging places, places of public accommodation, amusement, or resort, and other *places* to
      which the general public is invited . . . ."  Cal. Civ. Code § 54.1(a)(1).
28

1          **1.      If The Unruh Act And Disabled Persons Act Applied To**
2                    **Internet Websites, California Would Be Impermissibly**
                     **Regulating Conduct Occurring Outside Of Its Borders**

3          The Commerce Clause of the United States Constitution reflects the "special concern both

4    with the maintenance of a national economic union unfettered by state-imposed limitations on

5    interstate commerce and with the autonomy of the individual States within their respective

6    spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989). A statute that "directly controls

7    commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the

8    enacting State's authority and is invalid *regardless of whether the statute's extraterritorial reach*

9    *was intended by the legislature*. The critical inquiry is whether the practical effect of the

10   regulation is to control conduct beyond the boundaries of the State." *Id.* (striking state statute that

11   required out-of-state beer shippers to affirm their prices were no higher than prices charged in

12   bordering states) (emphasis added); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)

13   (Commerce Clause precludes state from imposing nationwide policy requiring full disclosure of

14   presale repairs to automobile).

15         "Because the internet does not recognize geographic boundaries, it is difficult, if not

16   impossible, for a state to regulate internet activities without projecting its legislation into other

17   States." *Am. Booksellers Found.* v. *Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (citations and

18   quotations omitted).[13] As the court explained,

19              A person outside Vermont who posts information on a website or
                on an electronic discussion group cannot prevent people in Vermont
20              from accessing the material. If someone in Connecticut posts
                material for the intended benefit of other people in Connecticut, that
21              person must assume that someone from Vermont may also view the
                material. This means that those outside Vermont must comply with
22              [Vermont's laws regulating Internet communications] or risk
                prosecution by Vermont.

23

24

25

26         [13] To borrow an analogy from the Fourth Circuit, "the content of the internet is analogous
     to the content of the night sky. One state simply cannot block a constellation from the view of its
27   own citizens without blocking or affecting the view of the citizens of other states." *Psinet, Inc. v.*
     *Chapman*, 362 F.3d 227, 240 (4th Cir. 2004).

28

1    *Id.*  For this reason, the *American Booksellers* court found that a Vermont statute making it a

2    crime to disseminate to minors over the Internet information that is indecent and harmful

3    constituted a *per se* Commerce Clause violation.  Although the Vermont statute did "not

4    discriminate against interstate commerce on its face," it nonetheless amounted to a *per se*

5    violation because "[i]n practical effect, Vermont had projected its legislation into other States,

6    and directly regulated commerce therein . . . ."  *Id.* at 104.  Numerous other courts have

7    invalidated on Commerce Clause grounds similar state statutes regulating the Internet.  *See, e.g.*,

8    *Psinet, Inc.*, 362 F.3d at 239; *ACLU v. Johnson*, 194 F.3d 1149, 1160 (10th Cir. 1999); *Se.*

9    *Booksellers Ass'n. v. McMaster*, 371 F. Supp. 2d 773, 786 (D.S.C. 2005); *Ctr. for Democracy &*

10   *Tech. v. Pappert*, 337 F. Supp. 2d 606, 610 (E.D. Pa. 2004); *Am. Libraries Ass'n v. Pataki*, 969 F.

11   Supp. 160, 169 (S.D.N.Y. 1997).

12       Similarly, interpreting the Unruh Act and Disabled Persons Act as applying to websites

13   like Target.com would violate the Commerce Clause.  Internet users from all states, not just

14   California, can and do visit Target Corporation's website to view merchandise and make

15   purchases.  (Bodnar Decl. ¶ 4.)  Due to the nature of the Internet, Target Corporation does not

16   have a separate website exclusively for California residents.  (*Id.* ¶ 5.)  Thus, if this Court were to

17   interpret California's access statutes as requiring Target Corporation to alter or modify its website,

18   those statutes would affect transactions between Target Corporation and Internet users throughout

19   the country.  (*Id.*)  Thus, even though the statutes on their face do not discriminate against

20   interstate commerce, interpreting them to apply to the Internet would nonetheless amount to a *per*

21   *se* Commerce Clause violation because, in practical effect, the interpretation will result in

22   California projecting its legislation into other states and directly regulating commerce therein.

23   *Am. Booksellers*, 342 F.3d at 104.

