# EXHIBIT I

Dockets.Justia.com

Page 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4       - - - - - - - - - - - - - - -

5    NATIONAL FEDERATION OF THE    )    Case No.

6    BLIND, et al.,                )    C 06-01802 MHP

7              Plaintiffs,         )

8    v.                            )

9    TARGET CORPORATION,           )

10             Defendant.          )

11      - - - - - - - - - - - - - - -

12

13              DEPOSITION OF DR. JAMES THATCHER

14                   FRIDAY, JUNE 2, 2006

15

16

17

18

19

20

21

22         BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23

24

25

EXHIBIT I PAGE 73

Page 27

1  worked on developing, those guidelines in IBM.

2       Q.   Did that include development of guidelines

3  for Internet pages?

4       A.   Yes.

5       Q.   How did you develop guidelines for

6  development of accessible Internet pages?

7       A.   Because I knew how screen readers worked and

8  I knew what -- what the requirements were for screen

9  readers, both at software and at Internet.  It was a

10 matter of -- first of all, there -- I'm sorry.  I'm

11 sorry.

12       There were a number of existing attempts at

13 guidelines and standards and in various countries and

14 various parts of this country.  And taking those

15 together with my knowledge of screen readers, we, I

16 think, simplified and -- and clarified guidelines for

17 both software and web and hardware.

18       Those guidelines have been public since about

19 1997.  And I think they probably have been changed

20 every six months.  They have evolved with changing

21 technology and with changing standards in the

22 community.

23       MR. PLUNKETT:  Can you read the last couple

24 of words back.

25       (Record read as follows:

EXHIBIT ___I___ PAGE __74__

Page 34

1    Q.    And who determines the standard for

2    accessibility in your consulting practice?

3    A.    Sometimes the client comes in with a specific

4    set of -- of provisions or checkpoints that they want

5    to be judged against.  And that is the case with

6    Priceline through the Attorney General of New York

7    where there are a list of some 20 items that are

8    brought or extracted, both from the Web Content

9    Accessibility Guidelines and from Section 508 Standards

10   on the web.

11         When I consult with a client, like Clayton

12   College, which is a small college in the Midwest, I

13   kind of take a combination of what I see as important

14   in -- in the Priority 1 and 2 Guidelines from -- from

15   the Web Content Accessibility Guidelines and Section

16   508.  And I look at that website from that perspective.

17   Q.    That's what you do in cases where the client

18   doesn't come in with a set of criteria for you to use

19   as the standard?

20   A.    That's correct.

21   Q.    Okay.  How do you determine which standards

22   from the WCAG are important?

23   A.    To begin with, they are -- they're listed in

24   three groups.  The -- with a priority level on each.

25         Priority 1 is supposedly those things that

Page 35

1    are essential.  These must be done in order for the

2    site to be used by people with disabilities.  Priority

3    2, these ought to be done.  There will be some people

4    who will find it very difficult to use the website if

5    you don't do these.  And the third group is this would

6    be helpful if you did these.  So those are the

7    priorities that were assigned by the Web Content

8    Accessibility Guidelines Working Group.

9              However, they don't -- one thing, those

10   were -- they came out in 1999.  So technology has

11   changed.  A second thing is there are some Priority

12   1 -- there's at least one Priority 1 guideline that is

13   in -- impossible for me to evaluate, "Use clear and

14   concise language."  I don't know how to say whether a

15   website uses clear and concise language so I don't

16   include that in my evaluation.

17        Q.   So you attempt to follow the three

18   priorities, but there's some exceptions to that?

19        A.   That's correct.

20        Q.   And one of the -- one of the items you need

21   to be sensitive to is the fact that the WCAG came out

22   in 1999, and technology has changed since then.  In

23   what ways does that require you to deviate from the

24   WCAG standards?

25        A.   I'll give you an example.  A Priority 2

Page 36

1   requirement on forms is to have default text in input

2   fields.  So, you know, if input fields where you're

3   supposed to type in your first name, you might have the

4   text "name" there.  And there actually is a Priority 2

5   checkpoint that says you should do that.

6           And the reason that was done is because the

7   second generation of screen readers didn't know there

8   was a form element there.  And so by putting text in

9   there, that second generation could find the form

10  element.  But that's just not an issue anymore.  So you

11  don't -- you don't worry about that checkpoint anymore.

12      Q.   Can you think of any other examples where

13  changes in technology require a deviation from the WCAG

14  standards?

15      A.   A very important one, which is not the same,

16  it's a combination of the fact that there was something

17  better in 508 dealing with navigation on pages.  And --

18  and the Web Content Accessibility Guidelines didn't get

19  it right.  And so there are -- there are a good --

20  there are good techniques for making pages -- making

21  navigation of pages better and ...

22      Q.   Any other examples?

23      A.   Not that I can think of right now.

24      Q.   You said there's at least one WCAG standard

25  in Priority 1 that you don't use because you don't

EXHIBIT __I__ PAGE __77__

Page 37

1  understand it.  I believe you mentioned that it was the

2  directive to use clear and concise language; is that

3  right?

4      A.    That is -- the way you said it right then

5  isn't quite right.  I said I don't know how to test it.

6  It isn't that I don't understand the idea of using

7  clear and concise language; although, it may seem that

8  way.  I -- I don't know how to test for clear and

9  concise language.

10      Q.    Because it's subjective?

11      A.    Yes.

12      Q.    Are there other WCAG standards -- withdraw.

13          Are there other WCAG standards that you don't

14  know how to test because they -- their compliance with

15  them is subjective?

16      A.    The way you phrase that, I don't want to

17  answer it that way.  Could you rephrase it?

18      Q.    Let me try.

19          Are there other WCAG standards that require a

20  subjective element in terms of the web page designer's

21  activity?

22      A.    That's a very good question, and the answer

23  is almost all of them.  The -- the -- there's a -- the

24  most important requirement on -- no, I can't say that.

25  Retract.

Page 38

1          One of the most important elements, the first

2     in every guideline of web accessibility, is to include

3     text equivalence.  It's a subjective thing as to

4     whether or not it's a good text equivalent.  People

5     argue about that.

6          Q.   So one could use a text equivalent, and that

7     would comply with the WCAG guideline, but it may not

8     make the site accessible if the text element they

9     choose is not a good one?

10         A.   That's right.

11              MR. PARADIS:  Do you want some more coffee?

12              THE WITNESS:  Yes.

13    BY MR. PLUNKETT:

14         Q.   I believe you said that when a client comes

15    to you for consulting on website accessibility, you use

16    a combination of standards.  Did that combination

17    include standards outside of the WCAG standards?

18         A.   Yes, it did.

19         Q.   What other standards would you incorporate?

20         A.   The Section 508 Standards for web

21    accessibility.

22         Q.   Any other sources of standards that you

23    incorporate in your consulting work?

