1  ROBERT A. NAEVE (CA SBN 106095)
   RNaeve@mofo.com
2  MORRISON & FOERSTER LLP
   19900 MacArthur Blvd.
3  Irvine, California  92612-2445
   Telephone: (949) 251-7500
4  Facsimile: (949) 251-0900

5  DAVID F. MCDOWELL (CA SBN 125806)
   SARVENAZ BAHAR (CA SBN 171556)
6  MICHAEL J. BOSTROM (CA SBN 211778)
   DMcDowell@mofo.com
7  SBahar@mofo.com
   MBostrom@mofo.com
8  MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
9  Los Angeles, California  90013-1024
   Telephone: (213) 892-5200
10 Facsimile: (213) 892-5454

11 STUART C. PLUNKETT (CA SBN 187971)
   SPlunkett@mofo.com
12 MORRISON & FOERSTER LLP
   425 Market Street
13 San Francisco, CA 94105-2482
   Telephone: (415) 268-7000
14 Facsimile: (415) 268-7522

15 Attorneys for Defendant
   TARGET CORPORATION
16

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19

20 NATIONAL FEDERATION OF THE BLIND,          Case No.    C06-01802 MHP
   the NATIONAL FEDERATION OF THE
21 BLIND OF CALIFORNIA, on behalf of their    **DECLARATION OF CHARLES
   members, and Bruce F. Sexton, on behalf of  LETOURNEAU IN SUPPORT OF
22 himself and all others similarly situated,  TARGET CORPORATION'S
                                                OPPOSITION TO PLAINTIFFS'
23              Plaintiffs,                      MOTION FOR PRELIMINARY
                                                INJUNCTION**
24         v.
                                               Date:    July 24, 2006
25 TARGET CORPORATION,                         Time:    2:00 p.m.
                                               Judge:   The Honorable Marilyn Hall Patel
26              Defendant.

27

28

   DECLARATION OF CHARLES LETOURNEAU
   CASE NO. 06-01802 MHP
   la-863207

1

## DECLARATION OF CHARLES LETOURNEAU

2      I, Charles (Chuck) Letourneau, have personal knowledge of the facts set forth below,

3  and if called as a witness, I could and would testify under oath to the following:

4

### Background

5      1.     For the past ten years, I have been the president of and principal consultant for

6  Starling Access Services, a company that specializes in accessible Web site design, site

7  evaluations, and training.

8      2.     From its establishment, I have been involved in the World Wide Web

9  Consortium's (W3C) Web Accessibility Initiative.  From 1997 to 1999, I co-chaired the

10  Initiative's Web Content Accessibility Guidelines Working Group.  I also served as the W3C's

11  alternate representative to the Section 508 Advisory Committee[1], a committee that was

12  organized pursuant to a congressional directive to recommend accessibility standards for the

13  purchase, development, and maintenance of electronic and information technology, which

14  includes web content (the "Section 508 Standards").

15      3.     I also spent two years leading a Website accessibility testing service for the

16  Canadian Treasury Board Secretariat, and six years working for the Canadian federal

17  government training employees with disabilities on how to use assistive technology in

18  conjunction with standard office software.

19      4.     Further details of my 11 years of experience with Web accessibility, 16 years of

20  experience working with individuals with disabilities in connection with the use of assistive

21  technology, and my combined 24 years of experience with computers and technology, are

22  provided in my curriculum vitae, which is attached hereto as Exhibit A.

23

### Accessing The Web Using Screen Readers

24      5.     The blind community most commonly accesses Internet webpages using screen

25  readers.  A screen reader is a software product that audibly reads the content of a computer

26 _____

27    [1] The advisory committee's full name was The Electronic and Information Technology
Access Advisory Committee ("EITAAC").

28

1   screen using a speech synthesizer.  Most screen readers are also capable of interpreting the

2   underlying code and structure of webpages, although some are better at it than others.

3       6.      There are various screen reader programs used by the blind community.  These

4   include Freedom Scientific's JAWS program, GWMicro's WindowEyes program, Dolphin's

5   Hal Screen Reader, Choice Technology's LookOUT program, ALVA Access Group, Inc.'s

6   Outspoken program, Apple's VoiceOver, and The Speakup Project, a free Linux based

7   program.  The most commonly used screen readers for the Windows Operating System are

8   JAWS and WindowEyes.

9       7.      Like most technology, screen readers have evolved rapidly over the past five

10  years.  For example, the current version of JAWS, which is 7.0,[2] is noticeably superior to

11  JAWS 4.01, which came on the market in late 2001, early 2002.  To illustrate:

12      •   JAWS 7.0 also allows for improved access to non-HTML content, such as

13          content provided in Adobe PDF format, content displayed in scripts, and

14          content displayed using flash technology.

