1  ROBERT A. NAEVE (CA SBN 106095)
   RNaeve@mofo.com
2  MORRISON & FOERSTER LLP
   19900 MacArthur Blvd.
3  Irvine, California 92612-2445
   Telephone: (949) 251-7500
4  Facsimile: (949) 251-0900

5  DAVID F. MCDOWELL (CA SBN 125806)
   SARVENAZ BAHAR (CA SBN 171556)
6  MICHAEL J. BOSTROM (CA SBN 211778)
   DMcDowell@mofo.com
7  SBahar@mofo.com
   MBostrom@mofo.com
8  MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
9  Los Angeles, California 90013-1024
   Telephone: (213) 892-5200
10 Facsimile: (213) 892-5454

11 STUART C. PLUNKETT (CA SBN 187971)
   SPlunkett@mofo.com
12 MORRISON & FOERSTER LLP
   425 Market Street
13 San Francisco, California 94105-2482
   Telephone: (415) 268-7000
14 Facsimile: (415) 268-7522

15 Attorneys for Defendant
   TARGET CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND, the NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, on behalf of their members, and Bruce F. Sexton, on behalf of himself and all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>TARGET CORPORATION,<br><br>  Defendant. | Case No.  C06-01802 MHP<br><br>**TARGET CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>Date:  July 24, 2006<br>Time:  2:00 p.m.<br>Jude:  Hon. Marilyn Hall Patel |

TARGET'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
CASE NO. 06-01802 MHP
la-867401

**TABLE OF CONTENTS**

**Page**

ARGUMENT .................................................................................................................................. 1

I. NFB FAILS TO STATE A CLAIM UNDER TITLE III OF THE ADA, BECAUSE TITLE III DOES NOT APPLY TO TARGET'S WEBSITE ........................ 1

    A. NFB Cannot State A Claim Under Title III By Alleging That Target.com Is A Service Of Target's Retail Stores ............................................................................ 2

    B. NFB Cannot State A Claim Under Title III By Alleging That Target.com Is A Service Of Target Corporation ................................................................................. 4

    C. It Is Not Sufficient For NFB To Allege That Target Corporation's Web Pages Are Inaccessible ............................................................................................. 7

II. NFB FAILS TO STATE A CLAIM UNDER THE UNRUH ACT OR THE DISABLED PERSONS ACT ................................................................................................. 8

    A. The Commerce Clause Bars NFB's State Law Claims .............................................. 8

    B. The Unruh Act Does Not Require Target Corporation To Alter Or Modify Its Website ................................................................................................................ 13

    C. NFB Has Not Alleged Intentional Discrimination Under The Unruh Act ............ 14

    D. The Disabled Persons Act Does Not Require Target To Alter Or Modify Its Website ................................................................................................................ 14

CONCLUSION ............................................................................................................................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

**Page**

**CASES**

Access Now v. Southwest Airlines, Co.,
 227 F. Supp. 2d 1312 (S.D. Fla. 2002) .................................................................. 1, 2, 6

Air Transp. Ass'n of Am. v. City and County of San Francisco,
 992 F. Supp. 1149 (N.D. Cal. 1998) ............................................................................ 11

Am. Libraries Ass'n v. Pataki,
 969 F. Supp. 160 (S.D.N.Y. 1997) .............................................................................. 12

Bibb v. Navajo Freight Lines, Inc.,
 359 U.S. 520 (1959) .................................................................................................... 12

Bowers v. NCAA,
 9 F. Supp. 2d 460 (D.N.J. 1998) ................................................................................... 4

Christensen v. Harris County,
 529 U.S. 576 (2000) ...................................................................................................... 6

Clegg v. Cult Awareness Network,
 18 F.3d 752 (9th Cir. 1994) .......................................................................................... 1

Diamond Multimedia Sys., Inc. v. Superior Court,
 19 Cal. 4th 1036 (1999) .............................................................................................. 13

Dobard v. San Francisco Bay Area Rapid Transit Dist.,
 No. C-92-3563-DLJ 1993 U.S. Dist. LEXIS 13677, *10 (N.D. Cal. Sept. 7,
 1993) .............................................................................................................................. 7

Ferguson v. Friendfinders, Inc.,
 94 Cal. App. 4th 1255 (2002) ..................................................................................... 10

Ford Motor Co. v. Tex. Dep't of Transp.,
 264 F.3d 493 (5th Cir. 2001) ...................................................................................... 10

Ford v. Schering-Plough Corp.,
 145 F.3d 601 (3rd Cir. 1998) ........................................................................................ 2

Hankins v. El Torito Rests., Inc.,
 63 Cal. App. 4th 510 (1998) ....................................................................................... 15

Hart v. Cult Awareness Network,
 13 Cal. App. 4th 777 (1993) ....................................................................................... 13

Hatch v. Superior Court,
 80 Cal. App. 4th 170 (2000) ....................................................................................... 10

Head v. New Mexico Board of Examiners in Optometry,
 374 U.S. 424 (1963) .................................................................................................... 11

