# EXHIBIT 1

Case 3:06-cv-01802-MHP   Document 43-2   Filed 07/10/2006   Page 1 of 19

Dockets.Justia.com

1

```
                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
                       SAN FRANCISCO DIVISION
                              - - -


  NATIONAL FEDERATION OF THE BLIND, the
  NATIONAL FEDERATION OF THE BLIND OF
  CALIFORNIA, on behalf of their members,
  and Bruce F. Sexton, on behalf of himself
  and all other similarly situated,
                  Plaintiff,
  vs.                               No.   C06-01802 MHP
  TARGET CORPORATION, et al.,
                  Defendants.
  ---------------------------/



                         DEPOSITION OF
                       CHARLES LETOURNEAU
                    SAN FRANCISCO, CALIFORNIA
                         JULY 5, 2006



  ATKINSON-BAKER, INC.
  COURT REPORTERS
  (800) 288-3376
  www.depo.com

  REPORTED BY: DANUTA KRANTZ, CSR NO. 4782
  FILE No.: A005872
```

1        A.   It was from Stuart.

2        Q.   Mr. Plunkett?

3        A.   Mr. Plunkett.

4        Q.   And what did Mr. Plunkett say to you,
5   roughly, the gist?

6        A.   Roughly, he introduced himself as
7   representing Morrison & Foerster.  He said that they
8   were legal representatives for Target Corporation in a
9   complaint filed by the, as I recall, the National
10  Federation of the Blind and probably others, and asked
11  me some questions about my experience in website
12  accessibility in my field, and that was the gist of it.
13  Yes.

14       Q.   Did he indicate that he was interested in
15  retaining your services as a litigation expert?

16       A.   I don't remember if that was in the first
17  call or in a follow-up call.  It might have been in the
18  first call, but I think he was wanting to find out if I
19  met his qualifications for --

20       Q.   Did he explain that this litigation
21  concerns the accessibility of target.com to blind
22  users?

23       A.   Yes.

24       Q.   Had you ever evaluated target.com before?

25       A.   No.

```
 1            Q.   And have you, up through now, gone and
 2      inspected target.com?
 3            A.   No, I have not.
 4            Q.   Why not?
 5            A.   I was not asked to.
 6            Q.   I take it you provide services to website
 7      designers and authors in helping them make their
 8      websites accessible; is that right?
 9            A.   Yes, among other things.
10            Q.   What standards do you apply when you assist
11      a website designer or author in making its website
12      accessible?
13            A.   Primarily I use the standards or guidelines
14      that I am asked to use by the client.
15            Q.   Have you assisted any retailer in making a
16      retailer's website accessible?
17            A.   No, I have not.
18            Q.   Have you assisted any business entity that
19      is not a government entity in making its website
20      accessible?
21            A.   No, I have not.
22            Q.   What types of entities have you assisted in
23      helping make their websites accessible?
24            A.   Federal government of Canada primarily, and
25      a number of nongovernmental organizations, such as
```

(Answer on line 5 circled by hand: "I was not asked to.")

```
 1    advocacy groups and organizations for people with
 2    disabilities.
 3         Q.   Were you asked not to look at target.com?
 4         A.   I don't recall being asked that.  I was not
 5    asked to look at it.
 6         Q.   Do you find it surprising that you were not
 7    asked to look at the website which is the subject of
 8    this litigation?
 9         A.   No, I don't think so, because I was asked
10    some specific questions that didn't require the answers
11    and which didn't require looking at the website.
12         Q.   What questions were you asked to address?
13         A.   I was asked three questions.  One was about
14    the different kinds of standards, the different
15    standards that exist for people to follow in designing
16    websites.  I was asked about screen reader usage by
17    people who are blind.  And I was asked specifically
18    there about the kind of versions of screen readers that
19    exist, differences between versions.
20              And thirdly, if other factors besides
21    websites' compliance affect how people with
22    disabilities interact with those websites.
23              MR. PARADIS:  Can you read that last answer
24    back, please?
25              (Record read.)
```

```
 1    Thatcher.
 2             MR. PARADIS:  Q.  Have you -- you have
 3    worked hand in hand with him on a variety of projects
 4    relating to web accessibility; is that right?
 5             A.  I wouldn't say hand in hand, but we have
 6    worked together on committees and working groups, yes.
 7             Q.  Would you say that Dr. Thatcher is highly
 8    regarded in the field among experts in your field?
 9             A.  Yes.
10             Q.  Have you reviewed the declaration that
11    Dr. Thatcher prepared and signed in this litigation?
12             A.  No.
13             Q.  Were you aware that Dr. Thatcher had
14    executed a declaration in this case?
15             A.  Yes.
16             Q.  Did you ever ask to see Dr. Thatcher's
17    declaration?
18             A.  No.
19             Q.  Why not?
20             A.  It was not part of what I was being asked.
21             Q.  You said that the third question you were
22    being asked was whether other factors besides website
23    compliance affect how people with disabilities interact
24    with websites.
25             What is the role of website compliance
```

```
 1          A.  Yes.
 2          Q.  Let me show you a document we have marked
 3    as Plaintiff's Exhibit F.  And I will give a copy to
 4    Stuart.
 5          MR. PLUNKETT:  Is this F because you
 6    premarked exhibits?
 7          MR. PARADIS:  Yes.  And I think all of this
 8    is Exhibit F.  That is your copy.
 9          Q.  Mr. Letourneau, would you review Exhibit F
10    and tell me if that looks like a printout of your
11    website?
12          A.  Yes.
13          Q.  Okay.  Now, the very first paragraph of
14    your website has a definition of web accessibility.  Do
15    you see that?
16          A.  Yes.
17          Q.  It says, "What does web accessibility mean?
18    To me it means that anyone using any kind of web
19    browsing technology must be able to visit any site and
20    get a full and complete understanding of the
21    information contained there, as well as have the full
22    and complete ability to interact with the site."
23              Is that your understanding of web
24    accessibility?
25          A.  Writ large, yes.
```

