# EXHIBIT 1.5

Case 3:06-cv-01802-MHP    Document 43-3    Filed 07/10/2006    Page 1 of 19

Dockets.Justia.com

```
 1   being used, correct?
 2              MR. PLUNKETT:  Objection.  Vague.
 3              THE WITNESS:  Could you read that back,
 4   please?
 5              (Record read.)
 6              THE WITNESS:  Not design only -- yes, I
 7   think that characterizes my --
 8              MR. PARADIS:  Q.  Okay.  Do you recall
 9   doing a declaration in this case?
10         A.   I am sorry?
11         Q.   Do you recall signing a declaration in this
12   case?
13         A.   Yes.
14         Q.   And do you recall in paragraph 10 of your
15   declaration referring to both the WCAG and the
16   Section 508 standards?
17         A.   Yes.
18         Q.   Let me -- it's not a trick.  Let me give
19   you a copy of your declaration.  I am showing you
20   Exhibit A, Plaintiff's Exhibit A, which is a copy of
21   your declaration.
22              So, in paragraph 10, would you please turn
23   to that?  Do you see where you mention both WCAG and
24   Section 508 standards?
25         A.   Yes.
```

```
 1    result of an accessible website, yes.
 2         Q.  At the bottom of this page, it says, "How
 3    can we help?"  And the very -- the first item talks
 4    about helping customers in designing accessible
 5    websites; is that correct?
 6         A.  Yes.
 7         Q.  You have -- you have done so as a
 8    consultant; is that correct?
 9         A.  Yes.
10         Q.  The second part -- second paragraph talks
11    about assisting a client who already has an existing
12    website in making -- in increasing its accessibility;
13    is that right?
14         A.  Yes.
15         Q.  Do you have a methodology that you follow
16    when you are asked to assess a website in terms of its
17    accessibility?
18         A.  Yes.
19         Q.  What is your methodology?
20         A.  My methodology is essentially the
21    methodology that you can read on the World Wide Web
22    Consortium's Web Accessibility Initiative site on
23    methodology for evaluating websites.
24             I don't recall the actual URL at the
25    moment.
```

```
1           Q.  Is part of your methodology determining the
2     extent to which the website complies with WCAG 1.0?
3           A.  If that's what the client has asked.
4           Q.  What methodology -- well, what guidelines
5     have you followed in assisting clients in improving
6     accessibility of their websites?
7           A.  I have used WCAG 1.0, I have used
8     Section 508.
9           Q.  Would it be fair to say that WCAG and
10    Section 508 are two sets of guidelines that are being
11    developed in concert with each other?
12          MR. PLUNKETT:  Objection.  Vague.
13          THE WITNESS:  Could you rephrase that or
14    ask it again or be more specific?
15          MR. PARADIS:  Q.  I will try.  The drafters
16    of Section 508 actually looked at WCAG 1.0 as part of
17    their process in developing the web access provisions
18    of Section 508, correct?
19          A.  Yes.
20          Q.  And in the published 508 standards, there
21    is actually an advisory note explaining how certain
22    components of Section 508 meet certain standards within
23    WCAG 1.0, correct?
24          A.  Yes.
25          Q.  And WCAG is now being updated, correct?
```

```
 1                THE WITNESS:  It was believed that it is
 2      important that guidance be available.
 3                MR. PARADIS:  Q.  Is one reason for that so
 4      that designers would know what features are important
 5      to include in their website so that the site is
 6      accessible?
 7           A.   That's one reason, yes.
 8           Q.   Is another reason so that software
 9      developers, such as the makers of JAWS, would be able
10      to interact with website designers in a common frame of
11      reference?
12                MR. PLUNKETT:  Objection.  Vague.  Calls
13      for speculation.
14                THE WITNESS:  It was hoped that it would be
15      used that way.
16                MR. PARADIS:  Q.  So when you do assist a
17      client in helping to make its website more accessible,
18      if a client's website has many images that lack alt
19      text, what do you advise the client to do?
20           A.   I recommend that they add appropriate alt
21      text.
22           Q.   And if a client's website has lots of forms
23      that contain no labels or other mechanism to facilitate
24      a blind user's interaction with the form, what do you
25      advise the client to do?
```

```
 1                MR. PLUNKETT:  Objection.  Vague.
 2     Incomplete hypothetical.  Calls for speculation.
 3                MR. PARADIS:  Q.  Can you answer that?
 4          A.  I recommend --
 5                MR. PLUNKETT:  Same objections.
 6                MR. PARADIS:  Q.  Go ahead.
 7          A.  I recommend that they follow the
 8     guidelines.
 9          Q.  Which calls for providing labeling on the
10     forms, correct?
11          A.  Yes.
12                MR. PLUNKETT:  Objection.  Asked and
13     answered.
14                MR. PARADIS:  Q.  And if a client has web
15     pages on its website that have lots of different
16     activities going on in the page but no headings to
17     facilitate a blind user skipping from one part of the
18     page to another, what do you advise the client to do?
19                MR. PLUNKETT:  Objection.  Vague.
20     Incomplete hypothetical.  Calls for speculation.
21                THE WITNESS:  That one depends entirely on
22     the content and the design of a page.
23                MR. PARADIS:  Q.  Have you ever advised a
24     client to provide headings on different parts of its
25     home page to facilitate a blind user navigating from
```

1    read.  He identified four types of barriers.

