# EXHIBIT 4

Dockets.Justia.com

```
00001
 1                UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4     - - - - - - - - - - - - - - - - -
 5     NATIONAL FEDERATION OF THE    )   Case No.
 6     BLIND, et al.,                )   C 06-01802 MHP
 7              Plaintiffs,          )
 8     v.                            )
 9     TARGET CORPORATION,           )
10              Defendant.           )
11     - - - - - - - - - - - - - - - - -
12
13              DEPOSITION OF DR. JAMES THATCHER
14                   FRIDAY, JUNE 2, 2006
15
16
17
18
19
20
21
22          BY:   CHRISTINE L. JORDAN, CSR NO. 12262
23
24
25
```

```
00043
   1          Q.   What is the purpose of considering a
   2    clarification to the alt-text rule?
   3          A.   What is the purpose of clarifying the rule,
   4    to make it clearer.
   5          Q.   Is it because it's difficult to apply as it
   6    is today?
   7          A.   I don't think it's difficult to apply.  I
   8    think the problem is that we want -- we want web
   9    developers to use accessibility standards and
  10    guidelines to guide their work in developing accessible
  11    products because they're not going to understand how
  12    people with disabilities use their products.
  13               Probably many web developers have never seen
  14    a blind person use a screen reader on their website.
  15    So we use those guidelines and standards to help them
  16    do that job.  And the clearer those standards and
  17    guidelines are to that end, the better job is going to
  18    be done.
  19          Q.   Do you know whether the WCAG standards that
  20    were drafted in 1999 are undergoing any revisions?
  21          A.   Yes, I do.
  22          Q.   Is there a version --
  23          A.   They are.
  24          Q.   -- Version 2.0 of them?
  25          A.   There's a Version 2.0 of the Web Content
```

```
00045
 1    specific, and they want to have guidelines that are
 2    more general.  The second is to make certain that each
 3    of the, let me call them, checkpoints be testable which
 4    would throw out the example I used earlier in this
 5    deposition about clear and lucid language or whatever
 6    the correct phrasing is of that.
 7             Let's see, testable.  I've forgotten what the
 8    third is.
 9         Q.  Do you know the timeline for the WCAG Version
10    2.0 to be finalized?
11         A.  Yes.  The timeline for the WCAG 2.0 -- that's
12    how WCAG is, W-C-A-G -- 2.0 has gone into what's called
13    last call, which is the last chance to provide comments
14    on the draft of the guidelines.  After that, the Web
15    Content Accessibility Guidelines Working Group will
16    seek and test websites that meet the various levels of
17    Web Content Accessibility Guidelines for two months,
18    approximately.
19             And if all of that is successful, then
20    sometime in September or October they will be -- maybe
21    the end of the year they'll be finalized.  It's a
22    process that has been going on for four years.
23         Q.  We talked earlier about the combination of
24    guidelines and standards that you use to provide a
25    consultancy service to someone regarding website
```

```
00081
 1    Resources of the state use the Section 508 Standards as
 2    their model for accessibility of information
 3    technology.
 4              I don't know about the details of any other
 5    states.  I know California has a law on accessible --
 6    accessibility, electronic and information
 7    accessibility.  But I don't know the details of it at
 8    all.
 9         Q.   Do you know if there are states who have
10    adopted web accessibility guidelines that differ from
11    Section 508?
12         A.   I don't know the answer to that question.
13    If -- if they -- if they do adopt -- if -- if they
14    don't adopt exactly 508 or exactly Web Content
15    Accessibility Guidelines, they may reword them a little
16    bit.  But they'll be essentially the same.
17         Q.   Have you -- do you know that?
18         A.   No.
19         Q.   Is it your opinion that there is a consensus
20    regarding the standards for website accessibility?
21         A.   I think you already asked that question, but
22    I'll answer it again.
23              Yes, I think there is a consensus, and I
24    think the W3C's Web Content Accessibility Guidelines
25    Version 2 is a manifestation of that consensus.
```

```
00082
 1          Q.   Are there any other manifestations of that
 2    consensus?
 3          A.   Well, I think another manifestation of that
 4    consensus is the work that I do and people like me do
 5    in -- in evaluating and -- and suggesting
 6    accessibility.  We've been doing it long enough that --
 7    that we understand the way things should be done.  And
 8    so the written version, as I said, we've gone five
 9    years on Version 1 of the guidelines, and now we're
10    going to have a new one that will help us clarify that,
11    that work.
12          Q.   Is Version 2.0 currently being used by those
13    who evaluate website accessibility?
