# EXHIBIT 1

Dockets.Justia.com

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                 SAN FRANCISCO DIVISION
                          - - -
 3

    NATIONAL FEDERATION OF THE BLIND, the
 4  NATIONAL FEDERATION OF THE BLIND OF
    CALIFORNIA, on behalf of their members,
 5  and Bruce F. Sexton, on behalf of himself
    and all other similarly situated,
 6                 Plaintiff,
 7  vs.                         No.  C06-01802 MHP
 8  TARGET CORPORATION, et al.,
                   Defendants.
 9  ---------------------------/
10
11
12                  DEPOSITION OF
13                CHARLES LETOURNEAU
14            SAN FRANCISCO, CALIFORNIA
15                  JULY 5, 2006
16
17
18  ATKINSON-BAKER, INC.
    COURT REPORTERS
19  (800) 288-3376
    www.depo.com
20
    REPORTED BY: DANUTA KRANTZ, CSR NO. 4782
21  FILE No.: A005872
22
23
24
25
```

1          A.    It was from Stuart.

2          Q.    Mr. Plunkett?

3          A.    Mr. Plunkett.

4          Q.    And what did Mr. Plunkett say to you,

5    roughly, the gist?

6          A.    Roughly, he introduced himself as

7    representing Morrison & Foerster.  He said that they

8    were legal representatives for Target Corporation in a

9    complaint filed by the, as I recall, the National

10   Federation of the Blind and probably others, and asked

11   me some questions about my experience in website

12   accessibility in my field, and that was the gist of it.

13   Yes.

14         Q.    Did he indicate that he was interested in

15   retaining your services as a litigation expert?

16         A.    I don't remember if that was in the first

17   call or in a follow-up call.  It might have been in the

18   first call, but I think he was wanting to find out if I

19   met his qualifications for --

20         Q.    Did he explain that this litigation

21   concerns the accessibility of target.com to blind

22   users?

23         A.    Yes.

24         Q.    Had you ever evaluated target.com before?

25         A.    No.

| | | |
|---|---|---|
| 1 | Q. | And have you, up through now, gone and inspected target.com? |
| 3 | A. | No, I have not. |
| 4 | Q. | Why not? |
| 5 | A. | I was not asked to. |
| 6 | Q. | I take it you provide services to website designers and authors in helping them make their websites accessible; is that right? |
| 9 | A. | Yes, among other things. |
| 10 | Q. | What standards do you apply when you assist a website designer or author in making its website accessible? |
| 13 | A. | Primarily I use the standards or guidelines that I am asked to use by the client. |
| 15 | Q. | Have you assisted any retailer in making a retailer's website accessible? |
| 17 | A. | No, I have not. |
| 18 | Q. | Have you assisted any business entity that is not a government entity in making its website accessible? |
| 21 | A. | No, I have not. |
| 22 | Q. | What types of entities have you assisted in helping make their websites accessible? |
| 24 | A. | Federal government of Canada primarily, and a number of nongovernmental organizations, such as |

1    advocacy groups and organizations for people with
2    disabilities.
3        Q.   Were you asked not to look at target.com?
4        A.   I don't recall being asked that.  I was not
5    asked to look at it.
6        Q.   Do you find it surprising that you were not
7    asked to look at the website which is the subject of
8    this litigation?
9        A.   No, I don't think so, because I was asked
10   some specific questions that didn't require the answers
11   and which didn't require looking at the website.
12       Q.   What questions were you asked to address?
13       A.   I was asked three questions.  One was about
14   the different kinds of standards, the different
15   standards that exist for people to follow in designing
16   websites.  I was asked about screen reader usage by
17   people who are blind.  And I was asked specifically
18   there about the kind of versions of screen readers that
19   exist, differences between versions.
20            And thirdly, if other factors besides
21   websites' compliance affect how people with
22   disabilities interact with those websites.
23            MR. PARADIS:  Can you read that last answer
24   back, please?
25            (Record read.)

1    Thatcher.

2            MR. PARADIS:   Q.   Have you -- you have
3    worked hand in hand with him on a variety of projects
4    relating to web accessibility; is that right?

5            A.   I wouldn't say hand in hand, but we have
6    worked together on committees and working groups, yes.

7            Q.   Would you say that Dr. Thatcher is highly
8    regarded in the field among experts in your field?

9            A.   Yes.

10           Q.   Have you reviewed the declaration that
11   Dr. Thatcher prepared and signed in this litigation?

12           A.   No.

13           Q.   Were you aware that Dr. Thatcher had
14   executed a declaration in this case?

15           A.   Yes.

16           Q.   Did you ever ask to see Dr. Thatcher's
17   declaration?

18           A.   No.

19           Q.   Why not?

20           A.   It was not part of what I was being asked.

21           Q.   You said that the third question you were
22   being asked was whether other factors besides website
23   compliance affect how people with disabilities interact
