# EXHIBIT 1.5

Dockets.Justia.com

1    being used, correct?

2                MR. PLUNKETT:  Objection.  Vague.

3                THE WITNESS:  Could you read that back,

4    please?

5                (Record read.)

6                THE WITNESS:  Not design only -- yes, I

7    think that characterizes my --

8                MR. PARADIS:  Q.  Okay.  Do you recall

9    doing a declaration in this case?

10               A.  I am sorry?

11               Q.  Do you recall signing a declaration in this

12   case?

13               A.  Yes.

14               Q.  And do you recall in paragraph 10 of your

15   declaration referring to both the WCAG and the

16   Section 508 standards?

17               A.  Yes.

18               Q.  Let me -- it's not a trick.  Let me give

19   you a copy of your declaration.  I am showing you

20   Exhibit A, Plaintiff's Exhibit A, which is a copy of

21   your declaration.

22               So, in paragraph 10, would you please turn

23   to that?  Do you see where you mention both WCAG and

24   Section 508 standards?

25               A.  Yes.

1    result of an accessible website, yes.

2         Q.  At the bottom of this page, it says, "How

3    can we help?"  And the very -- the first item talks

4    about helping customers in designing accessible

5    websites; is that correct?

6         A.  Yes.

7         Q.  You have -- you have done so as a

8    consultant; is that correct?

9         A.  Yes.

10         Q.  The second part -- second paragraph talks

11    about assisting a client who already has an existing

12    website in making -- in increasing its accessibility;

13    is that right?

14         A.  Yes.

15         Q.  Do you have a methodology that you follow

16    when you are asked to assess a website in terms of its

17    accessibility?

18         A.  Yes.

19         Q.  What is your methodology?

20         A.  My methodology is essentially the

21    methodology that you can read on the World Wide Web

22    Consortium's Web Accessibility Initiative site on

23    methodology for evaluating websites.

24              I don't recall the actual URL at the

25    moment.

1          Q.   Is part of your methodology determining the

2     extent to which the website complies with WCAG 1.0?

3          A.   If that's what the client has asked.

4          Q.   What methodology -- well, what guidelines

5     have you followed in assisting clients in improving

6     accessibility of their websites?

7          A.   I have used WCAG 1.0, I have used

8     Section 508.

9          Q.   Would it be fair to say that WCAG and

10    Section 508 are two sets of guidelines that are being

11    developed in concert with each other?

12              MR. PLUNKETT:   Objection.   Vague.

13              THE WITNESS:   Could you rephrase that or

14    ask it again or be more specific?

15              MR. PARADIS:   Q.   I will try.   The drafters

16    of Section 508 actually looked at WCAG 1.0 as part of

17    their process in developing the web access provisions

18    of Section 508, correct?

19         A.   Yes.

20         Q.   And in the published 508 standards, there

21    is actually an advisory note explaining how certain

22    components of Section 508 meet certain standards within

23    WCAG 1.0, correct?

24         A.   Yes.

25         Q.   And WCAG is now being updated, correct?

1          THE WITNESS:  It was believed that it is

2    important that guidance be available.

3          MR. PARADIS:  Q.  Is one reason for that so

4    that designers would know what features are important

5    to include in their website so that the site is

6    accessible?

7          A.  That's one reason, yes.

8          Q.  Is another reason so that software

9    developers, such as the makers of JAWS, would be able

10   to interact with website designers in a common frame of

11   reference?

12         MR. PLUNKETT:  Objection.  Vague.  Calls

13   for speculation.

14         THE WITNESS:  It was hoped that it would be

15   used that way.

16         MR. PARADIS:  Q.  So when you do assist a

17   client in helping to make its website more accessible,

18   if a client's website has many images that lack alt

19   text, what do you advise the client to do?

20         A.  I recommend that they add appropriate alt

21   text.

22         Q.  And if a client's website has lots of forms

23   that contain no labels or other mechanism to facilitate

24   a blind user's interaction with the form, what do you

25   advise the client to do?

1              MR. PLUNKETT:  Objection.  Vague.

2    Incomplete hypothetical.  Calls for speculation.

3              MR. PARADIS:  Q.  Can you answer that?

4         A.  I recommend --

5              MR. PLUNKETT:  Same objections.

6              MR. PARADIS:  Q.  Go ahead.

7         A.  I recommend that they follow the

8    guidelines.

