# EXHIBIT 3

Dockets.Justia.com

1

1       UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF CALIFORNIA
2          SAN FRANCISCO DIVISION
   -------------------------------------------------------------

3
   NATIONAL FEDERATION OF THE
4  BLIND, the NATIONAL FEDERATION OF
   THE BLIND OF CALIFORNIA on behalf
5  of their members, and BRUCE F.
   SEXTON on behalf of himself and
6  all others similarly situated,

7                    Plaintiffs,

8                              Court File No. C06-01802 (MHP)

9          -vs-

10 TARGET CORPORATION,

11                   Defendant.

12 -------------------------------------------------------------

13

14         The Deposition of GREGG BODNAR, taken in the

15 above-entitled matter, pursuant to Notice, before Gail M.

16 Hinrichs, RPR and Notary Public, at 2200 Wells Fargo

17 Center, 90 South Seventh Street, in the City of

18 Minneapolis, County of Hennepin, State of Minnesota, on

19 the 6th day of July, 2006, commencing at approximately

20 1:55 p.m.

21                    *      *      *

22

23

24

25

43

1                    THE WITNESS:  No.  That is not part of

2    my job duties.

3    BY MR. KONECKY:

4         Q.   Is that anything that you do at Target?

5                    MR. PLUNKETT:  Objection, vague.

6                    THE WITNESS:  I guess we -- we -- we do

7    make applications that are user friendly.  I guess I'm

8    confused by when you talk about -- when you talk about

9    accessibility -- access, what exactly you mean.

10   BY MR. KONECKY:

11        Q.   Well, when you make applications that are user

12   friendly, is there any part of that process which focuses

13   specifically on ensuring that the applications are user

14   friendly for people with vision disabilities that may need

15   to use screen reading software or other devices in order

16   to access a website?

17        A.   No.

18                   MR. PLUNKETT:  Objection, lacks

19   foundation.  You should wait for my objections.

20                   THE WITNESS:  Sorry.

21   BY MR. KONECKY:

22        Q.   The five people that you manage, did they have

23   any training in making applications or other aspects of a

24   website accessible to blind people or people with vision

25   disabilities?

44

1                    MR. PLUNKETT:  Objection, calls for

2    speculation.

3                    THE WITNESS:  Not that I'm aware of.

4    BY MR. KONECKY:

5         Q.    You testified before, I think, if I'm reading

6    my notes correctly, that there are approximately 20 to 40

7    Target employees that work on web design; is that right?

8         A.    That is my guess.

9         Q.    Okay.  Do you work with any of them?

10        A.    Yes.

11        Q.    Okay.  Approximately how many?

12        A.    I tend to work with four or five of them.

13        Q.    The same people you supervise or in addition

14   to the people you supervise?

15        A.    Other people.

16        Q.    Do the people that you work with that work on

17   web design have any training or experience that you are

18   aware of with respect to making a website accessible to

19   somebody who is blind or who has a vision disability?

20                   MR. PLUNKETT:  Objection, calls for

21   speculation.

22                   THE WITNESS:  I don't know.

23   BY MR. KONECKY:

24        Q.    Are you aware of anybody that works on the

25   Target.com website that has particular training or

62

1          Q.   The pharmacy, how does that work?  At least

2     how does the website component of it work?

3                    MR. PLUNKETT:  Objection, vague.

4                    THE WITNESS:  There is a pharmacy refill

5     and a -- prescription refill, excuse me, and a

6     prescription transfer functionality.

7     BY MR. KONECKY:

8          Q.   The prescription refill, tell me how that

9     works?

10                   MR. PLUNKETT:  Objection, vague.

11                   THE WITNESS:  A person with an existing

12    Target prescription can go online, enter in that

13    prescription information, and then if -- if it's all

14    right -- if it's -- excuse me, I can't think of the right

15    word, if there is refills available, would have a refill

16    waiting for them in the store.

