# EXHIBIT 2

Dockets.Justia.com

1   ROBERT A. NAEVE (CA SBN 106095)
    RNaeve@mofo.com
2   MORRISON & FOERSTER LLP
    19900 MacArthur Blvd.
3   Irvine, California  92612-2445
    Telephone: (949) 251-7500
4   Facsimile: (949) 251-0900

5   DAVID F. MCDOWELL (CA SBN 125806)
    SARVENAZ BAHAR (CA SBN 171556)
6   MICHAEL J. BOSTROM (CA SBN 211778)
    DMcDowell@mofo.com
7   SBahar@mofo.com
    MBostrom@mofo.com
8   MORRISON & FOERSTER LLP
    555 West Fifth Street, Suite 3500
9   Los Angeles, California  90013-1024
    Telephone: (213) 892-5200
10  Facsimile: (213) 892-5454

11  STUART C. PLUNKETT (CA SBN 187971)
    SPlunkett@mofo.com
12  MORRISON & FOERSTER LLP
    425 Market Street
13  San Francisco, California 94105-2482
    Telephone: (415) 268-7000
14  Facsimile: (415) 268-7522

15  Attorneys for Defendant
    TARGET CORPORATION
16

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19                SAN FRANCISCO DIVISION

20

21  NATIONAL FEDERATION OF THE BLIND,        Case No.    C06-01802 MHP
    the NATIONAL FEDERATION OF THE
22  BLIND OF CALIFORNIA, on behalf of their   **DECLARATION OF MICHAEL J.**
    members, and Bruce F. Sexton, on behalf of **BOSTROM IN SUPPORT OF**
23  himself and all others similarly situated,  **TARGET CORPORATION'S**
                                                **SURREPLY BRIEF IN SUPPORT**
24                   Plaintiffs,                **OF OPPOSITION TO PLAINTIFF'S**
                                                **MOTION FOR PRELIMINARY**
25            v.                                **INJUNCTION**

26  TARGET CORPORATION,                        Date:    July 24, 2006
                                               Time:    2:00 p.m.
27                   Defendant.                 Jude:    Hon. Marilyn Hall Patel

28

1

<u>Declaration of Michael J. Bostrom</u>

2      I, Michael J. Bostrom, declare as follows:

3      I am an attorney licensed to practice law in the state of California, and admitted to the

4  United States District Court for the Northern District of California. I am an attorney with

5  Morrison & Foerster LLP, counsel for Defendant Target Corporation ("Target") in this action. I

6  have personal knowledge of the facts set forth herein. If called as a witness, I would and could

7  competently testify as follows:

8      1.      I have listened to the recording of Plaintiff Bruce Sexton's June 23, 2006

9  telephone call to Target.com's 1-800 number. Attached hereto as Exhibit A is a true and correct

10  transcript of that recording. Blanks are inserted in the transcript where the recording is inaudible.

11      2.      Attached hereto as Exhibit B is a true and correct copy of relevant portions of the

12  transcript from the May 23, 2006 deposition of Bruce Sexton.

13      3.      Attached hereto as Exhibit C is a true and correct copy of relevant portions of the

14  transcript from the June 21, 2006 deposition of Dawn Wilkinson.

15      4.      Attached hereto as Exhibit D is a true and correct copy of relevant portions of the

16  transcript from the June 21, 2006 deposition of Dave Wilkinson.

17      5.      Attached hereto as Exhibit E is a true and correct copy of relevant portions of the

18  transcript from the June 30, 2006 deposition of Suzanne Tritten.

19      6.      Attached hereto as Exhibit F is a true and correct copy of relevant portions of the

20  transcript from the June 19, 2006 deposition of Chris Polk.

21      7.      Attached hereto as Exhibit G is a true and correct copy of relevant portions of the

22  transcript from the July 5, 2006 deposition of Charles Letourneau.

23      I declare under penalty of perjury under the laws of the United States that the foregoing is

24  true and correct.

25      Executed this 18th day of July, 2006, at Los Angeles, California.

26

27                                                    /S/
                                             _____
28                                              Michael J. Bostrom

# EXHIBIT A

# TRANSCRIPT OF BRUCE SEXTON'S JUNE 23, 2006 TELEPHONE CALL
## TO TARGET.COM'S 1-800 NUMBER

| | |
|---|---|
| Vinson | Thank you for calling Target.com, my name is Vinson, and how may I assist you today? |
| Sexton | Hi Vinson, I tried to make some purchases online. |
| Vinson | OK. And what would you like to know what the product _____?[1] |
| Sexton | I'd like to see if you could help me look through the products online to find some products like, Tide and get some business apparel, and a couple of things. |
| Vinson | OK, and what exactly—do you have the names of what you're looking for? |
| Sexton | Some Tide soap. Laundry soap, the largest that you have. |
| Vinson | I don't think we sell products like that on Target here. |
| Sexton | You don't sell Tide? |
| Vinson | No. I've had some Tide _____ I'm not showing anything here. |
| Sexton | OK. Then I would like to buy some—do you sell jeans and maybe some slacks? |
| Vinson | OK. And what type of jeans are you looking for? |
| Sexton | I want a pair of black jeans and a pair of blue jeans. |
| Vinson | OK. It's hard to specify what kind of jeans you have, because we have a lot of jeans on Target here. |
| Sexton | Uh huh. Could you tell me what they have? |
| Vinson | One moment, here. [long pause] OK, looks like the only jeans that we carry right now at the moment is the men's Masimo Duke jeans, light antique; Levi Strauss, signature regulars, fit _____ stone-washed jeans; men's Wrangler, relaxed fit bleached jeans; Levi Strauss signature relax fit like stone washed jeans; men's Masimo _____ mechanical—mechanic jeans; Levis light stone washed jeans; Levi's mechanic shorts—jean shorts; Levi's stone washed jeans. |
| Sexton | What are stone washed jeans? Are they blue or … |
| Vinson | Yes, they're like blue. |
| Sexton | Like blue and spotted or blue -- |
| Vinson | It's like dark blue. |
| Sexton | Dark blue? |
| Vinson | Yes. |
| Sexton | OK. Can I get a—so, what's the difference between the stone washed ones, if |

---

[1] Blanks indicate that the tape is inaudible.

|  | there're 2 different stone washed ones, they're like 2 different ones, or... |
|---|---|
| Vinson | They're just different brands. I'm not exactly too sure what's the difference between them. |
| Sexton | But they're not the same color, or... |
| Vinson | Yeah, they look the same color. |
| Sexton | OK. So they're 2 different brands. That's the difference. |
| Vinson | Yeah. There's different brands, like Levi's, Masimo, and all that. |
| Sexton | One's Levi's and one's what? |
| Vinson | Masimo. One's Levi's, one's Wranglers. |
| Sexton | Oh, one's regular fit and one's relaxed? |
| Vinson | Relaxed fit—we have a regular fit, carpenter antique stone washed jeans. |
| Sexton | OK, so you—do they have sizes on them? How do you... |
| Vinson | You would select sizes on the page here. |
| Sexton | Oh, OK, OK. All right, well, I want to buy some 32-30s that are Levi's and I want to buy some that are dark blue and I want to buy one that's light blue. |
| Vinson | One is dark blue, and one is light blue in Levi's. And what size did you want for the Levi's? Relaxed fit, dark stone washed jeans? |
| Sexton | Yeah. Relaxed fit, that are 32-30s. |
| Vinson | The only sizes we have is 34—30 in waist and 30 in length—34 in waist and 30 in length; 34, 32 in length. |
| Sexton | You don't have 32 in the waist? |
| Vinson | No. I'm looking and I'm not seeing that here. We must be out of stock on those. |
| Sexton | So, if I want to buy 32/30s—so you're on the regular Target.com website? |
| Vinson | Yes, that's correct. |
| Sexton | And they don't—they just don't carry—you guys just don't carry 32/30s, or ... |
| Vinson | If it's not showing on our sites here like I'm seeing see right now, that 32s and 30 in length that means we're out of stock here. |
| Sexton | So, that's kind of odd. Isn't 32 a popular size? |
| Vinson | Yeah, it is a popular size. That's why we—I'm assuming that's why it's sold out here. |
| Sexton | OK. So, OK, well then, how about let's look at some pants that are—that are dress pants, same size. |
| Vinson | Just pants—OK—we have the Merona flat front pants in khaki; Merona mini-stripe flat front pant, black; sheersucker straight cotton suit pants; flat front wool pants, black; Merona pin stripe, navy; Merona pinstripe, flat front wool pants, |

brown; pinstripe …

| | |
|---|---|
| Sexton | I want some black pants that—that will work—I don't know, I guess there's some way to tell how long they'll last if—if I don't like the ones that come, can I send them back? |
| Vinson | Yes. You can send them back. |
| Sexton | Well, what I'm looking for is some durable black pants that will keep their blackness for a long time and not fade. Like, I know there's Dockers sometimes they fade away. |
| Vinson | Dockers. |
| Sexton | Yeah, so, I'm looking—now flat is a brand? |
| Vinson | The only dress pants I see here on our site here is that mostly by Merona here. |
| Sexton | Merona? |
| Vinson | And I don't see any Dockers. I don't have any Dockers, so. |
| Sexton | That's OK. Does Merona have just a black pair of pants? |
| Vinson | We've got the Merona flat front wool pants in black. |
| Sexton | So, there's one pair of black—do they have 32/30s? |
| Vinson | I can't tell, I'll look here, one moment. Just 32/30s is a really popular size here. Because I also wear 32/30s. |
| Sexton | Hmmm |
| Vinson | _____ 32/30s _____ and they come and go. |
| Sexton | Yes. It seems like, though, on line you'd be able to reorder them. You know what I mean? Like, you could order and then when it got in stock, you would get it, but I guess not. |
| Vinson | No. We have Merona solid color flat front trousers in black, which _____ 32/30. What else, here. |
| Sexton | So, there is one? |
| Vinson | Yeah. In 32 and 30. |
| Sexton | In the black? |
| Vinson | Yes. |
| Sexton | OK. So, I guess I will put that in the shopping cart. |
| Vinson | OK, so is there anything else you'd like to order? |
| Sexton | Yeah. Let's see. How much are they, by the way? |
| Vinson | $24.99. |

| | |
|---|---|
| Sexton | All right. I got a way to go then. So you guys don't sell laundry soap at all. |
| Vinson | No, not from what I see here on Target.com here. You'll want to check the Target stores, because we don't sell like groceries or products like that. We only sell like furniture, like clothing, and sports utilities, electronics, DVDs... |
| Sexton | I'm not—let's see. Well, let's see, how could I browse around the site. Is there a way to like, could you tell me some of the products that are around. Maybe it'll give me some idea of what I want to buy, I'm not sure yet. |
| Vinson | I'm not exactly too sure what you want to shop here, but if you go onto our site, and there should be a category at the top, go into the men's, there should be like clothes, suits, suit separates, active wear, swim wear, young men's, Masimo. _____ all these categories to shop and look in. They are all on Target.com. Just to see for yourself when you're purchasing _____. And if you wanted to look at, like, electronics, you just go into the—you just scroll there cursor over the electronic bar and just pick whatever you want to look there. They give you a whole list of items for you to browse around here. |
| Sexton | Well, the problem is that I can't see. And you're site's not very accessible, so I was told that I could call here and browse with you, so. |
| Vinson | I see. Hmmm. |
| Sexton | So, that being right but unfortunately _____. |
| Vinson | I see. Yeah, 'cause we don't sell any like laundry soap here. I've tried searching under Tide and it didn't really bring me anything here, I mean like-- |
| Sexton | _____ I guess so you said there's a category called men's clothing. So, why don't we go there and maybe you can—you can see what's on the page _____. |
| Vinson | We have a category in, like, khakis, dress shirts... |
| Sexton | Do you have like khakis that are cargo pants, or they have like the pockets _____ |
| Vinson | I'll have a look here, it'll just be one moment. |
| Sexton | Oh, that'd be great. |
| Vinson | We have cargo shorts. I do not see any cargo pants here. |
| Sexton | Do you have cargo shorts that have 32 waist? |
| Vinson | I'll have a look here, one moment. |
| Sexton | What I'm looking for is the khakis with like pockets on the outside or, you know, ones that are ... |
| Vinson | Yeah. The only khakis I see that come in full length along the top are _____ the waist is only regular khakis with the little 2 side pockets, like what you put your hands in. I do see that we have cargo shorts. Let's see here. We do have 32s. And they'll be coming 4 different colors right now, camouflage, bt. olive, navy and dark brown. |
| Sexton | The dark brown—so that's—you don't have the light, like, khaki color, like that |

la-869409

|  | you normally would associate with khaki? |
|---|---|
| Vinson | I can have a look here, so one moment. |
| Sexton | That'd be great. |
| Vinson | Yeah, it looks like that color's been sold out here. |
| Sexton | Sold out. |
| Vinson | Yeah. And that's the only 4 colors we have available right now, camouflage, navy, bt. olive and dark brown. The other ones... |
| Sexton | [indistinguishable] |
| Vinson | ...sorry? |
| Sexton | Does the dark brown look like ugly—I don't really like dark browns unless it's like, I don't know how to explain it. |
| Vinson | It's really dark brown, pretty much like really dark. |
| Sexton | All right, well how about the regular khakis with the 2 pockets on the sides. Do they have 32/30s in that? |
| Vinson | I can have a look here, hold on one moment. |
| Sexton | Usually you won't have 32/29s, 'cause really, 29s would be better. |
| Vinson | I see. It looks like we have 32/30 here. And khaki color is available here, which is a tan color. |
| Sexton | Yeah. That's what I want. Let me put one of those in my cart. |
| Vinson | OK. And what else would you be looking for here? |
| Sexton | So there was—how much were those? |
| Vinson | Those khakis are actually $19.99 here. |
| Sexton | Oh, that's a good price. So there were no jeans whatsoever in 32/30s? |
| Vinson | Not at the moment. I can have another look here, though. |
| Sexton | Yeah, let's look at that. Let's see if there's any other colors, maybe black or a different brand maybe. |
| Vinson | OK. |
| Sexton | You're being very helpful, thank you so much. |
| Vinson | No problem. Let's see here. You're looking for black jeans here ___. I also see Levi's cargo shorts and 32 is available, it's in gray. |
| Sexton | You don't have any blue or black or... |
| Vinson | No. It's like a signature cargo shorts, so it comes in only gray. |
| Sexton | So, but they're jean gray—they're not like gray, gray, right? |
| Vinson | It looks—from one of the picture it looks like it's just gray, gray—the cargo |

5

|          | shorts I'm looking at right now. |
|----------|----------------------------------|
| Sexton   | So it's a light gray or dark gray? |
| Vinson   | Light gray. |
| Sexton   | Light gray. I don't like light gray that much. |
| Vinson   | I see. |
| Sexton   | Picky blind guy. I could see at one time. My mom's also blind and she learned a lot of color matching from my grandma. |
| Vinson   | I see, well. |
| Sexton   | OK, so, yeah, are there any pants, jeans _____ |
| Vinson   | I'm looking at the Wrangler relaxed fit black jeans right now. |
| Sexton   | Uh huh. |
| Vinson   | From what I see here, they only carry a 30/30 and a 42/30 which, yeah, |
| Sexton   | laughs |
| Vinson   | It kind of sucks. That's the only size ____ at the moment. |
| Sexton   | OK. |
| Vinson   | Of the black jeans. Let me just see if I can find any other black jeans. |
| Sexton   | Yeah, Wrangler is a good brand. |
| Vinson   | It seems like that's the only pair of black jeans we have from Wrangler and we are out of stock on that one. |
| Sexton   | Oh, OK. So, dark blue, light blue, black, nothing, huh? |
| Vinson   | I can double check those. Just give me another moment here. |
| Sexton   | Sure. |
| Vinson   | Levi's . . .we've got the Levi's dark stone washed jeans regular fit in 32s and 30s for $19.99. |
| Sexton   | In dark stone—you said the dark blue. |
| Vinson   | Yeah, dark blue. |
| Sexton   | For $19.99? |
| Vinson   | Yes. |
| Sexton   | All right, let's throw that in the cart. |
| Vinson   | OK. |
| Sexton   | Do they have any other colors, not really except for black, blue, dark blue? |
| Vinson   | Any other colors? |
| Sexton   | Yeah. I don't know of really any jeans that come in many different colors. I |

don't want white. And I don't probably want really anything like, I don't want a tan. I don't know if that come...any other...

| Vinson | Let me have a look here at what _____ jeans. |
|---|---|
| Sexton | So, we got those other jeans _____. |
| Vinson | We've got the Masimo Duke jeans light antique jeans. |
| Sexton | OK. |
| Vinson | They're like light blue. |
| Sexton | Sure. |
| Vinson | Those come in 32/30s. $24.99 but they are light blue—antique white or light blue. |
| Sexton | Oh, so they have a light blue? |
| Vinson | Yeah, it's like a light antique blue. But they're kind of worn in. |
| Sexton | _____ ? |
| Vinson | From what the picture looks like. |
| Sexton | Oh. They have like ____ ____ |
| Vinson | Yeah, it has like worn in--it looks like it's been worn a lot pretty much. |
| Sexton | Oh, like in the knees _____ |
| Vinson | Yeah. It's like an antique light--_____ it's like antique--_____ I think explains everything, well ____ antique light blue. And it comes in 32/30 also from what I see. So, what else do we have here. |
| Sexton | But that's the color? |
| Vinson | It's like light blue, antique light blue. |
| Sexton | Oh, OK. But that looks like a regular light blue jean, right, except that it has an older look to it? |
| Vinson | Yeah. Pretty much. |
| Sexton | OK. And they have those in 32/30? |
| Vinson | Yes. |
| Sexton | How much are those? |
| Vinson | $24.99 here. |
| Sexton | Oh, wow. Yeah. Let's throw those in the cart. A pair of those. And how much are we at right now—total? |
| Vinson | A subtotal is at $89.96 right now. |
| Sexton | OK, let's look for some other stuff. Can we go to electronics and look around? |
| Vinson | Certainly, what would you like to look around in the electronics area, we have |

digital cameras, camcorders, TVs, Target photo center, TVs, DVD players and video, home theater, MP3 players, satellite radio, home audio, car audio plus video, instruments plus karaoke, telephones and communications, home office, video games, home safety plus security. What would you like to have, or browse?

Sexton    Home office, let's look at that.

Vinson    OK. OK, and we also have a bunch of other subcategories here. We have telephone communications, computer plus accessories, computer software, office accessories, home office furniture. What would you like to browse in?

Sexton    The last one was home office furniture?

Vinson    Yes, that's correct.

Sexton    Let's look at that.

Vinson    We have other categories hold on—we have other categories in that category—we have desks, bookcase, file cabinets, office chairs. What would you like to look at here?

Sexton    Does it have more?

Vinson    Yes, there is more here. Hold on.

Sexton    What category?

Vinson    They have computer armoires, computer carts, computer workcenters, desk hutches, desk lamps, desk entertainment centers, file cabinets plus more, laptop carts, modular office furniture.

Sexton    What's a laptop cart?

Vinson    Umm, hold on a sec … I'm not too sure myself, maybe I should take a look here. Oh, it's like a little desk with wheels on it and there's a little platform where you can adjust your laptop where you want your laptop to be.

Sexton    Hmmm. A little tiny desk?

Vinson    It has like three wheels at the bottom here so you can move around easily. There's a spot for you to put your papers on, on the left side, light spot, you have a little platform that sticks out from the bar that comes up. There's a little platform for you to put your laptop on there.

Sexton    Now can I, now do you know if it can like be removed from the wheels? Like are the wheels at desk level? Like, so if I sat down at a chair would it be at …?

Vinson    It's adjustable here, like a chair.

Sexton    It's adjustable? Oh, okay. So the actual desk is adjustable. Now, do you know if I'd be able to take the wheels off and then just use it as a …?

Vinson    I'm pretty sure that it's assembly required here and you can choose to not have wheels here, have wheels or not.

