

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL FEDERATION OF THE BLIND,
the NATIONAL FEDERATION OF THE BLIND OF
CALIFORNIA, on behalf of their members, and
BRUCE F. SEXTON, on behalf of himself and all
others similarly situated,

        Plaintiffs,

    v.

TARGET CORPORATION,

        Defendant.

_____/

No. C 06-01802 MHP

**MEMORANDUM & ORDER**
**Re: Defendant's Motion to Dismiss;**
**Plaintiffs' Motion for Preliminary**
**Injunction**

UNITED STATES DISTRICT COURT
For the Northern District of California

    Plaintiffs National Federation of the Blind, National Federation of the Blind of California, Bruce Sexton, and all those similarly situated, filed this action against Target Corporation ("Target"), seeking declaratory, injunctive, and monetary relief. Plaintiffs claim that Target.com is inaccessible to the blind, and thereby violates federal and state laws prohibiting discrimination against the disabled. Now before the court is defendant's motion to dismiss for failure to state a claim. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

    Target operates approximately 1,400 retail stores nationwide, including 205 stores in California. Target.com is a website owned and operated by Target. By visiting Target.com,

customers can purchase many of the items available in Target stores. Target.com also allows a customer to perform functions related to Target stores. For example, through Target.com, a customer can access information on store locations and hours, refill a prescription or order photo prints for pick-up at a store, and print coupons to redeem at a store.

Plaintiffs allege that Target.com is not accessible to blind individuals. According to plaintiffs, designing a website to be accessible to the blind is technologically simple and not economically prohibitive. Protocols for designing an accessible internet site rely heavily on "alternative text": invisible code embedded beneath graphics. A blind individual can use screen reader software, which vocalizes the alternative text and describes the content of the webpage. Similarly, if the screen reader can read the navigation links, then a blind individual can navigate the site with a keyboard instead of a mouse. Plaintiffs allege that Target.com lacks these features that would enable the blind to use Target.com. Since the blind cannot use Target.com, they are denied full and equal access to Target stores, according to plaintiffs.

On February 7, 2006 plaintiffs filed this action in Superior Court of California for the County of Alameda. On March 9, 2006 defendant removed the case to federal court. Defendant now moves to dismiss the complaint for failure to state a claim. Defendant claims that each of the anti-discrimination laws protecting the disabled—the Americans with Disabilities Act, 42 U.S.C. section 12182, ("ADA"), Unruh Civil Rights Act, Cal. Civ. Code section 51 ("Unruh Act"), and the Disabled Persons Act, Cal. Civ. Code section 54.1 ("DPA")—covers access to only physical spaces. Since Target.com is not a physical space, defendant asserts that the complaint does not state a claim under these laws. Additionally, defendant contends that even if the Unruh Act and the DPA do govern access to websites, applying these state laws to the internet would violate the dormant commerce clause.

LEGAL STANDARD

I.      Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule

2

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   12(b)(6) focuses on the "sufficiency" of a claim—and not the claim's substantive merits—"a court

2   may [typically] look only at the face of the complaint to decide a motion to dismiss." Van Buskirk

3   v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).

4       A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted if "it

5   appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which

6   would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46 (1957). Dismissal can be based

7   on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

8   legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Allegations of

9   material fact are taken as true and construed in the light most favorable to the nonmoving party.

10  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not, however,

11  accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or

12  unreasonable inferences. See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001);

13  Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).

14

15  II.     Motion for Preliminary Injunction

16      "A preliminary injunction is a provisional remedy, the purpose of which is to preserve the

17  status quo and to prevent irreparable loss of rights prior to final disposition of the litigation." Napa

18  Valley Publ'g Co. v. City of Calistoga, 225 F. Supp. 2d 1176, 1180 (N.D. Cal. 2002) (Chen, Mag. J.)

19  (citing Sierra On Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984)). In light

20  of these considerations, a plaintiff seeking preliminary injunctive relief must demonstrate either: "(1)

21  a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious

22  questions going to the merits [have been] raised and the balance of hardships tips sharply in [the

23  plaintiff's] favor." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th

24  Cir. 2003) (en banc) (per curiam) (citing Clear Channel Outdoor, Inc. v. City of Los Angeles, 340

25  F.3d 810, 813 (9th Cir. 2003)); see also Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115,

26  1119 (9th Cir. 1999). The components of these two tests, together with the added consideration of

27  the public interest, operate on a sliding scale or "continuum." Southwest Voter Registration Educ.

28  Project, 344 F.3d at 918. Consequently, "the less certain the district court is of the likelihood of

3

success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Id. (citation omitted); see also Miller v. California Pac. Med. Ctr., 19 F.3d 449, 456 (9th Cir. 1994) (en banc).

In cases where a party seeks mandatory preliminary relief the Ninth Circuit has held that there must be a showing that "the law and the facts clearly favor granting such relief." Stanley v. University of Southern California, 13 F.3d 1313, 1320 (9th Cir. 1994); Martin v. Int'l Olympic Committee, 740 F.2d 670 (9th Cir. 1984). The "higher degree of scrutiny" is required because "prohibitory injunction[s] preserve[] the status quo. . . [while a] mandatory injunction goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored." Stanley, 13 F.3d at 1320 (internal citations omitted); see also Brewster v. West Irondequoit Cent. School Dist., 212 F.3d 738, 744 (2d Cir. 2000) superseded on alternate grounds by statute, Federal Rule of Civil Procedure Rule 52, as recognized in Zervos v. Verizon New York, Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001) (noting that an injunction is mandatory if it will alter rather than maintain the status quo or if it will provide movant with substantially all relief sought).

DISCUSSION

I.      Motion to Dismiss

        A.      ADA

        Title III of the ADA prevents discrimination against the disabled in places of public accommodation: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to) or operates a place of public accommodation." 42 U.S.C. § 12182(a).

