National Federation of the Blind et al v. Target Corporation Doc. 91 Att. 5

# EXHIBIT E

Dockets.Justia.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

\- - - - - - - - - - - - - - - -

NATIONAL FEDERATION OF THE BLIND, et al.,

Plaintiffs,

v.

TARGET CORPORATION,

Defendant.

Case No. C 06-01802 MHP

\- - - - - - - - - - - - - - - -

DEPOSITION OF BRUCE F. SEXTON

TUESDAY, MAY 23, 2006

BY: CHRISTINE L. JORDAN, CSR NO. 12262

1320 ADOBE DRIVE

PACIFICA, CALIFORNIA 94044

(650) 359-3201

Tuesday, May 23, 2006 1:43 P.M.

BRUCE F. SEXTON,

having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

EXAMINATION

BY MR. PLUNKETT:

**Q. Mr. Sexton, my name is Stuart Plunkett. I represent Target Corporation in this action.**

**Could you state your name and spell it for the record.**

A. Bruce Sexton. B-R-U-C-E; Sexton, S-E-X-T-O-N.

**Q. What is your current address?**

A. My current address is 242 -- no, sorry. 2415 Dwight Way, Berkeley, California, 94104 -- no, 107 (sic). Sorry. I just moved there not too long ago.

**Q. When did you move there?**

A. In August.

**Q. Okay. What was your prior address?**

A. It was in Dublin.

**Q. All right. How long were you in Dublin?**

A. All my life pretty much.

**Q. What's your date of birth?**

A. 11/25/1981.

**Q. Have you ever had your deposition taken before?**

A. No.

**Q. All right. I just want to give you a few preliminary instructions which you may have heard from counsel at some time. But just as a reminder, your testimony today is under oath, and you're sworn to tell the truth as if you were in a court.**

**The deposition will proceed in a question-and-answer format, and it's being transcribed by the court reporter. The court reporter can only take down one person's voice at a time, so I'll do my best to let you finish answering before I start another question. Hopefully you can do the same with respect to my questions.**

**Your counsel may state objections on the record. You should give him an opportunity to do that before you answer. Unless you're instructed by your counsel not to answer a question, you should go ahead and answer it if you understand the question, which raises another point.**

**If at any time you don't understand my questions, feel free to ask me to rephrase the question**

**or to define some term in the question or even to ask the court reporter to read back the question before you answer it. I want to make sure you understand every question that's asked before you answer it.**

**When the transcript is prepared after the deposition is concluded, you'll have an opportunity to review it and to make any changes. But you should be aware that we would be entitled to comment on any changes that you made after the deposition is completed which is why I ask that you give complete and accurate answers while we're here in the deposition.**

**If at any time during the deposition you want to take a break, just ask and we can take a break any time. Similarly, I'm going to feel free to take a break any time I want if that's okay with you.**

**Is there anything preventing you from proceeding with this deposition and from giving full and complete answers?**

MR. KONECKY: That's a new question, right, Counsel, after your preparatory remarks?

MR. PLUNKETT: Yes.

MR. KONECKY: Okay.

THE WITNESS: Could you repeat the question?

MR. PLUNKETT: Right.

BY MR. PLUNKETT:

**Q. Is there anything preventing you from proceeding with the deposition today and providing complete and accurate answers to questions?**

A. There's nothing preventing me from answering questions today, no.

**Q. All right. One of the common answers that -- or withdraw.**

**One of the reasons for asking that question is in case a witness is on medication or is not feeling well or something like that at the time of the deposition. So that's the type of information I was attempting to elicit, and it sounds like the answer to that is no, and you're fine to proceed; is that right?**

MR. KONECKY: Well, that's overbroad.

You can tell him if you're on any medication or there's anything else that would prevent you from -- as far as you know from testifying truthfully and accurately. But I think that's all the information he's seeking.

THE WITNESS: I'm ready to proceed. There's no -- nothing that I know of to -- that would prevent me from doing this.

MR. PLUNKETT: All right.

**Q. Just to be clear, I was asking for a list of sites that you consider to be accessible. And I know you listed Walmart.com and then you said "shopping." Is shopping a website?**

A. Oh, I'm sorry. What I meant was Safeway.com, shopping in places like Safeway or Albertsons.com, that sort of thing.

**Q. And are the websites that we've just talked about websites that are accessible to you using your adaptive technology?**

A. The websites that we've talked about are acceptably accessible to me, yes.

**Q. And what do you mean by "acceptably accessible"?**

A. They allow me to make purchases and navigate through their sites with -- with ease.

**Q. Are you able to identify any websites other than Target.com and Amazon.com that do not allow you to navigate through the sites and make purchases with ease?**

A. I've been to sites that -- that are -- like Amazon and Target I can recall. But I don't recall which ones they are. I didn't keep track of all of the ones I went to that were not accessible.

**Q. Can you tell me approximately how long you've**

**been making -- withdraw.**

**Can you tell me approximately how long you've been shopping using the Internet.**

A. I would say even since I was around, um, maybe 12, 15 -- between 12 and 15 years old is when I started shopping online.

