# EXHIBIT A

Dockets.Justia.com

TODD J. NEMOIR - 1.9.07

11:01  2    Q.   I will give you another explanation
11:01  3  that I neglected to give at the beginning.  If
11:01  4  your counsel objects, I'll still look at you to
11:01  5  get an answer, unless he actually instructs you
11:02  6  not to answer.  So he can object, but you still
11:02  7  have to answer, unless he -- unless he instructs
11:02  8  you not to answer.
11:02  9       Do you remember the question?
11:02 10       Do you want me to say it again?
11:02 11    A.   Please restate.
11:02 12    Q.   Okay.  Am I correct that -- that
11:02 13  Target.com is there not just for people to
11:02 14  purchase a product but also for customers to
11:02 15  browse an array of different products that are
11:02 16  advertised or put on the site?
11:02 17       MR. McDOWELL:  Same objection.
11:02 18       THE WITNESS:  Yes.
11:02 19  BY MR. KONECKY:
11:02 20    Q.   And it's there so that people can
11:02 21  browse for a variety of products?
11:02 22       Target.com is there so people can
11:02 23  browse for a variety of products without any
11:02 24  particular time limit or other pressure on them
11:03 25  to finish, is that correct?

TODD J. NEMOIR - 1.9.07

11:03  2       MR. McDOWELL:  Same objection.
11:03  3       THE WITNESS:  I don't know that
11:03  4  that's entirely accurate.
11:03  5  BY MR. KONECKY:
11:03  6    Q.   In what way is that not accurate?
11:03  7    A.   It -- it is not always the ultimate
11:03  8  strategy to make -- the efficiency of the guest
11:03  9  experience isn't always the ultimate strategy in
11:03 10  the way Target.com is designed.
11:03 11    Q.   But is -- is one of the strategies
11:03 12  with respect to Target.com's design to allow
11:03 13  customers to browse for products at their
11:03 14  leisure, either efficiently or without any
11:03 15  particular time pressure?
11:03 16       MR. McDOWELL:  Objection, beyond the
11:03 17  scope of the deposition, lacks foundation.
11:03 18       THE WITNESS:  Yeah.
11:03 19  BY MR. KONECKY:
11:03 20    Q.   Yes?
11:03 21    A.   Yes.
11:04 22    Q.   From sort of a descriptive or
11:04 23  logistical way of looking at it, how -- how does
11:04 24  an individual navigate through Target.com?
11:04 25       What do they have to do?

TODD J. NEMOIR - 1.9.07

11:04  2       MR. McDOWELL:  Objection, vague and
11:04  3  ambiguous.
11:04  4       THE WITNESS:  Can you specific to
11:04  5  what task the guest is trying to accomplish?
11:04  6  BY MR. KONECKY:
11:04  7    Q.   If a guest wants to navigate through
11:04  8  the products that might be available for sale at
11:04  9  either a Target store or on Target.com but using
11:05 10  Target.com in order to figure that information
11:05 11  out, what skills does that -- does the -- the
11:05 12  person using the website need to have in order
11:05 13  to figure out or perceive the information that's
11:05 14  provided on the website?
11:05 15       MR. McDOWELL:  Objection, lacks
11:05 16  foundation that any information on the website
11:05 17  has any bearing on what product is in Target
11:05 18  stores.
11:05 19       THE WITNESS:  I'm not specifically
11:05 20  involved in determining our Target guest and the
11:05 21  specific abilities that she might have.
11:05 22  BY MR. KONECKY:
11:05 23    Q.   Well, when -- you're involved in
11:05 24  designing the website to some degree, correct?
11:05 25    A.   Yes.

TODD J. NEMOIR - 1.9.07

11:05  2    Q.   Okay.  All right.  And when you
11:05  3  design the website, do you design it for people
11:06  4  with any particular skill level?
11:06  5    A.   None that I'm aware of.
11:06  6    Q.   There's no particular level of
11:06  7  Internet proficiency, for example, for which you
11:06  8  design Target.com's website, is that correct?
11:06  9    A.   Well, I -- I want to clarify.  We, as
11:06 10  part of Target, typically consider our -- our
11:06 11  core guest to be very educated and
11:06 12  technologically savvy, and that decision does go
11:06 13  into how we design certain components of our
11:06 14  experiences.
11:06 15    Q.   In order to be able to navigate
11:07 16  through the Target.com website, does somebody --
11:07 17  let me start that again.
11:07 18       Is the Target.com website designed so
11:07 19  that somebody has to be highly educated and
11:07 20  technologically savvy in order to navigate
11:07 21  through?
11:07 22       MR. McDOWELL:  Objection, lacks
11:07 23  foundation, beyond the scope.
11:07 24       THE WITNESS:  I don't think I'm the
11:07 25  best person to make that assessment.

Page 62

TODD J. NEMOIR - 1.9.07

11:07  2   BY MR. KONECKY:
11:07  3       Q.  Are you aware of -- of any
11:07  4   requirement in the design of Target.com for
11:07  5   users of any particular degree of education or
11:07  6   technological savvy in order to navigate through
11:07  7   the site?
11:07  8       A.  I'm sorry.
11:08  9       Could you repeat the question?
11:08  10      Q.  Sure.
11:08  11      MR. KONECKY:  Could you read back the
11:08  12  question?
11:08  13              *  *  *
11:08  14      (Whereupon, the reporter read back
11:08  15      the requested portion of the record.)
11:08  16              *  *  *
11:08  17      THE WITNESS:  There's not -- to the
11:08  18  best of my understanding, there's not a
11:08  19  particular education level or technological
11:08  20  ability that's dictated in any of the design
11:08  21  that we do.
11:08  22  BY MR. KONECKY:
11:08  23      Q.  Do you design Target.com so that it
11:08  24  is user friendly for the general public?
11:09  25      MR. McDOWELL:  Objection, lacks

Page 63

TODD J. NEMOIR - 1.9.07

11:09  2   foundation, beyond the scope.
11:09  3       THE WITNESS:  That is one of the
11:09  4   business objectives that it serves.  That is not
11:09  5   the only one.
11:09  6   BY MR. KONECKY:
11:09  7       Q.  And does the business objective of
11:09  8   making Target.com user friendly apply to users
11:09  9   with both high and moderate and low levels of
11:09  10  experience with the Internet?
11:09  11      A.  I've not been involved in any of
11:09  12  those conversations -- any conversations with
11:10  13  regard to differentiating users at that point.
11:10  14      Q.  Am I correct that the Target.com
11:10  15  design does not change or differentiate
11:10  16  depending upon the particular Internet skill set
11:10  17  or education level of the user?
11:10  18      A.  The experience is the same for users
11:10  19  of all experience levels.
11:10  20      Q.  The experience on Target.com?
11:10  21      A.  Correct.
11:10  22      Q.  Let's stick with sighted users of
11:10  23  Target.com for a moment.
11:11  24      I take it if you're accessing
11:11  25  Target.com as a sighted user, in order to

