# EXHIBIT A

Dockets.Justia.com

Page 22

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

| | | |
|---|---|---|
| 09:55 | 2 | NFB during the course of this litigation? |
| 09:55 | 3 | A. Correct. |
| 09:55 | 4 | Q. And were there any changes that you |
| 09:56 | 5 | discussed that were not able to be implemented? |
| 09:56 | 6 | A. I do not recall. |
| 09:56 | 7 | Q. You don't recall one way or the |
| 09:56 | 8 | other? |
| 09:56 | 9 | A. Correct. |
| 09:56 | 10 | Q. And do you recall any of the specific |
| 09:56 | 11 | changes that you discussed or proposed changes |
| 09:56 | 12 | that you discussed? |
| 09:56 | 13 | A. I recall that we talked about ALT |
| 09:56 | 14 | tags. |
| 09:56 | 15 | Q. Anything else? |
| 09:56 | 16 | A. Not specifically. |
| 09:57 | 17 | Q. Did you -- did you know at the time |
| 09:57 | 18 | how many -- well, what's your understanding of |
| 09:57 | 19 | what ALT tags are first of all? |
| 09:57 | 20 | A. My understanding is that ALT tags are |
| 09:57 | 21 | necessary to be used with readers. |
| 09:57 | 22 | Q. What do you mean necessary to be used |
| 09:57 | 23 | with readers? |
| 09:57 | 24 | A. My understanding is that for readers |
| 09:57 | 25 | such as JAWS to work on a website, ALT tags are |

Page 23

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

| | | |
|---|---|---|
| 09:57 | 2 | necessary. |
| 09:57 | 3 | Q. Okay. Readers, in other words, |
| 09:57 | 4 | devices that are used by people with vision |
| 09:57 | 5 | disabilities to browse or use a website? |
| 09:57 | 6 | A. Maybe vision disabilities, maybe |
| 09:57 | 7 | other disabilities. |
| 09:57 | 8 | Q. Including vision disabilities? |
| 09:57 | 9 | A. Correct. |
| 09:57 | 10 | Q. All right. And did you have any |
| 09:58 | 11 | understanding -- when did you first learn about |
| 09:58 | 12 | the concept of ALT tags? |
| 09:58 | 13 | A. Back in 2000. |
| 09:58 | 14 | Q. Okay. So you understood that ALT |
| 09:58 | 15 | tags were necessary for a person with a vision |
| 09:58 | 16 | disability who's using screen reader software to |
| 09:58 | 17 | get on to a website, you understand that alt |
| 09:58 | 18 | text was necessary to allow them to get on to |
| 09:58 | 19 | the website prior to this litigation? |
| 09:58 | 20 | A. When I say in 2000 I learned of ALT |
| 09:58 | 21 | tags, my understanding of ALT tags at that time |
| 09:58 | 22 | was that ALT tags were used for meta data for |
| 09:58 | 23 | things like search, et cetera. At that time, I |
| 09:59 | 24 | was not aware that they were needed solely for |
| 09:59 | 25 | -- I shouldn't say solely but for readers, |

Page 24

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

| | | |
|---|---|---|
| 09:59 | 2 | et cetera. 2000 was the first time that I had |
| 09:59 | 3 | entered the web space at all so. . . |
| 09:59 | 4 | Q. When was the first time that you |
| 09:59 | 5 | became aware that ALT tags were necessary for |
| 09:59 | 6 | people with vision disabilities to access the |
| 09:59 | 7 | website? |
| 09:59 | 8 | A. I don't recall. |
| 09:59 | 9 | Q. Do you know if it was within the |
| 09:59 | 10 | context of this litigation? |
| 09:59 | 11 | A. It was prior to that. |
| 09:59 | 12 | Q. Okay. Do you know how long prior to |
| 09:59 | 13 | that? |
| 09:59 | 14 | A. I don't recall. Again, trade |
| 09:59 | 15 | magazines. |
| 09:59 | 16 | Q. Okay. Do you know at the time that |
| 09:59 | 17 | you were speaking with Mr. Nitschke in 2006, did |
| 09:59 | 18 | you have any understanding of the extent to |
| 09:59 | 19 | which images, whether images of pictures or |
| 10:00 | 20 | images of text on Target.com, did not have ALT |
| 10:00 | 21 | tags? |
| 10:00 | 22 | A. No, I did not. |
| 10:00 | 23 | Q. Is that something that you discussed |
| 10:00 | 24 | with him at all, the extent to which there were |
| 10:00 | 25 | or there were not ALT tags? |

Page 25

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

| | | |
|---|---|---|
| 10:00 | 2 | A. No. |
| 10:00 | 3 | Q. Was it your understanding that there |
| 10:00 | 4 | were images and -- well, strike that. |
| 10:00 | 5 | Was it your understanding that there |
| 10:00 | 6 | were images, whether text images or picture |
| 10:00 | 7 | images, on Target.com that did not have ALT |
| 10:00 | 8 | tags? |
| 10:00 | 9 | A. Yes. |
| 10:00 | 10 | Q. Okay. Did you understand that to be |
| 10:00 | 11 | an obstacle or potential obstacle for people |
| 10:00 | 12 | with disabilities trying to access Target.com? |
| 10:00 | 13 | A. Not that that was solely what was |
| 10:01 | 14 | causing non-accessibility. |
| 10:01 | 15 | Q. Was there anything else that you |
| 10:01 | 16 | understood to be causing non-accessibility? |
| 10:01 | 17 | A. No. |
| 10:01 | 18 | Q. Was it your understanding or is it |
| 10:01 | 19 | not your understanding that the lack of ALT tags |
| 10:01 | 20 | on text or picture images on Target.com can cause |
| 10:01 | 21 | inaccessibility to that website? |
| 10:01 | 22 | A. To what extent? |
| 10:01 | 23 | Q. Well, what -- do you have an |
| 10:01 | 24 | understanding as to whether or not the lack of |
| 10:01 | 25 | ALT tags on a website can cause inaccessibility |

## Page 46

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

```
10:28   2   ambiguous.
10:28   3       THE WITNESS: What do you mean by
10:28   4   tracked?
10:28   5   BY MR. KONECKY:
10:28   6       Q.  Well, do you keep track of the -- or
10:28   7   do you -- does anybody determine or try to
10:28   8   determine the amount of revenues generated by
10:28   9   Target.com?
10:28  10       A.  Target.com has its own P & L.
10:28  11       Q.  Okay.  And what were the revenues of
10:28  12   Target.com in 2006?
10:28  13       A.  They will be approximately six
10:28  14   hundred and fifty million.
10:28  15       Q.  And do you know where those revenues
10:29  16   go?
10:29  17       MR. McDOWELL: Objection, vague and
10:29  18   ambiguous.
10:29  19       THE WITNESS: What do you mean where
10:29  20   they go?
10:29  21   BY MR. KONECKY:
10:29  22       Q.  I mean presumably, for example, some
10:29  23   goes back into the Target.com budget, is that
10:29  24   right, or not?
10:29  25       A.  I'm not -- I'm sorry.  I'm not
```

## Page 47

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

```
10:29   2   following what you mean by where they go.  They
10:29   3   go back into the budget.
10:29   4       Q.  Well, I don't know.  I guess I'm
10:29   5   asking you what happens to the six hundred --
10:29   6   describe for me in terms of organizationally
10:29   7   where the revenues generated by Target.com go.
10:29   8       MR. McDOWELL:  Same objection.
10:29   9       THE WITNESS: I'm sorry. I'm not
10:29  10   understanding what you mean by where do they go.
10:30  11   BY MR. KONECKY:
10:30  12       Q.  Why don't you understand the
10:30  13   question?
10:30  14       I mean obviously -- I don't mean that
10:30  15   in a way other than I'm trying to figure out a
10:30  16   way to rephrase it, so that you do understand
10:30  17   it.
10:30  18       A.  Well, in a company, the revenues go
10:30  19   to a lot of -- go to a lot of different places,
10:30  20   meaning that you spend a lot of money on a lot
10:30  21   of different things like overhead, fulfillment
10:30  22   costs, et cetera.
10:30  23       So I'm not really in a position to
10:30  24   explain to you exactly where every dollar of the
10:30  25   six hundred and fifty million goes.
```

## Page 48

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

```
10:31   2       MR. McDOWELL:  The --
10:31   3   BY MR. KONECKY:
10:31   4       Q.  When you say overhead, for example,
10:31   5   is that overhead for Target.com?
10:31   6       A.  Yes.
10:31   7       Q.  Okay.  Does any part of the six
10:31   8   hundred fifty million go to places other than
10:31   9   Target.com?
10:31  10       MR. McDOWELL:  Objection, vague and
10:31  11   ambiguous.
10:31  12       THE WITNESS: I can't -- I'm not in a
10:31  13   position to answer that question.  I do not know
10:31  14   where all of our revenues go.
10:31  15   BY MR. KONECKY:
10:31  16       Q.  Do you know whether any of the
10:31  17   revenues generated by Target.com are used to
10:31  18   benefit Target Corporation generally as opposed
10:31  19   to just specifically Target.com?
10:31  20       MR. McDOWELL:  Objection, vague and
10:31  21   ambiguous.
10:31  22       THE WITNESS: I can't explain where
10:31  23   all of our revenues go.
10:31  24   BY MR. KONECKY:
10:31  25       Q.  Do you know if any of your revenues
```

## Page 49

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

```
10:31   2   go to places other than specifically Target.com?
10:31   3       A.  I can't answer that question.
10:32   4       Q.  Who would be able to answer that
10:32   5   question?
10:32   6       A.  Steve Benson, our director of
10:32   7   finance.
10:32   8       Q.  When you say your director of
10:32   9   finance, you mean Target.com's director of
10:32  10   finance?
10:32  11       A.  Correct.
10:32  12       Q.  Do you know who Mr. Benson reports
10:32  13   to?
10:32  14       A.  Dale Nitschke.
10:32  15       Q.  Your boss?
10:32  16       A.  Uh-huh.
10:32  17       Q.  Who then reports to --
10:32  18       THE COURT REPORTER:  Is that a yes?
10:32  19       THE WITNESS: Yes.
10:32  20   BY MR. KONECKY:
10:32  21       Q.  Who then reports to the president of
10:32  22   Target Corporation?
10:32  23       A.  Yes.
10:32  24       MR. KONECKY:  Why don't we take a
10:32  25   quick break?
```

Page 70

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

11:15 2 Q. Okay. What is it then?

11:15 3 A. The number of calls taken per unit

11:15 4 this industry trend?

11:15 5 Q. Oh. Is there any way of tracking the

11:16 6 number of calls taken that do not result in a

11:16 7 sale?

11:16 8 A. No.

11:16 9 Q. That's not something that Target or

11:16 10 Amazon to your knowledge tracks?

11:16 11 Am I correct?

11:16 12 A. All of the contacts -- contacts per

11:16 13 unit is just a way of measuring how many

11:16 14 contacts come in. It doesn't mean that every

11:16 15 contact that comes in is to place an order. It

11:16 16 could be questions on: Where is my order? My

11:16 17 order came in damaged, et cetera.

11:17 18 Q. Do you know what the budget is for

11:17 19 the 1-800 number?

11:17 20 A. No, I do not.

11:17 21 Q. When I say the 1-800 number, I mean

11:17 22 that function?

11:17 23 A. Yes.

11:17 24 Q. You don't know one way or the other

11:17 25 what's --

Page 71

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

11:17 2 A. I would need to check.

11:17 3 Q. Okay. Do you have any estimate?

11:17 4 A. I do not.

11:17 5 Q. Okay. Paragraph three says,

11:17 6 "Target.com was created in 1999."

11:17 7 When you say Target.com, are you

11:17 8 referring to the division of Target Corporation

11:18 9 or the website or something else?

11:18 10 A. The website.

11:18 11 Q. Okay. So the -- am I correct that

11:18 12 the website was launched in 1999?

11:18 13 A. Yes, you are.

11:18 14 Q. Okay. When did the division of

11:18 15 Target Corporation called Target.com get formed?

11:18 16 A. I believe it was in 2000.

11:18 17 Q. Who was responsible for creating the

11:18 18 website Target.com?

11:18 19 A. Clarify.

11:18 20 Q. Who created it?

11:18 21 A. Target.

11:18 22 Q. Target Corporation?

11:18 23 A. Yes.

11:18 24 Q. And do you know why?

11:19 25 A. Industry trend.

Page 72

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

11:19 2 Q. Are there certain goals or benefits

11:19 3 that were trying to be achieved by following

11:19 4 this industry trend?

11:19 5 A. It was set up in 1999 as a test to

11:19 6 see if the guest wanted to interact with

11:19 7 Target.com on the Internet or not.

11:19 8 Q. And was it determined that guests as

11:19 9 a general matter did want to do that?

11:19 10 A. Yes.

11:19 11 Q. Why?

11:19 12 Has Target figured out why guests

11:19 13 want to interact with Target.com?

11:19 14 MR. McDOWELL: Objection, lacks

11:19 15 foundation.

11:19 16 THE WITNESS: I --

11:19 17 BY MR. KONECKY:

11:19 18 Q. Has Target reached any conclusion or

11:19 19 understanding of why guests interact with

11:20 20 Target.com?

11:20 21 MR. McDOWELL: Same objection.

11:20 22 THE WITNESS: I can't answer that

11:20 23 question.

11:20 24 BY MR. KONECKY:

11:20 25 Q. Do you know whether Target.com is

Page 73

PATRICIA ANN PERRY - CONFIDENTIAL - 1.10.07

11:20 2 responsible for increasing Target Corporation's

11:20 3 overall profits?

11:20 4 A. Target.com has operated at a loss,

11:20 5 so, no.

11:20 6 Q. For how long has it operated at a

11:20 7 loss?

11:20 8 A. Since 1999.

11:21 9 Q. When you say operated at a loss, can

11:21 10 you describe either quantitatively or

11:21 11 qualitatively what you mean?

11:21 12 A. Our profits have not been positive.

11:21 13 Q. Positive in relation to what?

11:21 14 A. In relation to a number that we call

11:21 15 EBIT which is the profit that we -- that both

11:21 16 Target Corporation and Target.com, any company

11:21 17 reports. So it's the amount of profit that's

11:21 18 made on the sales which Target.com has not made

11:21 19 profit.

