UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL FEDERATION OF THE BLIND, THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, on behalf of their members, and BRUCE SEXTON, on behalf of himself and all others similarly situated,

Plaintiffs,

vs.

Case No. C06-01802 MHP

TARGET CORPORATION,

Defendant.

_______________________________________/

Deposition of:

BERNADETTE JACOBS

June 19, 2007

SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California 94010
(415) 402-0004
(650) 692-8900
FAX: (415) 402-0005

Reported By:

Nancy P. Richmond, RPR

Dockets.Justia.com

INDEX
DEPOSITION OF BERNADETTE JACOBS
TUESDAY, JUNE 19, 2007


EXAMINATION BY: PAGE:
MR. KLESTOFF................................ 4

EXHIBITS: DESCRIPTION: PAGE:
1 Jacobs declaration............ 6




APPEARANCES:

DANIEL F. GOLDSTEIN, ESQUIRE
MEGHAN SIDHU CAPEK, ESQUIRE
Brown, Goldstein & Levy
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202-6701
410-962-1030 VOICE
410-385-0869 FAX
dfg@browngold.com

ALEXEI KLESTOFF, ESQUIRE
Morrison & Foerster, LLP
425 Market Street
San Francisco, California 94105
415-268-7334 VOICE
415-268-1522 FAX
aklestoff@mofo.com



BE IT REMEMBERED that, pursuant to the laws governing the taking and use of depositions, and on Tuesday, June 19, 2007, commencing at 1:03 p.m., thereof, at the Law Offices of Brown, Goldstein & Levy, 120 E. Baltimore Street, Suite 1700, Baltimore, Maryland 21202, before me, Nancy P. Richmond, Registered Professional Reporter and Notary Public for the State of Maryland, personally appeared,

---

BERNADETTE JACOBS

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. KLESTOFF:

Q. Mrs. Jacobs, my name is Alexei Klestoff, and I'm from the law firm of Morrison & Foerster, and we represent Target Corporation in this matter.
A. Okay.
Q. Can you please state your name for the record?
A. My name is Bernadette Mary Jacobs.
Q. I'm just going to go over a little bit



of the procedure for the deposition. Your testimony is under oath today, as if you were giving testimony in court.
A. Hm-hmm.
Q. And I'm just going to ask you questions, and you answer them to the best of your ability. And if there are any questions that are unclear, feel free to let me know. If you're tired and need a break, let me know. I just ask that, if there's a question pending when you want to take a break, that we finish the answer, and then we'll go ahead and take a break.
Is there any reason you couldn't testify fully and truthfully today?
A. No, sir.
Q. Have you ever been deposed before?
A. No.
Q. What did you do to prepare for the deposition today?
A. Back at the end of May, Meghan and I had went and gone through our declaration. And then yesterday, of course, I came in and we had a counsel meeting.
Q. Did you review any documents?
A. Yes.

Q. What documents were they?
A. The declaration.
Q. Anything else?
A. No.
MR. KLESTOFF: Okay. I'm going to mark your declaration as Jacobs Exhibit 1.
(Thereupon, Jacobs Exhibit Number 1 was marked.)
Q. I think what I'll do is, I'll just read portions of your declaration. And if your counsel has any problem with my reading skills or representations, he'll let me know.
In paragraph six, it says that you are legally blind. What does that mean to you?
A. Legally blind to me means anything under 20 -- 20/70, I believe it is.
Q. Does that represent -- is that an accurate description of your --
A. My blindness?
Q. -- your blindness?
A. Yes. Actually, the accurate description, I am totally blind, yes.
Q. Will you just give me a brief rundown of your educational background?
A. I graduated from high school at the



School for the Blind in Janesville. After high school, I went on to Wausau Area Technical College in Wausau, Wisconsin, where I received an associate degree as a medical secretary.
And that was in May of '79, I received the degree, graduated. Then, that's basically my education.
Q. And can you give me a brief rundown of your employment history?
A. Yes. After graduating in '79, in 1980 I served a three-month internship at the National Federation of the Blind on Johnson Street. That was from May through August of 1980.
Then, in October of 1980, I became employed by the State of Wisconsin Community Corrections, where I was a typist/receptionist 2. I worked for the State of Wisconsin for some five years, till March of '85, I believe.
In '85, then I actually started my own business in privatized child care. I actually did that for about not quite 15 years, maybe -- I guess it was about 14 years, excuse me.
And in 1999, I came up here for a workshop, after which I was married to my husband, met him out here. I moved out here in 2000.



