National Federation of the Blind et al v. Target Corporation Doc. 140 Att. 5
Case 3:06-cv-01802-MHP Document 140-6 Filed 07/16/2007 Page 1 of 10
COPY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

National Federation of the Blind, the National Federation of the Blind of California, on behalf of their members, and Bruce F. Sexton, on behalf of himself and all others similarly situated,

Plaintiffs,

vs. Case No. 06-01802 MHP

Target Corporation,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of Steven Jacobson
June 18, 2007

Carol Brausen Engels, RPR, Iowa CSR, CRR
BRAUSEN COURT REPORTING
2483 Sheldon Street
St. Paul, Minnesota 55113
(651) 483-3404
Fax (651) 483-3884

Deposition of Steve Jacobson, taken pursuant to Notice and agreement under the California Rules of Civil Procedure at the Law Firm of Faegre & Benson, 2200 Wells Fargo Bank Building, 90 South Seventh Street, in the City of Minneapolis, County of Hennepin, State of Minnesota, on the 18th day of June, 2007, at 9:18 o'clock a.m., before Carol Brausen Engels as notary public in and for the County of Ramsey, State of Minnesota.

* * * * *

A P P E A R A N C E S

RACHEL BRILL, Attorney at Law, of the Law Firm of Schneider & Wallace, Suite 2000, 180 Montgomery Street, San Francisco, California 94104, appeared on behalf of the Plaintiff. (415-421-7100

MATTHEW KREEGER, Attorney at Law, of the Law Firm of Morrison & Forester, 425 Market Street, San Francisco, California 94105, appeared on behalf of the Defendant. (415) 268-7000

JASON WALBOURN, Attorney at Law, Target Corporation, also appeared on behalf of the Defendant. (612)

Examination by Mr. Kreeger . . . . . . . . . . . . . 3
Exhibit No. 1, E-mail Chain . . . . . . . . . . . . 17

* * * * *

June 18, 2007
9:18 o'clock a.m.

Steve Jacobson,

having been first duly sworn, was examined and testified under oath as follows:

EXAMINATION

BY MR. KREEGER:

Q. Good morning, Mr. Jacobson. I know we met off the record. My name is Matthew Kreeger. I'm an attorney at Morrison & Forester, and I represent the Target Corporation.
A. Okay.
Q. Could you just go ahead and state your name for the record.
A. I'm Steve Jacobson.
Q. All right. And we're here to take your deposition. I know you've been through this at least once before. I'm going to ask you a series of questions, and you're to answer the questions to the best of your ability.
If I ever ask a question that you consider to be confusing or you don't understand, please let me know; and I will clarify or do my best. There's a court reporter who is taking down what we say, so it's important that we speak one at a time. I'll do

my best to let you finish your answer before I ask another question. Please let me finish my question before you answer. Do you have any questions about what we're doing today?
A. No.
Q. Any reason why you can't give accurate testimony this morning?
A. No.
Q. Okay. Now, I know you gave a deposition in this case in May of 2006. And as of that point in time, you discussed roughly ten times that you had visited the Target.com Web site. And I'm going to ask you some more about those visits.
But before I do that, could you let me know, have you visited the Target.com Web site since May of 2006?
A. I believe so, but very rarely.
Q. And on what occasions would you visit the Target Web site after May, 2006?
A. I'm thinking that I visited it, but I don't remember what the specific reason was.
Q. Can you give me approximately when that visit took place?
A. I'm just thinking I visited it since May, but I don't remember when.

Dockets.Justia.com

STEVE JACOBSON 06/18/07 5

Q. You discussed some frustrations you had with the Web site as of May, 2006. Had the state of the Web site changed at all since May, 2006, as far as its accessibility to a user with a screen reader?
A. Not that I had noticed. There was a new page having to do with -- it seems to me, there was a new page that had to do with accessibility issues with a phone number or something, but I didn't see any changes on the page itself.
Q. Was this visit in 2006 or 2007?
A. I don't remember for sure. I'm sorry.
Q. And was it just the one visit?
A. Yeah.
Q. Were you attempting to make a purchase at that point, or were you looking for information about products or something else?
A. Looking for product information, I believe.
Q. And do you remember what product or products you were looking for?
A. Basketball hoops.
Q. Did you use the search feature?
A. Yeah, I did.
Q. Did you find information about basketball hoops?
A. I didn't that day.
Q. Why not?

