```
                                              1
         UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
              SAN FRANCISCO DIVISION
- - - - - - - - - - - - - - - - - - - - - - -
National Federation of the
Blind, the National Federation of
the Blind of California, on behalf of
their members, and Bruce F. Sexton, on
behalf of himself and all others
similarly situated,

               Plaintiffs,

    vs.                    Case No. 06-01802 MHP

Target Corporation,

               Defendant.
- - - - - - - - - - - - - - - - - - - - - - -




            Deposition of Charlotte Czarnecki
                     June 18, 2007




            Carol Brausen Engels, RPR, Iowa CSR, CRR
                   BRAUSEN COURT REPORTING
                      2483 Sheldon Street
                   St. Paul, Minnesota 55113
                        (651) 483-3404
                      Fax (651) 483-3884

                  BRAUSEN COURT REPORTING
                      (651) 483-3404
```

```
                              CHARLOTTE CZARNECKI 06/18/07        2

        Deposition of Charlotte Czarnecki, taken pursuant
    to Notice and agreement under the California Rules of
    Civil Procedure at the Law Firm of Faegre & Benson, 2200
    Wells Fargo Bank Building, 90 South Seventh Street, in
    the City of Minneapolis, County of Hennepin, State of
    Minnesota, on the 18th day of June, 2007, at 1:08
    o'clock p.m., before Carol Brausen Engels as notary
    public in and for the County of Ramsey, State of
    Minnesota.
                    *  *  *  *  *

                 A P P E A R A N C E S
        RACHEL BRILL, Attorney at Law, Schneider & Wallace,
    Suite 2000, 180 Montgomery Street, San Francisco,
    California 94104, appeared on behalf of the Plaintiff.
    (415) 421-7100
        MATTHEW KREEGER, Attorney at Law, of the Law Firm
    of Morrison & Foerster, 425 Market Street, San
    Francisco, California 94105, appeared on behalf of the
    Defendant.
    (415) 268-7000
        JASON WALBOURN, Attorney at Law, Target
    Corporation, also appeared on behalf of the Defendant.
    (612)


    Examination by Mr. Kreeger . . . . . . . . . . . . 3
                     (No Exhibits.)
                    *  *  *  *  *

                  BRAUSEN COURT REPORTING
                      (651) 483-3404
```

```
                        CHARLOTTE CZARNECKI 06/18/07      3

                              June 18, 2007
                              1:08 o'clock p.m.
              Charlotte Czarnecki,
    having been first duly sworn, was examined and testified
    under oath as follows:
                         EXAMINATION
    BY MR. KREEGER:
    Q.  Good afternoon. Miss Czarnecki, my name is Matthew
        Kreeger, and I represent the Target Corporation, and
        I'm here today to take your deposition. Have you
        ever had your deposition taken before?
    A.  No.
    Q.  I'm going to ask a series of questions, and you are
        to answer the questions. There's a court reporter
        here who is going to take down everything we say.
        So it's important that we speak one at a time. I'll
        do my best to let you finish your answer before I
        ask another question. Please try to let me finish
        the question before you begin your answer. If at
        any time I ask a question that you consider unclear,
        please let me know; and I'll try to clarify.
              You'll have a chance after we're done to review
        the transcript to make sure it's accurate. Do you
        have any questions about what we're doing today?
    A.  No.

                  BRAUSEN COURT REPORTING
                      (651) 483-3404
```

```
                        CHARLOTTE CZARNECKI 06/18/07      4

    Q.  If you ever need a break, just let me know. We'll
        stop. Could you just state your name for the
        record?
    A.  My name is Charlotte Czarnecki.
    Q.  And I noted that you've submitted two declarations
        in this case. I want to ask you some questions
        about those; but before I do, can you just tell me
        what is your -- well, start again.
              How long have you been using a computer with a
        screen reader?
    A.  I have been using a computer with a screen reader
        with Windows since about 1997.
    Q.  Okay. And what screen reader or screen readers have
        you used?
    A.  I've used Jaws for Windows.
    Q.  Is that the only one?
    A.  Yes. In my -- I didn't say in my declaration
        because it was a DOS computer, but years ago my very
        first computer was around '95. I had a computer
        that had a screen reading software called Master
        Touch, and it was a DOS program, and I didn't do
        anything with the Internet with that computer. It
        was basically I used it for word processing. But I
        started using the computer with Jaws in 1997, and
        that's been the only screen reader I've used since

                  BRAUSEN COURT REPORTING
                      (651) 483-3404
```

