UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


NATIONAL FEDERATION OF THE

BLIND, THE NATIONAL FEDERATION

OF THE BLIND OF CALIFORNIA,
on behalf of their members,
and BRUCE SEXTON, on behalf
of himself and all others
similarly situated,

       Plaintiffs,


     vs.                    Case No.

                        C06-01802 MHP


TARGET CORPORATION,

       Defendant.

_____/


Deposition of

DANIEL FRYE

June 19, 2007

SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California  94010
(415) 402-0004
(650) 692-8900
FAX:  (415) 402-0005

Reported By:

Nancy P. Richmond, RPR

Dockets.Justia.com

Page 2

1        I N D E X
2        DEPOSITION OF DANIEL FRYE
3        TUESDAY, JUNE 19, 2007
4
5     EXAMINATION BY:                    PAGE:
6     MR. KLESTOFF.................................. 4
7
8
9     EXHIBITS:      DESCRIPTION:        PAGE:
10    1     Frye Declaration.................. 6
11    2     3/31/06 e-mail string............. 65
12    3     4/13/06 e-mail string............. 74
13    4     3/31/06 Frye e-mail............... 80
14    5     4/29/06 e-mail.................... 86
15
16
17
18
19
20
21
22
23
24
25

Page 3

1     APPEARANCES:
2
3        DANIEL F. GOLDSTEIN, ESQUIRE
4        MEGHAN SIDHU CAPEK, ESQUIRE
5        Brown, Goldstein & Levy
6        120 E. Baltimore Street
7        Suite 1700
8        Baltimore, Maryland  21202-6701
9        410-962-1030  VOICE
10       410-385-0869  FAX
11       dfg@browngold.com
12
13       ALEXEI KLESTOFF, ESQUIRE
14       Morrison & Foerster, LLP
15       425 Market Street
16       San Francisco, California  94105
17       415-268-7334  VOICE
18       415-268-1522  FAX
19       aklestoff@mofo.com
20
21
22
23
24
25

Page 4

1     BE IT REMEMBERED that, pursuant to the laws
2     governing the taking and use of depositions, and
3     on Tuesday, June 19, 2007, commencing at 9:30
4     a.m., thereof, at the Law Offices of Brown,
5     Goldstein & Levy, 120 E. Baltimore Street, Suite
6     1700, Baltimore, Maryland 21202, before me, Nancy
7     P. Richmond, Registered Professional Reporter and
8     Notary Public for the State of Maryland,
9     personally appeared,
10                      - - -
11
12              DANIEL FRYE
13    a witness, called for examination, having been
14    first duly sworn, was examined and testified as
15    follows:
16         EXAMINATION BY MR. KLESTOFF:
17       Q.  Good morning, Mr. Frye.  My name is
18    Alexei Klestoff, and I'm from Morrison & Foerster,
19    and we represent Target Corporation in this
20    action.  Can you please state your name for the
21    record?
22       A.  My name is Daniel Frye.
23       Q.  I'm going to talk a little bit about
24    procedure.  You're giving testimony under oath.
25    It's like you being in court.  I'll be asking you

Page 5

1     questions, and you just give me your answer to the
2     best of your ability.
3       A.  Sure.
4       Q.  If my questions are unclear, just let me
5     know.  And if you later on -- sometimes it happens
6     that you'll find that you'll think of some
7     additional information that was responsive to a
8     question that I asked earlier, just feel free to
9     let me know, and we'll go over that.
10            And if you're tired and you need a
11    break, just let me know.  I just ask that if
12    there's a question pending, we'll have you answer
13    that question first, and then we'll take a break.
14          Is there any reason you couldn't testify
15    fully and truthfully today?
16       A.  No.
17       Q.  Not under -- any on any medications?
18       A.  No.
19       Q.  Okay.  What did you do to prepare for
20    this deposition?
21       A.  I met with counsel for about an
22    hour-and-a-half.
23       Q.  And did you review any documents?
24       A.  Yes.
25       Q.  Do you remember what they were?

Page 6

1    A.  I reviewed my declaration and several
2  e-mail documents.
3    Q.  And do you remember what those e-mails
4  were about?
5    A.  They were about the Target suit in
6  question.
7    Q.  Okay.  So let's mark your -- you gave a
8  declaration in this case on -- I think it was on
9  May 23rd of this year.
10    MR. KLESTOFF:  And we'll mark that as
11  Exhibit 1.
12    (Thereupon, Frye Exhibit Number 1 was
13  marked.)
14    Q.  I'll set that in front of you, but I'll
15  just read portions of your declaration into the
16  record, and counsel -- if I get anything wrong,
17  I'm sure counsel will let me know.
18    So let's talk a little bit about your
19  background.  Can you just give me a brief rundown
20  of your educational background?
21    A.  Sure.  My B.A. is in history from
22  Erskine College, a small, four-year liberal arts
23  college in Due West, South Carolina.  My J.D. is
24  from Washington School of Law, graduated in 1993.
25    I have a certification in mediation from

Page 7

1  the University of Washington School of Law,
2  acquired in 1994.
3    Q.  So you're an attorney?
4    A.  I'm not practicing.
5    Q.  Not practicing.  And can you just give
6  me a brief rundown of your employment history?
7    A.  Of course.  I was a Social Security and
8  Americans with Disabilities Act consultant for the
9  National Federation of the Blind in 1995 for about
10  six months.
11    Following that, I went to work for the
12  Social Security Administration, where I served as
13  a contract representative and ultimately a union
14  representative, representing the interests of the
15  bargaining unit for the American Federation of
16  Government Employees, Local 3937.
17    I served with the Federal Government
18  from September of 1996 through October of 2002.
19  Subsequently, I took the position of National
20  Advocate with the Association of Blind Citizens of
21  New Zealand in November 2002.  In that role, I was
22  responsible for the administration of the
23  political and legislative priorities of consumer
24  and civil rights organization in New Zealand.
25    In September of 2005, I came to the

Page 8

1  employment of the National Federation of the
2  Blind.  I serve as its manager of affiliate
3  action, advocacy and training in the Department of
4  Affiliate Action.  I'm still in that position
5  today.
6    Q.  And in that position, what are your
7  responsibilities, generally?
8    A.  I am generally responsible for managing
9  our membership development and cultivation
10  efforts.  I am responsible for original writing
11  and editing of documents that are published in the
12  "Braille Monitor," the Federation's monthly
13  magazine, circulated to about 40,000 people.
14    I am responsible for administering our
15  individual and systemic advocacy initiatives that
16  come out of the Department of Affiliate Actions
17  that are brought to my attention.
18    Q.  And by administering these advocacy
19  programs, what -- specifically, what does that
20  entail?
21    A.  It may entail assisting a blind person
22  who has been denied access to a building because
23  they have a guide dog.  It may entail assisting
24  someone with a Social Security dispute.  It may
25  entail assisting someone in acquiring Medicare.

Page 9

1  It may entail employment discrimination or any
2  number of other miscellaneous issues that blind
3  people would encounter.
4    Q.  Would that include this lawsuit, as
5  well?
6    A.  Certainly it would include working in
7  cooperation with counsel to do whatever was
8  necessary to address the issues of the lawsuit.
9    Q.  And would that also include other
10  websites, access to other websites or
11  accessibility issues to other websites?
12    A.  It could potentially include that, if
13  that were brought to my attention.  My
14  responsibilities are brought in latitude and not
15  defined entirely until the issue arises.
16    Q.  Have any other -- have any issues about
17  other websites been brought to your attention in
18  the past?
19    MR. GOLDSTEIN:  Other than by counsel?
20    MR. KLESTOFF:  Of course.
21    A.  Other than by counsel, no, not
22  specifically; certainly not in the context of a
23  formal legal action.  I may occasionally have
24  people, you know, express frustration with a
25  website, but they don't remain in my memory, and

1  they certainly haven't been the product of a
2  specific case.
3      Q.  And how did you come to learn about
4  this, the issues with Target's website?
5          MR. GOLDSTEIN:  Other than through
6      conversations with counsel?
7          MR. KLESTOFF:  Of course.
8      Q.  I'm not looking for any conversations
9  with your lawyer.
10     A.  Sure.  The issue about Target has been a
11 ubiquitous one in terms of -- in terms of our
12 membership.  I've seen press releases that have
13 announced the issue at hand.
14         I've heard conversation in the course
15 of -- in the course of involvement with
16 membership.  It's difficult for me to identify
17 specifically how I came to learn about it, because
18 it's been so prevailing and available.
19     Q.  Do you remember when you first heard
20 anything about issues with Target's website?
21     A.  Not specifically.
22     Q.  All right.  Well, let's go back to your
23 declaration.  And it says here that on --
24 paragraph six of your declaration says that you're
25 legally blind.  What does that mean to you in

1  other varying definitions of the term?
2      A.  The statutory definition of legal
3  blindness is that one possesses vision that is --
4  well, I won't go into the specific statutory
5  definition.
6          But, essentially, one is legally blind
7  if they have less than ten percent of normal
8  vision in terms of straight-ahead vision or less
9  than twenty percent of the field of vision to the
10 left and right.
11         I am totally blind.  I have bilateral
12 enucleations, so I fall clearly within that
13 category.
14         MR. GOLDSTEIN:  Mr. Frye, could you, for
15     the benefit of the court reporter, spell the
16     word, "enucleations"?
17         THE WITNESS:  I'm not sure I could do it
18     for my benefit.
19     A.  Both of my eyes have been removed.  I
20 have prosthetic eyes.
21     Q.  And then the rest of that paragraph says
22 that you use screen access software to access the
23 Internet.  What type of screen access software do
24 you use?
25     A.  I use JAWS, which is a screen access

1  software.  I use a Braille display, which also
2  displays what one sees on the screen in
3  refreshable Braille.  Those are the two media that
4  I access the screen with.
5      Q.  And what version of JAWS do you use
6  currently?
7      A.  I think my version of JAWS is 7.10, but
8  I can't be sure.  It is not 8.0, but it's very
9  close to it.
10     Q.  Have you ever tried using 8.0?
11     A.  Yes.
12     Q.  And are there any differences that you
13 noticed?
14     A.  I'm not a technical expert, but the
15 substantive differences are sufficiently
16 sophisticated that I wouldn't perceive them.  I
17 wouldn't perceive the differences.
18     Q.  And the Braille display software that
19 you use, what version is that?  Do you know?
20     A.  I don't know.
21     Q.  Do you know what brand it is?
22     A.  I don't know.
23     Q.  And let's go -- let's start with JAWS.
24 How did you first -- how did you learn to use
25 JAWS?

1      A.  I received instruction from private
2  contractors, who were -- who were hired by my
3  employer.  And I also received some instruction
4  from a disability student service office during my
5  first year of law school.
6      Q.  And was that on version 7.10, or was
7  that on an earlier version?
8      A.  That would have been on an earlier
9  version.
10     Q.  Okay.  Do you remember what version that
11 was?
12     A.  No, although the earliest version I
13 recall using is, like, 4.5.  But I don't recall
14 what version I started on.  I'm sure that was not
15 the first one.
16     Q.  How would you describe your skill level
17 with JAWS?
18     A.  Competent.
19     Q.  Competent?
20     A.  Hm-hmm.
21     Q.  And by competent, what does that mean,
22 specifically?
23     A.  I'm proficient.  I'm able to do my job
24 with JAWS.  I'm able to do Internet research.  I'm
25 able to produce documents in Word.  I'm able to

Page 14

1   review Excel spreadsheets, generally able to
2   manipulate the Office Suite and use the Internet
3   and Outlook Express with JAWS.
4       Q.  Does that include online shopping?
5       A.  Yes.
6       Q.  In your experience with JAWS, are some
7   online websites more accessible or -- strike that.
8   Comparing JAWS -- strike that again.
9           Let's go back to the Braille display.
10  How did you learn how to use that?
11      A.  Through the same vendors that taught me
12  how to use speech software.
13      Q.  And was that an earlier version or the
14  same version as you use currently?
15      A.  I'm certain it was an earlier version.
16  I learned how to use the computer some ten or
17  fifteen years ago.
18      Q.  And --
19          MR. GOLDSTEIN:  Mr. Frye, if you could
20  turn slightly to your right, it might be
21  easier for the court reporter.
22          THE WITNESS:  Oh, sorry.
23          MR. GOLDSTEIN:  You're a very quiet man.
24      Q.  And how would you describe your skill
25  level with the Braille display software?

