UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL FEDERATION OF THE BLIND, THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, on behalf of their members, and BRUCE SEXTON, on behalf of himself and all others similarly situated,

Plaintiffs,

vs.

Case No. C06-01802 MHP

TARGET CORPORATION,

Defendant.

______________________________/

Deposition of

SHARON MANEKI

June 21, 2007

SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California 94010
(415) 402-0004
(650) 692-8900
FAX: (415) 402-0005

Reported By:

Nancy P. Richmond, RPR

INDEX
DEPOSITION OF SHARON MANEKI
THURSDAY, JUNE 21, 2007

EXAMINATION BY: PAGE:
MR. KLESTOFF................................ 4

EXHIBITS: DESCRIPTION: PAGE:

(NO EXHIBITS MARKED AT THIS TIME.)

APPEARANCES:

DANIEL F. GOLDSTEIN, ESQUIRE
MEGHAN SIDHU CAPEK, ESQUIRE
Brown, Goldstein & Levy
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202-6701
410-962-1030 VOICE
410-385-0869 FAX
dfg@browngold.com

ALEXEI KLESTOFF, ESQUIRE
Morrison & Foerster, LLP
425 Market Street
San Francisco, California 94105
415-268-7334 VOICE
415-268-1522 FAX
aklestoff@mofo.com

BE IT REMEMBERED that, pursuant to the laws governing the taking and use of depositions, and on Thursday, June 21, 2007, commencing at 1:30 p.m., thereof, at the Law Offices of Brown, Goldstein & Levy, 120 E. Baltimore Street, Suite 1700, Baltimore, Maryland 21202, before me, Nancy P. Richmond, Registered Professional Reporter and Notary Public for the State of Maryland, personally appeared.

---

SHARON MANEKI

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. KLESTOFF:

Q. Good afternoon, Ms. Maneki. As I said earlier, my name's Alexei Klestoff, and I'm from the law firm of Morrison & Foerster, and we represent Target Corporation in this lawsuit. Can you please state your name for the record?
A. Sharon Maneki.
Q. And I'm going to talk a little bit about procedure. Your testimony is under oath today, as if you were giving testimony in court. I'm going

to ask you questions, and you give me answers to the best of your ability. If any questions aren't clear, feel free to let me know.
If you want to take a break, just let me know. I just ask that if there's a question pending, that you answer my question before we take our break.
Is there any reason you couldn't testify fully and truthfully today?
A. No.
Q. Have you ever been deposed before?
A. Yes.
Q. How many times?
A. Once.
Q. And when was that?
A. It was sometime this year, February, March. I don't know.
Q. What type of case was it?
A. It was about voting systems.
Q. What did you do to prepare for the deposition today?
A. I talked to Dan.
Q. Did you review any documents?
A. I reviewed my statement that I made earlier.

Q. Okay. Can you give me a brief rundown of your educational background, please?
A. I have a master's in history.
Q. And can you give me a rundown of your employment history?
A. I currently work for the Department of Defense. I've been there for 22 years. Then there was a period of time where did I this and that; that was about two years. And then before that, I was a high school teacher for 15 years.
Q. What is your current position at the Department of Defense?
A. I'm a research analyst.
Q. I'm going to talk a little bit about the declaration that you submitted in this suit. In your declaration, you say you use a screen reader to access the Internet, among other programs. Do you use other programs to access the Internet?
A. No.
Q. What type of screen reader do you use?
A. JAWS.
Q. Do you know what the version is?
A. Well, at work I use six, but I just got seven a few days ago, and at home I have eight.
Q. Have you used multiple versions over

time?
A. Yes.
Q. Do you remember how many versions of JAWS you've used in the past?
A. No.
Q. Have you used these past versions to access the Internet?
A. Yes.
Q. Have you noticed any differences in the capability of it in accessing the Internet over time?
A. Yes.
Q. What sort of differences?
A. Well, JAWS introduced things to make it easier. They have put in commands to make the links, you know, more of a list. They did things to make it read better.
Q. And by read better, what do you mean?
A. Stay in the column it's supposed to stay in.
Q. How would you describe your skill level with JAWS?
A. I know the basics.
Q. How did you learn to use JAWS?
A. I had a trainer.