24       As a matter of statutory construction, this Court should not interpret the Unruh Act or the

25   Disabled Persons Act as applying to the Internet.  First, California courts presume that the

26   California legislature did not intend to give its statutes any extraterritorial effect.  *See Diamond*

27   *Multimedia Sys., Inc.* v. *Super. Ct.*, 19 Cal. 4th 1036, 1059-60 (1999).  Second, California courts

28   construe California's access statutes to avoid constitutional difficulties, if possible.  *See Hart v.*

*Cult Awareness Network*, 13 Cal. App. 4th 777, 793 (1993) (California courts should construe

California statutes, including the Unruh Act, "to avoid constitutional infirmity").[14]

### 2. Any Regulation Of The Internet Must Be Instituted At The National Level

The Commerce Clause also "protects against inconsistent legislation arising from the

projection of one state's regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S.

at 337.  A statute "must be evaluated not only by considering the consequences of the statute

itself, but also by considering how the challenged statute may interact with the legitimate

regulatory regimes of other States and what effect would arise if not one, but many or every, State

adopted similar legislation." *Id.* at 336.  Thus, the Commerce Clause bars states from regulating

"those phases of the national commerce which, because of the need of national uniformity,

demand that their regulation, if any, be prescribed by a single authority." *S. Pac. v. Ariz.*, 325

U.S. 761, 767 (1945).

---

[14] As explained in the motion to dismiss, the California legislature did not intend the Unruh Act to apply to the Internet.  First, in 2002, the legislature amended California Government Code Section 11135 — the public sector equivalent of the Unruh Act — to make Section 508's accessibility requirements applicable to websites published by the state and state-funded programs.  The legislature, however, chose *not* to amend the Unruh Act to make Section 508's accessibility requirements applicable to websites published by business establishments.  Second, although Target's California retail stores may properly be considered business establishments covered by the Unruh Act, that does not necessarily mean that Target Corporation's website is also a business establishment.  *See Curran v. Mount Diablo Council of the Boy Scouts*, 17 Cal. 4th 670, 700 (1998) (some of an entity's operations may constitute a "business establishment," while other operations of the same entity may not).  In evaluating whether the business operations at issues constitute a "business establishment," courts consider whether those operations constitute a traditional place of public accommodation that was subject to the California public accommodation statute that preceded the Unruh Act.  *See Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 616-17 (1995); *Curran*, 17 Cal. 4th at 698.  Target Corporation's website could not be considered a place of public accommodation under the prior statute, because it is not a place at all.  *See, e.g., Reno*, 521 U.S. at 851 (websites are "located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet").

The Disabled Persons Act only guarantees individuals with disabilities "full and equal access" to the "accommodations, advantages, facilities . . . and privileges of all common carriers, airplanes . . . private schools, hotels, lodging places, places of public accommodation, amusement, or resort, and other places to which the general public is invited . . . ." Cal. Civ. Code § 54.1(a)(1).  Because the statute lists only physical places as examples of covered facilities, under the doctrine of *noscitur a sociis* (know it from its associates), the Act should only be interpreted as applying to other physical places.  *Weyer*, 198 F.3d at 1114.  Internet websites are *not* physical places.

1    In *Southern Pacific*, the Court struck down an Arizona statute limiting the length of trains

2    within the state to 14 passenger and 70 freight cars. The Arizona law had the effect of forcing

3    interstate railroads to decouple their trains in Texas or New Mexico and reform the trains in

4    California. Thus, the practical impact of the Arizona law was to control the length of trains "all

5    the way from Los Angeles to El Paso." 325 U.S. at 775. In striking the Arizona law as violative

6    of the Commerce Clause, the Court noted:

7    
         With such laws in force in states which are interspersed with those
         having no limit on train lengths, the confusion and difficulty with
8        which interstate operations would be burdened under the varied
         system of state regulation and the unsatisfied need for uniformity in
9        such regulation, if any, are evident.

10   *Id.* at 773-74.

11   Relying on *Southern Pacific* and similar decisions, the court in *Am. Libraries Ass'n v.*

12   *Pataki*, found that New York's statute making it unlawful to disseminate communications harmful

13   to minors over the Internet constituted a *per se* Commerce Clause violation because the Internet,

14   like the railroad, is an area of commerce exclusively reserved for national regulation: "[t]he

15   Internet, like the rail and highway traffic at issue in the cited cases, requires a cohesive national

16   scheme of regulation so that users are reasonably able to determine their obligations. Regulation

17   on a local level, by contrast, will leave users lost in a welter of inconsistent laws, imposed by

18   different states with different priorities." 969 F. Supp. at 182-83.