24         A.   No, there are no other sources.

25         Q.   And are there -- do you -- withdraw.

EXHIBIT __I__ PAGE __79__

Page 39

1        Do you incorporate all of the Section 508

2   Standards?

3        A.   I think the answer to that -- the answer to

4   that question is yes, I incorporate all of the Section

5   508 Standards.

6        Q.   What year did the Section 508 Standards come

7   out?

8        A.   The -- the advisory committee which was

9   formed by the Access Board was in 1999, I believe.

10  Then the access -- of which I was the vice chair,

11  probably largely because of my work with the IBM

12  guidelines that preceded that.

13       And then we completed that work in 1999.  I

14  think it was the Access Board brought out its version

15  about a year later in 2000, and then they became

16  official in 2001, in June of 2001.

17       Q.   And obviously technology has changed since

18  2001, right?

19       A.   Yes.

20       Q.   Has that made any of the Section 508

21  Standards obsolete or difficult to apply in your

22  consulting business?

23       A.   I think that you're giving too much -- the

24  change in technology is evolutionary, not

25  revolutionary.  So things move.  And so the changes in

EXHIBIT __I__ PAGE __80__

Page 40

1    the guidelines are -- kind of also move cautiously and

2    slowly.  It's -- with the technology, it's possible

3    to -- we can interpret the Section 508 Standards in the

4    light of the new technology and reach reasonable

5    conclusions.  So -- reasonable conclusions so we don't

6    have to throw them out.

7           They are actually -- it's not just a new

8    technology; it's also our understanding, our

9    experience.  So in five years or six years, we have a

10   lot more experience in this area.  And so we can do a

11   better job of writing down the standards and

12   guidelines.

13          So Section 508 itself has been -- it's been

14   announced that they're going to redraw the Section 508

15   Standards.  A new advisory committee is being formed

16   right now to do that.

17      Q.   So you -- withdraw.

18          Are you able to identify any Section 508

19   Standards that you have difficulty applying in your

20   consultancy practice?

21      A.   No.

22      Q.   Do you know why the Section 508 Standards are

23   going to be redrawn?

24      A.   Because we've learned more because the

25   technology has changed.

Page 43

1      Q.    What is the purpose of considering a

2   clarification to the alt-text rule?

3      A.    What is the purpose of clarifying the rule,

4   to make it clearer.

5      Q.    Is it because it's difficult to apply as it

6   is today?

7      A.    I don't think it's difficult to apply.   I

8   think the problem is that we want -- we want web

9   developers to use accessibility standards and

10  guidelines to guide their work in developing accessible

11  products because they're not going to understand how

12  people with disabilities use their products.

13         Probably many web developers have never seen

14  a blind person use a screen reader on their website.

15  So we use those guidelines and standards to help them

16  do that job.  And the clearer those standards and

17  guidelines are to that end, the better job is going to

18  be done.

19     Q.    Do you know whether the WCAG standards that

20  were drafted in 1999 are undergoing any revisions?

21     A.    Yes, I do.

22     Q.    Is there a version --

23     A.    They are.

24     Q.    -- Version 2.0 of them?

25     A.    There's a Version 2.0 of the Web Content

EXHIBIT _I_ PAGE _82_

Page 44

1    Accessibility Guidelines.

2        Q.    Are you familiar with Version 2.0?

3        A.    I am familiar with Version 2.0.

4        Q.    Did you have any involvement in drafting

5    Version 2.0?

6        A.    Again, my involvement is indirect.    There's

7    a -- there's a Web Content Accessibility Guidelines

8    Working Group which has a mailing list which I have

9    watched since its inception.    And I sometimes -- I'm

10   not a member of the Working Group, but I sometimes

11   comment on that list on things that are going on.

12       Q.    Do you have an opinion regarding whether

13   Version 2.0 is an improvement over Version 1.0?

14       A.    I do have an opinion, and it's definitely an

15   improvement for the reasons I just indicated.    In fact,

16   the example I gave was from 2.0.    The example of text

17   equivalence I gave a moment ago was from 2.0.    It is --

18   when I was phrasing that, it's the kind of thing that

19   will happen with Section 508 revisions, clarification.

20       Q.    Do you know the purpose of the revisions to

21   the WCAG?

22       A.    Yeah, they're threefold.

23             The first one is to have guidelines that are

24   technology independent.    The hope is to have -- the

25   fact that Version 1 of the guidelines is very HTML

Page 45

1   specific, and they want to have guidelines that are

2   more general.  The second is to make certain that each

3   of the, let me call them, checkpoints be testable which

4   would throw out the example I used earlier in this

5   deposition about clear and lucid language or whatever

6   the correct phrasing is of that.

7           Let's see, testable.  I've forgotten what the

8   third is.

9       Q.   Do you know the timeline for the WCAG Version

10  2.0 to be finalized?

11      A.   Yes.  The timeline for the WCAG 2.0 -- that's

12  how WCAG is, W-C-A-G -- 2.0 has gone into what's called

13  last call, which is the last chance to provide comments

14  on the draft of the guidelines.  After that, the Web

15  Content Accessibility Guidelines Working Group will

16  seek and test websites that meet the various levels of

17  Web Content Accessibility Guidelines for two months,

18  approximately.

19          And if all of that is successful, then

20  sometime in September or October they will be -- maybe

21  the end of the year they'll be finalized.  It's a

22  process that has been going on for four years.

23      Q.   We talked earlier about the combination of

24  guidelines and standards that you use to provide a

25  consultancy service to someone regarding website

EXHIBIT __I__ PAGE __84__

Page 46

1    accessibility.  Do you know if there's a consensus in

2    the web design community regarding what the proper

3    combination is of standards and guidelines for judging

4    a website's accessibility?

5        A.    The Web Content Accessibility Guidelines

6    Working Group is a consensus-based organization.  So

7    the answer to that question is with Web Content

8    Accessibility Guidelines, both Version 1 and 2, those

9    are consensus documents.

10       Q.    But you use a combination of those guidelines

11   and Section 508, right?

12       A.    That's true.

13       Q.    Is there a consensus -- withdraw.

14             Is it your opinion that there is a consensus

15   about the proper combination of guidelines to use in

16   determining whether a website is accessible?

17             MR. PARADIS:  Are we talking about now, is

18   there a consensus now?  Is that your question?

19             MR. PLUNKETT:  Yes.

20             THE WITNESS:  Web Content Accessibility

21   Guidelines Version 2 is that consensus.  And I believe

22   that those -- those guidelines very accurately reflect

23   that combination that I use on a daily basis.

24             My combination is intuitive, but the effort

25   that's been going on for five years has been -- four or

Page 47

1    five years has really been to kind of nail that down.

2    BY MR. PLUNKETT:

3        Q.    Have you served as an expert in other

4    litigation matters?