15      •   JAWS 7.0 is much better at navigating a complex table of information, such as

16          a table that lists the prices and functionality of various laptop computers sold on

17          a retailer's webpage.

18      •   JAWS 7.0 also generally allows for easier navigation of websites.

19      Successive version of screen readers, including the successive versions of JAWS, have

20  continually allowed users greater access to websites.  I am informed that Plaintiffs have

21  offered the declaration of one computer user who relies on JAWS 4.51 to access websites.

22  I believe that user would have an easier time accessing and navigating websites using the

23  current version of JAWS.

24

25

26

27      [2] There is also a Beta version of JAWS, which is version 7.1, that is available for
        download on the Internet.  Version 7.1, however, is not yet available in stores.

28

1

**Guidelines on Accessibility**

2      8.      Web designers have a variety of accessibility guidelines to choose from when

3  creating new websites, or modifying existing websites to make them more accessible.[3]  These

4  include the Section 508 Standards, the Web Content Accessibility Guidelines ("WCAG")

5  written by the W3C, Microsoft's Accessibility Design Guidelines For the Web, IBM's Web

6  Accessibility Guidelines, Canada's Common Look and Feel Policy, the United Kingdom's

7  Guidelines for Government Websites, Australia's Guide to Minimum Website Standards

8  Accessibility, the State of Illinois' Accessibility Guidelines, and the State of Connecticut's

9  Accessibility Guidelines.  Many other countries and states have also published accessibility

10 guidelines.

11     9.      Strict adherence to any given set of guidelines, however, will not necessarily

12 render a website useable by a blind person.  Web designers will often pull from more than one

13 set of guidelines, and draw from their own experience when designing new sites or modifying

14 existing sites to make them more accessible.

15     10.     In North America, web designers often rely on the WCAG and the Section 508

16 Standards. These two sets of guidelines, however, are different from each other in a number of

17 respects. As I understand Plaintiffs' expert, Dr. Thatcher, acknowledged at his deposition,

18 WCAG and the Section 508 Standards are different in wording, different in organization,

19 different in intention, and contain substantive differences.  To cite a couple of examples:

20          •      WCAG and The Section 508 Standards have different rules for dynamic

21                 scripting content.[4]  The Section 508 Standards provide that the scripting

22                 function must be accessible.  WCAG provides that the information

23                 conveyed through the scripting function must be made accessible even

24                 when the user turns off the browser's script reading function.  There are

25

26          [3] Of course, if a client requests that a web designer use a specific set of guidelines when
creating a new site or modifying an existing cite, the web designer will do so.

27          [4] Dynamic scripting content includes such things as menus that pop up when the mouse
passes over an image on the screen.

28

1    occasions where any user might turn off a browser's scripting ability.
2    Some blind computer users might find scripted functions distracting or
3    difficult to use.  Users who turn off their browser's scripting function
4    should be able to access the scripted information in a WCAG compliant
5    website, but would not necessarily be able to access the same
6    information in a Section 508 compliant site.

7    •    WCAG provides that web designers should "mark up documents with
8    the proper structural elements."  In essence, this means the web designer
9    should use appropriate headings and other content mark up to assist the
10    user in navigating the various information contained in the site.  The
11    Section 508 Standards do not contain this requirement.

12    •    The Section 508 Standards require websites to notify users if a web
13    session is to be timed out, and to allow the user sufficient time to
14    complete the Web transaction (*i.e.*, a stock order, money transfer, or
15    merchandise purchase).  This is an important requirement because, even
16    with the most accessible websites, it may take blind users longer than
17    sighted users to complete a Web transaction.  WCAG, however, does
18    not include this requirement.

19    11.    Even when a web designer relies upon accessibility guidelines, he or she must
20    nonetheless exercise a great deal of discretion.  Indeed, a designer must exercise discretion in
21    organizing the content layout, choosing the most desirable headings, and implementing the
22    appropriate content mark ups.

23    12.    The exercise of discretion is also required because the WCAG guidelines,
24    written between 1997 and 1999, and the Section 508 Standards, written between 1998 and
25    2000, do not reflect recent technological changes in how websites are programmed.  The W3C
26    is in the process of revising WCAG, and The Section 508 Standards are slated for review this
27    coming September.

28

**Accessibility Depends On More Than Website Design**

13.    In my experience, a blind person's ability to access any given website depends on more than just the website's design.  It will depend on a host of additional factors including the screen reader used, the browser used, the user's technical abilities, the user's familiarity with the Internet in general (and his or her screen reader and browser in particular), and how much time the user is willing to spend exploring the cite.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12th day of June 2006, at Ottawa, Ontario, Canada.

Charles Letourneau