Healy v. Beer Inst.,
 491 U.S. 324 (1989) .................................................................................................... 11

Hooks v. OKBridge, Inc.,
 232 F.3d 208 (5th Cir. 2000) ........................................................................................ 6

Koebke v. Bernardo Heights Country Club,
 36 Cal. 4th 824 (2005) ................................................................................................ 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Marsh v. Edwards Theatres Circuit, Inc.,
    64 Cal. App. 3d 881 (1975) .......................................................................................... 14, 15

Martin v. Metro Atlanta RTA,
    225 F. Supp. 2d 1362 (N.D. Ga. 2002) ................................................................................ 5

Nat'l Collegiate Athletic Ass'n v. Miller,
    10 F.3d 633 (9th Cir. 1993) .................................................................................................. 8

NCAA v. Miller,
    10 F.3d 633 (9th Cir. 1993) ................................................................................................ 11

Neff v. Am. Dairy Queen Corp.,
    58 F.3d 1063 (5th Cir. 1995) ............................................................................................ 5, 7

People v. Hsu,
    82 Cal. App. 4th 976 (2000) ............................................................................................... 10

Presta v. Peninsula Corridor Joint Powers Bd.,
    16 F. Supp. 2d 1134 (N.D. Cal. 1998) ................................................................................ 14

Rendon v. Valleycrest Prods., Ltd.,
    294 F.3d 1279 (11th Cir. 2002) ........................................................................................ 2, 3

Reno v. ACLU,
    521 U.S. 844 (1997) ............................................................................................................. 3

S. Pac. Co. v. Arizona,
    325 U.S. 761 (1945) ........................................................................................................... 12

S.D. Myers, Inc. v. City and County of San Francisco,
    253 F.3d 461 (9th Cir. 2001) ................................................................................................ 9

Torres v. AT&T Broadband LLC,
    158 F. Supp. 2d 1035 (N.D. Cal. 2001) ................................................................................ 6

United States v. Carter,
    421 F.3d 909 (9th Cir. 2005) ................................................................................................ 7

Weyer v. Twentieth Century Fox Film Corp.,
    198 F.3d 1104 (9th Cir. 2000) .......................................................................................... 1, 2

**STATUTES**

28 C.F.R. § 36.104 ....................................................................................................................... 4

42 U.S.C. § 12132 ........................................................................................................................ 5

42 U.S.C. § 12182 (2)(A)(iii) ....................................................................................................... 7

42 U.S.C. § 12182(a) ................................................................................................................ 1, 5

Cal. Civ. Code § 51(d) ............................................................................................................... 13

## ARGUMENT

**I.    NFB FAILS TO STATE A CLAIM UNDER TITLE III OF THE ADA, BECAUSE TITLE III DOES NOT APPLY TO TARGET'S WEBSITE**

Target Corporation explained in Part II of its Opening Memorandum that Title III of the ADA prohibits discrimination "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of *any place of public accommodation*." 42 U.S.C. § 12182(a) (emphasis added). Target Corporation then demonstrated that NFB's Amended Complaint fails to state a claim under Title III because an Internet website is *not* a place of public accommodation, and because NFB had not otherwise alleged denial of access to any other physical place, as required by applicable law. (Mot. at 9-11 (citing *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *Access Now v. Southwest Airlines, Co.*, 227 F. Supp. 2d 1312, 1318 (S.D. Fla. 2002)); *see also Clegg v. Cult Awareness Network*, 18 F.3d 752, 756 (9th Cir. 1994).)

In its Opposition, NFB jettisons any pretense of arguing that Internet websites themselves can be physical *places* of public accommodation. (*See, e.g.*, Opp. at 4:2-8; 5:8-16 & 7:20-23.)[1] Instead, NFB argues that its complaint "rests comfortably within the recognized contours of the statute" (Opp. at 5)[2] because: (a) Target's bricks and mortar retail stores are places of public accommodation; (b) Target.com is a *service of* Target's retail stores; and (c) NFB's amended

---

[1] NFB's suggestion that Target's Motion to Dismiss should be denied because the Amended Complaint "does not allege that target.com is itself a place of public accommodation for purposes of the ADA" is both wrong and legally unavailing. NFB concedes that it premised its third claim for relief upon the allegation that Target.com is a place of public accommodation. (*See* Am. Compl. ¶¶ 11, 47, 48, 54, 60; Motion for Preliminary Injunction at 2:3-4). Target Corporation takes NFB at its word that this discredited theory of liability has been taken off the table. However, withdrawal of this theory of liability does not immunize NFB's third claim for relief from attack; as explained at pages 9 through 11 of Target Corporation's Opening Memorandum, NFB's third claim for relief is *not* cognizable under Title III of the ADA because it does not allege denial of access to a physical, concrete structure, as required by applicable law.

[2] We note in passing that NFB has not always been so cavalier in claiming that Title III applies to Internet websites. Indeed, Bradley Hodges, NFB's Technology Accessibility Manager, noted as recently as November 2004 that, "There's a misunderstanding that the ADA automatically applies to the Web, and it's not clear at all that it does . . . Reasonable people disagree on this." *For the Blind, a Welcoming Web*, SiteMorse, Nov. 25, 2004 (available at http://www.sitemorse.com/news.html?id=1103798086).