1    A.  The use of appropriate alt text is very
2    important to the experience of someone using the
3    website, someone with a screen reader using a website.
4        Q.  Is it a critical requirement for blind
5    users?
6            MR. PLUNKETT:  Objection.  Vague.
7    Incomplete hypothetical.  Calls for speculation.
8            THE WITNESS:  According to the standard, it
9    is important, a very important part of the web
10   experience.  Yes.
11           MR. PARADIS:  Q.  Based on your own
12   experience as an expert, would you agree that correctly
13   providing alt text is a critical access requirement for
14   blind users to a website?
15           MR. PLUNKETT:  Objection.  Incomplete
16   hypothetical.  Calls for speculation.
17           THE WITNESS:  In general, yes.
18           MR. PARADIS:  Q.  Another element you
19   mentioned here is, "misuse or don't use title."
20           What does "title" mean as you used it here?
21       A.  The title I am referring to there is the
22   HTML title that appears in the top bar of most browsers
23   to identify the page.
24       Q.  Is that sometimes also referred to as
25   headings?

```
 1            Q.   Yes.
 2            A.   What was the intent?
 3                 Would you repeat that, please?
 4                 (Record read.)
 5                 THE WITNESS:  Actually, I am not sure I
 6    understand what you mean by "intent" in that.
 7                 MR. PARADIS:   Q.  Am I correct that
 8    Priority Two is the designation for features that are
 9    important to provide because some people with
10    disabilities will have difficulty using the website
11    unless they are provided?
12            A.   I think that characterizes the intent of
13    Priority Two, yes.
14            Q.   And then Priority Three are features that
15    are not as important as Priorities One and Two, in
16    terms of making a website usable by disabled people; is
17    that correct?
18            A.   That is an interpretation of that, yes.
19            Q.   Is that an interpretation you would agree
20    with?
21            A.   I think in general, yes.
22            Q.   Looking again at slide 4 from this
23    Exhibit E, I see that using header elements to convey
24    document structure is a Priority Two item.  Do you see
25    that?
```

```
 1          A.  Yes.
 2          Q.  What does that mean?
 3              MR. PLUNKETT:  Objection.  Vague.
 4              THE WITNESS:  If a document is a structured
 5     document, then proper use of headers to identify the
 6     sections of that document will aid the understanding
 7     and navigation of that document.
 8              MR. PARADIS:  Q.  Would you consider this a
 9     basic navigation element as you have used the term
10     "basic"?
11          A.  For structured documents, yes.
12          Q.  And is this a basic navigation element that
13     blind people need?
14              MR. PLUNKETT:  Objection.  Incomplete
15     hypothetical.  Calls for speculation.
16              THE WITNESS:  The use of headers would make
17     it easier for a blind person to navigate a structured
18     document.  Do they need it?  That is open to
19     speculation.
20              MR. PARADIS:  Q.  Was it the consensus of
21     the WCAG working group -- let me start again.
22              Was there a WCAG working group?
23          A.  Yes.
24          Q.  Is that the group that developed the WCAG
25     1.0 standards?
```

```
 1          Q.  Right.  Unfortunately, the declaration and
 2     the attachments use letters.  The declaration is
 3     Exhibit B, and attached to the declaration as Exhibit A
 4     is an assessment report that Dr. Thatcher prepared in
 5     July of 2005.
 6          A.  Thank you.
 7          Q.  I would like you to look at the tab on the
 8     first page of this report, paragraph three.  It's
 9     labeled, "Summary:  Target.com accessibility."
10              And then he says in here, "The key issues
11     for accessibility of any site are:  No. 1, Text
12     equivalents for images."
13              Do you see that?
14          A.  Yes.
15          Q.  Do you agree with that?
16          A.  Yes.
17          Q.  No. 2, on the next page is, "Labeling for
18     forms."
19              Do you have an understanding of what
20     "Labeling for forms" means?
21          A.  Yes.
22          Q.  And do you consider labeling for forms to
23     be a key issue for accessibility of any site for blind
24     users?
25              MR. PLUNKETT:  Objection.  Calls for
```