2            And in terms of those four types of

3    barriers, do any of the differences between WCAG and

4    Section 508 matter?

5            MR. PLUNKETT:  Objection.  Vague.  Calls

6    for speculation.  Lacks foundation.  Calls for legal

7    conclusion.

8            THE WITNESS:  Yes.  It's not obvious to me.

9            MR. PARADIS:  Q.  Let me go through the

10    four types of barriers.

11            The first type of barrier Dr. Thatcher

12    discussed concerned lack of alt text on image links,

13    image button and image map areas.

14            Do you recall that?

15        A.  Yes.

16        Q.  Do any of these three differences that you

17    cite between WCAG and Section 508 affect whether the

18    lack of alt text is a barrier or is not a barrier to

19    blind users?

20            MR. PLUNKETT:  Objection.  Vague.

21            THE WITNESS:  No.

22            MR. PARADIS:  Q.  It remains a barrier

23    under both standards or guidelines, correct?

24        A.  That is -- I don't say what is or isn't

25    covered in these statements.

1        Q.   I take it you advise your clients, if they
2   are a government agency, for example, in the United
3   States, to follow, if they are a federal government
4   agency, to follow Section 508; is that right?
5        A.   Yes, in their procurement or redevelopment
6   of a website, certainly.
7        Q.   I take it that you find there is sufficient
8   guidance in Section 508 to set forth the elements
9   needed to make a website accessible to disabled users?
10       A.   No.  What I said was that I recommend to
11  federal U.S. organizations to use it because it's the
12  law.
13       Q.   So, but do you also believe it provides
14  many of the important elements needed for actual
15  usability by disabled people?
16       A.   It provides --
17            MR. PLUNKETT:  Objection.  Vague.  Calls
18  for speculation.
19            THE WITNESS:  I believe that it is not as
20  wide ranging as WCAG is in providing service to people
21  with different disabilities.
22            MR. PARADIS:  Q.  Is there anything in
23  Section 508 that provides a lesser level of
24  accessibility for blind users than WCAG?
25            MR. PLUNKETT:  Objection.  Vague.  The

1    documents would speak for themselves.

2             MR. PARADIS:  Q.  Let me withdraw that,

3    then.

4             You say you advise clients, federal

5    government agencies, to follow 508 because it's the

6    law.

7             Is there any other reason you would advise

8    such agencies to follow 508?

9         A.  If -- simply if they are not going to use

10   anything else, then 508 is the best chance they have

11   got.

12        Q.  If it's an entity that is not required to

13   follow 508, do you recommend that it follow WCAG?

14        A.  I recommend -- in the United States, I

15   recommend that they follow WCAG or 508 depending on

16   their -- again, it depends on a lot of factors around

17   what they are doing.

18        Q.  Now, would it be fair to say that when you

19   are advising or assisting a client on making its

20   website more accessible, part of the process is

21   bringing the website into compliance with WCAG or 508,

22   and part of the process is making sure that it is fully

23   usable?

24        A.  If that has been contracted, yes.

25        Q.  And I take it that meeting the guidelines

1    is part of the process for making your website fully
2    usable and accessible; is that correct?
3            MR. PLUNKETT:  Please read that back.
4            (Record read.)
5            MR. PLUNKETT:  Objection.  Vague.
6            MR. PARADIS:  It is vague.  Let me restate
7    it.
8        Q.  When advising a client to follow 508 or
9    what WCAG 1.0, I take it that the reason for that is
10   because meeting one of those standards will go a long
11   way towards making the client's website both accessible
12   and usable; is that correct?
13           MR. PLUNKETT:  Objection.  Vague.
14           THE WITNESS:  Yes, it's vague.  But, I
15   mean, it gives the client something to test against.
16           MR. PARADIS:  Q.  I take it some of the
17   elements are just very clear and obvious access
18   requirements, like providing alt text on image map
19   areas?
20           MR. PLUNKETT:  Objection.  Vague.
21           THE WITNESS:  It's clear and obvious to me.
22           MR. PARADIS:  Q.  In addition -- so one of
23   the benefits of following the guidelines is that it
24   gives an objective measurable test for whether the
25   website has at least minimum elements for access; is

```
 1              MR. PARADIS:  Q.  I am not asking -- I
 2   don't want that.  I am just wondering if you had any
 3   sense.  I take it you don't have any sense as you sit
 4   here of how much they overlap.
 5          A.   There is overlap between --
 6              MR. PLUNKETT:  Objection.  Asked and
 7   answered.
 8              THE WITNESS:  -- between the standards and
 9   the guidelines.
10              MR. PARADIS:  Q.  Would you say that the
11   Priority One elements in WCAG are very similar to the
12   Section 508 standards concerning website access?
13              MR. PLUNKETT:  Objection.  Vague.  The
14   documents speak for themselves.
15              THE WITNESS:  Could you repeat that,
16   please?
17              MR. PARADIS:  Read that back, please.
18              (Record read.)
19              THE WITNESS:  There are many similarities,
20   yes.
21              MR. PARADIS:  Q.  I take it that a website
22   can be brought into compliance with both sets of
23   standards; there is not a conflict between the two,
24   correct?
25          A.   That's correct.
```