14          A.   I think a fair answer is no because it --
15    it's not official yet.  But implicitly yes because the
16    example that I used, which I think is a good one,
17    rather than just say provide a text equivalent, we
18    separate out the kinds of text equivalent because we
19    know for an active image we want the equivalent to be
20    what the function of the image is for information,
21    varying the images.  We want the -- the alt-text or
22    text equivalent to convey that information.
23               We do that.  We understand that web
24    developers understand that.  That's now being put into
25    the standard rather than just -- or guideline rather
```

```
00100
  1                    THE WITNESS:  I applied a combination of
  2      Section 508 and the Web Content Accessibility
  3      Guidelines to look at the con- -- the code of
  4      Target.com to find whether there were -- whether
  5      alt-text had -- whether images had text equivalence,
  6      whether forms were labeled, whether navigation was
  7      possible, in-page navigation was possible, and whether
  8      you could use the site with a keyboard.
  9      BY MR. PLUNKETT:
 10           Q.   Is it correct, then, that you looked for
 11      violations of the four guidelines we just talked about
 12      to determine if Target.com was accessible or not?
 13           A.   That's true.
 14           Q.   Can a website violate one of those four
 15      guidelines yet still be accessible?
 16                MR. PARADIS:  Objection; incomplete
 17      hypothetical.
 18                THE WITNESS:  Yes, a website can violate one
 19      of those four and be accessible.
 20      BY MR. PLUNKETT:
 21           Q.   If a website does violate one of those
 22      standards, what guidelines do you apply to determine
 23      whether the website is nonetheless accessible?
 24                MR. PARADIS:  Objection; incomplete
 25      hypothetical.
```

```
00101
 1              THE WITNESS:  I don't have a standard to
 2   apply to a website that doesn't -- what I judge
 3   websites on is basically compliance.  And if a website
 4   is missing alt-text on unimportant images, I say you've
 5   got to fix that.  But in fact, the alt-text on those
 6   unimportant images is not important for access by
 7   screen readers.
 8   BY MR. PLUNKETT:
 9        Q.   Did you form an opinion about whether
10   Target.com is compliant with the standards and
11   guidelines that you applied?
12        A.   Yes, I did.
13        Q.   And what was your opinion?
14        A.   It is not.
15        Q.   Did you form an opinion about whether or not
16   Target.com is accessible to blind users?
17        A.   Yes, I did.
18        Q.   What is your opinion?
19        A.   It's not.
20        Q.   What is your opinion that it is not
21   accessible based on?
22        A.   Well, based first on -- on my looking at
23   approximately 15 pages and analyzing them specifically
24   in -- I looked at four categories.  One is whether or
25   not the images had text equivalence, whether or not
```

```
00102
 1     forms were labeled, whether or not you could use the
 2     keyboard and whether there was any facility for in-page
 3     navigation.  And, basically, Target fails on all four
 4     of those.
 5          Q.   If you learned that blind users of Target.com
 6     were able to complete purchases of the products they
 7     were seeking, would that change your opinion?
 8          A.   No, it would not change my opinion.
 9          Q.   Why not?
10          A.   Because the -- if it -- because if a -- if a
11     blind person were able to complete a purchase on
12     Target.com, which I really doubt, but if they were, it
13     would only be in the face of incredible difficulties
14     and in the face of the combination of very frustrating
15     and very annoying imagemaps that have no text
16     equivalence, in the face of having to tab 50 times in
17     order to find a Continue Checkout button that is
18     labeled Proceed to Checkout button, in the face of not
19     being able to activate that button with the normal
20     procedures, and in the face of having to fill out forms
21     with your personal and financial information, having
22     no -- no sense of -- of security that the forms are
23     properly labeled so when you're putting in your credit
24     card or address or telephone number you're not positive
25     you're putting that information in the correct place.
```

```
00108
  1    certain conditions that -- that are -- are so clear
  2    and -- and so simple that I don't make any exception to
  3    images being unimportant or images being very
  4    important.  Every image needs a text equivalent.
  5             It's easier to just take compliance -- a
  6    better example which you haven't raised, we haven't
  7    talked about at all is forms because forms, most of the
  8    time, work correctly.  But most of the time, it's not
  9    good enough.  So I insist that forms always be labeled,
 10    in effect, they be client -- be compliant to be sure
 11    that -- that the website or that the page will be
 12    usable by a person who is blind.
 13    BY MR. PLUNKETT:
 14         Q.   In your review of the images on Target.com
 15    which lack text equivalence, did you evaluate whether
 16    or not the inaccessibility of that particular image
 17    would have an impact on the user's ability to access
 18    the goods and services of Target.com?
 19         A.   That -- that was not my -- my purpose in
 20    writing -- in -- in the evaluation that I wrote down.