24   with websites.

25                What is the role of website compliance

18

1      A.  Yes.

2      Q.  Let me show you a document we have marked

3  as Plaintiff's Exhibit F.  And I will give a copy to

4  Stuart.

5           MR. PLUNKETT:  Is this F because you

6  premarked exhibits?

7           MR. PARADIS:  Yes.  And I think all of this

8  is Exhibit F.  That is your copy.

9      Q.  Mr. Letourneau, would you review Exhibit F

10 and tell me if that looks like a printout of your

11 website?

12     A.  Yes.

13     Q.  Okay.  Now, the very first paragraph of

14 your website has a definition of web accessibility.  Do

15 you see that?

16     A.  Yes.

17     Q.  It says, "What does web accessibility mean?

18 To me it means that anyone using any kind of web

19 browsing technology must be able to visit any site and

20 get a full and complete understanding of the

21 information contained there, as well as have the full

22 and complete ability to interact with the site."

23          Is that your understanding of web

24 accessibility?

25     A.  Writ large, yes.

20

1      A.   The use of appropriate alt text is very
2  important to the experience of someone using the
3  website, someone with a screen reader using a website.
4      Q.   Is it a critical requirement for blind
5  users?
6           MR. PLUNKETT:  Objection.  Vague.
7  Incomplete hypothetical.  Calls for speculation.
8           THE WITNESS:  According to the standard, it
9  is important, a very important part of the web
10 experience.  Yes.
11          MR. PARADIS:  Q.  Based on your own
12 experience as an expert, would you agree that correctly
13 providing alt text is a critical access requirement for
14 blind users to a website?
15          MR. PLUNKETT:  Objection.  Incomplete
16 hypothetical.  Calls for speculation.
17          THE WITNESS:  In general, yes.
18          MR. PARADIS:  Q.  Another element you
19 mentioned here is, "misuse or don't use title."
20          What does "title" mean as you used it here?
21     A.   The title I am referring to there is the
22 HTML title that appears in the top bar of most browsers
23 to identify the page.
24     Q.   Is that sometimes also referred to as
25 headings?

1        Q.  Yes.

2        A.  What was the intent?

3        Would you repeat that, please?

4        (Record read.)

5        THE WITNESS:  Actually, I am not sure I

6  understand what you mean by "intent" in that.

7        MR. PARADIS:  Q.  Am I correct that

8  Priority Two is the designation for features that are

9  important to provide because some people with

10  disabilities will have difficulty using the website

11  unless they are provided?

12        A.  I think that characterizes the intent of

13  Priority Two, yes.

14        Q.  And then Priority Three are features that

15  are not as important as Priorities One and Two, in

16  terms of making a website usable by disabled people; is

17  that correct?

18        A.  That is an interpretation of that, yes.

19        Q.  Is that an interpretation you would agree

20  with?

21        A.  I think in general, yes.

22        Q.  Looking again at slide 4 from this

23  Exhibit E, I see that using header elements to convey

24  document structure is a Priority Two item.  Do you see

25  that?

1   A.  Yes.

2   Q.  What does that mean?

3   MR. PLUNKETT:  Objection.  Vague.

4   THE WITNESS:  If a document is a structured
5   document, then proper use of headers to identify the
6   sections of that document will aid the understanding
7   and navigation of that document.

8   MR. PARADIS:  Q.  Would you consider this a
9   basic navigation element as you have used the term
10  "basic"?

11  A.  For structured documents, yes.

12  Q.  And is this a basic navigation element that
13  blind people need?

14  MR. PLUNKETT:  Objection.  Incomplete
15  hypothetical.  Calls for speculation.

16  THE WITNESS:  The use of headers would make
17  it easier for a blind person to navigate a structured
18  document.  Do they need it?  That is open to
19  speculation.

20  MR. PARADIS:  Q.  Was it the consensus of
21  the WCAG working group -- let me start again.

22  Was there a WCAG working group?

23  A.  Yes.

24  Q.  Is that the group that developed the WCAG
25  1.0 standards?

1         Q.   Right.  Unfortunately, the declaration and
2    the attachments use letters.  The declaration is
3    Exhibit B, and attached to the declaration as Exhibit A
4    is an assessment report that Dr. Thatcher prepared in
5    July of 2005.
6         A.   Thank you.
7         Q.   I would like you to look at the tab on the
8    first page of this report, paragraph three.  It's
9    labeled, "Summary:  Target.com accessibility."
10             And then he says in here, "The key issues
11   for accessibility of any site are:  No. 1, Text
12   equivalents for images."
13             Do you see that?
14        A.   Yes.
15        Q.   Do you agree with that?
16        A.   Yes.
17        Q.   No. 2, on the next page is, "Labeling for
18   forms."
19             Do you have an understanding of what
20   "Labeling for forms" means?
21        A.   Yes.
22        Q.   And do you consider labeling for forms to
23   be a key issue for accessibility of any site for blind
24   users?
25             MR. PLUNKETT:  Objection.  Calls for