9         Q.  Which calls for providing labeling on the

10   forms, correct?

11        A.  Yes.

12             MR. PLUNKETT:  Objection.  Asked and

13   answered.

14             MR. PARADIS:  Q.  And if a client has web

15   pages on its website that have lots of different

16   activities going on in the page but no headings to

17   facilitate a blind user skipping from one part of the

18   page to another, what do you advise the client to do?

19             MR. PLUNKETT:  Objection.  Vague.

20   Incomplete hypothetical.  Calls for speculation.

21             THE WITNESS:  That one depends entirely on

22   the content and the design of a page.

23             MR. PARADIS:  Q.  Have you ever advised a

24   client to provide headings on different parts of its

25   home page to facilitate a blind user navigating from

1    read.  He identified four types of barriers.

2               And in terms of those four types of

3    barriers, do any of the differences between WCAG and

4    Section 508 matter?

5               MR. PLUNKETT:  Objection.  Vague.  Calls

6    for speculation.  Lacks foundation.  Calls for legal

7    conclusion.

8               THE WITNESS:  Yes.  It's not obvious to me.

9               MR. PARADIS:  Q.  Let me go through the

10   four types of barriers.

11              The first type of barrier Dr. Thatcher

12   discussed concerned lack of alt text on image links,

13   image button and image map areas.

14              Do you recall that?

15        A.   Yes.

16        Q.   Do any of these three differences that you

17   cite between WCAG and Section 508 affect whether the

18   lack of alt text is a barrier or is not a barrier to

19   blind users?

20              MR. PLUNKETT:  Objection.  Vague.

21              THE WITNESS:  No.

22              MR. PARADIS:  Q.  It remains a barrier

23   under both standards or guidelines, correct?

24        A.   That is -- I don't say what is or isn't

25   covered in these statements.

1          Q.  I take it you advise your clients, if they

2     are a government agency, for example, in the United

3     States, to follow, if they are a federal government

4     agency, to follow Section 508; is that right?

5          A.  Yes, in their procurement or redevelopment

6     of a website, certainly.

7          Q.  I take it that you find there is sufficient

8     guidance in Section 508 to set forth the elements

9     needed to make a website accessible to disabled users?

10          A.  No.  What I said was that I recommend to

11     federal U.S. organizations to use it because it's the

12     law.

13          Q.  So, but do you also believe it provides

14     many of the important elements needed for actual

15     usability by disabled people?

16          A.  It provides --

17          MR. PLUNKETT:  Objection.  Vague.  Calls

18     for speculation.

19          THE WITNESS:  I believe that it is not as

20     wide ranging as WCAG is in providing service to people

21     with different disabilities.

22          MR. PARADIS:  Q.  Is there anything in

23     Section 508 that provides a lesser level of

24     accessibility for blind users than WCAG?

25          MR. PLUNKETT:  Objection.  Vague.  The

1    documents would speak for themselves.

2              MR. PARADIS:   Q.   Let me withdraw that,

3    then.

4              You say you advise clients, federal

5    government agencies, to follow 508 because it's the

6    law.

7              Is there any other reason you would advise

8    such agencies to follow 508?

9              A.   If -- simply if they are not going to use

10   anything else, then 508 is the best chance they have

11   got.

12             Q.   If it's an entity that is not required to

13   follow 508, do you recommend that it follow WCAG?

14             A.   I recommend -- in the United States, I

15   recommend that they follow WCAG or 508 depending on

16   their -- again, it depends on a lot of factors around

17   what they are doing.

18             Q.   Now, would it be fair to say that when you

19   are advising or assisting a client on making its

20   website more accessible, part of the process is

21   bringing the website into compliance with WCAG or 508,

22   and part of the process is making sure that it is fully

23   usable?

24             A.   If that has been contracted, yes.

25             Q.   And I take it that meeting the guidelines

1    is part of the process for making your website fully

2    usable and accessible; is that correct?

3              MR. PLUNKETT:  Please read that back.

4              (Record read.)