17    BY MR. KONECKY:

18         Q.   Okay.  I suppose they could find the most

19    convenient store looking at the store locator on the

20    website?

21         A.   No.  Prescription refills you have to go to

22    the store that you -- it was filled at.

23         Q.   But can you find out from the store -- from

24    the Target.com website which Target store's have

25    pharmacies?

62

1        Q.   The pharmacy, how does that work?  At least

2   how does the website component of it work?

3                     MR. PLUNKETT:  Objection, vague.

4                     THE WITNESS:  There is a pharmacy refill

5   and a -- prescription refill, excuse me, and a

6   prescription transfer functionality.

7   BY MR. KONECKY:

8        Q.   The prescription refill, tell me how that

9   works?

10                    MR. PLUNKETT:  Objection, vague.

11                    THE WITNESS:  A person with an existing

12  Target prescription can go online, enter in that

13  prescription information, and then if -- if it's all

14  right -- if it's -- excuse me, I can't think of the right

15  word, if there is refills available, would have a refill

16  waiting for them in the store.

17  BY MR. KONECKY:

18        Q.   Okay.  I suppose they could find the most

19  convenient store looking at the store locator on the

20  website?

21        A.   No.  Prescription refills you have to go to

22  the store that you -- it was filled at.

23        Q.   But can you find out from the store -- from

24  the Target.com website which Target store's have

25  pharmacies?

63

1        A.    Yes, you can find that out.

2        Q.    Okay.  And you can find out which one is

3    closest to you through that process on the website?

4        A.    Yes.

5                    MR. PLUNKETT:  Same objection.

6    BY MR. KONECKY:

7        Q.    What's the prescription transfer

8    functionality?

9        A.    That's where you can have a prescription

10   external to Target pharmacies and have that information

11   then sent to -- request the Target pharmacy to pull that

12   information from another pharmacy and fill it for you.

13       Q.    So you go online and you input your

14   prescription information, including where it is located in

15   terms of a different non-Target pharmacy, is that right so

16   far?

17       A.    Yeah, that's correct.

18       Q.    And then you make a request and at least in

19   some cases, the Target store is able to then get the

20   information from the outside pharmacy and fill your

21   prescription at the store for you to pick up at the store;

22   is that right?

23       A.    Yes.  You can -- you can provide that

24   information and the Target pharmacy will then request that

25   information from the other pharmacy to fulfill -- to fill

64

1     that prescription at the Target pharmacy.

2            Q.    And then could you -- or the consumer goes to

3     the Target pharmacy to actually get their medication or

4     their prescription, their filled prescription; is that

5     right?

6            A.    Yes, pick-ups are in the store.

7            Q.    And then the consumer can arrange for that

8     through the website; is that right?

9            A.    Yes, they can arrange for that.

10           Q.    Optical, what is that?

11           A.    Eyeglasses.

12           Q.    How does the eyeglass optical process work?

13           A.    There is just information --

14                 MR. PLUNKETT:  Objection, vague.

15                 THE WITNESS:  There is just information

16    online.

17    BY MR. KONECKY:

18           Q.    So the Target.com has informational pages

19    about optical products such as eyeglasses, which are

20    available at Target stores?

21           A.    Yes, that information is available.

22           Q.    The pharmacy also has a rewards program that

23    you can sign up for online?

24                 MR. PLUNKETT:  Objection, lacks

25    foundation.

1                    MR. PLUNKETT:  Objection, assumes facts,

2    vague.

3                    THE WITNESS:  No, it does not surprise

4    me.

5    BY MR. KONECKY:

6         Q.   Why not?

7                    MR. PLUNKETT:  Same objections.

8                    THE WITNESS:  This is the type of thing

9    you can do online.

10   BY MR. KONECKY:

11        Q.   What do you mean this is the type of thing?

12        A.   Provide information for people and allow them

13   to sign up for a number of different things.

14        Q.   A number of different things including things

15   and services that might be available at the store as well,

16   right?

17                    MR. PLUNKETT:  Objection, vague.  Lacks

18   foundation.