Sexton    So, do you know like if I had the wheels off, would it look like it could fit on

|  | your lap like a laptop, like could you put it in a backpack, do you know?  What are the dimensions?  Does it have ...? |
|---|---|
| Vinson | Well, it's like a little desk pretty much for a laptop like for your home.  It's not really portable, it's like when you're at home, you don't have a desk for your laptop, you can pretty much roll around your house that type of thing. |
| Sexton | Yeah, cause what I'm looking for is something that is kind of a hard surface so that I can bring around with me but anyway, okay, well, I guess we'll go back to electronics and maybe the furniture part and maybe look at the chairs. |
| Vinson | Okay. |
| Sexton | Office chairs. |
| Vinson | We actually have a large selection here.  You're looking for chairs with wheels? |
| Sexton | Yeah, a nice, a nice comfortable like padded chair with wheels, arm rest. |
| Vinson | Are you looking for leather or any material in particular or? |
| Sexton | Um, probably, well, leather would work if it looks kind of like a soft leather that would be comfortable to sit in, kind of like, the biggest idea something that has good support for everything, everything. |
| Vinson | Well, from the back to the neck, correct?  Like? |
| Sexton | Yeah. |
| Vinson | So pretty much they have big, a big backing from your head to your bottom pretty much.  _____, uh, back to it ... |
| Sexton | Yeah, that ... |
| Vinson | Like lean against? |
| Sexton | Yeah, something like that.  Or something that looks comfortable even if its not all the way, it could be pretty much all the way or ... hmm ...  What are the prices also like around? |
| Vinson | Like around a hundred here if you're looking at the really good ones with thick padding and all that.  Um ... |
| Sexton | Okay, so the ones, the ones that are around a $100, they, uh, and they look like they have nice padding and ... |
| Vinson | We actually had, we had one of those – it was called the Comfort Product-Sized Executive Office Chair with five motor massage and that was only for $149.99, but currently right now, it's on back order here, so that was a really good looking chair there – I saw a while ago, but currently that's placed on back order right now . . . at the moment. |
| Sexton | You could actually order it? |
| Vinson | Uh, you could order it, but there could be a chance that it might be cancelled to us by our systems here because of the lack of inventory here. |
| Sexton | Oh, okay.  Okay, well, I'm looking for something for around a $100 though, um. |

| Vinson | Okay, see what I can find here. Looking at a chair right now – the High Star or the Office Star High Black Executive Leather Chair with padded head rests in black that's for a $129.99. It looks pretty comfortable. |
|---|---|
| Sexton | What's _____ ? A $129 is pretty good. Well … |
| Vinson | Any of a variety of chairs here, like the, but they're usually high, like a high price here though. |
| Sexton | Well, why don't we, we can put that one in the cart and then take it out later, right? |
| Vinson | Yeah, we can save _____, but we have a large selection of chairs here so why don't we just browse through it first here. |
| Sexton | Okay. |
| Vinson | We have the High Black Executive Leather chair $9.99, $99, I mean, and 99 ¢. |
| Sexton | Okay. |
| Vinson | That doesn't look too bad also. It's hard to see if it's comfortable because all of them look like they have a lot of cushion on it, but it's hard to really tell if it's good or not, I mean, um … |
| Sexton | Right, they like to make the picture look … |
| Vinson | Yeah, it's always like the, yeah, they always make the picture look like extra better than the one you get for some reason, it's kind of like commercials in fast food restaurant or any commercial. [Laughter] Um, that's _____ . Yeah, _____ , but um, yeah, this chair I currently see at is on back order also, but let's see if we can't find another chair here since that's on back order. I'm pretty sure we can find something here, we have a lot of chairs. Let's see here … Boss Executive, um, fabric chair in grey $69.99, ships in 3-5 days here it says. |
| Sexton | What is it? |
| Vinson | Um, Boss Executive Mid-Back Fabric chair in grey, $69.99. |
| Sexton | The color is grey. |
| Vinson | Yeah, it's not leather, it's a fabric chair here, $69.99. |
| Sexton | Fabric is nice, too. Does it look big and square or does it look like curved kind of like rounded or like I don't want a huge, huge chair, I mean, you know, a college dorm room, well, actually, it's kind of a small room anyway, I don't want a huge chair, but I want a comfortable … |
| Vinson | I see, um, that chair looks like round, like rounded, it has like a square top, but the _____ makes it look round. |
| Sexton | Okay. |
| Vinson | We also have another one here, a mid-back manager's chair, fix arms back. |
| Sexton | Now that sounds nice. |

la-869409

| Vinson | It's for a $109.99. |
|---|---|
| Sexton | Does it kind of lower back kind of stuff? |
| Vinson | Yeah, it's like a mid-back, like only the back support is only to the middle, it doesn't support the neck, assuming from what it looks like here. |
| Sexton | Yeah. |
| Vinson | And that the, let's see here, the seat height adjustment back height adjustment, tilt tension, tilt walk, in black fabric and that chair right now I'm currently looking at is $109.99 here. |
| Sexton | Oh, yeah? Well, that one sounds nice, so there's that one that we saw first for $129 and then there was that $99 one and now there's a … |
| Vinson | Pretty much the first two that we were looking at were pretty, they have like the full back one, the full back support and those are leather chairs and this one that we're currently looking at is a fabric chair, a mid back one. |
| Sexton | The other ones look kind of big _____ |
| Vinson | Yes. |
| Sexton | Okay. Yeah, I guess, I guess, _____. Maybe something like that. So it looks like a regular kind of office chair with wheels, it has wheels, right? |
| Vinson | Yes. Let's see what else I can pull up here. |
| Sexton | I like that tilt feature, too. |
| Vinson | Let's see, uh, let's see here … let's see here … It's a mid-back manager's chair in black leather. |
| Sexton | That's the same one or that's a different one? |
| Vinson | It's a different one, but it's mid-back also in leather for $199.99. It's [an]office chair in leather black includes seat height adjustment, 300 degree swivel, _____ controls and adjustable tilt tension also in black leather, split leather, and that price, the price of that chair is $99.99 and there's a flat shipping charge of $12.99. So you're paying around $110 for that chair. It's shipped and that's like for the total price there. |
| Sexton | So the shipping on the pants and stuff like that, how does that work? |
| Vinson | It'll go on one shipment here, so it's pro-shipment charge and weight here. And then to order the chair itself, it most likely will come in a different shipment due to the size of it and they'll only be like a … from what I see for mid-back managers like $12 for the shipping for that one. The clothing itself won't be that much. |
| Sexton | Okay, and what about the other one? The other back, the manager, the mid-back manager one? |
| Vinson | The one with the fabric, the gray fabric? |
| Sexton | Yeah, yeah. |

la-869409

| | |
|---|---|
| Vinson | One moment here. Shipping for that one will be $33.33, $33.99 here for this one here. |
| Sexton | Wow. |
| Vinson | So it's more expensive for some odd reason here. Not exactly too sure. |
| Sexton | That's kind of weird, huh? |
| Vinson | Yeah, it is. [Laughter] |
| Sexton | So how much was the price on that one? For the actual price? |
| Vinson | For the mid-back leather one? |
| Sexton | No, no, no the gray one. |
| Vinson | The gray one was like $69.99, I think. |
| Sexton | So, really, its going to be the same price for the shipping. |
| Vinson | Yeah, that's pretty much almost the same price with the leather one here. I'm not exactly too sure how they work out the shipping here, but that's what they ask. |
| Sexton | Well, you know what they did, is they looked at the other one and they said well, how do we make it the same price? I'm just kidding. |
| Vinson | [Laughter] _____ noticing here. |
| Sexton | [Laughter] Alright, well, let's put the leather one in the shopping cart and let's move on to a different department and see if I can look at some other stuff around. |
| Vinson | What would you like to, which one did you like to add? The leather one or the … |
| Sexton | The leather one, let's add the leather one, might as well. The same price practically. |
| Vinson | And it says for this leather one, it usually ships in 5-7 days, so it might take a little longer. |
| Sexton | Okay, well, let's put that in there then we'll deal with it when we shop, when we actually … |
| Vinson | Okay, and what would you also like to look at? |
| Sexton | Okay, let's see … um, well, what else, what else do you carry? What other categories … |
| Vinson | Uh, entertainment, electronics, toys, sports, patio, plus garden, furniture, bed and bath, home, kids, babies, men's, women's. |
| Sexton | Uh, what's in men's? |
| Vinson | Men's … uh, clothing, suits, separates, active wear, swim wear, young men, Masimo, custom clothing. |

| | |
|---|---|
| Sexton | You actually have suits? Okay, well, I don't think I want to _____. |
| Vinson | _____? |
| Sexton | I don't know what sizes I'd wear in a suit anyway, um. |
| Vinson | Uh, I'm not exactly too sure, you might want to, usually if you want to get really good suit, you want to go to a tip top tailor place, and they get the exact size that you should get a perfect fit, cause it's really nice once you like get a perfect size for you. |
| Sexton | Yeah, yeah, that's true. Uh, okay, um ... |
| Vinson | 'Cause with pants, it's just like the way you spend in the length, with jackets it's like the upper chest, the waist size, you have to calculate a lot of things actually. Well, that's what I think. What else is also under men's is watches, personal care, luggage, outdoor sports, gifts for him. |
| Sexton | Oh, um, how about personal care. |
| Vinson | Let's look into that here ... Okay, we have other sub-categories here, it's massage, hand plus foot care, mental care, hair care, _____ plus fragrance, spa, men's health. |
| Sexton | How about hair care? Do you have shampoo? Ha-ha. |
| Vinson | Um, we have a ... |
| Sexton | What do you have in hair care? |
| Vinson | We got coloring, straightening, ironing, clippers and trimmers, uh, hair dryers, rollers, _____. |
| Sexton | You have curling irons for men? |
| Vinson | Um, I'm not exactly too sure. |
| Sexton | [Laughter] that's kind of funny, okay, so ... |
| Vinson | I, okay, _____ gave me to another sub-category like, as soon as I pressed Halton beauty, it brings me to the Halton beauty section, which was pretty much a category for women's and men's. |
| Sexton | Oh. |
| Vinson | Under men's health is shavers, trimmers, grooming, fragrances, body and bath and body. |
| Sexton | Did you say health care or did you say hair care? |
| Vinson | Uh, it was under men's health. Yeah, there's shavers and trimmers, grooming, fragrances, bath and body in that one. I'm guessing colognes and like, uh, shavers. |
| Sexton | Okay, uh ... hmmm, do-de-do-de-do ... alright, let's maybe go to a different category. Hmmm, what other categories do you have? Where did you find the electronics category? |

| | |
|---|---|
| Vinson | Um, electronics is on the right side of the page here and it says visual cameras, DVDs, DVD players, videos, home theater, MP3 players, _____ solid radio, home audio, car audio, instruments, telephone communications, home office, video games, and home safety, home safety, security. |
| Sexton | Is it safety or security? |
| Vinson | Safety, security – home safety plus security. |
| Sexton | Oh. |
| Vinson | Have a look into there like see … |
| Sexton | Umm, oh well, okay, so electronics, is that like a sub, I mean, that's a main category, right? |
| Vinson | Yes. |
| Sexton | So are there any other main categories that are around electronics?  I mean, what other main categories are there? |
| Vinson | What exactly are you looking for? |
| Sexton | Um, let's see … I'm not sure.  I want to kind of browse around.  Well, see you said men's, women's, and things like that, but you just, you said baby, _____ but you didn't say electronics, so I'm wondering what would be around that area?  Like how did you get to that? |
| Vinson | Um … |
| Sexton | ___ back to the … |
| Vinson | Cause our topic gives you a category bar and it says women's, men's, babies, kids, home, bed plus bath, furniture, patio plus garden, sports, toys, electronics and home entertainment.  And under electronics, there's a whole bunch of other subcategories here. |
| Sexton | Oh, okay.  Huh, what else do I …?  Um, how much are we at right now? |
| Vinson | Um, let me have a look here.  With that chair in your shopping cart, your subtotal is $189.95. |
| Sexton | Okay, um, hmmm, I'm wondering if you guys have like any fans or air conditioner kind of, portable air conditioner or fans … |
| Vinson | Hmmm, let me see if I can find that here. |
| Sexton | There's no way to shop shelf-by-shelf or anything _____ category? |
| Vinson | Yes, categories.  Let's see here … We have air conditioners here.  We have the something down air cooler and ionization, ionization, or Izoner, I can't even pronounce that, uh, air conditioning, it cools air, I'm pretty sure it filters air so um… |

la-869409

| | |
|---|---|
| Sexton | It's an air condition air?  Like, does it make the air cool or just conditions it just to make it more _____? |
| Vinson | It's a portable air conditioner so I guess it cools the air, cooler works by drawing in air in cooling it with a water saturated wick.  Shoots a stream of fresh air back out, cooling it by up to 12 degrees F.  Uses much less energy than the air conditioner, _____ from room-to-room, includes air purifying controls. |
| Sexton | That's cool.  How much is that? |
| Vinson | Uh, $79.99 here.  We also have a bunch more here. |
| Sexton | Uh, how much is the cheapest one? |
| Vinson | Uh, that is currently the cheapest one we have right now, $79.99. |
| Sexton | Uh, well, let's put that in the cart right now and we'll keep on looking. |
| Vinson | Okay.  Uh, so you still want to look into the air conditioning category? |
| Sexton | No, we'll look at other stuff.  I don't like to spend a lot of time in one place. |
| Vinson | Okay.  Uh, so what else would you like to look at here? |
| Sexton | Um, can we go back to the home page and look at all the categories.  There's got to be tons of 'em, there's got to be lots of things on that page.  Ready to do that? |
| Vinson | Yeah, back up on being page here. |
| Sexton | Now, let's see what do they have besides all of the ones you've read before less the men, the women and the … |
| Vinson | Those are pretty much the main categories, um, and after those main categories, you get a bunch of other sub-categories here. |
| Sexton | Oh, I see. |
| Vinson | Let's see here. |
| Sexton | Okay, well, I don't want to look for anything for babies and I don't want to look for anything for women.  Anything that would be men-related, almost anything.  I just want to look around. |
| Vinson | Okay, on this home, kitchen appliances, dining home décor, rugs, lighting, window coverings, bed plus bath, patio plus garden, furniture, storage, organizations, vacuums and floor care, home improvements, pets, luggage, that's in the home, under bed plus bath, is bed in the bag, bedding collections, comforters, fashion beddings plus accessories, bedding basics, sheets, kids plus bedding and bath, teen bedding, mattress, baths, bath coordinates. |
| Sexton | Mattress, bath? |
| Vinson | Mattress and then bath. |
| Sexton | Oh, oh, oh. |
| Vinson | No, it's not a bath.  You can't sleep in your bathtub.  [Laughter] |

| | |
|---|---|
| Sexton | It's not what's intended [laughter]. |
| Vinson | The bath towels, bathroom furniture, bathroom, bedroom furniture, bathroom furniture. Um, there's furniture, there's bath, bedroom, living room, kitchen plus dining, home office, patio furniture, media furniture, storage plus organization, _____ and furniture, kids furniture, dorm furniture. |
| Sexton | Oh, what's in dorm furniture? |
| Vinson | I'm not exactly too sure, let's have a look. There's _____ chairs, book cases, futons, seating, bean bags plus ottomans, kitchen carts, kitchen carts, uh, futons, tables, tables and chairs, |
| Sexton | Nothing sounds good yet. Hmmm … |
| Vinson | I'll stay up here. |
| Sexton | What about the organization _____ what's organization, organization storage? |
| Vinson | Storage plus organization? |
| Sexton | Yeah. |
| Vinson | Um, let's see here … um, it's just drawers, drawer carts, dining storage, hampers and sorters, _____ totes, storage boxes and bedroom, it's um, _____ system, folding _____, decorating, decorative shelving, garment racks, hanging storage, under bed storage, shoe organizers, shelving, that's under bedroom and then there's laundry room, basement, attic storage, living room, let's see here, dorm rooms, under bed storage, shoe organizers, soft-side storage. |
| Sexton | Soft-side? What's that? |
| Vinson | I'm not exactly sure, let's have a look here. Oh, it's just like, uh, little shelving units here. Trash cans. |
| Sexton | Hmmm. |
| Vinson | It's just like little mini storage units here. |
| Sexton | _____ Target.com you guys don't sell like shampoo, bars of soap, you know, those kind of things? |
| Vinson | Um, no, it doesn't look like we sell those kinds of things. We only sell like furniture and all that stuff. Uh, I could give you another site to shop on. Hold on one moment here. Uh, I think Amazon.com might sell those items, I'm not too sure, but I'll go look, cause we are affiliated with them. And if you go on to Amazon.com, they have sold products here, home needs, the thing is with them though, they, with Amazon.com, they can't order by phone here. You'd have to order it on your side there on the computer. And that's a policy they have on Amazon.com, but from what I see here, is that they do sell Tide products like soap products and all that on Amazon.com. |
| Sexton | Okay, so, if I order with Amazon, would I be putting, I wouldn't be putting it in the same shopping cart, would I? |

| | |
|---|---|
| Vinson | No, no, it would be like a different system here. |
| Sexton | Oh, okay. |
| Vinson | Cause they're like a different company. They're affiliated with us, but um, we don't handle their customer service here. |
| Sexton | I see _____. |
| Vinson | Yeah, separate companies here, but we are affiliated with them and Amazon.com does handle our site here. So it sounds pretty much Amazon's paying us. [Laughter] |
| Sexton | Oh, okay. |
| Vinson | But, yeah, Target.com does not sell any soap products here. |
| Sexton | Okay, that's kind of a bummer cause they sell it in the stores, I know that. |
| Vinson | Yeah, we sell like food products, we sell a lot of stuff in the Target Stores, but online we, like we can't, we don't sell like products like that online here. Sometimes, in stores, there's things we can like ship and all that stuff in stores, a lot of stuff in there. Can't ship online here. |
| Sexton | Um, let's see, well, can we look around some more? |
| Vinson | Yeah, we can look around some more here. Uh, what would you like to look at here? |
| Sexton | Um, let's see ... |
| Vinson | Anything in entertainment? |
| Sexton | Yeah, what kind of sub-categories are in entertainment? |
| Vinson | In entertainment, there's movies, music, books plus stationery, book mart, I don't know what that is, video games, home theater, electronics, game room, pretty much it in entertainment there. |
| Sexton | What about, what about, let's go back to clothing. |
| Vinson | Okay. Okay, I'm in clothing. What would you like to look at under? You have sub-categories of clothing, young men's, wear to work, ultimate collections, like khakis, golf t-shirts, custom clothing, and brands pretty much. |
| Sexton | Um, do they have t-shirts? |
| Vinson | T-shirts, uh, yeah, t-shirts here. What type of t-shirts are you looking for? |
| Sexton | Um, I don't know, how ... |
| Vinson | Like golf t-shirts, regular t-shirts, um, v-neck t-shirts, we have a lot of t-shirts here. Are you looking for like, just like regular t-shirts or the t-shirts that have the collars on them? |

17

| | |
|---|---|
| Sexton | Um, I don't know, gosh, um, I don't know, just t-shirts, really, different colors, different styles. |
| Vinson | Let's see. We have a lot of t-shirts here. Um, you got the Masimo, _____, pretty much plain, plain green. Uh, young men's Tokyo t-shirt in red, it says Tokyo on the front. |
| Sexton | Well, the kind of t-shirts I like are, I mean, the kind of colors I kind of, mostly not like light colors, not like light blue necessarily, bright red, I don't like really bright colors, I like kind of, not too dark sometimes, maybe black, but sometimes, but not always, too, too dark _____. |
| Vinson | Uh, okay, we have the utility, Colorado _____ green tee in navy, it says "Colorado" in the front, what else does it say? Uh, in the front, _____ it says like "How's your Aspen?" No clue what that means. What else do we have here? Gold Cup Mexico, soccer t-shirt, Masimo, Lanier T Academy. We've got the ice cold beer t-shirt in Navy, I don't know what that says here, has a truck and a, it says "Ice Cold Beer, Dreams Do Come True." |
| Sexton | [Laughter] |
| Vinson | _____ in navy. Let's see here. S, M, L and XL. |
| Sexton | Yeah, I'm a medium. |
| Vinson | Yeah, that t-shirt, what else do we have here? We have a deep brown Masimo t-shirt, it says "Freedom" at the top where the neck is, t says "Freedom." |
| Sexton | Is it a big "Freedom" or a small? |
| Vinson | No, it just says "Freedom" at the top there. |
| Sexton | _____ small _____ |
| Vinson | Yeah, it just says "Freedom" at the top there, um, like near the neck. |
| Sexton | Oh, like on the neckline? |
| Vinson | Yeah, where the neckline is, it just says "Freedom." |
| Sexton | Right below the neckline or on the neckline? |
| Vinson | Uh, below the neckline. |
| Sexton | Oh. |
| Vinson | Can I place you on hold for a moment, please. |
| Sexton | Okay. |
| Vinson | Uh, thank you. *[music in background]* Hello? |
| Sexton | Yes. |
| Vinson | Yes, thank you for holding. Okay, um, I can only look up a couple more items here because I have other calls in the cue right now. I need to take them here, so, um, what else would you like to look at here? Hello? |

Sexton    Yeah, sorry, uh, oh, gosh, so you're going to have to take some other calls, huh?