        "Discrimination" under the ADA encompasses the denial of the opportunity, by the disabled, to participate in programs or services, and providing the disabled with separate, but unequal, goods or services. See 42 U.S.C. § 12182(b)(1)(A)(i-iii). To ensure that the disabled have full and equal enjoyment of the goods and services of places of public accommodation, the ADA requires "reasonable modification" of "policies, practices, and procedures," the provision of

4

auxiliary aids to ensure effective communication with the disabled, and the removal of architectural and communications barriers.  42 U.S.C. § 12182(b)(2)(A)(ii-iv).  The ADA thus departs from certain anti-discrimination statutes in requiring that places of public accommodation take affirmative steps to accommodate the disabled.  H.R. Rep. No. 101–485, pt.2, at 104 (1990); 42 U.S.C. § 12182(b)(2)(A)(ii-iv).

Defendant contends that Target.com is not a place of public accommodation within the meaning of the ADA, and therefore plaintiffs cannot state a claim under the ADA.  Specifically, defendant claims that the complaint is deficient because it does not allege that "individuals with vision impairments are denied access to one of Target's brick and mortar stores or the goods they contain."  Def.'s Motion at 10.  However, the complaint states that "due to Target's failure and refusal to remove access barriers to Target.com, blind individuals have been and are being denied equal access to Target stores, as well as to the numerous goods, services and benefits offered to the public through Target.com."  Complaint ¶ 24.  Plaintiffs' legal theory is that unequal access to Target.com denies the blind the full enjoyment of the goods and services offered at Target stores, which are places of public accommodation.[2]

Defendant contends that even if Target.com is the alleged service of Target stores, plaintiffs still do not state a claim because they fail to assert that they are denied physical access to Target stores.  Although a plaintiff may allege an ADA violation based on unequal access to a "service" of a place of public accommodation, courts have held that a plaintiff must allege that there is a "nexus" between the challenged service and the place of public accommodation.  Under Ninth Circuit law, a "place of public accommodation," within the meaning of Title III, is a physical place.  See Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1114 (9th Cir. 2000) (concluding that places of public accommodation are "actual, physical places.")[3].  The Ninth Circuit has declined to join those circuits which have suggested that a "place of public accommodation" may have a more expansive meaning.  See Carparts Distribution Ctr., Inc. v. Automotive Wholesalers Assoc. of New England, Inc., 37 F.3d 12, 19–20 (1st Cir. 1994) (holding that "public accommodations" encompasses more than actual physical structures and includes the defendant insurance company); Doe v. Mutual of Omaha Ins. Co., 179 F.3d 557, 559 (7th Cir. 1999) (noting, in dicta, that a "place of public

1   accommodation" encompasses facilities open to the public in both physical and electronic space,

2   including websites).

3          In Weyer, plaintiff sued an insurance company for offering a policy that allegedly

4   discriminated against people with mental disabilities.  The Ninth Circuit adopted the reasoning of

5   the Third and Sixth Circuits, finding that there was "no nexus between the disparity in benefits and

6   the services which . . . [the insurance company] offers to the public from its insurance office."

7   Weyer, 198 F.3d at 1115.  The court noted that although an insurance office is a place of public

8   accommodation, an insurance company administering an employer-provided insurance policy is not

9   a place of public accommodation.  Id.

10          Similarly, the Eleventh Circuit in Rendon v. Valleycrest Prod., Ltd. held that the telephone

11   process for selecting contestants for "Who Wants to be a Millionaire" discriminated against people

12   with hearing and other physical disabilities.  294 F.3d 1279, 1280–81 (11th Cir. 2002).  The court

13   found that the studio where the show was filmed was a place of public accommodation and that

14   competing on the show was a privilege provided by the place of public accommodation.  Id. at

15   1283–84.  Thus, the court held that by using a discriminatory process for screening potential

16   contestants, defendant was denying disabled persons equal enjoyment of a privilege (competing on

17   the show) of a place of public accommodation (the studio).  Id. at 1284–85; see also Ford v.

18   Schering-Plough Corp., 145 F.3d 601, 612–13 (3d Cir. 1998) (holding that plaintiff failed to allege a

19   nexus between the place of public accommodation and the insurance benefits offered by the

20   employer); Stoutenborough v. National Football League, 59 F.3d 580, 583–84 (6th Cir. 1995)

21   (affirming the dismissal of a claim under Title III because the challenged service, the live telecast of

22   a football game, was not offered by a place of public accommodation, the stadium).

23          Defendant argues that the above-cited cases stand for the proposition that the ADA prohibits

24   only discrimination occurring on the premises of a place of public accommodation, and that

25   "discrimination" is limited to the denial of physical entry to, or use of, a space.  Each element of

26   defendant's argument will be addressed in turn.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

6

### 1.    Off-Site Discrimination

The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations *of* any place of public accommodation."  42 U.S.C. § 12182(a) (emphasis added).  The statute applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation.  Id.  To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute.  See id.; see also Rendon, 294 F.3d at 1285 (holding that a process for selecting contestants for a game show that screened out the disabled was actionable under Title III even though the process occurred outside the premises of the public accommodation); Stoutenborough, 59 F.3d at 582–83 (emphasis added) (concluding that Title III covers "*all* of the services which the public accommodation offers"); Weyer, 198 F.3d at 1115 (holding that "whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services").  To the extent defendant argues that plaintiffs' claims are not cognizable because they occur away from a "place" of public accommodation, defendant's argument must fail.

### 2.    Physical Access

According to defendants, in order for plaintiffs' claim to be actionable under the ADA, the "off-site" discrimination must still deny physical access to Target's brick-and-mortar stores.  Relying on Rendon, Access Now and Stoutenborough, defendant argues that the nexus theory applies only to the denial of physical access to a place of public accommodation, and thus plaintiffs' claim that Target.com (rather than Target stores) is inaccessible, is not legally cognizable.  However, consistent with the plain language of the statute, no court has held that under the nexus theory a plaintiff has a cognizable claim only if the challenged service prevents physical access to a public accommodation.  Further, it is clear that the purpose of the statute is broader than mere physical access—seeking to bar actions or omissions which impair a disabled person's "full enjoyment" of services or goods of a covered accommodation.  42 U.S.C. § 12182(a).  Indeed, the statute expressly states that the denial of equal "participation" or the provision of "separate benefit[s]" are actionable under Title III.  See 42 U.S.C. § 12182(b)(1)(A).