**Q. When shopping online, have you ever found it necessary to make a telephone call to the website owner to ask him a question about using their site?**

A. I don't recall ever making a phone call to a person asking them about how to use their site.

**Q. Do you recall ever asking for help from a sighted person when shopping online?**

A. I -- I have asked sighted people to help if there's somebody available to help. Oftentimes, there's not. And I've also e-mailed many -- many different places to -- well, I wouldn't say many but places where I incur problems about their site and the accessibility thereof.

**Q. You're saying that you've sent e-mails to the website operator if you've had accessibility issues?**

A. I've sent e-mails to the person who I think is in charge of that portion of the site, yes.

**Q. Can you remember any particular instances when you've done that?**

A. I can't remember specific instances where I've ever done that. I just know that I have.

**Q. Did you do that with Target.com?**

A. I never sent, to my knowledge, any e-mails to Target.com.

**Q. In your declaration at paragraphs 19 through 27, you talk about your experience shopping at Target retail stores. When going -- have you ever shopped at a Target retail store by yourself?**

MR. KONECKY: Do you want to read a particular section of the declaration that you're referring to?

MR. PLUNKETT: No, unless it would help the witness to answer. That was my clever way of transitioning into a new topic.

MR. KONECKY: I thought you were looking at paragraph 19 where it says, "I have shopped at Target stores for several years by myself and with members of my family."

THE WITNESS: Right. Yes, I have shopped by myself.

BY MR. PLUNKETT:

**Q. And when you shopped at Target by yourself, how were you able to pick products out and complete a purchase?**

A. I -- I would go to a customer service representative and ask them to help me out if -- if I needed it.

**Q. When you requested that service, was it always available to you?**

A. Finding somebody to help me wasn't always easy.

**Q. Can you explain that?**

A. The Target stores are pretty big, and so finding somebody isn't always easy to do because of the size of the store, because of the availability of people not -- not lack of my skill or independence because that's one of the things I'm trained how to do, is shop independently.

**Q. So when you were -- when you overcame the difficulty of finding someone in a Target store, were you always provided with the service of having someone help you shop there?**

MR. KONECKY: Objection; vague and ambiguous, assumes facts not in the record.

You can answer.

THE WITNESS: To my knowledge, I was always given service. The quality thereof may not have been the kind that I -- I would have liked. For example, I oftentimes bring somebody with me who -- who knows how

to describe products to me and what not to do with a blind person, such as to -- to only give me one option.

And I've had problems with customer service. Sometimes they'll say, "Well, this is -- this is a product, and that's what we have available." Yet when I go into the store when I hire somebody to come with me to do the same service, they might tell me that there's a lot -- a lot of options on the shelf and which ones they are because they are -- they're specifically hired to do that job with me.

**Q. Approximately how many times have you shopped at a Target store with the assistance of Target personnel?**

MR. KONECKY: Objection; overbroad.

THE WITNESS: I've been shopping at Target probably since I was -- independently since I was around 12 years old, and I'm 26 now. So whatever the average would be for somebody in that age range, it's probably around that. I mean, I'm just as avid of a shopper as anybody else.

BY MR. PLUNKETT:

**Q. Would you say approximately once a month -- withdraw.**

**Just to be clear, I'm asking about the times that you have gone to Target and shopped with the**

**assistance of Target personnel and not the times that you've gone to Target with somebody else. And I believe in your declaration -- I know in your declaration you say you've done both.**

A. Right.

**Q. So just to be clear, I want to limit my question to those times when you have shopped at Target with the assistance of Target personnel.**

**Can you estimate the approximate number of times you've done that?**

MR. KONECKY: Objection; vague and ambiguous and overbroad.

THE WITNESS: More often than not I have gone with somebody. So the number of times is probably few and far in between; though, I do do it and I have done it. I can't give you a number. I'm sorry.

BY MR. PLUNKETT:

**Q. Okay. And I don't want an exact number, but unfortunately we do need to have your best estimation.**

**Has it been more than ten times, if you know?**

A. Probably --

MR. KONECKY: I'm going to object as the preparatory remarks, and it's been asked and answered.

But you can answer again.

THE WITNESS: Probably more than ten times.

BY MR. PLUNKETT:

**Q. More than 20 times?**

A. I -- I don't -- I don't know if it's been more than 20 times. Probably between 10 and 35 times, if I had to guestimate.

**Q. And you mentioned earlier that there have been times when the quality of service was not up to par. On approximately how many of those occasions was the quality of service provided not up to par?**

MR. KONECKY: Objection; vague and ambiguous, overbroad.

THE WITNESS: I'd say about 70 percent of the time that I -- I go and use customer service it's -- it's poorer quality than what I would get if I brought somebody myself.

BY MR. PLUNKETT:

**Q. You mentioned that one of the problems is that you're not told about all of the options for a particular product; is that right?**

A. Yes.

**Q. Can you identify any other problems with the customer service you've experienced?**

A. Well, as I said before, not being able to find them because the fact that they're -- they're not around is -- is a problem. They don't always offer to

help -- help me. They don't come up to me necessarily within the first 10 or 20, sometimes 30 or 40 minutes that I'm there which, in my mind, if you're there for five minutes and you're blind, alone, they should come up to you and say, "Oh, can I help you," you know. It's just courtesy, common, nice thing to do.