Page 64

TODD J. NEMOIR - 1.9.07

11:11  2   navigate through it, you need to be able to
11:11  3   read, is that right?
11:11  4       A.  Yes.
11:11  5       Q.  Okay.  And if you're using a mouse,
11:11  6   you need to be able to -- be able to move the
11:11  7   mouse and point and click, is that right?
11:11  8       A.  If you're using a mouse, yes.
11:11  9       Q.  Is there anything else you need to be
11:11  10  able to do as sighted user in order to navigate
11:11  11  through Target.com?
11:11  12      A.  I'm sorry.  I -- the question's a bit
11:12  13  vague for me.
11:12  14      Q.  All right.  In what way is it vague?
11:12  15      A.  I mean we assume that you're able to
11:12  16  process the information and understand and make
11:12  17  judgments as to what you might be interested in.
11:12  18      Q.  In terms of designing Target.com, at
11:12  19  least for sighted users, am I correct that it's
11:12  20  designed to be user friendly so long as the
11:12  21  person is able to read and process information
11:12  22  and use a mouse?
11:12  23      A.  The friendliness of the experience is
11:12  24  one of the components that we take into account
11:12  25  when designing an experience.  It is not the

Page 65

TODD J. NEMOIR - 1.9.07

11:12  2   only one.
11:13  3       Q.  Okay.  I understand it's not the only
11:13  4   one.
11:13  5       But is there anything else that a
11:13  6   sighted user needs in order to have a user
11:13  7   friendly experience on Target.com other than the
11:13  8   ability to read text and the ability to point
11:13  9   and click a mouse?
11:13  10      A.  I understand -- you asked the same
11:13  11  question.  I still think it's vague.  I mean
11:13  12  we're still making assumptions as to their --
11:13  13  the cognitive ability of the person to
11:13  14  understand the marketing messages we're
11:13  15  communicating.  We're making assumptions about
11:13  16  the tools they have available to access the
11:13  17  site.
11:13  18      Q.  Well, when you design or when Target
11:13  19  designs the website, is there anything else that
11:14  20  Target puts in the design of the website which
11:14  21  would require, at least for sighted users,
11:14  22  anything other than the ability to read and the
11:14  23  ability to point and click a mouse in order to
11:14  24  have a user friendly experience on the website?
11:14  25      MR. McDOWELL:  Objection, asked and

Page 82

TODD J. NEMOIR - 1.9.07

```
11:43  2    A.  I'm sure there is more, yes.
11:43  3    Q.  Is there anything else that you can
11:43  4  think of right now?
11:43  5    A.  No.
11:43  6    Q.  What about from moving from one page
11:43  7  to another on Target.com?
11:43  8        Is there anything that a sighted user
11:43  9  needs other than to be able to visually see the
11:43 10  -- the page and the link on the page and to be
11:43 11  able to mechanically use the mouse in order to
11:43 12  point and click on the link?
11:43 13    A.  No.
11:44 14    Q.  Are -- when -- when Target.com was
11:44 15  first designed, am I correct that it was not
11:44 16  designed with the particular needs of a blind
11:44 17  user in mind?
11:44 18    A.  I was not at the company when
11:44 19  Target.com was designed.
11:44 20    Q.  Looking at the design, particularly
11:44 21  prior to 2006, is it fair to say that it was a
11:44 22  design that was directed for sighted users as
11:45 23  opposed to blind users?
11:45 24    A.  The implementation of the design
11:45 25  would have been accomplished sticking to the
```

Page 83

TODD J. NEMOIR - 1.9.07

```
11:45  2  developer's existing guidelines which would have
11:45  3  provided direction to insure that the
11:45  4  functionality of the site was accessible by all
11:45  5  of our guests.
11:45  6    Q.  I'm correct that you've had to add or
11:46  7  would have to add features to the site in order
11:46  8  to make it -- in order to provide blind users
11:46  9  with the equivalent ease of use or the same
11:46 10  level of ease of use as sighted people?
11:46 11      MR. McDOWELL:  Objection, vague and
11:46 12  ambiguous.
11:46 13      THE WITNESS:  We've made changes to
11:46 14  the site to improve the guest experience for
11:46 15  people who use screen readers.
11:46 16  BY MR. KONECKY:
11:46 17    Q.  And these changes you've made since
11:46 18  you've been there?
11:46 19    A.  Correct.
11:46 20    Q.  Okay.  Some time after March of 2006?
11:46 21    A.  Correct.
11:46 22    Q.  And prior to making those changes, am
11:46 23  I correct that in terms of perceiving the
11:46 24  information on the website or being able to move
11:46 25  through the website, that blind people or others
```

Page 84

TODD J. NEMOIR - 1.9.07

```
11:47  2  with vision disabilities that use screen access
11:47  3  software to not -- did not have equivalent ease
11:47  4  of use or the same level of ease of use on the
11:47  5  website?
11:47  6    A.  I wouldn't --
11:47  7      MR. McDOWELL:  Objection, vague and
11:47  8  ambiguous.
11:47  9      Go ahead.
11:47 10      THE WITNESS:  I wouldn't feel
11:47 11  comfortable making that assessment.
11:47 12  BY MR. KONECKY:
11:47 13    Q.  Do you disagree with that assessment?
11:47 14      MR. McDOWELL:  Same objection.
11:47 15      THE WITNESS:  I would need to give
11:47 16  that some more thought.
11:47 17  BY MR. KONECKY:
11:47 18    Q.  Sitting here today, as the person
11:47 19  most knowledgeable for Target on the subjects of
11:47 20  past efforts taken and contemplated efforts to
11:47 21  make Target.com accessible and/or usable by
11:48 22  people who are blind or visually impaired, would
11:48 23  you disagree with the statement that prior to
11:48 24  changes that are being implemented starting
11:48 25  March 2006 or some time shortly thereafter, that
```

Page 85

TODD J. NEMOIR - 1.9.07

```
11:48  2  blind individuals or individuals with vision
11:48  3  impairments that need screen access software
11:48  4  could not experience Target.com with the same
11:48  5  ease of use as sighted people?
11:48  6      MR. McDOWELL:  Vague and ambiguous.
11:48  7      THE WITNESS:  Again, you're making an
11:49  8  assessment that I don't feel comfortable with by
11:49  9  asking that question.  I find it difficult to
11:49 10  exactly compare the two experiences and call one
11:49 11  easier to use than the other.  They're different
11:49 12  experiences.  They're different ways of
11:49 13  experiencing the same content.
11:49 14  BY MR. KONECKY:
11:49 15    Q.  Well, if there's no alternate text
11:49 16  attached to an image, then the blind user cannot
11:50 17  experience that content, is that correct?
11:50 18    A.  That's correct.
11:50 19    Q.  And that's true regardless of how
11:50 20  sophisticated the blind user is, right?
11:50 21    A.  Yes.
11:50 22    Q.  Or where the blind user is dialing in
11:50 23  from or connecting from, right?
11:50 24    A.  Correct.
11:50 25    Q.  And prior to March 2006, there have
```