11:22 20 Q. Why does Target continue to use

11:22 21 Target.com?

11:22 22 A. I can't answer that question.

11:22 23 THE COURT REPORTER: I'm sorry.

11:22 24 What is your answer?

11:22 25 THE WITNESS: I can't answer that

# EXHIBIT B

1   LAURENCE W. PARADIS (California Bar No. 122336)
    lparadis@dralegal.org
2   MAZEN M. BASRAWI (California Bar No. 235475)
    mbasrawi@dralegal.org
3   DISABILITY RIGHTS ADVOCATES
    2001 Center Street, Third Floor
4   Berkeley, California 94704
    Telephone:    (510) 665-8644
5   Facsimile:    (510) 665-8511
    TTY:          (510) 665-8716
6
7   TODD M. SCHNEIDER (California Bar No. 158253)
    tschneider@schneiderwallace.com
    JOSHUA KONECKY (California Bar No. 182897)
8   jkonecky@schneiderwallace.com
    SCHNEIDER & WALLACE
9   180 Montgomery Street, Suite 2000
    San Francisco, CA  94104
10  Telephone:    (415) 421-7100
    Fax:          (415) 421-7105
11  TTY:          (415) 421-1655
12  DANIEL F. GOLDSTEIN (*pro hac vice*)
    dfg@browngold.com
13  BROWN, GOLDSTEIN & LEVY, LLP
    120 E. Baltimore St., Suite 1700
14  Baltimore, MD 21202
    Telephone:    (410) 962-1030
15  Fax:          (410) 385-0869

16

17                  **UNITED STATES DISTRICT COURT**

18                 **NORTHERN DISTRICT OF CALIFORNIA**

19                     **SAN FRANCISCO DIVISION**

| 20 | NATIONAL FEDERATION OF THE BLIND, the NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, on behalf of their members, and Bruce F. Sexton, on behalf of himself and all others similarly situated, | Case No.:  C 06-01802 MHP |
|---|---|---|
| | | **CLASS ACTION** |
| | | **EXPERT DECLARATION OF DR. JAMES W. THATCHER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| | Plaintiffs, | |
| | v. | Hearing Date: June 12, 2006 |
| | | Time:        2:00 p.m. |
| | TARGET CORPORATION, | Judge:       The Honorable Marilyn Hall Patel |
| | Defendant. | |

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644

1   I, James W. Thatcher, declare as follows:

2   1.      The facts in this declaration are based upon my personal knowledge.   If called to testify,

3   I could testify competently to the facts described in this declaration.

4                                              **Background**

5   2.      I am an independent Accessibility Consultant, living in Austin Texas.

6   3.      I was contacted by Mazen M. Basrawi of Disability Rights Advocates (hereinafter

7   "DRA") in July 2005.   Mr. Basrawi asked me to provide my expert assessment of the

8   accessibility of the website of the Target Corporation.   I submitted my report, "Accessibility

9   Assessment of Target.com," to DRA.   A true and correct copy of that report is attached as

10  Exhibit A.   DRA has continued to retain me as a litigation expert.

11  4.      I have consulted on accessibility with clients large and small, including Xerox, Google,

12  Success Factors, CCH, Thomson-West, Clayton College, NFB, The Rehabilitation Clinic of

13  Chicago and The State of Texas.   I serve as an auditor of Priceline.com approved by the Attorney

14  General of New York State.

15  
16                                    **Assistive Technology**

17  5.      I received my PhD in Computer Science from the University of Michigan in 1963.

18  6.      After that, my thesis advisor, Dr. Jesse Wright, and I both joined IBM Research in

19  Yorktown Heights, New York.

20  7.      With the birth of the IBM PC in the early 1980's, Dr. Wright (who is blind) and I had the

21  idea of making the PC "talk" so that it could be used by someone who could not see the screen.

22  We developed a tool which became the IBM Screen Reader in 1986, providing access to

23  computing for people who were blind.   The phrase "screen reader" was born as was the industry

24  of providing audio access for blind computer users.

25  8.      In those days computers used an operating system called DOS and screen readers were

26  *relatively* straight forward.   With the advent of the Graphical User Interface in the late 1980's,

27  
28  

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

---

*National Federation of the Blind, et al. v. Target Corporation, et al.*
**Case No.: C 06-01802 MHP**
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

1

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

1  the picture darkened and it looked like the access to computing by people who are blind would

2  be lost. I responded to this challenge leading the development of the first screen reader for a

3  graphical user interface, called IBM Screen Reader/2, released in 1992. I received the

4  Distinguished Service award from The National Federation of the Blind in 1994 for this work on

5  access to the Graphical User Interface.

6

7  9.      Systems like the screen readers and screen magnifiers for people with low vision are

8  called "assistive technology." I worked primarily on assistive technology until 1996 when I

9  moved from IBM Research to the IBM Accessibility Center in Austin, Texas.

10  10.     When I joined the IBM Accessibility center in 1996 I changed my focus from the

11  assistive technology that had engrossed me for the previous 13 years to accessibility. I took on

12  the challenge of bringing Accessibility into the IBM development process. Since IBM had a

13  long history of employing people with disabilities and of developing innovative assistive

14  technology, it was natural to demand that IBM produce accessible hardware, software, and

15  websites. The key to my approach was to develop accessibility guidelines for all areas where

16  IBM developed products and to get top level management support for requiring that IBM

17  developers follow those guidelines.

18

19                            **My Experience – Accessibility**

20  11.     There are two parts to providing access to computing for people with disabilities. One

21  part is the assistive technology, which has improved remarkably over the past fifteen years. The

22  other is the work of the application developer or website designer. Applications and websites

23  must follow certain protocols or standards so that the assistive technology will be able to get the

24  information that is displayed for a sighted user and communicate that information through

25  synthesized speech to a blind user in a clear and organized way.

26  12.     The simplest example of web accessibility is the problem of pictures (images) contained

27  in pages on the World Wide Web. These pictures can be photographs or drawings, but most

28

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

2

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

1    people don't realize that there are many "pictures" on most web pages that are important words

2    like "Go," "Search," "Contact us" and "Continue Checkout". These are often actually pictures

3    of words, not text that can be recognized and spoken by a screen reader.

4    13.     Web accessibility requires that "alternative text" is coded with each picture so that a

5    screen reader can speak the alternative text while a sighted user sees the picture. Note that

6    accessibility does not say "don't use pictures"; it says "include the alternative text along with

7    each picture." The alternative text does not change the visual presentation except that it appears

8    as a text pop-up when the mouse moves over the picture.

9

10                              **Section 508 Standards**

11   14.     Corporate support came when Congress passed the Workforce Rehabilitation Act in

12   1998. This Act contained Section 508 requiring that all federal agencies purchase only

13   accessible Electronic and Information Technology (IT). Representing IBM, I was Vice

14   Chairman of the Advisory Committee empanelled by the U.S. Access Board that proposed

15   Accessibility Standards for Section 508. These standards became effective in June 2001 for all

16   purchases of IT by federal agencies. This federal requirement on agency purchases led IBM to

17   adopt a policy that all products, those sold to the government, and those sold to non-

18   governmental customers, would meet the Section 508 standards. That made much more sense

19   than having two sets of products.

20

21                         **Web Content Accessibility Guidelines**

22   15.     The World Wide Web Consortium (W3C) is an international consortium where Member

23   organizations, staff, and the public work together to develop Web standards. In 1999 the W3C

24   released the Web Content Accessibility Guidelines (WCAG). These guidelines are organized

25   into three priority groups. The Priority One and Priority Two guidelines are similar to the

26   Section 508 Web Accessibility Standards.

27

28

---

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

3

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

### Applying the Standards and Guidelines

16.     When I undertake an expert assessment or audit of a website where a specific standard is not specified, I employ a combination of the Section 508 Standards and the Web Content Accessibility Guidelines, Priority One and Two.  It is a combination that strongly supports the assistive technology that I know well.

17.     There is more to accessibility than just the standards.  For the example of pictures I mentioned above, the Section 508 standard just says, "§1194.22(a): A text equivalent for every non-text element shall be provided (e.g., via "alt", "longdesc", or in element content)."

18.     This means different things for different kinds of pictures and an understanding of those alternatives is important in creating an accessible website or evaluating website accessibility. Pictures that are links or active buttons should have a text equivalent which is the function of the button or the link, like "Search" or "Continue Checkout".  For pictures which provide information, the text equivalent must convey the same information.  Sometimes images are just for decoration or formatting purposes; these pictures need a text equivalent too and it is called the null or the empty text equivalent.  That null text equivalent tells assistive technology to ignore the picture.

19.     One can't expect web designers and developers to know how people with disabilities use the Web.  That is the reason for the guidelines and standards.  But the final test has to be whether a web page can be used by a person with disabilities, in particular by a blind visitor using a screen reader.

### Evaluating Target.com

20.     Target.com is a commercial website that offers products and services for online sale and home delivery that are available in Target retail stores.  The online store allows the user to browse products, product descriptions and prices; view sale items and discounts for online shopping; print coupons for use in Target retail stores; purchase items for home delivery; order

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

4

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

1   pharmacy items and have prescriptions filled for pickup at Target retail stores; find retail store

2   locations; among a variety of other functions. The homepage of Target.com, captured on March

3   1, 2006, is attached hereto as Exhibit B.

4   21.   There are hundreds of web pages on Target.com, many of which change every day.

5   There are enterprise-level accessibility testing tools which I could use, but these testing tools are

6   imperfect. One of the leaders in the testing area who developed the first such tool, called

7   "Bobby," estimates that the testing tools can detect about 25 percent of accessibility problems

8

9   with the remainder requiring human involvement.

10   22.   A second reason for not depending on the testing tools is that accessibility errors in the

11   Target site are very repetitive. The same error occurs over and over and I believe it is more

12   important to thoroughly understand the accessibility issues on the site rather than just count

13   them. If I explain these errors and include information on what needs to be done to correct them

14   then the company is in a better position to build accessibility into the site in the future.

15   23.   Instead of attempting to evaluate the whole Target.com site, I looked at six top level

16   pages, including the Home Page, Browsing for Products (Men), Search Results, Investor

17   Relations, Press and Diversity. I also went through a complete transaction, finding a product,

18   adding it to the shopping cart, creating an account, entering credit card information, and

19

20   checking out. I looked for accessibility errors all the way through that purchasing process, which

21   consisted of nine distinct pages. The top level pages and the purchasing process added up to a

22   total of 15 pages.

23   24.   Expanding on my report (attached as Exhibit A) I will focus on four types of access

24   barriers found on the Target.com website. These four are especially important and are violations

25   of both the Web Content Accessibility Guidelines and the Section 508 Standards.

26

27   **Text Equivalents for Active Images**

28   25.   I mentioned this accessibility issue as an example of the concept of accessibility. There

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

5

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

1   is a sense in which it is the prototypical accessibility issue. The importance should be clear and

2   the solution is simple.

3   26.    Section 508 and the Web Content Accessibility Guidelines are almost identical in

4   addressing text equivalents.

5   27.    Section 508: "§1194.22 (a) A text equivalent for every non-text element shall be provided

6   (e.g., via "alt", "longdesc", or in element content)."

7

8   28.    WCAG: "1.1 Provide a text equivalent for every non-text element (e.g., via "alt",

9   "longdesc", or in element content)."

10  29.    Unfortunately there are many important pictures on Target.com that are active and that

11  lack a text equivalent. When I say "active images" I mean images that look and act like buttons

12  or images which are links to other parts of the site. An example of such an image from the

13  Target.com home page is attached hereto as Exhibit C.

14  30.    There are two links in this particular picture, one is "Gift Finder" and the other is "Red

15  Hot Shop". That is the way those links appear to a sighted user. The following is what the

16  screen reader reports to a blind user for the first link: "Ref equal sc underscore iw underscore l

17  underscore 1 601 minus 9748238 minus 9274539? Percent 5 Fencoding equals UTF8 ampersand

18  amp; node=3112881".

19

20  31.    That is not only meaningless; it is agonizing to listen to. The numbers, by the way, are

21  spoken in full, like "nine million seven hundred and forty eight thousand two hundred and thirty

22  eight."

23  32.    There is a simple explanation for why a screen reader would read this link the way it

24  does. If the page had been coded for accessibility, the text equivalent, "Gift Finder", would have

25  been attached to that picture, and "Gift Finder" is exactly what a screen reader would have

26  spoken. But there is no text equivalent present so a screen reader tries its best to compensate and

27  find other information that might help the blind user. When a text equivalent is missing, the

28

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

6

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

1   screen reader looks at what page the link will open so in the example here, it is speaking part of

2   the URL of that page.  That URL is the text that is displayed in the status area of Internet

3   Explorer when the mouse pointer is placed on the link.  Although this URL information is

4   sometimes helpful, in this case it is a string of nonsense symbols that is only of use to the content

5   management software that is managing the site and not intended for human reading.

6   33.     On many Target.com pages there are dozens of links similar to this; one following the

7   other making no sense for a blind visitor to the site.

8   

9   34.     On the 15 pages I examined in detail, there were 219 active images which had no text

10  equivalent.

11  35.     Even when text equivalents are provided there can be subtle problems concerning the

12  quality of that text equivalent.  An example is the "Continue Checkout" button that initiates the

13  checkout process after an item or items have been chosen.  The picture button is attached hereto

14  as Exhibit D.

15  36.     This button does have a text equivalent coded into the page.  The text equivalent for this

16  image button should be "Continue Checkout," because that is what the button does and that is the

17  text on the button.  But "Proceed to Checkout" is the text equivalent assigned to this picture on

18  Target.com.  This is not a critical error like the ones above but it is serious.  If a sighted person is

19  

20  helping a blind shopper, they might say, "Now just find the 'Continue Checkout' button in order

21  to make your purchase."  The blind shopper would respond, "I can't find the 'Continue

22  Checkout' button."

23  **Text Equivalents for Inactive Images**

24  37.     Although every picture must have a text equivalent to be valid code for a web page, a

25  screen reader will usually ignore the image if it lacks that text equivalent.  When an inactive

26  image doesn't have a text equivalent, at least a blind user is not inundated with gibberish as

27  illustrated on the active images above.  That is good news because on the 15 pages I examined in

28  

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

7

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

1  detail, there were 1,500 inactive images which had no text equivalent.