From April of 2000 through December of 2003, I worked as a receptionist for a company called Bolton Partners, Incorporated. Then, in March of 2004, I was hired on at Blind Industries & Services of Maryland, otherwise known as BISM.
I worked there as the rehab receptionist. Primarily my job was with the rehabilitation department.
And then I was laid off now just back in November of 2006 due to budget cuts. So at this point I am currently unemployed, looking for employment.
Q. All right. And in paragraph six it also says that you use screen access software to access the Internet. What type of screen access software do you use?
A. JAWS.
Q. Do you know what version?
A. I have 8.1.
Q. Have you used any other versions in the past?
A. Yes. Years ago my husband and I, I think -- and I don't remember what year. But, anyway, years ago my husband and I actually purchased the JAWS Office Pro, because we had the



Microsoft -- the Windows Office Suites. I believe it was Windows 2000 or something.
So I had the Office version, and I've actually used JAWS since about 1997, when I was trained on it. So I've actually been using the versions, I don't know -- did it start out with 5? I can't remember, but I do know that I have upgraded every one since, because my husband and I paid for a yearly upgrade.
Q. And has JAWS improved over time?
A. Oh, very definitely.
Q. And in what ways has it improved?
A. Oh, did -- when I first started, it didn't read any kind of spreadsheets. When I actually -- in the last several years now, probably five years, maybe, I have actually used it to design my own database for different things.
Q. How would you describe your skill level at using JAWS?
A. I consider myself to be an expert.
Q. And you said in -- you were trained on JAWS in 1997?
A. Yes.
Q. Where was that?
A. That was back in Wisconsin.

Q. And who trained you?
A. Actually, my beginning training, it was kind of a self-taught thing. I was handed a bunch of tapes by somebody in rehab, and they sat me in front of a computer in a classroom and said, "Well, you know, we don't know much about JAWS, but you can learn it from these tapes."
So, my first, you know, it was kind of self-taught, and then...
Q. Have you had any other formal training?
A. Yes. Yes, I did. I actually flew out here again in January of 1999, when I met my husband, and I flew out here for a two-week workshop for advanced computer skills and resume writing.
Q. And in your use of JAWS, have you found that some websites are easier to use than others?
A. Oh, most definitely.
Q. Can you give me an example -- strike that. Have you ever had any problems using JAWS?
A. Using JAWS? I wouldn't say using JAWS, particularly. No, not really.
Q. Okay. Do you use any other screen access software?
A. No.



Q. How long have you been using the Internet?
A. I believe since '97, when I was actually trained.
Q. And how often do you use the Internet?
A. I use it on a daily basis.
Q. What types of things do you use Internet for?
A. I use it for -- there are a couple of stores that I shop online for the sole purpose of deliveries, and I use it for pre-shopping to find out what's in stores. I use it for job -- you know, job searching, because, of course, I'm unemployed.
So I use it -- I use Career Builder every day. I check the e-mails and go through that stuff, apply for jobs. I also use it to do research.
If I want to find a recipe for something, I use it for that. I guess that's primarily what I use it for. But I am on the Internet on a daily basis every night.
Q. Aside from the things that you just mentioned, is there anything else that you use Internet for?



A. Nothing comes to mind offhand.
Q. You have mentioned the term "pre-shopping." Can you define "pre-shopping" for me?
A. Well, oftentimes I like to get online and see actually what is in a store before I go buy it.
Q. And by see what's in the store --
A. Comparing pricing, I do that.
MR. GOLDSTEIN: Let him finish the question next time, Ms. Jacobs.
THE WITNESS: I'm sorry.
A. Sorry.
Q. That's okay. In paragraph seven of your declaration, you say you use the Internet to shop all the time. How often do you use the Internet to shop?
MR. GOLDSTEIN: Meaning whether pre-shopping or shopping?
MR. KLESTOFF: Shopping, in general.
MR. GOLDSTEIN: Okay.
A. Probably pretty close to a weekly basis I'm shopping for something.
Q. And you mentioned that you do online shopping.



A. I do.
Q. And how often do you do that?
A. Online shopping, I might do that on a -- either, I would say, at least on a biweekly basis.
MR. GOLDSTEIN: Could we get a clarification? Some people use biweekly to mean every other week, and some people use it to mean twice a week. Could we find out which way this witness uses it?
MR. KLESTOFF: I'd be happy to find it out.
A. I'd say, yeah, I guess maybe I did use the wrong term.
MR. GOLDSTEIN: I didn't say that. It's just that people use that term both ways.
A. Well, okay. I do get -- I may not buy things twice a week, but I'm usually on somewhere at least twice a week, probably.
Q. How often --
MR. GOLDSTEIN: Also, we will agree, will we not, that we're sealing this transcript from her husband?
Q. How often do you buy things online?
A. I would say at least once a month I buy at least one item from somewhere.

Q. What types of websites do you make online purchases from?
A. That's a little unclear. In other words, do you want to know what websites or what --
Q. Websites would be fine.
A. Okay. I do a lot of shopping at Catherine's for clothing, because they have plus sizes and clothes that fit me better, and their prices are reasonable. Catherine's is probably my favorite website.
I sometimes will buy things on Amazon. Sometimes on QVC.com, drugstore.com. I buy my glucose on drugstore.com, because it's cheaper. I can buy it cheaper. I have been on Walmart.com. I think that's primarily it. I can't think of any others offhand.
Q. There aren't any other websites you can remember?
A. Actually, I'm sorry. I have -- I actually have purchased a couple of things at NFB.org. But I actually pre-shop online with them, and then call the NFB, the National Federation of the Blind, and since my husband works there, I just ask him to bring it home.