BRAUSEN COURT REPORTING (651) 483-3404

STEVE JACOBSON 06/18/07 6

A. You know, I don't remember for sure. I don't remember my visit very well. As I say, I know I visited once at least since 2006, but I just, I don't remember the circumstances that well.
Q. Okay. Okay. Now, before you identified roughly ten times that you had visited as of May, 2006. And in particular you discussed one visit in February of 2006 where you were looking for rechargeable batteries.
A. Okay.
Q. Do you remember that?
A. Yes.
Q. And at that point you were trying to make a purchase of the rechargeable batteries?
A. Correct.
Q. You also described some other attempts you had made to learn about which products were available in your visits to Target.com as of May, 2006, correct?
A. Yes.
Q. And on those times when you visited Target.com to learn about the availability of products, you used the search feature on the Web site?
A. Yes.
Q. And you were able to perform searches on those occasions, correct?

BRAUSEN COURT REPORTING (651) 483-3404

STEVE JACOBSON 06/18/07 7

A. I was able to perform searches, but I was not certain if I was getting all of the product information that was available.
Q. You obtained lists of results from your searches, did you not?
A. Yes.
Q. And those searches include -- I'm sorry. Start again.
Those search result lists included links to descriptions of the products, right?
A. I believe so. But we're going back quite a ways now, so it's not that clear in my mind anymore.
Q. Fair enough. Your major frustration at that point in time, in February of 2006, was your inability to proceed to check-out, correct?
A. Yes.
Q. And, in particular, you were able to add the rechargeable batteries you wanted to the shopping cart, correct?
A. Yes.
Q. But at that point you got stuck?
A. Yes.
Q. On the other occasions when you -- start again.
And that was because the "proceed to check-out" button that you needed to press was not visible to

BRAUSEN COURT REPORTING (651) 483-3404

STEVE JACOBSON 06/18/07 8

your screen reader?
A. Correct.
Q. Since February of 2006, have you checked the Target.com Web site to see if the "proceed to check-out" button is now visible to a screen reader?
A. I had checked, I believe, in March and April of 2006. I don't remember the dates or how many times. Maybe once, maybe twice, and found it was sometimes visible, but not always.
Q. How about since your last deposition in May of 2006, have you checked?
A. No, I haven't checked.
Q. Why not?
A. Probably for a number of reasons. Have not felt that I particularly wanted to give business to Target in that respect until this was resolved.
Q. Until the litigation was resolved?
A. Correct.
Q. And why is that?
A. Can you explain? I'm not sure what you're asking.
Q. Why is it that you don't want to give business to Target until the litigation is resolved?
A. I don't think the problems that we found were that unresolvable that this whole proceeding should have been necessary from my standpoint as a Target

BRAUSEN COURT REPORTING (651) 483-3404

customer. I've been a Target customer for 30 years, and all I want to do is spend some money there, and instead I'm spending my vacation time down here.
Q. Have you been to the Target retail store since May of 2006?
A. Oh, yes.
Q. So you don't have difficulty spending your money at the retail stores?
A. No, the retail store seems pretty willing to take my cash. I've been there. My wife and family shop there more than I do, but it's a regular part of our family shopping.
Q. Now, when you searched for information using the search feature on the Target.com Web site, you obtained lists of results; and the problem you encountered was that there were a higher number of unlabeled links or links that yielded numbers and letters instead of meaningful titles than you had run into on other sites?
A. Yes.
Q. But once you moved past those unlabeled links, you were able to locate search results, correct?
A. I did find search results. I did not know what the links I moved past had, whether there might have been more detailed search results or whether they