CHARLOTTE CZARNECKI 06/18/07                                        5

1  that time.
2  Q. Have you used multiple versions of Jaws over time?
3  A. Yes.
4  Q. Approximately how many versions of Jaws do you think
5     you've used?
6  A. I have used -- well, I started using Jaws at
7     Version 2.0, and now it's at Version 8.0, and I've
8     upgraded from every version, so that's probably
9     between six to eight versions.
10 Q. And throughout the time that you've been using Jaws,
11    have you used it to access the Internet?
12 A. Yes.
13 Q. Have you noticed any difference in the capability of
14    Jaws and accessing the Internet over time?
15 A. I have. There have been some improvements.
16 Q. How so?
17 A. Freedom Scientific has made it easier for, you know,
18    they've developed various shortcut keys so that you
19    can access different portions of the Internet
20    easier. The forms mode feature, for example, if you
21    need to fill out a form online, they have a feature
22    where it organizes that so you can use it a lot
23    easier. So, yeah, those are the things that I would
24    say that make it easier.
25 Q. When did this forms feature get added to Jaws?

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                                        6

1     MS. BRILL: Object to the extent it calls for
2  expert information, but you can answer.
3     THE WITNESS: I can guesstimate on that.
4  Probably around Version 4.5.
5  BY MR. KREEGER:
6  Q. Which was approximately when?
7  A. Oh, I don't know. I can't remember. Probably
8     around 2001 or '2. I don't know. I'm not an expert
9     on that.
10 Q. In your use of the Jaws screen reader with Internet
11    sites, have you found that some sites are easier to
12    use than others?
13    MS. BRILL: Objection, vague and ambiguous,
14 overbroad. You can answer.
15    THE WITNESS: I can answer?
16    MS. BRILL: Yes, you can.
17    THE WITNESS: What I would like to say about
18 Jaws and the use of the Internet is that Jaws has
19 changed over the years. But the Internet has also
20 changed over the years.
21    So I think every Web site is very unique in its
22 appearance, and every Web site has its own
23 challenges. And I would say that, yes, there are
24 some Web sites that are easier to use than others.
25

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                                        7

1  BY MR. KREEGER:
2  Q. And I believe in your declaration, the original
3     declaration you've filed a couple months ago, you
4     said that the majority of Web sites that you visited
5     are more accessible than you found Target.com to be.
6  A. Yes.
7  Q. What are some examples of sites that you found to be
8     less accessible than Target.com?
9  A. They're not shopping Web sites. There are some
10    newspaper Web sites that are rather confusing. I
11    found some -- I'm interested in some science-related
12    things, and those Web sites were pretty confusing,
13    but I would say that Target is one of the more
14    confusing of the shopping Web sites.
15 Q. What are some other Web sites that you've visited
16    using a screen reader? I mean shopping Web sites in
17    particular.
18 A. Well, I do my grocery shopping online. So I go to
19    like Simon Delivers, and I go to Lunds and Byerly's.
20    I've been to the Walgreens Web site.
21 Q. Any others?
22 A. I've been to the mall, so I've been to like JC
23    Penney and some of the other stores in like
24    Southdale Mall or something like that, but I don't
25    frequent that very often.

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                                        8

1  Q. Besides Target.com, have you visited any other
2     shopping sites and found them to be not useful?
3  A. I've been able to get through them. I don't think
4     they're perfect, but I've been able to use them.
5  Q. When was it that you visited Target.com and
6     encountered problems?
7  A. I have been to Target. Now, you know, trying to
8     pull these dates out of your memory is hard.
9  Q. To the best of your recollection.
10 A. You know, I've been in Target, you know, for the
11    past couple of years on and off. And I've had
12    struggles with the Web site.
13 Q. You mentioned in your declaration one incident that
14    happened in 2005 when you tried to access a wedding
15    registry. I'll ask you about that later. Can you
16    think of any other instances in which you visited
17    Target.com?
18 A. Yes, I often go to view the weekly ad or just to
19    browse around.
20 Q. How often would you say that you go to view the
21    weekly ad or browse around?
22 A. Well, I would say it varies. I mean I could go once
23    a month, but it varies.
24 Q. When was the last time that you visited Target.com?
25 A. Actually, I visited it this past week.