Page 15

1       A.  Comparable to that with the use of
2   speech.
3       Q.  You mean -- by that, you mean JAWS?
4       A.  Yes.
5       Q.  And in your experience, which software
6   is easier to use, JAWS or the Braille display
7   software?
8       A.  Their purposes, counsel, are
9   complementary.  Just for background, so that I can
10  give you an answer that I think will satisfy your
11  interests, I use speech to do substantial reading,
12  cursory review of documents.
13          I use Braille to edit and to help me
14  identify where I can find a semi-colon or a comma.
15  JAWS can, of course, accomplish the same goal, but
16  for my purposes, I use Braille for detail
17  orientation.  I use speech for general reading.
18      Q.  Which one do you use for using the
19  Internet, generally?
20      A.  I use them both, although primarily I
21  use speech, because when I'm accessing the
22  Internet, I'm not as invested where the commas
23  are.
24      Q.  Have you had any problems with the JAWS
25  software?

Page 16

1       A.  I haven't had any significant problems
2   with the JAWS software.
3       Q.  Have you had any -- well, have you had
4   any insignificant problems?
5           MR. GOLDSTEIN:  Object to the form.
6           MR. KLESTOFF:  You can go ahead and
7   answer that.
8       A.  I think with any computer software, one
9   occasionally encounters problems.  The problems
10  that I've encountered have never kept me from
11  being able to generally do my work.
12          Sometimes JAWS will freeze up.
13  Sometimes JAWS will read a double comma when
14  there's only a single comma there.  I mean, the
15  problems are those problems that Freedom
16  Scientific, the company that produces JAWS, will
17  be aware of.
18          Without a technical background, I can't
19  be more specific about the challenges that I've
20  encountered with JAWS.  But they are -- they are
21  ordinary in nature, and they are consistent with
22  the history of the software.
23      Q.  Have you ever had any problems with the
24  Braille display software?
25      A.  No.  I mean, no more so than I've

Page 17

1   encountered with JAWS.
2       Q.  Have you ever used any other types of
3   screen access software?
4       A.  I have been trained on how to use
5   Window-Eyes, the competitor speech software to
6   JAWS.
7           THE WITNESS:  Could I get some water,
8   please?
9           MR. GOLDSTEIN:  Yes.
10          THE WITNESS:  Thank you.
11      Q.  Why do you use JAWS as opposed to
12  Window-Eyes?
13      A.  I think the reason I use JAWS instead of
14  Window-Eyes is probably twofold.  It was the first
15  speech software to which I was exposed when I was
16  trained, and it is by far the dominant speech
17  software in the adaptive technology field.
18          And so I find that I can get better
19  technical support from JAWS than I can from
20  Window-Eyes.
21      Q.  So just to summarize what you just said,
22  you use JAWS because you get better technical
23  support; is that correct?
24          MR. GOLDSTEIN:  Object to the form.
25          MR. KLESTOFF:  Go ahead and answer.

Page 18

1      A.  I use JAWS because I get better, more
2  timely technical support, because the company is
3  significantly larger than Window-Eyes, its
4  competitor.
5      Q.  But it's not because of any superiority
6  between the two programs?
7      MR. GOLDSTEIN:  Object to the form.
8      A.  The answer to that is that JAWS, from my
9  perspective, is superior, though invariably, like
10  Coke and Pepsi, you'll find members of the
11  blindness community who prefer one over the other.
12      Both softwares are able to allow you to
13  access information that otherwise wouldn't be
14  accessed.  It's a good thing that both exist.
15  It's helpful to the market.
16      And the blindness community is a small
17  market, and that there are several speech software
18  systems out there is useful in terms of research
19  innovation for both products.
20      Q.  To your knowledge, why do people in
21  the -- what specific aspects of one program -- or
22  of Window-Eyes do people in the blindness
23  community feel is superior to JAWS?
24      A.  I don't feel equal to answering that.  I
25  am an advocate and a social sort of oriented

Page 19

1  person.  I'm not a technical specialist.
2      Q.  But what do people tell you -- what
3  specific reasons have people given you that -- for
4  their opinion that Window-Eyes is better?
5      MR. GOLDSTEIN:  Object to the form.
6      A.  The one rationale that I've heard is
7  that -- by those who prefer Window-Eyes, is that
8  they regard Window-Eyes as a system or software
9  that is more easily scripted to accommodate
10  unconventional mainframe software systems.
11      Both, as I understand it -- and, again,
12  I need to qualify any remarks I make by saying
13  that I'm not a computer specialist.
14      But most people tell me that Window-Eyes
15  is a software that can be more easily amended or
16  tinkered with to accommodate unconventional work
17  site environment, that JAWS is harder to modify,
18  though I understand that both programs can be
19  modified.  But you have to have more aptitude to
20  modify JAWS than you do to modify Window-Eyes.
21      Q.  To your knowledge -- or strike that.
22  Has anyone reported to you that Window-Eyes is
23  easier to use for online shopping as compared to
24  JAWS?
25      A.  No.

Page 20

1      Q.  Has anyone reported to you that JAWS is
2  easier to use than Window-Eyes for online
3  shopping?
4      A.  No.
5      Q.  Move on to a different topic.  How long
6  have you used the Internet?
7      A.  I've used the Internet probably since
8  the early to middle nineties, maybe -- maybe about
9  the time of second, third year in law school, '92,
10  '93, if you regard, like, Lexus Nexus as the
11  Internet.  I don't know if one does.  But that's
12  sort of what I started doing, online types of
13  things.
14      Q.  So you started using the Internet
15  primarily to use Lexus Nexus?
16      A.  Yeah.
17      Q.  Have you ever encountered any problems
18  with Lexus Nexus over the years?
19      A.  No.
20      Q.  How often do you use the Internet?
21      A.  Daily.
22      Q.  What sort of things do you use the
23  Internet for?
24      A.  Work-related research, current events
25  reading, shopping, shopping pre-preparation,

Page 21

1  pretty much a variety of things.  Work, current
2  events, shopping, if I want to know about a topic,
3  I Google it.
4      I guess I would say I use the Internet
5  for the full array of things that most people do.
6      Q.  Is there anything else specifically that
7  you can remember that you would use the Internet
8  for?
9      A.  No.  I mean, my answer is sufficiently
10  general that, I mean, there are all kinds of
11  things that I use the Internet for.  But I can't
12  remember anything specific.
13      Q.  And in paragraph seven of your
14  declaration, you say you regularly use the
15  Internet in connection with in-store shopping.
16  Let's just start with that first part.  In that
17  sentence, what did you mean by "regularly"?
18      A.  Well --
19      MR. GOLDSTEIN:  I think you should read
20  the entire paragraph to the witness, to be
21  fair.
22      MR. KLESTOFF:  Sure.
23      Q.  It says, "I regularly use the Internet
24  in connection with in-store shopping.  At least
25  twice a month, I visit websites for local stores,

Page 22

1  such as Wal-Mart and Safeway, to preview their
2  products, compare prices and determine what I want
3  to buy before I go to the store."
4      That word, "regularly," you say, "I
5  regularly use the Internet in connection with
6  in-store shopping." What does regularly mean?
7      A.  I think "regularly" is further defined
8  in the next sentence, that at least twice a month,
9  I use it to do store shopping previews.
10     Q.  Okay.  Do you make online purchases?
11     A.  Have I ever made online purchases?  Do I
12 make them?  Yes.
13     Q.  Make them, generally.
14     A.  I make then occasionally.
15     Q.  Occasionally.  How often?
16     A.  I don't know how often.  I probably
17 three or four times a year.
18     Q.  When was the last time that you
19 purchased something online?
20     A.  I can't be absolutely sure, but I know I
21 purchased some CD's online from Amazon a month or
22 so ago.
23     Q.  Did you have any problems with the
24 Amazon site?
25     A.  No, I didn't use it.  My wife did it.  I

Page 23

1  just purchased it.
2      Q.  So what do you mean by purchase?
3      A.  What do I mean by purchase?  I mean that
4  my wife and I talked about what CD's we want.  We
5  sat around the computer.  We looked to see if the
6  CD in question was available.  It was, and she put
7  our credit card information in, and the CD came in
8  the mail in exchange for the consideration of the
9  money it cost.
10     Q.  So did your wife do the navigation of
11 the website?
12     A.  Yes.
13     Q.  And is your wife sighted?
14     A.  No.
15     Q.  Do you know what screen access software
16 she was using?
17     A.  She doesn't use any.
18     Q.  So is she able to -- she has some vision
19 then?
20     A.  She does.
21     Q.  So she's able to get around on websites
22 generally without screen access software?
23     A.  She is.
24     Q.  And when was the last time that you
25 personally navigated a website to make an online

Page 24

1  purchase?
2      A.  The last time I personally navigated a
3  website to make an online purchase must have been
4  in May, when I went to the NFB.org website to
5  purchase my pre-registration and national banquet
6  ticket for our convention that's scheduled for a
7  few weeks from now.
8      Q.  And that was May of this year?
9      A.  Uh-huh, April or May.
10     MR. GOLDSTEIN:  I'm glad you reminded
11 me.
12     THE WITNESS:  It's too late to purchase
13 them now online.  You can get them at the
14 convention.
15     MR. GOLDSTEIN:  Oops.
16     A.  Did you ask a question?
17     Q.  Not yet.
18     A.  Oh, good.
19     Q.  How many -- and how many purchases do
20 you personally make without the assistance of your
21 wife online, as compared to in the store?
22     MR. GOLDSTEIN:  Object to the form.
23     A.  Yeah.  Can you clarify the question?
24     Q.  Well, can you give me a percentage of
25 the entire universe of your personal purchases

Page 25

1  without the assistance of your wife, what
2  percentage of those purchases were online?
3      MR. GOLDSTEIN:  Object to the form.
4      A.  I don't -- no, I can't give you a
5  percentage.  I can tell you that my wife purchases
6  dramatically more things online than I do.  I tend
7  to use the Internet for pre-shopping evaluation.
8      She can look at pictures and things and
9  make more of a definitive determination about
10 whether or not she wants to purchase it online.
11     Q.  Do you use the Internet all the time for
12 pre-shopping evaluation?
13     A.  No.
14     Q.  Strike that.  I'm sorry.
15     A.  Okay.
16     Q.  For all -- what websites do you
17 generally visit when you do this pre-shopping
18 evaluation?
19     A.  When I do pre-shopping evaluation, I
20 have visited any number of websites.  The ones
21 that immediately come to mind are referenced in my
22 declaration.
23     Q.  And that would be Wal-Mart and Safeway?
24     A.  Those are examples, yeah.
25     Q.  What other examples can you remember?

Page 26

1    A. I have visited Best Buy. I have visited
2  Target. I have visited -- I have visited a
3  bookstore website from time to time.
4    Q. Do you remember which bookstore website
5  that was specifically?
6    A. No. It was either Barnes & Noble or
7  B. Dalton or one of those major chain bookstores.
8    Q. Anything else?
9    A. Not that immediately come to mind;
10 though that doesn't mean that I haven't visited
11 others.
12   Q. And when you visit the Wal-Mart's online
13 site, have you had any problems in the past?
14   A. No, not significantly.
15   Q. Have you generally had any problems?
16   A. No.
17   Q. Have you had any problems at all with
18 Wal-Mart's site?
19   A. No.
20   Q. And when was the last time you visited
21 Wal-Mart's site?
22   A. Well, the time that, of course, comes to
23 mind is when I did my comparative evaluation to
24 purchase the XM satellite radio receiver. I can't
25 remember if that's been the last time or not.