Q. When was that?
A. 2000 or 2001, I'm not precisely sure which year it was.
Q. And was it a private trainer, or was it an organization that you used?
MR. GOLDSTEIN: Object to the form.
A. Do you want to know --
Q. What type of trainer did you use?
A. It was a company. The government paid for it.
Q. Do you remember the name of the company?
A. Bartimeus Group.
Q. Do you use any other screen readers?
A. No, not now. I did prior to JAWS.
Q. What screen reader was that?
A. It was for DOS. It was ASAP, and before that it was PC Vert.
Q. When was that?
A. Pardon me?
Q. When was that?
A. When was what?
Q. When did you use those two programs?
A. Well, PC Vert I used in 1985, and I don't know how long I used that; a couple of years. And then after that, I used ASAP. I think

that's what it was called. I'm not really sure if it was called ASAP or -- I think that's what it was called, though.
Q. When did you begin using JAWS?
A. About 2000 or maybe it was 2001. I'm not sure.
Q. Have you had any problems with JAWS in the past?
A. What do you mean?
Q. Any problems using the program?
A. Well, it depends on the item that you're using it with.
Q. Can you explain what you mean?
A. Well, I don't know that it's a problem with JAWS. There are problems because of where you're going or what you're trying to use.
Q. By where you're going, are you --
A. I mean, it's a problem with the website or a problem with the database, you know, if they're not compatible with JAWS.
Q. Have you encountered any problems that you can attribute specifically to JAWS and not to the particular website that you're using?
A. I wouldn't know.
Q. How long have you been using the

Page 10

Internet?
A. Since around 2000 or 2001.
Q. And how often do you use the Internet?
A. Almost every day.
Q. What types of things do you use the Internet for?
A. E-mail, go to a few websites.
Q. Which websites do you visit, generally?
A. NFB.org, NFB-MD, and then it depends. Sometimes I do some research.
Q. What types of research do you do?
A. Look things up. You know, sometimes I want to find a newspaper article. Sometimes I want to find facts about one thing or another, look in the, you know, encyclopedia, kind of things.
Q. Do you use the Internet to shop?
A. A little.
Q. By a little, what do you mean? How often?
A. A few times a year.
Q. A few times a year. And during those times, are you primarily making purchases online or viewing the website in order to go to the store?

Page 11

A. Both.
Q. Both. Do you make online purchases more or less often than -- strike that. When you access websites to shop, do you make more online -- sorry. Strike that.
Let's go back to your declaration. It says that you often shop at physical retail stores. How often do you shop at physical stores?
A. Oh, I'd say every month.
Q. Would you say once a month or more?
A. At least once a month.
Q. So is it fair to say that you make purchases in physical stores more often than you make online purchases?
A. Yes.
Q. You also say in your declaration that you sometimes will go to a website and review information about the products that they sell in the store. How often do you do that?
A. For particular occasions when I'm looking for something. I'd say, you know, once or twice a year.
Q. Once or twice a year?
A. Yeah.
Q. Have you ever made a purchase in the

Page 12

physical store without going to the store's website first?
A. Yes.
Q. What stores' websites do you access?
A. Well, Bed, Bath & Beyond, I have. Target, I have. Harry & David. They're the ones that come to mind.
Q. Are those all that you can remember?
MR. GOLDSTEIN: Objection. She said it's all that comes to mind.
Q. How often do you access Bed, Bath & Beyond, the website?
A. Not much.
Q. Is it once a year or more than that?
A. It might be once a year.
Q. And you, in your declaration, you specifically mention a time when you have accessed Bed, Bath & Beyond to see if they carry certain pots that you wanted. Did you end up buying those pots?
A. Yes.
Q. Where did you buy them?
A. Well, I bought them online, because Bed, Bath & Beyond sent me to the actual company. The name of the pots were All-clad, and Bed, Bath &

Page 13

Beyond didn't have it, so they sent me to that website.
Q. Did you have any problems accessing Bed, Bath & Beyond's website?
A. No.
Q. Did you have any problems accessing All-clad's website?
A. Not that I can remember.
Q. You also mentioned that you visit Harry & David's website. Do you have any problems accessing that website?
A. I -- I can access it. Sometimes I've had trouble completing the sale, so I've had to call them up on the phone, complete it on the phone.
Q. What was the specific problem with completing the sale?
A. I think the website just wouldn't cooperate. It wouldn't -- I couldn't get to -- I don't know, you know, but it was easier to just call them up on the phone.
I mean, I found what I wanted to find. Just couldn't get it ordered.
Q. Let's move on to Target's website. Actually, let's talk about Target in general. In

your declaration, you say that you visit Target retail stores regularly, and then you say that you generally visit a Target store every one or two months; is that correct?