19   As the *Pataki* court recognized, operators of Internet websites, like Target Corporation, are

20   in a worse position than the train engineer in *Southern Pacific*. The train engineer can steer

21   around Arizona, or reconfigure the train at the state line. Internet operators, however, "cannot

22   foreclose access to [their] work from certain states or send differing versions of [their]

23   communication to different jurisdictions." *Id.* at 183. The users must "thus comply with the

24   regulation imposed by the state with the most stringent standard or forego Internet communication

25   of the message that might or might not subject her to prosecution." *Id.*

26   The same analysis applies here. If California is permitted to regulate the Internet through

27   use of its access laws, then so is every other state. States, however, may have different views as to

28   what constitutes an accessible website, and may promulgate different and conflicting regulations

reflecting those views.  This is not hard to imagine given the numerous different versions of accessibility "standards" currently in existence.  (*See supra* Stmt. of Facts, pt. II.)

Worse yet, each state may take the approach NFB proposes here — to extend the coverage of existing access statutes to websites without specifying exactly what the law requires.  This would saddle the courts with the burden of deciding on a case-by-case basis whether a particular website is accessible, without any accepted standards.  Internet retailers like Target Corporation would be left with the choice of either avoiding the Internet altogether, or accepting the risk that their website, which complies with the laws of one state, may nonetheless expose them to massive liability in another.[15]  Thus, the resulting burdens on interstate commerce are undeniable.  To avoid such a result, regulation of the Internet must come from Congress.

> **B.** **Even If California's Access Statutes Did Apply To The Internet, They Do Not Require Target Corporation To Alter Or Modify Its Website**

> **1.** **The Unruh Act Does Not Require Target Corporation To Alter Or Modify Its Website**

Section (d) of the Unruh Act provides that "[n]othing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law . . . ."  Cal. Civ. Code § 51(d).  NFB provides no explanation as to how this Court could order Target Corporation to alter its website in the face of section (d)'s clear statement that the Unruh Act does *not* require alterations or modifications of covered facilities.

NFB is certainly aware of section (d) because NFB was the source of Assembly Bill 181, which, when passed in 1987, added section (d) to the Unruh Act.  (*See* Sen. Com. On Judiciary Analysis of Assembly Bill 181 (1985-86 Reg. Sess.) as amended May 27, 1987.)[16]  NFB sponsored the 1987 amendment to extend the Unruh Act's coverage to disabled persons.  As NFB explained to the California legislature,

---

[15] Here, for example, NFB seeks statutory damages of $4,000 for each blind Californian. (Am. Compl. ¶ 44.)  The National Eye Institute estimates that more than 356,000 blind and visually impaired individuals over the age of 40 reside in California.

[16] Bostrom Decl., Exhibit L, p. 169.

1

2

3

4

> In 1977, a California judge ruled in MARSH V. EDWARDS THEATRES CIRCUIT, INC. (134 Cal. Rptr. 844) that Sections 51 and 52 of the California Civil Code had no application to discrimination against physically handicapped persons. . . . The MARSH case has set such a precedent that blind and disabled persons are prevented from asserting their right of citizenship in the California Court under the Unruh Civil Rights Act.

5   (Report of Sharon Gold, NFB, in support of AB 181, March 11, 1987.)[17]  NFB's reading of

6   *Marsh* was correct.  *Marsh* rejected the plaintiff's argument that the Unruh Act's general

7   prohibition of arbitrary discrimination applied to discrimination against disabled persons.  *See*

8   *Marsh v. Edwards Theatres Cir., Inc.*, 64 Cal. App. 3d 881, 890 (1976).  *Marsh* went on to hold

9   that Section 54.1 does not require any modifications or alterations to structures, except those

10  required by the building standards and requirements provided in the Government Code and

11  Health and Safety Code.  *Id.* at 891.  Notably, NFB did *not* also seek to overturn that portion of

12  *Marsh's* holding.

13       Business establishments initially opposed NFB's proposal to extend the Unruh Act's

14  coverage to blind and disabled persons.  (*See* Jolinda Thompson, Cal. Rest. Assoc., letter to

15  Assemblyman Elihu Harris, April 25, 1986.)[18]  In an effort to accommodate the opposition, NFB

16  suggested that the legislature add intent language to the bill making it clear that adding the blind

17  and disabled to the Unruh Act's coverage did *not* change existing access standards as reflected in

18  California's building codes.  (*See* Sharon Gold, NFB, memorandum to Assemblyman Elihu

19  Harris, May 1, 1986.)[19]  Section (d) was added to the Unruh Act as a result of NFB's proffered

20  compromise.