5        A.    I don't know if that's the role that I play

6    with the Priceline situation, certainly not in this

7    sense of the meeting today.  Actually, the phrase

8    that -- I guess I'm the auditor, is the role in

9    Priceline.

10       Q.    What do you do as the auditor?

11       A.    They -- the -- Priceline agreed to first of

12   all bring their site into compliance with a set of --

13   of checkpoints.  And they were given a certain length

14   of time to do that.  And it was my role to come in and

15   see that they did do it and then to check that every

16   year for -- I think it's four years.  I think I'm in

17   the third year of that beginning this summer.

18       Q.    And in the Priceline matter, you were given a

19   specific set of guidelines to judge their progress?

20       A.    Yes.  Yes, it -- yes.  If you look at -- both

21   Priceline and Ramada have a specific set of checkpoints

22   that -- that are a combination, again, of Web Content

23   Accessibility Guidelines and Section 508.  And they're

24   a little bit different.  They negotiated with the

25   attorney general on which of those checkpoints to

EXHIBIT __I__ PAGE __86__

Page 71

1    navigation and activation.

2        Q.    You stated a moment ago that you concluded

3    that before that button could be activated by a

4    keyboard and it could only be activated by a mouse that

5    it was impossible to activate using a screen reader.

6    Is that correct, that if an element can only be

7    activated with a mouse it's impossible to activate it

8    with a screen reader?

9        A.    In your question just now, you made a

10   statement about what I had said and then asked a

11   question.  Could you separate the two and let me deal

12   with one then the other?

13       Q.    Yes.

14             Is it correct that it is impossible to

15   activate an element on a screen with a screen reader if

16   that element requires a mouse click?

17       A.    No, that's not true.

18       Q.    I know --

19       A.    It may be possible to activate an element

20   that requires a mouse click because JAWS can simulate a

21   mouse click.  All screen readers can -- can in effect

22   perform mouse clicks on the current point of focus.

23       Q.    Will the ability of a screen reader to

24   perform a mouse click depend on the particular version

25   of the screen reader that the user is using?

Page 79

1    mandatory and guidelines are just that.  I'm wondering

2    if that's true in your business.

3        A.    I think I've just answered that question in

4    saying it's an organizational -- it's an organizational

5    distinction.  The -- the federal government uses the

6    word standards, and the W3C uses the word guidelines.

7    And the content -- the importance of the content,

8    relevance of the content is -- is -- those words don't

9    make any difference.

10        Q.    We've talked about the WCAG standards,

11    Version 1.0 and Version 2.0, and we've also talked

12    about the Section 508 Standards and the IBM standards.

13    Are there other sources of standards for website

14    accessibility that you're aware of?

15        A.    First of all, you used the word standards and

16    guidelines -- words standards and guidelines in that

17    question.  And let's assume they all mean the same

18    thing.  They're sets of checkpoints about how to do

19    accessibility.

20            And organizations tend to want to have their

21    own stamp on -- on the checkpoints, and I think that's

22    what IBM did.  They wanted to have their versions which

23    tend to include implementations, for example.

24    They're -- they're minor variations.  There are other

25    organizations like the JIS, which is the Japanese

EXHIBIT __Ｉ__ PAGE __88__

Page 80

1    Industry Standards, are -- are writing web

2    accessibility standards which are basically variations

3    of Web Content Accessibility Guidelines.   I think that

4    the European community has generally adopted the Web

5    Content Accessibility Guidelines, generally.

6        Q.   Do you know whether Microsoft has standards?

7        A.   I don't think that Microsoft has a list of

8    web accessibility guidelines, again, answering the

9    question about guidelines and not about standards.   I

10   think they all -- they do have a set of software

11   guidelines because -- because they basically want to

12   communicate how software developers should work against

13   their -- their software tools, namely, accessibility

14   which is an important part of software accessibility.

15       Q.   Because of your earlier answer, I will use

16   the words standards and guidelines interchangeably.   If

17   at any point that becomes a problem, please let me

18   know.   Is that okay?

19       A.   That's okay.

20       Q.   Do you know if states have guidelines for

21   website accessibility?

22       A.    Yes, states have guidelines for web

23   accessibility.   For example, the state of Texas

24   recently passed a law that -- House Bill 2819 -- which

25   requires that -- that the Department of Information

EXHIBIT ___I___ PAGE __87__

Page 81

1   Resources of the state use the Section 508 Standards as

2   their model for accessibility of information

3   technology.

4           I don't know about the details of any other

5   states.  I know California has a law on accessible --

6   accessibility, electronic and information

7   accessibility.  But I don't know the details of it at

8   all.

9       Q.   Do you know if there are states who have

10  adopted web accessibility guidelines that differ from

11  Section 508?

12      A.   I don't know the answer to that question.

13  If -- if they -- if they do adopt -- if -- if they

14  don't adopt exactly 508 or exactly Web Content

15  Accessibility Guidelines, they may reword them a little

16  bit.  But they'll be essentially the same.

17      Q.   Have you -- do you know that?

18      A.   No.

19      Q.   Is it your opinion that there is a consensus

20  regarding the standards for website accessibility?

21      A.   I think you already asked that question, but

22  I'll answer it again.

23           Yes, I think there is a consensus, and I

24  think the W3C's Web Content Accessibility Guidelines

25  Version 2 is a manifestation of that consensus.

EXHIBIT __I__ PAGE _90_

Page 82

1      Q.    Are there any other manifestations of that

2   consensus?

3      A.    Well, I think another manifestation of that

4   consensus is the work that I do and people like me do

5   in -- in evaluating and -- and suggesting

6   accessibility.  We've been doing it long enough that --

7   that we understand the way things should be done.  And

8   so the written version, as I said, we've gone five

9   years on Version 1 of the guidelines, and now we're

10  going to have a new one that will help us clarify that,

11  that work.

12     Q.    Is Version 2.0 currently being used by those

13  who evaluate website accessibility?

14     A.    I think a fair answer is no because it --

15  it's not official yet.  But implicitly yes because the

16  example that I used, which I think is a good one,

17  rather than just say provide a text equivalent, we

18  separate out the kinds of text equivalent because we

19  know for an active image we want the equivalent to be

20  what the function of the image is for information,

21  varying the images.  We want the -- the alt-text or

22  text equivalent to convey that information.

23          We do that.  We understand that web

24  developers understand that.  That's now being put into

25  the standard rather than just -- or guideline rather

EXHIBIT __I__ PAGE __91__

Page 83

1    than just say, "Provide text equivalent."  So it's an

2    elaboration and clarification which I think is

3    understood.

4        Q.    When you say "we do that," who are you

5    referring too?

6        A.    I'm referring to people who do web

7    development, people who do web accessibility, people

8    who teach web accessibility.