1  complaint alleges that programming deficiencies in Target.com prevent individuals with vision
2  impairments from using *Target.com*. As demonstrated in the paragraphs that follow, this theory
3  of liability is *not* cognizable under Title III.

### A. NFB Cannot State A Claim Under Title III By Alleging That Target.com Is A Service Of Target's Retail Stores

As explained at pages 13 through 18 of Target Corporation's Opposition to NFB's Motion for Preliminary Injunction, to state a claim based upon alleged discrimination in the goods or services offered by a place of public accommodation, the Ninth Circuit requires that there be "some connection between the good or service complained of and an actual physical place" of public accommodation. *Weyer*, 198 F.3d at 1114. This connection or nexus is established by showing either that the challenged services were offered in, or precluded access to, a place of public accommodation. *See, e.g.*, *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1284 (11th Cir. 2002) (Title III applies to both tangible and intangible barriers that prevent disabled persons from entering, accessing or enjoying facility's goods, services and privileges offered by place of public accommodation); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613 (3rd Cir. 1998) ("goods, services, facilities, privileges, advantages, or accommodations" to which Title III ensures access should *not* be treated as "free-standing concepts but rather all refer to the statutory term 'public accommodation' and thus to what these places of public accommodation provide"); *Access Now,* 227 F. Supp. 2d at 1320 ("the Internet website at issue here is neither a physical, public accommodation itself as defined by the ADA, *nor a means to accessing a concrete space*").

NFB's Amended Complaint does not allege the required nexus between the purported service (*i.e.*, Target.com) and the place of public accommodation (*i.e.*, Target's retail stores) for several reasons. First and foremost, NFB's theory of liability is not supported by the allegations in its Amended Complaint. In particular, NFB alleges that Target.com is a service *of Target Corporation*, and not of Target's retails stores. (Id. ¶ 21.)[3] NFB does not (and cannot) allege that

---

[3] NFB's claim that it has properly alleged the nexus necessary between Target.com and Target's retail stores in paragraphs 20-23 of its Amended Complaint (Opp. at 7) misses the point.
(Footnote continues on next page.)

1  Target.com is a service offered *in* Target's retail stores. *See Reno v. ACLU,* 521 U.S. 844, 851

2  (1997) (Internet websites are "located in no particular geographical location"). Similarly, NFB

3  does not (and cannot) allege that purported programming deficiencies within Target.com

4  somehow limit blind shoppers from entering Target's bricks and mortar stores or from making

5  purchases therein. To the contrary, NFB alleges in its complaint that, "[d]ue to Target.com's

6  inaccessibility, blind Target customers must in turn spend time, energy, and/or money to make

7  their purchases at a Target store." (Am. Compl. ¶ 35.)

8        In short, NFB cannot establish the required nexus between the alleged programming

9  deficiencies contained within Target.com's web pages and Target's retail stores: These alleged

10  deficiencies do not exist within a Target retail store, and do not prevent anyone from shopping in

11  any of Target's retail stores. The Motion to Dismiss should be granted accordingly.

12        As it did in its Motion for Preliminary Injunction, NFB argues that the Eleventh Circuit's

13  opinion in *Rendon* shores up its Title III claim. However, as discussed in detail in Target

14  Corporation's Opposition to NFB's Motion for Preliminary Injunction (at pages 16-18), *Rendon*,

15  does *not* come within a country mile of supporting NFB's claims. To the contrary, *Rendon*

16  demonstrates that an "intangible barrier" is actionable under Title III only to the extent that it

17  precludes entry or use of a physical space. In *Rendon*, individuals competed to become

18  contestants on a television quiz show by dialing into a toll-free contestant hotline. *Rendon*, 294

19  F.3d at 1280. The plaintiffs claimed that use of this selection process violated Title III because

20  individuals with certain impairments could not use a telephone. *Id*. at 1280-81. The Eleventh

21  Circuit held that plaintiffs' allegations were sufficient to state a claim under Title III because the

22  contestant hotline prevented disabled contestants from accessing a physical place of public

23  accommodation — that is, the physical location of the television studio where the show was held.

---

(Footnote continued from previous page.)

Even assuming that these allegations are true, they do not establish that Target.com is a service of Target's retail stores because they do not show that services were offered in, or precluded access to, a place of public accommodation. For example, the fact that some products available through Target.com are also available at Target's retail stores does not establish that Target.com is a service of Target's retail stores within the meaning of Title III.