1  speculation. Incomplete hypothetical.
2              THE WITNESS: I think that proper labeling
3  of forms can make forms easier to use.
4              MR. PARADIS: Q. What is your
5  understanding of the requirements within WCAG 1.0
6  concerning labeling of forms?
7         A.   I believe it was a Priority Two. I just --
8  I want to refresh myself on that.
9         Q.   Sure.
10        A.   Yes. Priority Two.
11        Q.   And what is the purpose for requiring
12 labeling of forms within WCAG as you understand it?
13             MR. PLUNKETT: Objection. Vague.
14             THE WITNESS: It would -- my interpretation
15 of that has been that for screen readers that recognize
16 form labels, it allows the web page designer more
17 flexibility in how they design their forms, so that the
18 label that applies for a particular field is
19 discoverable.
20             MR. PARADIS: Q. Is the ultimate purpose,
21 as you understand it, so that a blind user can know
22 with confidence what each field within the form calls
23 for?
24        A.   It would aid that, yes.
25        Q.   And is the ultimate purpose, so that a

1  blind user can fill out a form with as much ease and
2  confidence as a sighted person could?
3          A.  Yes.
4          Q.  The third item Dr. Thatcher mentions is
5  labeled "Techniques for navigation."  And he says,
6  "Large pages with lots of links are organized into
7  groups or sections.  When those section headings are
8  marked up as HTML headings, the keyboard user can move
9  from section to section with a single key on the
10 keyboard.  Without this accommodation it is extremely
11 difficult to use the page for its intended purpose."
12          Do you agree that this is an important
13 access element for blind users in a web page such as
14 target.com?
15         A.  I can't --
16         MR. PLUNKETT:  Objection.  Calls for
17 speculation.
18         THE WITNESS:  I have not seen target.com,
19 so I can't --
20         MR. PARADIS:  Q.  Have you seen the website
21 of any large retail company?
22         A.  Yes.
23         Q.  Can you give me an example of one you have
24 seen in the last year?
25         A.  Company called Future Shop.

1   specific.  There are many techniques for navigation.
2            MR. PARADIS:  Q.  Well, looking at how
3   Dr. Thatcher describes it in paragraph three, he says,
4   "Large pages with lots of links are organized into
5   groups or sections."
6            Do you consider that an important access
7   feature for blind users of a web page that has lots of
8   links?
9            MR. PLUNKETT:  Objection.  Vague.  Calls
10  for speculation.  Incomplete hypothetical.
11           THE WITNESS:  It might very well.
12           MR. PARADIS:  Q.  In a website that has a
13  home page with lots of different sections that perform
14  different functions, is it important for such a page to
15  have techniques for navigation so that blind users can
16  move easily around the home page?
17           MR. PLUNKETT:  Objection.  Incomplete
18  hypothetical.  Calls for speculation.  Vague.
19           THE WITNESS:  There are many techniques for
20  navigation, and having some is important.
21           MR. PARADIS:  Q.  And particularly -- is it
22  particularly important to have a mechanism to avoid
23  repetitive navigation links on such a page?
24           MR. PLUNKETT:  Objection.  Incomplete
25  hypothetical.  Calls for speculation.  Vague.