1        Q.   In fact, you may advise a client to meet
2    both sets of standards in some situations; is that
3    correct?
4        A.   That's correct.
5        Q.   In fact, Section 508 advisory notes tell
6    readers what components of WCAG 1.0 are met and what
7    components are additional requirements, correct?
8        A.   That's correct.
9        Q.   So what was your point in identifying the
10   few differences between WCAG 1.0 and Section 508 in
11   your declaration?
12            MR. PLUNKETT:   Objection.   Vague.
13            THE WITNESS:   Yeah.   You are asking for my
14   opinion on my opinion?
15            MR. PARADIS:   Q.   Why did you say this in
16   your declaration?   What is the point you were trying to
17   make other than that there are some differences?
18       A.   I was asked if there were differences
19   between the two standards.
20       Q.   Do you find those differences significant
21   to you in any way in terms of evaluating whether
22   target.com is accessible or not?
23       A.   I am not evaluating target.com.
24            MR. PLUNKETT:   Objection.   Assumes facts.
25   Lacks foundation.   Argumentative.

```
 1              MR. PARADIS:  Q.  The court is being asked
 2    to evaluate this.  And do you find those differences
 3    between -- that you identified between 508 and WCAG to
 4    be significant in terms of an evaluation of whether
 5    target.com is accessible to blind users?
 6         A.  I don't know.  I have not looked at --
 7              MR. PLUNKETT:  Objection.  Foundation.
 8    Calls for speculation.
 9              THE WITNESS:  I have not looked at it.
10              MR. PARADIS:  Q.  Did you ever ask Target
11    or its lawyers why they cared if there were some
12    differences between 508 and WCAG?
13              MR. PLUNKETT:  Counsel, objection.  Asked
14    and answered.  Argumentative.
15              THE WITNESS:  I didn't ask.
16              MR. PLUNKETT:  Did you promise to finish by
17    1:00?
18              MR. PARADIS:  1:30.
19         Q.  How difficult would you say it is to make a
20    website compliant with 508 or WCAG 1.0?
21              MR. PLUNKETT:  Objection.  Calls for
22    speculation.  Incomplete hypothetical.  Lacks
23    foundation.
24              THE WITNESS:  There is no way to answer
25    that question.
```

```
 1   different?
 2        A.   Yes.
 3        Q.   And how did differences between users
 4   affect their interaction with a website, that was
 5   another question, right?
 6        A.   Approximately, yes.
 7        Q.   And now, in terms of whether you
 8   characterize a website as accessible or not, you look
 9   at the actual content and structure of the website,
10   correct?
11        A.   Yes.
12        Q.   You don't look at how one user with less
13   experience might have more difficulty than another user
14   with more experience; you look at, does the website
15   have the structural components needed to make it easily
16   usable by a wide variety of users, correct?
17             MR. PLUNKETT:  Objection.  Vague.
18   Incomplete hypothetical.
19             THE WITNESS:  Yeah.  It depends on what I
20   have been contracted to do with that evaluation or that
21   design.
22             MR. PARADIS:  Q.  Well, you mentioned in
23   your declaration that one of the blind people who
24   submitted a declaration used an older version of JAWS.
25   Do you remember that?
```

```
 1            A.   That's what I was told, yes.
 2            Q.   Were you told about the experiences of
 3   other blind users who still had difficulty even with
 4   newer versions of JAWS?
 5            MR. PLUNKETT:   Objection.  Assumes facts.
 6            THE WITNESS:   I don't recall.
 7            MR. PARADIS:   Q.   Did you ask anyone
 8   whether there were other blind users who had submitted
 9   declarations?
10            A.   I didn't ask about other people's
11   declarations.
12            Q.   So you just took the information you were
13   given by Target's lawyers and addressed only those
14   issues in your declaration; is that right?
15            A.   That's correct.
16            MR. PLUNKETT:   Objection.  Misstates the
17   testimony.  Argumentative.
18            MR. PARADIS:   Q.   And you didn't ask
19   Target's lawyers to tell you what the overall range of
20   experience of the blind users was, correct?
21            A.   I did not ask, that is correct.
22            Q.   You did not seek to elicit any information
23   from Target's lawyers that was not specifically given
24   to you; is that correct?
25            A.   That's correct.
```

```
 1    guidelines, 508 or WCAG?
 2              MR. PLUNKETT:  Objection.  Asked and
 3    answered.  Calls for speculation.  Vague.
 4              THE WITNESS:  I generally ask if there are