 21    For example, when I go to a page, the first thing I
 22    look at is how many images that are active are missing
 23    alt-text.  If 29 out of 40 images are missing alt-text,
 24    active images are missing alt-text, that's very
 25    serious.  I don't look at where they are and -- and how
```

```
00109
 1   important they are.
 2        Q.   Is it fair to say, then, in evaluating this
 3   component of Target.com you did a quantitative analysis
 4   not a qualitative analysis?
 5        A.   Actually, yes, that's fair to say except
 6   the -- the qualitative analysis is that in the case of
 7   Target.com, the lack of alt-text made the experience
 8   particularly difficult.  In other words, the
 9   qualitative thing came in in the strange number of
10   words and letters and characters that many of the
11   witnesses have testified to.
12        Q.   Skipping to your fourth criteria which is
13   keyboard access, are there standards or guidelines for
14   keyboard access in Section 508 or the WCAG Version 1.0?
15   I did not see them cited in your declaration.
16        A.   Is it okay if I check the report?
17        Q.   Sure.  Of course.
18             MR. PARADIS:  Can I take a break, then?
19             MR. PLUNKETT:  Sure.  Go off the record.
20             (Recess taken.)
21             MR. PARADIS:  Stuart, I may have five -- I
22   may want five minutes at the end.
23             MR. PLUNKETT:  Just tell me when I have to
24   stop.  I mean, I'm going to be not asking a whole bunch
25   of stuff I wanted to ask, but that's the agreement we
```

```
00137
 1                MR. PLUNKETT:  Those are all the questions I
 2      have.  Thank you very much for your time.
 3                THE WITNESS:  Thank you very much.
 4                MR. PARADIS:  I have a few questions.
 5                        EXAMINATION
 6      BY MR. PARADIS:
 7           Q.   Dr. Thatcher, Mr. Plunkett asked you a number
 8      of questions about Section 508 Guidelines or Standards
 9      and WCAG Guidelines or Standards, Versions 1 and
10      Versions 2.  To what extent does Target.com comply with
11      any of these standards?
12                MR. PLUNKETT:  Objection; vague.
13                THE WITNESS:  Target.com does not comply with
14      any of those standards.  And you asked to what extent,
15      I would say to really an extreme extent.
16      BY MR. PARADIS:
17           Q.   Mr. Plunkett asked you whether your analysis
18      was more quantitative rather than qualitative.  To what
19      extent have you reached a qualitative opinion about the
20      usability of the Target.com website?
21                MR. PLUNKETT:  Objection; vague.
22                THE WITNESS:  I think that -- that there are
23      in my report and in my declaration both quantitative
24      and qualitative aspects of my assessment.  And it's
25      kind of easier just to talk about the quantitative
```

```
00139
 1    given page.  And in all three of those cases, the home
 2    page of Target is a real, very serious problem.
 3         Q.  Mr. Plunkett asked you whether the experience
 4    of a blind user may vary depending upon the type of
 5    screen reader used.  Are there any screen readers
 6    available that a blind user could use that would make
 7    the Target.com web page easily usable?
 8         A.  No, there aren't.
 9         Q.  Mr. Plunkett also asked you about different
10    types of operating systems.  Are there any operating
11    systems currently available that a blind user could
12    employ that would make Target.com easily usable?
13         A.  No.
14         Q.  Mr. Plunkett asked you about different types
15    of web browsers.  Are there any web browsers currently
16    available that a blind user can employ that would make
17    Target.com easily usable?
18         A.  No.
19         Q.  Mr. Plunkett asked you about various types of
20    screen readers, and you talked about JAWS and
21    Window-Eyes.  Are there any screen readers currently
22    available that a blind user could employ that would
23    make Target.com readily or easily usable?
24         A.  No.
25         Q.  Mr. Plunkett asked you about different
```

```
00140
  1    versions of JAWS.  Are there any versions of JAWS
  2    available that a blind user could employ that would
  3    make Target.com easily usable?
  4         A.   No, there aren't.
  5         Q.   Based on your evaluation of Target.com, how
  6    easy or difficult is it for a blind person using screen
  7    access software to browse the site?
  8         A.   I believe it's impossible.
  9         Q.   Based on your evaluation, how difficult or
 10    easy is it for a blind person to find a particular item
 11    that person may wish to buy?
 12         A.   A person might be able to find a particular
 13    item if they were lucky and chose the right strategy.
 14         Q.   And based on your evaluation of Target.com,
 15    how difficult or easy would it be for a blind person to
 16    independently complete a purchase?
 17         A.   Impossible.
 18              MR. PARADIS:  No further questions.
 19              MR. PLUNKETT:  No questions.
 20              (At 12:50 P.M., the deposition proceedings
 21              concluded.)
 22
 23
 24              _____
                 DR. JAMES THATCHER
 25
```