```
 1   speculation.  Incomplete hypothetical.
 2           THE WITNESS:  I think that proper labeling
 3   of forms can make forms easier to use.
 4           MR. PARADIS:  Q.  What is your
 5   understanding of the requirements within WCAG 1.0
 6   concerning labeling of forms?
 7       A.  I believe it was a Priority Two.  I just --
 8   I want to refresh myself on that.
 9       Q.  Sure.
10       A.  Yes.  Priority Two.
11       Q.  And what is the purpose for requiring
12   labeling of forms within WCAG as you understand it?
13           MR. PLUNKETT:  Objection.  Vague.
14           THE WITNESS:  It would -- my interpretation
15   of that has been that for screen readers that recognize
16   form labels, it allows the web page designer more
17   flexibility in how they design their forms, so that the
18   label that applies for a particular field is
19   discoverable.
20           MR. PARADIS:  Q.  Is the ultimate purpose,
21   as you understand it, so that a blind user can know
22   with confidence what each field within the form calls
23   for?
24       A.  It would aid that, yes.
25       Q.  And is the ultimate purpose, so that a
```

1  blind user can fill out a form with as much ease and
2  confidence as a sighted person could?
3          A.  Yes.
4          Q.  The third item Dr. Thatcher mentions is
5  labeled "Techniques for navigation."  And he says,
6  "Large pages with lots of links are organized into
7  groups or sections.  When those section headings are
8  marked up as HTML headings, the keyboard user can move
9  from section to section with a single key on the
10 keyboard.  Without this accommodation it is extremely
11 difficult to use the page for its intended purpose."
12         Do you agree that this is an important
13 access element for blind users in a web page such as
14 target.com?
15         A.  I can't --
16         MR. PLUNKETT:  Objection.  Calls for
17 speculation.
18         THE WITNESS:  I have not seen target.com,
19 so I can't --
20         MR. PARADIS:  Q.  Have you seen the website
21 of any large retail company?
22         A.  Yes.
23         Q.  Can you give me an example of one you have
24 seen in the last year?
25         A.  Company called Future Shop.

```
 1    specific.  There are many techniques for navigation.
 2              MR. PARADIS:  Q.  Well, looking at how
 3    Dr. Thatcher describes it in paragraph three, he says,
 4    "Large pages with lots of links are organized into
 5    groups or sections."
 6              Do you consider that an important access
 7    feature for blind users of a web page that has lots of
 8    links?
 9              MR. PLUNKETT:  Objection.  Vague.  Calls
10    for speculation.  Incomplete hypothetical.
11              THE WITNESS:  It might very well.
12              MR. PARADIS:  Q.  In a website that has a
13    home page with lots of different sections that perform
14    different functions, is it important for such a page to
15    have techniques for navigation so that blind users can
16    move easily around the home page?
17              MR. PLUNKETT:  Objection.  Incomplete
18    hypothetical.  Calls for speculation.  Vague.
19              THE WITNESS:  There are many techniques for
20    navigation, and having some is important.
21              MR. PARADIS:  Q.  And particularly -- is it
22    particularly important to have a mechanism to avoid
23    repetitive navigation links on such a page?
24              MR. PLUNKETT:  Objection.  Incomplete
25    hypothetical.  Calls for speculation.  Vague.
```

```
 1              THE WITNESS:  In general, yes, I do believe
 2   that.
 3              MR. PARADIS:  Q.  And that is a requirement
 4   of Section 508 guidelines, correct?
 5         A.   I believe it is, yes.
 6         Q.   Just so I am clear, what do you mean by a
 7   computer -- I am sorry.  What do you mean by a web page
 8   versus a website?
 9         A.   A web page -- a lot of people are arguing
10   over this one right now.  In my opinion, a web page is
11   a single unit delivered by the entering of a URL, a web
12   address.  A website is the complete collection of
13   linked pages in a website.
14         Q.   The next item, No. 4, in Dr. Thatcher's
15   report, is labeled, Keyboard access.
16              Do you consider it a critical access
17   feature for blind users that a website enable them to
18   perform all of the user functions through a keyboard?
19              MR. PLUNKETT:  Objection.  Incomplete
20   hypothetical.  Calls for speculation.  Vague.
21              THE WITNESS:  I generally agree with that,
22   yes.
23              MR. PARADIS:  Q.  On the next paragraph,
24   going to the second sentence -- first of all, this
25   paragraph discusses target.com.  And it says, "On these
```