5              MR. PLUNKETT:  Objection.  Vague.

6              MR. PARADIS:  It is vague.  Let me restate

7    it.

8              Q.  When advising a client to follow 508 or

9    what WCAG 1.0, I take it that the reason for that is

10   because meeting one of those standards will go a long

11   way towards making the client's website both accessible

12   and usable; is that correct?

13             MR. PLUNKETT:  Objection.  Vague.

14             THE WITNESS:  Yes, it's vague.  But, I

15   mean, it gives the client something to test against.

16             MR. PARADIS:  Q.  I take it some of the

17   elements are just very clear and obvious access

18   requirements, like providing alt text on image map

19   areas?

20             MR. PLUNKETT:  Objection.  Vague.

21             THE WITNESS:  It's clear and obvious to me.

22             MR. PARADIS:  Q.  In addition -- so one of

23   the benefits of following the guidelines is that it

24   gives an objective measurable test for whether the

25   website has at least minimum elements for access; is

1    that correct?

2                    MR. PLUNKETT:  Objection.  Vague.

3                    THE WITNESS:  It's a reference to give

4    people some guidance on how to make their websites more

5    accessible.  I use it as a tool for evaluating

6    websites.

7                    MR. PARADIS:  Q.  Would you agree that one

8    of the reasons to measure your website against these

9    guidelines is so that there are certain minimum

10   objective standards that you can follow as a website

11   designer?

12                   MR. PLUNKETT:  Objection.  Vague.

13                   THE WITNESS:  In many cases, yes, that is

14   probably true.

15                   MR. PARADIS:  Q.  Then in terms of

16   usability, would it be fair to say that what you mean

17   by this is that, in an ideal world, you would want a

18   website designer to not only follow the guidelines, but

19   to also go one step further and check on actual

20   usability to make sure that they are meeting both the

21   letter of these guidelines and the ultimate goal of

22   usability?

23                   A.  In an ideal world, yes.

24                   Q.  I take it that, although there are some

25   differences between 508 and WCAG, the end goal of both

1    MR. PARADIS:  Q.  I am not asking -- I

2    don't want that.  I am just wondering if you had any

3    sense.  I take it you don't have any sense as you sit

4    here of how much they overlap.

5         A.  There is overlap between --

6         MR. PLUNKETT:  Objection.  Asked and

7    answered.

8         THE WITNESS:  -- between the standards and

9    the guidelines.

10        MR. PARADIS:  Q.  Would you say that the

11   Priority One elements in WCAG are very similar to the

12   Section 508 standards concerning website access?

13        MR. PLUNKETT:  Objection.  Vague.  The

14   documents speak for themselves.

15        THE WITNESS:  Could you repeat that,

16   please?

17        MR. PARADIS:  Read that back, please.

18        (Record read.)

19        THE WITNESS:  There are many similarities,

20   yes.

21        MR. PARADIS:  Q.  I take it that a website

22   can be brought into compliance with both sets of

23   standards; there is not a conflict between the two,

24   correct?

25        A.  That's correct.

1          Q.  In fact, you may advise a client to meet

2     both sets of standards in some situations; is that

3     correct?

4          A.  That's correct.

5          Q.  In fact, Section 508 advisory notes tell

6     readers what components of WCAG 1.0 are met and what

7     components are additional requirements, correct?

8          A.  That's correct.

9          Q.  So what was your point in identifying the

10    few differences between WCAG 1.0 and Section 508 in

11    your declaration?

12              MR. PLUNKETT:  Objection.  Vague.

13              THE WITNESS:  Yeah.  You are asking for my

14    opinion on my opinion?

15              MR. PARADIS:  Q.  Why did you say this in

16    your declaration?  What is the point you were trying to

17    make other than that there are some differences?

18         A.  I was asked if there were differences

19    between the two standards.

20         Q.  Do you find those differences significant

21    to you in any way in terms of evaluating whether

22    target.com is accessible or not?