19                    THE WITNESS:  These are services of

20   Target Corporation.

21   BY MR. KONECKY:

22        Q.   And they're services of Target Corporation

23   that are provided in some instances, such as the ones

24   you've testified before, at the store, correct?

25                    MR. PLUNKETT:  Objection, vague, lacks

68

1   foundation.

2                         THE WITNESS:  So yes, the fulfillment of

3   this would come through the store.

4   BY MR. KONECKY:

5       Q.   And the website, am I correct, makes it in

6   certain circumstances easier or more convenient for the

7   consumer to actually fulfill the transaction or the

8   ultimate objective at the store?

9                         MR. PLUNKETT:  Objection, calls for

10  speculation.

11                        THE WITNESS:  What do you mean by more

12  convenient?

13  BY MR. KONECKY:

14      Q.   Well, is it not one of the purposes for having

15  this kind of website to allow the customer to have more

16  ready access to the services or the products that might be

17  available at the store?

18                        MR. PLUNKETT:  Objection, calls for

19  speculation.

20                        THE WITNESS:  This provides another

21  channel for a guest to apply for this.  But the same thing

22  could be done in the store.

23  BY MR. KONECKY:

24      Q.   I understand the same thing could be done in

25  the store.  But I'm saying from Target's perspective and

73

1          A.    Yes, they can.

2          Q.    Okay.  Would you consider that a benefit of

3    Target.com, which then translates to lower prices in the

4    stores?

5                    MR. PLUNKETT:  Objection, vague, calls

6    for speculation.  Lacks foundation, improper lay opinion.

7                    THE WITNESS:  Again, I'm not the

8    business side.  I just implement it for them.

9    BY MR. KONECKY:

10         Q.    But as somebody who is implementing it, is

11   that your understanding?

12                   MR. PLUNKETT:  Same objections.

13                   THE WITNESS:  My understanding is there

14   is a business reason for doing it, yes.  Otherwise we

15   wouldn't have implemented it.  I don't know the specifics

16   behind that.

17   BY MR. KONECKY:

18         Q.    And is it your understanding that somebody by

19   using Target.com can get coupons that will make it cheaper

20   for them to buy groceries in the Target stores?

21                   MR. PLUNKETT:  Objection, asked and

22   answered, lacks foundation.  Calls for speculation.

23                   THE WITNESS:  Yes, they can print up

24   coupons that they can use in the store, yes.

25   BY MR. KONECKY:

74

1          Q.    People can also purchase products on

2    Target.com without ever visiting the store, right?

3          A.    Yes.

4          Q.    And when they purchase those products, at

5    least some of them, they can actually -- if they don't

6    like it -- go to a physical store and return it at the

7    physical store; is that right?

8                MR. PLUNKETT:  Objection, calls for

9    speculation, lack of foundation.

10               THE WITNESS:  That's my understanding.

11   BY MR. KONECKY:

12         Q.    That's part of the return policy of Target,

13   right?

14               MR. PLUNKETT:  Objection, calls for

15   speculation.

16               THE WITNESS:  I believe so.

17   BY MR. KONECKY:

18         Q.    Target has its own Visa card?

19         A.    Yes.

20         Q.    And that's something that can be applied for

21   online through Target.com?

22         A.    Yes.

23         Q.    And then the Visa card can then be used to

24   purchase products in the Target stores?

25         A.    The Target Visa can be used in Target stores

75

1   and other locations.

2        Q.    And in fact, if you do use the Target Visa in

3   Target stores and other locations, you can get 10 percent

4   off a shopping day at the Target stores; isn't that right?

5               MR. PLUNKETT:   Objection, calls for

6   speculation, lacks foundation, assumes facts.

7               THE WITNESS:   As a customer of Target's,

8   that's my experience, as a team member of Target, I do not

9   work on that, those systems or that business area.