Vinson    Yeah, its starting to get busy here. I really apologize.

Sexton    Oh, I guess it gets real busy at 2 in the morning.

Vinson    Oh, yeah, sometimes it does cause we, I, I, yeah, we get busy sometimes here cause we _____ the whole United States here.

Sexton    Oh, uh, your manager or something is telling you that you can't …

Vinson    Yeah, that's pretty much

Sexton    Did you explain to him that he or her that you're helping a blind customer to look through …?

Vinson    Uh, yes, I do understand that but, um, . . . yeah, I'm not too sure what she was saying after that though. But, um how much, what else would you like to shop for here?

Sexton    Uh, Uhhhhhh, gee, so . . . Do you have any solid color shirts that are . . .

Vinson    Like t-shirts?

Sexton    Yeah, t-shirts that are in the _____ range.

Vinson    We have the men's Masimo charcoal heather t-shirt here, and it's pretty much like dark gray, dark grayish color here.

Sexton    Is it like just solid dark gray?

Vinson    Mmmmmm, yeah, pretty much, from what the picture looks like here

Sexton    Okay. Um, what about a dark green or dark blue or black?

Vinson    Um, it seems like on their site here, we have a lot of bright t-shirts, we have one from Italy, England, Brazil . . .

Sexton    Is it alright if I get your name or your badge number maybe?

Vinson    Um, no, unfortunately I can only take calls, whatever comes in here. But if you give us a call back we'll have, like, more — we'll have more _____ representatives here that can best ___ you also.

Sexton    Oh, but I can't get your name or badge number just for a reference?

Vinson    Oh, no, I can . . . my name is Vinson _____, I work at the Vancouver call center here.

Sexton    How do you spell your name?

Vinson    V-I-N-S-O-N

Sexton    And you work at the what?

Vinson    Vancouver Call Center.

Sexton    How do you spell that . . . Vancouver?

Vinson    V-A-N-C-O-U-V-E-R in Vancouver, British Columbia here.

| | |
|---|---|
| Sexton | And the manager that told you that you had to go, can I get their name please? |
| Vinson | Unfortunately, I'm not authorized to give any of my names, because I'm not . . . because I'm not . . . I can't give their names here, but you could talk to her. |
| Sexton | Yeah, I'd love to talk to her, thank you. |
| Vinson | Okay.  Okay, can I just put you on hold for one moment please? |
| Sexton | Yeah, sure. |
| Vinson | Thank you. |
| On Hold Recording: | [Music plays in background] Thank you for calling, we'll be with you shortly . . . Your call is very important to us, we'll be with you shortly. |
| Vinson | Hello? |
| Sexton | Yes. |
| Vinson | Yes, thank you for holding, okay, first of all what I'm going to have to do is I'm just going to get you to make an account first, because all the items you asked for, that will make an account for you and put the items in your account _____ or their going to be lost here.  So why don't we make an account first here, and then put these items in your account here in your shopping cart, alright? |
| Sexton | Okay, and then I'll be able to come back in? |
| Vinson | Yeah, it will go come back to them here. |
| Sexton | Okay. |
| Vinson | Give me one moment here.  Can I get you name please? |
| Sexton | Hold on, I might have an account with you I'm not sure.  My name is Bruce Sexton. |
| Vinson | Can you spell that please? |
| Sexton | Yeah, B-R-U-C-E Sexton, S-E-X-T-O-N |
| Vinson | B-U . . . So the first name is B-U-C-E? |
| Sexton | Oh, sorry, B-R-U-C-E. |
| Vinson | Oh, Bruce.  Okay.  And an e-mail address please? |
| Sexton | Yes, bjsexton@comcast.net |
| Vinson | Okay.  I see that you have an account with us already. |
| Sexton | So I'll be able to call back, and have somebody help me purchase it, right? |
| Vinson | Yes.  Just give me one moment here.  Okay.  I have your shopping cart here, okay?  So if I could just put you on hold for one moment while I transfer you? |
| Sexton | Hold on, so there is no other identification other than "Vinson" for your name, there is no identification badge or . . . I don't know . . . |
| Vinson | No, there won't be any identification, but there will be notes left on your account |

20

|         | here, and there will be an e-mail sent to you here saying if I've helped you or not here. |
| Sexton  | And you've been very helpful.  I don't want to give you the wrong impression.  You really have. |
| Vinson  | No problem.  It's just that we are a call center here and there is only so long I can stay on the phone _____ you understand that. |
| Sexton  | I understand. |
| Vinson  | Would you like to still speak to someone hire up here, or . . .? |
| Sexton  | Oh yes.  Yes please the person [WAV file goes blank here] |

la-869409

# EXHIBIT B

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4   - - - - - - - - - - - - - - - -

5   NATIONAL FEDERATION OF THE    )   Case No.

6   BLIND, et al.,                )   C 06-01802 MHP

7            Plaintiffs,          )

8   v.                            )

9   TARGET CORPORATION,           )

10           Defendant.           )

11  - - - - - - - - - - - - - - - -

12

13          DEPOSITION OF BRUCE F. SEXTON

14             TUESDAY, MAY 23, 2006

15

16

17

18

19

20

21

22       BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23                      1320 ADOBE DRIVE

24              PACIFICA, CALIFORNIA 94044

25                       (650) 359-3201

Page 95

1          Target.com in that context to try to get help

2          completing your purchase?")

3          THE WITNESS:  I would say the only attempt I

4   have made is through the National Federation of the

5   Blind --

6          MR. PLUNKETT:  All right.

7          THE WITNESS:  -- to contact Target.

8   BY MR. PLUNKETT:

9      Q.   If you had wanted to contact Target.com while

10  you were using the website to ask for help in

11  completing a purchase, would you know how to do that?

12         MR. KONECKY:  Objection; incomplete

13  hypothetical, calls for speculation.  It's also vague

14  and ambiguous given the prior testimony.

15         THE WITNESS:  I'm pretty confident that I

16  could have found a way to contact Target to let them

17  know that I was having problems with their site if

18  that's what you're asking.

19         MR. PLUNKETT:  That's what I'm asking.

20  BY MR. PLUNKETT:

21     Q.   How would you go about contacting them?

22         MR. KONECKY:  Other than through the NFB?

23         MR. PLUNKETT:  Yes.

24         THE WITNESS:  I don't know.  I could call

25  them.  I could e-mail them.  I would have to do some

Page 96

1    research on that.

2    BY MR. PLUNKETT:

3        Q.    Did you ever do any research on that or, for

4    example, attempt to obtain their 800 number or an

5    e-mail address for customer support?

6                MR. KONECKY:  Objection; vague and ambiguous.

7                THE WITNESS:  I don't recall ever doing that

8    research, but I do know that I went through the NFB to

9    make a complaint and I assume they have that

10   information.

11               MR. PLUNKETT:  Thank you very much for your

12   time today.  Those are all the questions I have.

13               MR. KONECKY:  Deposition is concluded.

14               (At 4:50 P.M., the deposition proceedings

15               concluded.)

16

17

18
_____

BRUCE F. SEXTON

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3           I hereby certify that the witness in the

4    foregoing deposition, BRUCE F. SEXTON, was by me duly

5    sworn to testify to the truth, the whole truth and

6    nothing but the truth, in the within-entitled

7    cause; that said deposition was taken at the time and

8    place herein named; that the deposition is a true

9    record of the witness's testimony as reported by me, a

10   duly certified shorthand reporter and a disinterested

11   person, and was thereafter transcribed into typewriting

12   by computer.

13           I further certify that I am not interested in

14   the outcome of the said action, nor connected with nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17           IN WITNESS WHEREOF, I have hereunto set my

18   hand this 26th day of May, 2006.

19

20                        _____

21                        CHRISTINE   L. JORDAN, CSR #12262

22                        STATE OF CALIFORNIA

23

24

25

# EXHIBIT C

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4   NATIONAL FEDERATION OF THE BLIND,  )

5   the NATIONAL FEDERATION OF THE     )

6   BLIND OF CALIFORNIA, on behalf of  )

7   their members, and Bruce F. Sexton,)

8   on behalf of himself and all others)

9   similarly situated,                )

10                      PLAINTIFFS)

11  V.                                 ) NO. C06-01802 MHP

12                                     )

13  TARGET CORPORATION,                )

14                      DEFENDANT )

15              ORAL DEPOSITION OF

16                 DAWN WILKINSON

17         TAKEN IN LITTLE ROCK, ARKANSAS

18                 JUNE 21, 2006

19                                    CERTIFIED COPY

20

21

22  ATKINSON-BAKER, INC.
    COURT REPORTERS
23  (800) 288-3376
    www.depo.com
24  FILE NO.: A00554A

25  REPORTED BY: TERESA IDEN, CCR NO. 646

1    A    No.

2    Q    You don't have any kind of training with related to

3    adaptive software?

4    A    No.

5    Q    Okay.  How about in computer use, generally?

6    A    No.

7    Q    Okay.  If I'm silent, by the way, it's because I'm

8    listening to my notes here, so --

9    A    Oh.

10    Q    -- don't -- don't worry about that.  Have you had

11    any training in computer software?

12    A    No, I have not.

13    Q    How about web design?

14    A    No.  I'm clueless --

15    Q    Okay.

16    A    -- in web design.

17    Q    Okay.  Can you please describe your job history,

18    beginning with your current job and going backwards?

19    A    Okay.  That's easy.  It's the only job I've had.  I

20    started in the fall of '98 -- in August of 1998.  And I

21    started as a Braille Instructor at the School for the

22    Blind, teaching elementary children K-6.

23    Q    Okay.

24    A    And I taught braille with the addition of -- one

25    year I think they added an Arkansas History course on

1    me, and one year I -- I taught a couple of math classes

2    with the only three students in there, as well.  And

3    then, until August of this past year, when I began

4    teaching Adaptive Technology to secondary students.  And

5    so, this is my first year working with 7-12.  There were

6    one or two occasions where I had, like, one or two

7    students, during my braille instruction time that they

8    were students who had just come in and lost their

9    vision, you know, right recently within the last six

10   months or so.  And just -- they wanted someone to help

11   them with braille and just sort of, you know, show them

12   a little bit about what they could still do on a

13   computer --very, very basic stuff, but other than that,

14   this is my first year of ever actually teaching adaptive

15   technology full-time.

16   Q    And you said that you teach adaptive technology to

17   7th through 12th graders?

18   A    Uh-huh.

19   Q    Is that right?

20   A    Uh-huh.

21   Q    But not elementary school?

22   A    No.

23   Q    Is it a mixed classroom that you teach in?

24   A    I have -- I usually have on average of three to

25   four students at a time, per class period.  And they're

1    usually divided up, you know, grade-wise.

2    Q    Okay.  So, are you -- in teaching your adaptive

3    technology students, are you able to observe different

4    ranges of skill and ability?

5    A    Uh-huh.

6    Q    And what would you say about ranges?

7    A    I still get a lot of students who come in from

8    public school who have either had no opportunity to have

9    exposure to the equipment, or who have just lost their

10   vision for various reasons.  I get a lot of just the

11   basic, but then I also have some students who, because

12   they've been at the School for the Blind and they've had

13   exposure to computers and JAWS and things for several

14   years, that they're -- they're on a more higher skilled

15   level.  There are probably -- oh probably, you know,

16   just intermediate, you know, JAWS users probably.  They

17   are not -- we don't -- we don't teach anything advanced

18   like scripting or any of that kind of stuff.  We're

19   pretty -- pretty basic on word processing, navigation in

20   Word, and you know, basic Internet, e-mail, how to get

21   your work done on the computer, that kind of thing.

22   Q    Okay.  So, --

23   A    So, we're --

24   Q    Go on if you're not finished with --

25   A    Oh, no.

11

1   BY MR. BASRAWI:

2   Q    Do you -- I'm sorry.

3   A    Well, I just know that some links could be labeled

4   a little better than others.  But --

5   Q    So, you have gone to web pages that say, "Graphic,"

6   and then --

7   A    Uh-huh.

8   Q    -- has a label on it, correct?

9   A    Uh-huh.

10  Q    For a link?

11  A    Uh-huh.

12  Q    And does that make it easier than if there wasn't a

13  label on that graphic, to identify that link?

14             MR. PLUNKETT:  Objection.  Vague.

15  BY THE WITNESS:

16  A    Well, for essence of time -- for essence of time

17  and you know, the speaking commands, on trying to figure

18  out what it is, you know, yes.  It's obviously easier.

19  BY MR. BASRAWI:

20  Q    Okay.

21             MR. BASRAWI:  All right.  Let's take a

22         break, if you want.  Five minutes?

23             MR. PLUNKETT:  Sure.

24             (WHEREUPON , a short break was taken, after

25         which the deposition proceedings resumed as

1    you know, "Okay, wow.  Here's what's here.  Here's

2    what's available."  You know, five to ten minutes just

3    kind of reading, listening to it, tabbing, and seeing

4    what was there.

5    BY MR. BASRAWI:

6    Q    And this time that you were on target.com, was this

7    on or about May 21st?  Is this time, the time you're

8    talking about?

9    A    Uh-huh.

10   Q    Okay.

11             MR. PLUNKETT:  Please try to answer "Yes"

12        or "No."

13   BY THE WITNESS:

14   A    Yes.

15   BY MR. BASRAWI:

16   Q    Okay.  And when you visited the home page for the

17   first time, did you notice that there was a large number

18   of links that you were not able to identify?

19             MR. PLUNKETT:  Objection.  Assumes facts.

20        Lacks foundation.

21   BY THE WITNESS:

22   A    Initially, when it first came up and it started

23   reading -- I'm trying to remember if that was the one --

24   I don't remember being just floored by any, "Oh, my

25   Gosh.  I can't read it, I can't read it, I can't read

55

1    it."  I just -- I remember seeing, you know, okay, there

2    were a few things that it was -- you know, I thought,

3    "Oh, that's probably a picture or whatever."  But at

4    that point, I just began to tab and skip down to the

5    next -- the next table or next -- and then just went

6    from there.  And I just saw the departments and, you

7    know, the Target Baby, Toys, whatever, and I thought,

8    "Well, gee.  I don't know what that stuff is, but here's

9    everything I need."  And I just -- I just went from

10   there.

11   BY MR. BASRAWI:

12   Q    Were you curious as to what the stuff you couldn't

13   recognize was?

14   A    Well honestly, not really.

15   Q    Why not?

16   A    I -- well, I -- once I saw the dep -- all the

17   departments and everything and, you know, the shopping

18   and how to -- I just didn't really think about it.  I --

19   I don't know.  I just --

20   Q    Well, I'm --

21   A    It didn't bother me.

22   Q    Let me -- let me ask you this.  Would it bother you

23   to learn that those links that you didn't identify could

24   have been specials or offers that you never became aware

25   of?

1    turn that Virtual PC cursor off, you're going to lose

2    that spot.  You're going to have to tab to find it

3    again.  Even if you were directly on that "Proceed to

4    Checkout" when you turn that cursor off, then you're

5    still going to have to go back and find it.

6    Q    How long did it take you to figure out how to

7    activate the "Proceed to Checkout" button?

8    A    What program?  On JAWS?

9    Q    On JAWS.

10   A    Yeah.  Just probably a couple of minutes.  I

11   realized it wasn't going to work with the -- and then I

12   tried just routing the -- you know, routing the JAWS --

13   routing JAWS PC and then doing the left-click and

14   realized that wasn't going to work.  And I thought,

15   "Okay.  Let's just turn our Virtual PC cursor off."  And

16   did it.  And tabbed over and found my little "Proceed to

17   Checkout" button again, and hit Enter, and it worked.

18   Q    And you said it took about two minutes?

19   A    Uh-huh.  At most.

20   Q    Were you frustrated by the fact that it took two

21   minutes to figure it out?

22   A    I was a little surprised, initially, that it didn't

23   work.  But I thought, "Well, you know, there's gotta be

24   something JAWS isn't -- JAWS isn't telling it that it's

25   clicking.  JAWS isn't doing something, here."  And

1    again, I'm -- I'm on 7.0 and I do know that there are

2    later versions.  There's, like, a beta version or

3    something, 7.1, 7.2 -- I'm trying to think -- anyway,

4    and I don't have it.  So you know, I thought, "Well,

5    maybe this is the reason I should update or whatever."

6    I don't know, but -- but all the other buttons worked

7    fine.  So, I don't know what it is about that one.  It's

8    a little odd.  But everything else works great.  So,

9    once I got it going, you know, and then went back to my

10   normal Virtual Cursor Mode, it was fine.  And so, I just

11   kept going.

12   Q    Now, do you expect that a beginner screen reader

13   user would have been able to figure out how to activate

14   the button?

15                  MR. PLUNKETT:  Objection.  Vague.  Calls

16          for speculation.

17   BY THE WITNESS:

18   A    Well, it depends on really how much -- you know, as

19   a beginner, how much initiative do you take?  How much

20   are you going to read?  And how much are you going to,

21   you know, how much are you going to look at it?  And how

22   much are you going to try?  I don't -- I am totally self

23   taught on what I've learned and I know that, you know,

24   when I got -- so many changes have happened since I

25   started JAWS.  There wasn't even such a thing as, you

1    Q    Would you like me to break it down?

2    A    With -- you know, with the "Proceed to Checkout," -

3    - okay, if you just hit Enter would the JAWS work?  And

4    JAWS may very well work.  But like I said, I'm on 7.0,

5    so -- and I know it works on Freedom Box.  So, my -- I

6    would say that the odds are it's probably a JAWS issue.

7    With the -- the newer version it'll probably work.  I

8    mean, it worked fine on Freedom Box.  So, I'm not real

9    sure how much that problem is, again, a JAWS thing.  And

10   it'll be fixed just with -- with JAWS being updated,

11   like, using the beta or whatever.  It's going to -- it's

12   going to depend on -- a lot of things fix themselves as

13   the screen reader fixes itself.  And that's why I can't

14   specifically say that that's a website issue, because

15   the fact that it works for Freedom Box tells me that --

16   that that button works.  That the fact that it didn't

17   work with my 7.0 on JAWS is kind of a fluke.  And every

18   other button did.

19   Q    Other than the button issue, how about if the links

20   were labeled?  Would that make it easier for you to use?

21              MR. PLUNKETT:  Objection.  Calls for

22         speculation.

23   BY THE WITNESS:

24   A    Well, I -- I mean, I found all the links that I --

25   all the links that I needed, like, to the departments

1    and everything was all there.  And so, the fact that I

2    didn't have -- you know, that I didn't use the other

3    links, I don't know how that would have impacted my

4    visit because I -- you know --

5    BY MR. BASRAWI:

6    Q    Because you don't know what you were missing.

7    A    I didn't need them.  Yeah.  I just -- everything I

8    -- you know, I searched for stuff and shopped and put

9    stuff in and bought.  And it worked.  So, I -- I didn't

10   find them necessary.  That doesn't mean -- you know, --

11   other people might, but I was okay with it.