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Defendant's reliance on <u>Rendon</u>, <u>Access Now</u> and <u>Stoutenborough</u> to support this proposition is misplaced. In <u>Rendon</u>, the court held that the plaintiff stated a claim by alleging that an off-site telephone screening process discriminated against the disabled who sought to enjoy a privilege (being a contestant on a television show) offered by a place of public accommodation (the studio). <u>Rendon</u>, 294 F.3d at 1286. <u>Rendon</u> neither states nor suggests that a plaintiff proceeding under the "nexus" theory must plead denial of physical access to a place of public accommodation. On the contrary, the court held that tangible barriers restrict the disabled individual's right to access the physical space while intangible barriers "restrict a disabled person's ability to *enjoy* the defendant entity's goods, services and privileges." <u>Id.</u> at 1283 (emphasis added).

In <u>Access Now</u>, the court held that plaintiff failed to state a claim under the ADA because plaintiff alleged that the inaccessibility of southwest.com prevented access to Southwest's "virtual" ticket counters. <u>Access Now</u>, 227 F. Supp. 2d at 1231. "Virtual" ticket counters are not actual, physical places, and therefore not places of public accommodation. <u>Id.</u> Since there was no physical place of public accommodation alleged in <u>Access Now</u>, the court did not reach the precise issue presently in dispute: whether there is a nexus between a challenged service and an actual, physical place of public accommodation.

<u>Ford v. Schering-Plough Corp.</u>, 145 F.3d 601 (3d Cir. 1998) similarly does not support defendant's argument. The court held that plaintiffs failed to allege a nexus between the challenged insurance benefits and a place of public accommodation. <u>Id.</u> at 612–13. The court noted that employer-provided insurance benefits are a "term or condition of employment" subject to the provisions of Title I. <u>Id.</u> at 612. Although the insurance office of MetLife was a place of public accommodation, the insurance benefits were offered by the employer, Schering; no nexus existed because the office did not itself offer the benefits to the plaintiff. <u>Id.</u> "It is all the services which the public accommodation offers, not all the services which the lessor of the public accommodation offers[,] which fall within the scope of Title III." <u>Id.</u>

In <u>Stoutenborough</u>, the court found that there could be no Title III liability because the National Football League, the lessor of a public stadium, was not the entity that offered the

8

UNITED STATES DISTRICT COURT
For the Northern District of California

challenged service. In the words of the Sixth Circuit, "[t]he televised broadcast of football games is certainly offered through defendants, but not as a service of public accommodation. It is all of the services which the public accommodation offers, not all services which the lessor of the public accommodation offers which fall within the scope of Title III." Soutenborough, 59 F.3d at 583. Similarly, defendant contends, like the lessor in Stoutenborough, the owner in the present action (Target corporation) is the party through which Target.com is offered and thus a Title III claim is not actionable. See 42 U.S.C. § 12182. However, it is clear from the face of the complaint that many of the benefits and privileges of the website are services of the Target stores. Unlike in Stoutenborough, where there "service" was offered by a separate party leasing the public space, the challenged service here is heavily integrated with the brick-and-mortar stores and operates in many ways as a gateway to the stores.

The case law does not support defendant's attempt to draw a false dichotomy between those services which impede physical access to a public accommodation and those merely offered by the facility. Such an interpretation would effectively limit the scope of Title III to the provision of ramps, elevators and other aids that operate to remove physical barriers to entry. Although the Ninth Circuit has determined that a place of public accommodation is a physical space, the court finds unconvincing defendant's attempt to bootstrap the definition of accessibility to this determination, effectively reading out of the ADA the broader provisions enacted by Congress. In Rendon, even though the disabled individual did not contest the actual physical barriers of the facility in question, the Eleventh Circuit found that Title III was implicated because a "discriminatory procedure that deprived [the individual] of the opportunity to compete to be a contestant . . . *at* a place of public accommodation" was utilized. Rendon, 294 F.3d at 1281 (emphasis added) (internal citations omitted). Similarly, in the present action, plaintiffs have alleged that the inaccessibility of Target.com denies the blind the ability to enjoy the services of Target stores. The Ninth Circuit has stated that the "ordinary meaning" of the ADA's prohibition against "discrimination in the enjoyment of goods, services, facilities or privileges, is "that *whatever* goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and

9

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    services." <u>Wyer</u>, 198 F.3d 1115 (emphasis added).  Defendant's argument is unpersuasive and the

2    court declines to dismiss the action for failure to allege a denial of physical access to the Target

3    stores.

4

5            3.        Auxiliary Aids and Services

6            Alternatively, defendant asserts that under the auxiliary aid provision of the ADA, plaintiffs

7    contentions should be dismissed.  Title III of the ADA, in a section entitled "specific prohibitions,"

8    defines discrimination to include:

9            a failure to take such steps as may be necessary to ensure that no individual with a
         disability is excluded, denied services, segregated or otherwise treated differently
10        than other individuals because of the absence of auxiliary aids and services,
         unless the entity can demonstrate that taking such steps would fundamentally alter
11        the nature of the goods, service, facility, privilege, advantage, or accommodation
         being offered or would result in an undue burden.
12

13   42 U.S.C. § 12182(a)(2)(A)(iii).  This section explicitly exempts public accommodations from the

14   obligation to provide auxiliary aids or services if doing so would fundamentally change the nature of

15   the good or service, or result in an undue burden.  <u>Id.</u>

16           In regulations implementing this section, the Department of Justice has explained that the

17   ADA obligates public accommodations to communicate effectively with customers who have

18   disabilities concerning hearing, vision, or speech.  28 C.F.R. § 36.303(c); <u>see also</u> Nondiscrimination

19   on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg.

20   35544, at * 33, (July 26, 1991).  For example, a restaurant must ensure that an employee is available

21   to explain a menu to a blind customer, and a museum offering audio tours must provide alternative

22   formats of the tour that a deaf patron could use.  56 Fed. Reg. 35544 at *34.  However, while a

23   bookstore must ensure that it communicates with its customers in formats which accommodate the

24   disabled, a bookstore is not required to stock books in Braille.  <u>Id.</u> at * 41.  "The purpose of the

25   ADA's public accommodations requirements is to ensure accessibility to the goods offered by a

26   public accommodation, not to alter the nature or mix of goods that the public accommodation has

27   typically provided."  <u>Id.</u>  Indeed, the Department of Justice has explained that "the auxiliary aid

28   requirement is a flexible one."  <u>Id.</u> at * 34.  So long as the public accommodation communicates

                                                  10

1    effectively with customers, the public accommodation can choose amongst various formats and

2    methods of communication.  Id.  For instance, if a menu cannot be read by a blind person, the

3    restaurant need not make the menu available in Braille; the restaurant could ensure that waiters are

4    available to explain the menu.  Id.