**Q. Have there been customer service problems other than not being able to find someone and not being pointed out the different options of a particular product?**

MR. KONECKY: Objection; asked and answered.

You can continue.

THE WITNESS: I'm sure there have been, but I can't -- I can't recall.

BY MR. PLUNKETT:

**Q. You mentioned that you've waited at a Target store for 40 minutes before someone came up to you; is that correct?**

A. I --

MR. KONECKY: Objection; vague and ambiguous.

THE WITNESS: I think what I said is something between 10 and 40 minutes. And I'm not just standing there waiting for somebody; I'm actively looking for somebody to help me.

MR. PLUNKETT: Can you read the answer back.

(Record read as follows:
"ANSWER: I think what I said is something between 10 and 40 minutes. And I'm not just standing there waiting for somebody; I'm actively looking for somebody to help me.")
BY MR. PLUNKETT:
**Q. What's the longest you have looked for someone to help you before you found them?**
A. I can't -- I can't estimate that. I don't know.
**Q. Of the between 10 and 35 times that you've sought assistance at Target to help shop on your own, how many times or what percentage of the times did it take longer than you thought it should have to find someone to help you?**
A. I would guess between 25 and 35 percent of the time.
**Q. On the occasions that you shopped at Target on your own with the assistance of Target, did Target ever refuse to provide you with assistance?**
MR. KONECKY: Objection; vague and ambiguous, compound.
THE WITNESS: I don't think I nor anyone else would ever be denied service. No, I have not been denied service once I've found somebody to -- to attend

to my needs.
BY MR. PLUNKETT:
**Q. How far is the closest Target from where you currently reside?**
A. I --
MR. KONECKY: That you know.
THE WITNESS: Huh?
MR. KONECKY: I'll object as to the extent it requires speculation.
That you know.
THE WITNESS: The only Target that I'm sure of that's close to where I live is probably 30, 30 to 40 miles from where I live.
BY MR. PLUNKETT:
**Q. Have you ever shopped at that Target?**
A. Yes.
**Q. When was the last time you went there?**
A. I went to that Target -- the last time I can recall was around August 2005.
**Q. And which location is that, by the way?**
A. That's in Dublin.
**Q. When you went there in August 2005, how did you get there?**
A. I hired a driver and went with that person into the store with myself, my mom and the driver.

**Q. Okay. Did you ask Target for assistance in shopping at that time?**
A. No, I did not.
**Q. Okay. Who assisted?**
A. The driver that drove us.
**Q. And have you been to a Target store since August 2005?**
A. I have not been to a Target since August 2005. I have been to the Target.com website since August 2005.
**Q. Right. I promise I'll get to that. Believe it or not.**
A. I'm sure you will.
**Q. Turning again to your declaration, which is Exhibit 1, paragraph 29, it states, "I have attempted on numerous occasions to access Target.com with my screen reader."**
**Is your screen reader JAWS?**
A. My screen reader that I've attempted to access Target.com with is JAWS, yes.
**Q. And are you able to tell me which versions of JAWS you used when you were trying to access Target.com?**
A. I used the most current versions of JAWS that was available during the time that I first -- first

recall accessing Target.com.
**Q. Are you able to identify those versions by number?**
A. No. I just know that it was the most current version.
**Q. What was the date of the first time you tried to access Target.com?**
A. I don't know what the date was that I first tried to access Target.com.
**Q. Can you give me an approximation?**
A. The time that I started keeping track of when I first may have accessed Target was around about a year ago.
**Q. Did you try to go to Target.com before that?**
A. I may have come across it through, like, a search over the Internet or something like that.
**Q. You said about a year ago you started keeping track?**
A. Yes.
**Q. What do you mean by that?**
A. I mean that that's when I -- I decided to remember that I went to Target.com, keep that in my mind.
**Q. All right. It says in here you've attempted on numerous occasions -- withdraw.**

that long ago that I did it, maybe within the last month or two.

**Q. Do you recall what the name of that browser setting is?**

A. My best guess would be Browser History.

**Q. And do you remember what you changed that option to?**

A. To three -- to retain 365 days rather than 20 days.

**Q. All right.**

**You testified that since January 2005 you've attempted to access Target approximately 20 times. Approximately how much time have you spent on Target.com since January 2005?**

A. On average or, I should say, the average amount of time that I spend on a website is probably --

MR. KONECKY: I'm going to interrupt you there. Focus on his question. You want to have it read back?

MR. PLUNKETT: I'll just repeat it because I think what happened is you started to testify about the average amount of time on a website generally.

BY MR. PLUNKETT:

**Q. My question is: How much time did you spend on Target.com since January 2005?**

A. I -- I don't know. I don't know.

**Q. Okay. Can you provide me with your best estimate?**

A. Several hours.

**Q. Several hours since January 2005?**

A. Yes, several hours since January 2005.

**Q. Paragraph 31 of your declaration states, "Upon accessing Target.com on several occasions, I have become frustrated with inexplicable code and garbled text that has prevented me from continuing to navigate through the site."**

**On these occasions when you encounter inexplicable code and garbled text, approximately how much time did you spend on the site before you left the site?**

MR. KONECKY: Objection; overbroad.