TODD J. NEMOIR - 1.9.07

13:31  these two people from University of Minnesota to
13:31  do a basic awareness training, done anything
13:31  else that you are aware of in order to identify
13:32  possible barriers or obstacles on Target.com
13:32  with respect to people who use screen access
13:32  software?
13:32     A.  We have sought out a multitude of
13:32  different sources for best practices as far as
13:32  improving guest experience and usability to help
13:32  guide future development and improve the guest
13:32  experience overall.
13:32     MR. KONECKY:  Let me look at that
13:32  answer.
13:33  BY MR. KONECKY:
13:33     Q.  Has any of Target's efforts with
13:33  respect to seeking out a multiple -- multitude
13:33  of different sources to improve guest experience
13:33  specifically involved attempts to identify or --
13:33  identify potential barriers on the website for
13:33  people with vision disabilities, or identify
13:33  ways in which the website may or may not be
13:33  accessible to such individuals?
13:33     A.  Our efforts have been focused on
13:33  making the website easier to use for guests who

TODD J. NEMOIR - 1.9.07

13:33  are using assistive technologies.  And as part
13:34  of that, we sought out best practices for doing
13:34  that.
13:34     Q.  All right.  Describe the times you
13:34  sought out best practices.
13:34        I mean can you specifically identify
13:34  what has been done in that regard and when?
13:34     A.  A specific example that I can come up
13:34  with is labeling forms, HTML forms, and
13:34  providing additional information to a guest
13:34  using a screen reader.  As we began looking to
13:34  different ways of doing that, discovered that
13:34  there are actually a few different ways of
13:34  providing additional information as a screen
13:34  reader reads through the elements of that form.
13:35  And so it was finding a few different examples
13:35  of that actually being used and making a
13:35  determination of which would be the best
13:35  solution for Target.
13:35     Q.  When did you begin labeling HTML
13:35  forms?
13:35     A.  That was part of the site updates
13:35  project that kicked off in March.
13:35     Q.  Of 2006?

TODD J. NEMOIR - 1.9.07

13:35     A.  Correct.
13:35     Q.  And when did you start providing
13:35  additional information to people using screen
13:35  readers?
13:35     A.  For forms in specific?
13:35     Q.  For -- well, let's start with forms.
13:35     A.  Sometime between August and October
13:35  2006.  I'm not sure specifically when those
13:35  changes went into place.
13:36     Q.  And what about have -- have there
13:36  been any efforts to provide additional
13:36  information to people using screen reader or
13:36  screen access software other than with respect
13:36  to forms?
13:36     A.  Yes.
13:36     Q.  And when did -- when did that effort
13:36  begin?
13:36     A.  And also in March.
13:36     Q.  Of 2006?
13:36     A.  Correct.
13:36     Q.  Prior to March of 2006, has there
13:36  been any effort that you are aware of by Target
13:36  or on behalf of Target to identify potential
13:36  ways in which Target.com might not be accessible

TODD J. NEMOIR - 1.9.07

13:37  to individuals with vision disabilities using
13:37  screen access software?
13:37     A.  Can you restate it?
13:37        I feel like we've -- I've answered
13:37  that already.
13:37     Q.  Why don't I have it read back?
13:37     A.  No.  How about -- could you just tell
13:37  me what you mean?
13:37     Q.  Well, what I'm getting at is you have
13:37  answered a series of questions.  We talked about
13:37  -- because I originally asked you what you could
13:37  identify with respect to efforts to identify
13:37  potential barriers.  And so far, you've said
13:37  receiving Dr. Thatcher's report, or at least a
13:37  summary of it, potentially engaging these two
13:37  people from the University of Minnesota to
13:37  provide basic awareness training, and then you
13:38  testified that you sought out a multitude of
13:38  different sources to improve the guest
13:38  experience.  When I asked you about the
13:38  specifics of that, you said that in March of
13:38  2006, you included some labeling of -- of forms,
13:38  and then in August of 2006, there was an effort
13:38  to provide additional information to people

1          TODD J. NEMOIR - 1.9.07
14:34    2      A.   I'm struggling to recall the specific
14:34    3   improvements that were part of each release.
14:34    4   They were broken apart more to make better use
14:34    5   of development resources than to have
14:34    6   consistency in the features.
14:34    7          The first specific change was to
14:35    8   incorporate the -- both the ability of Target to
14:35    9   control the alternative text for images that
14:35   10   were on the site.
14:35   11      Q.   I'm not sure I understand your answer
14:35   12   which speaks more to my ability to understand
14:35   13   than anything else, but what -- what do you mean
14:35   14   specifically?
14:35   15          What was done with that -- the first
14:35   16   part that you started to describe?
14:35   17      A.   So for the -- the portions of the
14:35   18   experience that Target.com -- on Target.com that
14:35   19   a Target resource somewhere developed, we could
14:36   20   code -- we can code to include those ALT tags
14:36   21   for images ourselves.  There are significant
14:36   22   portions of the experience that Amazon develops,
14:36   23   and so we had no control in those areas.  In
14:36   24   those areas, they made the changes so that as we
14:36   25   provide the image, at the same time, we can

1          TODD J. NEMOIR - 1.9.07
14:36    2   provide an alternate text label for that as
14:36    3   well.
14:36    4      Q.   For the parts of the site that Amazon
14:36    5   -- is it right to say powers, operates?
14:36    6          What's the right terminology?
14:36    7      A.   Maintains.
14:36    8      Q.   Maintains?
14:36    9          For the sites that Amazon maintains,
14:37   10   Target provides the image, as well as the alt
14:37   11   text.
14:37   12      A.   Correct.  Within the content
14:37   13   management tool, there is an area where we
14:37   14   upload images and provide specifications about
14:37   15   that image, its height, its width, as well as
14:37   16   any other attributes in including ALT attributes
14:37   17   for that image.
14:37   18      Q.   And what did you say that was part
14:37   19   of?
14:37   20      A.   Seller Central.
14:37   21      Q.   It's a particular program or
14:37   22   protocol?
14:37   23      A.   That's the contact management tool
14:37   24   that Amazon provides to Target.com.
14:37   25      Q.   And it's the same tool that's used