2  38.    Many of those inactive images are used for formatting and should be assigned the null

3  text equivalent, but either way the screen readers ignore those pictures.  However some of those

4  images are important.  An example is shown in Exhibit E, which is an image containing the

5  words, "Narrow your results."  This image should have "Narrow your results" as its text

6  equivalent and that information would lead to the form below for a blind user just as it does for a

7  sighted user.  This image has no text equivalent on Target.com and is ignored by a screen reader

8  so the information in the image is not conveyed to a blind user.

9

10  39.    Another example of an inactive image without a text equivalent is attached hereto as

11  Exhibit F.  This picture is found on the Diversity page of Target.com.  The picture here is not a

12  screen shot of a web page; this is actually a picture on the diversity page, a picture of the words

13  comprising Target's "Definition of Diversity."  It has no text equivalent, which could easily be

14  coded as the words *in* the picture.  It would be far better to make the definition of diversity part

15  of the text on the page, rather than a picture at all.

16  40.    I have discussed a very small number of examples of missing or inadequate text

17  equivalents.  This is an indication of the problem.  These are just samples.  On *each* page there

18  are many, sometimes hundreds, of these accessibility barriers.

19

20  **Keyboard Access**

21  41.    It is a fundamental tenet of web accessibility that anything you can do with the mouse

22  you must also be able to do using only the keyboard.  This is typically moving to links or buttons

23  with the TAB key, then pressing ENTER to follow a link or SPACE to take the action of a

24  button.

25  42.    For a web page to be accessible it must be possible for a user to interact with the page

26  using only the keyboard.  The keyboard as a replacement for the mouse is absolutely essential for

27  some people with disabilities.  Blind users can't use a mouse because manipulating the mouse is

28

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

8

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

a visual activity of moving the mouse pointer from one visual spot on the page to another. With other disabilities, especially some kinds of mobility impairments, Web surfers may be incapable of the hand-eye coordination required to manipulate the mouse pointer.

43.     As I explained above, I went through a process of purchasing an item on Target.com. After finding the item and adding it to my shopping cart there is a screen containing a "Continue Checkout" button that I talked about above. A screen shot of the page where the "Continue Checkout" button appears is attached hereto as Exhibit G.

44.     The next step in the purchase process is to "press" the "Continue Checkout" button. But it is impossible to do that using the keyboard. It is necessary to use the mouse and click on the "Continue Checkout" button in order to proceed.  This is the only place where I found that mouse activation was required and activation by the keyboard did not work. But it is an absolutely critically place!  This is an essential step in making a purchase on Target.com and it cannot be completed by any person who cannot use the mouse.

45.     I concluded that it is impossible for a blind person using the keyboard to complete a purchase on Target.com using the standard sequence of screens for such a purchase.

46.     On April 6, 2006, when teaching a class on web accessibility at the California Web Accessibility Conference, I discovered that the barrier caused by the "Continue Checkout" button on the website of the Target Corporation had been removed.  It is now possible to activate that button from the keyboard and complete a purchase without using the mouse.  This was not possible in my tests prior to April 6, 2006. All other barriers on the website of the Target Corporation remain as discussed here.

**Navigation**

47.     This issue of navigation is somewhat subtle compared to the other issues I have discussed above.  The problem can be illustrated with the page that contains the "Continue Checkout" button that I discussed above shown in the screen shot contained in Exhibit E.  If you are not

---

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

9

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

using a mouse the problem of getting to that button is significant because keyboard access proceeds through the page from left to right and from the top to the bottom. In particular there are about 25 navigation links at the top of the page, followed by about 25 more in the shopping options section of the page. All of these precede the "Your Cart" section. That means a blind user must pass through all of these in order to get to the Continue Checkout button.

48.     Using the tab key to navigate through the page will require about 50 key strokes just to get the desired button. This takes a long time, it is confusing and it is distracting. This problem persists on every page that contains those navigation links.

49.     Screen reader users need some technique for skipping over all those links in order to get to the desired part of the screen. The Section 508 Web Accessibility Standards address this issue with the following provision: "§1194.22(o): A method shall be provided that permits users to skip repetitive navigation links."

50.     There is no accommodation on the Target.com website to comply with §1194.22(o).

51.     Screen readers provide for navigation of headings on a page with the keyboard. If heading text is in fact coded as a heading then this navigation works. For example, on the Continue Checkout page shown in Exhibit E, the two main sections have text that looks like heading text, "More Shopping Options" and "Your Cart". If that text were actually designated as "heading text" in the source code of the page (which it is not), then a screen reader user could get to the desired button with just 3 keystrokes, using the next heading key (H) twice followed by the TAB key.

### Labeling Forms

52.     Of course forms are very important on a shopping site. You need to enter a description in a search field, specify the number of each item you want, and fill out personal information including your address and credit card information.

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

10

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

53.     For each piece of information you enter in a form on a website, there has to be some prompting information near the entry field or check box or radio button to tell you what goes where.

54.     If you cannot see the screen it is absolutely essential that you are informed about the prompting information so that you know which information is to be entered into which field.

55.     There are simple techniques in a web page that will tie the prompting information to the input elements so that a blind user will hear exactly what information is to be entered in the current field. With this accommodation, a blind shopper can complete a purchase conveniently and confidently.

56.     The Section 508 standards and Web Content Accessibility Guidelines both have specific requirements for form labeling.

57.     Section 508 §1194.22(n): "When electronic forms are designed to be completed online, the form shall allow people using assistive technology to access the information, field elements, and functionality required for completion and submission of the form, including all directions and cues."

58.     WCAG 12.4: "Associate labels explicitly with their controls."

59.     On Target.com there are no accommodations to facilitate the handling of forms by shoppers who use screen readers.

## Conclusion

60.     There are many thousands of images on Target.com that lack text equivalents to make them available to people using screen readers.  It is impossible before April 6, 2006 to complete a transaction relying on keyboard interaction.  Though this one problem appears to have been fixed, many critical barriers remain.  None of the form controls on Target.com have proper labeling and there is no accommodation to facilitate keyboard navigation throughout Target.com pages.  I have described four types of barriers that are easiest to explain and that are especially

*National Federation of the Blind, et al. v. Target Corporation, et al.*
**Case No.: C 06-01802 MHP**
**Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction**

11

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704-1204
(510) 665-8644

important for screen readers.  There are other components of Web Accessibility for people with visual disabilities.  As of April 12, 2006 the website of the Target Corporation is virtually unusable by a visitor who is blind.

61.    If the Target Corporation modifies its existing website or creates a new website so that the result complies with the Section 508 Web Accessibility Standards and the Web Content Accessibility Guidelines, Version 1.0, Priority 1 and Priority 2, then these most severe barriers that I have described will be addressed and the site will be accessible by people with visual impairments.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

Executed this April day of _12_, 2006, at Austin, Texas.

JAMES W. THATCHER, PhD

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
Expert Declaration of Dr. James W. Thatcher in support of Plaintiffs' Motion for Preliminary Injunction

12

# Exhibit A

# Accessibility Assessment of Target.com

## Jim Thatcher
## http://jimthatcher.com
## July, 2005

## 1.    My background

Accessibility has been a major part of my work since I developed one of the first
audio access systems for blind computer users in 1984. This became IBM Screen
Reader for DOS (and thus the phrase was born) in 1986. Later I led the
development of the first screen reader for the Graphical User Interface (1991) and
I was deeply involved in the development of IBM Home page Reader (1998).

This background in assistive technology gives me special insight into IT
accessibility issues. I applied that insight leading the process to create the IBM
Accessibility Guidelines (http://www.ibm.com/able/guidelines.html) and in
bringing accessibility into the IBM development process. I served as Vice-chair of
the Electronic and Information Technology Access Advisory Committee
empanelled by the U. S. Access Board to draft standards for Section 508 and
wrote the web accessibility course for the Information Technology Technical
Assistance and Training Center at Georgia Tech that was funded by the U.S.
Department of Education in support of Section 508.

I worked for IBM for 37 years. Since retiring in March of 2000 I have been an
accessibility consultant (http://jimthatcher.com) working with clients large and
small including Xerox, Google, Priceline.com, SuccessFactors, Thomson-West,
Clayton College, NFB, The Rehabilitation Institute of Chicago and The State of
Texas.

## 2.    Standards for Web Accessibility

One needs some a measure of accessibility or definition of accessibility. How can
I judge whether a web page or web site is accessible to persons with disabilities.
The answer is to check for compliance with the Web Content Accessibility
Guidelines (or WCAG) (http://www.w3.org/TR/WCAG/) from the World Wide
Web Consortium (W3C) (http://www.w3c.org) and the federal Section 508 Web
Accessibility Standards.  These two sets of criteria are very similar and identical
on the critical items I shall talk about here.

## 3.    Summary: Target.com accessibility

I have been asked by the National Federation of the Blind to evaluate the
accessibility of Target.com.  The key issues for accessibility of any site are:

   (1) **Text equivalents for images**. Every image should have associated with
       it a text equivalent, called alt-text. For visitors to the website who use a

screen reader, the alt-text replaces the image and is spoken by a screen reader just like any other text on the page.

(2) **Labeling for forms**. Form controls like text entry fields or check boxes require HTML coding that identifies the purpose of the control so that a screen reader user will know what to type in the text field or what is being agreed to with the check box.

(3) **Techniques for navigation**. Large pages with lots of links are organized into groups or sections. When those section headings are marked up as HTML headings the keyboard users can move from section to section with a single key on the keyboard. Without this accommodation it is extremely difficult to use the page for its intended purpose.

(4) **Keyboard access**. Keyboard access to a web site is usually taken for granted. Shoppers with varying disabilities find it impossible to use a mouse and rely on the keyboard instead.

On these key issues, Target fails miserably. Forms are not labeled at all and nothing has been done to improve navigation for screen reader or keyboard users. As a rough estimate, 80% of the images lack text equivalents.  There is one spot in the shopping process (on the path I took to checkout) where it is impossible to move forward without using the mouse. Customers who do not use a mouse are not able to buy things on Target.com.

Usually when I evaluate or audit a web site there are a few blatant errors, but many more subtle issues with the style of accessibility accommodations. With Target.com I didn't get into the subtleties. Errors in the four categories listed above overwhelm any subtle issues. And those errors are almost everywhere.

## 4.    Structure of this report

The results of my evaluation of Target.com, besides the overview above, are contained in the tables in the Section 6.  There are three tables. The first table enumerates the problems I found including a count of the errors on the 15 pages that I analyzed.

For those problems that occur frequently (numbers 1 though 7) the second table lists the pages that I evaluated and the number of problems in each category. Finally, for reference, the detailed URL for each page that I checked is contained in the third table.

My method of evaluating Target.com was first to determine a set of representative pages. I chose the home page and then carried out a typical shopping activity, searching, checking out, and purchasing which involved 11 additional pages. I briefly looked at each of the pages linked from the top and the bottom of the home page (Cart, My Account, Gift Registries, etc., on the top and About Target, Careers, Investors, etc on the bottom). With three exceptions (Investors, Press, and Diversity) these seem to be similar to the pages I had already seen.

Target.com                                                    Accessibility Assessment - July 2005

I study each page with various tools at my disposal to check for the presence or absence of accessibility markup, and then when the markup is present, the quality of that markup. I test interactivity with the keyboard and with one or more screen readers.

The <u>Discussion</u> in Section 5 below was written as I carried out the evaluation. It contains some details that are not conveyed by the tables in the Detailed Results Section 6).

This evaluation of Target.com pages was conducted between July 21, 2005 and July 30, 2005.

## 5.    Discussion

### 6.4.    *Alt-text*

When alt-text is present on Target.com (approximately 15 percent of the time) it is generally very well done.  It is unusual in my experience to find such a combination of serious accessibility issues and yet what *has* been done has been done well.

When I came to checkout, I was very surprised to find that all active images had alt-text, and as I said above, the alt text is generally well chosen. There were minor exceptions, like alt=`"Proceed to Checkout"` and it should be alt=`"Continue Checkout"` which is the text on the image and the correct description of the action of the button.

As I said, when alt-text was used it was generally ok. An exception in the checkout process is the progress indication at the top of the page consisting of the Target Brand followed by six step names (sign in, address, items, wrap, ship, pay and place order) shown here:



The completed steps are indicated in light red; the current step is dark red (pay in this case) and yet to go steps are in grey (place order in this case). The alt-text for this image on Target.com is "target.com" which is inadequate but it is not clear what is best. There is (what should be) a heading immediately under the image which says "Payment" so to indicate that the current step is payment is redundant. I might use alt=`""` believing that the information is redundant or alt=`"step 6 of 7"` abstracting the key progress information that the image gives.

As I looked at new pages, ones that weren't similar to those I had checked lready, I continued to find blatant examples of a total disregard for accessibility, for

access to the web site by people with disabilities. The Investors link on the bottom of the Home page opens a page which consists of two frames lacking `title` attributes as required both by the Section 508 Web Accessibility Standards and by the Web Content Accessibility Guidelines from the W3C.



The main navigation links in the top frame (news, about us, companies, etc.) are images which do not have text equivalents. The investor information *itself* is an image of text with no equivalent. The information is not available to a potential investor using a screen reader.

The navigation menu down the left on the Investors page *does* have alt-text though the main menu across the top does not. Neither left nor top menus have alt-text on the Press page; *every single image is missing* a text equivalent.

The Diversity page offers a similar problem relating to text equivalents. The text in the "Definition of Diversity" shown in the screen shot below is actually a picture of text:



A MESSAGE FROM BOB ULRICH, CHAIRMAN AND CEO

That picture has no text equivalent and that means that Target's "Definition of Diversity" is not available to a visitor to the web site who is blind.