Q. Have you had any problems pre-shopping at NFB.org?
A. Oh, no, never.
MR. GOLDSTEIN: Sorry.
MR. KLESTOFF: I thought I'd ask.
Q. Is that all? Is that -- all the websites that you gave me are all that you can remember?
A. All that I can remember offhand.
Q. Okay. And you say Catherine's is your favorite website?
A. Hm-hmm.
Q. How often do you make online purchases from Catherine's?
A. I'd say probably maybe once every two to three months or something, if I want a dress or something. That's where I buy most of my dresses. My stockings are bought there.
Q. Have you ever had any problems accessing Catherine's?
A. Oh, no, hm-hm.
Q. Any problems with navigating the site?
A. No.
Q. And do you ever pre-shop at Catherine's?
A. Yes. I do.



Q. How often?
A. Well, I would say probably at least on a weekly basis I'm looking to see about sales.
Q. Is that with the specific intent to go to the store and purchase something, or are you just browsing?
A. Oh, if it's on sale, I want to purchase it usually. But if it's not, then I don't. Or I look; if they don't have something I want at the time, then that's it. I don't worry about it.
Q. So it's not always the case that you log onto the site with the specific intent of buying something?
A. No.
Q. And when you pre-shop at Catherine's, are you able to find everything you want at the store?
A. Most of the time.
Q. And you say most of the time. There are sometimes when you're able to find the particular item in the store?
A. Oh, yeah.
Q. Do you know why that is?
A. Sometimes they don't -- in the stores they don't always carry the size that I need.



Sometimes in the store they have run out of a color that I would like or the size.
Oftentimes, online -- and this is not just true of Catherine's, but many websites -- they actually have a wider variety of merchandise online as opposed to what's in the stores. They don't carry everything in the stores that's online. Many of them don't.
Q. Do you know if that's the case with Target?
A. I haven't been able to decipher that.
Q. Okay. And so you said you also shop on Amazon.
A. I have, yes.
Q. Have you had any problems with Amazon?
A. Sometimes, but not very often. I don't -- Amazon's probably one of the less common sites that I get onto.
Q. What types of problems have you experienced on Amazon?
A. Oh, sometimes they show a lot of -- they have a lot of graphics on their website, too. And oftentimes when I might be looking for a particular thing, I never find it, because when I plug into the links, thinking that it might be a

link that I want, it sends me on a wild goose chase. So I -- if I run out of time, then I just get off the site.

Q. And what percentage of the time do you have problems, generally?

MR. GOLDSTEIN: With Amazon?

MR. KLESTOFF: With Amazon.

A. With Amazon? Okay. I have actually been on Amazon four different times, and I have probably had problems with it maybe once out of the four times.

Q. And were you able to make purchases all four times or not?

A. Well, actually, twice I made purchases. I actually bought a bottle of perfume and a book.

Q. And were you able to make a purchase the time that you had problems?

A. No.

Q. And what about that fourth time, where you didn't have problems?

A. I just ran out of time, so it was a matter of, I had to get off the site, and I couldn't find what I wanted, and I just gave it up and did something else that I don't even remember what it was. But I just -- it was primarily that



I ran out of time.

Q. Actually, one more question about Catherine's. Have you ever purchased something in the store without going to the Catherine's website first?

A. No.

Q. Never?

A. Hm-hm. Not that I remember.

Q. Let's see. And you mentioned QVC.com. Have you had any problems accessing that site?

A. No.

Q. And what types of things do you purchase on QVC.com?

A. I actually two weeks ago just bought a drain cleaner, very nice one.

Q. And then what about drugstore.com? Have you had any problems accessing that website?

A. That -- yeah, that one is a little harder. That's a little more difficult, drugstore.com.

Q. Why is that harder?

A. Just because there are so many different -- they sell almost everything on there, from aspirin to Tums to diabetic supplies; and to try to decipher some of the different links on



that site, some of them can be pretty difficult. When you think you're into one website, it might throw you into another department, and you can't find what you want.

So I usually know what I want on drugstore, and now I've been able to figure out where to find the few things that I do buy on there.

Q. So is it fair to say, after using it a couple times, you've learned how to buy what you want from drugstore.com?

A. Hm-hmm.

Q. How about Walmart.com, have you had any problems there?

A. I have actually only been on there three times, but it's not -- I've had some difficulty, yes.

Q. What types of difficulty?

A. Just trying to find the departments that -- the clothing in the department or whatever that I want that's on sale.

Q. And what specifically is the problem?

A. Just kind of wading through all the graphics and images.

Q. Were you able to make any purchases any



of the times that you visited there?

A. Once.

Q. And what did you purchase that one time?

A. Actually, something kind of personal, underwear.

Q. All right. And the other two times, what was the specific -- well, let's talk about -- let's split them up.

A. Okay.

Q. What were the specific problems that you experienced the first time you accessed Wal-Mart and experienced problems?

A. I can't remember what I experienced from one time to the next, because, like I say, I've only been on that site three times, so I can't remember the details of it.