were totally irrelevant. I had no way of determining that.
Q. On the occasion when you had difficulties buying the rechargeable batteries, did you attempt to buy them at the Target retail stores?
A. I believe we did eventually.
Q. And did you successfully find the batteries you were looking for?
A. We hired someone to do shopping with us and -- routinely, and I believe my wife and that person found the rechargeable batteries we were looking for.
Q. At the Target retail store?
A. Yes.
Q. Have you spoken to anyone else who's a blind screen reader user about the accessibility of Target.com?
A. Yes, I'm sure I have.
Q. Can you describe any occasions where you had such conversations?
A. Well, especially before I was deposed, a lot of us were discussing the whole issue of accessibility of the Target Web site. As you likely know, there was a good deal of press coverage and so forth, and certainly we discussed it. I can't say that I would remember specific discussions about it. I know

several of us tried to figure out what sort of programming would result in the kind of button that appeared at check-out. But I don't -- I can't say that I remember specific conversations now as to who I talked to when.
Q. Did you learn from anyone else that they were able to proceed to check-out using the Target Web site screen reader?
A. I had heard that some had proceeded to check-out successfully. And in answering your previous question, I had found myself in one instance where -- or a button appeared that allowed me to get to check-out. It wasn't the same button. I can't remember what the verbiage was, but it did perform the same function. But I had no idea why.
Q. You weren't able to figure out why the button was there sometimes and not the other times?
A. Right.
Q. Since your last deposition in May of 2006, have you had any conversations with any other screen reader users about the accessibility of Target.com?
A. About the accessibility, yes.
Q. And what do you remember about those conversations?
A. The conversations had to do with -- I'm trying to remember now. More the length of the court case,

the depositions that were being taken, I guess, wondering how many people were being deposed, how long this was going to take. They did not really deal with the technical aspects of the accessibility.
Q. And when were those conversations that you're referring to?
A. Oh, gosh. I don't know. Sprinkled throughout the year.
Q. The year of 2006?
A. Yes.
Q. How about in 2007 have you talked to anybody about the accessibility of Target.com?
A. I guess I'm not sure what the scope of your question is. Obviously I've talked to people about the fact that I'm here this morning. Whether that would count as accessibility, I don't know.
Q. Anything besides conversations about today's deposition?
A. Only in the same sorts of general terms that I described in 2006.
Q. Questions about the lawsuit, you mean?
A. Right. The court case, the length of the lawsuit, issues there.
Q. Have you heard -- I'm sorry. Did you have more?

STEVE JACOBSON 06/18/07 13

A. I have not, as I said, visited the web page. So I didn't discuss specifics about that in terms of the button and so forth.
Q. Have you heard from anyone that the Target.com Web site has changed and become more accessible?
A. I received -- I saw a notice somewhere, as I mentioned before, that Target had added a page to deal with accessibility issues on the Web site. But I have not heard from any individuals that the site is more accessible.
Q. When you attempted to purchase the rechargeable batteries and you ran into the difficulty with the check-out button, did you call the Target 800 number for assistance?
A. I didn't. I don't know that there was an 800 number at that point.
Q. You mentioned in -- oh, actually before we get to that, you filed a declaration recently in this case. I believe you signed it in May of 2007. Is that correct?
A. Right.
Q. How is it you came to file a second declaration in this case?
A. I was contacted by the lawyers that were working for the plaintiff because of the fact that we do shop

BRAUSEN COURT REPORTING
(651) 483-3404

STEVE JACOBSON 06/18/07 14

regularly at Target and I had experience with accessing the Web site in the past.
Q. You mentioned that -- in your declaration, one of the things you mentioned is that if coupons were accessible to you, you would be interested in downloading them and using them.
A. Yes.
Q. Do you use coupons at other retail stores?
A. I have. I don't regularly use them, but I have used coupons.
Q. Which coupons have you used?
A. I've used coupons at the Simon Delivers shopping, grocery shopping service that's local here.
Q. And how often would you say you use coupons?
A. That's hard to say because the coupons didn't always apply. I mean certainly more than once, but I couldn't say there were coupons every time we shopped there.
Q. Besides the Simon delivery service, have you used any other coupons?
A. No, I haven't.
Q. So more than once, less than five times?
A. Oh, no, probably 15 or 20 times, I would guess.
Q. You say that your family goes to the Target stores regularly, correct?