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                                9

1  Q. Okay. What did you do when you visited it last
2     week?
3  A. I went, and I tried to look at the weekly ad, and I
4     was just browsing around the clothing section.
5  Q. Were you able to view the weekly ad last week?
6  A. I was able to view some of it. The key to the ad, I
7     think, is I know when I'm at a particular product,
8     but then when you press "enter" on that product,
9     then it gets to be pretty confusing because not only
10    is that product there, but it's advertising other
11    products.
12       And so it's the divide in between, you know,
13    where is the product that you're looking at, versus
14    where is the other stuff they're advertising is a
15    little bit confusing. Also, I found that there were
16    other links on there that were, they were links, but
17    they were all numbers and images and things like
18    that. I didn't know what they were.
19 Q. You said that last week you also browsed for some
20    clothing?
21 A. Yeah, I did.
22 Q. Were you able to find the clothes you were looking
23    for?
24 A. Again, I was able to find the product. But then to
25    know -- like I made a shopping cart, and I wasn't

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                               10

1     really sure what I had all in my shopping cart
2     because it said this thing on the bottom that said
3     "continue shopping," and it was just a little bit
4     confusing.
5  Q. I'm sorry. You couldn't tell what was in your
6     shopping cart? That was the problem?
7  A. Right, right. I was just, I was confused.
8  Q. In your declaration, you mentioned certain specific
9     issues that you had with Target.com back in 2003, '4
10    and '5. You mentioned links and images without
11    labels as to what they are.
12 A. Uh-huh.
13 Q. Have you noticed any improvement in Target.com on
14    that score?
15 A. Not 100 percent. There are still links and images
16    and labels there that are not properly labeled.
17 Q. Okay. But have you noticed any improvement?
18 A. Slight improvement.
19 Q. And what has improved?
20 A. It's hard for me to say just because I haven't
21    really analyzed it and really thought about it. But
22    I think that especially since the National
23    Federation of the Blind has made Target aware of the
24    problem, Target has done some improvement, but there
25    are still links on there that are not labeled. And

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                               11

1     to know where you're at in your site, if you're in
2     your cart versus the other list of products is still
3     very unclear and confusing.
4  Q. You mentioned in your declaration inexplicable code
5     and garbled text. Has there been any improvement at
6     Target.com on that issue?
7  A. There still is that garbled text there, as I said.
8     I don't know that there has been much improvement
9     with that.
10 Q. You also mentioned an issue with the forms and
11    unlabeled or incorrectly labeled form fields.
12 A. And maybe it's just my confusion; but, yeah, there
13    are -- I've just had, you know, where I'm trying to
14    fill out a form or go into a comma box, and it just
15    gets all confusing. And on my other Web sites, I
16    don't have that problem. I do shop online, and I
17    don't have that problem.
18 Q. So you still see problems with the performance of
19    the Target Web site?
20 A. Yes, yes.
21 Q. Have you managed to shop online at Target.com?
22 A. I've gotten -- I've never bought anything online at
23    Target.com. I've just browsed and looked and wasn't
24    very comfortable purchasing because I wasn't sure
25    what I was going to get. I would like to buy from

BRAUSEN COURT REPORTING
(651) 483-3404

CHARLOTTE CZARNECKI 06/18/07                               12

1     Target.com, though, because I am a customer of
2     Target.
3  Q. Have you been able to browse for information about
4     products that are available at Target through using
5     their Web site?
6  A. I have been able to find the title of a product, but
7     to go in and get like a description of what that
8     product is, it's a little bit -- it's confusing.
9  Q. You regularly shop at the Target retail store, is
10    that right?
11 A. Yes.
12 Q. One of them is near where you work?
13 A. Yes.
14 Q. How often would you say you visit a Target retail
15    store?
16 A. Probably once or twice a month.
17 Q. Do you ask for assistance from Target employees when
18    you visit a Target retail store?
19 A. Yes.
20 Q. And do you receive assistance?
21 A. I receive the assistance.
22 Q. Let me ask you about this wedding registry issue.
23    In 2005, you wanted to buy a gift off of a wedding
24    registry of a friend of yours?
25 A. Yes.