Page 27

1    Q. Have you had any problems with Safeway's
2  online site?
3    A. No, not really. Not really.
4    Q. No problems at all?
5    A. No, no problems that kept me from
6  identifying what I want and purchasing it,
7  purchasing the product, no.
8    Q. Let's go back to Wal-Mart. Have you
9  personally have you made any on line purchases at
10 Walmart.com?
11   A. Not that I recall.
12   Q. And on Safeway, have you made any online
13 purchases on the Safeway site?
14   A. Yes, we have made online purchases from
15 the Safeway site.
16   Q. Have you specifically, without the
17 assistance of your wife, made purchases on
18 Safeway's site?
19   A. No. That's -- that doesn't fall within
20 my scope of responsibilities in the dynamic of our
21 relationship.
22   Q. So let me see if I understand this.
23 Generally, on Safeway, you go online to the
24 Safeway site to do some pre-shopping evaluation,
25 and then your wife generally does the grocery

Page 28

1  shopping?
2    A. Hm-hmm. Yes.
3    Q. Have you ever personally gone to Safeway
4  to do grocery shopping by yourself?
5    A. I've personally gone to Safeway to look
6  at their items, compare them, chat with Renae
7  about what's available. But, generally, almost
8  exclusively Renae does the purchasing if we're
9  going to do online purchasing.
10   Q. Online purchases aside, have you ever
11 gone to Safeway to do grocery shopping in the past
12 without the assistance of your wife?
13   A. To the bricks-and-mortar store?
14   Q. Correct.
15   A. Yes.
16   Q. Have you had any problems at Safeway,
17 purchasing groceries?
18   A. Occasionally one will find that the
19 shopper assistant that you get isn't equal to
20 reading English. But besides the frustrations
21 that are associated with trying to find someone
22 that can answer my question sufficiently, no, I
23 haven't had any trouble acquiring what I need at
24 the store.
25   Q. One more question about Wal-Mart. Who

Page 29

1  makes the -- who generally makes the in-store
2  purchases at Wal-Mart, you or your wife?
3    A. In-store purchases have been made by
4  both of us and often jointly. We go together.
5    Q. The last time, when you purchased an XM
6  radio at Wal-Mart, did you go to the store by
7  yourself, or was it with -- jointly, with your
8  wife?
9    A. I went jointly with my wife.
10   Q. And does she generally need assistance
11 at the store to locate products and to purchase
12 them?
13   A. Sometimes, but not always.
14   Q. And you say you visited Best Buy's
15 online site. Have you had any problems with that
16 site?
17   A. No.
18   Q. And who generally makes the purchases at
19 Best Buy?
20   A. We actually, as far as I recall, haven't
21 made purchases from Best Buy. We looked at them
22 to compare availability. We went to their store,
23 but we have not purchased anything from Best Buy.
24   Q. Why haven't you purchased anything from
25 Best Buy?

Page 30

1    A.  Because I didn't find their customer
2  service to be satisfactory.
3    Q.  What specifically about their customer
4  service did you not find satisfactory?
5    A.  They weren't timely when we went into
6  the store to inquire about the availability of an
7  XM receiver, and their personnel didn't seem
8  familiar with the product.
9    Q.  And then the online bookstore site that
10 you weren't able to identify, have you had any
11 problems with that site?
12   A.  No.  The one that was either Barnes &
13 Noble's or B. Dalton?
14   Q.  Correct.
15   A.  No, I haven't had problems with those
16 sites, as far as I can recall.
17   Q.  And in terms of the in-store shopping,
18 who generally makes the purchases there, you or
19 your wife?
20   A.  Well, it depends on what occasion.  If
21 it's for Renae's birthday, I make the purchases.
22 If it's something we're purchasing for a family
23 member or friend, we may go together.  It's
24 circumstance contingent.
25   Q.  And you specifically identified Wal-Mart

Page 31

1  and Safeway in paragraph seven of your
2  declaration.  Do you visit those stores -- do you
3  visit Wal-Mart more often than other stores?
4       MR. GOLDSTEIN:  Object to the form.
5    A.  Wal-Mart --
6       MR. GOLDSTEIN:  Than any other given
7       store or than all stores together?  I mean,
8       what are we talking about here?
9    Q.  Well, strike that.  Why did you
10 specifically identify Wal-Mart and Safeway in your
11 declaration, as opposed to other stores?
12   A.  They were examples of stores that came
13 to mind at the time I was giving the declaration
14 of places that I regularly visit.
15   Q.  Do you visit those places more often as
16 compared to the other stores that you generally
17 visit?
18   A.  I don't know.  I haven't analyzed it all
19 that much.  They are just examples of places that
20 I can think of that I have visited.
21   Q.  And when you're determining what store
22 to make a purchase at, what's the general criteria
23 that you use?
24   A.  Well, I generally try to think about
25 what I understand the store to be known for

Page 32

1  carrying, its merchandise.  I am mindful of
2  economics, and I am mindful often of proximity to
3  my home, probably the same criteria that most
4  people would use to determine where to buy
5  product.
6    Q.  What's the most important criteria?  All
7  things --
8    A.  Well, I'm big on economics, so if I can
9  go and find something that's competitively priced,
10 I'll do that.
11   Q.  So if there's the same item is being
12 sold at Wal-Mart and, say, Best Buy, the price
13 would be the most important to you?  Is that
14 accurate?
15   A.  It certainly would be a significant
16 factor in the -- in my decision.  The fact is that
17 everything is going to be circumstance contingent.
18 It depends on where I am at the time.  It depends
19 on what my daily plans are, how convenient it's
20 going to be.
21       Any number of organizational factors
22 that I have to consider in functioning as a blind
23 person will come into play as to whether I go to
24 one store or another.
25   Q.  When you make your in-store purchases,

Page 33

1  how do you generally get to the store?
2    A.  I generally take a bus or take a taxi or
3  walk.  It depends on where it is and how
4  convenient it is and how much time I want to
5  invest.
6    Q.  In paragraph eight of your declaration,
7  you say, "For the most part, I do not enjoy
8  shopping because I find the crowds and waiting
9  around bothersome.  Using a store's website to
10 select what I want in advance streamlines the
11 shopping process so I can spend my time doing
12 other things."
13       How does the store's -- using a store's
14 website streamline the shopping process for you?
15   A.  It gives me advance knowledge of whether
16 or not the store has in its merchandise the
17 product that I want to buy, and it gives me a
18 sense of the comparative prices.
19       And so it allows me to determine some
20 advance information prior to going to the store.
21   Q.  In those instances that you haven't used
22 the Internet to pre-select items before you go to
23 the actual bricks-and-mortar store, have you ever
24 had any problems determining whether an item was
25 in stock?

Page 34

1  A. No.
2  Q. Have you ever had any problems
3  determining what the comparative prices were?
4     MR. GOLDSTEIN: Compared to what?
5     MR. KLESTOFF: Well, Mr. Frye said that
6  he uses the online sites to determine
7  comparative prices, the price of a particular
8  item. I'm just using his terminology.
9  A. Well, if I go to one store, yes, I would
10 have trouble knowing what comparative prices are,
11 because I likely wouldn't go to two stores to
12 achieve the same thing. I would just buy it and
13 go.
14 Q. In those instances where you haven't
15 used a store's website to pre-select items, have
16 you had any -- and then gone into the store, have
17 you had any problems determining what the prices
18 were?
19 A. No. I generally know what the price is
20 by the time I get it, take it to the counter and
21 buy it.
22 Q. Is there any other way that -- you
23 mentioned that using -- buying products online
24 streamlines the shopping process. Two of the ways
25 that you identified that it would streamline the

Page 35

1  process is knowing whether a particular item is in
2  stock and determining comparative prices,
3  comparative pricing.
4     Is there any other way that using a
5  store's website streamlines the process?
6  A. I may be able to get narrative
7  information about the product that I wouldn't be
8  able to elicit from the assistance of a shopping
9  assistant in the store, and that can be useful in
10 some circumstances.
11 Q. What do you mean by narrative
12 information?
13 A. Information about the product that might
14 be -- that might be on the box or might describe
15 the product more thoroughly than your average $7
16 an hour worker is prepared to invest in describing
17 to me.
18 Q. You said information on the box. That
19 would be something that --
20 A. Information on the box, on the package,
21 on the -- any marketing information that the
22 website might include is what I'm referring to.
23 Q. Is there any other way in which using a
24 store's website streamlines the shopping process
25 for you?

Page 36

1  A. Those are the ones that immediately come
2  to mind.
3  Q. In your declaration, you say that you
4  generally select what you want from the store
5  websites and then purchase the item at the store.
6  And you do that because you prefer to get your
7  hands on the product before you make a final
8  decision of whether to buy it.
9     What does "get my hands on the product"
10 mean?
11 A. It means that I want to see if the
12 product is something that I can use. It means I
13 want to look, for instance, at the satellite radio
14 receiver and determine if the buttons are
15 distinguishable or if it's a flat panel display
16 that can only be used by somebody with vision.
17    If I'm purchasing an appliance, I want
18 to see if the washing machine has knobs on it or
19 if it only has a flat panel display that's going
20 to be useless to me.
21    I can read and generally get a lot of
22 valuable information on the web, but before I make
23 a purchase, particularly of significance, I
24 want to look at it and see if it's something that
25 I'm going to be able to independently manage.

Page 37

1  Q. You do that for all your in-store
2  purchases?
3  A. No.
4  Q. What types of in-store purchases do you
5  do that for?
6  A. In-store purchases where the item in
7  question is something that is likely based on my
8  experience in life as a blind person to be
9  difficult for me to use.
10 Q. What specific types of products would
11 those be?
12 A. Like the appliances I previously
13 mentioned, like a satellite receiver, like a
14 radio, like a stereo, anything that you have to
15 operate that traditionally, as a result of the
16 evolution of product design, is going to prove
17 inaccessible to blind people.
18 Q. What store do you generally buy those
19 types of items at?
20 A. I don't buy anything in any general
21 store. I go to stores that are competitive.
22    I have gone to Wal-Mart. I have gone to
23 Sears. I have gone to Target. I have gone to any
24 variety of stores. It depends on what I'm needing
25 and based on the criteria shared with you earlier,

Page 38

1   what works for me.
2       Q.  Okay.  Let's move to your --
3       THE WITNESS:  Can we have a stretch
4   break?
5       MR. KLESTOFF:  Yeah, sure.
6       (Recess taken -- 10:00 a.m.)
7       (After recess -- 10:10 a.m.)
8       Q.  So let's move on to Target.  In your
9   declaration, you say you shop at Target stores at
10  least once every three months.  What types of
11  items do you purchase at Target?
12      A.  The item that I recall purchasing most
13  recently was patio furniture.  We bought a table
14  and four chairs for our backyard.
15      Q.  Any other types of products?
16      A.  I believe we've purchased gardening
17  supplies there, a rake or whatever those things
18  are, shovel and things.  I don't do that.
19      We probably purchased juice and one
20  thing or another.  We never can go to a store and
21  leave with only the thing we went to buy.
22      Q.  Is that all you can remember?
23      A.  Those are the things that come
24  immediately to mind.  I think we bought a ladder
25  one time.

Page 39

1       Q.  Who makes the in-store purchases
2   generally, you or your wife?
3       MR. GOLDSTEIN:  Are you talking about
4   Target, specifically?
5       Q.  At Target, specifically.
6       A.  It's circumstance contingent again.  So
7   sometimes me, sometimes Renae, sometimes joint.
8       Q.  What's your experience like when you go
9   into the store at Target, generally?
10      A.  Fine.
11      Q.  Are you able to locate the items that
12  you're looking for?
13      A.  Usually, yes.
14      Q.  And you said you also never leave Target
15  without buying something that you weren't looking
16  for.  How do you generally find those items?
17      MR. GOLDSTEIN:  Object to the form.  I
18  think he said that generally about stores,
19  not Target.
20      THE WITNESS:  Yeah.
21      Q.  Oh, generally, okay.  You said that you
22  never leave a store without also buying something
23  that you weren't looking for.  Is that the case
24  with Target?
25      A.  It's probably no less the case with

Page 40

1   Target than any other store, and mostly it was
2   meant sort of as a humorous sort of comment.
3       Q.  I understand.
4       A.  But, anyway --
5       MR. GOLDSTEIN:  Husband's lament.
6       THE WITNESS:  Exactly.
7       Q.  And you said most recently you purchased
8   patio furniture at Target?
9       A.  That's the merchandise I remember
10  purchasing most recently.
11      Q.  Was that the last time you shopped at
12  Target?
13      A.  Probably, but I can't swear to that.
14      Q.  Who went to the store, you or your wife?
15      A.  When we purchased the patio furniture?
16      Q.  Correct.
17      A.  Both of us.
18      Q.  Were you able to find what you were
19  looking for?
20      A.  Yeah.  We found something that met our
21  purposes.
22      Q.  Describe your experience that last time,
23  when you purchased patio furniture.
24      A.  It was an unconventional store
25  purchasing experience.  We went in; we looked

Page 41

1   around for patio furniture.  We looked at several
2   alternative pieces of merchandise.  We chose one,
3   and we purchased it.
4       Q.  Were you assisted by someone at Target
5   at that time?
6       A.  Yeah.  I think we had the assistance of
7   a sales representative.
8       Q.  Was he helpful?
9       A.  I'm sure he was.
10      Q.  You say you're sure he was.  You don't
11  remember specifically?
12      A.  Yeah.  I mean, it doesn't stand out as
13  distinguished customer service that I recall
14  vividly, but I'm sure it was -- I'm certain it was
15  adequate.  I'm certain it was perfectly fine.
16      Q.  So you were able to locate the item you
17  were looking for and make a purchase with no
18  problems?
19      A.  That's right.
20      Q.  Did you check Target's website before
21  you went to make this purchase?
22      A.  I don't recall, but we may have, because
23  we were looking at getting furniture.  And so we
24  may have, but I don't recall in the specific
25  instance if we used that technique or not.