A. Yes.

Q. When was the last time you visited a Target store?

A. Few weeks ago.

Q. Were you able to purchase what you wanted?

A. No.

Q. Why not?

A. It wasn't there.

Q. Okay. Did you ask for assistance?

A. I brought someone with me to look.

Q. And you also say in your declaration that you visit Target stores in Columbia and Ellicott City. Do you visit any other Target stores?

A. No.

Q. What types of things do you shop for at Target?

A. Toys for my grand-nieces, small gifts for Christmas, like cookies and candy, and sometimes videos.

Q. Do you shop for groceries at Target?

A. No.

Q. Do you know if the Targets you visit sell groceries?

A. I know they sell snacks.

Q. Okay. Do you know if they sell produce items?

A. I don't think so.

Q. Going back to the last time that you visited the Target store, did you log onto Target's website before you went to the store?

A. No.

Q. Why do you shop at Target?

A. Good bargains.

Q. Any other reasons?

A. It's a good place for toys.

Q. Are those all the reasons you can remember?

A. Hm-hmm.

Q. When you go to a Target store, are you generally able to find what you're looking for?

MR. GOLDSTEIN: You mean if it's in stock?

Q. Assuming it's in stock.

A. Yes.

Q. Have you asked for assistance from a store clerk when you've visited a Target store?

A. Yes.

Q. Have you gotten that assistance?

A. To some degree.

Q. Now let's move on to your -- the times that you've accessed Target's website. In your declaration you say that you found Target's website to be extremely difficult to navigate using a screen reader. Can you explain a little bit more about why it is extremely difficult to navigate?

A. Well, I have found that I can't get beyond a certain point. In other words, I can get to the home page, and maybe I can get one level down, but then I can't -- I can't get to the particular items.

And when you want to -- you know, you hear information, but you can't find it. Like it will say categories of items, and then you can't get to the categories. Or it says a category, but you can't get to the prices, because it says graphic, it says image map.

Q. Have you ever made a purchase on Target's website?

A. No.

Q. In your declaration, it says you've tried to access Target's website approximately four or five times; is that correct?

A. Well, it might really be three.

Q. Three times?

A. Yeah.

Q. Let's talk about the first time you accessed Target's site. When was that?

A. A while back. I couldn't tell you a specific date.

Q. Was it this year or last year or earlier?

A. Maybe two years ago.

Q. 2005?

A. Yeah, in that neighborhood. I mean, I can't give an exact date, but in that neighborhood.

Q. Do you remember what -- was it fall, winter, spring or summer?

A. Around Christmastime.

Q. What were you looking for?

A. Well, there's a person that I buy videos for, and I was trying to find out -- I buy Sesame Street, and I was probably trying to find out what

was in.
Q. Were you planning on making a purchase on the site, or were you just browsing?
A. Browsing.
Q. And how did you access the site? Did you go to Target's home page, or did you use an external link?
A. I put in Target.com.
Q. Where were you when you accessed the site?
A. Where was I?
Q. Were you at work or at home?
A. Home.
Q. What screen reader were you using?
A. JAWS.
Q. Were you able to find the videos you were looking for?
A. No.
Q. Why not?
A. I couldn't get there. Couldn't get to -- couldn't get to the section.
Q. What were the specific problems you had getting to the section?
A. Well, I think that I probably went onto the links, listened to them and couldn't get

beyond a certain point.
Q. Do you remember at what point that was?
A. No.
Q. How long did you try to navigate the site?
A. Ten or fifteen minutes.
Q. Did you try calling Target for help with the site?
A. No.
Q. Did you try e-mailing Target for help with the site?
A. No.
Q. Did you try contacting JAWS's tech support for help with the site?
A. No.
Q. Did you try calling Target's 800 number to get the information that you were looking for?
A. No.
Q. Did you go to the store to get the information you were looking for?
A. Eventually.
Q. How long after that did you go to the store?
A. Well, I don't know. Whenever I could work it out.