21       Now that NFB has attained its goal of adding blind and disabled persons to the Unruh

22  Act's coverage, NFB seeks to ignore the legislative compromise and use the Unruh Act to force

23

24

25

26        [17] Bostrom Decl., Exhibit L, pp. 166-168.

27        [18] Bostrom Decl., Exhibit L, p. 170.

          [19] Bostrom Decl., Exhibit L, p. 172.

28

Target Corporation to alter its website.  The legislature, however, has already spoken through section (d).  The Unruh Act does not require Target to alter or modify its website.[20]

### 2. The Disabled Persons Act Does Not Require Target Corporation to Alter or Modify Its Website

As discussed above, *Marsh* held that the Disabled Persons Act does not require any affirmative conduct at all; it "requires only that the operator [of a place of public accommodation] open its doors on an equal basis to all that can avail themselves of the facilities without violation of other valid laws and regulations."  *Marsh*, 64 Cal. App. 3d at 892.  *Marsh* also made clear that the "other valid laws and regulations" it was referring to are the building regulations set forth in the Government Code and Health and Safety Code.  *Id.* at 892 ("affirmative conduct is required only when directed by those sections dealing with construction of new facilities or with the repair and alteration of existing facilities"); *see also Arnold v. United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 446 (N.D. Cal. 1994) ("The degree of 'full and equal access' to places of public accommodation guaranteed to disabled persons under § 54.1(a) is defined by building code standards that are imposed under California Government Code § 4450.").  NFB has not demonstrated that California's building regulations pertain to Target Corporation's website, or regulate websites in anyway whatsoever.

The California legislature was aware of *Marsh*'s impact on the application of California's access statutes.  The legislature enacted the 1987 amendment to the Unruh Act to overrule *Marsh*'s holding that the Unruh Act does not apply to disabled persons.  The legislature, however, chose *not* to overrule *Marsh*'s holding that the Disabled Persons Act does not require places of public accommodation to take affirmative acts to make covered facilities accessible, except as

---

[20] NFB's Unruh Act claim also fails because NFB has not demonstrated intentional discrimination.  *See Org. for the Advancement of Minorities with Disabilities v. Brick Oven Rest.*, 406 F. Supp. 2d 1120, 1129 (S.D. Cal. 2005) (intentional discrimination must be shown except when an Unruh Act claim can be based on an ADA violation).  NFB's argument that Target Corporation's intent to discriminate can be inferred based on its "refusal" to modify its website (Mot. at 10) must be rejected, because the Unruh Act does not require modifications or alterations to covered facilities.  Furthermore, intent to discriminate will not be inferred from a facially neutral policy solely because that policy happens to have adverse affects on a protected class.  *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 854 (2005).

1   otherwise required by California's building codes.  The legislature also chose not to overrule

2   *Marsh*'s holding when it amended the Disabled Persons Act in 1992 to make a violation of Title

3   III of the ADA an automatic violation of the Disabled Persons Act.  As a result, this Court must

4   presume that the California legislature agreed with *Marsh*'s interpretation of the statute.  *Marina*

5   *Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 734 (1982) ("It is a well-established principle of statutory

6   construction that when the Legislature amends a statute without altering portions of the provision

7   that have previously been judicially construed, the Legislature is presumed to have been aware of

8   and to have acquiesced in the previous judicial construction.").

9       NFB attempts to avoid *Marsh*'s holding by relying on *Hankins* v. *El Torito Restaurants,*

10   *Inc.*, 63 Cal. App. 4th 510 (1998), for the proposition that a discriminatory policy may violate the

11   Disabled Persons Act.  NFB argues that "maintaining Target.com in an inaccessible state

12   constitutes a [discriminatory] policy" under *Hankins*.  (Mot. at 12.)  *Hankins*, however, does not

13   undermine *Marsh*'s holding that the Disabled Persons Act requires no affirmative conduct, except

14   as required by California's building codes.  *Hankins* held only that El Torito's policy of

15   preventing disabled customers from using an accessible employee bathroom in its restaurant

16   violated the Act because the restaurant did not have an accessible bathroom available for

17   customer use.  63 Cal. App. 4th at 522-24.  Thus, the *Hankins* court did not require El Torito to

18   undertake any affirmative conduct, such as NFB seeks here.  The *Hankins* court merely required