9        Q.    How many total people are you talking about?

10       A.    Um, I have really no idea what that number

11   is.  Um, if you take as an example an organization I

12   work with in Austin called Knowbility, which is spelled

13   with a K, K-N-O-W-B-I-L-I-T-Y, dot-com, they produce in

14   various cities but in Austin every year an event called

15   Accessibility Internet Rally where we train web

16   developers, usually about 100 of them, in web

17   accessibility.

18            And we solicit non-profits who need websites

19   and train them on how to describe what they need in the

20   website.  And then we team up the non-profits with the

21   web development groups who have been trained in

22   accessibility.  Then in a one-day rally, they build

23   accessible websites for their non-profits and are

24   judged -- those websites are judged by a set of judges

25   in Austin, including myself, and there are probably 25

EXHIBIT __I__ PAGE __92__

Page 84

1  of us in Austin that serve as judges.  And then we

2  celebrate the victors of that great event.

3      But the reason I say that is every year we're

4  training in Austin -- in Austin we're training in

5  developers and web accessibility.  We have trainings

6  all over the country like that in web accessibility

7  just from this organization called Knowbility.

8      So I think the number is in the thousands or

9  tens of thousands.

10     Q.   You testified earlier that in evaluating a

11  website's accessibility you use a combination of

12  guidelines and standards.  Do you know whether all of

13  these people you're talking about use the same

14  combination?

15     A.   Yes, I'm sure they do.

16     Q.   How do you know that?

17     A.   I'm sorry.  I was being sarcastic.

18      I don't know.  I don't know that they use the

19  same combination.  I want to -- the -- the concept of

20  accessibility is something that -- that is so easily

21  defined as really kind of a mistake.

22      Let me give a comparison.  We can have -- you

23  can talk about having correct code, valid code on your

24  website.  And the question of whether or not you have

25  valid code on your website is something that is

EXHIBIT __I__ PAGE __93__

Page 85

1    absolutely determinable.  Whether it's important or not

2    is a separate issue.

3            We can go to the W3C and check Target.com for

4    valid HTML code, and the answer would be yes or no.

5    But accessibility, which has guidelines or standards,

6    is more like usability.  You don't have a set of

7    absolute rules on how to make a website usable.  And

8    I'm sure that anybody at Target.com will talk about the

9    things they do to make their website usable, and they

10   probably have arguments about that.  Accessibility is

11   more similar to that.  The exact way to do it is -- is

12   subject to debate.

13           The overall requirements are not subject to

14   detail.  They're very, very direct and very simple.

15   And the ones I've talked about in my report and in my

16   declaration are only four subjects -- navigation,

17   alt-text, form labeling, and the infamous button.  And

18   those -- those are -- everybody agrees on that.

19   There's no debate about those four subjects.

20           MR. PLUNKETT:  Can we take a short break?

21           (Recess taken.)

22           MR. PARADIS:  Dr. Thatcher would like to

23   clarify two items.

24           THE WITNESS:  The first one is I may have

25   implied or that I thought that some one of the -- one

EXHIBIT __I__ PAGE __94__

Page 86

1    of the witnesses had actually been able to complete a

2    purchase, because in fact one of the reasons I may have

3    said that is I have a note somewhere about "complete a

4    purchase."

5           But the thing is that it wasn't the purchase

6    where -- the purchase was completed on Amazon.com; it

7    was not on Target.com.  And so I don't know if anyone

8    has ever been able to complete a purchase, a blind

9    user.

10          The second clarification deals with the test

11   that we did yesterday.  And given all the discussion

12   of -- of the button, what Mr. Paradis and Mr. Busrawi

13   wanted to find out is if it's possible for us to

14   activate that infamous button.  And in fact we found a

15   way to do that.

16   BY MR. PLUNKETT:

17       Q.   And that way is the way you have already --

18       A.   Yes.

19       Q.   -- described?

20       A.   That's correct.

21          (Defense Exhibit No. 11 was marked for

22          identification.)

23   BY MR. PLUNKETT:

24       Q.   I've had the court reporter mark as

25   Exhibit 11 a document from JimThatcher.com called "Side

EXHIBIT __I__ PAGE __95__

Page 87

1    by Side WCAG vs. Section 508."

2              Do you recognize this document?

3         A.    Yes, I do.

4         Q.    Tell me what it is generally.

5         A.    Generally, it is a side-by-side comparison of

6    the Priority 1 Web Content Accessibility Guidelines

7    with the Section 508 Web Accessibility Standards.

8         Q.    Did you create this document?

9         A.    I did.

10        Q.    Is that your web address at the bottom of the

11   page?

12        A.    It is.

13        Q.    If you turn to Page 4, a table begins on

14   Page 4 that appears to compare the WCAG guidelines with

15   the Section 508 Standards.  Is that a correct

16   description --

17        A.    That's correct.

18        Q.    -- of the table?

19        A.    That's correct.  It lists each of the 16 -- I

20   think it's 16 Web Content Accessibility Guidelines'

21   checkpoints and then talks about how they relate to

22   Section 508.

23        Q.    In the column marked "Comparison," there are

24   some places, for example, on Page 6 where the

25   Comparison states "the same."

EXHIBIT __I__ PAGE __96__

1     A.   Yes.

2     Q.   What does that indicate?

3     A.   It means that in my interpretive -- my

4 impression of the two is that they're having the same

5 effect, the same requirement.

6     Q.   And on the same page you'll see Comparison

7 that reads "not in 508."

8     A.   Yes.

9     Q.   What does that indicate?

10    A.   That the requirement, in this case for

11 auditory descriptions, checkpoint 1.3, it's -- there's

12 no corresponding item, in my opinion, that's in Section

13 508.

14    Q.   And in some of these Comparison boxes, there

15 is an indication that says "similar."

16    A.   Yes.

17    Q.   What does similar mean?

18    A.   Well, if you -- the Section 508 Standards

19 were actually drawn from the draft of the Web Content

20 Accessibility Guidelines, but they were converted into

21 what I understand is more regulatory language.  So lots

22 of the explanetary information is excluded and -- and

23 "shall" has replaced -- "such and such shall be done"

24 replaces an instruction, "provide text equivalent."

25 Instead, it's worded that "text equivalent shall be

EXHIBIT ___I___ PAGE___97

1    provided."  That's regulatory language, I guess.

2         Q.    And where the Comparison box indicates that

3    WCAG is "more restrictive," what does that mean?

4         A.    Can you refer --

5         Q.    Page 8.

6         A.    The reason this isn't just a simple table but

7    after each item there's a discussion is to try to

8    elaborate those similar and the same -- I don't

9    elaborate the same but similar and more restrictive.  I

10   try to elaborate in the discussion below.

11        Q.    Start --

12        A.    So -- okay.

13        Q.    Starting on Page 11, a table begins that

14   compares Section 508 to WCAG.  And immediately

15   preceding that table there's a statement that "if a

16   website is WCAG A-Compliant and its author wants to be

17   Section 508 compliant as well, there are five standards

18   he must address additionally."