TARGET'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
CASE NO. 06-01802 MHP
la-867401

3

1  *Id*. at 1284 ("Plaintiffs in the present case, however, are not suing merely to observe a television
2  show; rather, they seek the privilege of competing in a contest held in a concrete space . . . .").
3  *See Southwest Airlines*, 227 F. Supp. 2d at 1319-20 ("Most significantly, the Eleventh Circuit [in
4  *Rendon*] noted that the plaintiffs stated a claim under Title III because they demonstrated 'a nexus
5  between the challenged service and the premises of the public accommodation,' namely the
6  concrete television studio."). NFB has not alleged that purported programming deficiencies in
7  Target.com prevent blind shoppers from entering or shipping in Target's bricks and mortar stores.
8  The Motion to Dismiss NFB's third claim for relief should be granted accordingly.

      **B.    NFB Cannot State A Claim Under Title III By Alleging That Target.com Is A Service Of Target Corporation**

11  NFB also attempts to link up the purported programming deficiencies in Target.com with
12  Target's retail stores by arguing that Title III generally regulates all services of a "public
13  accommodation," and therefore applies to Target.com. (Opp. at 8.) While NFB does not specify
14  what it means by "public accommodation," the DOJ's regulations define "public
15  accommodation" as a "private entity that owns, leases (or leases to), or operates a place of public
16  accommodation." 28 C.F.R. § 36.104. Here, that entity is Target Corporation. But the law is
17  clear that Target Corporation is subject to the ADA *only* with respect to the operations of the
18  *places* of public accommodation it owns or operates, and not generally to all of its operations.
19  Therefore, NFB's argument returns full circle to the legal principle that, to state a claim under
20  Title III, NFB must establish discrimination in the goods and services of a physical place of
21  public accommodation, which, as discussed above, it cannot do.

22  Title III's discrimination prohibitions only extend to those *places* of public
23  accommodation owned or operated by Target Corporation; Title III does not extend to all of the
24  Corporation's other activities. It is for this reason that Title III does not apply to Target.com,
25  even if the website is a "service" operated by Target Corporation. *See*, *e.g.*, 28 C.F.R.
26  36.102(b)(2) (a public accommodation is "obligat[ed] … only with respect to the operations of a
27  place of public accommodation"); 56 Fed. Reg. 35544, 3551 (same); *Bowers v. NCAA*, 9 F. Supp.
28  2d 460, 482 (D.N.J. 1998) ("ACT and the Clearinghouse are subject to the ADA's anti-

1  discrimination principles only in the operation of that place of public accommodation. Mere
2  operation of one place of public accommodation does not by itself subject every other aspect of
3  the operator's business to Title III."), *rev'd in part on other grounds*, 346 F.3d 402 (3d Cir.
4  2003); ADA Title III Technical Assistance Manual Covering Public Accommodations and
5  Commercial Facilities, § III-1.2000 ("The entire [private] entity is, legally speaking, a public
6  accommodation, but it only has ADA title III obligations with respect to the operations of the
7  places of public accommodation."); *see also Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1067
8  (5th Cir. 1995) ("Neff and the United States point to numerous non-structural aspects of the San
9  Antonio Stores' operations that they contend ADQ controls, such as accounting, personnel
10 uniforms, use of trademarks, etc. While ADQ's control over these aspects may be relevant in
11 other contexts, we hold that because it does not relate to the allegedly discriminatory conditions at
12 the San Antonio Stores, it does not bear on the question of whether ADQ 'operates' the franchises
13 for the purposes of the ADA's prohibition on discrimination in public accommodations.").
14 NFB's bootstrap argument that "Title-III-applies-to-all-services" claim thus fails as a matter of
15 law.
16       NFB's reliance on *Martin v. Metro Atlanta RTA*, 225 F. Supp. 2d 1362 (N.D. Ga. 2002),
17 for the proposition that any service of a public accommodation is covered by Title III is wrong.
18 *Martin* involved interpretation of Title II of the ADA, which prohibits discrimination in "the
19 services … of … a public entity."  42 U.S.C. § 12132.  Based on this statutory language, *Martin*
20 held that the website of a metropolitan transit authority was subject to Title II of the ADA.  This
21 analysis is wholly inapplicable to Title III of the ADA, which prohibits discrimination in "the
22 services … of any place of public accommodation."  42 U.S.C. § 12182(a).  The statutory
23 language of Title II and Title III are markedly different in this respect, making any comparison
24 inappropriate.
25       In an attempt to find some support for its argument, NFB suggests that Congress
26 conducted hearings to determine whether Title III should be amended *to exclude* the Internet. But
27 this argument proves nothing for several reasons. Most importantly, NFB's argument fails to
28 acknowledge the plain fact that Congress *specifically directed* the Access Board to promulgate

TARGET'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
CASE NO. 06-01802 MHP
la-867401