1                THE WITNESS: In general, yes, I do believe
2      that.
3                MR. PARADIS: Q. And that is a requirement
4      of Section 508 guidelines, correct?
5                A. I believe it is, yes.
6                Q. Just so I am clear, what do you mean by a
7      computer -- I am sorry. What do you mean by a web page
8      versus a website?
9                A. A web page -- a lot of people are arguing
10     over this one right now. In my opinion, a web page is
11     a single unit delivered by the entering of a URL, a web
12     address. A website is the complete collection of
13     linked pages in a website.
14               Q. The next item, No. 4, in Dr. Thatcher's
15     report, is labeled, Keyboard access.
16               Do you consider it a critical access
17     feature for blind users that a website enable them to
18     perform all of the user functions through a keyboard?
19               MR. PLUNKETT: Objection. Incomplete
20     hypothetical. Calls for speculation. Vague.
21               THE WITNESS: I generally agree with that,
22     yes.
23               MR. PARADIS: Q. On the next paragraph,
24     going to the second sentence -- first of all, this
25     paragraph discusses target.com. And it says, "On these

```
 1              MR. PARADIS:  Q.  What about Section 508?
 2    Is it the recommended method under 508?
 3              A.  I don't remember the exact wording of 508.
 4    I would have to read it to refresh my memory.
 5              Q.  Is some form of form labeling required
 6    under Section 508?
 7              A.  I would have to read the web section of
 8    that again.  I don't have that in front of me.
 9              Q.  Back to Dr. Thatcher's assessment report.
10    He then says, in the summary paragraph, "Nothing has
11    been done to improve navigation for screen reader or
12    keyboard users," as part of his critique of target.com.
13              Assuming hypothetically that target.com
14    lacks navigation features to enable blind users to move
15    around within the home page easily, would you consider
16    that home page to be inaccessible to blind users?
17              A.  I would have to --
18              MR. PLUNKETT:  Objection.  Vague.
19    Incomplete hypothetical.  Calls for speculation.
20              THE WITNESS:  I would really have to
21    evaluate the website to give a complete and honest
22    answer to that.
23              MR. PARADIS:  Q.  Why didn't you evaluate
24    target.com?
25              A.  I was not asked to.
```

```
 1            Q.   Do you find it odd that you are being
 2   designated as an expert on web access in this case and
 3   have not even looked at the website at issue?
 4            MR. PLUNKETT:  Objection.  Argumentative.
 5            Do you find it odd?
 6            MR. PARADIS:  Q.  The question is to you.
 7   Do you find that odd?
 8            A.   I was asked three specific questions, and I
 9   provided my expertise on those answers.  You are asking
10   me a lot of extra questions, but I was not asked by the
11   lawyers on this side.
12            Q.   Do you only evaluate the specific issues
13   you are asked to address when you are called upon as an
14   expert on web access?
15            A.   I evaluate what the client has asked me to
16   evaluate.
17            Q.   Did you ever find it's curious, in your own
18   mind, hey, is target.com actually accessible to blind
19   people or not?
20            MR. PLUNKETT:  Objection.  Asked and
21   answered.
22            THE WITNESS:  I don't spend my time
23   wondering about all of the websites that are out there
24   in the world as to whether they are accessible or not.
25   There are 75 million websites nowadays.  No, I don't
```

```
 1    ask myself that question.
 2            MR. PARADIS:  Q.  This is the only website
 3    where you have been asked to -- strike that.
 4            Are there any other websites that you have
 5    been asked to address in any way as part of a
 6    litigation?
 7        A.  No.
 8        Q.  Did your client in this case ask you to
 9    address only those three questions?
10        A.  Yes.
11        Q.  The next item in Dr. Thatcher's summary
12    paragraph says, "As a rough estimate, 80 percent of the
13    images lack text equivalent."
14            Assuming hypothetically that that is
15    correct, would you consider this a significant access
16    barrier on target.com?
17            MR. PLUNKETT:  Objection.  Assumes facts.
18    Calls for speculation.
19            THE WITNESS:  I would have to look at the
20    website to completely answer that question.
21            MR. PARADIS:  Q.  You mentioned earlier the
22    phrase, critical images.  Let me ask you to turn to
23    page 6 of Dr. Thatcher's report.  He has got a section
24    here labeled Detailed Results.  And he has got a
25    summary box under 6.1.  Do you see that?
```

1    for speculation.  Lacks foundation.
2              THE WITNESS:  The purpose is to facilitate,
3    to make it easier for someone to do that.  Screen
4    readers are not often very good at fixing bad design or
5    mitigating bad design.
6              MR. PARADIS:  Q.  Now, the WCAG guidelines
7    that you helped develop were designed to make web pages
8    accessible to a wide variety of different types of
9    disabilities, correct?
10        A.   That's the intent, yes.
11        Q.   They were designed to make disabled people
12   able to access websites using a wide range of
13   screen-reading software, correct?
14        A.   It was to allow web page designers to make
15   web pages that could facilitate that interaction.
16        Q.   And the -- your understanding of access
17   is -- for website access is that even people using
18   older technologies should be able to interact with the
19   web page with ease, correct?
20        A.   Ideally, yes.
21             MR. PLUNKETT:  Objection.  Vague.
22             MR. PARADIS:  Q.  And under your definition
23   of access, the website designer should not design only
24   to the most up -- the most recent technologies, but to
25   the entire range of technologies that are generally