 5    any standards or guidelines to which they legally must
 6    apply.  And if not, then I use whatever is in my range
 7    of experience to help them make their website more
 8    accessible.
 9              MR. PARADIS:  Q.  Part of that is, I think
10    you have -- let me ask you.
11              In your website you reference WCAG, and I
12    think you said you primarily look to WCAG if it's not
13    an entity governed by 508; is that correct?
14        A.    As the basis, yes.
15        Q.    Then you say there are some techniques that
16    have changed and that you use your experience.
17              Would you say that these are methods that
18    you use that build upon compliance with WCAG?
19        A.    That seems fair to say, yes.
20        Q.    Now, in terms of whatever changes you are
21    referring to in paragraph 12, whatever they are, do any
22    of them affect -- in your understanding, do they --
23    start again.
24              Do any of the changes that you referred to
25    in paragraph 12 affect the requirements under 508 and
```

```
 1    WCAG that images have alt text?
 2            MR. PLUNKETT:  Objection.  Vague.  Lacks
 3    foundation.  Mischaracterizes the document.
 4            THE WITNESS:  I can't think of any.
 5            MR. PARADIS:  Q.  Would it be fair to say
 6    that for image maps, image buttons -- I don't want
 7    to -- let me start again.
 8            Is it okay with you if I use the word
 9    active images to refer to image links, image buttons
10    and image map areas?
11        A.  It is now, yes.
12        Q.  Would it be fair to say that for active
13    images, the alt text requirement is in both sets of
14    guidelines, and as far as you know, will continue to be
15    a requirement in any revised guidelines?
16            MR. PLUNKETT:  Objection.  Calls for
17    speculation.
18            THE WITNESS:  For a requirement to
19    compliance.
20            MR. PARADIS:  Q.  That's what I mean.  Is
21    it fair to say it will continue to be a requirement for
22    compliance?
23        A.  I can only assume so.  I don't know.  I am
24    not involved with either of the processes.
25        Q.  In terms of how you advise your own clients
```

```
 1    a problem on target.com.  Do you recall seeing his
 2    opinion?
 3            A.  I recall seeing his opinion, yes.
 4            Q.  Is it fair to say that the ability to use
 5    the keyboard to complete -- to interact with the
 6    website and not have to use a visual mouse, has been,
 7    is and will continue to be an access requirement or as
 8    part of the standards will be an access -- I will ask
 9    it again.
10                In terms of the keyboard as a way to
11    interact with the website, is it fair to say that that
12    is an access feature needed for compliance with 508 and
13    WCAG and will continue to be, as far as you know?
14            MR. PLUNKETT:  Objection.  Calls for
15    speculation.
16            THE WITNESS:  The first part -- you
17    actually asked three different things in that sentence.
18            MR. PARADIS:  Q.  I can break it down.
19                So in terms of the interaction, being able
20    to interact using a keyboard, is it fair to say that is
21    an access feature that has been required for compliance
22    with Section 508 and WCAG 1.0?
23            A.  Yes.
24            Q.  Is it fair to say that that remains a
25    requirement for compliance with 508 and WCAG 1.0?
```

```
 1           A.   I can only speculate.  I don't know.  I am
 2      assuming it will, but I don't know for sure.
 3           Q.   That is going to be my third question, will
 4      it continue to be, but currently, as it stands now, is
 5      it fair to say it is still a requirement for compliance
 6      with 508 and WCAG?
 7           A.   I thought that was the first question.
 8           Q.   First one was, has it been?  You said yes.
 9      And the current question is, is it still a requirement
10      currently?
11           A.   Since neither of those standards have
12      changed, then it must be.
13           Q.   And then my third question was, do you have
14      any reason to think it will not continue to be a
15      requirement?  Do you have any reason to think the
16      requirements will change when it comes to the keyboard
17      requirement?
18           A.   I could only speculate, but I don't imagine
19      them changing it, but anything is possible.
20           Q.   In terms of the navigation issue, do you
21      recall seeing Dr. Thatcher's assessment that there were
22      problems on target.com with lack of mechanisms to
23      enable easy navigation within a page?
24           A.   I recall seeing his -- yes.
25           Q.   And is it fair to say that both WCAG and
```