```
 1              MR. PARADIS:  Q.  What about Section 508?
 2     Is it the recommended method under 508?
 3              A.  I don't remember the exact wording of 508.
 4     I would have to read it to refresh my memory.
 5              Q.  Is some form of form labeling required
 6     under Section 508?
 7              A.  I would have to read the web section of
 8     that again.  I don't have that in front of me.
 9              Q.  Back to Dr. Thatcher's assessment report.
10     He then says, in the summary paragraph, "Nothing has
11     been done to improve navigation for screen reader or
12     keyboard users," as part of his critique of target.com.
13              Assuming hypothetically that target.com
14     lacks navigation features to enable blind users to move
15     around within the home page easily, would you consider
16     that home page to be inaccessible to blind users?
17              A.  I would have to --
18              MR. PLUNKETT:  Objection.  Vague.
19     Incomplete hypothetical.  Calls for speculation.
20              THE WITNESS:  I would really have to
21     evaluate the website to give a complete and honest
22     answer to that.
23              MR. PARADIS:  Q.  Why didn't you evaluate
24     target.com?
25              A.  I was not asked to.
```

1   Q.  Do you find it odd that you are being
2   designated as an expert on web access in this case and
3   have not even looked at the website at issue?
4           MR. PLUNKETT:  Objection.  Argumentative.
5           Do you find it odd?
6           MR. PARADIS:  Q.  The question is to you.
7   Do you find that odd?
8   A.  I was asked three specific questions, and I
9   provided my expertise on those answers.  You are asking
10  me a lot of extra questions, but I was not asked by the
11  lawyers on this side.
12  Q.  Do you only evaluate the specific issues
13  you are asked to address when you are called upon as an
14  expert on web access?
15  A.  I evaluate what the client has asked me to
16  evaluate.
17  Q.  Did you ever find it's curious, in your own
18  mind, hey, is target.com actually accessible to blind
19  people or not?
20          MR. PLUNKETT:  Objection.  Asked and
21  answered.
22          THE WITNESS:  I don't spend my time
23  wondering about all of the websites that are out there
24  in the world as to whether they are accessible or not.
25  There are 75 million websites nowadays.  No, I don't

```
 1    ask myself that question.
 2                MR. PARADIS:  Q.  This is the only website
 3    where you have been asked to -- strike that.
 4                Are there any other websites that you have
 5    been asked to address in any way as part of a
 6    litigation?
 7         A.   No.
 8         Q.   Did your client in this case ask you to
 9    address only those three questions?
10         A.   Yes.
11         Q.   The next item in Dr. Thatcher's summary
12    paragraph says, "As a rough estimate, 80 percent of the
13    images lack text equivalent."
14                Assuming hypothetically that that is
15    correct, would you consider this a significant access
16    barrier on target.com?
17                MR. PLUNKETT:  Objection.  Assumes facts.
18    Calls for speculation.
19                THE WITNESS:  I would have to look at the
20    website to completely answer that question.
21                MR. PARADIS:  Q.  You mentioned earlier the
22    phrase, critical images.  Let me ask you to turn to
23    page 6 of Dr. Thatcher's report.  He has got a section
24    here labeled Detailed Results.  And he has got a
25    summary box under 6.1.  Do you see that?
```

1     for speculation.  Lacks foundation.
2                THE WITNESS:  The purpose is to facilitate,
3     to make it easier for someone to do that.  Screen
4     readers are not often very good at fixing bad design or
5     mitigating bad design.
6                MR. PARADIS:  Q.  Now, the WCAG guidelines
7     that you helped develop were designed to make web pages
8     accessible to a wide variety of different types of
9     disabilities, correct?
10         A.   That's the intent, yes.
11         Q.   They were designed to make disabled people
12    able to access websites using a wide range of
13    screen-reading software, correct?
14         A.   It was to allow web page designers to make
15    web pages that could facilitate that interaction.
16         Q.   And the -- your understanding of access
17    is -- for website access is that even people using
18    older technologies should be able to interact with the
19    web page with ease, correct?
20         A.   Ideally, yes.
21              MR. PLUNKETT:  Objection.  Vague.
22              MR. PARADIS:  Q.  And under your definition
23    of access, the website designer should not design only
24    to the most up -- the most recent technologies, but to
25    the entire range of technologies that are generally