23         A.  I am not evaluating target.com.

24              MR. PLUNKETT:  Objection.  Assumes facts.

25    Lacks foundation.  Argumentative.

```
 1                MR. PARADIS:   Q.   The court is being asked

 2      to evaluate this.   And do you find those differences

 3      between -- that you identified between 508 and WCAG to

 4      be significant in terms of an evaluation of whether

 5      target.com is accessible to blind users?

 6           A.   I don't know.   I have not looked at --

 7                MR. PLUNKETT:   Objection.   Foundation.

 8      Calls for speculation.

 9                THE WITNESS:   I have not looked at it.

10                MR. PARADIS:   Q.   Did you ever ask Target

11      or its lawyers why they cared if there were some

12      differences between 508 and WCAG?

13                MR. PLUNKETT:   Counsel, objection.   Asked

14      and answered.   Argumentative.

15                THE WITNESS:   I didn't ask.

16                MR. PLUNKETT:   Did you promise to finish by

17      1:00?

18                MR. PARADIS:   1:30.

19           Q.   How difficult would you say it is to make a

20      website compliant with 508 or WCAG 1.0?

21                MR. PLUNKETT:   Objection.   Calls for

22      speculation.   Incomplete hypothetical.   Lacks

23      foundation.

24                THE WITNESS:   There is no way to answer

25      that question.
```

1              MR. PARADIS:  Q.  In your website, you

2      say -- you describe it as a relatively simple task.

3      What did you mean by that?

4              MR. PLUNKETT:  Asked and answered.  Same

5      objection.

6              THE WITNESS:  For an expert to make a

7      website more accessible is a relatively simple task.

8              MR. PARADIS:  Q.  And an expert -- who

9      would you consider sufficiently qualified?  What are

10     the qualification requirements to be an expert?

11             MR. PLUNKETT:  Objection.  Vague.  Calls

12     for speculation.

13             THE WITNESS:  Exactly.  A wide, thorough

14     and deep knowledge of all of the issues.

15             MR. PARADIS:  Q.  Are there -- I want to

16     get a sense from you of how many people would meet that

17     standard.  Would you say it's at least in the hundreds?

18         A.  I couldn't begin to guess that any more.

19         Q.  It's a lawyer's way of asking questions.

20             Would you say it's at least in the dozens?

21     Trying to get a bottom level here.

22         A.  I think I know a dozen people at least that

23     would qualify for that.

24         Q.  Did anyone at Target or anyone at its

25     attorneys who hired you suggest to you that they did

1    different?

2            A.  Yes.

3            Q.  And how did differences between users

4    affect their interaction with a website, that was

5    another question, right?

6            A.  Approximately, yes.

7            Q.  And now, in terms of whether you

8    characterize a website as accessible or not, you look

9    at the actual content and structure of the website,

10   correct?

11           A.  Yes.

12           Q.  You don't look at how one user with less

13   experience might have more difficulty than another user

14   with more experience; you look at, does the website

15   have the structural components needed to make it easily

16   usable by a wide variety of users, correct?

17               MR. PLUNKETT:  Objection.  Vague.

18   Incomplete hypothetical.

19               THE WITNESS:  Yeah.  It depends on what I

20   have been contracted to do with that evaluation or that

21   design.

22               MR. PARADIS:  Q.  Well, you mentioned in

23   your declaration that one of the blind people who

24   submitted a declaration used an older version of JAWS.

25   Do you remember that?

1            A.   That's what I was told, yes.

2            Q.   Were you told about the experiences of

3    other blind users who still had difficulty even with

4    newer versions of JAWS?

5                 MR. PLUNKETT:  Objection.  Assumes facts.

6                 THE WITNESS:  I don't recall.

7                 MR. PARADIS:  Q.  Did you ask anyone

8    whether there were other blind users who had submitted

9    declarations?

10           A.   I didn't ask about other people's

11   declarations.

12           Q.   So you just took the information you were

13   given by Target's lawyers and addressed only those

14   issues in your declaration; is that right?

15           A.   That's correct.

16                MR. PLUNKETT:  Objection.  Misstates the

17   testimony.  Argumentative.

18                MR. PARADIS:  Q.  And you didn't ask

19   Target's lawyers to tell you what the overall range of

20   experience of the blind users was, correct?

21           A.   I did not ask, that is correct.

22           Q.   You did not seek to elicit any information

23   from Target's lawyers that was not specifically given

24   to you; is that correct?

25           A.   That's correct.

1    guidelines, 508 or WCAG?