10  BY MR. KONECKY:

11       Q.    Do you have a Target Visa card?

12       A.    Yes, I do.

13               MR. KONECKY:   Why don't we take a quick

14  break.

15               (At this time a brief recess was taken From

16               3:45 p.m. To 3:55 p.m.)

17  BY MR. KONECKY:

18       Q.    Next paragraph of your declaration, paragraph

19  four, you talk about the different web pages on Target.com

20  being administered and hosted by numerous different

21  entities.   What do you mean by administered and what do

22  you mean by hosted?

23       A.    So basically the web pages themselves are on

24  servers that are controlled by third-party vendors.   So

25  you can have situations where you can host with somebody

89

1    Target content into the correct places.

2    BY MR. KONECKY:

3         Q.    And that's what Target is loading in through

4    the so called back end?

5         A.    Yes.

6         Q.    And then what do you mean by front end?

7         A.    That would be the template.

8         Q.    Which the user is actually seeing or viewing?

9         A.    Yes.

10        Q.    Or attempting to access.  All right.  Do you

11   know whether -- well, you interact with people from

12   Amazon?

13        A.    Very minimally.

14        Q.    Very minimally.  I take it you have never

15   inquired of Amazon or any other third-party vendor as to

16   whether or not modifications or improvements could be made

17   to enhance access for people with vision disabilities to

18   Target.com; is that correct?

19                  MR. PLUNKETT:  Objection, vague, lacks

20   foundation.

21                  THE WITNESS:  I have not, no.

22   BY MR. KONECKY:

23        Q.    Do you know if anybody from Target has

24   inquired with any of its other third-party contractors,

25   vendors such as Amazon, with respect to the issue of

90

1  making the website more accessible to blind users or users

2  with other visual disabilities?

3  　　　　　MR. PLUNKETT:  Objection, the question

4  potentially invades the attorney-client privilege, and I

5  would just counsel the witness to exclude any information

6  you may have learned from counsel.

7  　　　　　THE WITNESS:  The only part that I'm

8  aware of is that we have viewed requirements for Amazon

9  hosted materials that would change how that -- how that --

10  those pages are built.

11  BY MR. KONECKY:

12  　　　　Q.　Reviewed requirements for Amazon hosted

13  materials.  Who drafted these requirements?

14  　　　　A.　That I don't know.

15  　　　　Q.　Are they Target requirements or are they

16  Amazon requirements or somewhere else?

17  　　　　A.　My understanding is that Amazon actually

18  drafted -- made the first draft of the requirements that

19  are then reviewed.

20  　　　　Q.　So you receive these requirements from Amazon

21  or from somewhere else?

22  　　　　A.　I receive them from Target.com.

23  　　　　Q.　How are they labeled?

24  　　　　A.　I don't know what you mean.

25  　　　　Q.　I mean is there -- did you review them in a

1    paper format or on the computer or some other way?

2          A.    It's paper format.

3          Q.    So how is the document labeled?  Is there a

4    title to it?

5          A.    I really don't recall what the title was.

6          Q.    And is it a document that is particular to the

7    Target.com website or is it a document that's more generic

8    for Amazon generally?

9          A.    My understanding it's particular for the

10   Target.com website.

11         Q.    When did you first review it?

12         A.    Two or three weeks ago.

13         Q.    Do you know when it was drafted?

14         A.    No, I do not.

15         Q.    Do you know why it was drafted?

16         A.    No, I do not.

17         Q.    How did you come to learn about it?

18         A.    It was provided to me by Target.com.

19         Q.    Who in particular at Target.com?

20         A.    Kelly Spychalla.

21         Q.    Other than this document that you reviewed two

22   to three weeks ago from Amazon that was provided to you by

23   Kelly, are there any other instances that you are aware of

24   in which Target has communicated with any third-party

25   vendors with respect to the issue of making Target.com

92

1     accessible or more accessible to individuals with vision

2     disabilities?

3          A.     I'm not aware of us communicating anything to

4     vendors.

5          Q.     How big is this document, the one you were

6     just talking about from Amazon?