12   Q    Would you have spent less time on the website if

13   the labels -- if all the links that you encountered were

14   properly labeled?

15                MR. PLUNKETT:  Objection.  Calls for

16         speculation.  Assumes facts.

17   BY THE WITNESS:

18   A    Personally, I would have -- I was almost relieved

19   to just kind of skip to the parts that had the different

20   departments and then, you know, go, "Okay.  I want

21   music."  So, I went to music.  And then I searched for

22   CDs.  And I mean, you know, once I found those

23   department links it was kind of -- I thought, "Boy, I

24   don't know what all that is, but good grief."  You know,

25   at times it can almost be -- there can almost be too

1    Q    Okay.  I understand that you visited target.com on

2    May 23rd; is that correct?

3    A    Yes.

4    Q    Okay.  And at that visit, you used Freedom Box; is

5    that correct?

6    A    Yes.

7    Q    Did you notice any differences in the way you were

8    able to access target.com on that occasion from previous

9    occasions?

10   A    When it first comes up, the first thing it says is,

11   "Can I help you find something?"  And where as, you

12   know, JAWS would start reading more of the, "Target.com,

13   duh, duh, duh, duh."  You know, it would read the whole

14   thing and then it would get to the, "Can I help you find

15   something?"  You know, it was -- Freedom Box, when it

16   comes up, it's kind of designed to kind of start at the

17   -- like you know, big catch phrase.  And then, of course

18   with Freedom Box, when you -- a portion of the page --

19   you have to change that a little.  I mean, the page is -

20   - was going to be a little different that time because I

21   had been -- I had already created my account with JAWS

22   the time before.  But I did actually log out and, you

23   know, tell it that I wasn't me at one point just to see

24   kind of how it came up and what it said.  But other than

25   not having to enter, of course, Forms Mode when you fill

1    in -- like if you want to do a Search or if you're

2    entering your username or password or any of the other

3    stuff, the quantity. You -- of course, you don't have

4    those shortcuts. Like, there's certain shortcuts that

5    maybe JAWS might have that Freedom Box doesn't. I mean,

6    you can still use -- you can still use, like you know,

7    "E" to go to Edit for, you know, form fields and that

8    kind of thing. There are some things -- of course

9    Windows Find is going to work the same as it always

10   does. But, like, "B" for  -- things like "B" for button

11   and things like that are -- you know, are different. It

12   uses -- you use a modifier key and "H" to do headings.

13   You can use your -- whatever your modifier key is

14   because you can customize that. You can have it either

15   be your Insert or your Shift key -- you can -- you have

16   control over what your modifier key is, with Freedom

17   Box. So, you can -- you can still do things, it's just

18   a little bit different. And then, like, the checkout --

19   the "Proceed to Checkout" button. With Freedom Box, you

20   hit Enter and it works great. So, with JAWS, when I got

21   to the "Proceed to Checkout" button -- and honestly,

22   every other button worked fine -- but "Proceed to

23   Checkout", you hit Enter -- and you can hit Enter all

24   day, and it just sits there.

25   Q    And this is with which?

1    A    With JAWS. And so, with JAWS, you -- you do your

2    Insert+Z and turn off your virtual cursor and then you

3    tab over to find that "Proceed to Checkout" button

4    again, with your Virtual PC cursor off, and hit Enter

5    and it works fine. And then you can turn your cursor

6    back on and everything works beautifully. But with

7    Freedom Box, you didn't have to do that. You just hit

8    Enter and it will --

9    Q    And you're talking about the "Proceed to Checkout"

10   button when you're going to make a purchase?

11   A    Uh-huh.

12   Q    And do you know where that button was located, on

13   the page?

14   A    It's after you -- you've got your "Contents of Your

15   Cart" and you've got -- it'll say, you know, "Quantity,"

16   "Update," "Delete," you know, for each item that's in

17   there. And you keep tabbing across and you'll see all

18   the stuff in your cart. And then there's something that

19   says -- you've got, like, a "Continue Shopping," button

20   and then there's -- and it's right -- right in that

21   vicinity when you're -- when you're tabbing across. And

22   when your Virtual PC cursor is off, your arrow keys do

23   not work so well. It jumps around the screen too much.

24   So, you have to tab to find it. Because even if you're

25   directly on it and you -- and you do that Insert+C, to

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NATIONAL FEDERATION OF THE BLIND,
the NATIONAL FEDERATION OF THE
BLIND OF CALIFORNIA, on behalf of
their members, and Bruce F. Sexton,
on behalf of himself and all others
similarly situated,
                         PLAINTIFFS
V.                                          NO. C06-01802 MHP

TARGET CORPORATION,
                         DEFENDANT

        I, TERESA IDEN, Certified Court Reporter in and for

the State of Arkansas, Supreme Court Certificate No.

646, do hereby certify that the proceedings of the oral

deposition of DAWN WILKINSON, taken on behalf of the

Plaintiffs for the case stated by me in the caption

above are hereto true; that the foregoing transcript of

the deposition proceedings and the testimony of said

proceedings was taken by me in stenovoice and was

thereafter reduced to typewritten form by me or under my

direction and supervision; that the foregoing pages

numbered __1__ through 112 constitute a true and

accurate record of the proceedings held to the best of

my understanding and ability.

        I FURTHER CERTIFY that I am neither counsel for,

related to, nor employed by any of the parties to the

action in which this proceeding was taken; and further,

that I am not a relative or employee of any attorney or

counsel employed by the parties hereto, nor financially
interested, or otherwise, in the outcome of this action;
and that I have no contract with the parties, attorneys,
or persons with an interest in the action that affects
or has a substantial tendency to affect impartiality
that requires me to relinquish control of an original
deposition transcript or copies of the transcript before
it is certified and delivered to the custodial attorney,
or that requires me to provide and service not made
available to all parties to the action.

         WITNESS MY HAND AND SEAL as such Court Reporter
         on this the 30th day of June, 2006.

         TERESA IDEN, CCR
         CERTIFIED COURT REPORTER
         ARKANSAS SUPREME COURT CERTIFICATE NO. 646

                              EXPIRES: 12/31/2006

# EXHIBIT D

1              IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO DIVISION

4   NATIONAL FEDERATION OF THE BLIND,  )

5   the NATIONAL FEDERATION OF THE     )

6   BLIND OF CALIFORNIA, on behalf of  )

7   their members, and Bruce F. Sexton,)

8   on behalf of himself and all others)

9   similarly situated,                )

10                     PLAINTIFFS   )

11  V.                               ) NO. C06-01802 MHP

12                                   )

13  TARGET CORPORATION,              )

14                      DEFENDANT    )

15                  ORAL DEPOSITION OF

16                DAVID HENRY WILKINSON

17            TAKEN IN LITTLE ROCK, ARKANSAS

18                   JUNE 21, 2006

19                                 **CERTIFIED COPY**

20

21

22  ATKINSON-BAKER, INC.
    COURT REPORTERS
23  (800) 288-3376
    www.depo.com
24  FILE NO.: A00554A

25  REPORTED BY: TERESA IDEN, CCR NO. 646

1    Project Assist in using Microsoft Word.  And I was

2    enrolled in, but didn't attend on a regular basis, a

3    course in HTML a number of years ago.

4    Q    Okay.  Did you receive any kind of certification of

5    completion of these courses?

6    A    No.

7    Q    Okay.  With respect to adaptive software, have you

8    had any kind of formal training?

9    A    I have not.

10    Q    How did you learn to use adaptive software?

11    A    I read product manuals.  I learned how to use the

12    Help System. I called tech support, and I fought and

13    slogged my way through it.

14    Q    Okay.  No one has ever taught you how to use

15    adaptive equipment --

16    A    That is correct.

17    Q    -- or software?

18    A    That is correct.

19    Q    Other than the HTML or Microsoft courses that

20    you've taken, have you had any other training or

21    instruction in computers, generally?

22    A    I'm trying to think, to make sure I don't leave

23    anything out.

24    Q    To the best of your recollection.

25    A    I don't believe so.  To the best of my

·1    who wasn't home and whom I wouldn't have asked anyway.

2    The point was, I wanted to look around the website and

3    see what I could find, so I did.

4    Q    Okay.  You say in your declaration that you

5    encountered obstacles on target.com.  Do you recall what

6    those obstacles were?

7    A    Certainly a link that doesn't tell me where it's

8    going to go is a barrier to being able to get there.  I

9    also -- well, I'm trying to think if that's -- that's

10   Target-specific.  I think that it would be great if

11   those links -- I mean, if that -- if -- I'm -- and it

12   would be nice if they were labeled specifically.  Could

13   it be probably designed a bit better?  Okay.  But it

14   certainly didn't keep me from using the site.

15                   MR. BASRAWI:  I'm sorry.  Can you read back

16              that last answer, please?

17                   COURT REPORTER:  Answer, "Certainly the

18              link that doesn't tell me where it goes is a

19              barrier to being able to get there.  I also

20              know -- I'm trying to think if those are

21              Target-specific.  And it would be great if

22              those links -- it would be nice if they were

23              labeled.  Could it be designed a bit better?

24              Okay.  As for that, it didn't keep me from

25              using the site."

84

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NATIONAL FEDERATION OF THE BLIND,
the NATIONAL FEDERATION OF THE
BLIND OF CALIFORNIA, on behalf of
their members, and Bruce F. Sexton,
on behalf of himself and all others
similarly situated,

                    PLAINTIFFS

V.                                        NO. C06-01802 MHP

TARGET CORPORATION,

                    DEFENDANT

     I, TERESA IDEN, Certified Court Reporter in and for

the State of Arkansas, Supreme Court Certificate No.

646, do hereby certify that the proceedings of the oral

deposition of DAVID HENRY WILKINSON, taken on behalf of

the Plaintiffs for the case stated by me in the caption

above are hereto true; that the foregoing transcript of

the deposition proceedings and the testimony of said

proceedings was taken by me in stenovoice and was

thereafter reduced to typewritten form by me or under my

direction and supervision; that the foregoing pages

numbered __/__ through _|_|_8_ constitute a true and

accurate record of the proceedings held to the best of

my understanding and ability.

     I FURTHER CERTIFY that I am neither counsel for,

related to, nor employed by any of the parties to the

action in which this proceeding was taken; and further,

that I am not a relative or employee of any attorney or

counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide and service not made available to all parties to the action.

WITNESS MY HAND AND SEAL as such Court Reporter on this the 30th day of June , 2006.

TERESA IDEN, CCR
CERTIFIED COURT REPORTER
ARKANSAS SUPREME COURT CERTIFICATE NO. 646

EXPIRES: 12/31/2006

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NATIONAL FEDERATION OF THE
BLIND, the NATIONAL FEDERATION
OF THE BLIND OF CALIFORNIA,
on behalf of their members,
and BRUCE F. SEXTON, on behalf
of himself and all others
similarly situated,

      Plaintiffs,

-vs-               No. C06-01802 MHP

TARGET CORPORATION,

      Defendant.

**CERTIFIED COPY**

———————————————————

VIDEOTAPED DEPOSITION OF SUZANNE TRITTEN

OKLAHOMA CITY, OKLAHOMA

FRIDAY, JUNE 30, 2006

REPORTED BY:
TRENA K. BLOYE
CSR

JOB No. 49610

www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

```
 1                    A P P E A R A N C E S

 2

 3

 4   For the Plaintiffs:   Camilla L. Roberson
                           SCHNEIDER & WALLACE
 5                         180 Montgomery Street
                           Suite 2000
 6                         San Francisco, California 94104
                           415-421-7100
 7

 8

 9   For the Defendant:    Stuart C. Plunkett
                           MORRISON FOERSTER
10                         425 Market Street
                           San Francisco, California 94105
11                         415-268-6145

12

13   Videographer:         Bruce Rodgers

14   Also Present:         Curtis Chong

15

16

17

18

19

20

21

22

23

24

25
```

2

```
 1                    I N D E X

 2

 3                                          Page

 4  Direct Examination By Ms. Roberson        6

 5  Certificate Page                         80

 6

 7

 8

 9

10              PLAINTIFF'S EXHIBITS

11                                          Page

12  No. 1   Declaration of Suzanne Tritten   13

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1                    S T I P U L A T I O N S

2

3

4              IT IS HEREBY STIPULATED AND AGREED BY and

5    between the parties hereto, through their respective

6    attorneys, that the videotaped deposition of SUZANNE

7    TRITTEN may be taken on behalf of the Plaintiffs on

8    the 30th day of June, 2006 in Oklahoma City,

9    Oklahoma, by Trena K. Bloye, Certified Shorthand

10   Reporter for the State of Oklahoma, by agreement

11   pursuant to the Federal Rules of Civil Procedure.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
01:17:05   1        Q       With respect to the adaptive software
01:17:16   2    that you use, JAWS, have you had any training?
01:17:18   3        A       I am largely self-taught.
01:17:21   4        Q       Did you ever use any training manuals
01:17:29   5    or --
01:17:29   6        A       I use the -- my two primary sources for
01:17:35   7    learning Windows were the project assist training
01:17:39   8    materials and Windows 95 Explained.
01:17:47   9        Q       Have you had any training in any other
01:17:50  10    type of computer software?
01:17:56  11        A       No official training.
01:17:58  12        Q       So, does that mean you have taught
01:18:00  13    yourself that as well?
01:18:01  14        A       Yes.
01:18:01  15        Q       Okay.  Which software?
01:18:03  16        A       I can use Microsoft Word.  I have used
01:18:10  17    Word Perfect.  I can use the America Online
01:18:16  18    software.  I can use Outlook 2000.  My experience
01:18:25  19    with the Office Suite is Office 2000, and Outlook
01:18:31  20    Express.
01:18:31  21        Q       Okay.  And have you had any training in
01:18:34  22    web design or programming?
01:18:35  23        A       No.
01:18:36  24        Q       What is your occupation?
01:18:41  25        A       I am an adaptive technology consultant
```

10

| | | |
|---|---|---|
| 01:18:47 | 1 | and braille translator. |
| 01:18:48 | 2 | Q      And how long have you been doing that? |
| 01:18:57 | 3 | A      The consulting since 2000.  And the |
| 01:19:03 | 4 | braille translation since 1999.  And I have done |
| 01:19:10 | 5 | some training using teaching others to use JAWS as |
| 01:19:17 | 6 | well. |
| 01:19:17 | 7 | Q      Where did you do that training? |
| 01:19:19 | 8 | A      It's all been just as people have |
| 01:19:22 | 9 | contacted me.  I did some work for the State of |
| 01:19:25 | 10 | Oklahoma as well as a trainer. |
| 01:19:32 | 11 | Q      And where do you currently work? |
| 01:19:34 | 12 | A      From my home. |
| 01:19:39 | 13 | Q      Before you began working as a consultant, |
| 01:19:44 | 14 | what did you do? |
| 01:19:45 | 15 | A      I was a housewife and mother. |
| 01:19:54 | 16 | Q      Okay.  Does your current job require |
| 01:19:58 | 17 | expertise in computers? |
| 01:20:01 | 18 | A      It requires me to know how to use them. |
| 01:20:07 | 19 | But I don't -- I don't qualify it as expertise. |
| 01:20:14 | 20 | Q      Do you have to know how to use them well |
| 01:20:17 | 21 | enough to be able to teach others, though?  Is that |
| 01:20:21 | 22 | correct? |
| 01:20:21 | 23 | MR. PLUNKETT:  Objection.  Vague. |
| 01:20:30 | 24 | Can I interrupt?  Do you need me to |
| 01:20:32 | 25 | put the microphone on? |

11

| | | |
|---|---|---|
| 01:20:38 | 1 | VIDEOGRAPHER:  (Nods head.) |
| 01:20:45 | 2 | Q       (By Ms. Roberson)  Did you understand the |
| 01:20:47 | 3 | question? |
| 01:20:47 | 4 | A       Yes.  I didn't know if you were ready to |
| 01:20:49 | 5 | continue or not. |
| 01:20:51 | 6 | Q       Oh, okay. |
| 01:20:55 | 7 | A       I don't believe expertise is required to |
| 01:20:57 | 8 | teach another person the basics of how to use a |
| 01:21:00 | 9 | computer. |
| 01:21:03 | 10 | Q       Okay.  Would you say that you are very |
| 01:21:14 | 11 | proficient with computers? |
| 01:21:20 | 12 | A       I would say I'm proficient.  I know -- |
| 01:21:24 | 13 | you know, I know what I'm -- how do I say this?  I |
| 01:21:32 | 14 | know how to use a computer well enough to |
| 01:21:39 | 15 | accomplish the basic tasks required. |
| 01:21:43 | 16 | Q       And which tasks would those be? |
| 01:21:45 | 17 | A       Word processing, some internet surfing. |
| 01:21:53 | 18 | I'm not a programmer. |
| 01:21:55 | 19 | Q       Um-hum.  As a consultant, what are some |
| 01:22:06 | 20 | of your duties?  What kind of things do you do? |
| 01:22:13 | 21 | A       I test software to see if a visually |
| 01:22:16 | 22 | impaired person can use it. |
| 01:22:22 | 23 | Q       Which software? |
| 01:22:24 | 24 | A       At this time, the main work I am doing I |
| 01:22:33 | 25 | cannot say, due to non-disclosure agreements. |

12

| | | |
|---|---|---|
| 01:53:18 | 1 | website before? |
| 01:53:19 | 2 | A    No. |
| 01:53:19 | 3 | Q    So, that was your very first time going? |
| 01:53:22 | 4 | A    That was my very first visit. |
| 01:53:25 | 5 | Q    Okay.  And when you visited target.com, |
| 01:53:29 | 6 | did you receive advice, assistance, or instruction |
| 01:53:32 | 7 | from anyone? |
| 01:53:33 | 8 | A    No. |
| 01:53:33 | 9 | Q    So I'm to understand all you are told is |
| 01:53:38 | 10 | to look over it and see if you could make a |
| 01:53:41 | 11 | purchase? |
| 01:53:42 | 12 | A    Correct. |
| 01:53:42 | 13 | Q    About how much time did you spend on the |
| 01:53:52 | 14 | site on the 13th? |
| 01:53:53 | 15 | A    On the 13th, all total I spent about four |
| 01:53:57 | 16 | hours. |
| 01:53:59 | 17 | Q    Did the target.com website pose any |
| 01:54:08 | 18 | initial confusion for you when you accessed their |
| 01:54:11 | 19 | home page? |
| 01:54:12 | 20 | A    Confusion is not the appropriate term. |
| 01:54:17 | 21 | Q    I'm looking at Plaintiff's Exhibit A |
| 01:54:24 | 22 | (sic.), which is your declaration -- |
| 01:54:24 | 23 | A    Well -- |
| 01:54:27 | 24 | Q    Let me just read it to you.  And I'm sure |
| 01:54:30 | 25 | counsel will tell me if I have it incorrect. |

27

| | | |
|---|---|---|
| 01:54:33 | 1 | In paragraph four of your declaration, |
| 01:54:35 | 2 | you state, "On or about May 13, 2006, I accessed |
| 01:54:39 | 3 | target.com with the intention of navigating the |
| 01:54:42 | 4 | website and purchasing merchandise.  This was the |
| 01:54:44 | 5 | first time I ever visited target.com.  I spent a |
| 01:54:49 | 6 | little more than two hours on target.com exploring |
| 01:54:53 | 7 | the various functions and features on the website. |
| 01:54:55 | 8 | Because this was my first visit to target.com, I |
| 01:54:56 | 9 | did run into some initial confusion."  Is that |
| 01:55:00 | 10 | correct? |
| 01:55:00 | 11 | A      Well, that's the way we put it.  It was |
| 01:55:04 | 12 | put -- or that's the way we -- okay.  I had some |
| 01:55:11 | 13 | problems -- |
| 01:55:19 | 14 | Q      Okay. |
| 01:55:21 | 15 | A      -- getting -- okay.  I had some problems |
| 01:55:23 | 16 | because I simply did not understand the way things |
| 01:55:25 | 17 | were laid out initially. |
| 01:55:29 | 18 | Q      Well, what happened -- walk me through |
| 01:55:34 | 19 | that first visit.  You accessed target.com. |
| 01:55:38 | 20 | Correct? |
| 01:55:38 | 21 | A      Yes. |
| 01:55:38 | 22 | Q      Okay.  What happened when you accessed |
| 01:55:41 | 23 | target.com? |
| 01:55:42 | 24 | A      The first thing that caught my ear and |
| 01:55:46 | 25 | definitely got my attention is JAWS announced that |

28

| | | |
|---|---|---|
| 02:04:19 | 1 | instance, the group of links that -- the group of |
| 02:04:28 | 2 | image map links was larger than pretty much |
| 02:04:33 | 3 | anything I had encountered before. |
| 02:04:47 | 4 | Q    (By Ms. Roberson) I'm just looking at my |
| 02:04:49 | 5 | notes.  That's why I'm silent.  I'm sorry. |
| 02:04:52 | 6 | A    Um-hum. |
| 02:04:53 | 7 | Q    Do you have any idea what was on those |
| 02:05:01 | 8 | links? |
| 02:05:03 | 9 | A    I have no idea, because I never asked |
| 02:05:05 | 10 | anyone to tell me. |
| 02:05:07 | 11 | Q    Does that -- |
| 02:05:09 | 12 | A    My guess is that they are pictures of |
| 02:05:12 | 13 | things that Target is advertising. |
| 02:05:20 | 14 | Q    Okay.  Does it bother you that you |
| 02:05:23 | 15 | couldn't tell what those were? |
| 02:05:25 | 16 | A    No. |
| 02:05:28 | 17 | Q    So you're on the home page.  You realize |
| 02:05:32 | 18 | that there are all of these image links and that's |
| 02:05:38 | 19 | it's easier to go back up to the top of the home |
| 02:05:41 | 20 | page, correct, or the beginning of the home page? |
| 02:05:46 | 21 | A    Correct. |
| 02:05:47 | 22 | Q    Okay.  What did you do next? |
| 02:05:48 | 23 | A    I found the home link and pressed enter. |
| 02:05:55 | 24 | Q    And what happened? |
| 02:05:56 | 25 | A    A new page loaded.  And below the links |

02:06:01  1    at the top and the little search form there were

02:06:04  2    all kinds of links that referred to -- well, there

02:06:12  3    was like a shop by room link, there was all kinds

02:06:20  4    of links that would point you to various things

02:06:23  5    that you might find in the home section of a

02:06:25  6    department store.