5          Defendant contends that even if plaintiffs demonstrate a nexus between Target.com and

6    Target stores, Target.com falls under the auxiliary aid provision of Title III.  The auxiliary aid

7    requirement allows a public accommodation to provide the information in any format, so long as it

8    results in effective communication.  Thus, defendant concludes that Target need not modify its

9    website, so long as it provides the information contained therein in some other format, such as by

10   telephone.  However, the flexibility to provide reasonable accommodation is an affirmative defense

11   and not an appropriate basis upon which to dismiss the action.  After plaintiffs state a claim—by

12   alleging that the website is not accessible to the blind—the burden then shifts to defendants to assert,

13   as an affirmative defense, that they already provide the information on Target.com in another

14   reasonable format (such as over the phone).   Indeed, whether or not a blind-accessible Target.com is

15   a form of communication similar to the provisions of Braille menus is not at all clear from the face

16   of the complaint.  Nor is it clear whether or not the addition of "alt-tags" and other accessibility

17   programming features would alter the nature of the service.  Defendant's challenge is premature and

18   the court declines to dismiss the action on this basis.

19

20               4.    Conclusion

21          In sum, the court finds that to the extent that plaintiffs allege that the inaccessibility of

22   Target.com impedes the full and equal enjoyment of goods and services offered in Target stores, the

23   plaintiffs state a claim, and the motion to dismiss is denied.  To the extent that Target.com offers

24   information and services unconnected to Target stores, which do not affect the enjoyment of goods

25   and services offered in Target stores, the plaintiffs fail to state a claim under Title III of the ADA.

26   Defendant's motion to dismiss this portion of plaintiffs' ADA claim is granted.[4]

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      Unruh Civil Rights Act

The Unruh Act states that individuals with disabilities are "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).  Defendant advances three separate reasons for dismissing plaintiffs' claim under the Unruh Act.  First, Target.com is not a business establishment. Second, the complaint does not allege, and cannot prove, that Target engaged in intentional discrimination against the disabled.  Third, the Unruh Act does not require modification of Target.com.[5]  However, in 1992, the California legislature amended the Unruh Civil Rights Act to state that a violation of the ADA is a violation of the Unruh Act.  Cal. Civ. Code § 51(f). Thus, a plaintiff who pleads a violation of the ADA does not need to allege anything further in order to state a claim under the Unruh Act.  Lentini v. California Cntr. for the Arts, 370 F.3d 837, 847 (9th Cir. 2004).  Since plaintiffs state a claim under the ADA, they state a claim under the Unruh Act as well and the court need not reach defendant's challenges to plaintiffs' Unruh claims.

Notwithstanding, it is worth noting that defendant's argument that Target.com is not a business establishment is misplaced, since the complaint alleges that Target is a business establishment and Target.com is a service provided by Target and its stores.  Complaint at ¶ 40. Plaintiffs make two separate allegations.  First, defendant is violating the ADA and, thus the Unruh Act, by denying plaintiffs the full and equal enjoyment of a service (Target.com) of a place of public accommodation (Target).  Second, defendant is denying the blind equal access to services provided in places of public accommodation (Target stores) by denying the blind access to Target.com.  These two legal theories do not assume that Target.com is a business establishment, they rest upon the premise that Target.com is a service of a business establishment, and therefore defendant's argument that a website cannot be a business establishment is unavailing.

C.      Disabled Persons Act

The Disabled Persons Act states that:

Individuals with disabilities shall be entitled to full and equal access to accommodations, advantages, facilities, medical facilities, including hospitals,

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2    clinics, and physicians' offices, and privileges of all common carriers, airplanes,
     motor vehicles, railroad trains, motorbuses, streetcars, boats, or any other public
3    conveyances or modes of transportation (whether private, public, franchised,
     licensed, contracted, or otherwise provided), telephone facilities, adoption
4    agencies, private schools, hotels, lodging places, places of public accommodation,
     amusement, or resort, *and other places to which the general public is invited*."

5    Cal. Civ. Code § 54.1(a)(1) (emphasis added).

6         Defendant argues that the complaint fails to state a claim under the Disabled Persons Act for

7    two reasons.  First, the Disabled Persons Act applies to only physical places, and Target.com is not a

8    physical place.  Second, a claim under the Disabled Persons Act must be based on a violation of the

9    building code, and plaintiffs do not allege a violation of the building code.   However, similar to the

10   Unruh Act, pursuant to Cal. Civ. Code § 54.1(d), a violation of the ADA is a violation of the DPA.

11   The court need not reach defendant's arguments.

12

13        D.    Commerce Clause

14        Defendant argues that even if plaintiffs state a claim under the Unruh and Disabled Persons

15   Acts, applying these statutes to regulate Target.com violates the dormant commerce clause.

16   Defendant advances two reasons that such regulation would violate the commerce clause.  First,

17   state regulation of Target.com would regulate conduct occurring wholly outside of California.

18   Second, state regulation of Target.com would regulate an area of commerce that is reserved

19   exclusively for Congress.

20

21        1.    Extraterritorial Regulation

22        The Commerce clause forbids a state from regulating commerce "that takes place wholly

23   outside of the State's borders, whether or not the commerce has effects within the State."  Healy v.

24   The Beer Inst., 491 U.S. 324, 336 (1989) (quoting Edgar v. MITE Corp., 457 U.S. 624, 642–43

25   (1982)).  A state law directly controlling commerce "wholly outside the boundaries of a State" is per

26   se invalid regardless of whether the legislature intended to regulate activities outside of the state.