THE WITNESS: Could you repeat the question, please?

MR. PLUNKETT: Can you read it back.

(Record read as follows:

"QUESTION: Paragraph 31 of your declaration states, 'Upon accessing Target.com on several occasions, I have become frustrated with inexplicable code and garbled text that has prevented me from continuing to navigate

through the site.'

"On these occasions when you encounter inexplicable code and garbled text, approximately how much time did you spend on the site before you left the site?")

THE WITNESS: When I encounter inexplicable code and garbled text, I didn't spend much time on the inexplicable code and garbled text. I went other places on the site.

BY MR. PLUNKETT:

**Q. And so the inexplicable code and garbled text did not cause you to leave the site right away?**

MR. KONECKY: Objection; overbroad, misstates prior testimony.

THE WITNESS: Inexplicable code itself did not cause me to leave the site itself, that is, Target.com.

BY MR. PLUNKETT:

**Q. Can you describe for me where on the site you encountered inexplicable code and garbled text?**

A. From the very beginning of the site and -- at the very introduction of the site and also throughout the site.

**Q. And did the inexplicable code and garbled text prevent you from browsing for products on**

**Target.com?**

A. It was inexplicable and garbled. I don't know if it prevented me from -- from browsing for anything. It probably did because it's on the site and that's their main goal, is to sell products.

**Q. Do you recall an occasion when you accessed the home page of Target?**

A. Say that again, please.

**Q. Do you ever recall going to the home page of Target and navigating past the home page to other pages?**

A. I have traveled past the home page of Target.com.

**Q. Did you use a link on the home page to do that?**

A. I most likely used a link on the home page to go past that -- past that site.

**Q. Do you remember what link or what type of link you used to navigate past the home page?**

A. The link was much like any other link that went from one page to the next.

**Q. Do you remember how the link was identified?**

A. I don't remember the specific title of the link.

**Q. All right. Do you remember on the home page**

**a link to departments for shopping on Target.com?**

A. It seems to me that there were links to different sections of Target.com.

**Q. And were those links usable with JAWS -- withdraw.**

**Were those links accessible with JAWS?**

MR. KONECKY: Objection; vague and ambiguous, overbroad.

THE WITNESS: JAWS -- JAWS can click on almost any link. Whether I know what -- where it's going to go does -- is a different story.

BY MR. PLUNKETT:

**Q. Do you remember links on Target's home page to the various shopping departments that were described to you through JAWS that enabled you to know where the link would take you if you clicked on it?**

MR. KONECKY: Objection; compound, vague and ambiguous.

THE WITNESS: To the best of my knowledge, there were links that were on Target.com that got me from the home page to another site. And they were descriptive enough for me to know approximately where I was going but not all of them.

BY MR. PLUNKETT:

**Q. Paragraph 30 of your declaration states, "I**

**have found it extremely difficult, and at times impossible, to browse for products on Target.com using my screen reader if I do not have a specific item in mind."**

**Can you explain what you mean by that?**

A. When -- when I click on a link, it brings me to a page. And as I recall, the experiences I've had with Target have been that the links don't link to specific retail items that I can reasonably or even find at all in -- in graphic detail unless I do a search.

**Q. What do you mean that you can't find the item at all in graphic detail?**

A. Um, so if I link to a site where there may or may not be products, um, I don't know my -- the website isn't giving me enough -- or me or JAWS enough information to know what is on the site.

**Q. Your declaration says that, "At times it has been extremely difficult and at other times impossible to browse for products."**

A. Uh-huh.

**Q. Can you recall an occasion when it was impossible?**

A. I -- I think that's sort of what I was trying to describe in the last answers. Most of the time that

I've ever found an actual product, I've had to do a search. When I've found an actual -- when I've tried to browse link by link, I really haven't been able to browse the site in a way that I could really find a myriad of items that I -- I don't exactly know what -- what may or may not be.

If I'm looking for household items and I don't know what specific item I'm looking for, I cannot use the interface to just browse.

**Q. All right. You have to use the search function to search for a particular product?**

A. A specific product. And that's most of the time. I'm not sure if it's all of the time, but I know that I -- I have rarely, if any a time at any time, been able to -- to actually browse the Internet and just find a product.

**Q. Okay. Well, let's take those one at a time and start first with the search function.**

**Have you had any difficulties using the search function when you have a product in mind and you're going to search for that particular product?**

MR. KONECKY: Objection; vague and ambiguous, compound, assumes facts not in the record.

You can answer.

THE WITNESS: Could you repeat the question?

MR. PLUNKETT: Can you read it back.

(Record read as follows:

"QUESTION: Well, let's take those one at a time and start first with the search function.

"Have you had any difficulties using the search function when you have a product in mind and you're going to search for that particular product?")