1          TODD J. NEMOIR - 1.9.07
14:37    2   for all images that Amazon -- that are put on
14:38    3   the parts of the site that Amazon maintains?
14:38    4      A.   To the best of my knowledge.
14:38    5      Q.   And I know you mentioned this
14:38    6   earlier, but which parts of the site are that --
14:38    7   are they, the ones that Amazon maintains?
14:38    8      A.   All of the shopping and browsing and
14:38    9   checkout portions of the site.
14:38   10      Q.   And was putting the alt text on the
14:38   11   shopping and browsing portions of the site part
14:38   12   of the first release or subsequent release?
14:38   13      A.   I believe they were part of the
14:39   14   first.
14:39   15      Q.   And also as part of the first
14:39   16   release, Target coded the -- the other images on
14:39   17   the parts of the site that it maintained without
14:39   18   Amazon for alt text, is that right?
14:39   19      A.   I'm sorry.  I'm trying to be as
14:39   20   accurate as I can on this.  I don't specifically
14:39   21   remember how things made it into the various
14:39   22   releases at Amazon.com.  If I'm correct in
14:39   23   saying that Amazon provided that ability in the
14:39   24   first release, that would have then given us the
14:39   25   ability to begin providing alternate text for

1          TODD J. NEMOIR - 1.9.07
14:39    2   the tens of thousands of images that are
14:39    3   available on Target.com through Seller Central.
14:39    4   So there was the need to go back to those images
14:39    5   that had already been on the site to provide
14:40    6   alternate text for those.
14:40    7      Q.   How many of the tens of thousands of
14:40    8   images on the parts of the site maintained by
14:40    9   Amazon needed alt text?
14:40   10      A.   I don't know the number off the top
14:40   11   of my head.
14:40   12      Q.   Do you know if it was more than half?
14:40   13      A.   I'm pausing because the number that I
14:40   14   have in my memory is that there were twenty
14:40   15   thousand images that needed alternate text.  And
14:40   16   my pause is because I don't know if that also
14:40   17   included what would be considered decorative
14:40   18   images which do receive alternate text, but the
14:40   19   alternate text is blank.  And I wouldn't want to
14:41   20   make a guess as to if those were included or not
14:41   21   included in that twenty thousand number that I'm
14:41   22   remembering right now.
14:41   23      Q.   So it's either twenty thousand or
14:41   24   more?
14:41   25      A.   I don't know that's what I said.

## Page 142

TODD J. NEMOIR - 1.9.07

14:41  2  Q.  Well, I mean if they are included,
14:41  3  it's approximately twenty thousand; if they're
14:41  4  not included, it might be more than twenty
14:41  5  thousand?
14:41  6  A.  Correct.
14:41  7  Q.  Did -- did the alt text coding for
14:41  8  the non-Amazon parts of the site occur before or
14:41  9  after or at the same time as the coding for the
14:41  10  Amazon portions?
14:41  11    MR. McDOWELL:  Objection, lacks
14:41  12  foundation.
14:41  13    THE WITNESS:  Yes, to all three.
14:41  14  BY MR. KONECKY:
14:41  15  Q.  Okay.  Did they extend beyond more
14:41  16  than one phase?
14:41  17  A.  I am sorry.  In areas where we could
14:42  18  develop the experience part of following HTML
14:42  19  guidelines would include providing an ALT tag,
14:42  20  so prior experiences would have had that as part
14:42  21  of their development, and they continue to be
14:42  22  developed that way.
14:42  23  Q.  Prior to the releases that occurred
14:42  24  in 2006, was there any systematic effort to
14:42  25  include alternate text on either -- on any of

## Page 143

TODD J. NEMOIR - 1.9.07

14:42  2  the images on the Target.com website?
14:43  3  A.  For the portions of the site that are
14:43  4  not maintained by Amazon, as our developers code
14:43  5  and deliver those experiences on HTML, it would
14:43  6  have been best practice to include ALT tags
14:43  7  prior to this specific project.
14:43  8  Q.  But not for the parts of the site
14:43  9  maintained by Amazon?
14:43  10  A.  Again, Amazon maintains the HTML and
14:43  11  code related to those, so Target's ability to
14:43  12  provide that alternate text would be limited.
14:43  13  Q.  All right.  But I -- you're getting
14:43  14  ahead of me.
14:43  15    I just want to know prior to the
14:44  16  releases in 2006, am I correct that there was no
14:44  17  systematic effort for any of the parts of the
14:44  18  site maintained by Amazon to include alt text on
14:44  19  the images?
14:44  20  A.  Not that I'm aware of.
14:44  21  Q.  Okay.  And is that the same answer
14:44  22  for any other part of the site that's maintained
14:44  23  by another third-party, whether it's Amazon or a
14:44  24  different third-party?
14:44  25  A.  I -- I don't know the scope of what

## Page 144

TODD J. NEMOIR - 1.9.07

14:44  2  you're talking about when you say third-party.
14:44  3  Q.  Well, in which -- are there any other
14:44  4  entities that maintain portions of Target.com
14:44  5  other than Amazon?
14:44  6  A.  Yes.
14:44  7  Q.  Okay.  And for all of those entities,
14:45  8  was there ever any -- for all of those portions
14:45  9  of the site, was there any -- ever any
14:45  10  systematic effort prior to 2006 in order to
14:45  11  label images with alt text?
14:45  12  A.  I don't know.
14:45  13  Q.  You're not aware of any?
14:45  14  A.  I don't know.
14:45  15  Q.  With respect to the parts of the
14:45  16  Target.com in which Target is providing platform
14:45  17  as opposed to Amazon or a different entity, has
14:45  18  there been any systematic or regular
14:45  19  documentation of the inclusion of alt text in
14:46  20  the website?
14:46  21    MR. McDOWELL:  Objection, vague and
14:46  22  ambiguous.
14:46  23    THE WITNESS:  I'm not sure I
14:46  24  understand the specific question you're asking.
14:46  25  BY MR. KONECKY:

## Page 145

TODD J. NEMOIR - 1.9.07

14:46  2  Q.  Are there any written protocols for
14:46  3  doing that?
14:46  4  A.  There are development guidelines that
14:46  5  we've talked about before that would have
14:46  6  included following HTML coding best practices
14:46  7  that include -- and one of -- and HTML coding
14:46  8  best practice is that when you use images, you
14:46  9  specify a height or attribute or width
14:46  10  attribute --
14:46  11    THE COURT REPORTER:  I'm sorry.  HTML
14:46  12  and best practices is when you use images. . .
14:46  13    MR. McDOWELL:  And HTML best
14:46  14  practices is when you an image, you could -- you
14:46  15  supply a height attribute, a width attribute --
14:47  16    THE WITNESS:  And an ALT attribute.
14:47  17    THE COURT REPORTER:  Well, that's
14:47  18  your answer --
14:47  19    THE WITNESS:  Yeah.  And that's --
14:47  20    THE COURT REPORTER:  -- on the record
14:47  21  so. . .
14:47  22    Do you want to just adopt that, or I
14:47  23  mean it shows up as Mr. McDowell so. . .
14:47  24    MR. McDOWELL:  Did I -- did I --
14:47  25    THE WITNESS:  Yes, that was exact --