### 6.5.    Keyboard access

When evaluating Target.com for accessibility I stepped through a process of
shopping, selection, and purchase with just the keyboard (no mouse) and with a
screen reader. That keyboard process hit a snag at the crucial point in the
shopping process − continuing checkout (screen shot below):

**Customers who bought the items in your Cart also bought:**

- Ceramic 6" Chef's Knife - White



With focus on the "Continue Checkout" button (whose alt text is "proceed to
checkout") both the enter key and the space bar should activate the button. That
does not happen. Both the enter key and the space bar just cause the view cart
page to reload. It is impossible to get beyond this point using only the keyboard.

### 6.6.    Form Controls

It is essential to be sure that all edit fields, select menus, radio buttons, check
boxes and text areas have `label` elements or `title` attributes that
programmatically identify the purpose of the control for screen reader users.
When this is done, and a screen reader user lands on a control it will announce
that prompt, like "First Name edit" or "Zip Code edit" where the word "edit" is the
way the JAWS screen reader tells a blind user that the control is a text entry field.
Without this accommodation, JAWS may just say "edit" or worse it may pick up
some other words that it guesses might be the prompt and possibly give the user
the wrong information.

There are two ways of accomplishing this programmatic identification. One is to
assign an `id` to the control and enclose the on-screen prompt with a `label`
element whose `for` attribute is the same as the `id` of the control. The idea is
illustrated by the following hypothetical code.

```
<label for="fn">First Name:</label> <input id="fn" type="text" size=20>
```

The second method is to use the title attribute on the `input` element, like
`title="first name"`. This should only be used if the on-screen text is not
adequate or the prompting text is not-contiguous.

I found no instances of providing this vital information for disabled users.

# 6.    Detailed Results

The table below lists nine different problem types with a brief description of each. The "WCAG" column refers to the checkpoint number of the Web Content Accessibility Guidelines from the W3C (http://www.w3.org/TR/WCAG10/). The 508 column references the section of §1194.22 of the Section 508 Web Accessibility Standards (http://www.access-board.gov/508.htm).

The "Severity" column shows my professional assessment of importance the issue for access to the site by people with disabilities. For example, although Section 508 and WCAG both require that *every* image have alt-text, I rank missing alt-text on an active image (219 instances) as Critical because a disabled user will probably not be able to accomplish the related task because of the problem. In contrast, missing alt-text on a formatting image (1426 instances) is ranked Low severity because screen readers will ignore the image.

The Severity column also includes the number of errors of that type in the 15 pages that I examined.

## 6.1.    Problems

This table contains the description of 9 error types with corresponding references to the Web Content Accessibility Guidelines and the Section 508 Web Accessibility Standards and a severity indication with the total number of occurrences of the error for the 15 pages reviewed.

| # | Error Description | WCAG | 508 | Severity |
|---|---|---|---|---|
| 1 | Every active image including image links, image buttons, and image map areas must have clear simple alt-text specifying the function of the image. | 1.1 | (a) | Critical **(219)** |
| | Men ›<br>› Pants<br>› Shirts<br>› See All   The image map on left should read, "Men, Men's pants, Men's Shirts, See all Men's wear." Instead it sounds like this: "ref=sc_iw_l_3/601-6264770-6816961?%5Fencoding=UTF8&node=1162322 ref=sc_iw_l_3/601-6264770-6816961?%5Fencoding=UTF8&node=1041846 ... " | | | |
| 2 | Every information-bearing image (including image map images) requires alt-text conveying that information. | 1.1 | (a) | Critical or High **(74)** |
| | ⬇ Narrow your results  Needs alt="Narrow your results" and is a critical example. | | | |
| 3 | Every formatting image requires empty alt-text (alt=""). | 1.1 | (a) | Low **(1426)** |
| 4 | Form Controls require `label` elements or `title` attributes | 12.4 | (n) | Critical **(59)** |

Target.com                                    Accessibility Assessment - July 2005

| # | Error Description | WCAG | 508 | Severity |
|---|---|---|---|---|
| 5 | Provide navigation methods for keyboard users | 13.6 | (o) | Critical (*) |
| | *Every* page must provide this structured navigation. What needs to be done is most obvious on the search results page where all the "red bars", <br> **Most popular product matches for "oven"** <br> should be heading level 2 or 3 and with "Search Results" as heading level 1 and "Narrow your search" as heading level 2. | | | |
| 6 | Don't duplicate links text. Combine image with text and use alt="" on image or make the image not a link and use alt="". | n/a | n/a | Medium (62) |
| | **Black & Decker Countertop Toaster Oven**  Black & Decker Countertop Toaster Oven    The image link and text link are identical. | | | |
| 7 | Make target of link or function explicit. | 13.1 | n/a | Medium **(38)** |
| | For example  **+ ADD TO CART**  needs alt="Add to Cart" and title="Add Black and Decker counter toaster oven to cart" assuming this is the button associated with the example in #6 above. | | | |
| 8 | Every Frame needs a title attribute that specifies the function of the frame. | 12.1 | (i) | High **(3)** |
| 9 | Interaction with each page (shopping in particular) must be possible without a mouse. | 9.2 | (n) | Critical **(1)** |

## 6.2.    *Page Reviews*

This is the table of the pages that were reviewed with a tabulation of the number of occurrences of each kind of error.

| # | Page Description | Error # from Table 6.1 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **1** | **2** | **3** | **4** | **5** | **6** | **7** |
| 1 | Home Page | 124 | 12 | 174 | 1 | * | 0 | 12 |
| 2 | Browse Page (Men) | 16 | 17 | 225 | 2 | * | 18 | 0 |
| 3 | Search Results ("oven") | 40 | 3 | 360 | 2 | * | 35 | 26 |
| 4 | Detail on shopping item (**Ceramic 5" Utility Knife – White**) | 8 | 14 | 137 | 3 | * | 3 | 0 |
| 5 | Add to cart (gp / cart / view.html) | 0 | 5 | 144 | 4 | * | 3 | 0 |
| 6 | Guest Sign In | 1 | 1 | 14 | 5 | * | 0 | 0 |
| 7 | Guest Registration | 1 | 1 | 130 | 5 | * | 3 | 0 |
| 8 | Address Book | 0 | 0 | 14 | 7 | * | 0 | 0 |

Target.com                                Accessibility Assessment - July 2005

| # | Page Description | Error # from Table 6.1 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 9 | Payment Methods | 1 | 2 | 15 | 16 | * | 0 | 0 |
| 10 | Billing Address | 1 | 2 | 15 | 8 | * | 0 | 0 |
| 11 | Place Order | 1 | 1 | 37 | 2 | * | 0 | 0 |
| 12 | Thank you (confirmation) | 2 | 5 | 130 | 2 | * | 0 | 0 |
| 13 | Investor Relations | 10 | 3 | 2 | 0 | * | 0 | 0 |
| 14 | Press | 14 | 4 | 7 | 0 | * | 0 | 0 |
| 15 | Diversity | 0 | 4 | 22 | 2 | * | 0 | 0 |

## 6.3.     Page URL's

This table (included for completeness) contains the actual URL copied from the address bar of the browser for each of the pages reviewed and listed in table 6.2.

| # | Page Description | URL |
|---|---|---|
| 1 | Home Page | http://www.target.com/gp/homepage.html/601-6264770-6816961 |
| 2 | Browse Page (Men) | http://www.target.com/gp/browse.html/ref=nav_t_spc_2_1/601-6264770-6816961?%5Fencoding=UTF8&node=1041828 |
| 3 | Search Results ("oven") | http://www.target.com/gp/search.html/ref=sr_bx_1/601-6264770-6816961?field-keywords=oven&url=index%3Dtarget&x=24&y=11 |
| 4 | Detail on shopping item (**Ceramic 5" Utility Knife – White**) | http://www.target.com/gp/detail.html/ref=13307891_bxgy_cc_tex t_b/602-1333620-2499063%5Fencoding=UTF8&asin=B0002HDV8O |
| 5 | Add to cart (gp / cart / view.html) | http://www.target.com/gp/cart/view.html/602-1333620-2499063 |
| 6 | Guest Sign In | http://www.target.com/gp/cart/view.html/602-1333620-2499063 (yes seems to be same – must be cookie coming into play) |
| 7 | Guest Registration | https://www.target.com/gp/flex/checkout/sign-in/select.html/602-1333620-2499063 |
| 8 | Address Book | https://www.target.com/gp/flex/sign-in.html/602-1333620-2499063?%5Fencoding=UTF8&step=checkout |
| 9 | Payment Methods | https://www.target.com/gp/checkout/address/create.html/602-1333620-2499063 |
| 10 | Billing Address | https://www.target.com/gp/checkout/pay/select.html/602-1333620-2499063 |
| 11 | Place Order | https://www.target.com/gp/checkout/billing/select.html/602-1333620-2499063 |
| 12 | Thank you (confirmation) | https://www.target.com/gp/checkout/confirm/select.html/602-1333620-2499063 |
| 13 | Investor Relations | http://www.targetcorp.com/targetcorp_group/investor-relations/investor-relations.jhtml |
| 14 | Press | http://www.targetcorp.com/targetcorp_group/news/news.jhtml |

Target.com

| # | Page Description | URL |
|---|---|---|
| 15 | Diversity | http://target.com/targetcorp_group/diversity/index.jhtml |

# Exhibit B

Screen shot of Target.com, captured on 03.01.2006



Exhibit C

Image from Target.com home page showing two "picture links" –
Gift Finder and Red Hot Shop, captured on 02.26.2006

**Shop** Target.com

**Gift Finder** ⟩
**Red Hot Shop** ⟩

Exhibit D

Image button from Target.com showing the words "Continue Checkout"
but having "Proceed to Checkout" as a "text equivalent"

▸▸ **Continue Checkout**

Exhibit E

An example of an information bearing image from
Target.com search results page, captured on 02.26.2006

Narrow your results

# Exhibit F

Picture showing the words of Target's "Definition of Diversity"
from the Target.com website, captured on 02.26.2006



**Diversity is individuality.** It includes a wide spectrum of traits like personal style, age, race, gender, ethnicity, sexual orientation, language, physical ability, religion, family, citizenship status, socio-economic circumstances, education and life experiences. Target sees diversity as any trait that makes someone unique and does not interfere with effective job performance.

A MESSAGE FROM BOB ULRICH, CHAIRMAN AND CEO

Exhibit G

A screen shot of the web page in the purchase process on Target.com
containing the "Continue Checkout" button, captured on 02.26.2006



# EXHIBIT C

1      A.  Yes.

2      Q.  Let me show you a document we have marked

3   as Plaintiff's Exhibit F.  And I will give a copy to

4   Stuart.

5           MR. PLUNKETT:  Is this F because you

6   premarked exhibits?

7           MR. PARADIS:  Yes.  And I think all of this

8   is Exhibit F.  That is your copy.

9      Q.  Mr. Letourneau, would you review Exhibit F

10  and tell me if that looks like a printout of your

11  website?

12     A.  Yes.

13     Q.  Okay.  Now, the very first paragraph of

14  your website has a definition of web accessibility.  Do

15  you see that?

16     A.  Yes.

17     Q.  It says, "What does web accessibility mean?

18  To me it means that anyone using any kind of web

19  browsing technology must be able to visit any site and

20  get a full and complete understanding of the

21  information contained there, as well as have the full

22  and complete ability to interact with the site."

23           Is that your understanding of web

24  accessibility?

25     A.  Writ large, yes.

1          A.   The use of appropriate alt text is very

2     important to the experience of someone using the

3     website, someone with a screen reader using a website.

4          Q.   Is it a critical requirement for blind

5     users?

6               MR. PLUNKETT:  Objection.  Vague.

7     Incomplete hypothetical.  Calls for speculation.

8               THE WITNESS:  According to the standard, it

9     is important, a very important part of the web

10    experience.  Yes.

11              MR. PARADIS:  Q.  Based on your own

12    experience as an expert, would you agree that correctly

13    providing alt text is a critical access requirement for

14    blind users to a website?

15              MR. PLUNKETT:  Objection.  Incomplete

16    hypothetical.  Calls for speculation.

17              THE WITNESS:  In general, yes.

18              MR. PARADIS:  Q.  Another element you

19    mentioned here is, "misuse or don't use title."

20              What does "title" mean as you used it here?

21         A.   The title I am referring to there is the

22    HTML title that appears in the top bar of most browsers

23    to identify the page.

24         Q.   Is that sometimes also referred to as

25    headings?

1          Q.   Yes.

2          A.   What was the intent?

3               Would you repeat that, please?

4               (Record read.)

5               THE WITNESS:  Actually, I am not sure I

6     understand what you mean by "intent" in that.

7               MR. PARADIS:  Q.  Am I correct that

8     Priority Two is the designation for features that are

9     important to provide because some people with

10    disabilities will have difficulty using the website

11    unless they are provided?

12         A.   I think that characterizes the intent of

13    Priority Two, yes.

14         Q.   And then Priority Three are features that

15    are not as important as Priorities One and Two, in

16    terms of making a website usable by disabled people; is

17    that correct?

18         A.   That is an interpretation of that, yes.

19         Q.   Is that an interpretation you would agree

20    with?

21         A.   I think in general, yes.

22         Q.   Looking again at slide 4 from this

23    Exhibit E, I see that using header elements to convey

24    document structure is a Priority Two item.  Do you see

25    that?

1              A.   Yes.

2              Q.   What does that mean?

3                   MR. PLUNKETT:  Objection.  Vague.

4                   THE WITNESS:  If a document is a structured

5    document, then proper use of headers to identify the

6    sections of that document will aid the understanding

7    and navigation of that document.

8                   MR. PARADIS:  Q.  Would you consider this a

9    basic navigation element as you have used the term

10   "basic"?

11             A.   For structured documents, yes.

12             Q.   And is this a basic navigation element that

13   blind people need?

14                  MR. PLUNKETT:  Objection.  Incomplete

15   hypothetical.  Calls for speculation.

16                  THE WITNESS:  The use of headers would make

17   it easier for a blind person to navigate a structured

18   document.  Do they need it?  That is open to

19   speculation.

20                  MR. PARADIS:  Q.  Was it the consensus of

21   the WCAG working group -- let me start again.

22                  Was there a WCAG working group?

23             A.   Yes.

24             Q.   Is that the group that developed the WCAG

25   1.0 standards?