Q. Was it a problem with the links, or was it a problem with checking out or something else?

A. Trying to wade through the link and the different departments, as I recall, to the best of my ability.

Q. And then in your declaration you also mentioned that you shop at Circuit City?

A. I do.

Q. How often do you shop at Circuit City?

Page 22

A. Probably, oh, it might be once every three months I'm on there for something.
Q. And that's on the website?
A. Yes, hm-hmm.
Q. And is that for online purchases?
A. Actually, no. Only once did I actually buy something from them online.
Q. And the other times that you've accessed Circuit City, were you doing pre-shopping?
A. I actually did, yes.
Q. Did you ultimately make a purchase from Circuit City?
A. Yes, the one online? Excuse me.
Q. Aside from the one online.
A. Yes, hm-hmm.
Q. So you had no problems buying what you wanted at the store?
A. Hm-hm, no.
Q. What types of things do you buy at Circuit City?
A. I bought a splitter once, and I actually looked for it online, found it and purchased it in the store. And I purchased these for my husband. Telephone cords, that was one of the things. A printer cable. Now, are you saying at the store?

Page 23

Q. At the store, yes.
A. Yeah, that was it.
Q. Why did you decide to purchase those items in the store as opposed to online?
A. Because they were there. They were at the store.
Q. Okay. You said you pre-shopped for those items, correct?
A. I did, because I wanted to compare prices.
Q. And then, once you found the item that you wanted, why did you decide to go to the store instead of ordering them online?
A. We happened to be shopping at other places, and we picked them up on the way.
Q. And how often do you pre-shop at Circuit City?
A. I have probably done it twice in the last six months.
Q. How many times have you shopped at Circuit City, whether online or in the store?
A. I don't remember exactly how many.
Q. Was it more than five?
A. If it was, it wasn't many more than five. It might have been five.

Page 24

Q. So let's move on to Target.
A. Okay.
Q. You say you shop at Target about once a month.
A. Yes.
Q. What's your general experience at Target?
MR. GOLDSTEIN: Talking about the store?
MR. KLESTOFF: About the store.
A. In the store, when I walk in there?
Q. Hm-hmm.
A. I actually have a hard time finding a clerk or somebody to help me find something in the store.
Q. Okay.
A. Seems like there's nobody around.
Q. Do you ultimately find a clerk or --
A. Not always. I have gone there a couple of times and not found anybody. So when we didn't find anybody and we didn't find what we wanted, we walked out.
Q. You say "we." Who was with you at the time?
A. My husband.
Q. And is your husband sighted?

Page 25

A. Yes.
Q. And what was the particular reason you decided to leave the store and not purchase anything on those occasions?
A. Well, because we couldn't find what we wanted in the size that I wanted, and we couldn't find anyone to help us.
Q. Okay. Do you ever pre-shop before you go to the Target store?
A. I did once.
Q. What were you looking for?
A. Actually, that was the day that I got on line at Target.com to look for a gift for some friends of ours who were adopting a little boy from India. And they were leaving in two days, but I wanted to go and look online to see what they had, what size, so that I could go to the store quickly, get what I wanted, and take it to the church with all the other gifts.
Q. You said you tried to access the gift registry, correct?
A. I tried.
Q. And was that the first time you used Target's registry?
A. Hm-hmm.

Page 26

Q. And do you remember when that was?
A. I don't remember the day. I know that it was a Tuesday, because my friends were leaving on Thursday.
Q. And I think in your declaration you said it was --
A. It was in March.
Q. -- in March of this year?
A. Yes, correct.
Q. And how did you access -- how did you access the website?
A. I directly -- I typed directly into www.Target.com.
Q. And were you -- I'm sorry. Were you going to add something?
A. No, no. That's all right.
Q. Where were you when you accessed the website?
A. What do you mean, where was I?
Q. Were you at home?
A. Yes, hm-hmm. I was down in the basement.
Q. And what -- and you were using JAWS?
A. Yes.
Q. Do you remember what version it was?

Page 27

A. It was seven. I think it was just before I got 8.1, because I get upgrades in the mail on disc, so I can't remember exactly -- I can't remember the last number. It was seven point something, but I don't remember the number.
Q. Is it accurate to say that it was the last seven point version before the eight point version came out?
A. Yeah, I believe so.
Q. And you say you weren't able to access the registry. Can you give me a little bit more specifics as to how you weren't able to access it?
A. When I got onto the Target.com, immediately the home page came up, like it always does. And I couldn't -- I kept arrowing down or scrolling down through the links, and I could never find it.

I found gift finder, but I couldn't find any link that said something about registering. I kept going around and around and around, like the scroll.

And I could never find what I wanted, to get into the gift registry simply by arrowing.
Q. How many times did you try that?
A. Well, I was on that website for almost

Page 28

three hours.
Q. Okay. And then I think in your declaration, you said you decided to try to search for infant and toddler sleepers on the general Target.com website?
A. Correct, hm-hmm.
Q. And then it says -- then you basically say that you had problems doing the search; is that correct?
A. Yeah.
Q. What specific problems did you have?
A. I did not actually find infants and toddlers, per se, but what I found was baby. So I linked into that.

And as I recall, most of what I heard was image, image, image, image, and then I would hear a series of numbers, and then I would hear -- sometimes I would catch a number and then a fleece and then a number.

But nothing definite by size or -- no, I'm not sure if -- I don't recall if -- about the prices, but I couldn't find anything by size.