BRAUSEN COURT REPORTING
(651) 483-3404

STEVE JACOBSON 06/18/07 15

A. Correct.
Q. And there are times when you've asked for assistance at the Target stores from Target personnel?
A. Correct.
Q. Have you asked for information about coupons that might be available from the personnel at Target retail stores?
A. Probably not. I don't think so, no.
Q. How about the 800 number? Have you called the 800 number to ask about coupons?
A. No.

MR. KREEGER: Let's take a quick break. Just a few minutes, please.

(Short break taken.)

MS. BRILL: Actually, Mr. Jacobson had something he wanted to add regarding coupons.

MR. KREEGER: Yes, please.

THE WITNESS: Regarding coupons, my wife is the primary shopper, and I know she has used coupons from the newspaper, for example, that she's had people save for her.

And I also know she goes through the Target ads on the newspaper, so I wouldn't be the person to probably call about coupons if that came up. I felt that I should make sure you know that, but it isn't

BRAUSEN COURT REPORTING
(651) 483-3404

STEVE JACOBSON 06/18/07 16

that we never use coupons as a family.

MR. KREEGER: Understood.

THE WITNESS: But I don't necessarily use them.

BY MR. KREEGER:
Q. Your wife is vision impaired, too, isn't she?
A. Correct.
Q. And how does she use the coupons from the newspaper?
A. I'm not sure I understand what you mean.
Q. She reads the newspaper online or --
A. No, she will work with -- we work -- we pay a reader, someone who does reading and some shopping with her. And they'll go through ads sometimes, or she'll go through ads online or there is some digital newspaper services and find out about a coupon and see if someone has one they're not using. You know, it would be kind of like that.
Q. Understood. And you're not certain about her experience with Target and coupons, is that right?
A. Well, I believe she's used Target coupons; but I'm not sure what you mean about experiences.
Q. How often she uses them, when she --
A. No, I don't know for sure.
Q. Okay.

MR. KREEGER: Let's mark this as Jacobson Deposition Exhibit 1.

BRAUSEN COURT REPORTING
(651) 483-3404

(Jacobson Exhibit No. 1 marked.)

BY MR. KREEGER:

Q. Mr. Jacobson, this looks like it's an e-mail chain that includes an e-mail from Mike Freeman to Dan Frye. And part of that chain is an e-mail from you to Dan Frye from May of 2006. And I'm just going to -- maybe I'll just read the part of your e-mail that's here and ask you about that.

A. Okay.

Q. It looks like in the e-mail from you to Dan Frye, there's a bunch of material that's redacted. But there's one paragraph that remains; and it says, "Finally, as you might be aware, people are having inconsistent results when checking out from the Target site. There are clearly cases where the invisible button is not encountered. This says to me that there is a solution that is already available and the poor labeling of links is certainly correctable. It just seems to me that there must be more going on behind the scenes than I see because their behavior seems unnecessarily rigid."

Let me ask you, first of all, do you remember this e-mail?

A. No, I don't; but I don't deny it likely was

something I would have said.

Q. It sounds like you? Did you have e-mail correspondence with Dan Frye?

A. I vaguely remember having e-mail correspondence with him, and I'm assuming it was part of that chain. But, as you said, it was over a year ago.

Q. And who is Dan Frye?

A. He works for the National Federation of the Blind.

Q. Do you know Mr. Frye? Do you know him?

A. Do I know him? I thought you were asking her.

Q. I was asking you.

A. I have met him. I don't know him well.

Q. And you say you vaguely remember corresponding with him about the Target case?

A. Yes.

Q. Have you had other occasions to correspond with Mr. Frye?

A. No.

Q. And did you initiate this conversation or e-mail communication with Mr. Frye?

A. I don't remember for certain if I did or not. Yeah, he would not have written to me; but I don't know whether I may have reacted to something else I read on a public list and responded to him or -- I don't remember the circumstances.

Q. When you said there clearly were cases where the invisible button is not encountered, were you referring to your own experience or the experience of others?