BRAUSEN COURT REPORTING
(651) 483-3404

Q. And you weren't able to access the wedding registry online?
A. It was very confusing at the time.
Q. Okay. Have you tried a wedding registry more recently?
A. No.
Q. So after you couldn't succeed on the Web site, you went to the store?
A. I went to the store.
Q. And you asked for help at the store?
A. Yes, I did.
Q. And the Target employee at the store printed out the registry for you?
A. Yes, they printed out the -- she printed out the registry for me, all thirty-some odd pages of it.
Q. Thirty-some odd pages?
A. There was a lot of pages.
Q. Your friend had a lot of items on the wedding registry?
A. Yes.
Q. And the clerk read the list to you?
A. The clerk looked at the list, was very overwhelmed by the list and asked me what I wanted. But I had no idea what I wanted to get my friend. And I had no idea of the price range of the things on the list. And to stand there or go sit down and read the whole list would have been very -- it would have taken a long time. And that wouldn't have been a good idea, both on my time and on her time because I was shopping during my lunch hour.

The -- so I decided to pick a category, and even under that category there were a lot of things. And this person didn't seem comfortable reading all of the items.

One of the things that happens when you go to Target is that they find you the most -- the first available person to help you. That doesn't mean that this person is a trained reader. It doesn't mean that this person likes to read out loud. It doesn't even mean that this person has even helped a blind or vision impaired person ever before.

So for her to read that gift registry list, even a portion of it, she stumbled over the words. And so I just on a whim picked out a couple of soap and lotion holders, just to buy something for my friend. I needed to get it done.
Q. I see. You mentioned in your declaration that the clerk seemed reluctant to be reading the entire list?
A. Yes.

Q. Did you ask a supervisor for someone else to assist you?
A. That day when I went to Target to purchase the gift for my friend, I was on my lunch hour. And I went to Target, and it was actually 1:00 o'clock. I took a late lunch thinking that, you know, the store would be pretty well cleared out by then. And they provided me with a person, and this person was also a person with a disability. And he couldn't read. And he was very uncomfortable helping me.

And so I asked the supervisor to find me somebody else. And so they found -- I had to wait about five or ten minutes, and they found another person. So, you know, by the time I got the person to help me, I'm on a timeframe, too. So for me to go back to the supervisor to complain or whatever, I just didn't think it was fair, and I didn't think it was fair that somebody, supervisor or not, should have to read me all the categories or X number of items from a list. It would have helped if I could have browsed at that and got a good idea of what I was looking for online before I went to the store.
Q. Understood. Did you try calling the Target 800 number to ask them to read you the list over the phone?
A. I didn't know there was a Target 800 number.
Q. Have you successfully used the Target Web site to locate products that you were interested in and then gone and bought them at the store?
A. Yes.
Q. Have you done that frequently?
A. I've done it occasionally. I would like to do it more.
Q. I may have asked you this, and I apologize if I'm repeating myself. Have you successfully been able to access the weekly advertisement on the Web site?
A. I have been able to access the products in the weekly ad, some of the products.
Q. So you've been able to see what the products are and what the price is?
A. I -- yeah.
   MR. KREEGER: Let's just take a quick break here.
   (Short break taken.)
   MR. KREEGER: Back on.
BY MR. KREEGER:
Q. I would like to go back to this issue you mentioned about continuing problems in your more recent visits to the Target Web site. And you mentioned that you're still seeing issues with the forms, for

CHARLOTTE CZARNECKI 06/18/07                                        17

example. Can you give me an example of a form that you tried to fill out where you still were encountering difficulties in recent visits?

A. I think, you know, just selecting when you get a product to ensure that you have the right size, the right color, that type of thing.

Q. I'm sorry. I'm just not following. Can you maybe explain, for example?

A. For example, let's say you were to pick out a tank top. Well, you're going to have to get the right size; medium, large, et cetera. Then you're going to have to get the right color. And that's a little bit -- I mean it's -- that can be a little bit -- I think I do it, but I'm not really sure when I make my selections if it's the right thing because again when you put it on your cart, you have your cart, and you're not sure if, where the cart is at.

A lot of shopping Web sites that I go to, the cart is in its own separate frame, its own separate window, whereas this cart is sort of in the midst of everything else. So I'm not really sure if -- you know, when the curser comes on -- when you say "select" or whatever it is that you say, your curser always jumps to some -- your point of focus always jumps to some -- it's not a standard spot when the

---

CHARLOTTE CZARNECKI 06/18/07                                        18

new page comes up. It's hard for me to explain. I apologize.

Q. I think I get it. When you made a selection for a particular size and color, you're not getting feedback from the site that makes you sure you picked the right one?

A. Yes.

Q. But you haven't gone all the way to buy it to see if in fact you had the right one?

A. No. I should.

Q. Okay. You also mentioned that you're seeing some issues with -- actually, let me stop there. Are all the problems you experience with forms, do they involve attempts to use the shopping cart and purchase things?