Page 42

1    Q.   And you don't remember if you had any
2  problems accessing Target's site?
3    A.   I don't recall if I used Target's site
4  to determine whether or not to purchase the patio
5  furniture or not.  I can tell you that if we did
6  use the Target site to purchase the -- to preview
7  the patio furniture, I don't think I was party to
8  that review.  Renae would have done that, if, in
9  fact, we did it at all.
10        And I don't recall if in that instance
11  we used the previewing technique to achieve that
12  goal or not.  I don't remember.
13    Q.   Has your wife experienced any problems
14  accessing Target's site?
15    A.   I don't know.  She hasn't discussed them
16  with me, if she has.
17    Q.   All right.  Let's move on.  I want to
18  talk a little bit more about your XM radio
19  purchase.  You said that about a year ago you
20  tried to look for products on Target.com, but you
21  were unable to do so because the website was
22  inaccessible.  Do you remember the specific date
23  of that?
24    A.   No.
25    Q.   Do you remember if it was winter,

Page 43

1  spring?
2    A.   It would have been in springtime,
3  sometime between April and June.
4    Q.   April and June of 2006, correct?
5    A.   Yeah.
6    Q.   And how did you access Target's website?
7  Did you access it from Target's home page?
8    A.   Probably.  I probably went to
9  Target.com.
10    Q.   In general, when you access Target from
11  Target's website, do you log on to Target.com or
12  do you use external linking from other sites?
13      MR. GOLDSTEIN:  Object to the form.
14    A.   No.  I generally just go onto
15  Target.com.
16    Q.   And where did you -- where were you when
17  you accessed Target's website on that occasion?
18    A.   I was at probably a lunch break or an
19  afternoon break at work.
20    Q.   And what screen access software did you
21  use?
22    A.   JAWS.
23    Q.   Which version?
24    A.   I don't remember.  Probably the version
25  I have now or just the one before it.

Page 44

1    Q.   That would be 7.09?  Would that be a
2  fair assumption?
3    A.   Yeah.  I don't know how they count their
4  version numbers, but it would be a recent version.
5    Q.   How did you determine that you wanted to
6  purchase an XM radio?
7    A.   I enjoy music, and I enjoy talk radio,
8  and I had conversations with friends who found XM
9  to be a desirable product.  I fly a lot around the
10  country to do speaking, and I flew on AirTran,
11  which features XM onboard its airplanes.
12        And so both of those experiences
13  persuaded me that XM would be a product that might
14  be economical and entertaining.
15    Q.   Were you looking for a specific model of
16  XM radio?
17    A.   No.  I was looking for a portable model
18  that I could take with me if I wanted to, but that
19  I could also play through my non-portable stereo
20  at home.
21    Q.   You say you went to three store websites
22  to see what XM receivers they sold, to find out
23  how much they cost and to identify more of their
24  features.  And you specifically identify Wal-Mart,
25  Best Buy and Target.  Why did you pick those three

Page 45

1  sites?
2    A.   They were sites that or they were stores
3  where I had learned from acquaintances that XM
4  satellite radio receivers might be sold.
5    Q.   Did you look at any other sites?
6    A.   Not that I recall.
7    Q.   And you say you were easily able to find
8  the information you wanted at Walmart.com and
9  Bestbuy.com.
10    A.   Yes.  I found the information I needed
11  at those two sites.
12    Q.   And what specific information were you
13  looking for?
14    A.   I was specifically looking to determine
15  if they sold XM radio satellite receivers and to
16  determine if they had portable models of the same
17  and to determine how much they might cost.  Those
18  are the immediate things that I was looking to
19  identify.
20    Q.   Was there any other information that you
21  were looking for, aside from the three pieces of
22  information you identified?
23    A.   Mindful that this was a year ago, I
24  don't recall any other.  Those seem to be the
25  things I might have been looking for.

1    Q.  How did you access Wal-Mart.com on that
2  occasion?  Through its home page?  External
3  linking?
4    A.  Probably just through its home page.  I
5  mean, I would probably tend to access most things
6  through what I understood to be their Internet
7  website, usually affiliated with their store name
8  in one way or another.
9    Q.  Did you have any problems finding what
10  you wanted at Walmart.com?
11    A.  No.
12    Q.  How quickly were you able to find the
13  information that you wanted at Walmart.com?
14    A.  I don't know, 15, 20 minutes.
15    Q.  How did you access Bestbuy.com on that
16  occasion?
17    A.  Probably via its named website.
18    Q.  And how quickly were you able to access
19  the information you were looking for on
20  Bestbuy.com?
21    A.  Qualifying this, of course, mindful of
22  the fact that I didn't time myself, probably a
23  comparable amount of time, 15 to 20 minutes.
24    Q.  And you say in your declaration that
25  when you went to Target.com, the website was

1  specifically you did on that occasion?  When you
2  first got to the website, what did you do?
3    A.  Mindful that this has been a year or so
4  now, I would have -- my traditional practice is to
5  do a web link or a web list command with JAWS that
6  let's me just read the names of the links on the
7  page, a web link list command.  And I would have
8  reviewed the links to see if there was any link
9  that immediately might have seemed to have a
10  correlation to the item I was purchasing.
11      If I had found that link, I would have
12  gone to it and looked around with speech and read
13  the page, maybe.  And that's probably what I did
14  to start my process.
15    Q.  And you were able to do all those steps
16  on that occasion?
17      MR. GOLDSTEIN:  Object to the form.
18    A.  I'm certain I undertook most of -- I'm
19  certain I -- I undertook those steps when I went
20  to the site.  But being unable to identify
21  anything very clearly, I didn't -- I didn't find
22  what I was looking for.
23    Q.  Were you able to use the web list
24  command with JAWS to list the links on the page on
25  that occasion?

1  impossible to navigate with the screen reader.
2  Can you be a little bit more specific as to the
3  problems you were experiencing?
4    A.  When I went to the Target.com website, I
5  encountered hundreds of links which, when using
6  speech software, makes it a challenge to identify
7  what link might lead you to the product that you
8  want to find.
9      Many of those links were not,
10  apparently, in the terms of the computer people,
11  properly labeled, because they would simply say
12  graphic and a arbitrary number, which gave me no
13  valuable information.
14      And occasionally there would be -- there
15  would be brief narrative phrases like "sell here"
16  or something that didn't seem to have any
17  relationship to anything else.  Those are the
18  things that immediately come to mind.
19    Q.  Was that on the site's home page?
20    A.  That's where I would have originally
21  encountered that kind of stuff.  Invariably, I'm
22  sure, I tried to press other links and found
23  similar -- found similar information on pages
24  several layers in.
25    Q.  So why don't you walk me through what

1    A.  Yeah.  My understanding is that if you
2  do that command, the links will appear, and -- but
3  they all or many of them would just be graphics
4  and numbers.  They wouldn't have any -- they
5  wouldn't have any intelligent title that would
6  give you a sense of what the link was going to
7  take you to.
8    Q.  And after you got the list of links on
9  the page, what did you do then?  Do you remember?
10    A.  No.  I -- I might have gone up and
11  looked for a search box.  I may or may not have
12  found one.  The detail of what I did is clouded by
13  the passage of time.
14      What I remember vividly is that I was
15  unsuccessful in my effort and that the site was
16  incredibly cluttered, not well labeled and hard to
17  use.
18    Q.  Do you remember any other specific
19  problems with the website on that occasion?
20    A.  No.  Those were sufficiently
21  disheartening that I -- those were sufficiently
22  disheartening that I couldn't achieve my goal.
23    Q.  At some point you stopped using the
24  website for your search?
25    A.  Yes.

Page 50

1    Q.  Do you remember what specific point that
2   was?
3         MR. GOLDSTEIN:  Object to the form.
4    A.  Yeah.  I mean, I would have stopped
5   using or stopped attempting to do it after I
6   concluded that I wasn't going to be able to
7   identify the merchandise I wanted to purchase.
8    Q.  Was that on Target's home page?
9    A.  It was on the Target website.  I'm not
10  sure if I was on the home page when I concluded
11  that my search wasn't going to be fruitful.  I
12  don't recall at what part of the website I was on.
13   Q.  And of all the steps that you took that
14  you described earlier, how many times did you try
15  these steps?
16   A.  Repeatedly.  I don't know specifically
17  how many times.  I wasn't easily dissuaded.  You
18  know, I made a concerted effort.
19   Q.  Was it more than five?
20   A.  I'm not prepared to give you a number.
21   Q.  Can you -- I'm entitled to your best
22  estimate.  Is it less than ten?
23         MR. GOLDSTEIN:  Object to the form.  Is
24      what less than ten?  I mean, are you asking
25      how many times did you get gobbledegook in

Page 51

1   response to a web list, or how many times did
2   you search for an edit box?
3    Q.  How many times did you try going through
4   the steps that you described to me?  Was it less
5   than ten?
6    A.  Well, if I had done it ten times, it
7   would have probably taken me quite a bit of time,
8   so perhaps it was less than ten.  But, again,
9   counsel, I don't know how many times it was.  It
10  was repeatedly.
11   Q.  Okay.  And you say you were -- you
12  mentioned that you were using JAWS to navigate the
13  site; is that correct?
14   A.  Yes.
15   Q.  Were you using the Braille access
16  software as well?
17   A.  I'm sure I was referencing the Braille
18  access software.  In general, for the type of
19  search I was doing, the detail that I derive from
20  Braille access software would have offered very
21  little additional advantage.
22   Q.  Did you try to use any other screen
23  access software to access the site on that
24  occasion?
25   A.  No.

Page 52

1    Q.  Did you do anything else to try to
2   access the information you were looking for on the
3   site?
4         MR. GOLDSTEIN:  Object to the form.
5    A.  Did I do anything else to try and access
6   the information I was looking for on your website?
7   Is that what you asked?
8    Q.  Yes.
9    A.  No.  After I concluded I couldn't find
10  it, I didn't do anything else.
11   Q.  Did you call Target.com's 800 number for
12  help in accessing the site?
13   A.  No.
14   Q.  Did you e-mail Target.com for help
15  accessing the site?
16   A.  No.
17   Q.  Did you call JAWS's tech support people
18  for help accessing the site?
19   A.  No.
20   Q.  Did you ever try calling Target to get
21  the information that you wanted about the XM
22  radio?
23   A.  No, I did not.
24   Q.  Did you ever go to Target, the Target
25  bricks-and-mortar store, to look for the XM radio?

Page 53

1    A.  No.  Once I determined that I could find
2   what I wanted or do my pre-shopping evaluation on
3   other websites that I was able to successfully
4   use, I determined to give my business to stores
5   that offered me an accessible website.
6    Q.  So you never went to Target to look for
7   an XM radio?
8    A.  No.
9    Q.  And you say you bought the XM radio at
10  Wal-Mart, correct?
11   A.  Yes.
12   Q.  What type of -- what type of XM radio
13  did you ultimately end up buying?
14   A.  I think the model is called a My-Fi.
15   Q.  Do you remember how much it cost?
16   A.  Somewhere between 150 and $200, maybe a
17  little less, maybe a little more.
18   Q.  Did you ever find out if Target sold XM
19  radios since then?
20   A.  No.  I have one.  Do you?
21   Q.  I'm not --
22   A.  You're not sure?
23   Q.  I'm not sure.  And then you say in your
24  declaration that your experience using Target.com
25  was so frustrating that you haven't tried to use

Page 54

1  it to find product information again. This was
2  the XM radio, the last time you -- strike that.
3        Was the last time you accessed Target's
4  website the time when you were looking for that XM
5  radio?
6    A.  I may have accessed it to try and see if
7  I could use, as referenced in my declaration, a
8  gift registry. But those two instances have been
9  the last times I've tried to access the Target
10 website for any significant purchase.
11   Q.  So you -- was your attempt to access the
12 gift registry before or after the time you
13 accessed Target to -- for information about the XM
14 radio?
15   A.  My recollection is that it would have
16 been somewhat after the XM radio time, though not
17 significantly after it.
18   Q.  You say you haven't tried to use
19 Target's website to find product -- to find
20 product information again. Have you used Target's
21 website to do anything else?
22   A.  What else would you do on Target's
23 website? No.
24   Q.  No. You say -- have you gone to the
25 actual Target store since the last time you