Q. Were you able to find what you were looking for at the store?
A. Well, it was very inconvenient. I had to wait till I could get somebody, and then I just have to -- had to spend time going through, you know, what was there on the shelf and then pick something that said new release or new edition, whatever it said.
Q. But you were able to find what you were looking for?
A. Eventually, but, you know, it took -- it took time.
Q. Okay. Let's move on to the next time that you accessed Target's website. Do you know when that was?
A. Probably the same time of year. You know, it's usually Christmastime.
Q. Christmastime of 2005?
A. I don't know. I'm -- you know.
Q. You don't remember what year it was?
A. No.
Q. And what were you looking for on that occasion?
A. I have -- I mean, you know, I told you the kind of thing that I look for is videos, and

that's probably what I was doing right then.
Q. Were you planning on making a purchase or just browsing on that occasion?
A. Purchase.
Q. Were you planning on making the purchase online or at the store?
A. Store.
Q. And did you access Target's home page on that occasion?
A. Yes.
Q. And where were you when you accessed Target's site?
A. Home.
Q. And you were using JAWS?
A. Right.
Q. Were you able to accomplish what you set out to do on the site?
A. No.
Q. What were the specific problems?
A. Same as before.
Q. And that was, you just couldn't get beyond a certain point?
A. Right.
Q. How long did you try to navigate the site?

A. Ten minutes or so.
Q. Did you call Target for help with the --
A. No.
Q. Did you e-mail Target for help with the site?
A. No.
Q. Did you contact JAWS's tech support for help with the site?
A. No.
Q. Did you call Target's 800 number for the information you wanted?
A. No.
Q. Did you go to the store to purchase your item?
A. No.
Q. Why not?
A. Time.
Q. What about the last time that you accessed Target's website? When was that?
A. Sunday.
Q. This last Sunday?
A. Yeah.
Q. And why did you access the site on this occasion?
A. To remind myself about what it was like,

so that, you know, in case you asked me something, I would know.
Q. Were you planning on making a purchase that day?
A. No.
Q. How did you access the site?
A. Put in Target.com, you know, from the Internet Explorer.
Q. And were you at home when you accessed the site?
A. Hm-hmm.
Q. And you were using JAWS to access the site?
A. Hm-hmm.
Q. And were you able to accomplish what you set out to do on the site?
A. No.
Q. What were the specific problems you experienced?
A. Well, I went to -- I wanted to go to the kitchen products to see what they had, and I couldn't get to the -- I couldn't get to the information. I saw some headings, like I saw a quantity, but I couldn't find the number.
Q. Okay. Let's sort of go through this

step by step. You accessed Target's home page, and then what did you do?
A. I tabbed, and I arrowed down, listened to the links.
Q. Were you able to understand the links?
A. The ones that I got to, yes.
Q. What do you mean by the ones that you got to?
A. Well, I didn't get that far in. I didn't get that far down. I got to big headings. I didn't get to the small headings.
Q. What links were you able to understand?
A. I think that it was kitchen aids and furniture and things like that.
Q. Did you go any further than Target's home page?
A. I went -- I went on kitchen aids, but I couldn't -- couldn't get down to any particular items that I can remember. I just remember seeing QTY.
Q. So you got to the next page, the kitchen aids page?
A. Hm-hmm.
Q. And then you had JAWS list the links. Is that accurate?

A. Hm-hmm.
Q. And what links were you able to understand?
A. Well, it said stuff, but it didn't say -- you know, in other words, it would say quantity, price, this and that, but you could never get to any actual information.
You could hear price, you could hear quantity, but you couldn't hear what they were.
Q. Did you go any further than that page?
A. No.
Q. How long did you try to navigate the site?
A. Ten minutes.
Q. Did you call Target for help with the site?
A. No.
Q. Did you e-mail Target for help with the site?
A. No.
Q. Did you contact JAWS's tech support for help with the site?
A. No.
Q. Did you try calling Target's 800 number to get the information you wanted?