19   El Torito to stop blocking disabled persons' access to an accessible bathroom already in

20   existence.  Unlike in *Hankins*, NFB has not shown that Target Corporation has a policy that

21   prevents blind persons from using an otherwise accessible facility.[21]

22   _____

        [21] The Court should also deny NFB's Motion because the Unruh and Disabled Persons
23   Acts' "full and equal" access standards should be interpreted coextensively with the "full and
     equal" access standard of Title III.  As demonstrated in Section IV.B. above, a covered facility
24   satisfies the "full and equal" standard under Title III, and is not required to modify a policy or
     practice, so long as it provides alternative and effective means for the disabled to access its goods
25   and services.  "Full and equal" under California's access statutes should be interpreted
     coextensively with "full and equal" under Title III because (1) The Title III provisions
26   incorporated in both the Unruh Act and the Disabled Persons Act (*see* Cal. Civ. Code §§ 51(f) &
     54.1(d)) are more specific than the general "full and equal" provisions, and the specific provisions
27   should govern the general (*Marsh*, 64 Cal. App. 3d at 885); (2) the ADA provisions of the Unruh
     Act and Disabled Persons Act were added nearly a century after the "full and equal" provisions,
28   and a more recent provisions govern older ones (*Fleming v. Kent*, 129 Cal. App. 3d 887, 891
                                                              (Footnote continues on next page.)

1

2

## VI.    NFB HAS NOT DEMONSTRATED IRREPARABLE HARM OR THAT THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR

3

NFB's contention that it is entitled to a presumption of irreparable injury (Mot. at 17) is

4

incorrect because, as NFB acknowledges, such a presumption would only ensue from a proven

5

violation of one of the access statutes.  *See Silver Sage Partners, LTD. v. City of Desert Hot*

6

*Springs*, 251 F.3d 814, 827 (9th Cir. 2001).  As the foregoing shows, none of the statutes at issue

7

requires Target Corporation to modify its website.  NFB also contends that plaintiffs will

8

"continue to suffer irreparable harm throughout this litigation, absent a preliminary injunction"

9

because they will be unable to access Target.com's goods and services.  (Mot. at 17-18.)  Setting

10

aside the incorrect assumption that Target.com is inaccessible via screen readers, plaintiffs will

11

not suffer irreparable harm because Target.com's goods and services are also accessible via the 1-

12

800 number.  (Perry Decl. ¶¶ 7-9.)  For this same reason, NFB's assertion that the balance of

13

hardships tips in its favor (Mot. at 18) is not true.  Plaintiffs indisputably will have access to

14

Target.com's good and services in the absence of an injunction; on the other hand, if the Court

15

issues a mandatory injunction, it will require Target Corporation to expend resources to modify

16

its website before this case is fully adjudicated on the merits.  Furthermore, the fact that

17

Target.com has existed since 1999 (Perry Decl. ¶ 3) and NFB only commenced negotiations a

18

year ago undercuts any argument that there is now some urgency that supports preliminary relief.

19

## VII.    NFB HAS PROVIDED INSUFFICIENT DETAIL TO SATISFY THE SPECIFICITY REQUIREMENT OF RULE 65(D)

20

21

Federal Rule of Civil Procedure 65(d) requires preliminary injunctions to be "specific in

22

terms" and to "describe in reasonable detail, and not by reference to the complaint or other

23

document, the act or acts sought to be restrained."  Fed. R. Civ. P. 65(d).  This rule is "intended to

24

(Footnote continued from previous page.)

25

(1982)); (3) "[w]here the same term or phrase is used in a similar manner in two related statutes concerning the same subject, the same meaning should be attributed to the term in both statutes

26

unless countervailing indications require otherwise" (*City of Los Angeles v. County of Los Angeles*, 216 Cal. App. 3d 916, 924 (1989)); and (4) this conclusion is suggested by section

27

54.1(a)(3), which states expressly that "full and equal access" in its application to transportation is the same as the ADA standard except where the laws of California prescribe higher standards.