19              Is that an indication that there are five

20   Section 508 Standards that are not included in WCAG?

21        A.    No, that isn't the implication.

22        Q.    Can you explain that?

23        A.    Yes, I can.

24              The A-Compliance is compliance with only the

25   Priority 1 Web Content Accessibility Guidelines

EXHIBIT __I__ PAGE __98__

Page 90

1    provision -- checkpoints.  There are also, as I

2    mentioned earlier, Priority 2 and Priority 3.

3              This comparison is a comparison of just the

4    Priority 1 of Web Content Accessibility Guidelines and

5    508.  But when I start talking about 508, I have to --

6    and answer the question "how does Web Content

7    Accessibility Guidelines compare," I have to go into

8    other priority levels to bring out that comparison.

9         Q.    What was the purpose in making this chart?

10        A.    It's a question that many people ask:

11   What's -- what's the -- what's different about Section

12   508 from Web Content Accessibility Guidelines,

13   especially with the Priority 1 Web Content

14   Accessibility Guidelines compared with Section 508?

15   It's a common question.

16        Q.    Why is that a common question?

17        A.    Because those are the two mainstays of --

18   have been the two mainstays of accessibility

19   requirements for the past five years.  I'm not sure

20   when I wrote this, but it was quite a while ago.  I

21   actually did this as a -- at the request of the ATAP,

22   which is the Association for Tech Act Projects.  And

23   they sponsored this.  They asked me to do it.

24        Q.    And it's a common question because the WCAG

25   and Section 508 are different in some respects, right?

EXHIBIT I  PAGE 99

Page 91

1      A.     There's -- yes.  They're different in

2   wording.  They're different in organization.  They're

3   different in intention.  One is intended to be a part

4   of the law, and the other is intended to be a statement

5   about what is accessibility.

6      Q.     But there are also some guidelines in one

7   that are not in the other?

8      A.     There are also some substantive differences,

9   yes.  I think the best example of that is the case for

10  in-page navigation which I don't think is represented

11  very well in Section -- with Web Content Accessibility

12  Guidelines.  And I think it's a crucial issue.  It's a

13  crucial issue on Target, and it is represented in

14  Section 508.

15           (Defense Exhibit No. 12 was marked for

16           identification.)

17  BY MR. PLUNKETT:

18     Q.     I asked the court reporter to mark as

19  Exhibit 12 another group of pages from your website

20  titled "Side by Side 508 and WCAG 2.0."

21           Do you recognize this document?

22     A.     Yes, I recognize that document.

23     Q.     Did you create this document?

24     A.     Yes, I created that document.

25     Q.     Is that your web address at the bottom of the

EXHIBIT  I    PAGE  100

Page 96

1    nothing.  And it's long.

2            So as I mentioned earlier in my testimony, on

3    the home page, 89 percent of the characters in that

4    page are these symbols that are -- that the screen

5    reader is giving as the only information it can find

6    about the link.  So they -- the fact that they don't

7    have text equivalence is really disastrous.  If there

8    were several pictures that just were -- were decorative

9    and they didn't have alt-text, the screen reader isn't

10   going to replace -- isn't going to mention them.  It's

11   going to ignore them.  So that would be much less of a

12   problem than these are.

13   BY MR. PLUNKETT:

14       Q.   If on Target.com a user is able to access the

15   various shopping departments through links on the home

16   page, why is it disastrous that other elements of the

17   home page may not have alt-text?

18       A.   Because as I just indicated, that -- that --

19   the effect of those images not having alt-text is --

20   is, as you can read in the depositions of several of

21   the -- of the class members, it's frustrating and

22   confusing and annoying.  There are other examples of

23   inaccessible content on Target.com which don't even

24   appear.

25           I don't think they appear either in my report

EXHIBIT __I__ PAGE __101__

Page 97

1   or declaration, namely, the JavaScript menus that drop

2   down from each of the main links.  Those are totally

3   inaccessible to a person using the keyboard or screen

4   reader.  And I didn't raise those as issues because if

5   you go to them -- the page for toys, you will find

6   links to those various departments that appear in the

7   drop-down menu.

8          So the redundancy there is fine, and I'm not

9   going to complain about the lack of keyboard access to

10  those.  But the alt-text on those images has a negative

11  effect on the experience of anyone trying to use the

12  site as is indicated by several of the depositions.

13      Q.   And the negative effect is it's frustrating,

14  confusing and annoying for the user?

15      A.   That's correct, yes.  And we don't know --

16  they don't know if what they're missing is important

17  for their navigation.  They don't know if they can get

18  to those things.

19          And, by the way, they probably can't because

20  specials will be included in a highlighted imagemap,

21  and they're not going to know about those specials.

22      Q.   Is a website that's frustrating, confusing

23  and annoying inaccessible in your view?

24      A.   I can't -- I don't know how to answer in that

25  generality.  It's probably confusing, annoying and

EXHIBIT ___I___ PAGE ___l02___

Page 100

1           THE WITNESS:  I applied a combination of

2    Section 508 and the Web Content Accessibility

3    Guidelines to look at the con- -- the code of

4    Target.com to find whether there were -- whether

5    alt-text had -- whether images had text equivalence,

6    whether forms were labeled, whether navigation was

7    possible, in-page navigation was possible, and whether

8    you could use the site with a keyboard.

9    BY MR. PLUNKETT:

10       Q.   Is it correct, then, that you looked for

11   violations of the four guidelines we just talked about

12   to determine if Target.com was accessible or not?

13       A.   That's true.

14       Q.   Can a website violate one of those four

15   guidelines yet still be accessible?

16           MR. PARADIS:  Objection; incomplete

17   hypothetical.

18           THE WITNESS:  Yes, a website can violate one

19   of those four and be accessible.

20   BY MR. PLUNKETT:

21       Q.   If a website does violate one of those

22   standards, what guidelines do you apply to determine

23   whether the website is nonetheless accessible?

24           MR. PARADIS:  Objection; incomplete

25   hypothetical.

EXHIBIT ___I___ PAGE ___103___

1          THE WITNESS:  I don't have a standard to

2    apply to a website that doesn't -- what I judge

3    websites on is basically compliance.  And if a website

4    is missing alt-text on unimportant images, I say you've

5    got to fix that.  But in fact, the alt-text on those

6    unimportant images is not important for access by

7    screen readers.

8    BY MR. PLUNKETT:

9         Q.   Did you form an opinion about whether

10   Target.com is compliant with the standards and

11   guidelines that you applied?

12        A.   Yes, I did.

13        Q.   And what was your opinion?

14        A.   It is not.

15        Q.   Did you form an opinion about whether or not

16   Target.com is accessible to blind users?

17        A.   Yes, I did.

18        Q.   What is your opinion?

19        A.   It's not.

20        Q.   What is your opinion that it is not

21   accessible based on?