5

regulations defining *how* federal agency websites should be made accessible, while Congress *totally failed* to issue any type of directive with respect to private websites. Indeed, NFB offers *no* explanation for why Congress found it necessary to amend the Rehabilitation Act to require federal website accessibility, but somehow concluded that Title III applied to privately-maintained websites without such an amendment. Further, Congress had no need to conduct public hearings to decide whether the Internet should be *excluded* from Title III. As explained at page 14 of Target Corporation's Opposition to NFB's Motion for Preliminary Injunction, federal courts reached this conclusion on their own, without the assistance of Congress. *See also Access Now Inc. v. Claire's Stores, Inc.*, No. 00-1 40 17-CIV-MOORE, 2002 WL 1162422, at *5 (S.D. Fla. May 7, 2002) ("No court has held that internet websites made available to the public by retail entities must be accessible"); *Torres v. AT&T Broadband LLC*, 158 F. Supp. 2d 1035 (N.D. Cal. 2001). In addition, and contrary to NFB's claim, no where in the 156 pages of the hearing transcript to which it cited did any witness state that "the ADA needed to be amended to exclude the internet." (Opp. at 8.) Hence, the only point that fairly can be drawn from legislative history is that Congress could have directed, but did not direct, the Access Board to issue website accessibility standards for privately-managed websites.[4]

---

[4] NFB argues in footnote 6 of its Opposition that the U.S. Department of Justice "has thus found that Title III applies to internet websites." (Opp. at 9 n.6.) However, this claim is misleading and does nothing to bolster NFB's claims. It is settled that "[i]nterpretations such as those in opinion letters — like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant *Chevron*-style deference." Instead, "interpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade' . . ." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Under this standard, the DOJ "findings" upon which NFB relies are entitled to *no* deference for the following reasons:

1. As explained in footnote 9 of our Opposition to NFB's Motion for Preliminary Injunction, the district court in *Hooks v. OKBridge, Inc.*, held that Title III did *not* apply to Internet websites, because they are *not* physical places. The DOJ urged in its amicus brief that the Fifth Circuit reverse this holding. However, the appellate panel declined to follow the DOJ's view, and *affirmed* the district court's ruling, albeit on alternative grounds. *Hooks v. OKBridge, Inc.*, 232 F.3d 208 (5th Cir. 2000).

2. The DOJ's 1996 Opinion Letter to Senator Harkin is entitled to *no* deference or respect, because it is entirely at odds with the cases cited in Target's Motion that decline to extend Title III to Internet websites. *E.g.*, *Access Now, Inc. v. Southwest Airlines, Co.*, 227 F. Supp. 2d 1312 (S.D. Fla. 2002).

(Footnote continues on next page.)

Finally, NFB's reliance on general pronouncements on the scope of Title III in the legislative history is not enough to overcome the clear and unambiguous meaning of the terms of the statute itself which make clear that Title III does not apply to the Internet. *See, e.g.*, *United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005) ("It is well settled that, in a statutory construction case, analysis must begin with the language of the statute itself; when the statute is clear, judicial inquiry into its meaning, in all but the most extraordinary circumstances, is finished."); *Neff*, 58 F.3d at 1069 & n. 14 (cannon that remedial civil rights statutes should be liberally interpreted does *not* trump Title III's plain statutory meaning).

### C. It Is Not Sufficient For NFB To Allege That Target Corporation's Web Pages Are Inaccessible

Even if NFB could allege a sufficient nexus between Target.com and Target's retail stores, NFB's "Target.com-is-a-service" argument badly misapprehends the obligations Title III imposes upon covered public accommodations. Target Corporation acknowledges that public accommodations are required to provide auxiliary aids and services where necessary to ensure effective communication. 42 U.S.C. § 12182 (2)(A)(iii). However, this obligation "is a flexible one," and allows covered public accommodations to "choose among various alternatives as long as the result is effective communication." 56 Fed. Reg. 35544, 35566; *see also Dobard v. San Francisco Bay Area Rapid Transit Dist.*, No. C-92-3563-DLJ 1993 U.S. Dist. LEXIS 13677, *10 (N.D. Cal. Sept. 7, 1993) (public accommodation need not provide auxiliary aid or service requested by plaintiff). Hence, as the Department of Justice explains in the commentary accompanying its Title III regulations:

> A public accommodation can choose among various alternatives as long as the result is effective communication. For example, *a restaurant would not be required to provide menus in Braille for*

---

(Footnote continued from previous page.)

3. The DOJ's opinion letter did *not* find, hold, or require that websites themselves must be made "accessible." Rather, the DOJ went to great lengths to explain that "*instead of providing full accessibility through the Internet directly, covered entities may offer other alternate accessible formats . . . .*" (Emphasis added.) Hence, even if it were entitled to deference, the DOJ's Opinion Letter contradicts NFB's theory of liability that Target violates Title III solely because its website *itself* allegedly is inaccessible.

TARGET'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
CASE NO. 06-01802 MHP
la-867401

7

> *patrons who are blind, if the waiters in the restaurant are made available to read the menu. Similarly, a clothing boutique would not be required to have Brailled price tags if sales personnel provide price information orally upon request; and a bookstore would not be required to make available a sign language interpreter, because effective communication can be conducted by notepad.*

56 Fed. Reg. at 35566 (emphasis added).

Just as it would *not* be sufficient for a plaintiff to allege that a restaurant's menus are "inaccessible" because they are not printed in Braille, it is *not* sufficient for NFB to allege that Target.com is "inaccessible" because it lacks alt-tags, and the like. The question in either case is whether the information provided by the public accommodation can be communicated in some other effective way. In this case, NFB does not allege that Target refuses to make information about its goods and services available to blind individuals.[5] To the contrary, NFB alleges that blind individuals *can* obtain this information by visiting a Target retail store. (Am. Compl. ¶ 35.) NFB's "service" claim thus fails as a matter of law.