2                MR. PLUNKETT:  Objection.  Asked and

3    answered.  Calls for speculation.  Vague.

4                THE WITNESS:  I generally ask if there are

5    any standards or guidelines to which they legally must

6    apply.  And if not, then I use whatever is in my range

7    of experience to help them make their website more

8    accessible.

9                MR. PARADIS:  Q.  Part of that is, I think

10   you have -- let me ask you.

11                In your website you reference WCAG, and I

12   think you said you primarily look to WCAG if it's not

13   an entity governed by 508; is that correct?

14        A.  As the basis, yes.

15        Q.  Then you say there are some techniques that

16   have changed and that you use your experience.

17                Would you say that these are methods that

18   you use that build upon compliance with WCAG?

19        A.  That seems fair to say, yes.

20        Q.  Now, in terms of whatever changes you are

21   referring to in paragraph 12, whatever they are, do any

22   of them affect -- in your understanding, do they --

23   start again.

24                Do any of the changes that you referred to

25   in paragraph 12 affect the requirements under 508 and

1    WCAG that images have alt text?

2             MR. PLUNKETT:  Objection.  Vague.  Lacks

3    foundation.  Mischaracterizes the document.

4             THE WITNESS:  I can't think of any.

5             MR. PARADIS:  Q.  Would it be fair to say

6    that for image maps, image buttons -- I don't want

7    to -- let me start again.

8             Is it okay with you if I use the word

9    active images to refer to image links, image buttons

10   and image map areas?

11        A.  It is now, yes.

12        Q.  Would it be fair to say that for active

13   images, the alt text requirement is in both sets of

14   guidelines, and as far as you know, will continue to be

15   a requirement in any revised guidelines?

16             MR. PLUNKETT:  Objection.  Calls for

17   speculation.

18             THE WITNESS:  For a requirement to

19   compliance.

20             MR. PARADIS:  Q.  That's what I mean.  Is

21   it fair to say it will continue to be a requirement for

22   compliance?

23        A.  I can only assume so.  I don't know.  I am

24   not involved with either of the processes.

25        Q.  In terms of how you advise your own clients

1    a problem on target.com.  Do you recall seeing his

2    opinion?

3              A.  I recall seeing his opinion, yes.

4              Q.  Is it fair to say that the ability to use

5    the keyboard to complete -- to interact with the

6    website and not have to use a visual mouse, has been,

7    is and will continue to be an access requirement or as

8    part of the standards will be an access -- I will ask

9    it again.

10              In terms of the keyboard as a way to

11    interact with the website, is it fair to say that that

12    is an access feature needed for compliance with 508 and

13    WCAG and will continue to be, as far as you know?

14              MR. PLUNKETT:  Objection.  Calls for

15    speculation.

16              THE WITNESS:  The first part -- you

17    actually asked three different things in that sentence.

18              MR. PARADIS:  Q.  I can break it down.

19              So in terms of the interaction, being able

20    to interact using a keyboard, is it fair to say that is

21    an access feature that has been required for compliance

22    with Section 508 and WCAG 1.0?

23              A.  Yes.

24              Q.  Is it fair to say that that remains a

25    requirement for compliance with 508 and WCAG 1.0?

1          A.  I can only speculate.  I don't know.  I am

2    assuming it will, but I don't know for sure.

3          Q.  That is going to be my third question, will

4    it continue to be, but currently, as it stands now, is

5    it fair to say it is still a requirement for compliance

6    with 508 and WCAG?

7          A.  I thought that was the first question.

8          Q.  First one was, has it been?  You said yes.

9    And the current question is, is it still a requirement

10   currently?

11         A.  Since neither of those standards have

12   changed, then it must be.

13         Q.  And then my third question was, do you have

14   any reason to think it will not continue to be a

15   requirement?  Do you have any reason to think the

16   requirements will change when it comes to the keyboard

17   requirement?

18         A.  I could only speculate, but I don't imagine

19   them changing it, but anything is possible.

20         Q.  In terms of the navigation issue, do you

21   recall seeing Dr. Thatcher's assessment that there were

22   problems on target.com with lack of mechanisms to

23   enable easy navigation within a page?

24         A.  I recall seeing his -- yes.

25         Q.  And is it fair to say that both WCAG and