7          A.     In terms of pages?

8          Q.     Yes.

9          A.     It's five or six pages.

10         Q.     What are the requirements that are listed?

11         A.     I don't recall all of them, but I know it

12    included adding alt tags to links or graphics and titles

13    to links.

14         Q.     Anything else?

15         A.     I believe there was some requirements around

16    form information.

17.        Q.     What do you mean form information?

18         A.     Online forms, ordering the forms and then also

19    making sure required fields are represented by something

20    other than color.

21         Q.     Other than color?

22         A.     (Witness nodding head.)

23         Q.     Anything else that you recall?

24         A.     There's a requirement that spacer images

25    should have no alt tags.

93

1          Q.     What kind of images?

2          A.     Spacer images.

3          Q.     And what are those?

4          A.     Those are the images that are used to lay out

5     the look and feel of the pages.

6          Q.     And why wouldn't those require alt tags as you

7     understand it?

8          A.     Because they have no meaning.

9          Q.     Anything else?

10         A.     I can't recall.

11         Q.     Do you recall the Amazon document addressing

12    at all use of a keyboard as opposed to a mouse or in

13    addition to a mouse?

14         A.     In so much as the forms, yes.

15         Q.     Can you describe your understanding or memory

16    of how the document addressed keyboard issues?

17         A.     It addressed the ability to navigate forms

18    with the keyboard and also one particular section of our

19    product description pages.

20         Q.     Which section?

21         A.     The product description page has a box in it

22    with four tabs on it, and it's the ability to move between

23    those tabs that it addressed.

24         Q.     Anything else?  Subject areas that this

25    document addressed?

94

1          A.   Not that I can recall.

2          Q.   With respect to adding the alt tags, what did

3    the document say would need to be done?

4                    MR. PLUNKETT:   Objection, assumes facts.

5                    THE WITNESS:   It said that Target would

6    need to be able to -- or Target web pages would need to

7    have alt tags to all images.

8    BY MR. KONECKY:

9          Q.   Do Target web pages currently have alt tags

10   for images?

11         A.   Not consistently, no.

12         Q.   Is it doable to provide alt tags for all

13   images on Target.com?

14                   MR. PLUNKETT:   Objection, vague, also

15   calls for speculation.

16                   THE WITNESS:   I guess technically you

17   can -- you can do that.  I guess what doable is kind of a

18   vague term to me.

19   BY MR. KONECKY:

20         Q.   Well, are there any particular costs or other

21   burdens that would prevent Target from taking the Amazon

22   requirement or recommendation to add alt tags for all

23   information?

24                   MR. PLUNKETT:   Objection, assumes facts,

25   calls for speculation.

95

1                    THE WITNESS:  I don't know on Amazon's

2      side.  I would have to assume on that side.  I know there

3      would be some significant hours on our -- on our business

4      people's time to use the back end tools.

5      BY MR. KONECKY:

6            Q.   To actually implement the tags or to maintain

7      them?

8            A.   To implement and maintain them.

9            Q.   How many additional hours?

10           A.   I don't know.

11           Q.   Has there been any analysis of how many

12     additional hours?

13           A.   No, that I'm aware of.

14           Q.   Not that you're aware of?

15           A.   No, I'm not aware.

16           Q.   Are there any specific administrative or

17     financial costs or burdens that you are aware of that

18     would prevent Target from adding alt tags to all of its

19     images and information on Target.com?

20                    MR. PLUNKETT:  Objection, asked and

21     answered, calls for speculation.

22                    THE WITNESS:  I'm not -- I'm not aware

23     of what they are.

24     BY MR. KONECKY:

25           Q.   Are you aware that there are any?

96

1              MR. PLUNKETT:  Same objection.

2              THE WITNESS:  I could -- I could

3    speculate that it would require development on Amazon's

4    part, but I don't know.

5    BY MR. KONECKY:

6         Q.   What about titles to links -- well, let me

7    back up.