02:06:26  7         Q      And were all of those marked clearly?

02:06:29  8         A      Yes.

02:06:29  9         Q      And what did you do after that?

02:06:39  10        A      I found a link called "Shop by room," and

02:06:42  11   I clicked it, or pressed enter on it.

02:06:45  12        Q      And how did you find that link?

02:06:47  13        A      Using the arrow keys.

02:06:49  14        Q      Now, when you were on this page did you

02:06:58  15   find any links that were not readable by --

02:07:04  16   withdrawn.

02:07:05  17               Did you find any links that were

02:07:07  18   confusing?

02:07:09  19        A      There were a few more of the image map

02:07:14  20   links similar to those on the home page, but they

02:07:19  21   were very few and far between.

02:07:32  22        Q      And then what did you do?

02:07:34  23        A      Like I said, I activated the shop by room

02:07:38  24   link.  On the next page I found a link for

02:07:44  25   kitchens, since my intent was to look at dish

35

02:12:00  1        A        Correct.

02:12:01  2        Q        Is that generally what you do when you

02:12:07  3   are familiarizing yourself with a site, look for

02:12:10  4   shortcuts?

02:12:11  5        A        You have to, because most sites these

02:12:19  6   days are large.  You know, there aren't many sites

02:12:26  7   that have less than -- especially the home pages

02:12:29  8   anyway, that have less than 100 links anymore.  And

02:12:36  9   you have to -- you have to familiarize yourself

02:12:39  10  with -- I mean, it's like if you go into a house,

02:12:42  11  the first time you go in you're going to have to

02:12:46  12  look around to find the rooms.  But, eventually, as

02:12:51  13  you visit that house more often you're going to

02:12:56  14  learn, "I don't have to walk all the way around the

02:13:00  15  walls.  I can walk through the middle of this

02:13:03  16  room."  Do you understand what I'm saying?

02:13:05  17       Q        Um-hum.

02:13:06  18       A        As you get familiar you can take short

02:13:09  19  cuts or you can -- you know, familiarity, you just,

02:13:15  20  it happens.

02:13:16  21       Q        Sounds about right.  There is one thing.

02:13:21  22  Let's go back to the home page.  About how much

02:13:24  23  time did you spend on the home page before you

02:13:26  24  decided to go back up to the links at the top?

02:13:29  25       A        Probably about ten, fifteen minutes at

02:13:37  1    the most.

02:13:39  2        Q        And I am correct in saying that that's a

02:13:46  3    little longer than what you would normally have to

02:13:50  4    spend listening to image links and lots of weird

02:13:58  5    code?

02:13:59  6                  MR. PLUNKETT:  Objection.  Vague.

02:14:02  7    Mischaracterizes the record.

02:14:04  8        A        In this case, probably, actually, it was

02:14:06  9    less time.

02:14:09  10       Q        (By Ms. Roberson) Okay.

02:14:10  11       A        Because I determined that there wasn't

02:14:13  12   any need or serious use in exploring the rest of

02:14:18  13   the page.

02:14:19  14       Q        If you hadn't been asked to explore the

02:14:31  15   whole website, would you have stayed on this page,

02:14:35  16   or on this website, on Target's website?

02:14:38  17                MR. PLUNKETT:  Objection.  Calls for

02:14:42  18   speculation.

02:14:43  19       A        If I had not been asked, in all honesty,

02:14:55  20   I don't know that I would have visited the site.

02:14:58  21       Q        (By Ms. Roberson) Okay.

02:14:58  22       A        Target -- I guess I had always assumed --

02:15:04  23   I've always shopped online for things like

02:15:09  24   electronics, things where the specs. are right in

02:15:15  25   front of you, like 500 megabytes or -- of memory or

40

02:23:19  1      A       But, no, not websites.  I wouldn't try.

02:23:23  2      Q       Why not?

02:23:23  3      A       Because, for one thing, what you hear and

02:23:30  4   probably what are seen -- is seen on the screen, I

02:23:33  5   can't guarantee they are going to be the same.

02:23:38  6      Q       And why is that?

02:23:40  7      A       Because some graphics have what they call

02:23:47  8   alt tags, which means that while there is a nice,

02:23:51  9   pretty little picture on the screen, in the

02:23:54  10  underpinnings of the programming there is text.

02:23:58  11     Q       Okay.  And is that what you would hear?

02:24:08  12     A       And that's what I would hear.

02:24:11  13     Q       Okay.  Now, if there is isn't alt tags,

02:24:17  14  what would you hear?

02:24:18  15     A       If there aren't alt tags I would here

02:24:23  16  sometimes, usually the URL, like we -- like I

02:24:27  17  mentioned on the home page.

02:24:31  18     Q       Okay.  So on the home page, all of those

02:24:34  19  image maps where you heard the URL did not have alt

02:24:39  20  tags; is that correct?

02:24:41  21              MR. PLUNKETT:  Objection.  Calls for

02:24:42  22  speculation.

02:24:43  23     A       All I can say is that's my guess.

02:24:46  24     Q       (By Ms. Roberson) Okay.  Based on what

02:24:47  25  the screen reader was --

46

| | | |
|---|---|---|
| 02:53:14 | 1 | A       Here, this page, I pressed the add to bag |
| 02:53:18 | 2 | button.  This page came up and it said, "People who |
| 02:53:20 | 3 | bought these wind chimes also bought this." |
| 02:53:24 | 4 | Q       Um-hum. |
| 02:53:24 | 5 | A       And we had all kinds of wonderful |
| 02:53:27 | 6 | advertisements, and I had to find -- you know, I |
| 02:53:32 | 7 | had to locate the "Proceed to checkout" button, |
| 02:53:38 | 8 | because I didn't want any of these other things. |
| 02:53:40 | 9 | Q       Okay. |
| 02:53:41 | 10 | A       And -- |
| 02:53:55 | 11 | Q       Are you -- |
| 02:53:56 | 12 | A       And when I found it, I found out that -- |
| 02:54:08 | 13 | I guess I'm going to go on here.  I found out that |
| 02:54:13 | 14 | this button did not activate by pressing enter. |
| 02:54:18 | 15 | Q       The "Proceed to checkout" button? |
| 02:54:20 | 16 | A       Um-hum. |
| 02:54:21 | 17 | Q       So what did you do? |
| 02:54:22 | 18 | A       I used a standard work around. |
| 02:54:31 | 19 | Q       Okay.  What was that standard work |
| 02:54:34 | 20 | around? |
| 02:54:34 | 21 | A       I routed the JAWS cursor -- |
| 02:54:39 | 22 | Q       I'm sorry? |
| 02:54:40 | 23 | A       Okay. |
| 02:54:43 | 24 | Q       Please bring it to -- |
| 02:54:45 | 25 | A       Okay.  Let's do this in -- |

60

| | | |
|---|---|---|
| 02:54:48 | 1 | Q    You can use the same terms, just slowly. |
| 02:54:51 | 2 | A    Okay.  What I did is -- you know, you |
| 02:54:55 | 3 | asked me about the virtual cursor early on. |
| 02:54:59 | 4 | Q    Right. |
| 02:55:00 | 5 | A    That's what I'm using at the time I press |
| 02:55:03 | 6 | enter on that button. |
| 02:55:04 | 7 | Q    Okay. |
| 02:55:05 | 8 | A    It didn't work.  That doesn't mean -- |
| 02:55:10 | 9 | there's something there, it didn't activate.  So I |
| 02:55:13 | 10 | simulated using the mouse by pressing a keyboard |
| 02:55:19 | 11 | command that moved the JAWS cursor, or the mouse, |
| 02:55:26 | 12 | to that button where the virtual cursor was. |
| 02:55:34 | 13 | Q    Um-hum. |
| 02:55:35 | 14 | A    And then I pressed the simulated -- I |
| 02:55:42 | 15 | pressed a button on the keyboard that simulates a |
| 02:55:45 | 16 | left mouse click. |
| 02:55:47 | 17 | Q    And what button is that?  I could bring |
| 02:55:53 | 18 | out a computer if you -- |
| 02:55:54 | 19 | A    No.  Just give me a second.  The slash on |
| 02:55:58 | 20 | the number pad. |
| 02:55:59 | 21 | Q    Just the slash on the number pad? |
| 02:56:02 | 22 | A    Um-hum. |
| 02:56:02 | 23 | Q    Okay. |
| 02:56:07 | 24 | A    No.  I'm sorry.  It's the star. |
| 02:56:08 | 25 | Q    So the star on the number pad? |

61

02:56:10  1        A       Yeah.  I'm sorry.  It's the star.

02:56:16  2        Q       Okay.  So you simulated using the -- and

02:56:19  3    what did you call this process?  You used a term I

02:56:23  4    didn't understand.

02:56:24  5        A       Route the JAWS cursor to the PC cursor.

02:56:29  6        Q       Okay.

02:56:29  7        A       And, actually, in this case it's the

02:56:32  8    Virtual PC cursor.

02:56:39  9        Q       And this a standard work around, you

02:56:44  10    said?

02:56:44  11        A       Excuse me.  Yes.

02:56:46  12        Q       That's all right.  Just out of curiosity,

02:56:57  13    how did you learn about this particular command?

02:57:05  14        A       Through the tutorials I had read over

02:57:09  15    time.

02:57:10  16        Q       Okay.  Okay.  So you routed the JAWS

02:57:18  17    cursor to the PC cursor, and then what happened?

02:57:25  18        A       When I pressed the star on the number

02:57:29  19    pad, I heard the click, meaning that the link had

02:57:32  20    activated, or the button had activated, and I was

02:57:36  21    on my way.

02:57:40  22        Q       How long did it take you to figure out to

02:57:42  23    do this once you found the "Proceed to checkout"

02:57:47  24    out button?

02:57:50  25        A       About ten seconds, at most.

                                                                    62

```
 1              C E R T I F I C A T E

 2

 3

 4    STATE OF OKLAHOMA     )
                           ) SS:
 5    COUNTY OF OKLAHOMA    )

 6          I, Trena K. Bloye, Certified Shorthand

 7    Reporter for the State of Oklahoma, certify that the

 8    above-named SUZANNE TRITTEN was by me first duly

 9    sworn to testify the truth; that the above and

10    foregoing videotaped deposition taken by me in

11    stenotype and thereafter transcribed is a true and

12    correct transcript of the testimony of the witness;

13    that the deposition was taken on June 30, 2006, at

14    1:12 p.m., at D&R Reporting & Video, Suite 650, 119

15    North Robinson Avenue, Oklahoma City, State of

16    Oklahoma; that I am not an attorney for nor a

17    relative of any said parties, or otherwise

18    interested in the event of said action.

19          IN WITNESS WHEREOF, I have hereunto set my

20    hand and seal of office on this the 5th day of July,

21    2006.

22                              Trena K. Bloye
                           Oklahoma Certified Shorthand Reporter
23                             Certificate No. 1522
                             Exp. Date: December 31, 2006

24                         Trena K. Bloye
                           Certified Shorthand Reporter
25                         for the State of Oklahoma
```

# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
--oOo--

NATIONAL FEDERATION OF THE
BLIND, the NATIONAL FEDERATION
OF THE BLIND OF CALIFORNIA, on
behalf of their members, and Bruce
F. Sexton, on behalf of himself
and all others similarly situated,

        Plaintiffs,

    vs.                                    No. C06-01802 MHP

TARGET CORPORATION,

        Defendant.
_____/

CERTIFIED COPY

Videotaped Deposition of

**CHRISTOPHER POLK**

Monday, June 19, 2006

Reported by:
SHARON CABELLO, RPR
CSR No. 3080
Job No. 2758CC



**Phillips** *LEGAL SERVICES*
350 University Ave., Suite 270 • Sacramento, CA 95825
916.927.3600 • 888.333.8270
email: phillips@phillipsdepo.com
www.phillipsdepo.com

03:07:27 1    have any other degree?

03:07:28 2    A.        I have certificates and A Plus certification

03:07:37 3    in Network Plus.  I have the JAWS Trainer

03:07:41 4    Certification, and the Assistant Technology Trainer

03:07:44 5    Certification from Lion's World in Little Rock,

03:07:48 6    Arkansas.

03:07:49 7    Q.        Other than what you just described, have you

03:07:52 8    any other formal educational training?

03:07:53 9    A.        No, I have not.

03:07:54 10   Q.        With respect to adaptive software you just

03:07:58 11   testified that you've had certification in JAWS

03:08:01 12   training.  Can you describe that?

03:08:02 13   A.        It was a course basically where you went to

03:08:08 14   Freedom Scientific for a week and learned the

03:08:11 15   fundamentals of teaching JAWS.  I was mainly there to

03:08:15 16   get the certification, to get the piece of paper saying

03:08:20 17   that I was certified so I could continue to teach in

03:08:24 18   the State of Louisiana.

03:08:25 19   Q.        Okay.  And what is Freedom Scientific?

03:08:29 20   A.        Freedom Scientific is the company that makes

03:08:32 21   JAWS for Windows screen reading software that I use.

03:08:35 22   Q.        Okay.  And how long was this training program?

03:08:37 23   A.        Five days.

03:08:38 24   Q.        Okay.  Is there any other training that you've

03:08:43 25   had with respect to adaptive software?

C. Polk

6-19-06

| 03:08:48 | 1 | A.       No, there is not. |
|---|---|---|
| 03:08:49 | 2 | Q.       Okay.  Have you had training in computers or |
| 03:08:53 | 3 | software generally? |
| 03:08:55 | 4 | A.       Yes. |
| 03:08:56 | 5 | Q.       And what is that training? |
| 03:08:57 | 6 | A.       I took classes at New Horizons in Louisiana to |
| 03:09:04 | 7 | obtain my A Plus and my Network Plus certifications. |
| 03:09:09 | 8 | Q.       And can you describe what those certifications |
| 03:09:12 | 9 | are? |
| 03:09:13 | 10 | A.       The A Plus certification basically says that I |
| 03:09:18 | 11 | can effectively physically build a computer, configure |
| 03:09:22 | 12 | all the hardware peripherals, install the software, and |
| 03:09:25 | 13 | maintain it in an office environment. |
| 03:09:28 | 14 | The Network Plus basically states that I am |
| 03:09:32 | 15 | competent in the different types of topology of |
| 03:09:36 | 16 | different networks and I am able to effectively |
| 03:09:39 | 17 | administer security. |
| 03:09:41 | 18 | Q.       Okay.  Other than that training which you just |
| 03:09:44 | 19 | described, have you had any other formal training in |
| 03:09:49 | 20 | software? |
| 03:09:50 | 21 | A.       No, I have not. |
| 03:09:51 | 22 | Q.       Okay.  Have you had any training on Web |
| 03:09:54 | 23 | design? |
| 03:09:55 | 24 | A.       No, I have not. |
| 03:09:56 | 25 | Q.       Or programming, Web programming? |

C. Polk

6-19-06

03:09:58 1    A.        No, I have not.

03:09:59 2    Q.        Okay.  Can you please describe your job

03:10:04 3    history beginning with your current job and going

03:10:06 4    backwards?

03:10:07 5    A.        Right now I am the systems administrator for

03:10:12 6    HumanWear.  I am responsible for the entire U.S.'s

03:10:19 7    network.  Before that I was involved in the technical

03:10:24 8    support area the -- of HumanWear with the products.

03:10:29 9            Next in line is the Society For the Blind

03:10:33 10   where I was an instructor of JAWS doing office

03:10:37 11   applications, JAWS the Internet.  I was also

03:10:42 12   responsible for building computers and maintaining a

03:10:45 13   senior outreach programs computer site that they had.

03:10:51 14          Before then I was a contract employee for

03:10:54 15   Louisiana Rehab for a company called Touch Technical,

03:10:58 16   Incorporated, that is no longer in business.  I went to

03:11:01 17   the clients of rehab's homes and did training and

03:11:07 18   computer installation.

03:11:08 19          And before that I was contracted with

03:11:11 20   Lighthouse for the Blind out of Washington, D.C., who

03:11:14 21   had a contract with the IRS to go around and train the

03:11:18 22   IRS's blind employees on how to use JAWS and the IRS's

03:11:25 23   -- well, I will just say their databases, because I

03:11:28 24   shouldn't talk about that, but their databases that

03:11:32 25   they use internally.

04:23:54 1    Q.        Have you ever encountered a Web site that you
04:24:07 2    personally could not use?
04:24:22 3    A.        Yes.
04:24:23 4    Q.        Do you recall what that Web site is?
04:24:25 5    A.        I don't recall the exact URL, but it was the
04:24:30 6    Web site to download ring tones for a cell phone.
04:24:42 7    Q.        And why couldn't you use that Web site?
04:24:46 8    A.        It was a Java based application.
04:24:50 9    Q.        How do you know that?
04:24:52 10   A.        How do I know?
04:25:02 11   Q.        Yeah.
04:25:04 12   A.        I know the behavior of my screen reader when
04:25:08 13   it encounters Java based applications.  I did some more
04:25:14 14   investigation into it and actually found out that it
04:25:17 15   was Java based by looking at the code myself.
04:25:22 16   Q.        And would you say that you personally are a
04:25:30 17   very Web savvy computer user, Web savvy user?
04:25:35 18            MR. PLUNKETT:  Objection, vague.
04:25:36 19            THE WITNESS:  I am having a hard time with
04:25:54 20   this scale of being Web savvy versus not.
04:25:57 21   Q.        MR. BASRAWI:  You are saying that it requires
04:25:58 22   a person to be Web savvy in order to access certain Web
04:26:03 23   sites.
04:26:04 24   A.        Right.
04:26:04 25   Q.        So I am asking you are you Web savvy?

C. Polk

6-19-06

04:26:08 1    A.        I definitely think that I have really good

04:26:16 2    skills, but I know that there is people that have more,

04:26:18 3    and people that have less than I.