27   Id.; see also National Collegiate Athletic Association v. Miller, 10 F.3d 633, 639 (9th Cir. 1993).

28        Although the Ninth Circuit has not reached this issue, courts in several circuits have

13

invalidated state laws regulating the internet on the grounds that *any* regulation of the internet regulates conduct occurring outside the borders of the state.  See, e.g., American Booksellers Found. v. Dean, 342 F.3d 96, 103 (2d Cir. 2003) (striking down a Vermont law outlawing the knowing distribution of material harmful to a minor because residents of other states who post to the web would be subject to prosecution in Vermont); Psinet, Inc. v. Chapman, 362 F.3d 227, 240–41 (4th Cir. 2004) (invalidating a Virginia law that criminalized the dissemination of material harmful to minors over the internet on the grounds that any regulation of the internet necessarily regulates conduct occuring entirely out-of-state); ACLU v. Johnson, 194 F.3d 1149, 1161 (10th Cir. 1999) (concluding that a New Mexico law criminalizing the dissemination by computer of material harmful to a minor violated the commerce clause because state regulation of the internet necessarily controls transactions outside the state); Center for Democracy and Tech. v. Papper, 337 F. Supp. 2d 606, 662–63 (E.D. Pa. 2004) (holding that a law requiring Internet Service Providers to remove or disable access to child pornography applied the policies of Pennsylvania to internet transactions in other states).

     The cases cited above relied extensively on the analysis of the Southern District of New York in American Library Association v. Pataki, 969 F. Supp. 160 (S.D.N.Y. 1997).  At issue in that case was the constitutionality of a New York law criminalizing the intentional use of a computer to transmit sexually explicit material to a minor.  Id. at 163.  The court held that the law violated the dormant commerce clause on three separate grounds: the statute regulated conduct occuring wholly outside of New York; the burdens of the law on interstate commerce outweighed the benefits; and regulation of the internet is reserved exclusively for Congress.  Id. at 169.  According to the Pataki court, all on-line communication is inter-state; purely intra-state communication is impossible.  Id. at 174.  State regulation of the internet, then, necessarily subjects people in other states to New York law.  Id. at 177.  A California resident posting to the web, for intended viewing by a resident of Oregon, would risk prosecution under New York law, because New Yorkers could access the website.  Id. at 174.

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
For the Northern District of California

By contrast, several state and federal courts have held that states may regulate the internet without violating the commerce clause. For example, courts have upheld state anti-spam statutes by distinguishing the regulation of e-mail from the regulation of internet postings; e-mail messages can be targeted at recipients in particular geographical areas, whereas a posting to the internet is accessible to any internet user, regardless of location. See Ferguson v. Friendfinders, Inc., 94 Cal. App. 4th 1255 (Cal. Ct. App. 2002) (holding that a state law regulating unsolicited e-mail applied only to California residents receiving email through equipment located in California and thus did not regulate conduct outside California); Miracle, LLC v. First Choice Internet, Inc., 166 Md. App. 481, 525–26 (Md. Ct. Spec. App. 2006) (upholding a law prohibiting the transmission of email containing false information to a Maryland email address, on the grounds that the regulation applied only to transactions that used a computer in Maryland or were sent to an address in Maryland); Washington v. Heckel, 24 P.3d 404, 839–40 (Wash. 2001) (upholding a law prohibiting the dissemination of false or misleading information from a computer in Washington or to an email address in Washington, on the grounds that the statute did not regulate conduct outside the state of Washington).

Other courts have upheld state laws regulating the internet by reasoning that the statute was intended to apply only to local conduct, or that the state would enforce the law only against conduct occurring within the state. See, e.g., Ford Motor Co. v. Texas Dept. Of Transp., 264 F.3d 493 (5th Cir. 2001) (upholding a Texas law that made it illegal for Ford to sell used vehicles via a website); People v. Hsu, 82 Cal. App. 4th 976, 982, 985 (Cal. Ct. App. 2000) (rejecting a commerce clause challenge to a California law criminalizing use of the internet to knowingly distribute to a minor matter harmful to a minor on the grounds that the legislature intended to criminalize only conduct occurring within California); Hatch v. Superior Court of San Diego County, 80 Cal. App. 4th 170, 197 (Cal. Ct. App. 2000) (holding that a law criminalizing the knowing distribution, via the internet, to a minor of material harmful to a minor did not regulate out-of-state conduct because California would prosecute only offenses occuring within the state); People v. Lipsitz, 663 N.Y.S.2d 468, 475 (N.Y. App. Div. 1997) (rejecting a commerce clause challenge to application of consumer protection

15

laws to an on-line business, on the grounds that the law was intended to regulate only local conduct);

Defendant distinguishes the cases relied upon by plaintiffs—Ford, Hsu, and Friendfinders—on three grounds. First, defendant contends that the laws at issue in these cases did not directly regulate the internet since they did not involve the programming of a website. This argument is factually correct but legally meaningless. Since programming of a website has no heightened constitutional protection (or even statutory protection), there is no basis for drawing any legal conclusion from this fact. All of these decisions impacted conduct that would occur on or through the internet.

Second, defendant asserts that none of these laws controlled conduct beyond the borders of the states. It is true that the statute challenged in Friendfinders did not control conduct outside California because the law regulated e-mail sent to residents of California via equipment located in California. Friendfinders, 94 Cal. App. 4th at 1258, 1263. Similarly, the Texas statute at issue in Ford did not control conduct outside of the state. If enforced, the statute would simply prohibit Ford from selling vehicles to Texas consumers and shipping them to Texas dealers; Ford's website and sales in other states would be unaffected. Ford, 264 F.3d at 498–99. Defendant's attempt to distinguish Hsu, however, is less successful. Defendant contends that Hsu is distinguishable on the grounds that criminal laws are not enforced against conduct occurring outside the state, but this is generally true for civil statutes as well. A civil law preventing misleading advertisement, for instance, will generally not be enforced against advertising occurring wholly in another state.

Defendant's third argument is that the practical effect of regulating Target.com is to regulate conduct outside California *because of the nature of the internet*. Since Target.com is a single website viewed by customers nationwide, a modification mandated by California necessarily regulates the transactions of customers in other states who use Target.com. However, Plaintiffs respond that it is technologically and economically feasible to establish a separate website directing Target.com visitors to a California-specific site in compliance with state laws and avoiding a commerce clause violation. Defendant maintains that even if it could design a separate website for only California customers, this would still violate the commerce clause.