THE WITNESS: The search function is -- in my mind it is a text box that I write something in and press the search button. I've been able to successfully do that.

BY MR. PLUNKETT:

**Q. And after searching for a product and the page comes up with a product on it, have you ever added the product to the cart?**

A. I don't understand the question exactly. I mean, there's processes that I go through and you're jumping from searching to buying something.

**Q. Okay. Well, then let me back up.**

**After you enter the text in the box for the product you're searching for, I assume that you hit the function key to search; is that right?**

A. That's correct.

**Q. Then what happens next?**
A. After that, a page with products comes up.
**Q. All right. And have you been able to navigate that page to find the product you want and add it to the cart?**
MR. KONECKY: Objection; compound.
THE WITNESS: I've had difficulty navigating through the -- that part of it -- part of the site after it's -- after I've done a search.
BY MR. PLUNKETT:
**Q. Have you ever been able to do it -- withdraw.**
**Have you ever been able -- withdraw.**
**I understand that you've had difficulty navigating a page that it goes to. My question is whether you've been able to do it to find the item you want and to add it to the cart.**
MR. KONECKY: Objection; vague and ambiguous, compound.
THE WITNESS: I've been able to put a product in a shopping cart, but I don't know that I've ever been able to put the exact make and model, color that I've wanted into that shopping cart.
BY MR. PLUNKETT:
**Q. So you have added an item to a cart that you've searched for, correct, but you're just not sure**

**if that was the item you intended to add to the cart; is that what your testimony is?**
MR. KONECKY: I object. It's been asked and answered, and the testimony will speak for itself.
You can answer it again.
THE WITNESS: I'm not sure that the product that I -- I am selecting to go into the cart is the product -- the product that I want.
BY MR. PLUNKETT:
**Q. Why not?**
A. Because the description -- from my experience, the description of what I've looked for and the -- the way the page is set up, the way -- yeah, the way the page is set up, it reads the description of the item, the -- the price and the like, the make or the model of the item in such a way that it's confusing which one goes to which item. That's why when I put it in my cart it's confusing.
**Q. If I understand your testimony, you have clicked the add to cart button and added an item to a cart, right?**
MR. KONECKY: I'll object to it being compound, vague and ambiguous.
You can answer it.
THE WITNESS: If -- if the actual button is

called "add to cart," then I have been able to put it into a place where it's -- it would be considered checking out, or a cart.
MR. PLUNKETT: All right.
BY MR. PLUNKETT:
**Q. After you added an item to a cart, were you able to use -- withdraw.**
**After you added an item to a cart, could you verify at that time whether or not the item in the cart was the item you intended to put in the cart?**
MR. KONECKY: Objection; overbroad.
THE WITNESS: At the time that I put an item into the cart, it -- it seems to me that it was verified that I put what I put there. And if it was what I wanted, it told me if it was something I wanted or didn't want, I think.
MR. PLUNKETT: I'm sorry, I'm not sure I understand your answer. So let me rephrase the question.
BY MR. PLUNKETT:
**Q. Did you ever attempt, after adding an item to the cart, to use some function on the website to verify whether or not the item in the cart is the item you intended to put in the cart?**
A. Well, I used JAWS to go through the site and

the site then had a product that I put into the cart. But it was also trying to sell me, as I recall, some of the other products. So eventually I think I was able to determine what the item was that was actually in the cart that I added rather than the surrounding products.
**Q. So after you navigated past the other links that were trying to sell you other products, you were able to tell what was added to the cart; is that right?**
MR. KONECKY: Objection; overbroad.
If you can answer.
THE WITNESS: Could you ask the question again?
MR. PLUNKETT: Sure.
BY MR. PLUNKETT:
**Q. After you added an item to the cart, I understand that a page came up that you said was trying to sell you other products. After you on that page navigated past the links that were trying to sell you other products and you got to the cart, you were able to identify the item that had been added to the cart; is that correct?**
MR. KONECKY: Objection; vague and ambiguous, assumes facts not in the record, overbroad.
You can answer.
THE WITNESS: I don't understand the

question. I'm -- maybe I'm getting tired or something.
MR. PLUNKETT: Okay.
THE WITNESS: It's a lot of information in that question.
MR. PLUNKETT: I'm sorry about that. My question is probably confusing.
THE WITNESS: Uh-huh.
BY MR. PLUNKETT:
**Q. You said that a page would come up after you added an item to a cart where Target.com was trying to sell you other products; is that correct?**
A. Yes. Another page would come up and there would be the product that I put in the cart and other products.
**Q. Were you able to tell what item you put in the cart?**
MR. KONECKY: Objection; overbroad.
THE WITNESS: I'm almost certain at one point or another I was able to tell with a bit of difficulty which product I had put into the cart.
BY MR. PLUNKETT:
**Q. What was the difficulty you encountered?**
A. The general navigation of the page, the ambiguity of what was in the cart versus what was trying -- what was an extra item trying to be sold to