Page 146

TODD J. NEMOIR - 1.9.07

14:47  2    MR. McDOWELL: -- did I correctly
14:47  3  repeat what you had said?
14:47  4  BY MR. KONECKY:
14:47  5    Q.  Or were going to say?
14:47  6    A.  Yes.  That was what I was going to
14:47  7  say.
14:47  8    MR. WALBOURN:  Well, that's what he
14:47  9  said before.  She read it back incorrectly.
14:47 10  That's what he said before.
14:47 11    Start over and let him re-answer the
14:47 12  question because that's exactly what he said
14:47 13  previously.
14:47 14    MR. KONECKY:  The record is what it
14:47 15  is.
14:47 16    MR. WALBOURN:  I know.
14:47 17  BY MR. KONECKY:
14:47 18    Q.  The protocols that you were referring
14:47 19  to, are they Target protocols or are they the
14:47 20  W3C protocols for HTML text or coding or
14:48 21  something else?
14:48 22    A.  The -- the best practices that I'm
14:48 23  referring to would be Target's web development
14:48 24  best practices --
14:48 25    Q.  Okay.

Page 147

TODD J. NEMOIR - 1.9.07

14:48  2    A.  -- which make reference to the W3C
14:48  3  HTML.
14:48  4    Q.  And when was the last time those were
14:48  5  developed, drafted at Target?
14:48  6    A.  I am aware of a revision that
14:48  7  happened in late December, and they -- but
14:48  8  they're draft -- reviewed fairly frequently for
14:48  9  updates.
14:48 10    Q.  That's December 2006?
14:48 11    A.  Correct.
14:48 12    Q.  And how often have they been updated
14:48 13  over the past five years?
14:48 14    A.  I don't know.
14:48 15    Q.  At least once a year?
14:48 16    A.  I can only speak to the last year,
14:48 17  and I know that they had -- at a minimum of
14:49 18  three times, they've been updated to include
14:49 19  additional information.
14:49 20    Q.  Do you know of any other updates
14:49 21  prior to 2006?
14:49 22    A.  I would need to go back and reference
14:49 23  my notes.
14:49 24    Q.  You have notes about updates like
14:49 25  this?

Page 148

TODD J. NEMOIR - 1.9.07

14:49  2    A.  I get -- I get the updates when
14:49  3  they're made, and included in that is a revision
14:49  4  history of the document (witness indicating).
14:49  5    Q.  Okay.  And for purposes of finding
14:49  6  the document, what is the specific name?
14:49  7    A.  I don't know.  It would be -- I don't
14:49  8  know.
14:49  9    Q.  Okay.  Why did you include alternate
14:50 10  text coding as part of this release in 2006?
14:50 11    MR. McDOWELL:  Objection, lacks
14:50 12  foundation.
14:50 13    THE WITNESS:  To improve the guest
14:50 14  experience for users using screen readers to
14:50 15  access the website.
14:50 16    MR. McDOWELL:  Would you read back
14:50 17  the question?
14:50 18    * * *
14:50 19    (Whereupon, the reporter read back
14:50 20    the requested portion of the record.)
09:54 21    * * *
14:50 22  BY MR. KONECKY:
14:50 23    Q.  What other improvements or changes
14:50 24  relative to disability access were made during
14:50 25  these releases in 2006?

Page 149

TODD J. NEMOIR - 1.9.07

14:51  2    A.  I specifically remember changes being
14:51  3  made to forms on line to make them easier to use
14:51  4  and to provide additional page information for
14:51  5  screen readers, header tags specifically.
14:51  6  There's one more set of changes that I'm not
14:51  7  recalling.
14:51  8    Q.  Any changes with respect to use of a
14:51  9  keyboard?
14:51 10    A.  Those would have been specific
14:51 11  changes related to the forms I believe.
14:51 12    Q.  Anything else?
14:52 13    A.  Not that I remember.
14:52 14    Q.  Are these changes documented
14:52 15  anywhere?
14:52 16    A.  Yes.
14:52 17    Q.  Where?
14:52 18    A.  As part of a project definition that
14:52 19  was collaborated with Amazon that's maintained
14:52 20  by Target.com.
14:52 21    Q.  What's a project definition?
14:52 22    What does that mean?
14:52 23    A.  It outlines -- from my point of view,
14:52 24  it outlines the high level requirements that are
14:52 25  going into a specific project with Amazon.

Page 154

TODD J. NEMOIR - 1.9.07

15:13  2    A.  Yes.
15:13  3    Q.  Is that something that also applies
15:14  4  to Target.com?
15:14  5        MR. McDOWELL:  Objection, vague and
15:14  6  ambiguous.
15:14  7        THE WITNESS:  Well, what do you mean
15:14  8  by the question?
15:14  9  BY MR. KONECKY:
15:14  10    Q.  Well, would you agree with Dr.
15:14  11  Thatcher that in order for a web page on
15:14  12  Target.com to be accessible to somebody with a
15:14  13  vision disability that relies on screen access
15:14  14  software, that it must be possible for the user
15:14  15  to interact with the page using only the
15:14  16  keyboard?
15:14  17    A.  I agree that you should be able to
15:14  18  accomplish the same tasks by only interacting
15:14  19  with the keyboard.
15:14  20    Q.  And would you agree that that is
15:14  21  applicable generally to individuals with vision
15:14  22  disabilities who rely on screen access software?
15:14  23        MR. McDOWELL:  Objection, vague and
15:14  24  ambiguous.
15:15  25        THE WITNESS:  My understanding is

Page 155

TODD J. NEMOIR - 1.9.07

15:15  2  that people using the screen reading software
15:15  3  use the keyboard exclusively to navigate
15:15  4  applications, including web pages.
15:15  5  BY MR. KONECKY:
15:15  6    Q.  And that's true regardless of the
15:15  7  particular user's proficiency level or level of
15:15  8  education or location, right?
15:15  9    A.  Correct.
15:15  10    Q.  Okay.  And it's also true that in
15:15  11  response to Dr. Thatcher's report that in 2006,
15:15  12  Target made changes to its website to include
15:15  13  keyboard access in certain areas?
15:15  14    A.  I don't know that those changes were
15:15  15  made in response to this report.
15:15  16    Q.  Okay.  Those changes were not made
15:15  17  before this report, is that right?
15:16  18    A.  Correct.
15:16  19    Q.  And those changes track the
15:16  20  recommendations of Dr. Thatcher's report, right?
15:16  21        THE COURT REPORTER:  I'm sorry.
15:16  22        Track the recommendations of what?
15:16  23        MR. KONECKY:  Of Dr. Thatcher's
15:16  24  report.
15:16  25        THE WITNESS:  And what do you mean,