1      Q.  Right.  Unfortunately, the declaration and

2    the attachments use letters.  The declaration is

3    Exhibit B, and attached to the declaration as Exhibit A

4    is an assessment report that Dr. Thatcher prepared in

5    July of 2005.

6      A.  Thank you.

7      Q.  I would like you to look at the tab on the

8    first page of this report, paragraph three.  It's

9    labeled, "Summary:  Target.com accessibility."

10         And then he says in here, "The key issues

11   for accessibility of any site are:  No. 1, Text

12   equivalents for images."

13         Do you see that?

14     A.  Yes.

15     Q.  Do you agree with that?

16     A.  Yes.

17     Q.  No. 2, on the next page is, "Labeling for

18   forms."

19         Do you have an understanding of what

20   "Labeling for forms" means?

21     A.  Yes.

22     Q.  And do you consider labeling for forms to

23   be a key issue for accessibility of any site for blind

24   users?

25         MR. PLUNKETT:  Objection.  Calls for

1    speculation.  Incomplete hypothetical.

2              THE WITNESS:  I think that proper labeling

3    of forms can make forms easier to use.

4              MR. PARADIS:  Q.  What is your

5    understanding of the requirements within WCAG 1.0

6    concerning labeling of forms?

7              A.  I believe it was a Priority Two.  I just --

8    I want to refresh myself on that.

9              Q.  Sure.

10             A.  Yes.  Priority Two.

11             Q.  And what is the purpose for requiring

12   labeling of forms within WCAG as you understand it?

13             MR. PLUNKETT:  Objection.  Vague.

14             THE WITNESS:  It would -- my interpretation

15   of that has been that for screen readers that recognize

16   form labels, it allows the web page designer more

17   flexibility in how they design their forms, so that the

18   label that applies for a particular field is

19   discoverable.

20             MR. PARADIS:  Q.  Is the ultimate purpose,

21   as you understand it, so that a blind user can know

22   with confidence what each field within the form calls

23   for?

24             A.  It would aid that, yes.

25             Q.  And is the ultimate purpose, so that a

1    blind user can fill out a form with as much ease and

2    confidence as a sighted person could?

3        A.  Yes.

4        Q.  The third item Dr. Thatcher mentions is

5    labeled "Techniques for navigation."  And he says,

6    "Large pages with lots of links are organized into

7    groups or sections.  When those section headings are

8    marked up as HTML headings, the keyboard user can move

9    from section to section with a single key on the

10   keyboard.  Without this accommodation it is extremely

11   difficult to use the page for its intended purpose."

12           Do you agree that this is an important

13   access element for blind users in a web page such as

14   target.com?

15       A.  I can't --

16           MR. PLUNKETT:  Objection.  Calls for

17   speculation.

18           THE WITNESS:  I have not seen target.com,

19   so I can't --

20           MR. PARADIS:  Q.  Have you seen the website

21   of any large retail company?

22       A.  Yes.

23       Q.  Can you give me an example of one you have

24   seen in the last year?

25       A.  Company called Future Shop.

1    specific.  There are many techniques for navigation.

2              MR. PARADIS:  Q.  Well, looking at how

3    Dr. Thatcher describes it in paragraph three, he says,

4    "Large pages with lots of links are organized into

5    groups or sections."

6              Do you consider that an important access

7    feature for blind users of a web page that has lots of

8    links?

9              MR. PLUNKETT:  Objection.  Vague.  Calls

10   for speculation.  Incomplete hypothetical.

11             THE WITNESS:  It might very well.

12             MR. PARADIS:  Q.  In a website that has a

13   home page with lots of different sections that perform

14   different functions, is it important for such a page to

15   have techniques for navigation so that blind users can

16   move easily around the home page?

17             MR. PLUNKETT:  Objection.  Incomplete

18   hypothetical.  Calls for speculation.  Vague.

19             THE WITNESS:  There are many techniques for

20   navigation, and having some is important.

21             MR. PARADIS:  Q.  And particularly -- is it

22   particularly important to have a mechanism to avoid

23   repetitive navigation links on such a page?

24             MR. PLUNKETT:  Objection.  Incomplete

25   hypothetical.  Calls for speculation.  Vague.

1          THE WITNESS:  In general, yes, I do believe

2      that.

3          MR. PARADIS:  Q.  And that is a requirement

4      of Section 508 guidelines, correct?

5          A.  I believe it is, yes.

6          Q.  Just so I am clear, what do you mean by a

7      computer -- I am sorry.  What do you mean by a web page

8      versus a website?

9          A.  A web page -- a lot of people are arguing

10     over this one right now.  In my opinion, a web page is

11     a single unit delivered by the entering of a URL, a web

12     address.  A website is the complete collection of

13     linked pages in a website.

14         Q.  The next item, No. 4, in Dr. Thatcher's

15     report, is labeled, Keyboard access.

16         Do you consider it a critical access

17     feature for blind users that a website enable them to

18     perform all of the user functions through a keyboard?

19         MR. PLUNKETT:  Objection.  Incomplete

20     hypothetical.  Calls for speculation.  Vague.

21         THE WITNESS:  I generally agree with that,

22     yes.

23         MR. PARADIS:  Q.  On the next paragraph,

24     going to the second sentence -- first of all, this

25     paragraph discusses target.com.  And it says, "On these

1    for speculation.  Lacks foundation.

2              THE WITNESS:  The purpose is to facilitate,

3    to make it easier for someone to do that.  Screen

4    readers are not often very good at fixing bad design or

5    mitigating bad design.

6              MR. PARADIS:  Q.  Now, the WCAG guidelines

7    that you helped develop were designed to make web pages

8    accessible to a wide variety of different types of

9    disabilities, correct?

10             A.  That's the intent, yes.

11             Q.  They were designed to make disabled people

12   able to access websites using a wide range of

13   screen-reading software, correct?

14             A.  It was to allow web page designers to make

15   web pages that could facilitate that interaction.

16             Q.  And the -- your understanding of access

17   is -- for website access is that even people using

18   older technologies should be able to interact with the

19   web page with ease, correct?

20             A.  Ideally, yes.

21             MR. PLUNKETT:  Objection.  Vague.

22             MR. PARADIS:  Q.  And under your definition

23   of access, the website designer should not design only

24   to the most up -- the most recent technologies, but to

25   the entire range of technologies that are generally

1    being used, correct?

2                    MR. PLUNKETT:  Objection.  Vague.

3                    THE WITNESS:  Could you read that back,

4    please?

5                    (Record read.)

6                    THE WITNESS:  Not design only -- yes, I

7    think that characterizes my --

8                    MR. PARADIS:  Q.  Okay.  Do you recall

9    doing a declaration in this case?

10                   A.  I am sorry?

11                   Q.  Do you recall signing a declaration in this

12   case?

13                   A.  Yes.

14                   Q.  And do you recall in paragraph 10 of your

15   declaration referring to both the WCAG and the

16   Section 508 standards?

17                   A.  Yes.

18                   Q.  Let me -- it's not a trick.  Let me give

19   you a copy of your declaration.  I am showing you

20   Exhibit A, Plaintiff's Exhibit A, which is a copy of

21   your declaration.

22                   So, in paragraph 10, would you please turn

23   to that?  Do you see where you mention both WCAG and

24   Section 508 standards?

25                   A.  Yes.

# EXHIBIT D

Page 62

TODD J. NEMOIR - 1.9.07

11:07  2  BY MR. KONECKY:
11:07  3  Q.  Are you aware of -- of any
11:07  4  requirement in the design of Target.com for
11:07  5  users of any particular degree of education or
11:07  6  technological savvy in order to navigate through
11:07  7  the site?
11:07  8  A.  I'm sorry.
11:08  9  Could you repeat the question?
11:08  10  Q.  Sure.
11:08  11  MR. KONECKY:  Could you read back the
11:08  12  question?
11:08  13  * * *
11:08  14  (Whereupon, the reporter read back
11:08  15  the requested portion of the record.)
11:08  16  * * *
11:08  17  THE WITNESS:  There's not -- to the
11:08  18  best of my understanding, there's not a
11:08  19  particular education level or technological
11:08  20  ability that's dictated in any of the design
11:08  21  that we do.
11:08  22  BY MR. KONECKY:
11:08  23  Q.  Do you design Target.com so that it
11:08  24  is user friendly for the general public?
11:09  25  MR. McDOWELL:  Objection, lacks

Page 63

TODD J. NEMOIR - 1.9.07

11:09  2  foundation, beyond the scope.
11:09  3  THE WITNESS:  That is one of the
11:09  4  business objectives that it serves.  That is not
11:09  5  the only one.
11:09  6  BY MR. KONECKY:
11:09  7  Q.  And does the business objective of
11:09  8  making Target.com user friendly apply to users
11:09  9  with both high and moderate and low levels of
11:09  10  experience with the Internet?
11:09  11  A.  I've not been involved in any of
11:09  12  those conversations -- any conversations with
11:10  13  regard to differentiating users at that point.
11:10  14  Q.  Am I correct that the Target.com
11:10  15  design does not change or differentiate
11:10  16  depending upon the particular Internet skill set
11:10  17  or education level of the user?
11:10  18  A.  The experience is the same for users
11:10  19  of all experience levels.
11:10  20  Q.  The experience on Target.com?
11:10  21  A.  Correct.
11:10  22  Q.  Let's stick with sighted users of
11:10  23  Target.com for a moment.
11:11  24  I take it if you're accessing
11:11  25  Target.com as a sighted user, in order to

Page 64

TODD J. NEMOIR - 1.9.07

11:11  2  navigate through it, you need to be able to
11:11  3  read, is that right?
11:11  4  A.  Yes.
11:11  5  Q.  Okay.  And if you're using a mouse,
11:11  6  you need to be able to -- be able to move the
11:11  7  mouse and point and click, is that right?
11:11  8  A.  If you're using a mouse, yes.
11:11  9  Q.  Is there anything else you need to be
11:11  10  able to do as sighted user in order to navigate
11:11  11  through Target.com?
11:11  12  A.  I'm sorry.  I -- the question's a bit
11:12  13  vague for me.
11:12  14  Q.  All right.  In what way is it vague?
11:12  15  A.  I mean we assume that you're able to
11:12  16  process the information and understand and make
11:12  17  judgments as to what you might be interested in.
11:12  18  Q.  In terms of designing Target.com, at
11:12  19  least for sighted users, am I correct that it's
11:12  20  designed to be user friendly so long as the
11:12  21  person is able to read and process information
11:12  22  and use a mouse?
11:12  23  A.  The friendliness of the experience is
11:12  24  one of the components that we take into account
11:12  25  when designing an experience.  It is not the

Page 65

TODD J. NEMOIR - 1.9.07

11:12  2  only one.
11:13  3  Q.  Okay.  I understand it's not the only
11:13  4  one.
11:13  5  But is there anything else that a
11:13  6  sighted user needs in order to have a user
11:13  7  friendly experience on Target.com other than the
11:13  8  ability to read text and the ability to point
11:13  9  and click a mouse?
11:13  10  A.  I understand -- you asked the same
11:13  11  question.  I still think it's vague.  I mean
11:13  12  we're still making assumptions as to their --
11:13  13  the cognitive ability of the person to
11:13  14  understand the marketing messages we're
11:13  15  communicating.  We're making assumptions about
11:13  16  the tools they have available to access the
11:13  17  site.
11:13  18  Q.  Well, when you design or when Target
11:13  19  designs the website, is there anything else that
11:14  20  Target puts in the design of the website which
11:14  21  would require, at least for sighted users,
11:14  22  anything other than the ability to read and the
11:14  23  ability to point and click a mouse in order to
11:14  24  have a user friendly experience on the website?
11:14  25  MR. McDOWELL:  Objection, asked and

Page 82

TODD J. NEMOIR - 1.9.07

11:43  2      A.   I'm sure there is more, yes.
11:43  3      Q.   Is there anything else that you can
11:43  4   think of right now?
11:43  5      A.   No.
11:43  6      Q.   What about from moving from one page
11:43  7   to another on Target.com?
11:43  8           Is there anything that a sighted user
11:43  9   needs other than to be able to visually see the
11:43  10  -- the page and the link on the page and to be
11:43  11  able to mechanically use the mouse in order to
11:43  12  point and click on the link?
11:43  13     A.   No.
11:44  14     Q.   Are -- when -- when Target.com was
11:44  15  first designed, am I correct that it was not
11:44  16  designed with the particular needs of a blind
11:44  17  user in mind?
11:44  18     A.   I was not at the company when
11:44  19  Target.com was designed.
11:44  20     Q.   Looking at the design, particularly
11:44  21  prior to 2006, is it fair to say that it was a
11:44  22  design that was directed for sighted users as
11:45  23  opposed to blind users?
11:45  24     A.   The implementation of the design
11:45  25  would have been accomplished sticking to the

Page 83

TODD J. NEMOIR - 1.9.07

11:45  2   developer's existing guidelines which would have
11:45  3   provided direction to insure that the
11:45  4   functionality of the site was accessible by all
11:45  5   of our guests.
11:45  6      Q.   I'm correct that you've had to add or
11:46  7   would have to add features to the site in order
11:46  8   to make it in -- in order to provide blind users
11:46  9   with the equivalent ease of use or the same
11:46  10  level of ease of use as sighted people?
11:46  11          MR. McDOWELL:  Objection, vague and
11:46  12  ambiguous.
11:46  13          THE WITNESS:  We've made changes to
11:46  14  the site to improve the guest experience for
11:46  15  people who use screen readers.
11:46  16  BY MR. KONECKY:
11:46  17     Q.   And these changes you've made since
11:46  18  you've been there?
11:46  19     A.   Correct.
11:46  20     Q.   Okay.  Some time after March of 2006?
11:46  21     A.   Correct.
11:46  22     Q.   And prior to making those changes, am
11:46  23  I correct that in terms of perceiving the
11:46  24  information on the website or being able to move
11:46  25  through the website, that blind people or others