I knew what size I needed, but there was so many images and graphic things to wade through and numbers that I simply gave up out of

Page 29

frustration. I called my husband, and I said I can't find it.
Q. Did you try using the search function on --
A. Yes, I did.
Q. And did that work for you?
A. No. I kept -- every time I would plug in something -- I actually tried to type in their name, to see if I could find something, you know, for the gift registry, and it actually came up with zero results.
Q. What other things did you search for, what terms, specifically?
A. Sleepwear was what I wanted that particular day.
Q. Did you try entering terms such as "infant and toddler sleepers"?
A. Hm-hmm.
Q. You did? Did that work for you?
A. I don't remember the results that it gave me, but I do know that I wasn't satisfied with what I found.
Q. Okay. Were you able to access any product information on the site at all that day?
MR. GOLDSTEIN: Let me just get a

clarification. On any given product, all the information or partial information about any product?

MR. KLESTOFF: Any product information at all.

A. A lot of it was very hard to decipher. It was kind of bits and pieces of things. I had more trouble deciphering things. Because I wasn't sure and it wasn't clear to me, I just gave it up.

Q. And by deciphering things, do you mean you just couldn't understand the term that was being read out?

A. No. It wasn't that at all. All I was hearing was image and numbers.

Q. Okay.

A. And maybe an occasional -- what type of material, cotton, fleece, you know, that kind of thing.

Q. Did you call Target for help with the site that day?

A. No, I did not.

Q. Did you e-mail Target for help with the site that day?

A. No, I didn't.

Q. Did you try calling JAWS's I.T. people



or their help support line for help that day?

A. No. I truly didn't believe it was a JAWS thing.

Q. Did you try calling Target's 800 number to access the gift registry?

A. To be perfectly honest, I couldn't find it.

Q. Did you ultimately go to Target to look at the gift registry that day?

A. No, I did not.

Q. And you say you ultimately gave your acquaintance a gift card, correct?

A. Correct.

Q. And your husband picked it up?

A. He did.

Q. Okay. Why did your husband get the gift card instead of you?

A. Because I was out of town.

Q. Okay. So who was -- who was ultimately going to pick up -- when you accessed Target's website that day, who was going to pick up the gift at Target, you or your husband?

A. Both of us had planned to pick it up after church on a Wednesday night.

Q. What day were you out of town?



A. Actually, it was Wednesday, but I was coming back later Wednesday, in time for church.

Q. Okay. And why did you choose to give your acquaintance a gift card rather than an item from their registry?

A. Well, because it actually just so happened that at the last minute we decided that church wasn't a good plan because of the events of the day, so we decided not go to church. And Safeway is actually closer to our home, and my husband simply picked up the gift card from Safeway.

Q. Have you ever bought a gift card at a Target store?

A. Hm-hm.

Q. Have you ever bought a gift card at Target's website?

A. No.

Q. And you say you pre-shopped at Target one time; is that correct?

A. Just that particular day, yes.

Q. Okay. Since your experience with Target.com's gift registry, have you been to Target?

A. Yesterday.



Q. Yesterday. Were you able to find what you were looking for?

A. No.

Q. Why not?

A. Well, because no matter what link I plugged into, I was on a wild goose chase. I never did find it.

Q. So you were on Target.com yesterday?

A. Yes, I was, and I still never found the sleepwear that I've been looking for originally, because I went back to see if I could find it.

Q. So my original question was, have you been to the Target store --

A. Yes.

Q. -- since --

A. Oh, I -- to the store or online?

Q. To the store, between today and March of this year.

MR. GOLDSTEIN: The other way around, between March of this year and today.

MR. KLESTOFF: Yes.

A. Between March of this year and today, yes, twice.

Q. And were you able to find what you were looking for at the store?

A. My husband and I were together. And, yes, we found what we were looking for at the store.
Q. And you say you accessed Target.com yesterday, correct?
A. Yes, hm-hmm.
Q. And you experienced problems?
A. Yes.
Q. What specific problems?
A. No matter what link I went to, I still never found what I originally set out to find, still never found the sleepwear.
Q. So what was the specific problems with the link, with the links?
A. I never heard -- I'm trying to think how to phrase this it. I never -- I didn't -- the screen reader, JAWS, did not read everything that was on the screen. And sometimes it won't if there's a lot of graphics or a lot of numbers or a lot of -- sometimes colors can be a problem for JAWS.
So I wasn't sure exactly what the problem was, but I never did find the sleepwear that I originally set out to find.
Q. So let's do step by step. You logged



onto Target.com?
A. Correct.
Q. And then what did you do?
A. Well, I got to the home page, and, of course, the first thing I did was I went back through the steps that I had originally done in March, just to see what had changed and what hadn't.
I did find that there was more text, but I did not -- the only thing I could find -- I never heard registry, never. The only thing I heard was gift finder.
Q. Okay.
A. I tried to plug in even into that, and it didn't -- it just showed all kinds of, oh, clearance, and it mentioned all kinds of things that they had clearance or, you know, women's, men's, boys', baby, that kind of thing.
But then, since I never heard after the gift finder how to register, I again decided to go back through the items at large. So I went back to the items at large and plugged into baby, because it did not say infants and toddlers. It said baby.
So I plugged into baby and scrolled down



through those items. And again I was confronted with a lot of image link, image map link, image map link and a bunch of abbreviations that I couldn't understand.
And then I found a bunch of numbers. And on the next line below the numbers it said, $14 -- or $16, I'm sorry. But because I didn't know what the numbers meant and that was all I could find, I just gave it up because I still never found what I wanted.
Q. Did you try the search function on Target's --
A. I did, and it actually put -- sent me back to the weird numbers and the $16.
Q. What specific terms did you search for?
A. I wanted -- I tried to find sleepwear or -- let me think what were the other terms I used, because I typed in something. I think it was sleepwear. I believe it was.
Q. Was that the only term?
A. Yes, hm-hmm.
Q. And did you try calling Target.com's help line?
A. Yesterday?
Q. Yesterday.