A. I was experience -- I was referring to my own experience in March. That's what I had firsthand knowledge of.

Q. Did Mr. Frye respond to your e-mail?

A. Not that I remember.

Q. Have you had any other e-mail communications with anybody about the Target issues?

A. There have been occasionally questions raised on public lists that I have responded to carefully. I don't believe I've had any more private communications with anyone by e-mail.

Q. What do you mean by "public lists"?

A. Internet-type lists where lists are archived and open to the public when comments have come up. I have tended to not say anything there, either, but I could have responded to something there.

Q. And what do you mean by "respond carefully"?

A. Well, clearly because of my involvement with depositions and feelings I've expressed there, I have tried to be careful to avoid becoming drawn into any kind of emotional responses or anything

that weren't completely factual.

Q. Do you feel emotional about the issue of Target's accessibility?

A. Yes, to some degree I do.

Q. How so?

A. On the one hand, Target is saying they welcome customers in their press and they're putting all of us through this when it's not necessary.

Q. Putting you through the lawsuit, you mean?

A. The lawsuit, the waiting. If there is work being done on the Web site, they're not saying anything about it. In your questions you imply that something may have been change -- may have changed because you're asking if I noticed anything, but this just shouldn't be necessary.

Q. Are you curious as to whether the Web site has changed?

A. Oh, sure.

Q. Why haven't you gone to check it out and see if it has?

A. Because I've got to figure out when I did what when I talked to you.

Q. You don't want to --

A. I don't remember. This has gone on for so long, it's just difficult to -- I don't know the legal

STEVE JACOBSON 06/18/07 21

implications of what should have changed, what didn't, what we're talking about in terms of when the Web site was accessible. It's just easier to avoid the whole issue by not looking.

Q. So you won't have to answer questions about it at the depositions?

A. No, I wouldn't say that. It's more to try to figure out when I knew what. You know, you're asking me even in this deposition, well, did you talk to somebody in 2006 or 2007? Well, you know, this has been an issue now for a year and a half, and I just don't remember whether I talked to somebody before or after New Years, for example.

The only reason I remember the February thing is I made a point to -- there was a lot of press, and I was looking for batteries, and it made sense to make sure I knew if anyone asked me -- at that point, of course, I didn't know I was going to be deposed -- make sure that I know what the issues were. And I had dealt with Target's Web site before then, and so I thought it was a good time to visit, or I wouldn't even have remembered that very clearly.

Q. Were there times when you read these public list discussions of the Target Web site where you felt

BRAUSEN COURT REPORTING
(651) 483-3404

STEVE JACOBSON 06/18/07 22

like there were things you wanted to say but you didn't say?

A. Sure.

Q. What is it that you would have wanted to say?

A. I would probably have said some of what I just said to you and maybe what I touched on in that e-mail, that it seemed to me that there were solutions that were seeming available to Target and that it didn't make sense to go through this whole procedure, drag this out as it has been dragged out. Probably something along those lines.

Q. Okay.

MR. KREEGER: Okay. That's all I have. Thank you for your time, Mr. Jacobson.

MS. BRILL: You're done. We will read and sign.

(Deposition concluded at 9:53 o'clock a.m.)

* * * * *

BRAUSEN COURT REPORTING
(651) 483-3404

STEVE JACOBSON 06/18/07 23

STATE OF MINNESOTA )
COUNTY OF RAMSEY ) SS.

BE IT KNOWN THAT, I, CAROL BRAUSEN ENGELS, took the foregoing deposition of Steve Jacobson;

THAT, I was then and there a notary public in and for the County of Ramsey, State of Minnesota;

THAT, I exercised the power of that office in taking said deposition;

THAT, by virtue thereof I was then and there authorized to administer an oath;

THAT, said witness, before testifying, was duly sworn to testify to the truth, the whole truth, and nothing but the truth, relative to this action;

THAT, said witness reserved the right to read and sign the deposition;

THAT, said deposition is a true record of the testimony given by the witness;

THAT, I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

WITNESS MY HAND AND SEAL 18TH OF JUNE, 2007.