A. To put things into the shopping cart. And I haven't bought because I -- I don't want to essentially buy something, you know.

Q. Right. Understood.

A. I'm very insecure about that. However, I would like to get a Web site to be able to use the Target Web site to purchase things and feel very comfortable with it because I do shop online with other Web sites without problem. And I think I can do the same thing with Target.

---

CHARLOTTE CZARNECKI 06/18/07                                        19

Q. Understood. Okay. You also mentioned issues with garbled text and numbers instead of descriptions. Can you give me an example of where you've seen that in your recent visits to Target.com?

A. As you see a list of products, there is a -- well, there are links scattered all throughout the pages of the site, but let's say I'm looking at food. I've seen it at food. I've seen them at clothes. I've seen them everywhere where there is a link. I don't know what that link is. I don't know if it's an "add to shopping cart" link or what it is.

It's on -- like it's the garbled, it's the first thing that I see usually is the garbled text link. And then I see the name of the product. And then I don't remember what else I see.

Q. And this was a recent visit, you say?

A. Uh-huh, it was.

Q. Can you maybe give me a specific product that you were looking for where you encountered this difficulty.

A. I'll go back to that tank top.

Q. Okay.

A. I was looking at the ads, and I saw the women's tank top. And right up above that if you press your up arrow, you would find that link where it's the

---

CHARLOTTE CZARNECKI 06/18/07                                        20

garbled text. I don't know that link is. It might be a "buy" link. It might be an "add to cart" link. How I added it to the cart, because I was just conducting an experiment, was I went into the description of the product itself, and I think I added -- I think I added it to the cart, but I'm not sure because I don't know where the cart was.

Q. So if I understand correctly, your major problem with completing the purchase at Target.com is your uncertainty as to what's in the cart?

A. Yes.

Q. Have you tried calling the 800 number to see if they could assist you on that issue?

A. No. I haven't. And I would like to say that I would like to purchase the things online independently. I shouldn't have to call an 800 number. I think that's a nice service, but I shouldn't have to -- I shouldn't have to do that.

MR. KREEGER: Okay. That's all we have. Thanks for your time.

THE WITNESS: Thank you very much.

(Deposition concluded at 1:41 p.m.)

* * * * *

```
 1   STATE OF MINNESOTA )
                       ) SS.
 2   COUNTY OF RAMSEY  )

 3          BE IT KNOWN THAT, I, CAROL BRAUSEN ENGELS, took the
     foregoing deposition of Charlotte Czarnecki;
 4
            THAT, I was then and there a notary public in and
 5   for the County of Ramsey, State of Minnesota;

 6          THAT, I exercised the power of that office in
     taking said deposition;
 7
            THAT, by virtue thereof I was then and there
 8   authorized to administer an oath;

 9          THAT, said witness, before testifying, was duly
     sworn to testify to the truth, the whole truth, and
10   nothing but the truth, relative to this action;

11          THAT, said witness reserved the right to read and
     sign the deposition;
12
            THAT, said deposition is a true record of the
13   testimony given by the witness;

14          THAT, I am neither attorney or counsel for, nor
     related to or employed by any of the parties to the
15   action in which this deposition is taken and, further,
     that I am not a relative or employee of any attorney or
16   counsel employed by the parties hereto, or financially
     interested in this action.
17
     WITNESS MY HAND AND SEAL 19TH OF JUNE, 2007.
18

                _____
                CAROL BRAUSEN ENGELS, RPR
                IOWA CSR NO. 1126
                Notary Public
                Ramsey County, Minnesota
                My Commission Expires Jan. 31, 2010
```

---

DEPOSITION CORRECTION SHEET

CASE TITLE: NFB, et al., v. Target Corporation.
DEPOSITION OF: Charlotte Czarnecki

REASON FOR CHANGE   A:  Correct Transcription
                    B:  To Correct Spelling
                    C:  To Correct Testimony

| PAGE | LINE | DESIRED CHANGE | REASON |
|------|------|----------------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Deponent's Signature: _____

Subscribed and sworn to before:
a Notary Public, County of _____, State
of _____ on _____, 2007.

PLEASE PROVIDE ALL OTHER PARTIES WITH A COPY WITHIN
30 DAYS AND RETURN ORIGINAL TO THE TAKING ATTORNEY.

Carol Brausen Engels, RPR
BRAUSEN COURT REPORTING
2483 Sheldon Street
St. Paul, Minnesota 55113