Page 55

1  accessed Target's website?
2    A.  With the passage of time, it's hard to
3  remember all of the chronology. But, of course,
4  we purchased the -- we purchased the patio
5  furniture sometime last spring or summer. So it
6  may be that that occurred before or after.
7        And I may have gone to a Target in the
8  interim with Renae to look at something or
9  another, yes. But I don't recall that we've
10 purchased anything specifically; I don't recall
11 that we haven't.
12   Q.  Let's move on to the occasion when you
13 attempted to access Target's gift registry. Do you
14 remember specifically when that was?
15   A.  No. It was in the spring or so of last
16 year. Yeah, the spring or so of last year, I
17 think is when it was. I believe that's what my
18 declaration says.
19   Q.  Do you remember what month it was?
20   A.  No. I don't remember specifically what
21 month it was.
22   Q.  Was that before or after you purchased
23 your patio set from Target?
24   A.  I don't recall. For some reason, I
25 think it was slightly before, but I don't

Page 56

1  remember, to be sure.
2    Q.  And how did you access the site on that
3  occasion?
4    A.  Probably in a very similar fashion to
5  the way I would have tried to access the site when
6  I was looking for the XM receiver.
7    Q.  And that would be by directly accessing
8  the home page?
9    A.  Yes.
10   Q.  Was that the first time you tried to
11 access Target's baby registry?
12   A.  Probably, yes.
13   Q.  Had you tried to access Target's wedding
14 registry in the past?
15   A.  I -- I think when I went on to look at
16 the baby registry, I observed that there was a
17 wedding registry and may have tried to look at
18 both simultaneously. I don't think I looked at
19 them on separate occasions.
20   Q.  And on that specific occasion that you
21 accessed Target's baby registry, where were you
22 when you accessed it?
23   A.  I was on a break or at lunch at work, I
24 imagine.
25   Q.  Do you remember what software you were

Page 57

1  using?
2    A.  I used JAWS exclusively.
3    Q.  When you say you were unable to access
4  the online registry using a screen reader, what
5  was the specific problem on that occasion?
6    A.  I couldn't find a list of the products
7  that were -- that would have been on a registry, a
8  registrant's list.
9    Q.  Let's walk through the specific steps
10 that you took. You first logged onto the -- to
11 Target's home page, correct?
12   A.  Hm-hmm.
13   Q.  And then what did you do?
14   A.  I would have checked for what link
15 seemed most appropriate. I might have gone to
16 that link. I can't recall if I found a link that
17 said registry or baby registry, but I may have.
18       As I recall, I might have made modestly
19 more progress in determining that there was a
20 registry. And after that, I found myself barred
21 from being able to determine much more.
22       I couldn't find the person's -- I
23 couldn't find a list of registrants. I couldn't
24 figure out how to access the person's file or
25 preferences. Certainly, I couldn't get in to see

Page 58

1   what the merchandise was that they wanted.
2       Q.   Were you able to do a search for the
3   registrant's name?
4       A.   Not that I can recall.  I didn't see
5   that option available to me.
6       Q.   And on that occasion, how many times did
7   you try to access the baby registry?
8       A.   Repeatedly.  Again, I don't know how
9   many times.  I wouldn't want to be disingenuous
10  and tell you a specific number.
11      Q.   Is it safe to say less than ten times?
12      A.   You can probably safely say less than
13  ten times, but I can't guarantee that that's the
14  number or anything.
15      Q.   Did you call Target's online help
16  number?
17      A.   No.  I wasn't aware that there was an
18  online help number, but I made no such calls.
19      Q.   Did you ever e-mail Target.com about the
20  problem?
21      A.   I made no further inquiries through any
22  resources available, if they existed.
23      Q.   So it would be accurate to say that you
24  didn't use JAWS's tech support people?
25      A.   It would.

Page 59

1       Q.   Did you call Target to try to access the
2   registry that way?
3       A.   I made no further inquiries.
4       Q.   You didn't go to the Target store, did
5   you --
6       A.   I did not.
7       Q.   -- to check the registry?
8       A.   No.
9       Q.   Have you ever accessed a baby registry
10  at the actual store?
11      A.   At the actual Target store?
12      Q.   Correct.
13      A.   No.
14      Q.   Have you ever accessed a wedding
15  registry at the actual Target store?
16      A.   Ultimately no, I don't think I've ever
17  used any of the Target registries.
18      Q.   Then you say you ultimately selected a
19  gift from the Babies R Us online registry instead,
20  and your wife purchased it from the store.  Why
21  was it that your wife purchased it from the store
22  rather than you?
23      A.   Probably because I was either out of
24  town or working.  My wife is a freelance writer,
25  and she has more discretionary time than do I.

Page 60

1       Q.   So was the plan that your wife would --
2   you would select the gift and your wife would
3   purchase it from the store?
4       A.   Are you kidding?  It was probably a
5   joint exercise.
6       Q.   By joint exercise, what do you mean?
7       A.   We probably talked about it and looked
8   at it, and I looked around on the site, and she
9   probably looked around on the site, and we
10  probably came to some understanding.
11      Q.   But was your wife ultimately going to
12  make the purchase at the store?
13      A.   Probably.
14      Q.   Probably?
15      A.   Yeah.  It was simply a matter of
16  convenience and such.  I don't need to go to the
17  store to demonstrate any particular capacity or
18  motivation.  We just do what is convenient in the
19  course of our lives, dependent on what our
20  respective schedules are, counsel.
21      Q.   But on that specific occasion, you don't
22  remember whether you --
23      A.   No.
24          MR. GOLDSTEIN: Let him finish the
25      question, please, Mr. Frye.

Page 61

1       Q.   On that specific occasion, do you
2   remember whether the plan was for your wife to
3   purchase the gift at the store?
4       A.   I remember that that's ultimately what
5   happened, and I presume that was probably our
6   plan.
7       Q.   So you've identified two times where
8   you've tried to use Target's website specifically;
9   the time when you were looking for information
10  about the XM receiver and the time when you tried
11  to access Target's gift registry.
12          Are there any other times that you've
13  used Target's website?
14      A.   No, not that come to mind.
15      Q.   So you've only used Target's website
16  twice?
17      A.   Those are the only two times that
18  immediately come to mind; that's right.
19      Q.   You don't specifically remember any
20  other time?
21      A.   No.
22      Q.   Have you visited Target's website in the
23  last two or three months?
24      A.   Last two or three months, I don't -- I
25  don't think I have.

Page 62

1    Q.   Are you aware of any changes that have
2  been made to the site recently?
3    A.   Not as a result of my personal
4  observation.
5    Q.   Has anyone told you -- aside from your
6  conversations with counsel, has anyone told you of
7  any changes that have been made to Target's
8  website?
9    A.   I have heard unsubstantiated sort of
10  rumbling that, as a result of these actions, that
11  efforts might be being taken to improve the
12  quality of the site, but I have not observed them
13  personally.  This is conversation just in general
14  that is occurring within the blindness community.
15    Q.   Do you remember any specifics about
16  these conversations?
17    A.   No, just that measures might be underway
18  to improve the quality of the accessibility of the
19  site.
20    Q.   And you haven't accessed the site since
21  you've had these conversations?
22    MR. GOLDSTEIN:  Asked at least three
23  times.
24    A.   No, I have not.
25    Q.   How did you come to provide a

Page 63

1  declaration in this lawsuit?
2    A.   I was invited to provide a declaration
3  as a result of invitations that were generally
4  made to the community to review and evaluate the
5  website.
6    Q.   When was the first time you had contact
7  with the attorneys in this action?
8    MR. GOLDSTEIN:  Concerning this case?
9    Q.   Concerning this case.
10    A.   It would have been spring of last year,
11  probably late-ish March of 2006.
12    Q.   And were you contacted first, or was it
13  the other way around?
14    A.   I'm sure that I was contacted first.
15    Q.   And you say there was a general
16  invitation to the blind community to access the
17  website and evaluate it -- access Target's website
18  and evaluate it; is that correct?
19    A.   Yes.
20    Q.   When was that?
21    A.   Well, after I had conversation with
22  counsel, we -- I learned about the invitation.  It
23  would have been in late-ish March.
24    Q.   Do you subscribe to any Internet mailing
25  lists?

Page 64

1    A.   Yes.
2    Q.   Which ones?
3    A.   I subscribe to a number of the NFB,
4  National Federation of the Blind, sponsored
5  mailing lists.  The ones that immediately come to
6  mind are "Blind Law," which is a mailing list for
7  blind attorneys and other blind people involved in
8  the legal profession in one context or another;
9  "Blind Rehabilitation Professionals"; "Blind" --
10  the list serve for the National Federation of the
11  Blind in Washington, since I have deep routes in
12  Seattle.
13    For a time I was subscribed to the -- an
14  employment list to help blind people find
15  employment.
16    Those are the ones that immediately come
17  to mind.  I maybe subscribe to others.  There are
18  70 or 80 such lists.  I'm certainly not subscribed
19  to them all.
20    MR. KLESTOFF:  I'm going hand out what
21  I'd like to mark as Exhibit 2.
22    MR. GOLDSTEIN:  I assume, by the way,
23  these are Frye 1 and Frye 2?
24    MR. KLESTOFF:  Correct.
25    MR. GOLDSTEIN:  Because otherwise, we

Page 65

1  end up with a multiplicity of ones and twos
2  from 20 different depositions.
3    MR. KLESTOFF:  Correct.
4    (Thereupon, Frye Exhibit Number 2 was
5  marked.)
6    Q.   And I'll just represent to you that this
7  looks like this is a March 31, 2006, message with
8  the subject, "NFB-DB assistance sought with Target
9  Corporation lawsuit."  And at the very top it says
10  "From:  Dan Frye," and it looks like the message
11  is from David Andrews.  At the very top it says,
12  "Dan Frye."
13    And it says, "As you may know, the NFB
14  has filed a lawsuit against Target Corporation for
15  the inaccessibility of its website,
16  http://www.Target.com.  If you have encountered
17  access barriers on Target.com and are willing to
18  provide testimony for use in the lawsuit, please
19  contact Brett Kaufman at Disability Rights
20  Advocates, using the following contact information
21  as soon as possible."
22    And it lists Brett Kaufman's name,
23  title, his phone number and his e-mail, and it
24  says that -- goes on to say, "Should you have
25  additional questions about how you can best be of

Page 66

1  assistance or provide support for this initiative,
2  please contact me directly at my contact details
3  provided below for a briefing before communicating
4  with the staff at Disability Rights Advocates.
5      "Thank you for your cooperation," and it
6  has your name, Daniel B. Frye. And it says,
7  "Manager of Affiliate Action Advocacy and
8  Training, National Federation for the Blind."
9      A. I'm sure it doesn't say for the Blind.
10     Q. I apologize. National Federation of the
11 Blind, Department of Affiliate Action, and it
12 gives your address on Johnson Street, your phone
13 numbers and e-mails and the web address.
14     A. Okay.
15     MR. GOLDSTEIN: Let me lodge an
16 objection at this point on the question of
17 scope. The additional hearing was postponed,
18 an additional briefing and these depositions
19 also noted purportedly in connection with the
20 declarations that were filed at the Court's
21 request on the use of Target.com for
22 pre-shopping.
23     This exhibit has absolutely nothing to
24 do with that topic. The representation has
25 been that -- from Target, that these

Page 67

1  depositions should not count towards the
2  limit on depositions because they are
3  restricted to and narrowed to the scope of
4  the issue of pre-shopping.
5      And, therefore, I think it is an abuse
6  of the deposition process and the agreement
7  made in this case to proceed on this matter.
8      MR. KLESTOFF: Your objection is noted.
9      Q. Who is David Andrews? Are you familiar
10 with someone named David Andrews?
11     A. Yes. David Andrews is the list serve
12 owner of the NFB sponsored list service.
13     Q. And how did it come about that you sent
14 this message to David Andrews?
15     A. I sent the message to David Andrews at
16 the request of counsel.
17     Q. And here it says -- it specifically
18 says, "If you have encountered access barriers on
19 Target.com, and are willing to provide testimony
20 for use in the lawsuit, please contact Brett
21 Kaufman."
22     Why did you phrase it in that particular
23 way?
24     A. I used the language provided to me at
25 the advice of counsel.