A. No.
Q. Did you go to the store --
A. No.
Q. -- to get the information? We talked about three times that you've accessed Target's site. Are those all the times you've tried accessing Target's site?
A. Yes.
Q. In your declaration, you say that Target's website is poor compared to other retailers' websites in terms of accessibility. Can you give me any examples of retailers' websites that are less accessible than Target's website?
A. No. I can give more accessible, not less.
Q. Have you ever tried to access the coupons on Target's website?
A. I'd like to.
Q. Have you ever tried?
A. No.
Q. How did you learn about the existence of these coupons?
A. From word of mouth.
Q. Do you know what types of coupons they

are?
A. So much off.
Q. I'm sorry?
A. So much off coupons.
Q. Do you know if that's the weekly ad that you're referring to?
A. I don't know.
Q. How did you come to learn about this lawsuit?
A. From the National Federation of the Blind.
Q. When was that?
A. Well, I heard about it this year. I heard about it other times, but I don't -- I don't know when.
Q. Do you remember the first time you heard about the lawsuit?
A. It was a while ago, but I couldn't tell you when.
Q. Could you tell me the year?
A. No.
Q. How did you come to provide a declaration in this lawsuit?
A. I saw the e-mail about it.
Q. What e-mail was this?

A. What e-mail?
Q. Who was this e-mail from?
A. I don't know. It was a -- I saw it a few times, and, you know, I don't know. It was on a list. I don't know what it was.
Q. When did you first see this e-mail?
A. Maybe in the winter. I'm not sure.
Q. The winter of this year?
A. Hm-hmm.
Q. And was there only one e-mail?
A. I don't know.
Q. Was there less than five?
A. Oh, you know, I get tons of e-mail. I don't count them.
Q. I'm just specifically referring to this --
A. Right, and I don't keep track of that stuff.
Q. You can't give me an estimate?
A. No.
Q. When did you first make contact with the lawyers in this lawsuit?
MR. GOLDSTEIN: About this case?
Q. About this case.
A. I guess May.

Q. May of this year?
A. Hm-hmm.
Q. Who initiated the contact? Was it you or the attorneys?
A. Me.
Q. What prompted you to initiate the contact?
A. The e-mail.
Q. So would it be fair to say that you received that e-mail or at least one version of that e-mail around May of this year?
A. I saw it earlier than that, but I didn't do anything at first.
Q. Why not?
A. Busy.
Q. Do you subscribe to any listservs?
A. Yes.
Q. Which ones?
A. They're related to the National Federation of the Blind. One is about newsline. The others are just people's e-mail lists.
Q. Are you aware -- have you reviewed any postings regarding this lawsuit?
A. I think I read a newspaper article.
Q. What newspaper was that in?

Page 30

A. Oh, I couldn't tell you.
Q. So you've never reviewed any postings on the listservs you identified regarding this suit?
A. Just the one about looking for information from people.
Q. What specific information was that?
A. How they -- what kind of experience we've had with the website.
Q. Is that similar to the e-mails you referred to earlier?
A. That's what I'm referring to.
MR. KLESTOFF: Let's take a quick break, and I'll see if I have anything else.
THE WITNESS: Okay.
MR. GOLDSTEIN: Okay.
(Recess taken -- 2:14 p.m.)
(After recess -- 2:15 p.m.)
Q. Just a few more questions. You said that you, in the past, when you've shopped at a Target, a physical Target store, you have asked for assistance from a store clerk; is that correct?
A. Yes. Mostly I bring somebody with me. If I haven't, then I ask, yes.
Q. I think you testified earlier that you

Page 31

do get assistance to an extent. Can you explain?
A. Well, sometimes they have trouble finding stuff, too. That's what I mean by extent.
Q. Is there anything else that you meant by that?
A. No.
Q. On those occasions where do you get assistance from a store clerk, are you generally able to make your purchase?
A. It varies.
Q. How does it vary?
A. Sometimes they can't find the items, either.
Q. On those occasions when you haven't been able to make your purchase in the store and you've used the assistance of a store clerk, are there any other reasons why you weren't able to make your purchase?
MR. GOLDSTEIN: What? Object to the form of the question.
Q. Let me rephrase. On those occasions when you aren't able to make a purchase, you say there have been occasions when you haven't been able to make a purchase when you've been using the -- when you've been assisted by a store clerk.