28

1  be of general application so that defendants should *never be left to guess* at what they are

2  forbidden [or compelled] to do."  Fed. R. Civ. P. 65 Adv. Comm. Notes (emphasis added); *see*

3  *also Fortyune*, 364 F.3d at 1086-87 ("those against whom an injunction is issued should receive

4  fair and precisely drawn notice of what the injunction actually" requires).  NFB fails to propose

5  an injunction that satisfies these standards.  NFB asks this Court to order Target Corporation to

6  modify its website so that it will be "readily accessible to and usable by blind people who use

7  screen access software," but NFB fails to identify any standard that would tell Target Corporation

8  what specifically it would need to do to make the site "readily accessible" and "usable."  The

9  record demonstrates that (a) there are many sources of web accessibility guidelines, (b) the

10  guidelines are not consistent, (c) the two sets of guidelines that NFB's expert draws from — the

11  WCAG and Section 508 — are inconsistent, outdated, and under revision, and (d) a website that

12  is designed in compliance with any set of guidelines is not necessarily accessible to blind users.

13  (*See supra* Stmt. of Facts pt. II.)  Furthermore, the experts are in agreement that accessibility

14  guidelines as a general matter leave a great deal of discretion to the website designer.  (Thatcher

15  Depo. at 37:10-38:5, 84:16-85:19; Letourneau Decl. ¶¶ 11-12.)[22]

16          As a substitute for complying with Rule 65(d), NFB requests that the Court order an on-

17  going meet and confer process in which Target Corporation will confer with NFB whenever it

18  encounters a website design issue and the parties will bring all disputes to the Court.  There is no

19  authority that such a court-monitored meet and confer process can displace the requirements of

20  Rule 65(d).  Furthermore, given the complexity of website design, particularly on large retail

21  websites such as Target.com, NFB's proposal would likely impose upon the Court undue

22  administrative burdens and expenses.

23

24  [22] Because it fails to provide any guidelines, NFB essentially requests an "obey the law" injunction.  Such injunctions do not satisfy the specificity requirements of Rule 65(d).  *See*

25  *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531-32 (11th Cir. 1996) (vacating "obey the law" injunction ordering that "[d]efendant shall not discharge stormwater . . . *if such discharge would*

26  *be in violation of the Clean Water Act*" because the injunction failed to "specifically identify the acts that [the defendant] was required to do or refrain from doing"); *United States v. Dinwiddie*,

27  76 F.3d 913, 928 (8th Cir. 1996) (injunction ordering appellant not to violate statute violated Rule 65(d) "by calling on [appellant] to guess at what kind of conduct is permissible").

28

1

**VIII.   IF THE INJUNCTION IS GRANTED, THE COURT SHOULD REQUIRE A BOND THAT COVERS TARGET CORPORATION'S COMPLIANCE COSTS**

2

3          NFB's request that the Court waive the bond requirement of Rule 65(c) or require only a

4    nominal bond (Mot. at 20) is baseless.  The bond requirement is mandatory, *Hoechst Diafoil*

5    *Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999), and although some courts have

6    waived it, they do so only where there is no realistic likelihood of harm to the defendant or where

7    the moving party shows an overwhelming likelihood of success.  *Jorgensen v. Cassiday*, 320 F.3d

8    906, 919 (9th Cir. 2003); *Colin ex rel. Colin v. Orange Unified Sch. Dist.,* 83 F. Supp. 2d 1135,

9    1151 (C.D. Cal. 2000).  NFB comes no where near demonstrating an overwhelming likelihood of

10   success, but more importantly, NFB seeks a mandatory injunction that would require Target

11   Corporation to expend resources to modify its website before NFB's claims are adjudicated on

12   the merits.  There could not be a more appropriate case than this one for requiring NFB to post a

13   bond in the amount of Target Corporation's costs to comply with a mandatory injunction.

14   *Nintendo of Am. v. Lewis Galoob Toys*, 16 F.3d 1032, 1037 (9th Cir. 1994) (bond requirement

15   "assures district court judges that defendants will receive compensation for their damages in cases

16   where it is later determined a party was wrongfully enjoined.")  Those costs cannot be determined

17   on the present record, which as noted above, does not include the standards that Target

18   Corporation would have to follow in the requested injunction.  Accordingly, if preliminary relief

19   is granted, Target Corporation requests permission to submit a cost estimate before the Court sets

20   the bond amount.

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CONCLUSION**

For the foregoing reasons, the Court should deny NFB's motion for preliminary injunction.

Dated:  June 12, 2006                ROBERT A. NAEVE
                                                   DAVID F. MCDOWELL
                                                   STUART C. PLUNKETT
                                                   SARVENAZ BAHAR
                                                   MICHAEL J. BOSTROM
                                                   MORRISON & FOERSTER LLP


                                        By:    /s/ Robert A. Naeve
                                                   Robert A. Naeve

                                                   Attorneys for Defendant
                                                   TARGET CORPORATION