22        A.   Well, based first on -- on my looking at

23   approximately 15 pages and analyzing them specifically

24   in -- I looked at four categories.  One is whether or

25   not the images had text equivalence, whether or not

EXHIBIT __I__ PAGE __104__

Page 104

1    a product, for example?

2              MR. PARADIS:  We're talking about a blind

3    user with screen reader software?

4              MR. PLUNKETT:  Yes.  Thank you.

5              THE WITNESS:  Is it possible for a blind user

6    to not be inundated with the missing -- not be bothered

7    by the missing alt-text on all those imagemaps and just

8    instead go to the search field and search for a

9    product, yes, that's possible.

10   BY MR. PLUNKETT:

11        Q.   Is it possible for a blind user to skip past

12   those annoying elements at the beginning of the home

13   page and go to the department links?

14        A.   Actually, the annoying elements are at the

15   bottom.  So if -- if you -- if you want to go to the

16   search button or you want to go to the main department

17   links, you don't have to hear those imagemap links.

18             I just -- I'm amused of thinking of -- of

19   avoiding those -- those links; whereas, I'm sure that

20   the developers or the designers of the Target.com site

21   do everything in their power that they can think to do

22   to get people to look at exactly those things that

23   you're asking me is it possible for a blind user to

24   avoid.  I mean, those are the things they want -- the

25   specials they want to sell.

EXHIBIT __I__ PAGE __105__

1   accessibility, the way I define it is applying certain

2   standards and guidelines.

3        If -- if you -- if you want to ask the

4   question is it possible for someone to complete a task

5   on a site that lacks alt-text, absolutely.  And I've

6   given examples where images are really not important

7   and they aren't compliant if they don't have alt-text

8   but they don't bother anybody if they don't.  However,

9   if you have important images that lack alt-text, you

10  often won't be getting -- not getting information that

11  you need.  So there's a gradation in terms of number

12  one.

13       Q.   You stated earlier that you formed the

14  opinion that Target.com was both noncompliant and

15  inaccessible.  Are those two opinions based on

16  different sets of evaluations that you conducted?

17       A.   No, those are the same.

18       Q.   So in your opinion, Target.com is

19  inaccessible because it's noncompliant?

20       A.   In my opinion, Target.com is inaccessible in

21  the items that I've talked about in both my declaration

22  and report, namely, lack of image -- lack of alt-text

23  on important images -- on images, lack of labeling of

24  forms, lack of navigation on a page and keyboard

25  access.

EXHIBIT __I__ PAGE __106__

1      Q.   And in those respects, Target.com is

2   inaccessible in your opinion because it's not in

3   compliance with the standards and guidelines; is that

4   right?

5           MR. PARADIS:   Objection; asked and answered,

6   vague and ambiguous.

7           THE WITNESS:   Ask again, please.

8           MR. PLUNKETT:   Can you read it back.

9           (Record read as follows:

10          "QUESTION:   And in those respects, Target.com

11          is inaccessible in your opinion because it's

12          not in compliance with the standards and

13          guidelines; is that right?")

14          THE WITNESS:   Yes, that's right.

15  BY MR. PLUNKETT:

16     Q.   In order to determine whether a website with

17  images that lack text equivalence is inaccessible in

18  addition to being noncompliant, would you need to make

19  a determination of how important that particular image

20  is to the ability of the user to access the goods and

21  services of that site?

22          MR. PARADIS:   Objection; incomplete

23  hypothetical.

24          THE WITNESS:   I -- as I have already stated,

25  when I do website evaluation, there are -- there are

EXHIBIT __I__ PAGE __107__

1    certain conditions that -- that are -- are so clear

2    and -- and so simple that I don't make any exception to

3    images being unimportant or images being very

4    important.  Every image needs a text equivalent.

5           It's easier to just take compliance -- a

6    better example which you haven't raised, we haven't

7    talked about at all is forms because forms, most of the

8    time, work correctly.  But most of the time, it's not

9    good enough.  So I insist that forms always be labeled,

10   in effect, they be client -- be compliant to be sure

11   that -- that the website or that the page will be

12   usable by a person who is blind.

13   BY MR. PLUNKETT:

14        Q.   In your review of the images on Target.com

15   which lack text equivalence, did you evaluate whether

16   or not the inaccessibility of that particular image

17   would have an impact on the user's ability to access

18   the goods and services of Target.com?

19        A.   That -- that was not my -- my purpose in

20   writing -- in -- in the evaluation that I wrote down.

21   For example, when I go to a page, the first thing I

22   look at is how many images that are active are missing

23   alt-text.  If 29 out of 40 images are missing alt-text,

24   active images are missing alt-text, that's very

25   serious.  I don't look at where they are and -- and how

EXHIBIT ___I___ PAGE ___108___

Page 109

1    important they are.

2        Q.   Is it fair to say, then, in evaluating this

3    component of Target.com you did a quantitative analysis

4    not a qualitative analysis?

5        A.   Actually, yes, that's fair to say except

6    the -- the qualitative analysis is that in the case of

7    Target.com, the lack of alt-text made the experience

8    particularly difficult.  In other words, the

9    qualitative thing came in in the strange number of

10   words and letters and characters that many of the

11   witnesses have testified to.

12       Q.   Skipping to your fourth criteria which is

13   keyboard access, are there standards or guidelines for

14   keyboard access in Section 508 or the WCAG Version 1.0?

15   I did not see them cited in your declaration.

16       A.   Is it okay if I check the report?

17       Q.   Sure.  Of course.

18            MR. PARADIS:  Can I take a break, then?

19            MR. PLUNKETT:  Sure.  Go off the record.

20            (Recess taken.)

21            MR. PARADIS:  Stuart, I may have five -- I

22   may want five minutes at the end.

23            MR. PLUNKETT:  Just tell me when I have to

24   stop.  I mean, I'm going to be not asking a whole bunch

25   of stuff I wanted to ask, but that's the agreement we

EXHIBIT___I___ PAGE__109

Page 110

1   made.

2           MR. PARADIS:  Sure.

3           MR. PLUNKETT:  So I'm going to -- I know I'm

4   skipping around.  Are we on the record?

5           MR. PARADIS:  There was a question pending.

6   Can you reread the last question?

7           (Record read as follows:

8           "QUESTION:  Skipping to your fourth criteria

9           which is keyboard access, are there standards

10          or guidelines for keyboard access in Section

11          508 or the WCAG Version 1.0?  I did not see

12          them cited in your declaration.")

13          THE WITNESS:  In my report on Page 21 of

14  Exhibit 9, there's a table of the various kinds of

15  problems that I looked at.  And the last one is,

16  "Interaction with each page (shopping in particular)

17  must be possible without a mouse."  And it refers to

18  508 Provision 1194.22(n) and Web Content Accessibility

19  Guidelines Checkpoint 9.2.

20  BY MR. PLUNKETT:

21      Q.   On that table where it has "n/a," what does

22  that indicate?  I see three places where there's an

23  n/a.