## II. NFB FAILS TO STATE A CLAIM UNDER THE UNRUH ACT OR THE DISABLED PERSONS ACT

### A. The Commerce Clause Bars NFB's State Law Claims

NFB begins its Commerce Clause analysis by misleadingly suggesting that the Commerce Clause is designed *solely* to prohibit economic protectionism — *i.e.*, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (Opp. at 18.) The Commerce Clause does prohibit economic protectionism, but it *also* prohibits state laws that directly regulate interstate commerce by controlling conduct occurring beyond the state's borders. *See Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) (state statutes that directly regulate commerce violate the Commerce Clause *per se* just like statutes aimed at economic protectionism). The Unruh Act and the Disabled Persons Act, if interpreted

---

[5] Nor could it: As explained in the Opposition to NFB's Motion to Dismiss, Target Corporation provides a toll-free 800 number to assist shoppers navigate through its website.

1  to require that Internet websites be programmed in a particular way, would indisputably control
2  conduct beyond the state's borders.  Thus, the Court must reach the issue of whether the
3  Commerce Clause precludes such an interpretation.
4        NFB attempts to lead the Court away from the proper *per se* Commerce Clause analysis,
5  and towards the less scrutinizing balancing test that applies to regulations that only *indirectly*
6  affect interstate commerce.  According to NFB, the Disabled Persons Act and the Unruh Act do
7  not directly regulate interstate commerce because neither act contains language explicitly or
8  implicitly targeting either out-of-state entities or entities engaged in interstate commerce.  (Opp.
9  at 19.)  Target agrees that these statutes do not contain provisions bringing Internet websites
10 within their reach, but NFB cannot ask this Court to interpret these statutes as applying to the
11 Internet — which is by its very nature an interstate commercial medium[6] — and then ignore the
12 constitutional ramifications of the interpretation it proposes.[7]
13       Because it ignores the very interpretation for which it advocates, NFB relies almost
14 exclusively on balancing test cases to support its argument that state statutes can regulate the
15 Internet without violating the Commerce Clause.  Those cases have no relevance here.  Unlike
16 NFB's proposed interpretation of the Unruh Act and Disabled Persons Act, the statutes at issue in
17 NFB's cases did *not* directly regulate the Internet by dictating how Internet users must program

---

[6] As NFB itself recognizes, "the internet plays a central role in the commercial life of our state and nation."  (Opp. at 17.)

[7] The only case NFB cites for its argument that the language of the statute is dispositive in Commerce Clause challenges is *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461 (9th Cir. 2001).  But *S.D. Myers* does *not* hold that a statute will violate the Commerce Clause *only if* the language of the statute explicitly or implicitly targets interstate commerce.  Moreover, that case, which rejected plaintiff's Commerce Clause challenge to an ordinance requiring city and county contractors to provide the same benefits to employees with registered domestic partners as provided to married employees, is inapposite here for two reasons.  First, the Ninth Circuit found that the plaintiff had mischaracterized the ordinance as applying to its employees engaging in out-of-state conduct.  In fact, the ordinance only applied to employees "working on a City contract."  *Id.* at 468.  Second, the ordinance affected an "out-of-state entity only after that entity has affirmatively chosen to subject itself to the Ordinance by contracting with the City."  *Id.* at 469.  The Ninth Circuit specifically found that it was "significant to [its] 'direct regulation' inquiry that the City imposes the Ordinance through contract rather than by legislative fiat."  *Id.*  Here, NFB argues for an interpretation of California's access statutes that *would* control conduct beyond California's borders, and that control would be exercised by legislative fiat, *not* by contractual agreement.

their websites, nor did the statutes at issue control conduct beyond the enacting state's borders:

- In *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001), the Fifth Circuit held that a Texas statute prohibiting automobile manufacturers from operating a car dealership in Texas could be applied to Ford's attempt to sell cars over the Internet to Texas citizens without violating the Commerce Clause. The statute at issue, however, did not purport to dictate how Ford programmed its website, nor did it have the practical effect of prohibiting Ford from selling cars over the Internet to individuals outside of Texas.

- In *People v. Hsu*, 82 Cal. App. 4th 976 (2000), and *Hatch v. Superior Court*, 80 Cal. App. 4th 170 (2000), the California Court of Appeals held that California could make it a crime to send pornographic materials to known minors over the Internet with the intent of seducing those minors to engage in sexual activity without violating the Commerce Clause. That California can criminalize such activity is not relevant here for three reasons: (1) the seduction of California minors is not legitimate commerce (*Hsu*, 82 Cal. App. 4th at 984); (2) criminalizing the seduction of minors does not affect how Internet users program their websites; and (3) California's criminal laws do not practically control conduct beyond California's borders (*Id.* at 985 (California's penal scheme only allows for the prosecution of "criminal acts that occur wholly or partially within the state").