8              On the alt tags, was there anything in the

9    document from Amazon which indicated that it would be too

10   costly or too burdensome to put alt tags on all the

11   information on the Target website?

12             MR. PLUNKETT:  Objection, assumes facts

13   not in evidence.

14             THE WITNESS:  No.

15   BY MR. KONECKY:

16        Q.   Any of your conversations with anybody from

17   Amazon, has that issue ever been expressed?

18             MR. PLUNKETT:  Objection, assumes facts,

19   lacks foundation.

20             THE WITNESS:  I had no conversation.

21   BY MR. KONECKY:

22        Q.   All right.  On the titles to links, is there

23   anything in the Amazon document which indicated that

24   putting those titles on would create some kind of burden,

25   whether cost or administrative or otherwise, that would

97

1    make it impractical or undesirable to provide such titles?

2                          MR. PLUNKETT:  Objection, assumes facts.

3                          THE WITNESS:  There was nothing that I

4    can recollect.

5    BY MR. KONECKY:

6          Q.   Is there any particular cost, burdens, either

7    financial or administrative, that you are aware of that

8    would make it undesirable or prohibitive to provide titles

9    on the links on the website for blind users?

10                         MR. PLUNKETT:  Objection, calls for

11   speculation, assumes facts.  Calls for speculation.

12                         THE WITNESS:  I can only guess.

13   BY MR. KONECKY:

14         Q.   You're not aware of anything else?

15         A.   No.

16                         MR. PLUNKETT:  Same objections.

17   BY MR. KONECKY:

18         Q.   On the online forms, anything in the Amazon

19   document that indicated that putting on the fields that

20   you were talking about for the online forms for blind

21   people to be able to navigate and to know where to input

22   information, that doing that on Target.com would be too

23   costly or too administratively burdensome, is there any

24   indication in the Amazon documents of such costs or

25   burdens?

116

1        A.    No.    Beyond conversations with attorneys, I

2    have not been privy to any discussions about the checkout

3    button.

4        Q.    Okay.    In paragraph five of your declaration

5    you say that if this court were to order Target.com to

6    alter or modify one or more of the web pages on its

7    website, (or to order Target.com to request that its

8    third-party contractors alter or modify the web pages they

9    administer on Target.com's behalf) those alterations and

10   modifications would affect transactions between Target.com

11   and Internet users throughout the country, not just

12   transactions between Target.com and Internet users who

13   reside in California.

14            Is there any specific way that modifying the

15   web pages to achieve access for blind users would alter or

16   modify transactions between Target.com and Internet users

17   throughout the country other than making it more

18   accessible for blind people?

19            MR. PLUNKETT:    Objection, vague, calls

20   for speculation.    Lacks foundation.

21            THE WITNESS:    Yeah, I don't know of

22   anything specific.    I do know that changes made on the

23   website would be viewed by all users.

24   BY MR. KONECKY:

25        Q.    But am I correct as you sit here today, you

117

1   don't know of any specific way in which making

2   accessibility modifications to Target.com to improve

3   access for blind people would affect transactions between

4   Target.com and the Internet users in any part of the

5   country, other than to make the website more accessible to

6   blind people?

7               MR. PLUNKETT:   Objection, it calls for

8   speculation, argumentative, lacks foundation.   Assumes

9   facts.

10              THE WITNESS:   I don't know of any.

11              (Whereupon BODNAR Exhibit 6 was marked for

12              identification by the court reporter and

13              attached hereto.)

14  BY MR. KONECKY:

15      Q.   Have you seen Exhibit 6 before?

16      A.   No, I actually have not seen this page before.

17      Q.   I'll say for the record this is a page I

18  printed off Target.com yesterday entitled Your California

19  Privacy Rights.   Can you read that sentence after that

20  first heading?

21      A.    Under California law, California residents who

22  have an established business relationship with Target may

23  choose to opt out of Target disclosing personal

24  information about them to third parties for marketing

25  purposes.