04:26:22 4    Q.        You train people on how to use the Web,

04:26:25 5    correct?

04:26:25 6    A.        Yes, I did.

04:26:26 7    Q.        So would you say you are more savvy than the

04:26:34 8    people that you train?

04:26:37 9    A.        In most cases, yes.

04:26:46 10   Q.        Okay.  Are you an expert in that area?

04:26:50 11              MR. PLUNKETT:  Objection, vague.

04:26:51 12              THE WITNESS:  How would you define "expert"?

04:26:56 13   Q.        MR. BASRAWI:  How would you define expert as

04:27:01 14   you understand the term?

04:27:03 15   A.        I don't know whether I would consider myself

04:27:08 16   a, quote, "expert" or not.  I definitely have more

04:27:15 17   skills than a lot of people, and less skills than some

04:27:19 18   people.  I have never put myself on a scale to rate my

04:27:24 19   savviness or expertise on the Web.

04:27:28 20   Q.        Okay.  You have certification in screen reader

04:27:32 21   use and in various computer skills, correct?

04:27:39 22              MR. PLUNKETT:  Objection, mischaracterizes

04:27:41 23   testimony.

04:27:41 24              THE WITNESS:  Yes, I do.

04:27:44 25   Q.        MR. BASRAWI:  Okay.  Going back to a Web site

C. Polk

6-19-06

04:48:45 1                    THE WITNESS:  Yes, I have.

04:48:50 2    Q.       MR. BASRAWI:  And what was -- do you recall

04:48:55 3    what those were?

04:48:59 4                    MR. PLUNKETT:  Objection, vague.

04:49:00 5                    THE WITNESS:  What do you mean what they were?

04:49:04 6    Q.       MR. BASRAWI:  What those buttons that you were

04:49:06 7    unable to use were, on which Web sites?

04:49:12 8                    MR. PLUNKETT:  Objection, vague.

04:49:14 9                    THE WITNESS:  I see buttons every day that I

04:49:18 10   can't click that don't describe what they do.

04:49:21 11   Q.       MR. BASRAWI:  Okay.  Can you tell me about

04:49:24 12   your experience with the Proceed to Checkout button on

04:49:26 13   target.com?

04:49:33 14                   MR. PLUNKETT:  Objection, lacks foundation.

04:49:39 15                   THE WITNESS:  One of the checkout buttons at

04:49:41 16   the top of the page did actually click and bring me to

04:49:43 17   a new page.  The one at the bottom did not.

04:49:46 18   Q.       MR. BASRAWI:  Okay.  Let's talk about the one

04:49:49 19   at the top of the page.  When you said it did take you

04:49:54 20   to the next page, another page, what steps did you take

04:49:58 21   in order to activate the button to make it to go to

04:50:01 22   another page?

04:50:02 23   A.       I pressed Enter on it.

04:50:04 24   Q.       You pressed Enter on it?

04:50:05 25   A.       I did.

C. Polk

6-19-06

| | | |
|---|---|---|
| 04:50:06 | 1 | Q.        Were you in forms mode at the time? |
| 04:50:08 | 2 | A.        No, I was not. |
| 04:50:09 | 3 | Q.        Okay.  And the one at the bottom of the page, |
| 04:50:11 | 4 | what steps did you attempt to use to activate that |
| 04:50:15 | 5 | button? |
| 04:50:16 | 6 | A.        I tried Enter on it, space bar, forms mode, |
| 04:50:23 | 7 | and routing my JAWS to the PC and clicking. |
| 04:50:27 | 8 | Q.        And none of these techniques worked? |
| 04:50:30 | 9 | A.        No, I could not get that button to activate. |
| 04:50:32 | 10 | Q.        Okay.  Was that frustrating to you at all? |
| 04:51:09 | 11 | A.        It was more of a curiosity type of thing to |
| 04:51:13 | 12 | me.  I am of the mind set that I want to know why it |
| 04:51:19 | 13 | doesn't work. |
| 04:51:19 | 14 |           So frustrating, I was not really frustrated, |
| 04:51:23 | 15 | but I had my interest piqued about why. |
| 04:51:25 | 16 | Q.        Do you think that's because your field is |
| 04:51:29 | 17 | computers that piqued your curiosity? |
| 04:51:35 | 18 | A.        I don't know how I would feel if my field was |
| 04:51:37 | 19 | not computer, so I don't know how to answer that. |
| 04:51:39 | 20 | Q.        Okay.  If you were trying to buy something |
| 04:51:46 | 21 | would it frustrate you if you could not activate the |
| 04:51:50 | 22 | checkout button? |
| 04:51:51 | 23 |           MR. PLUNKETT:  Objection, incomplete |
| 04:51:53 | 24 | hypothetical. |
| 04:51:53 | 25 |           THE WITNESS:  Maybe a little, yes. |

C. Polk

6-19-06

05:46:05 1          THE WITNESS:  Can you explain that a little

05:46:10 2     better?  I'm sorry.

05:46:12 3     Q.      MR. BASRAWI:  You have been testifying that

05:46:13 4     all you can testify to is whether a JAWS user or a

05:46:18 5     screen reader user has the requisite advanced training,

05:46:28 6     such as that which you have, and what that person would

05:46:32 7     be able to do; is that correct?

05:46:35 8          MR. PLUNKETT:  Objection, vague,

05:46:37 9     mischaracterizes the evidence.

05:46:38 10          THE WITNESS:  I can't really say that because

05:46:45 11    there could be someone less skilled than I am at JAWS

05:46:50 12    that can learn to figure things out, also.

05:46:54 13    Q.      MR. BASRAWI:  So somebody would have to

05:46:57 14    problem solve, troubleshoot in order to overcome

05:46:59 15    barriers on target.com?

05:47:02 16    A.      Yes.

05:47:02 17          MR. PLUNKETT:  Objection, calls for

05:47:03 18    speculation, incomplete hypothetical.

05:47:04 19          THE WITNESS:  Yes, as in with any Web site or

05:47:10 20    any application.

05:47:10 21    Q.      MR. BASRAWI:  Do you find troubleshooting

05:47:13 22    challenging?

05:47:15 23          MR. PLUNKETT:  Objection, vague, lacks

05:47:17 24    foundation.

05:47:17 25          THE WITNESS:  Can you explain a little better,

C. Polk

6-19-06

| | |
|---|---|
| 05:47:20 | 1 |
| 05:47:21 | 2 |
| 05:47:23 | 3 |
| 05:47:26 | 4 |
| 05:47:27 | 5 |
| 05:47:30 | 6 |
| 05:47:33 | 7 |
| 05:47:34 | 8 |
| 05:47:37 | 9 |
| 05:47:40 | 10 |
| 05:47:41 | 11 |
| 05:47:46 | 12 |
| 05:47:49 | 13 |
| 05:47:58 | 14 |
| 05:47:58 | 15 |
| 05:47:59 | 16 |
| 05:48:02 | 17 |
| 05:48:05 | 18 |
| 05:48:05 | 19 |
| 05:48:16 | 20 |
| 05:48:20 | 21 |
| 05:48:23 | 22 |
| 05:48:24 | 23 |
| 05:48:24 | 24 |
| 05:48:32 | 25 |

please?

Q.     MR. BASRAWI:  I mean, do you enjoy troubleshooting?

A.     Yes.

Q.     Okay.  Do you find troubleshooting to be a challenge?

        MR. PLUNKETT:  Same objections.

        THE WITNESS:  Do you mean to get over a challenge, or do I find it a challenge for myself to troubleshoot?

Q.     MR. BASRAWI:  I'm not even sure I understand the distinction there.

        Do you find troubleshooting to be challenging?

        MR. PLUNKETT:  Same objections.

        THE WITNESS:  Yes.

Q.     MR. BASRAWI:  Okay.  And do you enjoy being challenged?

A.     Yes.

Q.     Okay.  So you don't know how anybody else with any other level of skill would be -- would react to target.com?

        MR. PLUNKETT:  Objection, calls for speculation.

        THE WITNESS:  I don't know how to predict what one person's experience would be over mine, no.

1                    REPORTER'S CERTIFICATE

2

3          I certify that the witness in the foregoing

4    deposition was by me duly sworn to testify in the

5    within-entitled cause; that said deposition was taken

6    at the time and place therein named; that the

7    testimony of said witness was reported by me, a duly

8    Certified Shorthand Reporter of the State of

9    California authorized to administer oaths and

10   affirmations, and said testimony was thereafter

11   transcribed into typewriting.

12          I further certify that I am not of counsel

13   or attorney for either or any of the parties to said

14   deposition, nor in any way interested in the outcome

15   of the cause named in said deposition.

16          IN WITNESS WHEREOF, I have hereunto set my

17   hand this 26th day of June              , 2006.

18

19

20          _____

21          SHARON CABELLO
            Certified Shorthand Reporter
22          State of California
            Certificate No. 3080

23

24

25

# EXHIBIT G

1     UNITED STATES DISTRICT COURT

     NORTHERN DISTRICT OF CALIFORNIA

2      SAN FRANCISCO DIVISION

       - - -

3

 NATIONAL FEDERATION OF THE BLIND, the

4 NATIONAL FEDERATION OF THE BLIND OF

 CALIFORNIA, on behalf of their members,

5 and Bruce F. Sexton, on behalf of himself

 and all other similarly situated,

6      Plaintiff,

7 vs.      No. C06-01802 MHP

8 TARGET CORPORATION, et al.,

      Defendants.

9 --------------------------/  **CERTIFIED COPY**

10

11

12      DEPOSITION OF

13     CHARLES LETOURNEAU

14    SAN FRANCISCO, CALIFORNIA

15     JULY 5, 2006

16

17

18 ATKINSON-BAKER, INC.

 COURT REPORTERS

19 (800) 288-3376

 www.depo.com

20

 REPORTED BY: DANUTA KRANTZ, CSR NO. 4782

21 FILE No.: A005872

22

23

24

25

1

1             UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

2             SAN FRANCISCO DIVISION

                  - - -

3

NATIONAL FEDERATION OF THE BLIND, the

4  NATIONAL FEDERATION OF THE BLIND OF

CALIFORNIA, on behalf of their members,

5  and Bruce F. Sexton, on behalf of himself

and all other similarly situated,

6                 Plaintiff,

7  vs.                    No.  C06-01802 MHP

8  TARGET CORPORATION, et al.,

                 Defendants.

9  ---------------------------/

10

11

12

13

14         Deposition of CHARLES LETOURNEAU, taken on

15  behalf of Plaintiffs, at San Francisco, California,

16  commencing at 9:30, Wednesday, July 5, 2006, before

17  Danuta Krantz, CSR No. 4782.

18

19

20

21

22

23

24

25

```
 1                 A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4   LAW OFFICES OF DISABILITY RIGHTS ADVOCATES
     2001 Center Street

 5   Third Floor
     Berkeley, California 94704

 6   BY:  LAURENCE W. PARADIS, ESQUIRE

 7

 8

     FOR THE DEFENDANTS:

 9

     LAW OFFICES OF MORRISON & FOERSTER

10   425 Market Street
     Suite 3300

11   San Francisco, California 94105
     BY:  STUART C. PLUNKETT, ESQUIRE

12

     Also Present:  Christopher Springer, Heather

13   Akers-Healy.

14   James Thatcher was present via speakerphone.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X
 2  CHARLES LETOURNEAU:
 3  EXAMINATION                              PAGE
        BY MR. PARADIS                        5
 4
 5  EXHIBITS
 6  PLAINTIFF'S                              PAGE
 7  A   Declaration of Charles Letourneau    5
 8  B   Expert Declaration of Dr. James W. Thatcher 5
 9  D   Federal Register, Thursday, December 21,
        2000, Part II, Architectural and
10      Transportation Barriers Compliance Board  5
11  E   Checkpoints for Guideline, Introduction
        to the Checkpoint Set                 5
12
    F   Starling Access Services Accessible
13      Web Design - a definition             5
14  I   Plain Language Association International,
        Fourth Biennial Conference Proceedings,
15      September 26-29, 2002                  5
16  K   email from Chuck Letourneau to Stuart
        C. Plunkett June 28, 2006             5
17
    L   email from Chuck Letourneau to Stuart C.
18      Plunkett June 28, 2006                5
19  M   Ensure your web site is a welcoming place,
        by Chuck Letourneau, Canadian Disability,
20      Spring 2004                           5
21  N   Followup Research 2006-1-06-10, Simple vs.
        Complex tables/charts                 5
22
23
24
25
```

4

1    websites -- that you have been developing standards for

2    website accessibility.  What standards are those?

3         A.   I was involved in the development of the

4    Web Content Accessibility Guidelines, Version 1.0.

5         Q.   For -- to make our day a little easier, can

6    we call that WCAG 1.0?

7         A.   WCAG, yes.

8         Q.   WCAG 1.0?

9         A.   Yes.

10        Q.   What is WCAG 1.0?

11        A.   It is a recommendation of the World Wide

12   Web Consortium's Web Accessibility Initiative, which

13   contains guidelines that people can use to develop more

14   accessible websites.

15        Q.   Does it contain several different priority

16   levels?

17        A.   Yes, it does.

18        Q.   And what does Priority One represent under

19   WCAG 1.0?

20        A.   Priority One, the checkpoint, if not met,

21   would be inaccessible to a person who is affected by

22   that particular guideline.

23        Q.   Okay.  And what kind of people are affected

24   by that particular guideline?

25        A.   Depends on the which guideline.  That is --

1    you have to be more specific.

2         Q.   Okay.   Is it concerning people with various

3    types of disabilities?

4         A.   There are -- yes.

5         Q.   And so for -- if a website does not meet

6    Priority One, to that extent it is inaccessible to some

7    people with disabilities?   Is that your understanding?

8              MR. PLUNKETT:   Objection.   Incomplete

9    hypothetical.

10             THE WITNESS:   It may be.

11             MR. PARADIS:   Q.   You say "may."   Why do

12   you qualify that?

13        A.   Because the question was not specific

14   enough to answer simply.

15        Q.   What about Priority Two, what does that

16   represent?

17        A.   Priority Two would -- complying with

18   Priority Two checkpoints would make a website easier

19   for people with certain disabilities to use.

20        Q.   To the extent a website does not meet

21   Priority Two checkpoints, what does that mean in your

22   mind?

23        A.   That someone would have more difficulty

24   using the website than a website that complied with

25   Priority Two.

1        Q.   Again, Priority Two is also directed at

2   making websites accessible for people with various

3   types of disabilities; is that right?

4        A.   Yes.

5        Q.   And then Priority Three, what does that

6   represent?

7        A.   Priority Three are an extra distance that

8   one can go to make the website experience further,

9   again, easier for someone to use.

10       Q.   Okay.   Would you say that you are an expert

11  in the field of web accessibility for people with

12  disabilities?

13       A.   Yes.

14       Q.   What was your first contact from any person

15  relating to this litigation?

16       A.   What was it?

17       Q.   Yes.

18       A.   It was a phone call.

19       Q.   Okay.   About how long ago?

20       A.   I would have to see my correspondence to

21  remember the exact date, but it was, I think, in June,

22  beginning of June.

23       Q.   Okay.   June of 2006, so about a month ago?

24       A.   I think so.

25       Q.   And who was that call from?

```
 1              Q.   And have you, up through now, gone and
 2     inspected target.com?
 3              A.   No, I have not.
 4              Q.   Why not?
 5              A.   I was not asked to.
 6              Q.   I take it you provide services to website
 7     designers and authors in helping them make their
 8     websites accessible; is that right?
 9              A.   Yes, among other things.
10              Q.   What standards do you apply when you assist
11     a website designer or author in making its website
12     accessible?
13              A.   Primarily I use the standards or guidelines
14     that I am asked to use by the client.
15              Q.   Have you assisted any retailer in making a
16     retailer's website accessible?
17              A.   No, I have not.
18              Q.   Have you assisted any business entity that
19     is not a government entity in making its website
20     accessible?
21              A.   No, I have not.
22              Q.   What types of entities have you assisted in
23     helping make their websites accessible?
24              A.   Federal government of Canada primarily, and
25     a number of nongovernmental organizations, such as
```

13

```
 1                    MR. PARADIS:  Q.  So I take it you were not
 2    asked to render an opinion as to whether or not
 3    target.com is accessible; is that right?
 4           A.   That's correct.
 5           Q.   Did you ever ask anyone why you were not
 6    being asked to address that issue?
 7           A.   No.
 8           Q.   You know who Dr. Thatcher is, correct?
 9           A.   Yes, I do.
10           Q.   And is he an expert in the same field as
11    you?
12                MR. PLUNKETT:  Objection.  Calls for legal
13    conclusion.
14                THE WITNESS:  Jim, I would say, is a very
15    well respected person in his field, yes.
16                MR. PARADIS:  Q.  And just so we are clear,
17    we are talking about the field of web accessibility for
18    people with disabilities?
19           A.   Yes.
20           Q.   Would you say that Dr. Thatcher is one of
21    the preeminent experts in that field?
22                MR. PLUNKETT:  Objection.  Calls for legal
23    conclusion.
24                You can answer.
25                THE WITNESS:  I have great respect for Jim
```

1          A.  For certain people's ability to access a

2    website.

3          Q.  And the features that are relevant to blind

4    users that are listed as Priority One, would you agree

5    that those features are essential for website access by

6    the blind?

7                MR. PLUNKETT:  Objection.  Calls for

8    speculation.  Incomplete hypothetical.

9                THE WITNESS:  That is the definition of

10   Priority One.  If it doesn't meet Priority One, then

11   some people with some disabilities would have -- would

12   be unable to access that particular feature of a

13   website.

14         Q.  And to the extent a website lacks the

15   Priority One elements needed by blind people, that

16   website would by definition be inaccessible to blind

17   people?

18               MR. PLUNKETT:  Objection.  Incomplete

19   hypothetical.  Calls for speculation.

20               THE WITNESS:  I will answer that by saying

21   that it would be noncompliant.

22               MR. PARADIS:  Q.  Now, Priority Two, to the

23   extent -- what was your intent in designating certain

24   elements as Priority Two?

25         A.  You mean what were the working groups?

31

1    A.   Yes.

2    Q.   What does that mean?

3         MR. PLUNKETT:   Objection.   Vague.

4         THE WITNESS:   If a document is a structured

5    document, then proper use of headers to identify the

6    sections of that document will aid the understanding

7    and navigation of that document.

8         MR. PARADIS:   Q.   Would you consider this a

9    basic navigation element as you have used the term

10   "basic"?

11        A.   For structured documents, yes.

12        Q.   And is this a basic navigation element that

13   blind people need?

14        MR. PLUNKETT:   Objection.   Incomplete

15   hypothetical.   Calls for speculation.

16        THE WITNESS:   The use of headers would make

17   it easier for a blind person to navigate a structured

18   document.   Do they need it?   That is open to

19   speculation.

20        MR. PARADIS:   Q.   Was it the consensus of

21   the WCAG working group -- let me start again.

22        Was there a WCAG working group?

23        A.   Yes.

24        Q.   Is that the group that developed the WCAG

25   1.0 standards?

1      A.  Yes.

2      Q.  Was it the consensus of the WCAG working

3  group that providing headers as a navigation feature

4  was necessary in order to make websites easily usable

5  by some disabled people?

6      A.  I think the actual intent of that was to

7  provide information about the structure of documents so

8  that people could discover the structure of documents.

9  I don't recall in 1997 that it was actually a

10  significant navigation tool.

11      Q.  How about today, do you consider providing

12  headers on complex web pages, websites, an important

13  navigation tool to make the web page or the website

14  accessible to blind people?

15          MR. PLUNKETT:  Objection.  Incomplete

16  hypothetical.  Calls for speculation.

17          THE WITNESS:  I would speculate that -- I

18  would say that it is important to make a website more

19  usable, not necessarily -- it's not accessible or

20  inaccessible.  It's more accessible, more usable.

21          MR. PARADIS:  Q.  In terms of making a

22  website more usable, is it your understanding that it's

23  important to provide headings on a complex website?

24          MR. PLUNKETT:  Same objection.

25          MR. PARADIS:  Q.  And I am talking about in

34

1  terms of making the website accessible to blind people.