16

UNITED STATES DISTRICT COURT
For the Northern District of California

However, in <u>Healy</u>, the Supreme Court held that:

> . . . a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.

<u>Healy</u>, 491 U.S. at 336. Thus, to determine what the "practical" effects of the regulation are, courts should inquire into the actual effects of state legislation rather than the effects intended by the legislature. The Connecticut beer-pricing statute at issue in <u>Healy</u> stated that nothing in the statute prevented out-of-state shippers from changing their prices outside Connecticut. <u>Id.</u> at 328–29. Yet the statute made it illegal for these shippers to sell beer in Connecticut at a higher price than that in a bordering state during the time period covered by the Connecticut posted price. <u>Id.</u> at 329. Thus, despite the legislature's stated intentions, the statute had the effect of controlling prices outside Connecticut; the statute limited the prices a shipper could charge outside of Connecticut once the shipper had posted a price for Connecticut beer. <u>Id.</u> at 338–39.

Similarly, in <u>Miller</u>, Nevada passed a law requiring national collegiate organizations to afford Nevada athletes certain procedural rights in disciplinary proceedings. <u>Miller</u>, 10 F.3d at 637. The practical effect of the legislation was to force the NCAA to apply the Nevada statute to enforcement proceedings in every state, because the NCAA's organizational integrity and mission require that enforcement procedures "be applied even-handedly and uniformly on a national basis." <u>Id.</u> at 638–39.

Defendant's argument—that if this court applies the Unruh Act and the Disabled Persons Acts to Target.com, the practical effect will be to force it to modify its website for all customers nationwide—is not sustainable. This assumes that Target would decline to design a separate California site, and instead simply modify its Target.com site for consumers nationwide. <u>Healy</u> lends no support to defendant's argument, since <u>Healy</u> does not address whether a statute violates the commerce clause when a defendant can comply with a statute in such a way as to avoid extraterritorial application. The commerce clause is not necessarily implicated since Target could choose to make a California-specific website.

17

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Indeed, even if Target chooses to change its entire website in order to comply with California

2    law, this does not mean that California is regulating out-of-state conduct.  Courts have held that

3    when a defendant chooses to manufacture one product for a nationwide market, rather than target its

4    products to comply with state laws, defendant's choice does not implicate the commerce clause.

5    See, e.g., Lorillard Tobacco Co. v. Reilly, 84 F. Supp. 2d 180, 199–200 (D. Mass. 2000) (holding

6    that a Massachusetts labeling law for cigars did not violate the commerce clause even though cigar

7    companies preferred to label their packages the same way nationwide for the purpose of efficiency);

8    Ferguson, 94 Cal. App. 4th at 1265 (rejecting the argument that since e-mail advertisements are sent

9    in an automated fashion, it is impractical to sort e-mails by location, and holding that a company's

10   decision to conform all of its e-mail to California law did not implicate the commerce clause); Sable

11   Communications of California, Inc. v. FCC, 492 U.S. 115, 125 (1989) (holding that community

12   obscenity laws which required a "dial-a-porn" company to determine the location of its callers and

13   tailor its messages accordingly did not violate the Constitution despite the costs of identifying and

14   complying with various local laws).

15   Moreover, it is noteworthy that various commentators have observed that the case which

16   many courts have followed in invalidating state regulation of the internet, Pataki, rests on an

17   incorrect technical understanding of the internet.  See, e.g., Jack L, Goldsmith & Alan O. Sykes, *The*

18   *Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 882 (2001) (noting that contrary to

19   the assumption of many courts, including the Pataki court, internet content providers can identify the

20   geographic location of their users and target content based on the location of the users).  Pataki

21   asserts that someone who puts content on the internet has "no way to determine the characteristics of

22   their audience . . . [such as] age and geographical location."  Pataki, 969 F. Supp. at 167.  This is

23   simply incorrect.  It is common practice for websites for entities operating in multiple countries to

24   have a single site that directs customers to different versions based upon language.  Websites can

25   determine the location of a user from information they provide, such as a credit card number, or

26   from the internet service provider an individual uses.  It may, or may not, be prohibitively expensive

27   for a website to tailor its content based on the location of its users, but it is certainly technically

28   feasible.

18

Given the foregoing, the court finds that it is inappropriate at the motion to dismiss stage to assert a commerce clause violation based on the mere fact that Target, at the remedy stage, may ultimately choose to make its nationwide website accessible to the blind. The Supreme Court has noted that the relevant inquiry is the "practical effect" of the law. See Healy, 491 U.S. at 336. At this juncture, it would be premature for the court to determine what the practical effect of imposing California's accessibility requirements upon Target.com will be.

### 2.    Exclusive Province of Congress

Defendant argues that under the dormant commerce clause California cannot regulate Target.com because the internet requires uniform, national regulations.

The commerce clause prevents a state from regulating "those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." Southern Pac. Co. v. Arizona, 325 U.S. 761, 767 (1945). In 1912, Arizona passed a law prohibiting railroad trains from having more than fourteen passenger or seventy freight cars. Id. at 763. Most other states did not regulate the number of cars in a train, although some states had length limits that differed from Arizona's limit. Id. at 773–74. The practical effect of the Arizona law was to force railroad companies to break up and reconfigure their trains prior to entering, and after leaving, Arizona. Id. at 774–75. The Supreme Court found that the Arizona law imposed a "serious burden" on interstate railroad traffic, costing Southern Pacific over one million dollars per year and forcing significant delays in service while the trains were broken up and reconfigured. Id. at 771–72. The law did not significantly improve safety, and may have actually increased accidents by increasing the number of trains. Id. at 776–77. Given the law's uncertain effect on safety, and the evidence of cost increases and service delays, the state interest in safety was outweighed by the national interest in "economical and efficient railway transportation service." Id. at 783–84. The Court struck down the law as violating the commerce clause. Id.