me from Target.com.
**Q. Was there a place on the page -- withdraw.**
**Was there -- withdraw.**
**Did the website identify for you how many items were in the cart?**
A. I don't recall.
**Q. Have you ever seen an element on the page that identifies for you how many items are in the cart?**
A. I don't recall.
**Q. Did you ever look for that?**
A. I don't recall.
**Q. After navigating through these difficulties and identifying the item that was in the cart, were you able to determine whether that was the item you had intended to add to the cart?**
MR. KONECKY: Objection; overbroad, vague and ambiguous, assumes facts not in the record, asked and answered.
You can answer.
THE WITNESS: The -- could you repeat the question?
MR. PLUNKETT: Could you read it back.
(Record read as follows:
"QUESTION: After navigating through these difficulties and identifying the item that

was in the cart, were you able to determine whether that was the item you had intended to add to the cart?")
THE WITNESS: Sometimes I was able to identify that it was the -- the wrong item that I didn't want to add to the cart, and sometimes I was able to identify that it was close to the right item that I wanted.
So for instance, it may have been a towel that I wanted, but it may not have been the color blue that I wanted. But I don't recall whether, if ever, I've actually gotten the actual product, color, and brand that I wanted in the cart.
BY MR. PLUNKETT:
**Q. You can't recall an occasion when you were able to verify that you added the correct item to the cart?**
A. Not -- not a correct item but something that was to -- to my liking, my specifications, if you will. So ...
**Q. When you say that the item was not to your specifications, do you mean it was not the product you intended to add to the cart?**
A. When I said not to my liking, I meant that it's the one that I didn't intend to put into the cart.

**Q. What did you do on those occasions when you verified that the item in the cart is not the one you wanted in the cart?**
MR. KONECKY: Objection; overbroad.
THE WITNESS: Well, I've done several different things on several different occasions.
BY MR. PLUNKETT:
**Q. What are the different things you've done?**
A. One occasion I -- I tried to purchase the item anyways.
**Q. And what happened when you tried to do that?**
A. It brought me to -- let me start over.
When I -- when I tried to buy the product, it brought me to another page asking whether I was certain I wanted to buy products -- this is paraphrasing. I don't know exactly what it said, but it -- the gist is that it asked me if I wanted to buy other products and if I was sure I wanted to buy the products in my -- in my cart. That's the gist of it.
**Q. And what did you do next?**
A. I pressed another button that said something like "go to the next step" or "make a purchase."
**Q. And then what happened, were you able to complete the purchase?**
A. No, I was never able to complete a purchase.

**Q. What happened when you attempted to complete the purchase?**
A. It just kept circling around that -- that process that I just described to you.
**Q. And just so the record is clear, that process is that it would continue to offer you additional items to buy, that's what it kept circling back to?**
A. And am I sure that I wanted to buy that product that I had put in my cart.
**Q. Did you ever see a button on Target.com called "proceed to checkout"?**
A. I never -- I never encountered a button that said "proceed to checkout" or -- that may -- may or may not be true. I don't know if that's the button that kept circling me around or if it was the one that I never encountered.
**Q. Did you ever -- withdraw.**
**In your times visiting Target.com, did you ever arrive on a page requiring you to sign in or create a new account?**
A. Could you repeat the question?
**Q. In your times using Target.com, did you ever arrive at a page requiring you to sign in or create a new account?**
A. Could you be more specific?

**Q. Well, all right, I'll represent to you that there is a page on Target.com that requires a user to sign in with an e-mail and a password or to create a new account.**
**Did you ever arrive at a page like that?**
A. Could you be more specific?
**Q. I don't know if I can be more specific than that.**
A. Okay.
**Q. And I'm just asking for your best recollection sitting here.**
MR. KONECKY: Well, maybe you should ask a different question.
I mean, answer it if you can.
But there's been an expression that the witness doesn't understand the question.
THE WITNESS: Yeah, I don't --
MR. KONECKY: You can answer, or you can ask another question.
THE WITNESS: Could you ask me another question? I don't quite understand that one.
BY MR. PLUNKETT:
**Q. Do you ever recall being on a page on Target.com where you were asked to sign in?**
A. I'm having the same problem with that

question. I don't understand what you're asking.
**Q. Gosh, I don't know if I can be much more specific, but I'll try.**
A. Okay.
**Q. Do you recall ever being on Target.com and being prompted for your e-mail address or for a password?**
A. I tried to sign up for e-mail ads or something like that at Target.com.
**Q. Can you recall being on any other page where you were prompted to enter your e-mail address?**
MR. KONECKY: Any other page on Target?
MR. PLUNKETT: Correct.
THE WITNESS: I think I tried applying for a Target credit card on Target.com.
BY MR. PLUNKETT:
**Q. What do you remember about that?**
A. That I went through the form and stopped midway through and did not come back to it, didn't finish it.
**Q. What information was that form asking you for?**
A. The basic information that credit card companies need to -- to give you a credit card -- name, address, those sorts of things.