Page 156

TODD J. NEMOIR - 1.9.07

15:16  2  track the changes?
15:16  3  BY MR. KONECKY:
15:16  4    Q.  Well, the changes that Target made to
15:16  5  Target.com in 2006 with respect to disability
15:16  6  access were changes -- all of those changes were
15:16  7  subjects included in Dr. Thatcher's report which
15:16  8  is here as Exhibit 2, right?
15:16  9    A.  I don't know that that's true.  I
15:16  10  haven't reviewed this in its entirety.
15:17  11    Q.  Okay.  Well, keyboard access is one
15:17  12  of the changes that Target made in 2006,
15:17  13  correct?
15:17  14    A.  Yes.
15:17  15    Q.  And keyboard access was one of the
15:17  16  recommendations that you recall from Dr.
15:17  17  Thatcher?
15:17  18    A.  So to be clear, all I ever saw were
15:17  19  the summary of the changes from Dr. Thatcher,
15:17  20  and, yes, that was part of the summarized
15:17  21  changes.
15:18  22    Q.  Okay.  On page ten of the report --
15:18  23  well, that actually starts toward the bottom of
15:18  24  page nine where Dr. Thatcher talks about
15:18  25  navigation.  And then on page forty-nine or --

Page 157

TODD J. NEMOIR - 1.9.07

15:18  2  excuse me -- paragraph forty-nine on page ten,
15:18  3  it says that:  "Screen reader users need some
15:18  4  technique for skipping over all of those links
15:19  5  in order to get to the desired part of the
15:19  6  screen."
15:19  7        Do you -- first of all, did Target
15:19  8  make any changes with respect to navigation for
15:19  9  people using screen readers on the website in
15:19  10  2006 as part of those releases?
15:19  11    A.  Yes.
15:19  12    Q.  Okay.  And specifically, what kind of
15:19  13  change was made there?
15:19  14    A.  The specific change that I remember
15:19  15  was adding header tags to pages --
15:19  16    Q.  Uh-huh.
15:19  17    A.  -- so that the specific content areas
15:19  18  of a page could be separated by. . .
15:19  19    Q.  And does that assist in allowing
15:19  20  people using screen access software to skip over
15:20  21  other links in order to get to where they want
15:20  22  to go?
15:20  23    A.  Yes.
15:20  24    Q.  And do you agree with Dr. Thatcher
15:20  25  that oftentimes without that technique, the

Page 158

TODD J. NEMOIR - 1.9.07

15:20  2  header tags, there can be multiple links that
15:20  3  would take a lengthy amount of time for somebody
15:20  4  using screen access software to get through, in
15:20  5  order to get to the desired location?
15:20  6      MR. McDOWELL: Objection, lacks
15:20  7  foundation, vague and ambiguous.
15:20  8      THE WITNESS: I'm sorry. I haven't
15:20  9  had a time to read all of this.
15:20 10  BY MR. KONECKY:
15:20 11      Q.  Well, take a minute to read paragraph
15:20 12  forty-seven through fifty-one.
15:21 13      A.  Okay.
15:21 14      Q.  Okay. On page forty-eight, Dr.
15:21 15  Thatcher writes that using the tab key to
15:21 16  navigate through the page that he's describing
15:21 17  in the previous paragraph, in order to get to
15:22 18  the continued checkout button, will require
15:22 19  about fifty key strokes just to get to the
15:22 20  desired button.
15:22 21      Do you see where I am?
15:22 22      A.  Just to be clear, that's paragraph
15:22 23  forty-eight?
15:22 24      Q.  Paragraph forty-eight.
15:22 25      A.  Okay.

Page 159

TODD J. NEMOIR - 1.9.07

15:22  2      Q.  The continued checkout reference is
15:22  3  in the preceding paragraph.
15:22  4      Does that comport with your
15:22  5  understanding of Target.com prior to -- at least
15:22  6  prior to the releases that occurred in 2006?
15:22  7      MR. McDOWELL: Objection, vague and
15:22  8  ambiguous.
15:22  9      THE WITNESS: I can't say either way.
15:22 10  I don't know.
15:22 11  BY MR. KONECKY:
15:22 12      Q.  Okay. So you don't have any reason
15:22 13  to disagree with the observation by Dr. Thatcher
15:22 14  when he wrote this report in the earlier part of
15:23 15  2006 that there were multiple key strokes that
15:23 16  would be necessary for a blind user to go
15:23 17  through in order to navigate to the desired
15:23 18  result or the desired location?
15:23 19      A.  I have no reason to disagree with
15:23 20  that finding.
15:23 21      Q.  And would you agree that this results
15:23 22  in extra time for the blind user to navigate
15:23 23  through the website as compared to the sighted
15:23 24  user?
15:23 25      MR. McDOWELL: Objection, vague and

Page 160

TODD J. NEMOIR - 1.9.07

15:23  2  ambiguous.
15:23  3      THE WITNESS: I don't know that I can
15:23  4  say that actually.
15:23  5  BY MR. KONECKY:
15:23  6      Q.  Do you disagree with that?
15:23  7      A.  With comparing the time?
15:23  8      I don't know that I could say that.
15:24  9  That's a -- I can't compare as you just did.
15:24 10      Q.  Do you agree that putting headers on
15:24 11  to -- header tags on to the pages can allow a
15:24 12  blind user to move through the site more quickly
15:24 13  and easily than without the header tags?
15:24 14      A.  Yes.
15:24 15      Q.  And would you agree that that's
15:24 16  generally the case for any blind or visually
15:24 17  impaired user that relies on screen access
15:24 18  software?
15:24 19      A.  Yes.
15:24 20      Q.  Okay. And on the other hand, would
15:24 21  you agree that for blind users that use screen
15:24 22  access software without the header tags, it's
15:24 23  going to take longer for them to navigate
15:24 24  through the site?
15:24 25      A.  Correct. So it would take longer for

Page 161

TODD J. NEMOIR - 1.9.07

15:25  2  a person using a screen reader -- screen reading
15:25  3  software to navigate a page without header tags
15:25  4  than with?
15:25  5      Q.  Yes.
15:25  6      A.  That's what I would guess.
15:25  7      Q.  You agree with that?
15:25  8      A.  Yes.
15:25  9      Q.  And would you agree that in a case --
15:25 10  that there can be cases without header tags, for
15:25 11  example, even on Target.com, where it could take
15:25 12  fifty strokes to get to a desired location when
15:25 13  the header tags aren't there to guide the user?
15:25 14      MR. McDOWELL: Objection, lacks
15:25 15  foundation.
15:25 16      THE WITNESS: Can you ask the
15:25 17  question in a different way?
15:25 18  BY MR. KONECKY:
15:25 19      Q.  Sure. Without the header tags to
15:25 20  guide the user, would you agree that it can
15:25 21  often take multiple key strokes, up to fifty in
15:26 22  the case of Target.com, for a blind user to get
15:26 23  from one place to the desired result?
15:26 24      MR. McDOWELL: Same objection.
15:26 25      THE WITNESS: Yes.