Page 84

TODD J. NEMOIR - 1.9.07

11:47  2   with vision disabilities that use screen access
11:47  3   software to not -- did not have equivalent ease
11:47  4   of use or the same level of ease of use on the
11:47  5   website?
11:47  6      A.   I wouldn't --
11:47  7           MR. McDOWELL:  Objection, vague and
11:47  8   ambiguous.
11:47  9           Go ahead.
11:47  10          THE WITNESS:  I wouldn't feel
11:47  11  comfortable making that assessment.
11:47  12  BY MR. KONECKY:
11:47  13     Q.   Do you disagree with that assessment?
11:47  14          MR. McDOWELL:  Same objection.
11:47  15          THE WITNESS:  I would need to give
11:47  16  that some more thought.
11:47  17  BY MR. KONECKY:
11:47  18     Q.   Sitting here today, as the person
11:47  19  most knowledgeable for Target on the subjects of
11:47  20  past efforts taken and contemplated efforts to
11:47  21  make Target.com accessible and/or usable by
11:48  22  people who are blind or visually impaired, would
11:48  23  you disagree with the statement that prior to
11:48  24  changes that are being implemented starting
11:48  25  March 2006 or some time shortly thereafter, that

Page 85

TODD J. NEMOIR - 1.9.07

11:48  2   blind individuals or individuals with vision
11:48  3   impairments that need screen access software
11:48  4   could not experience Target.com with the same
11:48  5   ease of use as sighted people?
11:48  6           MR. McDOWELL:  Vague and ambiguous.
11:48  7           THE WITNESS:  Again, you're making an
11:49  8   assessment that I don't feel comfortable with by
11:49  9   asking that question.  I find it difficult to
11:49  10  exactly compare the two experiences and call one
11:49  11  easier to use than the other.  They're different
11:49  12  experiences.  They're different ways of
11:49  13  experiencing the same content.
11:49  14  BY MR. KONECKY:
11:49  15     Q.   Well, if there's no alternate text
11:49  16  attached to an image, then the blind user cannot
11:50  17  experience that content, is that correct?
11:50  18     A.   That's correct.
11:50  19     Q.   And that's true regardless of how
11:50  20  sophisticated the blind user is, right?
11:50  21     A.   Yes.
11:50  22     Q.   Or where the blind user is dialing in
11:50  23  from or connecting from, right?
11:50  24     A.   Correct.
11:50  25     Q.   And prior to March 2006, there have

Page 86

TODD J. NEMOIR - 1.9.07

11:50  2  been many images on Target.com which did not
11:50  3  have alternate text, is that right?
11:50  4     A.  Yes.
11:50  5     Q.  Over half of the images perhaps,
11:50  6  right?
11:50  7     A.  I wouldn't be able to put a number to
11:50  8  it.
11:50  9     Q.  Possibly over half?
11:50  10    MR. McDOWELL:  Anything is possible.
11:50  11  It calls for speculation.
11:50  12    THE WITNESS:  (Witness indicating).
11:50  13    I wouldn't be able to speculate.
11:50  14  BY MR. KONECKY:
11:50  15    Q.  Okay.  Am I correct that how ever
11:50  16  many number of images on Target.com that did not
11:50  17  have alternate text though, that because the
11:51  18  blind individual cannot perceive the content of
11:51  19  those images, that that person's experience is
11:51  20  not equivalent to or with the same level of ease
11:51  21  as the sighted person's experience?
11:51  22    MR. McDOWELL:  Objection, vague and
11:51  23  ambiguous.
11:51  24    THE WITNESS:  You're drawing one
11:51  25  example to characterize the entire guest

Page 87

TODD J. NEMOIR - 1.9.07

11:51  2  experience.  In that one example, I would agree
11:51  3  with the way you're describing it.
11:51  4  BY MR. KONECKY:
11:51  5    Q.  And have you -- you're familiar with
11:51  6  the expert report provided by James Thatcher in
11:51  7  this case?
11:51  8    A.  I am familiar with some suggestions
11:51  9  that Dr. Thatcher made.
11:51  10    Q.  Are you familiar with any
11:51  11  observations he made about the Target.com
11:51  12  website?
11:51  13    A.  I know about the summary of those
11:52  14  observations, not the specifics.
11:52  15    Q.  Are you aware that he estimated that
11:52  16  up to eighty percent of the images on
11:52  17  Target.com, at least as of June 2005, did not
11:52  18  have alternate text?
11:52  19    A.  No.
11:52  20    Q.  Is that something that you would
11:52  21  disagree with?
11:52  22    A.  We've covered this.  I don't know
11:52  23  that I can put a number to the percentage of
11:52  24  images that did or did not have alternate text.
11:52  25    Q.  But my question is slightly

Page 88

TODD J. NEMOIR - 1.9.07

11:52  2  different.
11:52  3    As Target's person most knowledgeable
11:52  4  regarding past efforts taken and contemplated
11:52  5  efforts to make Target.com accessible and/or
11:52  6  usable by people who are blind or visually
11:52  7  impaired, do you have any basis to disagree with
11:52  8  the statement that in June of 2005,
11:52  9  approximately, eighty percent of the images on
11:53  10  Target.com did not have alternate text?
11:53  11    A.  I cannot agree or disagree to the
11:53  12  statement.
11:53  13    Q.  And can you or would you disagree
11:53  14  with the statement that as of the beginning of
11:53  15  April of -- as of the beginning of 2006, that at
11:53  16  least half of the images on Target.com did not
11:53  17  have alternate text on them?
11:53  18    MR. McDOWELL:  Objection, asked and
11:53  19  answered.
11:53  20    THE WITNESS:  Again, I have no
11:53  21  assessment of what that percentage would be.
11:53  22  BY MR. KONECKY:
11:53  23    Q.  Either way, you agree that there are
11:53  24  thousands of images on Target.com on any given
11:53  25  day?

Page 89

TODD J. NEMOIR - 1.9.07

11:53  2    A.  Yes.
11:53  3    Q.  Okay.  And the images can include not
11:53  4  just pictures but also text, right?
11:53  5    A.  Yes.
11:53  6    Q.  And that for each of those images, if
11:53  7  an image does not have alternate text, a blind
11:54  8  user cannot perceive the information being
11:54  9  provided by that image, is that correct?
11:54  10    A.  Using an existing screen reader, yes,
11:54  11  that's my understanding.
11:54  12    Q.  Okay.
11:54  13    MR. KONECKY:  Why don't we take a
11:54  14  break?
11:54  15    MR. McDOWELL:  Should we take lunch?
11:54  16    MR. KONECKY:  Yeah.  That sounds
11:54  17  good.
12:16  18    * * *
12:16  19    (Whereupon, a lunch recess was taken.)
13:07  20    * * *
13:07  21  BY MR. KONECKY:
13:07  22    Q.  Did you prepare in any way for this
13:08  23  deposition today?
13:08  24    A.  Yes.
13:08  25    Q.  How did you do that?

Page 138

TODD J. NEMOIR - 1.9.07

14:34  2    A.  I'm struggling to recall the specific
14:34  3  improvements that were part of each release.
14:34  4  They were broken apart more to make better use
14:34  5  of development resources than to have
14:34  6  consistency in the features.
14:34  7        The first specific change was to
14:35  8  incorporate the -- both the ability of Target to
14:35  9  control the alternative text for images that
14:35  10  were on the site.
14:35  11    Q.  I'm not sure I understand your answer
14:35  12  which speaks more to my ability to understand
14:35  13  than anything else, but what -- what do you mean
14:35  14  specifically?
14:35  15        What was done with that -- the first
14:35  16  part that you started to describe?
14:35  17    A.  So for the -- the portions of the
14:35  18  experience that Target.com -- on Target.com that
14:35  19  a Target resource somewhere developed, we could
14:36  20  code -- we can code to include those ALT tags
14:36  21  for images ourselves.  There are significant
14:36  22  portions of the experience that Amazon develops,
14:36  23  and so we had no control in those areas.  In
14:36  24  those areas, they made the changes so that as we
14:36  25  provide the image, at the same time, we can

Page 139

TODD J. NEMOIR - 1.9.07

14:36  2  provide an alternate text label for that as
14:36  3  well.
14:36  4    Q.  For the parts of the site that Amazon
14:36  5  -- is it right to say powers, operates?
14:36  6        What's the right terminology?
14:36  7    A.  Maintains.
14:36  8    Q.  Maintains?
14:36  9        For the sites that Amazon maintains,
14:37  10  Target provides the image, as well as the alt
14:37  11  text.
14:37  12    A.  Correct.  Within the content
14:37  13  management tool, there is an area where we
14:37  14  upload images and provide specifications about
14:37  15  that image, its height, its width, as well as
14:37  16  any other attributes in including ALT attributes
14:37  17  for that image.
14:37  18    Q.  And what did you say that was part
14:37  19  of?
14:37  20    A.  Seller Central.
14:37  21    Q.  It's a particular program or
14:37  22  protocol?
14:37  23    A.  That's the contact management tool
14:37  24  that Amazon provides to Target.com.
14:37  25    Q.  And it's the same tool that's used

Page 140

TODD J. NEMOIR - 1.9.07

14:37  2  for all images that Amazon -- that are put on
14:38  3  the parts of the site that Amazon maintains?
14:38  4    A.  To the best of my knowledge.
14:38  5    Q.  And I know you mentioned this
14:38  6  earlier, but which parts of the site are that --
14:38  7  are they, the ones that Amazon maintains?
14:38  8    A.  All of the shopping and browsing and
14:38  9  checkout portions of the site.
14:38  10    Q.  And was putting the alt text on the
14:38  11  shopping and browsing portions of the site part
14:38  12  of the first release or subsequent release?
14:38  13    A.  I believe they were part of the
14:39  14  first.
14:39  15    Q.  And also as part of the first
14:39  16  release, Target coded the -- the other images on
14:39  17  the parts of the site that it maintained without
14:39  18  Amazon for alt text, is that right?
14:39  19    A.  I'm sorry.  I'm trying to be as
14:39  20  accurate as I can on this.  I don't specifically
14:39  21  remember how things made it into the various
14:39  22  releases at Amazon.com.  If I'm correct in
14:39  23  saying that Amazon provided that ability in the
14:39  24  first release, that would have then given us the
14:39  25  ability to begin providing alternate text for

Page 141

TODD J. NEMOIR - 1.9.07

14:39  2  the tens of thousands of images that are
14:39  3  available on Target.com through Seller Central.
14:39  4  So there was the need to go back to those images
14:40  5  that had already been on the site to provide
14:40  6  alternate text for those.
14:40  7    Q.  How many of the tens of thousands of
14:40  8  images on the parts of the site maintained by
14:40  9  Amazon needed alt text?
14:40  10    A.  I don't know the number off the top
14:40  11  of my head.
14:40  12    Q.  Do you know if it was more than half?
14:40  13    A.  I'm pausing because the number that I
14:40  14  have in my memory is that there were twenty
14:40  15  thousand images that needed alternate text.  And
14:40  16  my pause is because I don't know if that also
14:40  17  included what would be considered decorative
14:40  18  images which do receive alternate text, but the
14:40  19  alternate text is blank.  And I wouldn't want to
14:41  20  make a guess as to if those were included or not
14:41  21  included in that twenty thousand number that I'm
14:41  22  remembering right now.
14:41  23    Q.  So it's either twenty thousand or
14:41  24  more?
14:41  25    A.  I don't know that's what I said.

36 (Pages 138 to 141)

Page 142

TODD J. NEMOIR - 1.9.07

14:41  1
14:41  2      Q.   Well, I mean if they are included,
14:41  3   it's approximately twenty thousand; if they're
14:41  4   not included, it might be more than twenty
14:41  5   thousand?
14:41  6      A.   Correct.
14:41  7      Q.   Did -- did the alt text coding for
14:41  8   the non-Amazon parts of the site occur before or
14:41  9   after or at the same time as the coding for the
14:41  10  Amazon portions?
14:41  11        MR. McDOWELL:  Objection, lacks
14:41  12  foundation.
14:41  13        THE WITNESS:  Yes, to all three.
14:41  14  BY MR. KONECKY:
14:41  15     Q.   Okay.  Did they extend beyond more
14:41  16  than one phase?
14:41  17     A.   I am sorry.  In areas where we could
14:42  18  develop the experience part of following HTML
14:42  19  guidelines would include providing an ALT tag,
14:42  20  so prior experiences would have had that as part
14:42  21  of their development, and they continue to be
14:42  22  developed that way.
14:42  23     Q.   Prior to the releases that occurred
14:42  24  in 2006, was there any systematic effort to
14:42  25  include alternate text on either -- on any of

Page 143

TODD J. NEMOIR - 1.9.07

14:42  1
14:42  2   the images on the Target.com website?
14:43  3      A.   For the portions of the site that are
14:43  4   not maintained by Amazon, as our developers code
14:43  5   and deliver those experiences on HTML, it would
14:43  6   have been best practice to include ALT tags
14:43  7   prior to this specific project.
14:43  8      Q.   But not for the parts of the site
14:43  9   maintained by Amazon?
14:43  10     A.   Again, Amazon maintains the HTML and
14:43  11  code related to those, so Target's ability to
14:43  12  provide that alternate text would be limited.
14:43  13     Q.   All right.  But I -- you're getting
14:43  14  ahead of me.
14:43  15        I just want to know prior to the
14:43  16  releases in 2006, am I correct that there was no
14:44  17  systematic effort for any of the parts of the
14:44  18  site maintained by Amazon to include alt text on
14:44  19  the images?
14:44  20     A.   Not that I'm aware of.
14:44  21     Q.   Okay.  And is that the same answer
14:44  22  for any other part of the site that's maintained
14:44  23  by another third-party, whether it's Amazon or a
14:44  24  different third-party?
14:44  25     A.   I -- I don't know the scope of what

Page 144

TODD J. NEMOIR - 1.9.07

14:44  1
14:44  2   you're talking about when you say third-party.
14:44  3      Q.   Well, in which -- are there any other
14:44  4   entities that maintain portions of Target.com
14:44  5   other than Amazon?
14:44  6      A.   Yes.
14:44  7      Q.   Okay.  And for all of those entities,
14:45  8   was there ever any -- for all of those portions
14:45  9   of the site, was there any -- ever any
14:45  10  systematic effort prior to 2006 in order to
14:45  11  label images with alt text?
14:45  12     A.   I don't know.
14:45  13     Q.   Okay.  You're not aware of any?
14:45  14     A.   I don't know.
14:45  15     Q.   With respect to the parts of the
14:45  16  Target.com in which Target is providing platform
14:45  17  as opposed to Amazon or a different entity, has
14:45  18  there been any systematic or regular
14:45  19  documentation of the inclusion of alt text in
14:46  20  the website?
14:46  21        MR. McDOWELL:  Objection, vague and
14:46  22  ambiguous.
14:46  23        THE WITNESS:  I'm not sure I
14:46  24  understand the specific question you're asking.
14:46  25  BY MR. KONECKY:

Page 145

TODD J. NEMOIR - 1.9.07

14:46  1
14:46  2      Q.   Are there any written protocols for
14:46  3   doing that?
14:46  4      A.   There are development guidelines that
14:46  5   we've talked about before that would have
14:46  6   included following HTML coding best practices
14:46  7   that include -- and one of -- and HTML coding
14:46  8   best practice is that when you use images, you
14:46  9   specify a height or attribute or width
14:46  10  attribute --
14:46  11        THE COURT REPORTER:  I'm sorry.  HTML
14:46  12  and best practices is when you use images. . .
14:46  13        MR. McDOWELL:  And HTML best
14:46  14  practices is when you an image, you could -- you
14:46  15  supply a height attribute, a width attribute --
14:47  16        THE WITNESS:  And an ALT attribute.
14:47  17        THE COURT REPORTER:  Well, that's
14:47  18  your answer --
14:47  19        THE WITNESS:  Yeah.  And that's --
14:47  20        THE COURT REPORTER:  -- on the record
14:47  21  so. . .
14:47  22        Do you want to just adopt that, or I
14:47  23  mean it shows up as Mr. McDowell so. . .
14:47  24        MR. McDOWELL:  Did I -- did I --
14:47  25        THE WITNESS:  Yes, that was exact --

37 (Pages 142 to 145)

Page 146

TODD J. NEMOIR - 1.9.07

14:47 1
14:47 2    MR. McDOWELL: -- did I correctly
14:47 3  repeat what you had said?
14:47 4  BY MR. KONECKY:
14:47 5    Q.  Or were going to say?
14:47 6    A.  Yes.  That was what I was going to
14:47 7  say.
14:47 8    MR. WALBOURN: Well, that's what he
14:47 9  said before.  She read it back incorrectly.
14:47 10 That's what he said before.
14:47 11    Start over and let him re-answer the
14:47 12 question because that's exactly what he said
14:47 13 previously.
14:47 14    MR. KONECKY: The record is what it
14:47 15 is.
14:47 16    MR. WALBOURN: I know.
14:47 17 BY MR. KONECKY:
14:47 18    Q.  The protocols that you were referring
14:47 19 to, are they Target protocols or are they the
14:47 20 W3C protocols for HTML text or coding or
14:48 21 something else?
14:48 22    A.  The -- the best practices that I'm
14:48 23 referring to would be Target's web development
14:48 24 best practices --
14:48 25    Q.  Okay.

Page 147

TODD J. NEMOIR - 1.9.07

14:48 1
14:48 2    A.  -- which make reference to the W3C
14:48 3  HTML.
14:48 4    Q.  And when was the last time those were
14:48 5  developed, drafted at Target?
14:48 6    A.  I am aware of a revision that
14:48 7  happened in late December, and they -- but
14:48 8  they're draft -- reviewed fairly frequently for
14:48 9  updates.
14:48 10   Q.  That's December 2006?
14:48 11   A.  Correct.
14:48 12   Q.  And how often have they been updated
14:48 13 over the past five years?
14:48 14   A.  I don't know.
14:48 15   Q.  At least once a year?
14:48 16   A.  I can only speak to the last year,
14:48 17 and I know that they had -- at a minimum of
14:49 18 three times, they've been updated to include
14:49 19 additional information.
14:49 20   Q.  Do you know of any other updates
14:49 21 prior to 2006?
14:49 22   A.  I would need to go back and reference
14:49 23 my notes.
14:49 24   Q.  You have notes about updates like
14:49 25 this?

Page 148

TODD J. NEMOIR - 1.9.07

14:49 1
14:49 2    A.  I get -- I get the updates when
14:49 3  they're made, and included in that is a revision
14:49 4  history of the document (witness indicating).
14:49 5    Q.  Okay.  And for purposes of finding
14:49 6  the document, what is the specific name?
14:49 7    A.  I don't know.  It would be -- I don't
14:49 8  know.
14:49 9    Q.  Okay.  Why did you include alternate
14:50 10 text coding as part of this release in 2006?
14:50 11    MR. McDOWELL: Objection, lacks
14:50 12 foundation.
14:50 13    THE WITNESS:  To improve the guest
14:50 14 experience for users using screen readers to
14:50 15 access the website.
14:50 16    MR. McDOWELL: Would you read back
14:50 17 the question?
14:50 18         *  *  *
14:50 19    (Whereupon, the reporter read back
14:50 20     the requested portion of the record.)
09:54 21         *  *  *
14:50 22 BY MR. KONECKY:
14:50 23    Q.  What other improvements or changes
14:50 24 relative to disability access were made during
14:50 25 these releases in 2006?

Page 149

TODD J. NEMOIR - 1.9.07

14:51 1
14:51 2    A.  I specifically remember changes being
14:51 3  made to forms on line to make them easier to use
14:51 4  and to provide additional page information for
14:51 5  screen readers, header tags specifically.
14:51 6  There's one more set of changes that I'm not
14:51 7  recalling.
14:51 8    Q.  Any changes with respect to use of a
14:51 9  keyboard?
14:51 10   A.  Those would have been specific
14:51 11 changes related to the forms I believe.
14:51 12   Q.  Anything else?
14:51 13   A.  Not that I remember.
14:52 14   Q.  Are these changes documented
14:52 15 anywhere?
14:52 16   A.  Yes.
14:52 17   Q.  Where?
14:52 18   A.  As part of a project definition that
14:52 19 was collaborated with Amazon that's maintained
14:52 20 by Target.com.
14:52 21   Q.  What's a project definition?
14:52 22    What does that mean?
14:52 23   A.  It outlines -- from my point of view,
14:52 24 it outlines the high level requirements that are
14:52 25 going into a specific project with Amazon.

Page 154

TODD J. NEMOIR - 1.9.07

15:13  2    A.  Yes.
15:13  3    Q.  Is that something that also applies
15:14  4  to Target.com?
15:14  5       MR. McDOWELL:  Objection, vague and
15:14  6  ambiguous.
15:14  7       THE WITNESS:  Well, what do you mean
15:14  8  by the question?
15:14  9  BY MR. KONECKY:
15:14  10   Q.  Well, would you agree with Dr.
15:14  11 Thatcher that in order for a web page on
15:14  12 Target.com to be accessible to somebody with a
15:14  13 vision disability that relies on screen access
15:14  14 software, that it must be possible for the user
15:14  15 to interact with the page using only the
15:14  16 keyboard?
15:14  17   A.  I agree that you should be able to
15:14  18 accomplish the same tasks by only interacting
15:14  19 with the keyboard.
15:14  20   Q.  And would you agree that that is
15:14  21 applicable generally to individuals with vision
15:14  22 disabilities who rely on screen access software?
15:14  23      MR. McDOWELL:  Objection, vague and
15:14  24 ambiguous.
15:15  25      THE WITNESS:  My understanding is

Page 155

TODD J. NEMOIR - 1.9.07

15:15  2  that people using the screen reading software
15:15  3  use the keyboard exclusively to navigate
15:15  4  applications, including web pages.
15:15  5  BY MR. KONECKY:
15:15  6    Q.  And that's true regardless of the
15:15  7  particular user's proficiency level or level of
15:15  8  education or location, right?
15:15  9    A.  Correct.
15:15  10   Q.  Okay.  And it's also true that in
15:15  11 response to Dr. Thatcher's report that in 2006,
15:15  12 Target made changes to its website to include
15:15  13 keyboard access in certain areas?
15:15  14   A.  I don't know that those changes were
15:15  15 made in response to this report.
15:15  16   Q.  Okay.  Those changes were not made
15:16  17 before this report, is that right?
15:16  18   A.  Correct.
15:16  19   Q.  And those changes track the
15:16  20 recommendations of Dr. Thatcher's report, right?
15:16  21      THE COURT REPORTER:  I'm sorry.
15:16  22      Track the recommendations of what?
15:16  23      MR. KONECKY:  Of Dr. Thatcher's
15:16  24 report.
15:16  25      THE WITNESS:  And what do you mean,

Page 156

TODD J. NEMOIR - 1.9.07

15:16  2  track the changes?
15:16  3  BY MR. KONECKY:
15:16  4    Q.  Well, the changes that Target made to
15:16  5  Target.com in 2006 with respect to disability
15:16  6  access were changes -- all of those changes were
15:16  7  subjects included in Dr. Thatcher's report which
15:16  8  is here as Exhibit 2, right?
15:16  9    A.  I don't know that that's true.  I
15:16  10 haven't reviewed this in its entirety.
15:17  11   Q.  Okay.  Well, keyboard access is one
15:17  12 of the changes that Target made in 2006,
15:17  13 correct?
15:17  14   A.  Yes.
15:17  15   Q.  And keyboard access was one of the
15:17  16 recommendations that you recall from Dr.
15:17  17 Thatcher?
15:17  18   A.  So to be clear, all I ever saw were
15:17  19 the summary of the changes from Dr. Thatcher,
15:17  20 and, yes, that was part of the summarized
15:17  21 changes.
15:18  22   Q.  Okay.  On page ten of the report --
15:18  23 well, that actually starts toward the bottom of
15:18  24 page nine where Dr. Thatcher talks about
15:18  25 navigation.  And then on page forty-nine or --

Page 157

TODD J. NEMOIR - 1.9.07

15:18  2  excuse me -- paragraph forty-nine on page ten,
15:18  3  it says that:  "Screen reader users need some
15:18  4  technique for skipping over all of those links
15:19  5  in order to get to the desired part of the
15:19  6  screen."
15:19  7       Do you -- first of all, did Target
15:19  8  make any changes with respect to navigation for
15:19  9  people using screen readers on the website in
15:19  10 2006 as part of those releases?
15:19  11   A.  Yes.
15:19  12   Q.  Okay.  And specifically, what kind of
15:19  13 change was made there?
15:19  14   A.  The specific change that I remember
15:19  15 was adding header tags to pages --
15:19  16   Q.  Uh-huh.
15:19  17   A.  -- so that the specific content areas
15:19  18 of a page could be separated by. . .
15:19  19   Q.  And does that assist in allowing
15:19  20 people using screen access software to skip over
15:20  21 other links in order to get to where they want
15:20  22 to go?
15:20  23   A.  Yes.
15:20  24   Q.  And do you agree with Dr. Thatcher
15:20  25 that oftentimes without that technique, the

Page 158

TODD J. NEMOIR - 1.9.07

15:20  1
15:20  2  header tags, there can be multiple links that
15:20  3  would take a lengthy amount of time for somebody
15:20  4  using screen access software to get through, in
15:20  5  order to get to the desired location?
15:20  6      MR. McDOWELL:  Objection, lacks
15:20  7  foundation, vague and ambiguous.
15:20  8      THE WITNESS:  I'm sorry.  I haven't
15:20  9  had a time to read all of this.
15:20  10  BY MR. KONECKY:
15:20  11      Q.  Well, take a minute to read paragraph
15:20  12  forty-seven through fifty-one.
15:21  13      A.  Okay.
15:21  14      Q.  Okay.  On page forty-eight, Dr.
15:21  15  Thatcher writes that using the tab key to
15:21  16  navigate through the page that he's describing
15:21  17  in the previous paragraph, in order to get to
15:22  18  the continued checkout button, will require
15:22  19  about fifty key strokes just to get to the
15:22  20  desired button.
15:22  21      Do you see where I am?
15:22  22      A.  Just to be clear, that's paragraph
15:22  23  forty-eight?
15:22  24      Q.  Paragraph forty-eight.
15:22  25      A.  Okay.

Page 159

TODD J. NEMOIR - 1.9.07

15:22  1
15:22  2      Q.  The continued checkout reference is
15:22  3  in the preceding paragraph.
15:22  4      Does that comport with your
15:22  5  understanding of Target.com prior to -- at least
15:22  6  prior to the releases that occurred in 2006?
15:22  7      MR. McDOWELL:  Objection, vague and
15:22  8  ambiguous.
15:22  9      THE WITNESS:  I can't say either way.
15:22  10  I don't know.
15:22  11  BY MR. KONECKY:
15:22  12      Q.  Okay.  So you don't have any reason
15:22  13  to disagree with the observation by Dr. Thatcher
15:22  14  when he wrote this report in the earlier part of
15:23  15  2006 that there were multiple key strokes that
15:23  16  would be necessary for a blind user to go
15:23  17  through in order to navigate to the desired
15:23  18  result or the desired location?
15:23  19      A.  I have no reason to disagree with
15:23  20  that finding.
15:23  21      Q.  And would you agree that this results
15:23  22  in extra time for the blind user to navigate
15:23  23  through the website as compared to the sighted
15:23  24  user?
15:23  25      MR. McDOWELL:  Objection, vague and

Page 160

TODD J. NEMOIR - 1.9.07

15:23  1
15:23  2  ambiguous.
15:23  3      THE WITNESS:  I don't know that I can
15:23  4  say that actually.
15:23  5  BY MR. KONECKY:
15:23  6      Q.  Do you disagree with that?
15:23  7      A.  With comparing the time?
15:23  8      I don't know that I could say that.
15:24  9  That's a -- I can't compare as you just did.
15:24  10      Q.  Do you agree that putting headers on
15:24  11  to -- header tags on to the pages can allow a
15:24  12  blind user to move through the site more quickly
15:24  13  and easily than without the header tags?
15:24  14      A.  Yes.
15:24  15      Q.  And would you agree that that's
15:24  16  generally the case for any blind or visually
15:24  17  impaired user that relies on screen access
15:24  18  software?
15:24  19      A.  Yes.
15:24  20      Q.  Okay.  And on the other hand, would
15:24  21  you agree that for blind users that use screen
15:24  22  access software without the header tags, it's
15:24  23  going to take longer for them to navigate
15:24  24  through the site?
15:24  25      A.  Correct.  So it would take longer for

Page 161

TODD J. NEMOIR - 1.9.07

15:25  1
15:25  2  a person using a screen reader -- screen reading
15:25  3  software to navigate a page without header tags
15:25  4  than with?
15:25  5      Q.  Yes.
15:25  6      A.  That's what I would guess.
15:25  7      Q.  You agree with that?
15:25  8      A.  Yes.
15:25  9      Q.  And would you agree that in a case --
15:25  10  that there can be cases without header tags, for
15:25  11  example, even on Target.com, where it could take
15:25  12  fifty strokes to get to a desired location when
15:25  13  the header tags aren't there to guide the user?
15:25  14      MR. McDOWELL:  Objection, lacks
15:25  15  foundation.
15:25  16      THE WITNESS:  Can you ask the
15:25  17  question in a different way?
15:25  18  BY MR. KONECKY:
15:25  19      Q.  Sure.  Without the header tags to
15:25  20  guide the user, would you agree that it can
15:25  21  often take multiple key strokes, up to fifty in
15:26  22  the case of Target.com, for a blind user to get
15:26  23  from one place to the desired result?
15:26  24      MR. McDOWELL:  Same objection.
15:26  25      THE WITNESS:  Yes.