A. No.
Q. Did you try e-mailing Target.com's help people?
A. No. As a matter of fact, as I scrolled down through, it did not tell me anything about e-mail. I had no idea.
Q. Did you try to contact your JAWS's tech support people?
A. No.
Q. And were you planning on making a purchase that day?
A. No.
Q. Aside from yesterday and the time you tried to access the gift registry, can you tell me, about how many other times have you accessed Target.com?
A. I haven't. Those are the only two times, yesterday and that one day in March, and I had spent on there for three hours.
Q. Prior to that, you had never accessed Target.com?
A. No.
Q. And you say you've been to the store -- between March 2007 and today, you've been to the store two times?

A. Correct.
Q. And I don't remember if I asked you this already, but were you able to find what you were looking for at the store?
MR. GOLDSTEIN: Asked and answered.
A. Yes. You did ask, yes, hm-hmm.
Q. Have you ever tried to use Target's gift registry at the store?
A. No, and the reason being that it's not possible for a blind person to independently do that.
Q. Is it possible in your opinion to do that with assistance from someone at the Target store?
A. If they're willing to assist, and that's not always the case. Sometimes they don't have time. Other times I simply don't think they always want to.
Q. Okay.
A. And I guess, if I want to be truthful, I actually feel better when I can do something like that independently. Because if I want to do something personal, I don't always want to be asking people, "Oh, jeez. I need this kind of size in this kind of clothing" that I might not



want them to know about.
Q. So just to be clear, you've never tried to use the registry at the store?
A. Oh, no.
Q. What did you buy last time you shopped at Target, at the store?
A. Swimmies. They are little pull-ups that you use on a child when they go swimming in a pool or whatever. They're supposed to be, you know, for protection.
Q. Right. And you were able to -- did you ask for assistance buying the Swimmies?
A. No. Actually, again, I was with my husband. We stopped there after church, and we all went in, because it was a couple of weeks ago, another day when it was very, very hot, and we didn't want to stay in the van.
So we all went in, and we found -- my husband, I should say, found them almost immediately, 'cause he knew which section to go to.
Q. Is it generally the case that you and your husband go to Target together?
A. Yes.
Q. Have you ever been to Target by



yourself?
A. Alone? No, not -- not here. I used to shop all the time in Target in Wisconsin alone.
Q. Did you have any problems at the Target in Wisconsin?
A. Most of them, no, as I recall. But that was before I could go online, so, you know.
Q. When was that? When were you in Wisconsin?
A. Oh, my. I was born and raised in Wisconsin. I never came out here till 1999 for -- you know, moved out here, so...
Q. Let's move on to another topic. How did you learn about this lawsuit?
A. Actually, through the National Federation of the Blind. I read the monthly magazine, the "Braille Monitor." I actually -- when the lawsuit started, the people that talked to me about it were friends of mine.
Q. Okay.
A. So I actually found out through some of them. And, of course, you know, all the -- Dan has come, you know, and given presentations at, you know, chapter meetings and different things. So it's not like it's any secret.



Q. And how did you come to provide a declaration in this lawsuit?
MR. GOLDSTEIN: You can state the route or method, but to the extent that there's an issue as to the substance of any communications with counsel, you're not to get into those at all.
THE WITNESS: Okay.
A. I simply stepped up and volunteered when it was asked for volunteers.
Q. Who asked for volunteers?
A. Dr. Maurer, the president of the National Federation of the Blind.
Q. When was that?
A. Sometime in May of '07, I believe. I can't remember the exact date.
Q. And where was that?
A. Right at the center, in Dr. Maurer's office.
Q. That's the National Federation of the Blind Center?
A. Correct.
Q. Where is that located?
A. 1800 Johnson Street, Baltimore, Maryland.

Q. And was it just you and Dr. Maurer, or was it --
A. Oh, no. No, no. There were many of us, but it was a room full of blind folks.
Q. Was this a formal meeting?
A. I don't know that it was formal. He specifically asked for all blind folks in the center to report to his office at 8:00 o'clock in the morning.
Q. Did he say why?
A. No. Of course not. He paged everyone. And once we go into his office, then, of course, the meeting continued.
Q. Was the meeting strictly limited to seeking --
MR. GOLDSTEIN: I'm going to have to instruct her on the grounds of attorney-client privilege not to answer what took place at that meeting, since I was present.
A. Okay.
Q. So you're going to follow your attorney's advice?
A. Of course.
Q. Okay. Let's see. When was the first