CAROL BRAUSEN ENGELS, RPR
IOWA CSR NO. 1126
Notary Public
Ramsey County, Minnesota
My Commission Expires Jan. 31, 2010

BRAUSEN COURT REPORTING
(651) 483-3404

STEVE JACOBSON 06/18/07 24

DEPOSITION CORRECTION SHEET

CASE TITLE: NFB, et al., v. Target Corporation
DEPOSITION OF: Steve Jacobson

REASON FOR CHANGE A: Correct Transcription
B: To Correct Spelling
C: To Correct Testimony

| PAGE | LINE | DESIRED CHANGE | REASON |
|---|---|---|---|
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |

Deponent's Signature: ______________

Subscribed and sworn to before: ______________
a Notary Public, County of ______________, State of ______________ on ______________, 2007.

PLEASE PROVIDE ALL OTHER PARTIES WITH A COPY WITHIN 30 DAYS AND RETURN ORIGINAL TO THE TAKING ATTORNEY.

Carol Brausen Engels, RPR
BRAUSEN COURT REPORTING
2483 Sheldon Street
St. Paul, Minnesota 55113

BRAUSEN COURT REPORTING
(651) 483-3404



2001 Center Street, Third Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
TTY: (510) 665-8716
general@dralegal.org

June 15, 2007

**Via Facsimile (415.268.7522)**

Kristina Paszek
Morrison & Forrester LLP
425 Market Street
San Francisco, CA 94105

Re: *NFB v. Target Corp.*

Dear Kristina:

Attached please find additional documents responsive to Target's document requests in this case (NFB0422-0424), which were discovered today.

Sincerely,

Roger Heller

cc: (all w/attachments)
Joshua Konecky (via fax)
Daniel Goldstein (via fax)
Laurence Paradis

Jacobson
EXHIBIT NO. 1
6-18-07
C. Brausen

...en (k7uij@panix.com)
...rch 31, 2006 4:16 PM

...arget

... give you an answer. If Target truly uses the same web ..., I don't see accessibility as a problem; although ... bit wordy and awkward to use (and I mean the general ...ripped-down access site here), it's doable. If you know ...ok for, you can browse and purchase items without ... haven't tried it with Target to see. I know when we ... the lawsuit, some members of NABS said: "Hey wait a ... Target and it worked fine!". But, as I understand it, ... to reproduce their success, they had problems, i.e., ... I understand it, one can go through all the checkout ... last -- to make the purchase -- which requires holding ... an icon or punching a button that screen-readers do not ... Curtis Chong couldn't make it work and I believe Steve ...'t, either. But some others still wonder if we aren't ... bruisin'!k As I say, I don't really know as I haven't ... There's a Target close enough to me that I just go in ... stuff!

... sued Southwest Airlines a few years ago, alleging their ...accessible, I was thankful that we (NFB) didn't join in -- ... asked -- because I myself *had* used the site to ... to a miniconvention in Spokane a few days before I read ... The site was awkward -- not inaccessible. I will say, ... even though the guy lost the suit (as he should have), ... do some redesign of the site so that it was far easier to ... technology. I am finding, incidentally, that sites such ... Alaska Air and HOrizon, while still useable, are becoming ... to figure out -- more tables, less narrative description. ... sight impairs the ability to read and process the written ...

...pose my musings helped much, for which I am sorry. (smile)

... Mar 2006, Frye, Dan wrote:

... have just been brought in the loop today. Is this (access to the ...site) really an issue from your perspective? Your feedback would be ...ted.

REDACTED

NFB0422

REDACTED

-----Original Message-----
From: Jacobson [mailto:steve.jacobson@visi.com]
Sent: Thursday, May 04, 2006 2:46 PM
To: ...
Subject: Question about the Target Action

REDACTED

NFC0423

REDACTED

[illegible] might be aware, people are having inconsistent [illegible]cking out from the Target site. There are [illegible]s where the invisible button is not encountered. [illegible] that there is a solution that is already [illegible] the poor labeling of links is certainly [illegible] It just seems to me that there must be more going [illegible] scenes than I see because there behavior seems [illegible] rigid.

REDACTED