Page 68

1      Q. Okay.
2      MR. GOLDSTEIN: Let me just say there
3  that, because I regard communications
4  between -- not because I regard -- because
5  the case law teaches that communications
6  between attorney and client with respect to
7  matters intended to be disclosed to third
8  parties is not privileged, I am not
9  instructing this witness to refrain from
10 answering these questions.
11     However, I don't want anyone to think
12 that, in the process, we're waiving the
13 attorney-client privilege. We're not waiving
14 the attorney-client privilege. This simply
15 happens to be a non-privileged communication.
16     MR. KLESTOFF: Noted.
17     Q. Did you ask for people to provide you
18 information about their lack of problems accessing
19 Target.com?
20     A. Can you read to me the sentence? I
21 believe what it says is that I asked them to
22 evaluate or review the website. I didn't ask them
23 to tell me if they found problems or successes.
24     Q. This one specifically says, "If you have
25 encountered access barriers on Target.com."

Page 69

1      A. Okay. Then I asked them to let us know.
2      Q. Have you ever sent out a message
3  requesting information from people who have had no
4  problems accessing Target, Target's website?
5      A. As I recall, I've sent out two messages
6  of a similar nature, and I don't recall the
7  language in the other one. My request would have
8  generally wanted people to review and honestly
9  evaluate what they saw.
10     I wasn't specifically seeking a
11 favorable or a negative answer. I was seeking
12 objective information that could be used in the
13 course of this action.
14     Q. And I want to summarize your earlier
15 testimony. You say that this specific language in
16 this March 31, 2006, posting was provided to you
17 by counsel, correct?
18     A. Correct.
19     Q. And then later on, it says, "Should you
20 have any additional questions about how you can
21 best be of assistance or provide support for this
22 initiative, please contact me directly for a
23 briefing before communicating with staff at
24 Disability Rights Advocates."
25     What was that briefing? Can you

Page 70

1  describe that to me?
2      A.  I was simply going to let people who
3  ordinarily might be unfamiliar with legal
4  exercises know that they were going to be giving a
5  declaration, that the declaration had the
6  potential to be used in the course of this action,
7  that anything they said would be reduced to
8  writing, and to simply allay any fears that they
9  might have had regarding what, to many, can seem
10  an intimidating exercise.
11      It would have given them -- reaffirmed
12  that they had Mr. Kaufman's information and send
13  them on their merry way.
14      Q.  Was there any other reason why the
15  briefing was set up?
16      A.  No.
17      Q.  How many briefing sessions were there?
18      A.  I don't recall specifically.  There
19  weren't a lot.
20      Q.  Was it less than five?
21      A.  No, it would have been not less than
22  five.
23      Q.  Was it less than ten?
24      A.  It may have been less than ten at one
25  point, yes.

Page 71

1      Q.  You say at one point.  Were there
2  subsequent briefing sessions?
3      A.  Well, there was a subsequent message
4  that I sent out, which may have yielded further
5  inquiries.  Some people called me.  Some people
6  who apparently didn't feel a need to have a
7  briefing would have contacted Disability Rights
8  Advocates in California directly.
9      So at one point it was certainly less
10  than ten.  It may have ultimately gone over ten,
11  but I can't tell you that it went significantly
12  higher than that.
13      Q.  Is it fair to say between ten to
14  fifteen?
15      A.  It's fair to say between ten and twenty.
16      Q.  Ten and twenty.  Do you know how many
17  people responded to your message?
18      A.  Not ultimately, because some people
19  contacted DRA directly.
20      Q.  Of the people that contacted you
21  specifically, was it between fifteen and twenty?
22      A.  I'm sorry.
23      MR. GOLDSTEIN:  Objection.  Witness just
24  said it was between ten and twenty.
25      MR. KLESTOFF:  I thought he was

Page 72

1  referring to the briefing sessions.
2      A.  Yeah.  There were between ten and twenty
3  briefing sessions, but I'm not clear what your
4  question is.
5      Q.  How many people were at these briefing
6  sessions?
7      A.  They were telephone briefing sessions.
8  They didn't come and see me in my office.
9      Q.  Did you get any comments in response to
10  your message that were positive about Target's
11  website?
12      A.  I don't recall which message it was in
13  response to, but I did get one comment from a lady
14  who was reluctant to be critical of Target because
15  Target was known for the charitable solicitation
16  of fruit baskets or something at Christmastime and
17  had been supportive of her local chapter.
18      Q.  And that was the only --
19      A.  That was the only unqualified
20  positive -- unqualified positive response.
21      I received responses from one or two
22  people whose evaluation was either inconclusive or
23  inconclusive about the nature of the website or
24  who ruminated on their reflection on a variety of
25  things, including whether or not they thought the

Page 73

1  case was meritorious.
2      Q.  How many inconclusive responses were
3  there?
4      A.  Two or three.  I don't know.
5      Q.  Do you remember what any of the
6  responses specifically said?
7      A.  Most of the inconclusive responses
8  specifically said they hadn't had occasion to
9  review the website, that they had heard secondhand
10  from others that it was difficult to use and that
11  others still had told them that they had had no
12  problems.
13      But their experience was -- but they
14  weren't prepared to comment, because they
15  themselves had not accessed the website.
16      Q.  And of the responses that ruminated on
17  the merit of the lawsuit, do you remember what --
18  specifically what those responses were?
19      MR. GOLDSTEIN:  Objection.  Some of
20  those we have produced where they did not get
21  into the attorney-client sphere, but where
22  they did contain requests that certain things
23  be communicated to counsel, among the client,
24  we have not produced those.
25      And the witness is instructed not to

1    answer with respect to those.
2        With respect to those comments, and I
3    believe we produced them yesterday or Friday,
4    the additional ones we found, where there is
5    no reference to communications to counsel,
6    you're free, of course, Mr. Frye, to respond
7    to the question.
8    A.   Sure.   And your question was, what did
9    they say why they thought it wasn't meritorious?
10   Q.   Correct.
11   A.   Oh, they wondered -- they wondered
12   whether or not, you know, ultimately the website
13   was going to be regarded as successful, was it
14   going to be regarded as accessible.
15       Again, they didn't know for sure, but
16   they wondered.   They referenced other website
17   actions, legal actions that had been taken, not by
18   the NFB, that they regarded as erroneous.
19       All of that is to say that it was their
20   personal opinion that was being offered.   Much of
21   it I regard as erroneous.
22       MR. KLESTOFF:   I'd like to mark this
23   next as Frye Exhibit 3.
24       (Thereupon, Frye Exhibit Number 3 was
25   marked.)

1    Q.   Frye Exhibit 3, just represent to you
2    this is another message from David Andrews, the
3    subject, "NFB-DB assisting with Target lawsuit
4    easier than ever."
5        And it says, "Dan Frye has asked me to
6    post the following.   It is important."   And it
7    says, "David Andrews.   As part of the Federation's
8    legal action against Target's web operations, we
9    are in need of blind people to examine the
10   website, Target.com, and offer their assessment,
11   particularly as it relates to any access problems
12   experienced, as soon as possible.
13       "Initially, I thought that the officials
14   at Disability Rights Advocates wanted people to
15   draft their own declarations.   As it turns out,
16   however, they only want people to review the site
17   and then call and verbally articulate your
18   experience to them.   They will then draft your
19   statement for you to review and sign.
20       "If any of you have not done this,
21   please take the time to review the website and
22   call the law clerk assigned to this case at
23   Disability Rights Advocates, our partner in
24   prosecuting this action.
25       "Please contact as soon as possible

1    Brett Kaufman."
2        And it gives his title, his phone number
3    and his e-mail.
4        And then it says, "Finally, please
5    simply let me know when you've made contact with
6    representatives at Disability Rights Advocates so
7    that I can track the number of people who have
8    been referred to them and who have actually filed
9    the statement.   We need at least 30 people to make
10   statements, and if you'll keep me informed, I'll
11   be best able to monitor our progress."
12       It says, "Thank you and please call me
13   if you have any questions," and gives your name
14   and address and phone numbers and website.
15       MR. GOLDSTEIN:   Mr. Klestoff, I think it
16   used the word "experiences" in the plural,
17   "verbally articulate your experiences to
18   them."
19       MR. KLESTOFF:   I'm sorry.   That's
20   correct.   I apologize.
21   Q.   How did you come to send this message to
22   David Andrews?
23   A.   I sent this message at the advice of
24   counsel.
25   Q.   And then --

1    A.   At the advice and request of counsel.
2    Q.   And the language in that, in the first
3    sentence, your message says, "We are in need of
4    blind people to examine the website, Target.com,
5    and offer their assessment, particularly as it
6    relates to any access experiences experienced."
7        Why did you choose that language?
8    A.   Well, I wanted people to review it and
9    assess it and let us know if they were finding any
10   difficulties.   But the language that I used was
11   developed in consultation with counsel.
12   Q.   Do you remember how many people
13   responded to this message?
14   A.   No.   I think when I referenced that I
15   spoke in briefing ten to twenty, that would
16   represent the number of people I spoke to as a
17   result of both solicitations.
18   Q.   And then it says that the Disability
19   Rights Advocates wants people to review the site,
20   then call and verbally articulate people's
21   experiences to them, and then they will draft the
22   statement.
23       Why was it handled this way?   Do you
24   know?
25   A.   That was the strategy determined by

Page 78

1  counsel. And the original message didn't
2  specifically give that detail, so we wanted to
3  make it clear to people that that would be the
4  means that it would be handled by -- by which it
5  would be handled.
6      Q. And at the end there, it says, "We need
7  at least 30 people to make statements." Why was
8  that specific number chosen? Do you know?
9      A. Advice of counsel.
10     Q. Okay. Have you ever -- have you made
11  any other communications such as this since April
12  of 2006?
13     A. No.
14     Q. Has there been anything in the "Braille
15  Monitor" regarding the lawsuit, that you're aware
16  of?
17     A. Probably there has. I just can't
18  remember what monthly edition, but I'm sure
19  there's been something, but I can't swear to that.
20  I'd have to go back and review the "Monitors."
21     Q. And were the -- were these mentions of
22  the Target website in connection with efforts to
23  seek out people to submit declarations in this
24  action?
25     A. Since I can't remember whether or not

Page 79

1  there has been something subsequent to these
2  messages in the "Monitor," I certainly am not
3  going to remember the content of those messages.
4      It is possible, it seems likely to me,
5  that there would have been, but I don't know if
6  there has been, and I certainly am not aware of
7  its content. That is not to say I don't read the
8  "Monitor," but I don't recall if we have covered
9  that specifically or not.
10     Q. Do you remember if there were any such
11  mentions previous, before these message?
12     A. No, I don't remember when or if the
13  "Monitor" has covered the issue. I'm inclined to
14  think it has, but I don't remember when or if or
15  what the content would have been.
16     Q. Are you aware of any pod casts on this
17  issue?
18     A. No.
19     MR. GOLDSTEIN: Again, I'm going to --
20  everything since we got away from Mr. Frye's
21  use is beyond the scope of what was
22  represented by Target to be the reason for
23  these depositions.
24     MR. KLESTOFF: I'm going to mark another
25  Exhibit as Frye Exhibit 4.

Page 80

1      MR. GOLDSTEIN: Could I have some
2  representation, counsel, as to the connection
3  between Frye Exhibit 4 and pre-shopping by
4  Mr. Frye on the Target website?
5      MR. KLESTOFF: This will -- this e-mail
6  certainly goes to Mr. Frye's awareness of
7  problems on the website and any efforts to
8  access the site after these e-mails.
9      MR. GOLDSTEIN: Again, it has absolutely
10  nothing to do with the issue that led to the
11  Court agreeing that there could be these
12  additional depositions that would not count
13  towards the limit. And I object to any
14  questions related to Exhibit 4 as altogether
15  outside the scope of this deposition.
16     MR. KLESTOFF: That's noted.
17     (Thereupon, Frye Exhibit Number 4 was
18  marked.)
19     Q. And I'm just going to represent to you
20  that this is -- it looks like an e-mail string
21  between you and Mike Freeman, dated March 31,
22  2006, and it's got the Bates number at the bottom,
23  NFB 0422.
24     And at the bottom it looks like there's
25  a message from you, Mr. Frye, to Mike.

Page 81

1      And it says, "Smile. I've just been
2  brought in the loop today. Is this," parentheses,
3  "access to the Target website," close parentheses,
4  "really an issue from your perspective? Your
5  feedback would be useful to have. Best, Dan
6  Frye."
7      What did you mean about being brought in
8  the loop?
9      A. As I've testified, I was consulted by
10  counsel in late-ish March; apparently, it was near
11  the end of March. And I was asked to place the
12  announcements that we have discussed on the web
13  page and to help identify people who could assess
14  the merits and demerits of the Target website.
15     As part of that exercise, I sent out the
16  announcements via David Andrews, and I solicited
17  the objective input of others in the organization.
18     Q. And then Mr. Freeman, in response to
19  your e-mail, responds, just to summarize the
20  e-mail, save time -- and if counsel has any
21  problem, he's welcome to object -- Mr. Freeman
22  says that, "If Target uses the same web engine as
23  Amazon, I don't see accessibility as a problem.
24  Although Amazon can be wordy and awkward to use,
25  it's doable."