Page 32

And you say that you -- that was because the store clerk had trouble finding the item in the store. Are there any other reasons why you weren't able to make your purchase?
MR. GOLDSTEIN: Object to the form. How could she know?
Q. To your knowledge.
A. No.
Q. So, to your knowledge, on those occasions when you've used the assistance of a store clerk and haven't been able to make a purchase, the only reason was that the store clerk was not able to find the item at the store?
MR. GOLDSTEIN: Object to the form.
A. Well, you know, some store clerks are not very talented.
Q. And by not very talented, what do you mean?
A. They don't know what they're doing.
Q. And has that prevented you from making a purchase in the past?
A. Sure.
Q. And by "they don't know what they're doing," what does that mean?
A. They're guessing.

Page 33

Q. Guessing at what, specifically?
A. You know, they don't know their products. They're guessing about where things are.
MR. KLESTOFF: Okay. I think that's all I have, Ms. Maneki. I appreciate your time.
THE WITNESS: All right.
MR. GOLDSTEIN: Mrs. Maneki, it will surprise you to hear that I have no questions for you. So that concludes your deposition.
You have the right to read the transcript and review it and make such corrections as you believe are appropriate within 30 days of your receipt of the transcript.
You can waive that right, but I would advise you to read and review the transcript.
THE WITNESS: Okay.
(Whereupon, the deposition was concluded at 2:20 o'clock p.m..)
---------------

CERTIFICATE

STATE OF MARYLAND )
COUNTY OF CARROLL )

I, NANCY P. RICHMOND, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of SHARON MANEKI; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 22nd day of June, 2007.

______________________

NANCY P. RICHMOND, RPR
and Notary Public

AL BETZ & ASSOCIATES, INC.
Administrative Offices
P.O. Box 665
Westminster, Maryland 21158
VOICE - (410)752-1733 FAX (410)875-2857
e-mail - productiondept@albetzreporting.com

DATE: June 22, 2007
JOB NUMBER: NR256882
CASE CAPTION: NATIONAL FEDERATION OF THE BLIND V. TARGET CORP.
COURT: UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
CASE NO. C06-01802 MHP
DEPONENT: SHARON MANEKI
DATE OF DEPOSITION: June 21, 2007
ATTORNEYS/FIRMS:
ATTORNEY NAME/FIRM
DANIEL F. GOLDSTEIN, ESQUIRE
MEGHAN SIDHU CAPEK, ESQUIRE
Brown, Goldstein & Levy

ALEXEI KLESTOFF, ESQUIRE
Morrison & Foerster, LLP

Dear Sir/Madam:

Bound herewith is the transcript of the above-referenced deposition. Please read the transcript and sign the errata pages. Any additions or corrections should be listed on the errata sheets provided. Please remove the signed, completed errata sheets and return them to the address listed above for processing.

If this process has not been completed within (30) thirty days from the date of this letter, we will assume that the right to read the deposition has been waived. This is in accordance with Rule 30(e) of the Federal Rules of Civil Procedure and Rule 411 Section (a) of the Maryland Rules of Procedure.

READING & SIGNING PROCEDURE

The deposition of SHARON MANEKI, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

DEPOSITION ERRATA SHEET

RE: Al Betz & Associates, Inc.
File No.: NR256882
CASE CAPTION: NATIONAL FEDERATION OF THE BLIND V. TARGET CORP.
DEPONENT: SHARON MANEKI
DEPOSITION DATE: June 21, 2007

I have read the entire transcript of my Deposition taken in the above-captioned matter or the same has been read to me. I request that the changes noted on the following errata sheet be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and authorize you to attach it to the original transcript.

PAGE/LINE CHANGE REASON

SIGNATURE_______________________ DATE: _____

SHARON MANEKI

PAGE/LINE CHANGE REASON

SIGNATURE_______________________ DATE: _____

SHARON MANEKI