24      A.   Meaning that there aren't corresponding

25  standards for those particular items.

EXHIBIT __I__ PAGE __110__

Page 112

1    can use, is the guidelines and standards.  That's what

2    the companies need to use.  But if for some one reason

3    still a blind person can't use it, we have to look into

4    why.

5        Q.   Do you agree that blind users' experiences on

6    a website will vary based on different factors?

7             MR. PARADIS:   Objection; vague and ambiguous.

8             THE WITNESS:   Definitely true.

9    BY MR. PLUNKETT:

10       Q.   What are some of those factors, in your

11   opinion?

12       A.   Some of those factors are whether -- whether

13   the web page has text equivalence for its images,

14   whether it has forms labeled, whether you're able to

15   navigate conveniently, whether you can use the keyboard

16   and you get everything that's on the page.

17       Q.   Are there factors other than the design of

18   the web page that will impact the blind user's

19   experience?

20       A.   There was a -- there have been some studies

21   of the way blind users access the web, and there are

22   really different strategies for -- that have been

23   learned by those users over the years.  So they -- they

24   attack a web page in different ways.

25             Some tend to use links list to start off

EXHIBIT __I__ PAGE __111__

Page 113

1    which, in the case of the home page of Target.com, is a

2    bad place to start off because you get those very long

3    links composed of numbers and letters.  Others will

4    want to just tab through the page to discover its

5    structure.  Others will listen to the whole page.

6              So there are different strategies, and some

7    of them would work better than others in -- in -- in

8    especially addressing a page that is very poorly

9    designed through the guidelines and standards.

10        Q.    So the blind user's strategy for accessing a

11   web page will have an effect on his or her experience

12   on the web page?

13        A.    I think that's true.

14        Q.    What about the blind user's experience with

15   computers generally?

16        A.    That would come into play.

17        Q.    What about the particular type of computer

18   that the blind user is using?

19        A.    I'm thinking more with the blind user is

20   using a computer that -- a very old computer, then,

21   yes, that would definitely impact that experience.

22        Q.    What about the blind user's experience with a

23   particular screen reader that he or she is using?

24        A.    Sure, that's going to affect it.

25        Q.    What about the type of operating system that

EXHIBIT __I__ PAGE __112__

Page 114

1    the blind user is employing?

2         A.    I've been assuming all the way we're using

3    Windows and Internet Explorer in this discussion.

4         Q.    But if a user were accessing -- withdraw.

5               If a user were employing a different

6    operating system?

7         A.    There -- since there are -- we're talking

8    about blind users, I believe so, since there are not

9    good screen readers in other operating systems, which

10   operating system is being used is very important.

11        Q.    What about which web browser is being used?

12        A.    On my machine there are about four --

13   Netscape, Opera, Internet Explorer, Home Page Reader.

14   There's another one, Firefox.  None of them compare

15   favorably for a screen reader to use to Internet

16   Explorer.  All of them are inferior to Internet

17   Explorer for a screen reader user.

18        Q.    Will the blind user's experience on a

19   particular website depend on the particular screen

20   reader that he's using, including the version of that

21   screen reader?

22        A.    Yes, to some extent.  Less so since the two

23   major screen readers in this country are Internet --

24   Internet Explorer -- are JAWS and Window-Eyes.  I think

25   that the experience for JAWS and Window-Eyes user is

EXHIBIT ___I___ PAGE ___113___

1    very similar and so that covers the vast majority of

2    blind users.

3        Q.    What about the version of JAWS or Window-Eyes

4    that the user is employing?

5        A.    We've already discussed that some -- sorry.

6    We've discussed that to some extent.  There have

7    been -- I'm sure the developers don't see it as minor

8    changes, but there have been minor changes in the

9    recent four or five releases.

10            There was a major change that I mentioned

11    earlier with the advent of the single letter keys for

12    navigating the structures of documents.  So I think

13    that -- that the experience could be quite different if

14    you were in a version before that major change and

15    relatively unimportant in our conversation since then.

16        Q.    Do you agree that more recent versions of

17    screen readers have made websites more accessible even

18    though a particular website may not have been

19    redesigned for accessibility?

20        A.    I don't believe that recent versions of

21    screen readers make websites more or less accessible.

22        Q.    And by "recent versions," are you talking

23    about the last couple of years?

24        A.    I don't think -- I don't think that versions

25    of -- of screen readers make websites accessible

EXHIBIT __I__ PAGE __14__

Page 116

1   whether a couple years or five years.  I think what

2   makes them accessible is whether or not they have the

3   right kind of code in a web page, whether the images

4   have text equivalence and the forms are labeled, so on.

5        Q.   You don't agree that a particular website

6   will be more accessible to a blind user if he has a

7   screen reader that was designed yesterday as opposed to

8   one that was designed seven years ago?

9        A.   That was a double negative, I think.  And I'm

10  not sure how to answer it.  Would you rephrase?

11       Q.   Right.  Yes.

12            Is it your opinion that the type of screen

13  reader somebody is using has no effect on the

14  accessibility of a website?

15       A.   It has -- the type -- the version of screen

16  reader the user -- the blind user is using has a

17  definite effect, especially when you're talking about a

18  big gap, has a definite effect on the experience of

19  that user.  I don't think it has any effect on the

20  accessibility of the web page.

21       Q.   Why?

22       A.   Because the accessibility of the web page is

23  whether or not it has certain characteristics that

24  we've gone over several times.

25       Q.   Because the accessibility of a web page is

EXHIBIT __I__ PAGE __115__

Page 123

1  question is:  Well, maybe the text could be -- the

2  current situation is pay.  It might include that fact

3  that you've already gone through blah, blah, blah in

4  the current situation to pay.  All of those would be

5  adequate, but it's not clear which one is best.

6  Different designers will do different ways and all of

7  them will be acceptable.

8      Q.   Is it correct that, as with the Proceed to

9  Checkout button, the progress bar is compliant because

10  it has alt-text -- it just has alt-text that, in your

11  opinion, does not assist the user?

12      A.   No, that isn't quite accurate here because

13  the requirement of both standards and guidelines is

14  that the text equivalent be provided.  And I think

15  there's no sense in which that image has a text

16  equivalent, which is Target.com.

17      Q.   In your opinion, would the inability of a

18  blind user to see this progress bar affect his ability

19  to complete a purchase on Target.com?

20      A.   In a marginally so, yes (sic).  Knowing where

21  you are is helpful.  That's the purpose of the progress

22  bar.  The reason the developers put it there is to help

23  the sighted user know what stage they are.  So, yes, I

24  think it's a reasonable part.

25      Q.   Did you evaluate whether there are other ways

EXHIBIT __I__ PAGE __116__

Page 124

1    for the user to know where they are in the checkout

2    phase?