- In *Ferguson v. Friendfinders, Inc.*, 94 Cal. App. 4th 1255 (2002), the California Court of Appeal held that California's anti-spamming statute did not violate the Commerce Clause because the statute "does not regulate the Internet or Internet use per se. It regulates individuals and entities that (1) do business in California, (2) utilize equipment located in California, and (3) send [spam e-mails] to California residents." *Id.* at 1264. Here, however, NFB's interpretation of the Unruh Act and Disabled Persons Act *would* regulate the Internet and Internet use *per se* by dictating how webpages are programmed. Moreover, the reach of those acts would not be limited to Internet users whose websites

are hosted on equipment located within California.[8]

NFB tacitly admits that its proposed interpretation of the California statutes presents constitutional difficulties when it argues that Target Corporation and other Internet retailers could *theoretically* avoid the extraterritorial effects of California's webpage programming requirements by creating separate links on their homepages leading to separate websites for each of the 50 states. Even if NFB could establish the theoretical feasibility of this proposal, California's access statutes would still violate the Commerce Clause because the "critical inquiry" in determining whether a statute violates the Commerce Clause is not theoretical feasibility, but "whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the state." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (emphasis added); *see also NCAA v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993) (Nevada statute violated Commerce Clause because, even though plaintiff could theoretically avoid effects of statute, practical effect of statute would be to control conduct outside of Nevada).[9] NFB fails to address the practical effects that California's access statutes would have on out-of-state conduct if the Court adopts NFB's interpretation.

NFB also gives short shrift to *Healy's* teaching that a statute "must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. NFB argues that the Court need not worry about the interaction between California's Internet regulations and other states' regulations because (1) the constitutional line is only crossed when

---

[8] NFB's argument that state equal protection laws are somehow beyond Commerce Clause challenge is also meritless. While NFB states that it is not aware of a single case striking down a state equal protection law on the basis that it would somehow violate the Commerce Clause (Opp. at 20), this very Court has invalidated state equal protection laws as violative of the Commerce Clause. *See Air Transp. Ass'n of Am. v. City and County of San Francisco*, 992 F. Supp. 1149, 1162 (N.D. Cal. 1998) (invalidating equal protection ordinance on Commerce Clause grounds to extent it purported to control out-of-state conduct).

[9] Notwithstanding *Healy*'s clear teaching, NFB cites *Head v. New Mexico Board of Examiners in Optometry*, 374 U.S. 424 (1963), to support its argument that "[m]any state statutes whose practical effect is to regulate conduct outside its borders have survived judicial scrutiny." (Opp. at 23.) The statute at issue in *Head*, however, dealt with purely in-state conduct — *i.e.,* publishing *within the State of New Mexico* advertising for prescription eyeglasses. *Head*, 374 U.S. at 427.

1  compliance with one state's law is a violation of another's; and (2) no other state "requires"
2  websites to discriminate against the disabled.  (Opp. at 24.)  These arguments are meritless.
3        First, NFB's proposed rule that a statute only violates the Commerce Clause when
4  compliance would violate another state's laws makes no sense.  Taken to its logical conclusion, it
5  would mean that a state may regulate an area of interstate commerce in any way it chooses so long
6  as it is the first to do so.  The validity of that law would then depend on whether and how
7  subsequent states regulated in the same area.  There is no support for this interpretation of the
8  Commerce Clause.[10]
9        Second, NFB deliberately ignores the real issues in this case when it dismissively states
10 that no other state "requires" websites to discriminate against the disabled.  NFB is not merely
11 advocating an interpretation of California's access statutes that would require Internet users to
12 refrain from engaging in invidious discrimination, such as refusing to sell merchandise to
13 disabled persons.  NFB advocates that the statutes be interpreted in a way that dictates precisely
14 how Target Corporation and other retailers should program their websites.  It is not difficult to
15 imagine different states promulgating inconsistent and conflicting webpage programming
16 requirements.  Indeed, as Target Corporation demonstrated in its Opposition to NFB's Motion for
17 Preliminary Injunction, several states have already promulgated their own programming
18 requirements for state-run websites.  If those states were to extend their webpage programming
19 requirements to private sector websites, Internet users would be forced to wade in a sea of
20 inconsistent and potentially conflicting standards.  Internet commerce, which is by its very nature
21 interstate commerce, would most certainly be impaired as a result.  If the Internet is "to be
22 regulated at all, national uniformity in the regulation adopted, such as only Congress can
23 prescribe, is practically indispensable . . . ."  *S. Pac. Co. v. Arizona*, 325 U.S. 761, 771 (1945).
24 *See also Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997) ("[t]he Internet,

---

[10] NFB cites *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959), as support for its argument.  In that case, the Supreme Court found that an Illinois statute violated the Commerce Clause because, among other reasons, compliance with that statute would be in violation of another state's laws.  The Court, however, did not hold that a statute violates the Commerce Clause *only if* compliance would violate another state's laws.