2          MR. PLUNKETT:  Same objection.

3          THE WITNESS:  Headers are important to

4  delineate the structure of a structured document, a

5  structured website that has content in it.  Again,

6  it's -- there are other ways to make a web page usable

7  and accessible without using headings if the page is

8  designed properly.

9          MR. PARADIS:  Q.  What are those other

10  ways?

11          A.  The --

12          MR. PLUNKETT:  Objection.  Incomplete

13  hypothetical.

14          THE WITNESS:  There are many, many ways to

15  design and lay out a web page, as many as there are

16  people's different ideas about how to lay out a web

17  page.  Some of them are easier to follow than others.

18  Some pages don't lend themselves to structure in that

19  way.

20          MR. PARADIS:  Q.  Are there basic page

21  navigation techniques that you recommend to your

22  clients when developing websites, when designing

23  websites?

24          A.  That depends on the type of website, on the

25  content, on the -- of the page.  It varies depending on

1  the design.

2       Q.  Have you ever been to a website of a

3  retailer?

4       A.  Yes.

5       Q.  That type of a website, are there basic web

6  page navigation techniques that you would recommend to

7  a client to make such a website accessible to blind

8  people?

9       MR. PLUNKETT:  Objection.  Vague.

10  Incomplete hypothetical.

11       THE WITNESS:  I can't speculate.  I mean,

12  there are just -- I have not reviewed a commercial

13  website to look at that type of feature.

14       MR. PARADIS:  Q.  Let me ask you to refer

15  again to your website printout, exhibit -- Plaintiff's

16  Exhibit F, that box, No. 1.

17       Where you -- do you have that in front of

18  you?

19       A.  Yes, I do.

20       Q.  So in here, where you say that, "A website

21  can be made inaccessible to a very large audience,"

22  what are the basic site navigation tools that you

23  considered necessary for a blind user back when you

24  authored this?

25       MR. PLUNKETT:  Objection.  Assumes facts.

1  Vague.

2          THE WITNESS:  That is going back a long

3  way, but probably -- I have already mentioned the --

4  simply making sure that all of the mechanisms were

5  there to move around in the site.

6          At the time, a lot of people made web pages

7  that didn't have any links for going backwards or

8  forwards or going back to the home page, and some

9  people still do.  And you can't -- if you come into

10  that page, you can't move around the site.

11          MR. PARADIS:  Q.  Would you consider the

12  use of header elements to convey document structure in

13  a complex website another basic site navigation

14  element?

15          A.  No.

16          Q.  Would you consider the use of header

17  elements to convey document structure a basic access

18  feature needed by blind people for a complex website?

19          MR. PLUNKETT:  Objection.  Incomplete

20  hypothetical.

21          THE WITNESS:  No.

22          MR. PLUNKETT:  Why don't we take a

23  five-minute break.

24          MR. PARADIS:  Off the record for five

25  minutes.

1          THE WITNESS:  Headers are one mechanism

2    that screen reader users can use to navigate a page if

3    it has headers.

4          MR. PARADIS:  Q.  Do you consider it a --

5    if there are no headings on a complex web page, how is

6    a blind user supposed to get around -- supposed to be

7    able to navigate around the page?

8          MR. PLUNKETT:  Objection.  Vague.

9    Incomplete hypothetical.  Calls for speculation.

10         THE WITNESS:  A person can navigate by link

11   to link, by table to table, form to form, paragraph by

12   paragraph, word by word.  There are many ways to

13   navigate a web page using a screen reader.

14         MR. PARADIS:  Q.  I take it -- well, back

15   to your website where you said in box 1 that, "A web

16   designer can make a web page inaccessible by failing to

17   include basic site navigation tools."

18         You have mentioned the next page, previous

19   page.  What are the other basic site navigation tools

20   that failing to include in a website would make it

21   inaccessible to blind people?

22         MR. PLUNKETT:  Objection.  Asked and

23   answered.  Calls for speculation.  Incomplete

24   hypothetical.

25         THE WITNESS:  I think the one that I

1  mentioned was it, being able to move from page to page

2  through the site.

3          MR. PARADIS:  Q.  Not -- what about moving

4  within a page, are there any basic site navigation

5  tools that failing to include in a website would make

6  the page inaccessible to blind users?

7          MR. PLUNKETT:  Objection.  Calls for

8  speculation.  Incomplete hypothetical.

9          THE WITNESS:  In my opinion, no.

10         MR. PARADIS:  Q.  You are familiar with the

11  Section 508, Guidelines for Web Accessibility; is that

12  right?

13         A.  Yes.

14         Q.  Are you familiar with the requirements in

15  Section 508 that websites be designed so that users can

16  skip repetitive navigation links?

17         A.  Yes.

18         Q.  And what is the mechanism for blind users

19  that is needed so they can skip repetitive navigation

20  links?

21         A.  There are many possible mechanisms that

22  someone can use to skip repetitive navigation links.

23         Q.  Within a web page, can you give me one

24  mechanism that is -- that screen-reading software

25  relies upon so that blind users can skip repetitive

1    Q.  It is a set of guidelines developed by the

2 World Wide Web Consortium to aid web designers in how

3 to make their website accessible to people with

4 disabilities; is that correct?

5    A.  Yes.

6    Q.  It is a consensus set of guidelines; is

7 that right?

8         MR. PLUNKETT:  Objection.  Vague.

9         THE WITNESS:  It was a consensus of the

10 working group, yes.

11         MR. PARADIS:  Q.  And you felt comfortable

12 referring people to WCAG 1.0 for guidance on how to

13 make their websites accessible when you drafted this

14 paragraph, correct?

15    A.  That sounds reasonable.  Yes.

16    Q.  And do you still refer people to WCAG 1.0

17 for guidance on how to make their websites accessible?

18    A.  It's amongst the tools that I refer people

19 to.

20    Q.  Within WCAG 1.0, is the use of headings --

21 I am sorry.  Is the use of headers for in-page

22 navigation an important access feature?

23    A.  I believe it's a Priority Two --

24         MR. PLUNKETT:  Asked and answered.

25         THE WITNESS:  -- Priority Two checkpoint.

1    access the site.  Therefore, it was totally

2    inaccessible.

3         Q.  Have you encountered web pages that you

4    considered inaccessible because they lacked header

5    elements?

6         A.  No.

7         Q.  Have you encountered any web pages that, in

8    fact, lacked header elements?

9         A.  Yes.

10        Q.  Did you consider those pages accessible

11   despite that?

12        A.  I considered those pages to be

13   noncompliant.  They were, however, usable.

14        Q.  How about pages that are complex pages, I

15   believe that is the term you were using, have you

16   encountered complex web pages that lacked header

17   elements?

18        A.  Yes.

19        Q.  Did you consider those pages inaccessible?

20        A.  I considered them noncompliant.  They were

21   usable, not as usable perhaps as they would have been

22   with header elements.

23        Q.  Now, we have talked that the use of header

24   elements is a Priority Two item under WCAG.  That means

25   they are -- that the lack of such header elements in a

1    Q.  Right.  Unfortunately, the declaration and

2  the attachments use letters.  The declaration is

3  Exhibit B, and attached to the declaration as Exhibit A

4  is an assessment report that Dr. Thatcher prepared in

5  July of 2005.

6    A.  Thank you.

7    Q.  I would like you to look at the tab on the

8  first page of this report, paragraph three.  It's

9  labeled, "Summary:  Target.com accessibility."

10    And then he says in here, "The key issues

11  for accessibility of any site are:  No. 1, Text

12  equivalents for images."

13    Do you see that?

14    A.  Yes.

15    Q.  Do you agree with that?

16    A.  Yes.

17    Q.  No. 2, on the next page is, "Labeling for

18  forms."

19    Do you have an understanding of what

20  "Labeling for forms" means?

21    A.  Yes.

22    Q.  And do you consider labeling for forms to

23  be a key issue for accessibility of any site for blind

24  users?

25    MR. PLUNKETT:  Objection.  Calls for

1    speculation.  Incomplete hypothetical.

2             THE WITNESS:  I think that proper labeling

3    of forms can make forms easier to use.

4             MR. PARADIS:  Q.  What is your

5    understanding of the requirements within WCAG 1.0

6    concerning labeling of forms?

7        A.  I believe it was a Priority Two.  I just --

8    I want to refresh myself on that.

9        Q.  Sure.

10       A.  Yes.  Priority Two.

11       Q.  And what is the purpose for requiring

12   labeling of forms within WCAG as you understand it?

13            MR. PLUNKETT:  Objection.  Vague.

14            THE WITNESS:  It would -- my interpretation

15   of that has been that for screen readers that recognize

16   form labels, it allows the web page designer more

17   flexibility in how they design their forms, so that the

18   label that applies for a particular field is

19   discoverable.

20            MR. PARADIS:  Q.  Is the ultimate purpose,

21   as you understand it, so that a blind user can know

22   with confidence what each field within the form calls

23   for?

24       A.  It would aid that, yes.

25       Q.  And is the ultimate purpose, so that a

1    blind user can fill out a form with as much ease and

2    confidence as a sighted person could?

3         A.   Yes.

4         Q.   The third item Dr. Thatcher mentions is

5    labeled "Techniques for navigation."  And he says,

6    "Large pages with lots of links are organized into

7    groups or sections.  When those section headings are

8    marked up as HTML headings, the keyboard user can move

9    from section to section with a single key on the

10   keyboard.  Without this accommodation it is extremely

11   difficult to use the page for its intended purpose."

12        Do you agree that this is an important

13   access element for blind users in a web page such as

14   target.com?

15        A.   I can't --

16        MR. PLUNKETT:  Objection.  Calls for

17   speculation.

18        THE WITNESS:  I have not seen target.com,

19   so I can't --

20        MR. PARADIS:  Q.  Have you seen the website

21   of any large retail company?

22        A.   Yes.

23        Q.   Can you give me an example of one you have

24   seen in the last year?

25        A.   Company called Future Shop.

1  providing labeling for forms?

2      A.  Yes.

3      Q.  And do you agree that those are the two

4  ways that forms should be labeled?

5      A.  I agree that those are two ways to provide

6  explicit linking of labeled text to form fields.

7      Q.  Do you agree that one or the other such

8  mechanism should be provided so that blind users can

9  fill out forms easily?

10     A.  They will make it easier for people using

11  screen readers that recognize those constructs.

12     Q.  Are there any other ways to enable blind

13  people to fill out forms easily and with confidence?

14     A.  Yes.

15     Q.  What are they?

16     A.  By proper design and placement of labeling

17  text.

18     Q.  What do you mean by that?

19     A.  I mean that if -- if labeled text is placed

20  in close proximity adjacent to form fields, and most

21  screen readers in my experience will get it right, it

22  is possible to design a form so that people get it

23  wrong, as Jim points out in his statement.  But it is

24  possible to not use the label text or title text, label

25  or title elements, and yet still have a usable form.

60

1          MR. PARADIS:  Q.  What about Section 508?

2   Is it the recommended method under 508?

3          A.  I don't remember the exact wording of 508.

4   I would have to read it to refresh my memory.

5          Q.  Is some form of form labeling required

6   under Section 508?

7          A.  I would have to read the web section of

8   that again.  I don't have that in front of me.

9          Q.  Back to Dr. Thatcher's assessment report.

10  He then says, in the summary paragraph, "Nothing has

11  been done to improve navigation for screen reader or

12  keyboard users," as part of his critique of target.com.

13          Assuming hypothetically that target.com

14  lacks navigation features to enable blind users to move

15  around within the home page easily, would you consider

16  that home page to be inaccessible to blind users?

17          A.  I would have to --

18          MR. PLUNKETT:  Objection.  Vague.

19  Incomplete hypothetical.  Calls for speculation.

20          THE WITNESS:  I would really have to

21  evaluate the website to give a complete and honest

22  answer to that.

23          MR. PARADIS:  Q.  Why didn't you evaluate

24  target.com?

25          A.  I was not asked to.

1      Q.   Do you find it odd that you are being

2   designated as an expert on web access in this case and

3   have not even looked at the website at issue?

4              MR. PLUNKETT:  Objection.  Argumentative.

5              Do you find it odd?

6              MR. PARADIS:  Q.   The question is to you.

7   Do you find that odd?

8         A.   I was asked three specific questions, and I

9   provided my expertise on those answers.  You are asking

10   me a lot of extra questions, but I was not asked by the

11   lawyers on this side.

12        Q.   Do you only evaluate the specific issues

13   you are asked to address when you are called upon as an

14   expert on web access?

15        A.   I evaluate what the client has asked me to

16   evaluate.

17        Q.   Did you ever find it's curious, in your own

18   mind, hey, is target.com actually accessible to blind

19   people or not?

20              MR. PLUNKETT:  Objection.  Asked and

21   answered.

22              THE WITNESS:  I don't spend my time

23   wondering about all of the websites that are out there

24   in the world as to whether they are accessible or not.

25   There are 75 million websites nowadays.  No, I don't

1  ask myself that question.

2           MR. PARADIS:  Q.  This is the only website

3  where you have been asked to -- strike that.

4           Are there any other websites that you have

5  been asked to address in any way as part of a

6  litigation?

7      A.  No.

8      Q.  Did your client in this case ask you to

9  address only those three questions?

10     A.  Yes.

11     Q.  The next item in Dr. Thatcher's summary

12  paragraph says, "As a rough estimate, 80 percent of the

13  images lack text equivalent."

14          Assuming hypothetically that that is

15  correct, would you consider this a significant access

16  barrier on target.com?

17          MR. PLUNKETT:  Objection.  Assumes facts.

18  Calls for speculation.

19          THE WITNESS:  I would have to look at the

20  website to completely answer that question.

21          MR. PARADIS:  Q.  You mentioned earlier the

22  phrase, critical images.  Let me ask you to turn to

23  page 6 of Dr. Thatcher's report.  He has got a section

24  here labeled Detailed Results.  And he has got a

25  summary box under 6.1.  Do you see that?

1   Dr. Thatcher's report.  He mentioned one spot in the

2   shopping process where he found it was impossible to

3   move forward without using the mouse.

4           Do you see that, page two, at the end of

5   that first paragraph?

6       A.  Yes.

7       Q.  Assuming hypothetically that -- first of

8   all, do you have any reason to dispute Dr. Thatcher's

9   finding that there was one point in the shopping

10  process on target.com where it was impossible to move

11  forward without using a mouse?

12          MR. PLUNKETT:  Objection.  Vague.  Counsel,

13  I am sure you are not going to like me making speaking

14  objections, but when this witness has already said they

15  have not looked at the website, for you to ask him

16  whether he has a reason to believe or disbelieve

17  something Dr. Thatcher said about the website, is

18  inappropriate.

19          MR. PARADIS:  You are right, that is a

20  speaking objection.

21      Q.  So the question is, do you have any basis

22  to dispute this finding?

23      A.  I can neither confirm nor deny anything

24  Dr. Thatcher has said about this website.

25      Q.  So that would apply generally to all of

1  Dr. Thatcher's findings?

2      A.  That's correct.

3      Q.  Assuming hypothetically that there was this

4  one spot in the shopping process where a mouse click

5  was required to proceed with the shopping process,

6  would you consider that to be a significant access

7  barrier to blind users?

8          MR. PLUNKETT:  Objection.  Assumes facts.

9  Incomplete hypothetical.  Calls for speculation.

10         THE WITNESS:  Again, without seeing and

11  evaluating it for myself, I can't answer that.

12         MR. PARADIS:  Q.  Let me ask you this.

13  WCAG requires that every interaction with a web page

14  must be possible without using a mouse, correct?

15     A.  I believe that is the sense of the wording

16  in one of those checkpoints, yes.

17     Q.  And the same requirement exists under

18  Section 508, correct?

19     A.  Mm-hmm.  I think, again, without having

20  reviewed 508 in the past few days.

21     Q.  So, why are you hesitant to say that this

22  is, in fact -- that this would be a significant access

23  barrier if, in fact, it exists on target.com?

24         MR. PLUNKETT:  Objection.  Argumentative.

25  Mischaracterizes the testimony.  Vague.

1    Q.  And is it your understanding that all of

2  the Priority One -- strike that.

3         Let me ask you to assume hypothetically

4  that there were 74 such image map images on 15 randomly

5  selected pages on target.com during Dr. Thatcher's

6  inspection.

7         Would you consider those to be a

8  significant access barrier to blind users?

9         MR. PLUNKETT:  Objection.  Assumes facts.

10  Incomplete hypothetical.  Calls for speculation.

11  Vague.

12         THE WITNESS:  I would really have to see

13  the website to answer that.

14         MR. PARADIS:  Q.  Going down to No. 4 on

15  this chart, it says, "Form controls require a label

16  element for title attributes."

17         Do you see that?

18    A.  Yes.

19    Q.  Those are Priority One or Priority --

20  strike that.

21         Are those Priority One or Priority Two

22  requirements under WCAG?

23    A.  I believe they are Priority Two.

24    Q.  Let me ask you to assume hypothetically

25  that Dr. Thatcher found 59 such situations on

1    target.com when he inspected 15 pages where there were

2    form controls that lacked either label elements or

3    title attributes.

4            Would you consider those instances to be

5    significant access barriers to blind users?

6            MR. PLUNKETT:  Objection.  Assumes facts.

7    Calls for speculation.  Incomplete hypothetical.

8    Vague.

9            THE WITNESS:  As I mentioned earlier, there

10   are other ways of associating forms with labels that

11   might in this case make that not an issue, but I don't

12   know.  I haven't seen the site.

13           MR. PARADIS:  Q.  You described one other

14   way, and let me ask.  Is there more than one other way?

15           MR. PLUNKETT:  Objection.  Asked and

16   answered.

17           THE WITNESS:  There may be.  I don't know.

18   I can't recall offhand.

19           MR. PARADIS:  Q.  Let me call that the

20   third way for indicating the -- let me call that the

21   third way for facilitating the filling out of forms by

22   blind users.  Okay?

23           Let me ask you to assume hypothetically

24   that in the 15 pages that Dr. Thatcher looked at there

25   were 59 instances where there were form controls that

1  lacked all three.  There was no label element, there

2  was no title attribute, and there was no third way to

3  facilitate blind users to fill out the form with

4  confidence.

5        Would you consider those instances to be

6  significant access barriers to blind users?

7        MR. PLUNKETT:  Objection.  Assumes facts.

8  Incomplete hypothetical.  Calls for speculation.

9  Vague.

10        THE WITNESS:  I don't know whether there

11  are any other possible ways of having that form

12  completed on the website.  There may be an accessible

13  alternative.  I don't know.

14        MR. PARADIS:  Q.  Let me go back to the alt

15  text requirement for, say, an image link.

16        What happens when a blind user is using a

17  screen-reading program such as JAWS and encounters an

18  image link that lacks alt text?

19        A.  Generally, what is read, if there is no alt

20  text, it will read -- it may read the title text if

21  there is title text.  If there is no title text, it may

22  read the URL of the page that it's linking to.

23        Q.  What happens when a blind user using a

24  screen-reading program such as JAWS encounters an image

25  map area that lacks alt text?

1    MR. PLUNKETT: Objection. Asked and

2    answered. Incomplete hypothetical. Calls for

3    speculation. Vague.

4    THE WITNESS: Quite possibly.

5    MR. PARADIS: Q. The next page of

6    Dr. Thatcher's report, page 7, his box continues,

7    summary box. And the next item he mentions is,

8    "Provide navigation methods for keyboard users." And

9    he described the barrier that he found as critical

10    because a shopper was unable to continue in the

11    shopping process without using a mouse.

12    Would you also consider such a barrier

13    critical?

14    MR. PLUNKETT: Objection. Lacks

15    foundation. Incomplete hypothetical. Assumes facts.

16    Asked and answered. Vague.

17    THE WITNESS: I would have to see the

18    construct in particular to know whether it was --

19    whether it really was inaccessible or not.

20    MR. PARADIS: Q. Would you agree that the

21    very essence of web access for blind users is designing

22    a website so that the blind user can navigate through

23    and interact with the site using their keyboard rather

24    than a mouse?