By contrast, in Exxon Corp v. Governor of Maryland, the Supreme Court upheld a Maryland law prohibiting a producer or refiner of petroleum from operating a retail gas station. 437 U.S. 117, 119 (1978). The Supreme Court determined that the law did not seriously burden the flow of

19

interstate commerce, because even if certain firms withdrew from the Maryland market, they would be replaced by others. Id. at 127. The commerce clause does not protect the market structure, or the market share of firms. Id. Moreover, the existence of a national market in gasoline did not preempt the states from regulating retail gasoline sales. Id. at 128. Exxon did not face conflicting state regulations of its national enterprise, but rather feared that all states would follow Maryland; several states had enacted or proposed similar legislation requiring producers to divest their retail holdings. Id. at 129.

Similarly, in Allied Artists Pictures Corp. v. Rhodes, a district court upheld an Ohio statute against a commerce clause challenge. 496 F. Supp. 408, 412–13 (S.D. Ohio 1980). Ohio passed a law prohibiting "blind bidding"— licensing a movie to a theatre before the theatre owner is able to view the picture. Id. The law also altered other practices in the licensing of movies in Ohio. Id. at 420–21. Following Exxon, the court rejected the argument that states cannot regulate movie licensing merely because the market for movies is national in scope. Id. at 437. Other states which regulated the distribution and licensing of films had laws similar to the Ohio statute. Id. The court found the situation analogous to Exxon, in that the companies did not face conflicting state regulations but rather feared that all states would adopt similar regulations banning blind bidding. Id.

Regulations issued by the Attorney General of Massachusetts concerning advertising and warning labels for cigarettes and cigars were challenged in Lorillard Tobacco Co. v. Reilly, 84 F. Supp. 2d 180 (D. Mass. 2000). The court upheld, in part, the regulations which prevented advertising in areas likely to be visited by minors, such as playgrounds, schools, and parks. Id. at 183. Cigar companies were required to place warning labels on their products for the first time. Id. at 193. The court rejected the argument that Massachusetts could not require warning labels on cigars because the market for cigars is national in scope. Id. at 199. Warning stickers could be placed on only those products sold in Massachusetts. Id. If, as a result of the Massachusetts regulations, the cigar companies found it more efficient to put the same warning on all cigars, that did not implicate the commerce clause. Id.

However, the court invalidated the application of the advertising regulations to national

20

media, such as magazines, on the grounds that the burdens on interstate commerce would outweigh the state's interest in promoting public health.  Id. at 203.  The regulations would otherwise require a company which placed an advertisement in a national market to comply with the Massachusetts regulations in the event that the edition wound up in Massachusetts.  Id.  If a magazine runs a "Massachusetts edition," however, it must comply with the regulations.  Id.

Applying the forgoing commerce clause analysis to the internet, several courts have held that only Congress can regulate the internet, since the internet requires uniform, national regulations. The most extensive analysis is provided by Pataki.  The court analogized the internet to the interstate railroad and highway systems, implying that just as a single train or car travels through interstate systems, so internet communication travels across states.  Pataki, 969 F. Supp. at 182.  Different state regulations would subject internet users to chaotic, conflicting mandates.  Id. at 182–83.  A user would have to comply with the most stringent state standard or forgo use of the internet altogether. Id.  The court offered the example of different state standards for material harmful to minors posted on the internet.  Id. at 183.  An individual posting information on-line could not restrict access to users from other states, so a user would be subject to prosecution in all states; each state might have a different definition of what material is considered "harmful to minors."  Id.; see also American Booksellers Found., 342 F.3d at 104 (predicting that "the internet will soon be seen as falling within the class of subjects that are protected from state regulation because they 'imperatively demand a single uniform rule.'"); Johnson, 194 F.3d at 1162 (agreeing with Pataki that state regulation would lead to inconsistent regulations, and therefore only Congress should regulate the internet).

However, a state's ability to extend benefits or protections to its citizens through its laws is not necessarily precluded by the failure of Congress to act.  Indeed, Congress' inaction can be viewed as an encouragement to state legislatures to fill the gaps left in the statute.  Thus, the lack of congressional action explicitly addressing accessibility requirements for private websites should not be construed to bar the extension of the protections of California statutes to these websites.  Such a construal would mean that in an age when commerce is increasingly conducted on and through the internet, a legal vacuum would be created whereby strategic actors could avoid prosecution and violate state laws with impunity.  Indeed, some courts have found that the internet should not be

21

UNITED STATES DISTRICT COURT
For the Northern District of California

exempt from state regulation. <u>See, e.g.,</u> <u>Ford</u>, 264 F.3d at 505 (rejecting the idea that state laws of general applicability cannot apply to the internet, on the grounds that internet activity would otherwise be immune from state regulation); <u>Lipsitz</u>, 663 N.Y.S.2d at 581–82 (holding that states should be able to regulate conduct on the internet, or else criminal activity could simply relocate to the internet).

In any event, as aforementioned, the commerce clause issue is not triggered at this preliminary stage and thus the court declines to rule on it for purposes of the present motion.

II.    <u>Motion for Preliminary Injunction</u>

In opposition to plaintiffs' motion for a preliminary injunction, defendant asserts that (1) the motion is more appropriately conceived of as request for mandatory injunction and under the relevant legal standard plaintiffs cannot demonstrate a clear likelihood of success, (2) plaintiffs cannot even make the initial factual showing that Target's goods and services are inaccessible to the blind, (3) plaintiffs cannot establish a violation of the "specific prohibitions" of section 12182(b)(2)(A) of the ADA, (4) plaintiffs' state law claims fail as a matter of law, (5) plaintiffs fail to identify with specificity the standards that the court should impose upon Target in violation of Rule 65(d), (6) the court should deny plaintiffs' claim for waiver of the bond requirement.