**Q. And why did you not complete the form?**
A. Because at the time I did not -- I did not wish to proceed with the application.
**Q. Did you ever arrive on a page on Target.com that asked you for any information about shipping?**
A. I don't recall ever coming to a point where it asked about shipping.
**Q. Do you recall ever arriving on a page that asked you for information about payment type?**
A. I'm almost certain that I did not incur any page like that.
**Q. We were talking earlier about the website circling around and taking you back to the same area where it asked you if you were sure if you wanted to buy. Can you provide me with an estimate of the amount of time you spent trying to get out of that circle?**
MR. KONECKY: Objection; overbroad, vague and ambiguous.
THE WITNESS: I probably spent 15 to 20 minutes trying to not only get out of that circle but find the -- the place where I could actually make a purchase, a button or a link, so on and so forth.
BY MR. PLUNKETT:
**Q. Do you know if at the time you were looking for that button or the link to make a purchase you were**

BY MR. PLUNKETT:

**Q. Do you know what insert-Z does on JAWS? Are you familiar with that function?**

A. I've -- I've used it before, but I'm not sure that I know exactly what it does.

**Q. Okay. Are you familiar with the concept of turning the virtual concept off and tabbing through the elements of a page using the PC cursor?**

A. Yes. I'm familiar with that, yes.

**Q. Did you attempt to do that in navigating this page we've been talking about?**

A. Yes, I used the virtual PC cursor with the JAWS cursor off to navigate through the page.

**Q. Did you ever tab through the page with the virtual cursor turned off?**

A. I don't know that I did.

MR. PLUNKETT: We could take a break now.

MR. KONECKY: Okay.

(Recess taken.)

BY MR. PLUNKETT:

**Q. I want to now talk about the problems you've had in browsing for products on Target.com. And maybe the best way to do that is to read what's in paragraph 33 of your declaration and then ask you about it.**

**At paragraph 33 it says, "In the summer of**

**2005, I attempted to purchase towels in preparation for moving into my dorm room the following fall. I searched Target.com for, quote, towels, unquote, and found several items. However, the numerous results were not matched with the different product descriptions. Because of this situation, I could not determine which product I wanted to purchase. I became so frustrated that I did not continue to the point where I could even attempt to complete a transaction on Target.com."**

**And my question is what you mean by your statement that the "numerous results were not matched with the different product descriptions."**

A. When I searched for "towels," many -- many different brands and sizes and colors of towels or whatever came up from that search were the numerous part.

**Q. Is this the -- this was the result of a search. Is this the same problem you experienced when you were browsing on the website, that you couldn't match the product descriptions with the item?**

A. While browsing I rarely found products that -- that I -- I rarely found products, period.

**Q. Can you explain to me what you mean by you couldn't find products when browsing?**

A. I didn't get the same list of type of products. For instance, "towels," I didn't get that broad of a selection. I didn't even get a selection of towels. I might have gotten -- I may have gotten soaps and bathroom products but not -- so more broad categories rather than the specific.

**Q. Okay. Well, I'll represent to you that from the Target home page there are links to departments such as Women, Men, Baby, Kids, Home, Bed and Bath, Furniture, et cetera.**

**Do you recall those links being at the top of the Target page?**

A. I seem to recall hearing those links.

**Q. Did you ever attempt to go into, for example, the Bed and Bath department using that link to find a specific product category like towels or soap?**

A. I think that is the process I went through.

**Q. And you were not able to find a product categories using that process?**

A. After clicking on the link, I don't know exactly where it brought me. But I know that it frustrated me to no end, wherever it did bring me, and I wasn't able to find that specific product line.

**Q. What caused that frustration?**

A. The inability to navigate the next or the

preceding pages.

**Q. Despite the frustration that you experienced in trying to navigate the previous pages, when you arrived at the department page like Bed and Bath or Home, did you ever attempt to search through the links and try to find more specific product categories like towels or soap?**

MR. KONECKY: Objection; compound.

THE WITNESS: Could you rephrase the question?

MR. PLUNKETT: I was afraid you were going to ask that.

THE WITNESS: Sorry.

BY MR. PLUNKETT:

**Q. When you would browse on Target.com and you would go to an area like Home, I believe your testimony is that the links on the page were frustrating and it was frustrating to navigate.**

**My question is whether or not you nonetheless attempted to search on that page for links to more specific product categories like towels.**

A. Uh-huh.

MR. KONECKY: Vague and ambiguous, overbroad.

THE WITNESS: I think what happened, the process that I went through was to browse broad

categories and then it reminded me of more specific things that I might want. That's not usual -- generally the way I would like to browse a website. But once I found that I had a specific thing in mind, because of that trigger, I think what I did is is search. I think that would be accurate to say. That was a long process, and it wasn't fun.

BY MR. PLUNKETT:

**Q. Were you able to look at product descriptions on Target.com?**

MR. KONECKY: Objection; overbroad.

THE WITNESS: It seemed to me that I -- I was able to see certain parts of the product description and it seemed to me that there was missing parts. But since I couldn't tell whether they were there or not, I don't know.