1    TODD J. NEMOIR - 1.9.07
15:44  2  information is to be entered into which field is
15:44  3  necessary in order for -- let me start that
15:44  4  again.
15:44  5         Would you agree that form labeling or
15:44  6  some similar design feature on a website is
15:45  7  necessary for a blind user using screen access
15:45  8  software to know where information is to be
15:45  9  entered in which field when filling out an
15:45  10  online form?
15:45  11     A.  I lost you in the question.
15:45  12         I think that it's essential for all
15:45  13  guests to understand what the purpose of each
15:45  14  form element is.
15:45  15     Q.  And for guests with vision
15:45  16  disabilities, would you agree that form
15:45  17  labeling, including prompting information, that
15:45  18  interacts with the screen access software is
15:45  19  necessary in order to achieve that result?
15:45  20         MR. McDOWELL:  Objection, asked and
15:45  21  answered.
15:45  22         THE WITNESS:  Again, I'd still
15:45  23  maintain that that is a way, but not the only
15:45  24  way to accomplish the intended result.
15:45  25  BY MR. KONECKY:

1    TODD J. NEMOIR - 1.9.07
15:45  2     Q.  Well, let me ask you two questions
15:46  3  about that.
15:46  4         Am I correct that there must be some
15:46  5  accommodation, whether it's form labeling or
15:46  6  something else, that's put into the site to
15:46  7  accomplish the result that we're talking about,
15:46  8  that is to insure that people with vision
15:46  9  disabilities are prompted to know which
15:46  10  information is to go where when filling out an
15:46  11  online form?
15:46  12     A.  Yes.  The page must be developed in
15:46  13  such a way that the information pertaining to
15:46  14  form elements either in order or in code relates
15:46  15  back to the input for that form.
15:46  16     Q.  And if that does not happen, people
15:46  17  with vision disabilities as a general matter are
15:46  18  going to have difficulty knowing which
15:46  19  information to input where, isn't that right?
15:47  20         MR. McDOWELL:  Objection, vague and
15:47  21  ambiguous.
15:47  22         THE WITNESS:  Without associating the
15:47  23  two either in order or through code, I would
15:47  24  agree with you that a guest using screen reading
15:47  25  software would have trouble associating --

1    TODD J. NEMOIR - 1.9.07
15:47  2  understanding what the purpose of each form
15:47  3  element was.
15:47  4  BY MR. KONECKY:
15:47  5     Q.  And that would apply to the guest
15:47  6  with a vision disability regardless of the
15:47  7  particular screen access program or the
15:47  8  particular level of education or the particular
15:47  9  location from where that person is accessing the
15:47  10  website, isn't that right?
15:47  11         MR. McDOWELL:  Objection, lacks
15:47  12  foundation.
15:47  13         THE WITNESS:  I don't know that I can
15:47  14  answer that.  I've not done a complete
15:48  15  evaluation of all assistive technology that
15:48  16  people with vision impairment use to access
15:48  17  websites.
15:48  18  BY MR. KONECKY:
15:48  19     Q.  From what you're aware of, as the
15:48  20  person most knowledgeable today on behalf of
15:48  21  Target, am I correct that, generally speaking,
15:48  22  people with vision disabilities will need some
15:48  23  kind of accommodation, whether or not it's form
15:48  24  labeling or something else, on the website in
15:48  25  order to be prompted to know where to put what

1    TODD J. NEMOIR - 1.9.07
15:48  2  information when filling out an online form?
15:48  3         MR. McDOWELL:  This witness is not
15:48  4  designated for that category.  So despite your
15:48  5  attempt to identify him as a Target designee on
15:48  6  that topic, he is not.
15:48  7         To the extent you can answer the
15:48  8  question, feel free.
15:48  9         THE WITNESS:  I'm not sure I
15:48  10  understand what you're asking by the question.
15:48  11  BY MR. KONECKY:
15:48  12     Q.  Well, are you aware of any situation
15:49  13  in which it would not be important to provide
15:49  14  form labeling or some similar accommodation or
15:49  15  program in the site itself to allow an
15:49  16  individual who uses screen access software to
15:49  17  know where to put which information when filling
15:49  18  out online forms?
15:49  19         MR. McDOWELL:  Objection, vague and
15:49  20  ambiguous.
15:49  21         THE WITNESS:  If the page is coded in
15:49  22  such a way that the text to that is read is
15:49  23  immediately preceding or next to the input box
15:49  24  that the guest is asked to fill out, a guest
15:49  25  would be able to -- would you be aware of the

Page 178

TODD J. NEMOIR - 1.9.07

15:50  1
15:50  2  relationship between those two elements.
15:50  3  BY MR. KONECKY:
15:50  4      Q.  Are you aware of any such instances
15:50  5  like that on Target.com?
15:50  6      A.  I don't know.
15:50  7      Q.  Okay.  And on Target.com, some of the
15:50  8  information that a guest may need to fill in
15:50  9  would include private information, like their
15:50  10  credit card number, right?
15:50  11     A.  Correct.
15:50  12     Q.  All right.  So it's important for a
15:50  13  guest with a vision disability trying to make a
15:50  14  purchase on Target.com to have adequate and
15:50  15  reliable form labeling so they know where
15:50  16  they're putting information, including private
15:50  17  information like a credit card number, right?
15:50  18         MR. McDOWELL:  Objection, vague and
15:50  19  ambiguous.
15:50  20         THE WITNESS:  Again, form labeling
15:50  21  would be one way of associating the information
15:50  22  that's being asked for and the actual input area
15:51  23  for the guest.
15:51  24  BY MR. KONECKY:
15:51  25     Q.  It's actually the only way that

Page 179

TODD J. NEMOIR - 1.9.07

15:51  1
15:51  2  you're aware of as you sit here today, right?
15:51  3      A.  Well, as I've been talking, the other
15:51  4  way would be to immediately put the text in
15:51  5  physical relationship to the form element.
15:51  6      Q.  And has Target done that?
15:51  7      A.  I -- sorry.  For the specific -- for
15:51  8  example, for credit card area, those form
15:51  9  elements have been labeled.
15:51  10     Q.  No.  The alternative to form
15:51  11  labeling, is that something that Target has
15:51  12  done?
15:51  13     A.  I don't know.
15:51  14     Q.  And the form labeling itself is
15:51  15  something that Target did in 2006?
15:51  16     A.  Correct.
15:51  17     Q.  After receiving Mr. Thatcher's
15:51  18  report?
15:51  19     A.  Correct.
15:51  20     Q.  And when Target did the form labeling
15:52  21  on the site, it didn't make distinctions based
15:52  22  upon the level of skill of a particular user or
15:52  23  the -- other individualized attributes of a
15:52  24  particular user, did it?
15:52  25         MR. McDOWELL:  Objection, vague and