Page 174

TODD J. NEMOIR - 1.9.07

15:44  2  information is to be entered into which field is
15:44  3  necessary in order for -- let me start that
15:44  4  again.
15:44  5       Would you agree that form labeling or
15:44  6  some similar design feature on a website is
15:45  7  necessary for a blind user using screen access
15:45  8  software to know where information is to be
15:45  9  entered in which field when filling out an
15:45 10  online form?
15:45 11     A.  I lost you in the question.
15:45 12       I think that it's essential for all
15:45 13  guests to understand what the purpose of each
15:45 14  form element is.
15:45 15     Q.  And for guests with vision
15:45 16  disabilities, would you agree that form
15:45 17  labeling, including prompting information, that
15:45 18  interacts with the screen access software is
15:45 19  necessary in order to achieve that result?
15:45 20       MR. McDOWELL:  Objection, asked and
15:45 21  answered.
15:45 22       THE WITNESS:  Again, I'd still
15:45 23  maintain that that is a way, but not the only
15:45 24  way to accomplish the intended result.
15:45 25  BY MR. KONECKY:

Page 175

TODD J. NEMOIR - 1.9.07

15:45  2     Q.  Well, let me ask you two questions
15:46  3  about that.
15:46  4       Am I correct that there must be some
15:46  5  accommodation, whether it's form labeling or
15:46  6  something else, that's put into the site to
15:46  7  accomplish the result that we're talking about,
15:46  8  that is to insure that people with vision
15:46  9  disabilities are prompted to know which
15:46 10  information is to go where when filling out an
15:46 11  online form?
15:46 12     A.  Yes.  The page must be developed in
15:46 13  such a way that the information pertaining to
15:46 14  form elements either in order or in code relates
15:46 15  back to the input for that form.
15:46 16     Q.  And if that does not happen, people
15:46 17  with vision disabilities as a general matter are
15:46 18  going to have difficulty knowing which
15:46 19  information to input where, isn't that right?
15:47 20       MR. McDOWELL:  Objection, vague and
15:47 21  ambiguous.
15:47 22       THE WITNESS:  Without associating the
15:47 23  two either in order or through code, I would
15:47 24  agree with you that a guest using screen reading
15:47 25  software would have trouble associating --

Page 176

TODD J. NEMOIR - 1.9.07

15:47  2  understanding what the purpose of each form
15:47  3  element was.
15:47  4  BY MR. KONECKY:
15:47  5     Q.  And that would apply to the guest
15:47  6  with a vision disability regardless of the
15:47  7  particular screen access program or the
15:47  8  particular level of education or the particular
15:47  9  location from where that person is accessing the
15:47 10  website, isn't that right?
15:47 11       MR. McDOWELL:  Objection, lacks
15:47 12  foundation.
15:47 13       THE WITNESS:  I don't know that I can
15:47 14  answer that.  I've not done a complete
15:48 15  evaluation of all assistive technology that
15:48 16  people with vision impairment use to access
15:48 17  websites.
15:48 18  BY MR. KONECKY:
15:48 19     Q.  From what you're aware of, as the
15:48 20  person most knowledgeable today on behalf of
15:48 21  Target, am I correct that, generally speaking,
15:48 22  people with vision disabilities will need some
15:48 23  kind of accommodation, whether or not it's form
15:48 24  labeling or something else, on the website in
15:48 25  order to be prompted to know where to put what

Page 177

TODD J. NEMOIR - 1.9.07

15:48  2  information when filling out an online form?
15:48  3       MR. McDOWELL:  This witness is not
15:48  4  designated for that category.  So despite your
15:48  5  attempt to identify him as a Target designee on
15:48  6  that topic, he is not.
15:48  7       To the extent you can answer the
15:48  8  question, feel free.
15:48  9       THE WITNESS:  I'm not sure I
15:48 10  understand what you're asking by the question.
15:48 11  BY MR. KONECKY:
15:48 12     Q.  Well, are you aware of any situation
15:49 13  in which it would not be important to provide
15:49 14  form labeling or some similar accommodation or
15:49 15  program in the site to allow an
15:49 16  individual who uses screen access software to
15:49 17  know where to put which information when filling
15:49 18  out online forms?
15:49 19       MR. McDOWELL:  Objection, vague and
15:49 20  ambiguous.
15:49 21       THE WITNESS:  If the page is coded in
15:49 22  such a way that the text to that is read is
15:49 23  immediately preceding or next to the input box
15:49 24  that the guest is asked to fill out, a guest
15:49 25  would be able to -- would you be aware of the

45  (Pages 174 to 177)

Page 178

TODD J. NEMOIR - 1.9.07

15:50 2 relationship between those two elements.
15:50 3 BY MR. KONECKY:
15:50 4 Q. Are you aware of any such instances
15:50 5 like that on Target.com?
15:50 6 A. I don't know.
15:50 7 Q. Okay. And on Target.com, some of the
15:50 8 information that a guest may need to fill in
15:50 9 would include private information, like their
15:50 10 credit card number, right?
15:50 11 A. Correct.
15:50 12 Q. All right. So it's important for a
15:50 13 guest with a vision disability trying to make a
15:50 14 purchase on Target.com to have adequate and
15:50 15 reliable form labeling so they know where
15:50 16 they're putting information, including private
15:50 17 information like a credit card number, right?
15:50 18 MR. McDOWELL: Objection, vague and
15:50 19 ambiguous.
15:50 20 THE WITNESS: Again, form labeling
15:50 21 would be one way of associating the information
15:50 22 that's being asked for and the actual input area
15:51 23 for the guest.
15:51 24 BY MR. KONECKY:
15:51 25 Q. It's actually the only way that

Page 179

TODD J. NEMOIR - 1.9.07

15:51 2 you're aware of as you sit here today, right?
15:51 3 A. Well, as I've been talking, the other
15:51 4 way would be to immediately put the text in
15:51 5 physical relationship to the form element.
15:51 6 Q. And has Target done that?
15:51 7 A. I -- sorry. For the specific -- for
15:51 8 example, for credit card area, those form
15:51 9 elements have been labeled.
15:51 10 Q. No. The alternative to form
15:51 11 labeling, is that something that Target has
15:51 12 done?
15:51 13 A. I don't know.
15:51 14 Q. And the form labeling itself is
15:51 15 something that Target did in 2006?
15:51 16 A. Correct.
15:51 17 Q. After receiving Mr. Thatcher's
15:51 18 report?
15:51 19 A. Correct.
15:51 20 Q. And when Target did the form labeling
15:52 21 on the site, it didn't make distinctions based
15:52 22 upon the level of skill of a particular user or
15:52 23 the -- or other individualized attributes of a
15:52 24 particular user, did it?
15:52 25 MR. McDOWELL: Objection, vague and

Page 180

TODD J. NEMOIR - 1.9.07

15:52 2 ambiguous.
15:52 3 THE WITNESS: I don't know.
15:52 4 BY MR. KONECKY:
15:52 5 Q. You're not aware of them, or are you
15:52 6 making any such individualized inquiries of
15:52 7 particular users?
15:52 8 MR. McDOWELL: Same objection.
15:52 9 THE WITNESS: I did not -- I
15:52 10 personally did not, no.
15:52 11 BY MR. KONECKY:
15:52 12 Q. And you're not aware of anybody else
15:52 13 doing that, is that right?
15:52 14 A. Correct.
15:52 15 MR. McDOWELL: It's getting late.
15:52 16 Why don't we take a quick break?
15:52 17 MR. KONECKY: Sure.
15:57 18 * * *
15:57 19 (Whereupon, a short recess was taken.)
15:57 20 * * *
15:57 21 BY MR. KONECKY:
15:57 22 Q. Okay. Previously, earlier this
15:57 23 morning, you were testifying about certain
15:57 24 assumptions that may have been made with respect
15:57 25 to the user when determining how to design the

Page 181

TODD J. NEMOIR - 1.9.07

15:57 2 site, such as being technologically savvy or
15:57 3 well educated, at least as ambiguously defined,
15:57 4 correct?
15:57 5 A. Correct. Target.com would define
15:58 6 their guest as well educated and technically
15:58 7 savvy.
15:58 8 Q. And then Target or Target.com, a
15:58 9 division of Target, would design the website
15:58 10 with that particular guest in mind?
15:58 11 A. Correct.
15:58 12 Q. And that particular guest -- and in
15:58 13 doing so, there would only be one website design
15:58 14 for Target.com?
15:58 15 There wouldn't be more than one
15:58 16 Target.com. It would be one design to set a
15:58 17 certain level of use for whatever user group
15:58 18 Target was assumed was its target population?
15:59 19 A. So I would say that Target.com is a
15:59 20 collection of many experiences, and the specific
15:59 21 guest segment and attributes of that guest would
15:59 22 be defined by each experience. Broadly
15:59 23 speaking, Target.com would identify the shopping
15:59 24 experience as a single guest profile.
15:59 25 Q. And the -- and each experience would

# EXHIBIT E

# DISABILITY
# RIGHTS ADVOCATES

A NON-PROFIT CORPORATION

www.dralegal.org
general@dralegal.org

HUNGARY AFFILIATE:
Fax 36-1310-3583

449 15th Street, Suite 303
Oakland, CA 94612-2821
Phone (510) 451-8644
Fax (510) 451-8511
TTY (510) 451-8716

BOARD OF DIRECTORS
  Shelley Bergum
  California Communications Access Foundation
  Peter Blanck
  University of Iowa School of Law
  Frederick L. Cannon
  Keefe, Bruyette & Woods, Inc.
  Mark A. Chavez
  Chavez & Gertler LLP
  Dr. Alan Kalmanoff
  Institute for Law and Policy Planning
  Johnnie Lacy
  CRIL (Retired)
  Paul Longmore
  San Francisco State University
  Laurence Paradis
  Disability Rights Advocates
  Walter Park
  Access Consultant
  Anne E. Schneider
  LD Access Foundation, Inc.
  Michael P. Stanley
  Legal Consultant
  Liane Chie Yasumoto
  Corporation on Disabilities and Telecom.

ATTORNEYS & MANAGEMENT
  Laurence Paradis
  Executive Director
  Sid Wolinsky
  Litigation Director
  Melissa Kasnitz
  Managing Attorney
  Caroline Jacobs
  Senior Staff Attorney
  Stephen Tollafield
  Staff Attorney
  Roger Heller
  Staff Attorney
  Kevin Knestrick
  DRA Fellow
  Alexius Markwalder
  The California Endowment Fellow
  Mazen Basrawi
  EJW / Lieff Cabraser Heimann & Bernstein Fellow
  Laurie Ferreira
  Finance Director
  Caroline Amirno
  Office Manager
  Patricia Kirkpatrick
  Development Director

ADVISORY BOARD
  Joseph Cotchett
  Cotchett, Pitre, Simon & McCarthy
  Hon. Joseph Grodin
  Retired Justice, California Supreme Court
  Kathleen Hallberg
  Ziffren, Brittenham & Branca
  Karen Kaplowitz
  President, New Ellis Group
  Yoshi Kawauchi
  Architect - Japan
  Leslie Klinger
  Partner, Kopple & Klinger LLP
  Hon. Charles Renfrew
  Retired, United States District Judge
  Margaret R. Roisman
  Partner, Roisman Henel LLP
  Guy T. Saperstein
  Gerald Uelmen
  Former Dean, Santa Clara University School of Law

May 5, 2005

Mr. Robert J. Ulrich
Chairman & Chief Executive Officer
Target Corporation
1000 Nicollet Mall
Minneapolis, MN 55403

**Re: Inaccessible Website**

Dear Mr. Ulrich,

We are writing on behalf of the National Federation of the Blind, a nation-wide organization of blind citizens that advances the rights of its members. The NFB is concerned about its members' inability to use the Target website (http://www.target.com) with adaptive software known as screen readers. The complaints include the presence of a large amount of information and interactive features contained in the website that are not made accessible to screen-reading software. After extensive technical analysis and user testing, we have determined that the Target website fails to comply with even the minimum standards of website accessibility.

Title III of the Americans with Disabilities Act requires that places of public accommodation not discriminate against people with disabilities in their goods and services. This obligation entails the construction and maintenance of commercial websites in a manner accessible to all persons including persons who are blind.

We prefer, if possible, to resolve this matter through negotiation. Accordingly, if Target Corporation is willing to sit down with us to negotiate changes in company policies and practices to rectify the inaccessibility of its website, we are pleased to meet with you for that purpose. If you are willing to meet with us and representatives from the NFB for this purpose, please let us know by June 6, 2005. If we do not hear from you by that time, and if we find the Target website to remain inaccessible, then we will consider alternative action, including litigation. Thank you for your earliest attention to the above matter.

Sincerely,

Mazen M. Basrawi, Esq.

cc:     Laurence W. Paradis, Esq.
        Daniel Goldstein, Esq.