contact you had with the attorneys in this lawsuit?
A. Now, I'm a little bit --
MR. GOLDSTEIN: About this lawsuit?
A. About -- yeah, that's what I was going to say. About this suit or any other time?
Q. No, about this suit.
A. I don't recall, because all the -- I've heard so many things at different times that, you know, everything just kind of runs together. So I can't give you a truthful answer.
Q. Was it this year?
A. I can't even tell you that, because it's been some time. I don't remember. At least in the last year.
Q. When was the first time -- without telling me the substance of the conversation, when was the first time you had a conversation with any of the lawyers in this suit?
A. You mean about the suit?
Q. Right.
A. I believe it was that particular day of the meeting.
MR. KLESTOFF: Okay. All right. Why don't we take a break, and I'll see if I have



anything else?
THE WITNESS: Okay.
(Recess taken -- 2:00 p.m.)
(After recess -- 2:10 p.m.)
Q. I just want to go back to that last time that you -- when you accessed Target.com.
A. Yesterday?
Q. Yes. And I just want to make sure I've got everything that happened yesterday.
A. Okay.
Q. So you logged onto the site, and it's my understanding that there's a function on JAWS that will list the links on the page; is that correct?
A. Yes. Yes, you simply arrow up and use the arrow keys to scroll down.
Q. And you did that, correct?
A. Absolutely.
Q. And then what happened?
A. The only thing that I actually found was gift finder. But, to me, I didn't think it was registry. I never did find gift registry. I just found gift finder.
Q. Was that the only link that you could find?
A. Oh, no. There were all kinds of links,



but they -- they were nothing that I wanted, nothing that I knew.
I also found a search link. It said "site search." And I scrolled down again another line, and it said "edit." So I pressed enter, and it said "forms mode on." When it says that -- anyway, it said "forms mode on," which indicated to me that I could type in what I was searching for.
So I did exactly that. I typed in -- let me think. What did I type in? Oh dear, can I go back? Because when I -- actually, I found something called baby, okay?
So I actually plugged in on baby, and they also had the site search, okay? So, again, went into the site search, pressed enter for forms mode on, and typed in the word "sleepwear." Okay?
That page came up. And again I looked for the 12-month size, to see if I could find it. And, again, I was confronted with the image map link, image map link, image map link, image map link, image map link.
Then I came again to numbers. Six zero zero zero, something or other, $16. I remember exactly, $16.

Then I found something else that was a series -- it said six twelve dash zero zero, something or other. I can't remember all the numbers, but it was a whole series of numbers. Then I heard $7.

Q. Okay.

A. But I still did not find anything that indicated to me sleepwear.

Q. Okay.

A. And at that point I didn't even hear whether it was one piece, cloth, fleece, cotton, any of it. It was mostly images and numbers.

Q. Was there anything there that you were able to understand?

A. Yes, $16, $7. I could understand prices, but I couldn't understand if it was a one-piece pajamas, you know, pajamas, if it was a two piece, if it was a onesy. Sometimes they call them onesy's. I had no idea.

Q. And so, going back to when you were on Target's home page, you said you plugged into baby?

A. Yes.

Q. Does that mean -- does that mean you found a link that read out to you "baby"?



A. Yes. It just said "baby," hm-hmm.

Q. And then on the next page, you said you looked for 12-month size?

A. Correct.

Q. Was that, you were looking for a specific link that said 12-month size?

A. Well, I actually wasn't sure if I would find the size first or the actual like sleepwear, because I actually found -- looked into, like, bedding. There was some kind of bedding sets.

I didn't -- couldn't tell what they were all were. Something was a six-piece something. I didn't understand all of that.

There were a lot of image map link, image map links again. And I would hear things like six piece or bedding, but I never did find my sleepwear, never.

Q. Okay. And you also said that you went into the site search field, correct?

A. Yes.

Q. And I don't think you ever told me what terms you searched for.

A. Actually, I thought I did at one point.

Q. Let me --

MR. GOLDSTEIN: She did.



A. Yes.

Q. It was -- oh, you're right. You searched for the term "sleepwear."

A. Hm-hmm, yeah.

MR. KLESTOFF: Okay. I think that's all I have. I appreciate your time.

THE WITNESS: Thank you.

MR. GOLDSTEIN: Thank you, Bernadette. And you have -- I neglected to say, you have the right to read and review your deposition transcript and, so long as do you it within 30 days of receipt of the transcript, make such corrections as you deem appropriate.

You can also waive that right. I advise you not to waive that right.

THE WITNESS: Oh, no. I wouldn't think of it.

MR. GOLDSTEIN: Although we do have a superb court reporter.

THE WITNESS: Having said that --

(Whereupon, the deposition was concluded at 2:20 o'clock p.m.)

---------------



CERTIFICATE

STATE OF MARYLAND )
COUNTY OF CARROLL )

I, NANCY P. RICHMOND, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of BERNADETTE JACOBS; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 20th day of June, 2007.

______________________
NANCY P. RICHMOND, RPR
and Notary Public

AL BETZ & ASSOCIATES, INC.
Administrative Offices
P.O. Box 665
Westminster, Maryland 21158
VOICE - (410)752-1733 FAX (410)875-2857
e-mail - productiondept@albetzreporting.com

DATE: July 2, 2007
JOB NUMBER: NR256842
CASE CAPTION: NATIONAL FEDERATION OF THE BLIND V. TARGET CORP.
COURT: UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
CASE NO. C06-01802 MHP
DEPONENT: BERNADETTE JACOBS
DATE OF DEPOSITION: June 19, 2007
ATTORNEYS/FIRMS:
ATTORNEY NAME/FIRM
DANIEL F. GOLDSTEIN, ESQUIRE
MEGHAN SIDHU CAPEK, ESQUIRE

ALEXEI KLESTOFF, ESQUIRE
Morrison & Foerster, LLP



Dear Sir/Madam:

Bound herewith is the transcript of the above-referenced deposition. Please read the transcript and sign the errata pages. Any additions or corrections should be listed on the errata sheets provided. Please remove the signed, completed errata sheets and return them to the address listed above for processing.