Page 82

1    Are you aware that -- whether or not
2  Target uses the same web engine as Amazon?
3    A.  I've been told that it does.  I'm not
4  personally aware of it.  I don't have that
5  technical aptitude.
6    Q.  And have you personally had any problems
7  with Amazon's website?
8    A.  No.
9    Q.  And then later on he says, "I know when
10  we first heard of the lawsuit, some members of
11  NABS said, 'Hey, wait a minute.  I tried Target
12  and it worked fine.'"
13    Do you know what NABS stands for?
14    MR. GOLDSTEIN:  All right.  Go ahead and
15  answer.
16    A.  NABS stands for the National Association
17  of Blind Students.  It's a division of the
18  National Federation of the Blind.
19    Q.  Are you aware of any such comments that
20  were made to you?
21    MR. GOLDSTEIN:  I object, because you
22    did not give him the total context of the
23    comments.  This is an instance where not
24    reading the entire portion is misleading.
25    I think it has to be clear that after

Page 83

1    the statement, "I know when we first heard of
2    the lawsuit, some members of NABS said, 'Hey,
3    wait a minute.  I tried Target and it worked
4    fine,'" that the message continues, "but, as
5    I understand it, when challenged to reproduce
6    their success, they had problems; i.e., they
7    failed."
8    Q.  Okay.  And then the sentence that comes
9  after that, says, "As I understand it, one can go
10  through all the checkout steps except the last, to
11  make the purchase, which requires holding one's
12  mouse over an icon or punching a button that
13  screen readers do not detect."
14    Have you yourself ever had any problems
15  using the checkout function on Target?
16    A.  I never managed to get as far as
17  checkout.
18    Q.  Are you aware of other people's problems
19  with -- specifically with the checkout function on
20  Target.com?
21    A.  Yes.  I've been informed that other
22  people have been unsuccessful in checking out
23  because of the -- what I understand to be the
24  graphic nature of it and the fact that it's not
25  usable with the speech software.

Page 84

1    Q.  Then later on it says, "I know Curtis
2  Chong couldn't make it work, and I believe Steve
3  Jacobson couldn't either."  Who is Curtis Chong?
4    A.  Curtis Chong is currently the deputy
5  director at the Iowa Department for the Blind, a
6  rehabilitation department serving blind and
7  vision-impaired people in the state of Iowa.
8    He has significant technical background,
9  used to be the Director of the International
10  Braille and Technology Center.  He is the
11  president of the Computer Users Division of the
12  National Federation of the Blind.  That division
13  name may not be exactly correct.
14    Curtis is a technological guru in the
15  blindness field, whose knowledge of access
16  software and access technology is absolutely
17  credible.
18    Q.  And who is Steve Jacobson?
19    A.  Steve is a member of the NFB.  He lives
20  in Minnesota.  Steve also has significant computer
21  aptitude.  I believe he's a computer engineer of
22  some kind.  I'm not as well acquainted with Steve.
23    Q.  Have you ever exchanged e-mails with
24  Mr. Jacobson?
25    A.  Yes.

Page 85

1    Q.  Have you exchanged e-mail with
2  Mr. Jacobson on the subject of Target's --
3  Target.com's accessibility?
4    A.  Yes.
5    Q.  And what did Mr. Jacobson have to say
6  about the accessibility of the website?
7    MR. GOLDSTEIN:  Objection to the extent
8    that some of that had to do with
9    communications to counsel in this case.
10    We have produced the paragraph of the
11    Jacobson e-mail that is not attorney-client
12    privilege, and -- but -- and you may,
13    Mr. Frye, talk about that paragraph to the
14    extent that counsel asks about it, but not
15    otherwise.
16    A.  And I'd have to hear that paragraph to
17  remember our conversations.  They were in excess
18  of a year ago.
19    Q.  Do you remember generally if it was --
20  if Mr. Jacobson had good things to say about the
21  website?
22    A.  No.  I remember that Mr. Jacobson had
23  concerns about the website, but I don't remember
24  specifically what he had to say.  I'm happy to
25  have you review that paragraph with me, and then

Page 86

1  I'll be able to give you more detail about our
2  exchange within what counsel has said I can talk
3  to you.
4      Q.  We'll get to that.  Have you — was that
5  the only e-mail that you've ever exchanged with
6  Mr. Jacobson?
7      MR. GOLDSTEIN:  On the subject of
8  Target?
9      Q.  On the subject of Target's accessibility
10  problems.
11      A.  As far as I recall, that's all.
12      MR. KLESTOFF:  Let's take a break, and
13  I'll see if I have anything else.
14      THE WITNESS:  Okey doke.
15      (Recess taken — 11:22 a.m.)
16      (After recess — 11:26 a.m.)
17      MR. KLESTOFF:  Let's go back on the
18  record.  I'm going to mark another document
19  as Frye Exhibit 5.
20      (Thereupon, Frye Exhibit Number 5 was
21  marked.)
22      Q.  And this is — appears to be an e-mail
23  chain between you, Mr. Frye, and someone named
24  Chairman Mal.
25      MR. GOLDSTEIN:  And, again, I lodge my

Page 87

1      objection as to scope.
2      Q.  And, first, can you tell me — it's an
3  April 26 — or 29, 2006, e-mail with a subject of
4  "Target" — it says "Target suit."  Can you tell
5  me who Chairman Mal is?
6      A.  He's a member of the National Federation
7  of the Blind.  His name is Malcolm Graham.  He
8  lives in Austin, Texas.
9      Q.  And the original message, it says, "Dan,
10  I reviewed the Target website but got nowhere.  I
11  wonder, however, should I contact the Disability
12  Rights law firm?  I'm quite new at JAWS with the
13  Internet.  Moreover, I really didn't want to
14  purchase anything from them."
15      It says, "I hope you and Renae are well.
16  Little Markee is chilling today, and Beau had his
17  annual shots today."
18      A.  Beau is a dog.
19      Q.  To your knowledge — or strike that.
20  Has anyone else made these types of complaints,
21  where people have had — have tried accessing
22  Target specifically to see if they could but
23  without the intent to purchase anything?
24      A.  Not to my knowledge, though they may
25  have.  But, I mean, not to my specific knowledge.

Page 88

1      Q.  And this is the only e-mail to that
2  effect that you can recall?
3      A.  It's the only one that I can recall,
4  unless you produced another e-mail.  I had, you
5  know, exchanges with a variety of people, and,
6  like I said, it's conceivable that others, mindful
7  of the action underway, would have inquired out of
8  curiosity's sake.  But I don't recall anyone
9  specifically.
10      Q.  And then your response is — it's on the
11  same day, April 29, 2006?
12      A.  I'm a timely responder.
13      Q.  It says, "Thank you for your message.
14  As far as I know, everybody is invited to contact
15  the Disability Rights Advocates, our partners, to
16  share their perspective on the website.  I imagine
17  that having the diverse views of blind people,
18  from experts to beginners with adaptive
19  technology, will prove useful.
20      "I encourage you to contact the firm and
21  let them determine if your comments will be useful
22  in this context.  My best to Mark and Beau."  And
23  signed, "Best, Dan Frye."
24      Do you know if Mr. Graham ever contacted
25  Disability Rights Advocates?

Page 89

1      A.  No.
2      Q.  Since you received — let's go back to
3  Frye Exhibit 4, please.  And then, since that
4  March 31, 2006, e-mail — strike that.  Have
5  you — between March 31, 2006, the date of this
6  e-mail, to the present, have you accessed
7  Target.com?
8      A.  At some point in the — like I said,
9  with the distance of time, I don't remember
10  specifically when.  But, as discussed, in the
11  spring of last year I would have accessed
12  Target.com to inquire about the XM satellite radio
13  and subsequent to inquire about the registry at
14  the store.
15      Q.  And do you remember if that was after
16  this e-mail or before?
17      A.  I presume it was after.  It was in the
18  spring, and that's pretty early in the spring, so
19  I presume it was after.
20      Q.  Do you remember if it was after your
21  April 13, 2006, message to David Andrews, which
22  would be Exhibit 3?
23      A.  I don't specifically remember, but
24  probably or certainly in close proximity to those
25  times.

Page 90

1    MR. KLESTOFF:  I think that's all I have
2  today, Mr. Frye.  I appreciate your time.
3    THE WITNESS:  It's my pleasure.
4    MR. GOLDSTEIN:  I have no questions for
5  the witness.
6    Mr. Frye, you have the right to review
7  and make corrections to the transcript within
8  30 days after the delivery of the transcript
9  to you.  While you can waive that right, I
10  would advise you to exercise that right.
11    THE WITNESS:  I will exercise that
12  right.
13    (Whereupon, the deposition was concluded
14  at 11:35 o'clock a.m.)
15    ---------------
16
17
18
19
20
21
22
23
24
25

Page 91

1          CERTIFICATE
2
3  STATE OF MARYLAND   )
4  COUNTY OF CARROLL   )
5
6    I, NANCY P. RICHMOND, Registered
7  Professional Reporter, do hereby certify that I
8  was authorized to and did stenographically report
9  the foregoing deposition of DANIEL FRYE; that a
10  review of the transcript was requested; and that
11  the transcript is a true record of my stenographic
12  notes.
13    I FURTHER CERTIFY that I am not a
14  relative, employee, attorney, or counsel of any of
15  the parties, nor am I a relative or employee of
16  any of the parties' attorney or counsel connected
17  with the action, nor am I financially interested
18  in the action.
19    Dated this 20th day of June, 2007.
20
21  _____
22    NANCY P. RICHMOND, RPR
23    and Notary Public
24
25

Page 92

1
2          AL BETZ & ASSOCIATES, INC.
3            Administrative Offices
4              P.O. Box 665
5          Westminster, Maryland 21158
6      VOICE - (410)752-1733 FAX (410)875-2857
7    e-mail - productiondept@albetzreporting.com
8
9  DATE:  July 2 2007
10  JOB NUMBER:  NR256841
11  CASE CAPTION:  NATIONAL FEDERATION OF THE BLIND V.
12          TARGET CORP.
13  COURT:  UNITED STATES DISTRICT COURT FOR THE
14  NORTHERN DISTRICT OF CALIFORNIA
15  CASE NO.  C06-01802 MHP
16  DEPONENT:  DANIEL FRYE
17  DATE OF DEPOSITION:  June 19, 2007
18  ATTORNEYS/FIRMS:
19  ATTORNEY NAME/FIRM
20    DANIEL F. GOLDSTEIN, ESQUIRE
21    MEGHAN SIDHU CAPEK, ESQUIRE
22
23    ALEXEI KLESTOFF, ESQUIRE
24    Morrison & Foerster, LLP
25

Page 93

1  Dear Sir/Madam:
2
3      Bound herewith is the transcript of the
4  above-referenced deposition.  Please read the
5  transcript and sign the errata pages.  Any
6  additions or corrections should be listed on the
7  errata sheets provided.  Please remove the signed,
8  completed errata sheets and return them to the
9  address listed above for processing.
10
11      If this process has not been completed
12  within (30) thirty days from the date of this
13  letter, we will assume that the right to read the
14  deposition has been waived.  This is in accordance
15  with Rule 30(e) of the Federal Rules of Civil
16  Procedure and Rule 411 Section (a) of the Maryland
17  Rules of Procedure.
18
19
20
21
22
23
24
25

Page 94

1     READING & SIGNING PROCEDURE
2
3          The deposition of DANIEL FRYE, taken in
4     the matter, on the date, and at the time and place
5     set out on the title page hereof.
6          It was requested that the deposition be
7     taken by the reporter and that same be reduced to
8     typewritten form.
9          It was agreed by and between counsel and
10    the parties that the Deponent will read and sign
11    the transcript of said deposition.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1   PAGE/LINE        CHANGE        REASON
2   _____
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  SIGNATURE_____ DATE: _____
25              DANIEL FRYE

Page 95

1       DEPOSITION ERRATA SHEET
2   RE: Al Betz & Associates, Inc.
3   File No.: NR256841
4   CASE CAPTION: NATIONAL FEDERATION OF THE BLIND V.
5       TARGET CORP.
6   DEPONENT: DANIEL FRYE
7   DEPOSITION DATE: June 19, 2007
8       I have read the entire transcript of my
9   Deposition taken in the above-captioned matter or
10  the same has been read to me. I request that the
11  changes noted on the following errata sheet be
12  entered upon the record for the reasons indicated.
13  I have signed my name to the Errata Sheet and
14  authorize you to attach it to the original
15  transcript.
16  PAGE/LINE        CHANGE        REASON
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  SIGNATURE_____ DATE: _____
25              DANIEL FRYE