3        A.    No.    And I -- and that's -- that's --

4    that's -- that's been a subject of other questions like

5    the problem with all the links on the front page, the

6    home page.    The fact that there are alternative

7    techniques that you might be able to find doesn't

8    forgive the process of doing it right in these other

9    cases.

10       Q.    You mentioned the example of the investor

11   page?

12       A.    Yeah.

13       Q.    And you state that the links on the left that

14   the -- the links on the top of the investor page are

15   not accessible.

16            MR. PARADIS:    Where are you referring to?

17            MR. PLUNKETT:    Page 4 of the report.

18            THE WITNESS:    Page 18 of the --

19            MR. PLUNKETT:    Of the document.

20            MR. PARADIS:    Okay.    I'm there.

21   BY MR. PLUNKETT:

22       Q.    You mention on this page that the navigation

23   menu down the left side of the investor page does have

24   the alt-text; whereas, the links across the top do not;

25   is that right?

EXHIBIT __I__ PAGE __117__

Page 128

1          And I think -- and I -- and the people who do

2     guidelines and standards think usually is not good

3     enough for forms.  One has to be certain that the

4     information that you're typing in is the information

5     that's required for that object or the thing you're

6     agreeing to with a check box is exactly what it is

7     you're agreeing to.  The question you're answering with

8     a radio button is unequivocally that question that

9     you're hearing on the screen reader.  And the way you

10    do that is by following the standards and guidelines to

11    label the forms.

12          It is the fact that many websites today

13    are -- have very few alt-text errors but very few

14    websites have complete form labeling.  And the reason

15    is it usually works.  And I say usually is not good

16    enough.

17    Q.    Did you evaluate whether the forms on

18    Target.com could be filled out by a blind user despite

19    this labeling issue?

20    A.    I did not do each one and make sure they

21    spoke correctly.

22    Q.    Did you evaluate whether or not a user of

23    JAWS could complete the forms on Target.com by

24    switching back and forth between forms mode and normal

25    mode?

EXHIBIT ___I___ PAGE ___118___

Page 129

1       A.    I did not evaluate that.

2       Q.    The next issue you identify are techniques

3   for navigation.  And the first thing you mention are

4   the inability to skip static navigation links on

5   Target.com.  Is that -- am I identifying that issue

6   correctly?

7       A.    I don't remember using the word "static."

8       Q.    Let's take a look at paragraph 47 and 48.  I

9   would just ask you to review those and describe to me

10  what the navigation issue is that you're identifying.

11      A.    As I begin that paragraph, I say that the

12  navigation issue is more subtle.  And the reason it's

13  more subtle is that, as sighted users and developers,

14  evaluators, we don't think of navigating a page because

15  we do it automatically.  And the web designer does it

16  automatically by bringing our focus using large print

17  or a large picture.  Automatically we know how to find

18  things on a page.

19          When a keyboard user or a screen reader user

20  comes to a page, there are real issues on how you

21  navigate it:  Do you list all the links and try to find

22  something that way, do you use the JAWS "find" command,

23  do you try to tab through everything on the page.

24          And these techniques are often very

25  burdensome and discouraging and confusing.  I've

EXHIBIT __I__ PAGE __119__

1   question.

2              MR. PLUNKETT:   Yes.

3   BY MR. PLUNKETT:

4       Q.   Is it your opinion that a blind user of

5   Target.com cannot access the website's goods and

6   services because of these navigation links at the top

7   of the page that don't have coding that allow them to

8   be skipped easily?

9       A.   No, it's not my opinion that blind users

10  cannot access the page.

11      Q.   It's your opinion that it's more difficult?

12      A.   Yes, it is my opinion that it's much more

13  difficult to not have some way to facilitate in-page

14  navigation, much more difficult.

15      Q.   Isn't it true that the user's ability to skip

16  past these links will depend on the type of screen

17  reader that's being employed?

18      A.   You asked a number of questions back a while

19  about the version and level of competence of the screen

20  reader user.  This is a good example of that because

21  all -- excuse me -- Window-Eyes and JAWS both have skip

22  commands, skip to the next non-link text, skip to the

23  next non-link text that's longer than 42 characters and

24  things like that.

25              The problem with these is that they're not

EXHIBIT __I__ PAGE__120__

1    Provision (p), as in Peter, with the Section 508

2    Standards.

3           When -- when the text gets -- when the page

4    gets really big and full, then finding something is

5    more difficult to the point of perhaps being

6    impossible, leading to be discouraged or not being able

7    to complete the task.

8           Q.   It's true, though, that there are functions

9    on the screen readers that allow the user to navigate

10   pages that do not have marked up headings, correct,

11   such as search functions?

12          A.   Yes.  A good example of that would be using

13   the built in search functions in either Windows-Eyes or

14   JAWS.  For example, if you talked about trying to find

15   the Continue Checkout button, you could say, well,

16   don't -- don't try to tab through.  Just search for

17   "Continue Checkout."  Of course if you did that, they

18   wouldn't find it because Continue Checkout is not the

19   alt-text on the button; "Proceed to Checkout" is.

20          Q.   So you would search for the word "checkout"?

21          A.   That's a good idea.

22          MR. PLUNKETT:  Pardon me while I check my

23   notes.

24   BY MR. PLUNKETT:

25          Q.   If you could turn to Page 13 of that

EXHIBIT I PAGE 121

1   document, which is the end of paragraph 60 of your

2   declaration.

3       A.    Yes.

4       Q.    It reads, "As of April 12, 2006, the website

5   of the Target Corporation is virtually unusable by a

6   visitor who is blind."

7             Is that your opinion today, as of today?

8       A.    Yes, that's my opinion as of today.

9       Q.    Let me restate that question.

10            As of today, is it your opinion that the

11  website of the Target Corporation is virtually unusable

12  by a visitor who is blind?

13      A.    Yes.

14      Q.    Does that mean that a blind person, in your

15  opinion, cannot make a purchase on Target.com?

16            MR. PARADIS:   Objection; incomplete

17  hypothetical.

18            THE WITNESS:   Um, no.  I think it is -- it is

19  actually possible for a blind person to make a purchase

20  on Target.com.  I -- I am as close to certain as I can

21  be that no blind person has ever made a purchase on

22  IBM -- excuse me -- on Target.com.

23            MR. PLUNKETT:   Can you read the last sentence

24  of that answer.

25            (Record read as follows:

EXHIBIT __I__ PAGE __122__

CERTIFICATE OF REPORTER

I hereby certify that the witness in the foregoing deposition, DR. JAMES THATCHER, was by me duly sworn to testify to the truth, the whole truth and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of June, 2006.

CHRISTINE  L.  JORDAN,  CSR  #12262

STATE OF CALIFORNIA

141

EXHIBIT ___I___ PAGE___123___