TARGET'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
CASE NO. 06-01802 MHP
la-867401

12

like the rail and highway traffic at issue in the cited cases, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations").

Because NFB's proposed interpretation of the Unruh Act and the Disabled Persons Act would raise the very serious constitutional issues described above, as a matter of statutory construction, the Court should not interpret California's access statutes as applying to the Internet. *See Hart v. Cult Awareness Network*, 13 Cal. App. 4th 777, 793 (1993) (California courts should construe California statutes, including the Unruh Act, "to avoid constitutional infirmity"); *see also Diamond Multimedia Sys., Inc.* v. *Superior Court*, 19 Cal. 4th 1036, 1059-60 (1999) (California courts presume that the California legislature did not intend to give its statutes any extraterritorial effect).

### B. The Unruh Act Does Not Require Target Corporation To Alter Or Modify Its Website

NFB's Unruh Act claim also fails because the Unruh Act states clearly on its face that it does not require any alterations or modifications to covered facilities. Section (d) provides:

> Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure . . . .

Cal. Civ. Code § 51(d).

NFB argues that section (d) "applies solely to the alteration of physical structures, specifically establishments, facilities and buildings." (Opp. at 15.) NFB, however, cannot have its cake and eat it too. If an "establishment" under the Unruh Act is a physical structure, as NFB argues, then neither Target Corporation nor its website is a "business establishment" under the Unruh Act because corporations and websites are not physical structures. If the term "establishment" is broad enough to encompass non-structural facilities, then section (d) makes clear that the Unruh Act does not require alterations or modifications to those facilities. Moreover, section (d) provides that it does not require alterations or modifications "of any sort *whatsoever*." Such broad language cannot reasonably be interpreted as including only physical

1  alterations or modifications and not programming alterations or modifications.

### C. NFB Has Not Alleged Intentional Discrimination Under The Unruh Act

NFB has also failed to refute Target Corporation's showing that NFB has not alleged intentional discrimination under the Act. NFB relies on *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134 (N.D. Cal. 1998), to support its argument that intentional discrimination is not required in cases alleging discrimination against disabled persons. NFB's reliance is misplaced. *Presta* merely held that intentional discrimination is not required where an Unruh Act claim is based on an ADA violation. As demonstrated above, NFB cannot base its Unruh Act claim on an ADA violation because the ADA does not apply to the Internet.

NFB's fallback argument — that Target Corporation's alleged knowledge of the effects the programming of its website has on disabled persons constitutes intentional discrimination — has been explicitly rejected by the California Supreme Court. Intent to discriminate will *not* be inferred from a facially neutral policy solely because that policy happens to have adverse effects on a protected class. *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 854 (2005). Rather, a plaintiff must allege and prove that the defendant adopted the policy *for the purpose* of discriminating against a protected class. *Id.* (rejecting plaintiffs' sexual orientation discrimination claim because plaintiffs did "not point to any evidence that [defendant country club] adopted its spousal benefit policy to accomplish discrimination on the basis of sexual orientation"). NFB ignores *Koebke*'s holding.

### D. The Disabled Persons Act Does Not Require Target To Alter Or Modify Its Website

NFB has also failed to refute Target Corporation's showing that under *Marsh v. Edwards Theatres Circuit, Inc.*, 64 Cal. App. 3d 881 (1975), the Disabled Persons Act would not require Target Corporation to alter or modify its website. NFB's argument that *Marsh* is limited to architectural barrier cases (Opp. at 16) is unpersuasive. *Marsh* made clear that the Disabled Persons Act does not require any affirmative conduct at all; it "requires only that the operator [of a place of public accommodation] open its doors on an equal basis to all that can avail themselves of the facilities without violation of other valid laws and regulations." *Marsh*, 64 Cal. App. 3d at

892. Here, NFB has cited no laws or regulations dictating how Internet users should program their websites.

NFB's reliance on *Hankins* v. *El Torito Rests., Inc.*, 63 Cal. App. 4th 510 (1998), to defeat *Marsh*'s holding is also misplaced. *Hankins* held only that El Torito's policy of preventing disabled customers from using an accessible employee bathroom in its restaurant violated the Act because the restaurant did not have an accessible bathroom available for customer use. *Id.* at 522-24. Thus, the *Hankins* court did not require El Torito to undertake any affirmative conduct, such as NFB seeks here. The *Hankins* court merely required El Torito to stop blocking disabled persons' access to an accessible bathroom already in existence. Unlike in *Hankins*, NFB has not alleged that Target Corporation has a policy that prevents blind persons from using an otherwise accessible facility.

## CONCLUSION

For the foregoing reasons, Target Corporation respectfully requests that the Court grant its Motion to Dismiss without leave to amend.

Dated: July 10, 2006

ROBERT A. NAEVE
DAVID F. MCDOWELL
STUART C. PLUNKETT
SARVENAZ BAHAR
MICHAEL J. BOSTROM
MORRISON & FOERSTER LLP

By:  /S/
     Robert A. Naeve

     Attorneys for Defendant
     TARGET CORPORATION