25    MR. PLUNKETT: Objection. Vague. Calls

1  for speculation.  Lacks foundation.

2          THE WITNESS:  The purpose is to facilitate,

3  to make it easier for someone to do that.  Screen

4  readers are not often very good at fixing bad design or

5  mitigating bad design.

6          MR. PARADIS:  Q.  Now, the WCAG guidelines

7  that you helped develop were designed to make web pages

8  accessible to a wide variety of different types of

9  disabilities, correct?

10         A.  That's the intent, yes.

11         Q.  They were designed to make disabled people

12  able to access websites using a wide range of

13  screen-reading software, correct?

14         A.  It was to allow web page designers to make

15  web pages that could facilitate that interaction.

16         Q.  And the -- your understanding of access

17  is -- for website access is that even people using

18  older technologies should be able to interact with the

19  web page with ease, correct?

20         A.  Ideally, yes.

21         MR. PLUNKETT:  Objection.  Vague.

22         MR. PARADIS:  Q.  And under your definition

23  of access, the website designer should not design only

24  to the most up -- the most recent technologies, but to

25  the entire range of technologies that are generally

1  being used, correct?

2            MR. PLUNKETT:  Objection.  Vague.

3            THE WITNESS:  Could you read that back,

4  please?

5            (Record read.)

6            THE WITNESS:  Not design only -- yes, I

7  think that characterizes my --

8            MR. PARADIS:  Q.  Okay.  Do you recall

9  doing a declaration in this case?

10           A.  I am sorry?

11           Q.  Do you recall signing a declaration in this

12 case?

13           A.  Yes.

14           Q.  And do you recall in paragraph 10 of your

15 declaration referring to both the WCAG and the

16 Section 508 standards?

17           A.  Yes.

18           Q.  Let me -- it's not a trick.  Let me give

19 you a copy of your declaration.  I am showing you

20 Exhibit A, Plaintiff's Exhibit A, which is a copy of

21 your declaration.

22           So, in paragraph 10, would you please turn

23 to that?  Do you see where you mention both WCAG and

24 Section 508 standards?

25           A.  Yes.

1    definitely change the perception of overall

2    accessibility of the website, actual accessibility as

3    opposed to compliance accessibility.

4         Q.  Is there a point at which the number of

5    access barriers that a blind person encounters

6    increases on a website that you would say that website

7    is inaccessible to a blind user?

8              MR. PLUNKETT:  Objection.  Incomplete

9    hypothetical.

10             THE WITNESS:  I would have to actually

11   evaluate an actual case to answer that completely.

12             MR. PARADIS:  Q.  I take it each instance

13   where such an image lacks alt text is considered a

14   barrier under all of the applicable guidelines,

15   correct?

16        A.  Yes.

17             MR. PLUNKETT:  Objection.  Vague.  Calls

18   for speculation.

19             MR. PARADIS:  Q.  I take it you are

20   hesitant -- I am correct that as more -- as more and

21   more such images -- let me start again.

22             Am I correct that as the percentage of such

23   images which lack alt text increases, you would say

24   that website is more and more difficult for a blind

25   user to interact with easily?

1          A.   Yes.

2          Q.   And as part of the updating process, the

3    working group, WCAG, is looking at, among other things,

4    Section 508 standards relating to website design; is

5    that correct?

6          A.   I don't know.

7          Q.   Are you involved in the working group on

8    the revisions to WCAG?

9          A.   No.

10         Q.   So, assuming hypothetically you have been

11   asked by a private business in the United States, not a

12   government agency, but a private business, that has a

13   website already, and you have been asked to assist it

14   in making its website more accessible, how would you go

15   about that?

16         A.   I would review their website, according to

17   my methodology, which involves using the WCAG

18   checkpoints, it involves using any other applicable

19   factors relating to accessibility that I have become

20   familiar with over the last ten years.

21         Q.   What are those other items that you are

22   thinking of?  What other than WCAG are you thinking of?

23         A.   Mostly, usability factors that have come

24   from experience and watching and working with people

25   who use screen readers and other assistive technologies

1   to move around and navigate and use a website.

2          So it's personal experience.

3      Q.  Can you describe these navigation features?

4          MR. PLUNKETT:  Objection.  Mischaracterizes

5   the testimony.

6          THE WITNESS:  Perhaps I misspoke there when

7   I said navigation features.  Techniques that are not

8   included in the web content guidelines or their

9   technical support materials because those things were

10  created back in 1997 through '99, and the technologies

11  and techniques have evolved, so things that are not

12  specifically written.

13          I have would to review my own documents to

14  come up with an exact example.

15          MR. PARADIS:  Q.  Can you think of any

16  examples, any techniques?

17      A.  If you have give me a minute, I might be

18  able to.

19      Q.  Okay.  Let's go off the record.

20          (Short recess.)

21          MR. PARADIS:  Q.  Have you had -- been able

22  to think of any such techniques that go beyond WCAG?

23      A.  Actually, no, I was not able to.

24      Q.  Now, you were also involved in the

25  development of the Section 508 standards as an

1          That allows the user to skip things without

2    the use of other structural navigation elements, such

3    as headers.

4          Tab index is a technique that allows the

5    author to define the order that links on the page or

6    other elements on the page will be reached when using

7    the tab key to move through a page.

8          Q.  Do you recommend that clients use one or

9    the other form of these, or headings, as ways to

10   provide in-page navigation?

11         A.  Depending on the content of the site.

12         Q.  Do you recommend that some one of these

13   three, some form within this group of three be used?

14         A.  As appropriate to the content of the page.

15         Q.  Are there any situations in which you

16   recommend none of these three be used?

17         A.  I can't think of any offhand, but there is

18   no reason why there couldn't be a page that wouldn't

19   benefit from any of those.

20         Q.  Looking at your website again -- actually,

21   let me show you what we have marked as Exhibit M.  This

22   was produced to us today along with some of your other

23   documents.  It's a two-page article from California

24   Disability -- I mean, from Canadian Disability, spring

25   of 2004.

1    Q.  So, notwithstanding the three differences

2  you mentioned, lack of alt text on image links, image

3  buttons and image map areas remains a barrier under

4  both sets of guidelines; is that correct?

5            MR. PLUNKETT:  Objection.  Vague.

6  Incomplete hypothetical.  Lacks foundation.

7            THE WITNESS:  It would be noncompliant and

8  not necessarily unusable.

9            MR. PARADIS:  Q.  But would you agree that

10  it would be a barrier to a blind person?

11        A.  It might be.

12            MR. PLUNKETT:  Objection.  Vague.

13  Incomplete hypothetical.

14            MR. PARADIS:  Q.  Is there any reason

15  why --

16            MR. PLUNKETT:  Calls for speculation.  I am

17  sorry, the witness answered sooner than I could get my

18  objection.

19            You should try to wait for me to do that.

20            MR. PARADIS:  Q.  Looking at -- the second

21  category of barriers Dr. Thatcher noted are form

22  controls that lacked label elements or title

23  attributes.

24            That would be noncompliant with both sets

25  of standards, correct?

1       A.  Yes.

2       Q.  You are familiar with that requirement?

3       A.  Yes.

4       Q.  And under that requirement -- let me ask

5  you again.

6       Dr. Thatcher noted that target.com, all of

7  the forms lacked label elements or title attributes.

8       Would that be noncompliant under both WCAG

9  and 508 guidelines?

10      MR. PLUNKETT:  Objection.  Assumes facts.

11  Calls for speculation.  Incomplete hypothetical.

12      THE WITNESS:  I am uncomfortable talking

13  about a website I have not seen.  You are asking me to

14  differentiate between compliance and usability of a

15  website.  And if someone is wanting to comply with

16  either of these standards or both of these standards,

17  and -- that's there.

18      MR. PARADIS:  Q.  If a website is brought

19  into compliance, strict compliance with WCAG 1.0, would

20  you say it is generally accessible for blind users?

21       A.  I would have to evaluate any particular

22  website on its own merits.

23       Q.  Is there any reason -- you recommend

24  following WCAG 1.0 in your website.

25       Is there any reason why you hesitate to say

1  that following WCAG 1.0 scrupulously would be anything

2  less than access?

3         A.   Certainly, because you have to know how

4  people with disabilities use the web, how they use

5  their technology, and most web designers out there, in

6  my opinion, do not know that.

7              So strictly following the guidelines for

8  compliance does not necessarily mean you will have an

9  accessible website, nor does it mean if you don't

10 follow the web guidelines you won't have an accessible

11 website.

12         Q.   Can you give me an example of a website

13 that doesn't follow WCAG or Section 508 that you

14 consider accessible?

15         A.   Not offhand, no.  There are any number of

16 websites that do not comply with those guidelines that

17 are still usable to a person with a screen reader or

18 other assistive technology.

19         Q.   What do you mean by usable as distinct from

20 accessible?

21         A.   In general, I -- accessibility is the

22 technical accessibility of a website.  In other words,

23 does it comply with whatever guidelines you are being

24 asked to follow.  Usability means can you in any way,

25 shape or form accomplish the purpose of the website or

101

1    the web page or the web construct for that application.

2         Q.   Now, in your website you talk about access

3    to you means that a website is usable by a broad range

4    of people.  Do you remember that?

5         A.   Yes.

6         Q.   And in that regard, are you including blind

7    people who may have only basic familiarity with

8    screen-reading software?

9         A.   Ideally, in an ideal world, yes.

10        Q.   And a website -- and are you including

11   blind people who may not have -- strike that.

12             What about when you -- let me start again.

13             When you say usable, in your mind, does

14   that mean something less than equivalent usability as a

15   sighted person has when it comes to blind people and

16   websites?

17             MR. PLUNKETT:  Objection.  Vague.

18             THE WITNESS:  That is pretty vague.

19             MR. PARADIS:  Q.  How do you measure

20   usability?  Do you measure it in terms of it is

21   equivalent usability as a sighted person would have?

22        A.   How do I measure usability?  I measure

23   usability by performing usability tests with subjects

24   who are going to be using the website.  So it's a

25   formal process.

102

1    A.    Superlatives of any sort are uncomfortable.

2    Q.    There are common requirements involved, and

3    some differences, correct?

4    A.    Yes.

5    Q.    Would you agree that the common elements --

6    well, let me ask it this way.  Would you agree that the

7    differences are just a few?

8         MR. PLUNKETT:  Objection.  Vague.  The

9    documents speak for themselves.

10        THE WITNESS:  Yeah.

11        MR. PARADIS:  Q.  Can you quantify to what

12   extent the guidelines are similar versus different in

13   terms of defining whether it's an accessible website?

14        MR. PLUNKETT:  Same objections.

15        THE WITNESS:  I could go through both

16   documents and read each point by point.

17        MR. PARADIS:  Q.  Do you have any rough

18   sense in your own head of -- to what extent they are

19   really overlapping requirements and to what extent

20   there are actually significant differences between the

21   two sets of standards or guidelines?

22        MR. PLUNKETT:  Same objections.  Asked and

23   answered.

24        THE WITNESS:  I am not going to do mental

25   arithmetic on the spot here.

1        Q.  In fact, you may advise a client to meet

2   both sets of standards in some situations; is that

3   correct?

4        A.  That's correct.

5        Q.  In fact, Section 508 advisory notes tell

6   readers what components of WCAG 1.0 are met and what

7   components are additional requirements, correct?

8        A.  That's correct.

9        Q.  So what was your point in identifying the

10  few differences between WCAG 1.0 and Section 508 in

11  your declaration?

12          MR. PLUNKETT:  Objection.  Vague.

13          THE WITNESS:  Yeah.  You are asking for my

14  opinion on my opinion?

15          MR. PARADIS:  Q.  Why did you say this in

16  your declaration?  What is the point you were trying to

17  make other than that there are some differences?

18       A.  I was asked if there were differences

19  between the two standards.

20       Q.  Do you find those differences significant

21  to you in any way in terms of evaluating whether

22  target.com is accessible or not?

23       A.  I am not evaluating target.com.

24          MR. PLUNKETT:  Objection.  Assumes facts.

25  Lacks foundation.  Argumentative.

1    MR. PARADIS:  Q.  The court is being asked

2   to evaluate this.  And do you find those differences

3   between -- that you identified between 508 and WCAG to

4   be significant in terms of an evaluation of whether

5   target.com is accessible to blind users?

6        A.  I don't know.  I have not looked at --

7        MR. PLUNKETT:  Objection.  Foundation.

8   Calls for speculation.

9        THE WITNESS:  I have not looked at it.

10       MR. PARADIS:  Q.  Did you ever ask Target

11  or its lawyers why they cared if there were some

12  differences between 508 and WCAG?

13       MR. PLUNKETT:  Counsel, objection.  Asked

14  and answered.  Argumentative.

15       THE WITNESS:  I didn't ask.

16       MR. PLUNKETT:  Did you promise to finish by

17  1:00?

18       MR. PARADIS:  1:30.

19       Q.  How difficult would you say it is to make a

20  website compliant with 508 or WCAG 1.0?

21       MR. PLUNKETT:  Objection.  Calls for

22  speculation.  Incomplete hypothetical.  Lacks

23  foundation.

24       THE WITNESS:  There is no way to answer

25  that question.

1  there any recent technological changes that -- well,

2  let me ask you this.  What changes are you talking

3  about?

4      A.  I am -- in the first place, it would be

5  more correct to say that the techniques documents of

6  the WCAG guidelines don't reflect many of the recent

7  changes in technology.  The techniques were very

8  specifically aimed at HTML.  And there are many more

9  web technologies out there now that are being used

10  besides HTML that are not covered in the techniques.

11          So there would be no guidance whatsoever

12  for practical implementation, practical use of those

13  things.

14      Q.  So what do you advise your clients to do if

15  they want to make their website more accessible, given

16  this development?

17          MR. PLUNKETT:  Objection.  Vague.

18          THE WITNESS:  Yeah.

19          MR. PARADIS:  Q.  Well, in your website you

20  say that you will help a client make their existing

21  website more accessible.

22          How does that factor in with the statement

23  that there are -- that WCAG and 508 don't reflect

24  certain recent developments in techniques?  What do you

25  do?

1        A.  I --

2            MR. PLUNKETT:  Objection.  Vague.

3            THE WITNESS:  I rely on my own experience

4   on -- and work that has been done subsequently that has

5   not been encoded into ratified standards and ratified

6   documents.

7            MR. PARADIS:  Q.  I take it that -- well,

8   have you ever talked with Dr. Thatcher about the

9   approach he follows?

10       A.  We never had that level of discussion, no.

11       Q.  You never compared notes about how you go

12  about this?

13       A.  No.

14       Q.  Have you ever seen his work before?

15       A.  Seen his work?

16       Q.  Yes.  Any assessments he has done?

17       A.  No.

18       Q.  Have you ever talked with him, Hey, what do

19  you think we should advise our clients to do, given

20  that the codes are still in development?

21       A.  No.  I think the last time we talked we

22  talked about bird watching.

23       Q.  And I take it the fact the codes are still

24  evolving does not keep you from advising your clients

25  on how to make their websites accessible; is that fair

1    out is, in your mind, what is the role, what is the

2    import of the fact that WCAG and 508 are being revised?

3    Does it, in your mind, mean that a website designer or

4    manager can simply -- should simply wait until that

5    process is over before taking any action to make their

6    website accessible?

7              MR. PLUNKETT:  Objection.  Lacks

8    foundation.  Vague.

9              THE WITNESS:  That -- yeah.  I don't know

10   how to answer that.

11             MR. PARADIS:  Q.  Would it be fair to say

12   that you advise clients that the access standards, WCAG

13   and 508, the guidelines are being -- are evolving, but

14   that they in their current state do provide good

15   guidance on how to make websites accessible?

16             MR. PLUNKETT:  Objection.  Asked and

17   answered.  Vague.

18             THE WITNESS:  Depends on what I have been

19   contracted to do.  I mean --

20             MR. PARADIS:  Q.  If a client comes to you

21   and says, I have a website.  I saw your website, and

22   you say you can advise me on how to make my website

23   more accessible, that's what I want to do.  Do you

24   advise your clients, you should meet -- part of the

25   process is you should meet one or the other of these

1   guidelines, 508 or WCAG?

2            MR. PLUNKETT: Objection. Asked and

3   answered. Calls for speculation. Vague.

4            THE WITNESS: I generally ask if there are

5   any standards or guidelines to which they legally must

6   apply. And if not, then I use whatever is in my range

7   of experience to help them make their website more

8   accessible.

9            MR. PARADIS: Q. Part of that is, I think

10   you have -- let me ask you.

11            In your website you reference WCAG, and I

12   think you said you primarily look to WCAG if it's not

13   an entity governed by 508; is that correct?

14        A. As the basis, yes.

15        Q. Then you say there are some techniques that

16   have changed and that you use your experience.

17            Would you say that these are methods that

18   you use that build upon compliance with WCAG?

19        A. That seems fair to say, yes.

20        Q. Now, in terms of whatever changes you are

21   referring to in paragraph 12, whatever they are, do any

22   of them affect -- in your understanding, do they --

23   start again.

24            Do any of the changes that you referred to

25   in paragraph 12 affect the requirements under 508 and

1   508 require some form of navigation aid so that blind

2   users can easily navigate around within a page?

3              MR. PLUNKETT:  Objection.  Leading.  The

4   document speak for itself.

5              THE WITNESS:  Yes.

6              MR. PARADIS:  Q.  Are you aware of any

7   differences between 508 and WCAG when it comes to

8   navigation within a page?

9              MR. PLUNKETT:  Objection.  Asked and

10  answered.

11             MR. PARADIS:  Q.  I am still not sure

12  myself, so I am asking you.

13             Are there any differences between 508 and

14  WCAG 1.0 as far as navigation aids that are required?

15             MR. PLUNKETT:  Same objections.

16             THE WITNESS:  I am sure we have been

17  through this.

18             MR. PARADIS:  Q.  Can you indicate to me

19  one way or another, yes or no?

20             MR. PLUNKETT:  You need to review the

21  standards?

22             THE WITNESS:  Yeah.  Actually, 508 doesn't

23  specifically require the use of -- it doesn't name the

24  use of structural markup.

25             MR. PARADIS:  Q.  Does it have some

130

1    requirement for aid for in-page navigation?

2         A.   Skip repetitive links.   A method should be

3    provided that permits users to skip repetitive

4    navigation links.

5         Q.   When advising companies regarding their

6    compliance, their website -- strike that.

7              When advising a company that seeks to make

8    its website accessible, do any of the differences

9    between Section 508 and WCAG 1.0 change the advice you

10   would give the client in terms of the problems

11   Dr. Thatcher identified?

12             MR. PLUNKETT:   Objection.   Vague.   Lacks

13   foundation.   Calls for speculation.

14             MR. PARADIS:   Q.   I will rephrase it.

15             Assuming hypothetically you were advising a

16   company regarding the types of access issues that

17   Dr. Thatcher identified, and there were four, lack of

18   alt text, lack of labeling on forms, keyboard -- being

19   able to interact with a keyboard, and in-page

20   navigation.

21             Would the differences between WCAG 1.0 and

22   Section 508 affect the advice you would give a client?

23             MR. PLUNKETT:   Objection.   Vague.   Lacks

24   foundation.   Incomplete hypothetical.   Calls for

25   speculation.

CERTIFICATE OF REPORTER

1
2     I, DANUTA KRANTZ, a Certified Shorthand

3  Reporter, hereby certify that the witness in the

4  foregoing deposition was by me duly sworn to tell

5  the truth, the whole truth and nothing but the

6  truth in the within-entitled cause;

7     That said deposition was taken down in

8  shorthand by me, a disinterested person, at the

9  time and place therein stated, and that the

10  testimony of the said witness was thereafter

11  reduced to typewriting, by computer, under my

12  direction and supervision.

13     I further certify that I am not of counsel

14  or attorney for either or any of the parties to

15  the said deposition nor in any way interested in

16  the event of this cause and that I am not related

17  to any of the parties thereto.


19     DATED:___July 7_____, 2006




23  _____

24  DANUTA KRANTZ, CSR 4782