The court need not reach many of these grounds of denial since defendant is correct in its assertion that plaintiffs cannot demonstrate that the relevant facts *clearly favor* a finding that Target.com is inaccessible to the blind. In support of its contention, defendant submits the declarations of three blind individuals who allegedly have successfully navigated the Target.com website, searching for and purchasing products. <u>See, e.g.,</u> Dawn Wilkinson Dec. ¶ 5 (noting that with the use of screen reader JAWS version 7.0 "I was able to access Target.com, navigate the various links on the site, and search for specific products. I was also able to find the specific products I was shopping for, and browse through the various departments within Target.com"); Dave Wilkinson Dec. ¶ 4 (using JAWS version 7.1 "I spent a little more than two and a half hours on Target.com exploring the various functions and features on the website . . . I conducted searches on Target.com by category and department, and was able to find the products I was searching for. I was

22

able to add my product selections to the Target.com virtual shopping cart, and remove items . . . that I later chose not to purchase."); Tritten Dec. ¶¶ 4–6 ("I thought using Target.com was fun. I enjoyed browsing the products sold on Target.com, and playing around with the "Gift Finder" feature. It was not difficult to access or navigate the site. I was able to access different departments, review products, and find out all sorts of details on product availability and return options.").

Defendant assert that although the screen readers did not always work seamlessly on Target.com, the three individuals "were able to work around any difficulties they encountered and that they had an enjoyable experience on the website." Mot at 5:26–28; see, e.g., Tritten Dec. ¶ 8 ("I usually have to do some groping around the first time I visit a new website, but I did not have many difficulties at all on Target.com"); Dave Wilkinson Dec. ¶ 5 ("I was able to navigate and use the features on the site with little or no difficulty. When I did encounter an obstacle, or when a process was unclear, I was able to work my way around the obstacle without any significant difficulty.").

In response, plaintiffs note that defendant's declarants are not typical blind shoppers but "web olympians" with unusually high levels of skill in web technology; individuals who enjoy the challenges of troubleshooting and the difficulties of overcoming barriers on a given website. See, e.g, Wilkinson Dep. at 8:22–9:5; 106:16–24, 108:13–23; Dawn Wilkinson Dep. at 7:12–8:8, 11:1–23; Tritten Dec. at ¶ 2.

However, defendant also draws the court's attention to statements in the deposition testimony of the eight declarants which were submitted by plaintiffs in support of their motion; statements that bring into question plaintiffs' claims of inaccessibility. For example, many of the declarants admitted to spending a relatively short time on the website before concluding that the website was inaccessible. See, e.g., Volonte Dep. at 29:19–23 (spending no more than "a few minutes on the website"); Uttermohlen Dep. at 26:9–11; Ayala Jacobson Dep. at 44:22–45:18. Moreover, at least one declarant admitted to regularly visiting Target.com to conduct detailed "product searches" before going to a Target store to purchase the chosen products. Jacobson Dep. at 48:12–51:12 (noting that "it's easiest sometimes to look at a website to see what products are available before we go there. . . . I recall looking for specific products more than once in some cases, but my intention was to see what products were available").

23

It is evident from the foregoing that it would be premature for this court to rule on an injunction as there are sufficient questions raised with respect to whether the average blind person is able to access Target's website. Additional discovery is required before the trier of fact can adequately make this determination. Moreover, the current motion is not one brought to maintain the status quo and plaintiffs can point to no emergency that "tips the balance of hardships" in their favor. Rather, in this motion, plaintiffs seek an order by the court directing Target to take affirmative steps, with the attendant monetary and man-hour expenditures, to change the programming of its websites to accommodate the blind. The Ninth Circuit has clearly stated that such requests for mandatory relief are disfavored and should be denied absent a showing that the relevant law and facts are clearly in favor of the moving party. See, e.g., Stanley, 13 F.3d at 1320 (declining to grant an injunction compelling a university to "hire a [coach] at a substantially higher rate of pay than she had received prior to the expiration of her employment contract . . . .") Plaintiffs cannot make this showing and thus their motion is denied without prejudice. After full discovery has been conducted plaintiffs are at liberty to move for a permanent injunction.

CONCLUSION

Defendant's motion to dismiss plaintiffs' complaint is GRANTED in part and DENIED in part. Plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

Date:   September 5, 2006

_____
MARILYN HALL PATEL
United States District Judge
Northern District of California

24

UNITED STATES DISTRICT COURT
For the Northern District of California

ENDNOTES

1.  Unless otherwise noted, background facts are taken from plaintiffs' complaint.

2.   Defendant cites to the legislative history of the ADA and the Rehabilitation Act as evidence that Congress did not intend the ADA to apply to websites.  Specifically, defendant contends that since Congress has amended the Rehabilitation Act to require that federal government websites be accessible to the blind, but has not similarly amended the ADA, Congress has refrained from imposing accessibility requirements on private websites.  See 29 U.S.C. § 794(d).  Plaintiffs respond that in passing the ADA, Congress sought to eliminate a broad range of discrimination against the disabled, and intended the ADA to keep pace with technological change.  See 42 U.S.C. § 12101(b); H.R. Rep. No. 101-485, pt.2, at 108 (1990).  At oral argument, however, the parties conceded that the ADA does not explicitly mention websites.  It is clear that the legislative history of the ADA is inconclusive on the issue of the regulation of private websites and the court declines to draw an inference from the absence of congressional action.

3.  The examples listed by the ADA as examples of places of public accommodation provide support for the notion that such an entity must be a physical place.  They include: inns, hotels, restaurants, motion picture houses, auditoriums, bakeries, laundromats, museum, parks, zoos and health spas.  See 42 U.S.C. § 12181(7)(A)-(L).

4.  It appears from a review of the website in question—which the court notes is not in evidence but nonetheless does raise some questions—that Target treats Target.com as an extension of its stores, as part of its overall integrated merchandising efforts.  See www.target.com. This suggests to the court that perhaps with more evidence, the court's determination of what may be covered under the ADA in this kind of integrated merchandising may be subject to amendment.  The website is a means to gain access to the store and it is ironic that Target,  through its merchandising efforts on the one hand, seeks to reach greater numbers of customers and enlarge its consumer-base, while on the other hand it seeks to escape the requirements of the ADA.  A broader application of the ADA to the website may be appropriate if upon further discovery it is disclosed that the store and website are part of an integrated effort.  Parties may file briefing on this issue later if the court deems it appropriate.

5.  Specifically, defendant argues that, under section 51(d) of the Unruh Act, a business establishment must make a modification only if another provision of law requires the modification in question.  According to defendant, no statute requires modification of websites to ensure that they are accessible by the blind.  The Unruh Civil Rights Act provides that:

> Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall anything in this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

25

Cal. Civ. Code § 51(d).