BY MR. PLUNKETT:

**Q. I'm going to ask you about some of the other features on Target.com to see whether or not you have attempted to access and use them. One of the features on Target.com is a Store Locator. Have you ever attempted to use that feature?**

A. I don't recall using that feature.

**Q. Another feature is the Wedding Registry. Have you ever attempted to use that?**

A. My sister was married last May, and she had certain gifts in her own profile. I may have come across Target.com then.

**Q. Do you recall attempting to make a purchase from a wedding registry on Target.com?**

A. I don't recall.

**Q. Do you ever attempt to use the Baby Registry on Target.com to either register or to make a purchase?**

A. No, I don't -- I don't have any babies.

**Q. Did you ever try to purchase a product off the Baby Registry for someone else?**

A. No, I don't think so.

**Q. When you experienced some of the difficulties you described on Target.com, did you ever attempt to contact somebody who is either an expert in JAWS or th product -- the JAWS product maker to try to figure out how you might work around that problem?**

A. Could you repeat the question?

**Q. Yeah.**

**When you encountered difficulties on Target.com, did you ever attempt to talk to the makers of JAWS or to someone who may be more familiar with JAWS to see if there was a work-around?**

A. I spoke to many people about -- about whether JAWS would be able to use Target.com's website more

efficiently.

**Q. And other than attorneys, who did you have those conversations with?**

A. I've had conversations with friends and acquaintances.

**Q. Okay. What was the nature of those conversations?**

A. The nature of the conversations were about whether they were able to access Target more efficiently than I had.

**Q. Okay. And what did they say to you?**

MR. KONECKY: Objection; overbroad, vague and ambiguous.

BY MR. PLUNKETT:

**Q. I don't want to take them one at a time any more than anybody else wants me to. So if you could just describe to me generally what they said, but if there are significant differences, please identify them.**

A. Most people said that they've had difficulties navigating through Target.com's website.

**Q. Have you ever talked to another blind person or legally blind person who was able to make a purchase on Target.com without the assistance of a sighted person?**

A. I have never talked to somebody who has told me that they have been able to make a purchase at Target.com.

**Q. Did the people you talked to describe similar difficulties -- withdraw.**

**Did the people you talked to describe difficulties that were similar to the ones you've described today?**

A. I don't know if they went into so much detail as I described today, but it seems to me that they described similar situations.

**Q. All right. Have you ever tried to use a screen reader other than JAWS to access Target.com?**

A. I have not used any other screen reader than -- other than JAWS to access Target.com.

**Q. Did you at any point try to contact Target.com about any of the difficulties you were experiencing on the website?**

A. I was under the impression that people -- other people who -- who have -- other people have had been contacting Target.

**Q. What do you mean by that?**

A. I mean that I -- if ever I had the inclination to -- to complain to Target.com, I was under the impression that -- I already knew that other

people would be -- were -- or were looking into doing that -- going through that process.

**Q. What other people? Are you talking about in the litigation?**

A. I'm talking about the other people like people in the National Federation of the Blind.

**Q. Okay. Well, I guess my question is a little different, and that is: When you personally were using Target.com to try to make purchases and you encountered difficulties, did you ever attempt to contact Target.com in that context to try to get help completing your purchase?**

MR. KONECKY: Objection; vague and ambiguous. He's already testified that -- well, I'm not going to repeat his testimony, but your question is vague and ambiguous.

THE WITNESS: Could you ask the question again?

MR. PLUNKETT: Can you read it back.

(Record read as follows:

"QUESTION: Well, I guess my question is a little different, and that is: When you personally were using Target.com to try to make purchases and you encountered difficulties, did you ever attempt to contact

Target.com in that context to try to get help completing your purchase?")

THE WITNESS: I would say the only attempt I have made is through the National Federation of the Blind --

MR. PLUNKETT: All right.

THE WITNESS: -- to contact Target.

BY MR. PLUNKETT:

**Q. If you had wanted to contact Target.com while you were using the website to ask for help in completing a purchase, would you know how to do that?**

MR. KONECKY: Objection; incomplete hypothetical, calls for speculation. It's also vague and ambiguous given the prior testimony.

THE WITNESS: I'm pretty confident that I could have found a way to contact Target to let them know that I was having problems with their site if that's what you're asking.

MR. PLUNKETT: That's what I'm asking.

BY MR. PLUNKETT:

**Q. How would you go about contacting them?**

MR. KONECKY: Other than through the NFB?

MR. PLUNKETT: Yes.

THE WITNESS: I don't know. I could call them. I could e-mail them. I would have to do some

research on that.

BY MR. PLUNKETT:

**Q. Did you ever do any research on that or, for example, attempt to obtain their 800 number or an e-mail address for customer support?**

MR. KONECKY: Objection; vague and ambiguous.

THE WITNESS: I don't recall ever doing that research, but I do know that I went through the NFB to make a complaint and I assume they have that information.

MR. PLUNKETT: Thank you very much for your time today. Those are all the questions I have.

MR. KONECKY: Deposition is concluded.

(At 4:50 P.M., the deposition proceedings concluded.)

________________________________

BRUCE F. SEXTON

CERTIFICATE OF REPORTER

I hereby certify that the witness in the foregoing deposition, BRUCE F. SEXTON, was by me duly sworn to testify to the truth, the whole truth and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of May, 2006.

________________________________

CHRISTINE L. JORDAN, CSR #12262
STATE OF CALIFORNIA