Page 180

TODD J. NEMOIR - 1.9.07

15:52  1
15:52  2  ambiguous.
15:52  3         THE WITNESS:  I don't know.
15:52  4  BY MR. KONECKY:
15:52  5      Q.  You're not aware of them, or are you
15:52  6  making any such individualized inquiries of
15:52  7  particular users?
15:52  8         MR. McDOWELL:  Same objection.
15:52  9         THE WITNESS:  I did not -- I
15:52  10  personally did not, no.
15:52  11  BY MR. KONECKY:
15:52  12     Q.  And you're not aware of anybody else
15:52  13  doing that, is that right?
15:52  14     A.  Correct.
15:52  15         MR. McDOWELL:  It's getting late.
15:52  16  Why don't we take a quick break?
15:52  17         MR. KONECKY:  Sure.
15:57  18         *  *  *
15:57  19         (Whereupon, a short recess was taken.)
15:57  20         *  *  *
15:57  21  BY MR. KONECKY:
15:57  22     Q.  Okay.  Previously, earlier this
15:57  23  morning, you were testifying about certain
15:57  24  assumptions that may have been made with respect
15:57  25  to the user when determining how to design the

Page 181

TODD J. NEMOIR - 1.9.07

15:57  1
15:57  2  site, such as being technologically savvy or
15:57  3  well educated, at least as ambiguously defined,
15:57  4  correct?
15:57  5      A.  Correct.  Target.com would define
15:58  6  their guest as well educated and technically
15:58  7  savvy.
15:58  8      Q.  And then Target or Target.com, a
15:58  9  division of Target, would design the website
15:58  10  with that particular guest in mind?
15:58  11     A.  Correct.
15:58  12     Q.  And that particular guest -- and in
15:58  13  doing so, there would only be one website design
15:58  14  for Target.com?
15:58  15         There wouldn't be more than one
15:58  16  Target.com.  It would be one design to set a
15:58  17  certain level of use for whatever user group
15:58  18  Target was assumed was its target population?
15:59  19     A.  So I would say that Target.com is a
15:59  20  collection of many experiences, and the specific
15:59  21  guest segment and attributes of that guest would
15:59  22  be defined by each experience.  Broadly
15:59  23  speaking, Target.com would identify the shopping
15:59  24  experience as a single guest profile.
15:59  25     Q.  And the -- and each experience would

Page 186

TODD J. NEMOIR - 1.9.07

16:07  2  used as part of the best practices, do they
16:07  3  contain reference to any of the specific
16:07  4  elements which Dr. Thatcher recommends are
16:07  5  necessary for access and/or which were part of
16:07  6  any of the releases that Target did in 2006?
16:07  7     MR. McDOWELL: Objection, compound,
16:07  8  lacks foundation.
16:07  9     The witness hadn't seen Dr.
16:07  10  Thatcher's report so --
16:07  11     MR. KONECKY: I'll break it down.
16:07  12     MR. McDOWELL: Thank you.
16:07  13  BY MR. KONECKY:
16:07  14     Q.  Is there anything in the best
16:07  15  practices web page review process, that is the
16:08  16  process by which the lead developers look at web
16:08  17  pages as they're coming out, which specifically
16:08  18  prompts a consideration of alternate text?
16:08  19     A.  Yes.
16:08  20     Q.  Okay.  Can you describe that?
16:08  21     A.  That specific issue when using an
16:08  22  image tag properly formed HTML would include
16:08  23  several attributes, and that would include an
16:08  24  ALT tag.
16:08  25     Q.  And this is something that the lead

Page 187

TODD J. NEMOIR - 1.9.07

16:08  2  developers were reviewing for each new website
16:08  3  page since before 2006?
16:08  4     A.  I don't know.
16:08  5     Q.  But the -- the -- the best practices
16:09  6  which you've described is what the lead
16:09  7  developers are following are best practices that
16:09  8  Target had had since before 2006?
16:09  9     A.  That document existed before 2006,
16:09  10  yes.
16:09  11     Q.  How long had that document existed
16:09  12  for?
16:09  13     A.  I don't know.
16:09  14     Q.  For more than two or three years?
16:09  15     A.  I don't know.
16:09  16     Q.  Thousands of pages have been released
16:09  17  under those -- hundreds of thousands of pages
16:09  18  have been added to Target.com or changed on
16:09  19  Target.com using those best practices as the
16:09  20  baseline for the review process by the lead
16:09  21  developers, is that right?
16:10  22     A.  No, not entirely.  Pages that are
16:10  23  created as part of Amazon's publishing system
16:10  24  would be created using the templates that Amazon
16:10  25  has created which may have preceded that

Page 188

TODD J. NEMOIR - 1.9.07

16:10  2  document.
16:10  3     Q.  So for the pages that Amazon is
16:10  4  maintaining, do your lead developers review
16:10  5  those pages before they get released?
16:11  6     A.  It depends on the specific area of
16:11  7  the experience.  If it is a change to a template
16:11  8  that's controlled within Seller Central, I don't
16:11  9  know the answer.  If it is the creation of or
16:11  10  modification of a site experience, for example,
16:11  11  the checkout experience, yes, my developers
16:11  12  would review that code.
16:11  13     Q.  So what percentage of web page is
16:11  14  maintained by Amazon are reviewed under the best
16:11  15  practices protocol by Target before they're made
16:12  16  live?
16:12  17     A.  By the sheer volume of pages that get
16:12  18  created through the template system, I would say
16:12  19  the percentage is very small, but I don't know.
16:12  20     Q.  When you say very small, do you mean
16:12  21  less than ten percent?
16:12  22     A.  Yes.
16:12  23     Q.  Less than five percent?
16:12  24     A.  I don't know.
16:12  25     Q.  In any event, your testimony is that

Page 189

TODD J. NEMOIR - 1.9.07

16:12  2  the lead developers of Target by reference to
16:12  3  best practices that Target has had prior to 2006
16:13  4  check at least some of the new web pages that
16:13  5  get released as they're being released or before
16:13  6  they go live, is that right?
16:13  7     A.  Yes.
16:13  8     Q.  Okay.  And am I correct that the lead
16:13  9  developers at Target were doing that in 2005?
16:13  10     A.  I don't know.
16:13  11     Q.  Do you know if they were doing it at
16:13  12  any time before 2006?
16:13  13     A.  I don't know.
16:13  14     Q.  But you do know that subsequent to
16:13  15  2006, or at least the start of 2006, multiple
16:13  16  pages of Target.com were found not to have
16:14  17  alternate text, is that right?
16:14  18     A.  Yes.
16:14  19     Q.  And are you aware of any specific
16:14  20  procedure for insuring that pages, new pages of
16:14  21  Target.com that are on templates provided by
16:14  22  Amazon are checked to insure that they have
16:14  23  alternate text?
16:14  24     MR. McDOWELL: Objection, asked and
16:14  25  answered.