If this process has not been completed within (30) thirty days from the date of this letter, we will assume that the right to read the deposition has been waived. This is in accordance with Rule 30(e) of the Federal Rules of Civil Procedure and Rule 411 Section (a) of the Maryland Rules of Procedure.



READING & SIGNING PROCEDURE

The deposition of BERNADETTE JACOBS, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.



DEPOSITION ERRATA SHEET

RE: Al Betz & Associates, Inc.
File No.: NR256842
CASE CAPTION: NATIONAL FEDERATION OF THE BLIND V. TARGET CORP.
DEPONENT: BERNADETTE JACOBS
DEPOSITION DATE: June 19, 2007

I have read the entire transcript of my Deposition taken in the above-captioned matter or the same has been read to me. I request that the changes noted on the following errata sheet be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and authorize you to attach it to the original transcript.

PAGE/LINE CHANGE REASON

________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________

SIGNATURE_______________________ DATE: _____
BERNADETTE JACOBS

PAGE/LINE CHANGE REASON

SIGNATURE________________________ DATE: _____

BERNADETTE JACOBS

EXHIBITS

Case 3:06-cv-01802-MHP Document 127 Filed 05/25/2007 Page 12 of 70

LAURENCE W. PARADIS (California Bar No. 122336)
ROGER N. HELLER (California Bar No. 215348)
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
TTY: (510) 665-8716

JOSHUA KONECKY (California Bar No. 182897)
RACHEL BRILL (California Bar No. 233294)
SCHNEIDER & WALLACE
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 421-7100
Fax: (415) 421-7105
TTY: (415) 421-1655

DANIEL F. GOLDSTEIN (*pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Telephone: (410) 962-1030
Fax: (410) 385-0869

PETER BLANCK (*pro hac vice*)
900 S. Crouse Ave.
Crouse-Hinds Hall, Suite 300
Syracuse, NY 13244-2130
Telephone: (315) 443-9703
Fax: (315) 443-9725

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NATIONAL FEDERATION OF THE BLIND, the NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, on behalf of their members, and Bruce F. Sexton, on behalf of himself and all others similarly situated,

Plaintiffs,

v.

TARGET CORPORATION,

Defendant.

Case No.: C 06-01802 MHP

**CLASS ACTION**

**DECLARATION OF BERNADETTE JACOBS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

EXHIBIT
Jacobs #1
6/19/07 MR

I, Bernadette Jacobs, declare as follows:

1. The facts in this declaration are based upon my personal knowledge. If called to testify, I could testify competently to the facts described in this declaration.

2. My name is Bernadette Jacobs.

3. I live in Gwynn Oaks, Maryland.

4. I am a former receptionist.

5. I have been a member of the National Federation of the Blind since 1976.

6. I am legally blind and use screen-access software to access the Internet.

7. I use the Internet to shop all the time and, from time to time, look up product information and availability online before going to the store. I have visited websites for my favorite clothing store, Catherine's, and Circuit City, before shopping at those stores. Going to the website beforehand gives me a clear sense of what products the stores have that I might want to buy and what the current prices are.

8. I shop at Target about once a month. There is a Target in Columbia, Maryland that is across the street from my church. Sometimes, after church, I go to Target to buy clothes for my son or to purchase gifts.

9. This past March, I tried to access Target's gift registry but eventually gave up out of frustration. On that occasion, some friends who were adopting a child from India had registered at Target for children's clothes and items. I planned to select a gift from Target's online registry and pick up the item from the store after church. (My friends were leaving for India in two days and there was no time to order online.) When I got to Target's website, I was not able to access the registry. So, instead, I tried to search for infant and toddler sleepers on Target.com at large, knowing that was an item my friends had requested. I made my way to what I thought was the correct web page. I wanted to do a search by age group because my friends needed clothes for a 12 month old and my husband, who is sighted, told me you can search for clothing by age on Target's website. No matter what I did, however, I could not figure out how to search by age group and I could not access any product information. As I arrowed up and down the page,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644

Case 3:06-cv-01802-MHP Document 140-2 Filed 07/16/2007 Page 19 of 19

nothing was readable. After a long time of getting nowhere, I became so exasperated that I decided not to get a gift at all. I ended up giving a gift card that my husband had picked up from Safeway. Since that experience, I have not returned to Target.com.

10. If Target.com's gift registry were accessible, I would use it frequently. Because I am a member of a large church, I often receive invitations for weddings and baby showers from fellow church members, many of whom register for gifts at Target. It would be a great convenience for me to be able to select gifts from Target's online registry then purchase the gift from the store after church.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of May, 2007, at Baltimore, MD.

BERNADETTE JACOBS

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644