EXHIBITS

1   LAURENCE W. PARADIS (California Bar No. 122336)
    ROGER N. HELLER (California Bar No. 215348)
2   DISABILITY RIGHTS ADVOCATES
    2001 Center Street, Third Floor
3   Berkeley, California 94704
    Telephone:    (510) 665-8644
    Facsimile:    (510) 665-8511
4   TTY:          (510) 665-8716

5   JOSHUA KONECKY (California Bar No. 182897)
    RACHEL BRILL (California Bar No. 233294)
6   SCHNEIDER & WALLACE
    180 Montgomery Street, Suite 2000
7   San Francisco, CA 94104
    Telephone:    (415) 421-7100
8   Fax:          (415) 421-7105
    TTY:          (415) 421-1655
9

10  DANIEL F. GOLDSTEIN (*pro hac vice*)          PETER BLANCK (*pro hac vice*)
    BROWN, GOLDSTEIN & LEVY, LLP                  900 S. Crouse Ave.
11  120 E. Baltimore St., Suite 1700             Crouse-Hinds Hall, Suite 300
    Baltimore, MD 21202                          Syracuse, NY 13244-2130
12  Telephone:    (410) 962-1030                 Telephone:    (315) 443-9703
13  Fax:          (410) 385-0869                 Fax:          (315) 443-9725

14

15              UNITED STATES DISTRICT COURT

16           NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

19  NATIONAL FEDERATION OF THE             Case No.: C 06-01802 MHP
    BLIND, the NATIONAL FEDERATION OF
20  THE BLIND OF CALIFORNIA, on behalf of  CLASS ACTION
    their members, and Bruce F. Sexton, on behalf
21  of himself and all others similarly situated,   DECLARATION OF DANIEL FRYE IN
                                                     SUPPORT OF PLAINTIFFS' MOTION
22              Plaintiffs,                          FOR CLASS CERTIFICATION

23  v.

24  TARGET CORPORATION,

25              Defendant.

26

27

28

EXHIBIT

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644

I, Daniel B. Frye, declare as follows:

1.      The facts in this declaration are based upon my personal knowledge.   If called to testify, I could testify competently to the facts described in this declaration.

2.      My name is Daniel B. Frye.

3.      I live in Baltimore, Maryland.

4.      I am the Manager of Affiliate Action Advocacy and Training for the National Federation of the Blind.

5.      I have been a member of the National Federation of the Blind since 1982.

6.      I am legally blind and use screen-access software to access the Internet.

7.      I regularly use the Internet in connection with in-store shopping.  At least twice a month, I visit websites for local stores, such as Wal-Mart and Safeway, to preview their products, compare prices, and determine what I want to buy before I go to the store.

8.      For the most part, I do not enjoy shopping because I find the crowds and waiting around bothersome.  Using a store's website to select what I want in advance streamlines the shopping process so I can spend my time doing other things.

9.      Although I could buy products directly online, I often select what I want from store websites then purchase the item at the store.  I do so because I prefer to get my hands on the product before I make a final decision of whether to buy it.  Also, sometimes I want to buy an item right away.

10.     I shop at Target stores at least once every three months.  Target offers a great selection of household products and furniture at reasonable prices.  Recently, I bought a patio set from Target.

11.     About one year ago, I tried to look for products on Target.com, but was unable to do so because the website was inaccessible.  On that occasion, I wanted to buy a portable XM-satellite radio receiver.  I planned to select a receiver online then go to the store so that I could feel the design, button locations, etc., before making the final decision to purchase it.  I had a general idea of what I wanted and went to three store websites to see what receivers they sold,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
Declaration of Daniel B. Frye in Support of Plaintiff's Motion for Class Certification
1

1    how much they cost, and learn more about their features. I was easily able to find the

2    information I wanted at Walmart.com and Bestbuy.com. When I went to Target.com, however,

3    the website was impossible to navigate with a screen reader. I could not even determine if

4    Target sold XM receivers. I became so frustrated that I abandoned my search at Target

5    altogether. Instead, I selected the receiver I liked best from Wal-Mart.com then purchased it at a

6    Wal-Mart store. If Target.com had been accessible, and offered the type of receiver I wanted at a

7    competitive price, I would have purchased it from a Target store.

8    12.        My experience using Target.com was so frustrating that I have not tried to use it to

9    find product information again. As a result, I do not make as many purchases from Target as I

10   would if its website were accessible.

11   13.        If Target.com were accessible, I would also use Target's gift registry. Several friends

12   of mine have registered at Target for weddings and baby showers. Last spring, some friends

13   registered at Target and Babies "R" Us for their baby shower. I tried to use Target's online

14   registry to select a shower gift. I was unable to access the online registry using a screen reader

15   and, again, became so frustrated that I gave up. I selected a gift from the Babies "R" Us online

16   registry instead and my wife purchased it from the store.

17   14.        I declare under penalty of perjury under the laws of the United States of America that

18   the foregoing is true and correct.

19

     Executed this 23rd day of May, 2007, at Baltimore, MD,
20

21

22                                                 DANIEL B. FRYE

23

24

25

26

27

28

*National Federation of the Blind, et al. v. Target Corporation, et al.*
Case No.: C 06-01802 MHP
Declaration of Daniel B. Frye in Support of Plaintiff's Motion for Class Certification                    2

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, THIRD FLOOR
BERKELEY, CALIFORNIA 94704-1204
510.665.8644

# [nfb-db] Assistance Sought with Target Corporation Lawsuit

**David Andrews** dandrews at visi.com
*Fri Mar 31 22:30:43 CST 2006*

- Previous message: [nfb-db] Fwd: PAC Mate 4.0 Released!
- **Messages sorted by:** [ date ] [ thread ] [ subject ] [ author ]

---

>*From Dan Frye:*

As you may know, the NFB has filed a lawsuit against Target Corporation
for the inaccessibility of its website
http://www.target.com.

If you have encountered access barriers on Target.com, and are willing
to provide testimony for use in the lawsuit, please contact Brett
Kaufman at Disability Rights Advocates using the following contact
information as soon as possible.

Brett Kaufman
Law Clerk
Disability Rights Advocates
510-665-8644
bkaufman at dralegal.org

Should you have additional questions about how you can best be of assistance
or provide support for this initiative, please contact me directly at my
contact
details provided below for a briefing before communicating with the staff at
Disability Rights Advocates. Thank you for your cooperation.

Daniel B. Frye
Manager of Affiliate Action Advocacy and Training
National Federation of the Blind
Department of Affiliate Action
1800 Johnson Street
Baltimore, Maryland 21230
Telephone: (410) 659-9314 Ext. 2208
Cell: (410) 241-7006
Fax: (410) 659-6893
E-Mail: dfrye at nfb.org
Web Address:
www.nfb.org



Voice of the Nation's Blind"

---

- Previous message: [nfb-db] Fwd: PAC Mate 4.0 Released!
- **Messages sorted by:** [ date ] [ thread ] [ subject ] [ author ]

---

More information about the nfb-db mailing list

# [nfb-db] Assisting with Target Lawsuit Easier Than Ever

**David Andrews** <u>dandrews at visi.com</u>
*Thu Apr 13 22:35:36 CDT 2006*

- Previous message: [nfb-db] Fwd: Jernigan Institute News - April 13, 2006
- Next message: [nfb-db] President Maurer on Thru Our Eyes Radio Show
- **Messages sorted by:** [ date ] [ thread ] [ subject ] [ author ]

---

Dan Frye has asked me to post the following: it is important.

David Andrews

As part of the Federation's legal action against Target's web operations, we are in need of blind people to examine the website target.com, and offer their
assessment, particularly as it relates to any access problems experienced, as soon as possible. Initially, I thought that the officials at Disability Rights
Advocates wanted people to draft their own declarations. As it turns out, however, they only want people to review the site, and then call and verbally articulate your experiences to them. They will then draft your statement for you to review and sign. If any of you have not done this, please take the time to review the website, and call the law clerk assigned to this case at Disability Rights Advocates, our partner in prosecuting this action.

Please contact, as soon as possible:

Brett Kaufman
Law Clerk
Disability Rights Advocates
510-665-8644
<u>bkaufman at dralegal.org</u>

Finally, please simply let me know when you've made contact with representatives at Disability Rights Advocates so that I can track the number of people
that have been referred to them and who have actually filed a statement. We need at least 30 people to make statements, and if you will keep me informed, I'll be best able to monitor our progress.

Thank you. Please contact me if you have any questions.

Daniel B. Frye
Manager of Affiliate Action Advocacy and Training
National Federation of the Blind
Department of Affiliate Action
1800 Johnson Street
Baltimore, Maryland 21230
Telephone: (410) 659-9314 Ext. 2208
Cell: (410) 241-7006
Fax: (410) 659-6893
E-Mail: <u>dfrye at nfb.org</u>
Web Address:
www.nfb.org



DISABILITY RIGHTS ADVO Fax:1-510-665-8511    Jun 15 2007 05:10pm P003/005

From: Mike Freeman [k7uij@panix.com]
Sent: Friday, March 31, 2006 4:16 PM
To: Frye, Dan
Subject: RE: Target

Hi, Dan.

I can't honestly give you an answer. If Target truly uses the same web engine as Amazon, I don't see accessibility as a problem; although Amazon can be a bit wordy and awkward to use (and I mean the general site, not the stripped-down access site here), it's doable. If you know what words to look for, you can browse and purchase items without problems. But I haven't tried it with Target to see. I know when we first heard of the lawsuit, some members of NABS said: "Hey wait a minute! I tried Target and it worked fine!". But, as I understand it, when challenged to reproduce their success, they had problems, i.e., they failed. AS I understand it, one can go through all the checkout steps except the last -- to make the purchase — which requires holding one's mouse over an icon or punching a button that screen-readers do not detect. I know Curtis Chong couldn't make it work and I believe Steve Jacobson couldn't, either. But some others still wonder if we aren't cruisin' for a bruisin'!k As I say, I don't really know as I haven't used the site. There's a Target close enough to me that I just go in there and buy stuff!

When that dude sued Southwest Airlines a few years ago, alleging their site to be inaccessible, I was thankful that we (NFB) didn't join in -- not that we were asked -- because I myself *had* used the site to purchase tickets to a miniconvention in Spokane a few days before I read of the suit. The site was awkward -- not inaccessible. I will say, though, that even though the guy lost the suit (as he should have), Southwest did do some redesign of the site so that it was far easier to use with access technology. I am finding, incidentally, that sites such as those of Alaska Air and HOrizon, while still useable, are becoming more awkward to figure out -- more tables, less narrative description. Apparently, sight impairs the ability to read and process the written word. (har)

I don't suppose my musings helped much, for which I am sorry. (smile)

Mike

On Fri, 31 Mar 2006, Frye, Dan wrote:

> Mike:
> Smile!! I have just been brought in the loop today. Is this (access to the Target website) really an issue from your perspective? Your feedback would be useful to have.
>
> Best,
>
> Dan Frye

REDACTED



**Unknown**

| | |
|---|---|
| **From:** | Dan Frye [dfrye@nfb.org] |
| **Sent:** | Saturday, April 29, 2006 8:43 PM |
| **To:** | Chairman Mal; Frye, Dan |
| **Cc:** | markee.noble@earthlink.net |
| **Subject:** | re: Target suit |

Malcolm:

Thank you for your message. As far as I know, everybody is invited to contact the
Disability Rights Advocates organization, our partners, to share their perspective on the
website. I imagine that having the diverse views of blind people, from experts to
beginners with adaptive technology, will prove useful.
I encourage you to contact the firm and let them determine if your comments will be useful
in this context. My best to Mark and Beau.

With Kind Regards,

Dan Frye

> ----- Original Message -----
>From: "Chairman Mal" <chairmanmal@earthlink.net
>To: "Frye, Dan" <DFrye@nfb.org
>Date: Sat, 29 Apr 2006 14:35:43 -0500
>Subject: Target suit

>Dan,
>I reviewed the Target web-site but got nowhere. I wonder,
however, should I contact the Disability Rights law firm? I am quite new at JAWS with the
Internet. Moreover, I really didn't want to purchase anything from them. I hope you and
Renee are well. Little Markee is chilling today, and Beau had his annual shots this
morning.
>Malcolm



NFB0006