# EXHIBIT A

Westlaw.

151 Cal.App.4th 1224 Page 1
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

C
Belton v. Comcast Cable Holdings, LLC
Cal.App. 1 Dist.,2007.

Court of Appeal, First District, Division 1, California.
Thomas BELTON et al., Plaintiffs and Appellants,
v.
COMCAST CABLE HOLDINGS, LLC, Defendant and Respondent.
No. A112591.

June 8, 2007.

**Background:** Cable subscribers brought action against cable service provider, challenging provider's practice of offering music service only as part of basic tier cable package including television service as unlawful tying and other claims. The Superior Court, Sonoma County, No. 234091,Elaine T. Rushing, J., granted provider's motions for summary adjudication and to dismiss. Subscribers appealed.

**Holdings:** The Court of Appeal, Stein, J., held that:

(1) basic tier requirement did not create an unlawful tying arrangement under the Sherman Act;

(2) provider did not violate federal Communications Act's prohibition on negative option billing;

(3) basic tier requirement did not violate the Unruh Civil Rights Act as applied to blind subscriber;

(4) basic tier requirement did not violate the Americans with Disabilities Act (ADA) as applied to blind subscriber;

(5) representation that there were technical reasons for basic tier requirement was not false or misleading, for purposes of unfair competition claim;

(6) any error by trial court in sustaining objections to subscribers' declarations was harmless; and

(7) basic tier requirement was not an unconscionable contract term.

Affirmed.
West Headnotes
[1] Appeal and Error 30 863

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k862 Extent of Review Dependent on Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases
On review of a summary judgment or summary adjudication favoring the defendant, the reviewing court looks at the record anew to determine whether the defendant conclusively has shown that (1) one or more elements of a cause of action cannot be established, or (2) there is a complete defense.

[2] Antitrust and Trade Regulation 29T 135(1)

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk135 Practices Prohibited or Required
                    29Tk135(1) k. In General; Unfairness. Most Cited Cases
Unfair competition statute establishes three varieties of unfair competition: acts or practices which are unlawful, or unfair, or fraudulent; in other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa. West's Ann.Cal.Bus. & Prof.Code § 17200.

[3] Antitrust and Trade Regulation 29T 128

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk126 Constitutional and Statutory Provisions
                29Tk128 k. Purpose and Construction in General. Most Cited Cases
The unfair competition statute governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 1224                                                                                           Page 2
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
**(Cite as: 151 Cal.App.4th 1224)**

preservation of fair business competition. West's Ann.Cal.Bus. & Prof.Code § 17200.

**[4] Antitrust and Trade Regulation 29T ⚷135(2)**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk135 Practices Prohibited or Required
                      29Tk135(2) k. Source of Prohibition or Obligation; Lawfulness. Most Cited Cases
By proscribing any unlawful business practice, the unfair competition statute "borrows" violations of other laws and treats them as unlawful practices that the statute makes independently actionable. West's Ann.Cal.Bus. & Prof.Code § 17200.

**[5] Appeal and Error 30 ⚷1078(1)**

30 Appeal and Error
    30XVI Review
        30XVI(K) Error Waived in Appellate Court
            30k1078 Failure to Urge Objections
                30k1078(1) k. In General. Most Cited Cases
Cable service subscribers waived for appellate review any contention in their action against cable service provider based on the Americans with Disabilities Act (ADA), the Cartwright Act, and certain other statutes, where subscribers failed to raise any claim of error with respect to the court's disposition of their claims based on the statutes in their opening briefs. Americans with Disabilities Act of 1990, § 2, 42 U.S.C.A. § 12101; West's Ann.Cal.Bus. & Prof.Code §§ 16720, 16727.

**[6] Antitrust and Trade Regulation 29T ⚷604**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(E) Particular Industries or Businesses
            29Tk602 Telecommunications
                29Tk604 k. Television and Radio. Most Cited Cases
Cable service provider's requirement that subscribers who wished to purchase only music service had to purchase basic cable package that included television did not create an unlawful tying arrangement under the Sherman Act; because the subscribers did not want cable television, which was the tied product, provider's alleged practice could not have injured competition in the tied product market. Sherman Act, § 1, 15 U.S.C.A. § 1.
See *1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 563 et seq.;* *Cal. Jur. 3d, Monopolies and Restraints of Trade, § 43 et seq.*

**[7] Antitrust and Trade Regulation 29T ⚷569**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
A tying arrangement under antitrust laws exists when a party agrees to sell one product, i.e., the tying product, on the condition that the buyer also purchases a different product, i.e., the tied product, thereby curbing competition in the sale of the tied product.

**[8] Antitrust and Trade Regulation 29T ⚷569**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
Assuming that separate products in separate markets exist, a plaintiff claiming an illegal tying arrangement must plead: (1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; and (3) a substantial amount of sale was effected in the tied product; the latter element is sometimes referred to as "tied market foreclosure."

**[9] Antitrust and Trade Regulation 29T ⚷569**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
Under both the Cartwright Act and the Sherman Act,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the absence of evidence of some tied market foreclosure or anticompetitive impact in the tied product market, the plaintiff cannot establish an unlawful tying claim. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.; West's Ann.Cal.Bus. & Prof.Code § 16720.

[10] Antitrust and Trade Regulation 29T ⇐569

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
Not every refusal to sell two products separately can be said to restrain competition; if each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts.

[11] Antitrust and Trade Regulation 29T ⇐569

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
When a purchaser is forced to buy a product he would not have otherwise bought even from another seller in a tied-product market, there can be no adverse impact on competition, for purposes of unlawful tying, because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

[12] Antitrust and Trade Regulation 29T ⇐569

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
Without an adverse impact on competition in the tied product market there is no harm to competition, and no unlawful tying.

[13] Telecommunications 372 ⇐1228

372 Telecommunications
    372VI Cable Television
        372k1228 k. Rates and Charges. Most Cited Cases
Cable service provider did not violate the federal Communications Act's prohibition on negative option billing when they required subscribers, who wished to purchase only music service, to purchase basic cable package that included television service; subscribers understood that they were purchasing a package or tier of cable service that included television service and music service, as opposed to a la carte music service and affirmatively placed an order for the tier of cable services they were billed for. Communications Act of 1934, § 623(f), 47 U.S.C.A. § 543(f).

[14] Civil Rights 78 ⇐1047

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1047 k. Theaters and Places of Exhibition or Entertainment. Most Cited Cases
Cable service provider's practice of offering music service only as part of basic cable package including television service did not violate the Unruh Civil Rights Act, as applied to blind subscriber, despite subscriber's claim that the practice had an adverse impact on blind persons, under provision of the Act expressly exempting standards applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability, where the practice applied equally to sighted and blind subscribers. West's Ann.Cal.Civ.Code § 51.

[15] Civil Rights 78 ⇐1044

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1044 k. In General. Most Cited Cases

**Civil Rights 78 ⇐1049**

78 Civil Rights
    78I Rights Protected and Discrimination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 5 of 20

151 Cal.App.4th 1224                                                                                      Page 4
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

Prohibited in General
        78k1043 Public Accommodations
              78k1049 k. Place of Business or Public Resort. Most Cited Cases
The Unruh Act secures equal access to public accommodations and prohibits discrimination by business establishments; it, however, explicitly exempts standards that are applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability. West's Ann.Cal.Civ.Code § 51.

[16] Civil Rights 78 €⇒1047

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
              78k1047 k. Theaters and Places of Exhibition or Entertainment. Most Cited Cases
Blind cable service subscriber's allegation that cable service provider's practice of offering music service only as part of basic cable package including television service had an adverse impact on blind persons did not demonstrate denial of access to a place of public accommodation, as required to state a claim under the Americans with Disabilities Act (ADA); cable services were not a place of public accommodation. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq. (ADA).

[17] Antitrust and Trade Regulation 29T €⇒604

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(E) Particular Industries or Businesses
              29Tk602 Telecommunications
                  29Tk604 k. Television and Radio. Most Cited Cases
Given a finding that cable service provider's requirement that subscribers wishing to purchase only music service had to purchase package including television service did not create an unlawful tying arrangement under the Sherman Act, the same practice could not have amounted to an "unfair" business practice in violation of the policy or spirit of the Sherman Act against unlawful tying, as would support subscribers' claim under the unfair competition statute, where subscribers identified no other anticompetitive effect caused by packaging of the services together. Sherman Act, § 1, 15 U.S.C.A. § 1; West's Ann.Cal.Bus. & Prof.Code § 17200.

[18] Antitrust and Trade Regulation 29T €⇒528

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
              29Tk527 Purpose of Antitrust Regulation
                  29Tk528 k. In General. Most Cited Cases
The purpose of federal and state antitrust laws is to protect and promote competition for the benefit of consumers.

[19] Antitrust and Trade Regulation 29T €⇒535

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
              29Tk532 Judicially Created Tests of Legality
                  29Tk535 k. Rule of Reason. Most Cited Cases
Antitrust laws are designed to prohibit only unreasonable restraints of trade, meaning conduct that unreasonably impairs competition and harms consumers.

[20] Appeal and Error 30 €⇒762

30 Appeal and Error
    30XII Briefs
        30k762 k. Reply Briefs. Most Cited Cases
Court of Appeal would not consider subscribers' contention that cable service provider's practice of offering music service only as part of basic cable package including television was unfair, under the unfair competition statute, because it violated the spirit, if not the letter, of the Unruh Civil Rights Act and the Americans with Disabilities Act (ADA), in subscribers' action challenging the practice, where such argument was raised for the first time in the reply brief. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq. (ADA); West's Ann.Cal.Bus. & Prof.Code § 17200; West's Ann.Cal.Civ.Code § 51.

[21] Antitrust and Trade Regulation 29T €⇒224

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   29Tk224   k.   Telecommunications; Telemarketing. Most Cited Cases
Cable service provider's statement on its rate cards that it "requires subscription to basic cable TV in order to obtain any other services," was not likely to deceive a reasonable consumer to believe that legal or technical reasons required subscription to basic cable, as would support subscribers' claim under the fraudulent prong of the unfair competition statute, despite subscribers' contention that use of the passive voice and the absence of a stated reason for the requirement created such an implication. West's Ann.Cal.Bus. & Prof.Code § 17200(1).

**[22] Antitrust and Trade Regulation 29T ☞136**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk136 k. Fraud; Deceit; Knowledge and Intent. Most Cited Cases
To establish an unfair competition claim under the fraudulent prong of the unfair competition statute, plaintiffs must show that the alleged representations were false or were likely to have misled "reasonable consumers." West's Ann.Cal.Bus. & Prof.Code § 17200(1).

**[23] Appeal and Error 30 ☞170(1)**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(A) Issues and Questions in Lower Court
         30k170 Nature or Subject-Matter of Issues or Questions
            30k170(1) k. In General. Most Cited Cases
Court of Appeal would not consider cable service subscribers' contention that certain rate cards issued by cable service provider were confusing concerning statement charges for digital service, in support of subscriber's contention that provider misrepresented its practice of offering music service only as part of basic cable package including television in violation of the unfair competition statute, where subscribers failed to raise the issue before the trial court. West's Ann.Cal.Bus. & Prof.Code § 17200(1).

**[24] Antitrust and Trade Regulation 29T ☞224**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk224   k.   Telecommunications; Telemarketing. Most Cited Cases
Any representation by cable service provider's representatives that there were technical reasons for provider's practice of requiring a subscription to basic cable tier in order to obtain any other services was not false or misleading, as would support subscribers' claim under the fraudulent prong of the unfair competition statute; provider's construction manager declared that at time representations were made, system was configured to provide basic cable television service and FM service to every subscriber and did not trap out or scramble the basic television cable signal and that although basic television could be trapped out, to do so would entail technical changes. West's Ann.Cal.Bus. & Prof.Code § 17200(1).

**[25] Antitrust and Trade Regulation 29T ☞136**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk136 k. Fraud; Deceit; Knowledge and Intent. Most Cited Cases
A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable as a misrepresentation in support of a claim under the fraudulent prong of the unfair competition statute. West's Ann.Cal.Bus. & Prof.Code § 17200(1).

**[26] Appeal and Error 30 ☞1056.1(3)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)11 Exclusion of Evidence
            30k1056 Prejudicial Effect
               30k1056.1 In General
                  30k1056.1(3)   k.   Particular Evidence. Most Cited Cases
Any error by trial court, in sustaining objections to cable service subscribers' declarations describing statements by provider's representatives regarding areas in which FM music service was available as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP    Document 142-2    Filed 07/30/2007    Page 7 of 20

151 Cal.App.4th 1224                                                                        Page 6
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

stand alone service, was harmless, in subscribers' action against provider challenging provider's practice of not offering music as stand alone service; the statements were offered to demonstrate falsity of prior statements by provider's representatives that technical reasons prevented such stand alone service, but a decision to drop or unbundle the service in a limited area did not render the representatives' prior statements false.

[27] Appeal and Error 30 ⚿766

30 Appeal and Error
　　30XII Briefs
　　　　30k766 k. Defects, Objections, and Amendments. Most Cited Cases
Any error by trial court was harmless, in sustaining objections to declarations by cable service subscribers' attorney that was purported to show that subscribers wanted only FM music service but were nevertheless required to purchase basic cable, and that subscriber was told provider did not have technology to provide FM service alone, despite subscribers' contention that testimony would have created a triable issue in their action against provider challenging provider's practice of not offering stand alone music service; subscribers failed to reference the excluded testimony in their separate statement of disputed facts or to identify which fact or facts the testimony placed in dispute.

[28] Telecommunications 372 ⚿1249

372 Telecommunications
　　372VI Cable Television
　　　　372k1245 Civil Liabilities and Actions in General
　　　　　　372k1249 k. Actions. Most Cited Cases
Trial court did not abuse its discretion when it failed to sustain cable service subscribers' objection that several of provider's asserted undisputed facts misquoted their testimony, in subscribers' action against provider challenging provider's practice of not offering music as stand alone service; court was well within its discretion to conclude it could simply review the testimony itself to determine whether any material discrepancies existed.

[29] Telecommunications 372 ⚿1228

372 Telecommunications
　　372VI Cable Television
　　　　372k1228 k. Rates and Charges. Most Cited Cases
Availability of alternative sources for music carried by cable service provider's FM music service and the fact that such service was non essential rendered provider's requirement that subscribers purchase basic tier in order to receive music service not oppressive, and there was no element of surprise because subscribers understood that they had to buy basic cable, such that the basic tier requirement was not oppressive, as was required to find contract between provider and subscribers unconscionable in violation of Consumer Legal Remedies Act (CLRA); subscribers could access music through broadcast programming, compact disc, the Internet, or satellite service. West's Ann.Cal.Civ.Code § 1770.

[30] Contracts 95 ⚿1

95 Contracts
　　95I Requisites and Validity
　　　　95I(A) Nature and Essentials in General
　　　　　　95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
A court may deem a contract provision unconscionable, and therefore unenforceable, only if it is both procedurally and substantively unconscionable.

[31] Contracts 95 ⚿1

95 Contracts
　　95I Requisites and Validity
　　　　95I(A) Nature and Essentials in General
　　　　　　95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
The procedural element of unconscionability focuses on two factors, oppression and surprise; oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice, and surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.

[32] Contracts 95 ⚿1

95 Contracts
　　95I Requisites and Validity
　　　　95I(A) Nature and Essentials in General
　　　　　　95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
The substantive element of unconscionability focuses on the actual terms of the agreement and evaluates

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether they create overly harsh or one-sided results as to shock the conscience.

[33] Contracts 95 ⛝1

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
The availability of alternative sources from which to obtain a desired service defeats any claim of oppression, as required to support a claim that an agreement is unconscionable, because the consumer has a meaningful choice.

[34] Telecommunications 372 ⛝1228

372 Telecommunications
    372VI Cable Television
        372k1228 k. Rates and Charges. Most Cited Cases
Cable service provider's requirement that subscribers purchase basic tier in order to receive music service did not "shock the conscience," as required to find provision in contract for cable services unconscionable, in violation of the Consumer Legal Remedies Act (CLRA). West's Ann.Cal.Civ.Code § 1770.

[35] Contracts 95 ⛝1

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
Basing an unconscionability determination on the reasonableness of a contract provision would inject an inappropriate level of judicial subjectivity into the analysis; the question instead is whether the terms of the agreement are such an extreme departure from common business practice, and so one-sided as to "shock the conscience."

**636 Norbert C. Babin, Michael J. Langston, Santa Rosa, for Plaintiffs and Appellants.
Coblentz, Patch, Duffy & Bass LLP, Richard R. Patch, Virginia A. Crisp, Susan K. Jamison, San Francisco, for Defendant and Respondent.
STEIN, J.
*1229 Thomas Belton and Larry Hall (hereafter plaintiffs) are subscribers to cable service provided by Comcast Cable Holdings, LLC (Comcast). They appeal from a judgment entered in Comcast's favor after the court granted Comcast's motion for summary adjudication with respect to plaintiffs' causes of action for unfair competition (Bus. & Prof.Code, § 17200) and violation of the Unruh Act (Civ.Code, § 51 (the Unruh Act)). The court also dismissed, pursuant to Civil Code section 1781, subdivision (c) (3), the remaining cause of action alleging violation of the Consumer Legal Remedies Act, Civil Code section 1750 et seq. (CLRA).

We shall affirm the judgment.

Facts

The amended complaint alleged that plaintiffs are residents of Sonoma County and subscribers to Comcast cable services. Larry Hall is legally blind. All of the causes of action were premised upon the common allegation that Comcast offered FM or music services to Sonoma County residents only as a part of a basic cable tier package that included television cable service. Plaintiffs alleged that this practice forced them to purchase television cable services that they did not want because they had no other practicable means of **637 obtaining access to the FM or music services. With respect to Hall, the complaint also alleged Comcast's practice was discriminatory because Hall was blind and could not use the television cable service. Plaintiffs further alleged that Comcast expressly or impliedly falsely represented to the public that it was "technologically or legally necessary" to subscribe to the basic cable tier "in order to receive the FM/music service." Finally, they alleged that Comcast's advertisements did not "conspicuously disclose the actual price of the FM and/or music services."

After deposing plaintiffs, Comcast moved for summary adjudication of the first cause of action for unfair competition (Bus. & Prof.Code, § 17200), and the third cause of action for a violation of the Unruh Act. Comcast also filed a *1230 motion, pursuant to Civil Code section 1781, subdivision (c)(3), to dismiss the remaining cause of action alleging violation of the CLRA.

As relevant to the issues on appeal, the motions were based upon the following undisputed facts:

When Mr. Belton subscribed, he was informed that a

subscription to the basic cable tier, which included television service, was required to receive the FM or music service that was also included in that tier. Belton later asked a Comcast customer service representative whether he could get FM service only, and was told he could not. He did not ask why he had to purchase the basic cable tier because he had asked the same question of several of Comcast's predecessors, and he was always told that it was "technical." Mr. Belton did not want television cable service. He subscribed to it only in order to get the audio. Although Mr. Belton protested the unavailability of FM or music services a la carte,[FN1] he did ask Comcast to provide the basic cable tier of service, and he has never been billed for a service he did not request.

> FN1. For convenience we adopt the parties' use of the phrase "a la carte" to describe the unbundling of the services included in a tier of cable service, and offering them separately.

When Mr. Hall subscribed to Comcast services, he was informed and understood that he had to subscribe to basic cable programming in order to get the audio service that he wanted.[FN2] Approximately a year after Mr. Hall subscribed to Comcast services, he twice inquired about the availability of the FM audio service a la carte. He informed the representative that he was blind, and that was why he was making the request. He initially testified that he was told Comcast did not have the technology to do that. Yet, later in the deposition he stated he was informed that it was not "possible" to get audio only, but could not recall whether the representative said it was technically not possible. Hall testified Comcast treated him the same as their sighted subscribers. It was also undisputed that Comcast applies its policy of requiring its customers to subscribe to the basic cable tier of service in order to receive FM or music service to all residential subscribers. Hall subscribed to a premium cable package, and placed an order to add a digital video and audio package. He, like Belton, did not want the television service included in the package. Both plaintiffs admitted that they "understood basic cable is required to receive music service."

> FN2. Plaintiffs cited no evidence to dispute the asserted fact that "Hall ... was informed that a subscription to basic cable programming was required to receive cable music service." Instead they objected only that Comcast "misquoted" his testimony because Hall's testimony referred to "certain video services" not to "basic cable." The court overruled this objection.

**638 Both Hall and Belton could obtain FM or music service by listening to remote stations live over the Internet, and they both had computers and *1231 Internet service.[FN3] It was undisputed that DirecTV, a satellite service, also offered digital quality music. Both plaintiffs could also receive a number of FM stations on the radio at home.[FN4]

> FN3. Although plaintiffs stated that they disputed this fact, they offered no evidence to dispute the availability of FM stations over the Internet. Instead they simply pointed out that although Belton testified that he knew FM stations were available over the Internet, he also stated he had not gone through the "elaborate process" to use his computer this way.

> FN4. Although plaintiffs asserted this fact was disputed as to Belton, they cited the same deposition testimony that Comcast relied upon and disputed only the assertion that Belton testified that three stations "are available easily over the air." In the cited testimony Belton testified that he could get KPFA and KQED with a large outdoor antenna and KRCB, a local station.

With respect to their allegation of misrepresentations or false advertising, both plaintiffs admitted they had not seen any false written statements from Comcast suggesting that music service was offered a la carte. It was also undisputed that the rate cards attached to the complaint did not contain any representations that legal or technical reasons prevented Comcast from offering FM or music service separately from the rest of the basic cable package. Plaintiffs further admitted that the cards stated either that basic cable is required to receive any other services, or that basic service was the minimum level of cable service that could be purchased. They also admitted that all of the rate cards stated the correct price for basic cable service, which included FM service.[FN5]

> FN5. Plaintiffs stated they disputed the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 10 of 20

151 Cal.App.4th 1224                                                                    Page 9
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

additional assertions of fact that the rate cards stated the correct price for FM service, and for DMX music, a digital music service that Hall ordered in addition to basic cable, but cited only the cards themselves as their evidence. Plaintiffs offered no argument to explain how these cards misrepresented the price, and the court therefore concluded that they failed to create a triable issue of fact.

With respect to plaintiffs' assertion that representatives of Comcast had orally represented to them there were technical reasons why they could not get FM or music service a la carte, Comcast offered the declarations of James Bordessa, its construction manager, and Shirley I. Gulbransen, its regional vice president. Bordessa declared that Comcast's basic television service was the service automatically provided when cable service is installed. The signal for all other services must be either "trapped," i.e., blocked by a physical device installed at the curb, or electronically "scrambled," for those customers who do not order and pay for them. To receive a trapped service the physical trap is removed by the installer. To receive a scrambled service the customer must obtain and hook up a converter box that " 'unscrambles' the signal." In order to provide music service without the basic television service, it would be necessary either to install a trap that blocks the basic television signal but allows the music signal through, or to scramble the basic signal. Comcast had not designed or manufactured a trap for, and did not scramble, the basic signal so that it could offer "stand-alone" music service, *1232 for several reasons. The same expense of installation, customer service, and other costs would still exist whether the customer received the basic cable package or music service alone. Therefore provision of music service alone would not be profitable unless priced at a level close to that charged for the basic cable service package. At the same time, because Comcast also faced extensive competition from other providers **639 of music service, such as local radio stations, Internet-based radio services, and satellite entertainment providers, there was a significant risk that the demand for such "stand-alone" music service would not be high enough to allow it to recoup its "roll-out" costs and the administrative and infrastructure expenses it would incur. Also, scrambling or trapping posed a significant risk of theft of service because a knowledgeable customer can remove the trap, or obtain boxes that will unscramble the signal.

Plaintiffs offered an expert declaration disputing the assertion that reconfiguring Comcast's system to trap out basic cable television would be costly, because another company already manufactured a trap that could trap out the basic television cable, but let the FM or other music service signal through. The expert also challenged the business reasons Comcast's witnesses had stated for Comcast's decision not to implement the technical changes that would allow it to offer FM or music service a la carte. He declared that because a trap that could accomplish this was already being manufactured it would not be costly for Comcast to deploy such a trap. He further declared that the risk of theft of service would not be any greater than under Comcast's current configuration of its tiers of service because "a savvy customer can learn how to remove *any* trap."

After ruling on the parties' evidentiary objections, the court, in a detailed order, found that there were no material triable issues of fact, and stated its reasons for concluding that Comcast was entitled to judgment as a matter of law on the causes of action for violation of Business and Professions Code section 17200 and for a violation of the Unruh Act. In a separate order, the court determined that the cause of action for violation of the CLRA was without merit. It entered judgment in Comcast's favor. Plaintiffs filed a timely notice of appeal.

**Analysis**

**I.**

**Unfair Competition and the Unruh Act**

[1] The motion for summary adjudication was directed to the first cause of action for unfair competition based upon of *1233 Business and Professions Code section 17200, and the third cause of action for violation of the Unruh Act. "On review of a summary judgment [or summary adjudication] favoring the defendant, we look at the record anew to determine whether the defendant conclusively has shown that (1) one or more elements of a cause of action cannot be established, or (2) there is a complete defense." (*Van Ness v. Blue Cross of California* (2001) 87 Cal.App.4th 364, 371, 104 Cal.Rptr.2d 511).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 11 of 20

151 Cal.App.4th 1224                                                                                                      Page 10
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

### A. Unfair Competition

[2][3][4] " 'Business and Professions Code section 17200 ... establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (*Cel-Tech* ).) "It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Ibid.*)

**640 [5] The amended complaint alleged that Comcast's practice of requiring its subscribers to purchase the basic cable tier, which included television programming they did not want, in order to obtain the FM or music service that was also included, violated many predicate statutes. In their opening brief on appeal, however, plaintiffs contend that the court erred in granting Comcast's motion for summary adjudication only with respect to their contentions that Comcast's practice constituted: (1) unlawful tying in violation of the Sherman Act (15 U.S.C. § 1 (the Sherman Act)); (2) negative option billing in violation of 47 United States Code section 543(f); and (3) a violation of the Unruh Act.[FN6]

FN6. In the proceedings below plaintiffs also alleged Comcast's practice violated other predicate statutes, including Business and Professions Code sections 17509 and 17000, the Americans with Disabilities Act (42 U.S.C. § 12101(ADA)) and the Cartwright Act (Bus. & Prof.Code, §§ 16720 & 16727). Yet, in their opening brief they did not raise any claim of error with respect to the court's disposition of these claims. We therefore deem any contention based upon these predicate statutes to have been waived, and shall not consider plaintiffs' contentions based upon predicate violations of Business and Professions Code sections 17509, 16727 and 16720, which they reassert on appeal for the first time in their reply brief. (See, e.g., *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8, 265 Cal.Rptr. 788.)

On appeal, plaintiffs also rely on violations of the CLRA as yet another predicate statute for their unfair competition claim. To avoid repetition, we shall address these arguments in the context of review of the motion that the separate cause of action for violation of the CLRA was without merit. (See fn. 17, *post.*)

*1234 We shall first review the court's determination under the " unlawful prong" of Business and Professions Code section 17200 that the undisputed facts established that Comcast's practice did not violate any of these predicate statutes and therefore was not illegal. Next we address the court's determination that Comcast was entitled to summary adjudication with respect to the unfairness prong, based upon these same predicate statutes. Third, we review the determination, based upon the undisputed facts, that Comcast's practice was not fraudulent or deceptive. Finally, we address plaintiffs' contention that numerous errors in evidentiary rulings prevented them from creating a triable issue of fact.

#### 1. Unlawful Prong

##### a. Tying

[6][7][8][9][10] Both the Sherman Act and the Cartwright Act (Bus. & Prof.Code, § 16720 (the Cartwright Act)) prohibit tying arrangements that operate as unreasonable restraints on trade. "A tying arrangement under antitrust laws exists when a party agrees to sell one product (the tying product) on the condition that the buyer also purchases a different product (the tied product), thereby curbing competition in the sale of the tied product." (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 183-184, 91 Cal.Rptr.2d 534 (*Freeman* ), citing *Northern Pac. R. Co. v. United States* (1958) 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545.) "Assuming that separate products in separate markets exist, a plaintiff claiming an illegal tying arrangement must plead: '(1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product; (2) the party had sufficient economic power in the tying market to coerce the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 12 of 20

151 Cal.App.4th 1224                                                                 Page 11
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

purchase of the tied product; and (3) a substantial amount of sale was effected in the tied product.' " (*Freeman, supra,* at p. 184, 91 Cal.Rptr.2d 534.) The latter element is sometimes referred**641 to as "tied market foreclosure." Under both the Cartwright Act and the Sherman Act, in the absence of evidence of some tied market foreclosure or anticompetitive impact in the tied product market, the plaintiff cannot establish an unlawful tying claim. (*Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 540-541, 78 Cal.Rptr.2d 133 (*Viacom*); *Jefferson Parish Hospital District No. 2 v. Hyde* (1984) 466 U.S. 2, 16, 104 S.Ct. 1551, 80 L.Ed.2d 2 (*Jefferson Parish*).)[FN7]

> FN7. The mere sale of products packaged together, or refusal to sell such products separately, does not constitute unlawful tying. "[N]ot every refusal to sell two products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts." (*Jefferson Parish, supra,* 466 U.S. at pp. 11-12, 104 S.Ct. 1551.) "Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively-conduct that is entirely consistent with the Sherman Act." (*Ibid.*) Recently, in *Illinois Tool Works Inc. v. Independent Ink, Inc.* (2006) 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26, the court reaffirmed that "[m]any tying arrangements, even those involving patents and requirements ties, are fully consistent with a free, competitive market." (*Id.* at p. 1292.)

[11] *1235 Plaintiffs' unlawful tying theory was that the basic tier of cable television was the "tied" service that they were required to purchase in order to obtain the "tying" service, i.e., music or FM services. The court correctly determined that this claim, whether stated as a violation of the Cartwright Act or as a violation of the Sherman Act, was precluded as a matter of law based upon the undisputed fact that neither plaintiff wanted cable television service. Since plaintiffs would not otherwise have purchased the tied product, i.e., basic cable television programming, the alleged business practice could not have foreclosed or injured competition in the tied product market. "[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." (*Jefferson Parish, supra,* 466 U.S. at p. 16, 104 S.Ct. 1551; see also *Freeman, supra,* 77 Cal.App.4th at p. 187, 91 Cal.Rptr.2d 534.)

[12] In *Viacom, supra,* 66 Cal.App.4th 534, 78 Cal.Rptr.2d 133, the court applied this principle to hold that a practice similar to Comcast's did not constitute an unlawful tying arrangement. The plaintiffs alleged that Viacom required them to purchase broadcast channels as a prerequisite to purchasing satellite cable channels. (*Id.* at p. 539, 78 Cal.Rptr.2d 133.) The court held, among other things, that "devastating to their case is [the] concession in their pleading that, if not for Viacom's business practice, plaintiffs would not buy broadcast channels at all because they are available for free over the airwaves. This concession establishes that the challenged practice has no effect on competition in the tied product market." (*Id.* at p. 543, 78 Cal.Rptr.2d 133.) Without an adverse impact on competition in the tied product market there is no harm to competition, and no unlawful tying. (*Id.* at pp. 543-544, 78 Cal.Rptr.2d 133.)

Plaintiffs' attempt to distinguish *Viacom* on the ground that it interpreted and applied the Cartwright Act, not section 1 of the Sherman Act, is unavailing. Although *Viacom, supra,* 66 Cal.App.4th 534, 78 Cal.Rptr.2d 133 interprets and applies Business and Professions Code section 16727, this section was patterned after section 1 of the Sherman Act, and the court relied **642 upon United States Supreme Court authority interpreting the Sherman Act in reaching its conclusion that the plaintiff failed to state a claim under the Cartwright Act. (*Viacom,* p. 541 & fn. 2, 78 Cal.Rptr.2d 133.)

Based upon the foregoing authorities, the court correctly concluded that the undisputed material facts established that plaintiffs could not show market *1236 foreclosure in the tied product market, and therefore Comcast's practice was not an unlawful tying arrangement under section 1 of the Sherman Act.

**b. Negative Option Billing**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[13] The next statutory predicate for plaintiffs' Business and Professions Code section 17200 claim was that Comcast's practice of providing FM or music service only as part of a basic tier that included television programming constituted "negative option billing" in violation of 47 United States Code section 543(f). Section 543(f) prohibits a cable operator from charging "a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. For purposes of this subsection, a subscriber's failure to refuse a cable operator's proposal to provide such service or equipment shall not be deemed to be an affirmative request for such service or equipment." (47 U.S.C. § 543(f).)

This section does not, by its terms, prohibit the practice of packaging cable services in tiers. In fact, the practice of packaging cable services in tiers was recognized and addressed by the federal regulations concerning negative option billing, specifying that in some circumstances a cable provider can drop particular channels from a package and then bill for them separately. (See *Time Warner Cable v. Doyle* (7th Cir.1995) 66 F.3d 867, 872-873, 878-882; see also *Morrison v. Viacom, Inc.* (1997) 52 Cal.App.4th 1514, 1529, 61 Cal.Rptr.2d 544.) Instead, 47 United States Code section 543(f) prohibits the practice of providing a service the customer had not affirmatively requested by name, and then charging for it if the customer fails to exercise the "negative option" of canceling or opting out of the proffered service. Therefore, to establish a violation of this predicate statute plaintiffs had to show that Comcast provided a service to the plaintiffs they had not affirmatively requested by name.

The undisputed facts, however, were that both plaintiffs understood they were purchasing a package or tier of cable service that included television service and music service, as opposed to a la carte FM or music service, and that each plaintiff affirmatively placed an order for the tier of cable services they were billed for.[FN8] Although plaintiffs disputed defendant's assertion of fact that Belton affirmatively requested "by name" the basic tier of service, the only evidence they cited was Belton's testimony that he requested the basic tier of service "under protest." This evidence does not create a material issue of disputed fact because, whether or not Belton *liked* the fact that he had to order the basic tier of cable service to get the music *1237 services, it was nonetheless undisputed that he affirmatively placed an order for that tier, understanding that it was a package including television programming and FM or music services. Since the undisputed facts established that neither plaintiff was provided or billed for a service he did not order by name plaintiffs could not, as a matter of law, establish that Comcast's practice **643 constituted negative option billing in violation of 47 United States Code section 543(f).

> FN8. Belton testified that he was never charged for a service he did not request. Hall testified that he ordered an additional tier of digital programming, understanding that music was only a part of the programming in that tier.

### c. The Unruh Act

[14] The third predicate statute we address is plaintiffs' allegation that Comcast's practice of packaging FM or music service together with television programming, or refusing to provide FM or music service by itself, violated the Unruh Act.

[15] "[T]he Unruh Act secures equal access to public accommodations and prohibits discrimination by business establishments." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1150, 278 Cal.Rptr. 614, 805 P.2d 873.) It, however, "explicitly exempts standards that are 'applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability.'" (*Id.* at p. 1172, 278 Cal.Rptr. 614, 805 P.2d 873.) It was undisputed that Hall was treated exactly the same as sighted subscribers, and that Comcast applied its "policy of requiring its customers to subscribe to the basic cable tier [of video] service in order to receive music service to *all* residential subscribers regardless of ... disability." Any inference that the policy discriminated against blind persons is precluded by the undisputed fact that both Hall, who was blind, and Belton, who was not, were required to purchase the basic cable tier, which included television programming they did not want. On its face, the policy therefore applied equally to sighted and blind subscribers.

Plaintiffs nonetheless contend that Comcast's practice was discriminatory "in fact" because sighted persons, even if they do not want cable TV, could use it, whereas blind persons could not. In other words, they argue that although the policy is facially neutral, it disproportionately and adversely impacts blind

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 14 of 20

151 Cal.App.4th 1224                                                                                      Page 13
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

people. The contention that Comcast's policy, despite its equal application to all subscribers, has an adverse impact on blind persons fails, as a matter of law, to state a violation of the Unruh Act. In *Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d 1142, 278 Cal.Rptr. 614, 805 P.2d 873, the court held, "an adverse impact claim challenges a standard that is applicable alike to all such persons based on the premise that, notwithstanding its universal applicability, its actual impact demands scrutiny. If the Legislature had intended to include adverse impact claims, it would have omitted or at least qualified" the language in section 51 of the Unruh Act that expressly exempts standards that are applicable *1238 alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability. (*Id.* at pp. 1172-1173, 278 Cal.Rptr. 614, 805 P.2d 873.) In *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 853, 31 Cal.Rptr.3d 565, 115 P.3d 1212, the court reaffirmed that a policy that is neutral on its face is not actionable, even if it has a disproportionate impact on a protected class.[FN9]

> FN9. Plaintiffs did not allege or contend below a claim of *disparate treatment* in the application of a facially neutral policy, which may be cognizable under the Unruh Act. See *Koebke v. Bernardo Heights Country Club, supra,* 36 Cal.4th at p. 853, 31 Cal.Rptr.3d 565, 115 P.3d 1212. Moreover, in their separate statement they did not dispute that Comcast treated Hall the same as their sighted subscribers.

Plaintiffs argue that they need not show discriminatory intent because Hall's claim states a violation of subdivision (f) of Civil Code section 51. Subdivision (f) to Civil Code section 51 provides that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 ... shall also constitute a violation of this **644 section." A federal district court, in *Presta v. Peninsula Corridor Joint Powers Bd.* (N.D.Cal.1998) 16 F.Supp.2d 1134 (*Presta* ), held that if an Unruh Act claim is based upon subdivision (f) of Civil Code section 51, the plaintiff need not prove discriminatory intent when such intent is not required to prove the claim under the ADA, because subdivision (f) essentially incorporates the ADA. (*Presta, supra,* at pp. 1135-1136.)

[16] Even if we assume arguendo that the *Presta* court (*Presta, supra,* 16 F.Supp.2d 1134) correctly interpreted California law (see *Howard Contracting, Inc. v. G.A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 52, 83 Cal.Rptr.2d 590 [decisions of the federal courts on issues of interpretation of California law are not binding precedent] ), it is unavailing because plaintiffs cannot show any denial of access to a place of public accommodation in violation of the ADA, and therefore a claim under subdivision (f) of Civil Code section 51 fails as a matter of law. Hall's claim is that, except for the FM or music service, the programming provided in the basic cable tier is "inaccessible" to blind people, and therefore Comcast must accommodate blind individuals by providing FM or music services a la carte. Yet, to state a claim under the ADA, plaintiffs must show that they have been denied access to *a place of public accommodation* and, as a matter of law, cable services are not such a place. (*Torres v. AT & T Broadband, LLC* (2001) 158 F.Supp.2d 1035 (*Torres* ).) In *Torres,* a blind plaintiff contended that the on-screen channel menu provided by a digital cable service was inaccessible to blind people. The court held that "[t]he ADA includes an exhaustive list of private entities that constitute a public accommodation, and a digital cable system is not one of them." (*Id.* at p. 1037.) It also rejected the plaintiff's argument that "when he uses the defendants' digital cable channel menu, his television set becomes a place of exhibition or entertainment. [T]he plaintiff's home cannot reasonably be classified as a place of *public* exhibition or *1239 entertainment. Thus, neither the digital cable system nor its on-screen channel menu can be considered a place of public accommodation within the meaning of the ADA." (*Id.* at pp. 1037-1038.) Since the undisputed facts did not establish a violation of the right of any individual under the ADA, plaintiffs failed as a matter of law to establish an Unruh Act claim under subdivision (f) of Civil Code section 51. Any exception recognized in *Presta, supra,* to the requirement under the Unruh Act that plaintiffs show unequal treatment and discriminatory intent was inapplicable.

The court therefore correctly concluded based upon the undisputed fact that Comcast's practice of requiring all subscribers to purchase the basic cable tier, which included television programming, in order to obtain FM or music service, did not as a matter of law violate the Unruh Act.[FN10]

> FN10. This same analysis also supports the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 15 of 20

151 Cal.App.4th 1224                                                                                         Page 14
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

court order granting summary adjudication of the separate cause of action for a violation of the Unruh Act.

### 2. Unfairness Prong

[17] Plaintiffs contend that, even if not unlawful, Comcast's challenged practice is nonetheless actionable under the *unfairness* prong of Business and Professions Code section 17200. Specifically they argue that the practice of bundling FM radio or music service with video service in the basic tier violates at least "the policy or spirit," if not the letter, of the Sherman Act's prohibition of unlawful tying.

They rely upon the definition of "unfair" set forth in **645*Cel-Tech, supra,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527. In *Cel-Tech,* the court, in the context of an unfair competition claim by a competitor, defined "unfair" as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Id.* at p. 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.) The *Cel-Tech* court further required "that any finding of unfairness to competitors under [Business and Professions Code] section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Id.* at pp. 186-187, 83 Cal.Rptr.2d 548, 973 P.2d 527.) The court left open the question whether this definition should also apply in the context of unfair competition claims brought by consumers (*id.* at p. 187, fn. 12, 83 Cal.Rptr.2d 548, 973 P.2d 527), leading to a split of authority on this question among the courts of appeal. (See *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1273-1274, 39 Cal.Rptr.3d 634 [noting the split of authority and urging the California Supreme Court to resolve it].) This court, however, has followed the line of authority that also requires the allegedly unfair business practice be "tethered" to a legislatively declared policy or has some actual or threatened *1240 impact on competition. (See *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 853-854, 128 Cal.Rptr.2d 389.)

[18][19][20] Plaintiffs' attempt to restate the unlawful tying theory under the unfairness prong fails because the same undisputed facts that establish the absence of any anticompetitive effect in the tied product market precludes a finding that Comcast's practice threatened an incipient violation of section 1 of the Sherman Act, or violated its policy or spirit, or otherwise threatens competition. "The purpose of federal and state antitrust laws is to protect and promote competition for the benefit of consumers. [Citations.] Antitrust laws are designed to prohibit only unreasonable restraints of trade, meaning conduct that unreasonably impairs competition and harms consumers. [Citations.] If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason-because it unreasonably restrains competition and harms consumers-the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375, 113 Cal.Rptr.2d 175; see also *RLH Industries, Inc. v. SBC Communications, Inc.* (2005) 133 Cal.App.4th 1277, 1286, 35 Cal.Rptr.3d 469.) In the absence of some restraint upon competition, the mere practice of packaging services together is not inherently anticompetitive or harmful to consumers. (See *Jefferson Parish, supra,* 466 U.S. at pp. 11-12, 104 S.Ct. 1551; see also *Illinois Tool Works, Inc. v. Independent Ink, supra,* 126 S.Ct at p. 1292["[M]any tying arrangements, even those involving patents and requirements ties, are fully consistent with a free, competitive market"].) Plaintiff identifies no other anticompetitive effect caused by the packaging of these services together, and identifies no other policy underlying section 1 of the Sherman Act that Comcast's practice violated. Therefore the court correctly concluded that, as a matter of law, Comcast's practice **646 was not unfair.[FN11]

> FN11. In their reply brief plaintiffs also rely upon the ADA and the Unruh Act, and the federal law proscribing negative option billing, as a "tether" to a legislatively declared policy that they contend Comcast's practice violated. They assert in conclusory fashion that Comcast's practice was unfair because it violated the spirit, if not the letter, of each of these statutes, but offer no supporting argument or authorities other than for the general assertion that Business and Professions Code section 17200 claims have been based upon the Unruh Act and federal consumer protection statutes. We

151 Cal.App.4th 1224                                                           Page 15
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

shall not consider this argument because they are raised for the first time in the reply. (*Neighbours v. Buzz Oates Enterprises, supra,* 217 Cal.App.3d at p. 335, fn. 8, 265 Cal.Rptr. 788.)

*1241 *3. Fraudulent Prong*

[21][22] Plaintiffs alleged two types of misrepresentations or false advertising in support of their unfair competition claim under the fraudulent prong of Business and Professions Code section 17200: (1) those made in "advertisements and/or promotional material," specifically rate cards attached as exhibits to their complaint, and (2) oral statements that there was a legal or technical reason why they were not offered FM or music services separately from the television or video services included in the basic tier, or why it was necessary to subscribe to the basic tier in order to get the FM or music service. To establish an unfair competition claim under the fraudulent prong, plaintiffs must show that these representations were false or were likely to have misled "reasonable consumers." (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 878, 85 Cal.Rptr.2d 301.)

[23] In support of the fraudulent prong of their unfair competition claim, plaintiffs first relied upon rate cards distributed by Comcast or its predecessors. In their opposition to Comcast's statement of undisputed material facts, plaintiffs admitted that the rate cards upon which they relied did not make any affirmative representations that legal or technological reasons prevented the provision of FM radio or music service a la carte. [FN12] They also admitted the cards clearly stated that subscription to basic cable "is required" in order to receive any other service. Plaintiffs further conceded that, if Comcast had simply used the active voice and stated, "*Comcast* requires subscription to basic cable TV in order to obtain any other services," the statement would not be misleading. Nonetheless, they argued that "[b]y saying that subscription to basic cable is 'required' without spelling out that it is only [Comcast's] *policy* to do so, the unwitting subscriber who wishes only audio services is forced into accepting the unwanted Basic Cable TV." They asserted that the use of the passive voice created a "clear implication that legal or technological reasons require subscription to basic cable" when the truth was that the requirement was "a mere profit strategy of the cable company."

FN12. The court ruled that plaintiffs failed to create a triable issue with respect to respondent's asserted fact that these cards did not misrepresent the price for FM and DMX service. Although this fact was disputed, the only evidence they cited was the cards themselves.
We shall not consider plaintiffs' argument that two of the rate cards were confusing concerning the statement charges for digital (DMX) service, because these arguments were not raised below. (See *Jordan-Lyon Productions, Ltd. v. Cineplex Odeon Corp.* (1994) 29 Cal.App.4th 1459, 1472, 35 Cal.Rptr.2d 200; *Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 989, 263 Cal.Rptr. 878.)

Since the material facts were undisputed, the court may decide as a matter of law whether members of the public were likely to be deceived. (See, e.g., **647*Van Ness v. Blue Cross of California, supra,* 87 Cal.App.4th at p. 376, 104 Cal.Rptr.2d 511.) We *1242 conclude, as did the court below, that a reasonable consumer would not likely be deceived by the mere use of the passive voice in the statements in the rate cards. In context, any reasonable consumer would understand that the requirement that every subscriber purchase the basic cable service, in order to receive any other service, was imposed by Comcast. Nor would any reasonable consumer infer from the mere *absence* of any stated reason for the requirement that there were legal or technical reasons why they had to purchase the basic cable tier of service.

[24] The other evidence plaintiffs offered was their own testimony about conversations they had with representatives of Comcast or its predecessors. Nothing in this testimony identifies any oral statement that there were *legal* reasons why FM or music service was not available a la carte. Generously construed, it did establish that at some point after subscribing, plaintiffs were told by a Comcast employee, or one of its predecessors, that there were technical reasons why music or FM services were not provided a la carte.

Assuming arguendo that this evidence was sufficient to create a triable issue of fact as to whether Comcast made such a representation to the public, the court correctly concluded that there was no triable issue of fact as to whether the statement was false or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP    Document 142-2    Filed 07/30/2007    Page 17 of 20

151 Cal.App.4th 1224                                                                 Page 16
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

misleading. Comcast met its burden to show these oral statements were neither false nor misleading by submitting the declaration of its construction manager, James Bordessa. Bordessa declared that at the time any such representations were made, Comcast's system was configured to provide basic cable television service to every subscriber, and did not trap out or scramble the basic television cable signal. He acknowledged that the basic television cable signal could be trapped out, but declared that to do so would entail technical changes in the traps Comcast used, or the provision of converter boxes to unscramble the television signal for all subscribers who wanted that service. Bordessa also explained some of the business reasons why Comcast had not designed, manufactured or deployed a trap in its system to allow only the music service through.

[25] Plaintiffs' expert, Milan Petrovich, declared that another company already manufactured a trap that could allow the FM or music service signal through while blocking everything else. Petrovich disputed Bordessa's assertion that it would be costly for Comcast to deploy such a trap. He noted that since another company already manufactured the device, there would be no development costs, and Comcast could charge the customer for the cost of installation. Petrovich's declaration failed to create a triable issue that at the time the alleged oral representations were made to plaintiffs they were false or misleading. Nothing in his declaration disputed Bordessa's description of how Comcast's system was then configured and that the system did not deploy such a trap. That it was possible to reconfigure the system to use such *1243 a trap simply did not create a dispute that until such a trap was deployed there were, in fact, technical reasons why Comcast did not offer FM or music services a la carte. The remainder of plaintiffs' expert's declaration merely disagreed with the business reasons Bordessa and another expert gave for why Comcast had not reconfigured its system to trap or scramble the basic television signal. This dispute was not material to the truth of the statement that there were technical reasons why plaintiffs could not **648 get the music or FM service on a stand-alone basis.[FN13]

> FN13. Of course, a "perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable." (_Consumer Advocates v. Echostar Satellite Corp._ (2003)

113 Cal.App.4th 1351, 1362, 8 Cal.Rptr.3d 22.) Yet, in the proceedings below and on appeal plaintiffs fail to articulate in what respect the oral statement, even if truthful, might be misleading.

### 4. Evidentiary rulings

[26] Plaintiffs also argue that the court erred in sustaining Comcast's objection to certain evidence they offered, and in overruling their objections to some of Comcast's assertions of undisputed facts. These contentions fail either on the merits, or because any error was harmless.

Plaintiffs first argue that if the court had not abused its discretion by sustaining Comcast's evidentiary objections to certain declarations filed by Belton and Hall, they could have created a triable issue as to the truth of the oral statements that there were technical reasons why FM or music service was not offered separately from the basic cable television programming. Belton declared that in April of 2005, after the motion for summary adjudication was filed, but before the opposition was due, he spoke to a Comcast supervisor who informed him that FM service was now available on a "stand-alone basis" in Santa Rosa, but had been dropped in Healdsburg, where Belton resided. Hall declared that also in April 2005 he talked to a representative who told him FM service had been cancelled.[FN14] Any error with respect to this evidentiary ruling is harmless. A decision in March or April 2005 to drop FM service, or unbundle it in a limited area, does not render false the statements of representatives made prior to April 2005 that there were technical reasons why FM service was not offered on a stand-alone basis. (See _Stockinger v. Feather River Comm. College_ (2003) 111 Cal.App.4th 1014, 1028, 4 Cal.Rptr.3d 385 [error in excluding evidence *1244 opposing summary judgment is harmless because admission of evidence would not have changed the outcome].)

> FN14. Gulbransen, Comcast's regional vice president, in a reply declaration, explained that in March 2005, Comcast discontinued FM service in Healdsburg and other northern California communities to free up bandwidth and enable Comcast to offer more high-definition digital and pay-per-view video programming options. She further declared that, in Santa Rosa, "due to certain franchise requirements, FM music

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 18 of 20

151 Cal.App.4th 1224                                                                                                Page 17
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

service has not been dropped, and it is now offered on a stand-alone basis," at "a price close to what is charged for the basic television tier of service."

[27] Plaintiffs also challenge the court's ruling sustaining Comcast's objection to portions of Hall's and Belton's deposition testimony attached as Exhibits C, Q and R to the declaration of plaintiffs' counsel, Norbert Babin. Plaintiffs contend this excluded testimony would have created a triable issue because it would have shown that they only wanted FM service and were nevertheless required to purchase basic cable, and that Hall was told Comcast did not have the "technology" to provide FM service alone. We need not address the merits of the evidentiary ruling because, again, any error was harmless. Plaintiffs failed to reference any of the excluded testimony in their separate statement of disputed facts. Nor did they identify which fact or facts this testimony placed in dispute. In the absence of a reference to this evidence in the separate statement, the court was free to disregard it, and plaintiffs are precluded from now contending that it created a triable issue of fact. (See **649_North Coast Business Park v. Nielsen Construction Co. (1993) 17 Cal.App.4th 22, 30-31, 21 Cal.Rptr.2d 104_ [it is not enough to create a triable issue of fact to submit a document that may support it without referencing the evidence in the separate statement and identifying facts to which it relates].) Moreover, the legal analysis of whether Comcast's practice was illegal, unfair, or deceptive assumed the truth of plaintiffs' allegation that they had to buy basic cable to get FM or music service and that they did not want video. It also assumed they had been told there were technical reasons why FM or music service was not offered a la carte. Therefore, even if the court had admitted this evidence, it would not have changed the court's ruling on the motions, and any error was therefore harmless.

[28] Finally, plaintiffs assert that the court should have sustained their objection that several of Comcast's asserted undisputed facts "misquoted" plaintiffs' testimony. The court was well within its discretion to conclude it could simply review the testimony itself to determine whether any material discrepancies existed.

For the forgoing reasons, we conclude that the court did not err in granting the motion for summary adjudication as to plaintiffs' causes of action for unfair competition, and a violation of the Unruh Act.

## II.

### Consumer Legal Remedies Act

[29] The court also granted Comcast's motion, pursuant to Civil Code section 1781, subdivision (c)(3), that plaintiffs' second cause of action was without *1245 merit. (_Consumer Advocates v. Echostar Satellite Corp., supra,_ 113 Cal.App.4th at p. 1359, 8 Cal.Rptr.3d 22 [the CLRA does not permit summary judgment motions, and instead provides this alternate, but similar, procedure to establish that the action is without merit].) In their second cause of action, plaintiffs alleged that Comcast violated two provisions of the CLRA: First, they alleged that Comcast violated Civil Code section 1770, subdivision (a)(19) by inserting an unconscionable term in its contract, i.e., the requirement that customers buy the basic tier of cable service even when the customer only wanted the music or FM service included in that tier. Second, they alleged Comcast violated Civil Code section 1770, subdivision (a)(14) because this requirement constituted negative option billing and discrimination against visually impaired subscribers, in violation of the Unruh Act.

The court properly determined that the contentions based upon negative option billing and the Unruh Act were without merit for the same reasons that it granted summary adjudication on the unfair competition cause of action, and there is no need to repeat that analysis here. With respect to the allegation that the requirement that customers purchase the basic tier was unconscionable, the question is "one of law which we consider de novo." (_Olsen v. Breeze, Inc._ (1996) 48 Cal.App.4th 608, 621, 55 Cal.Rptr.2d 818.)

[30][31][32] A court may deem a contract provision unconscionable, and therefore unenforceable, only if it is _both_ procedurally and substantively unconscionable. (See _Armendariz v. Foundation Health Psychcare Services, Inc._ (2000) 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.) "The procedural element of unconscionability focuses on two factors: oppression and surprise. [Citation.] ' "Oppression" arises from an inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice." ' [Citation.] ' "Surprise" involves the extent to which the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 19 of 20
151 Cal.App.4th 1224
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

Page 18

supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to **650 enforce the disputed terms.' [Citation.] [¶] The substantive element of unconscionability focuses on the actual terms of the agreement and evaluates whether they create ' "overly harsh" ' or ' "one-sided" ' results as to ' "shock the conscience." ' " (_Aron v. U-Haul Co. of California_ (2006) 143 Cal.App.4th 796, 808, 49 Cal.Rptr.3d 555.)

[33] The availability of alternative sources from which to obtain the desired service defeats any claim of oppression, because the consumer has a meaningful choice. (See, e.g., _Freeman v. Wal-Mart Stores, Inc._ (2003) 111 Cal.App.4th 660, 670, 3 Cal.Rptr.3d 860.) Moreover, when the challenged term is in a contract concerning a nonessential recreational activity, the consumer always has the option of simply foregoing the activity. (_Olsen v. Breeze, Inc., supra,_ 48 Cal.App.4th at pp. 621-622, 55 Cal.Rptr.2d 818 [ski binding adjustment *1246 company's contract provision releasing company from liability for injury resulting from its work is not unconscionable even though release was alleged to be a standard practice in the industry because skiing is a nonessential recreational activity].) Listening to music or FM radio is also a nonessential recreational activity that plaintiffs could simply have forgone if they disliked the requirement that they purchase the basic cable tier. Moreover, the undisputed facts established that Hall and Belton had other means of listening to music or the radio, some of which were available for free. Broadcast FM programming was available for free from local radio stations, and Hall admitted that he could receive a number of FM stations on the radio at his home and could also listen to music on a compact disc player. Moreover, almost all of the remote stations carried by Comcast in Sonoma County offered live broadcasts of their programming over the Internet, and both Hall and Belton had computers and Internet service. It was also undisputed that DirecTV, a satellite service, offered digital quality music. Plaintiffs asserted various reasons why they considered these alternatives less desirable, including that the satellite service was expensive, and that in their opinion the quality of sound when listening to FM radio over the Internet was inferior. These variables may have explained why plaintiffs preferred listening through a cable hook-up, but did not create a dispute that these alternatives existed. Plaintiffs did not lack _meaningful choice,_ including obtaining the same service for free over the Internet or radio airwaves, or simply foregoing the nonessential recreational activity. (See, e.g., _Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc._ (2001) 89 Cal.App.4th 1042, 1056, 107 Cal.Rptr.2d 645; _Shadoan v. World Savings & Loan Assn._ (1990) 219 Cal.App.3d 97, 103, 268 Cal.Rptr. 207; _Dean Witter Reynolds, Inc. v. Superior Court_ (1989) 211 Cal.App.3d 758, 771, 259 Cal.Rptr. 789.) Therefore Comcast's requirement that subscribers purchase the basic tier in order to receive FM or music service was not oppressive.

Moreover, there was no element of "surprise," because the requirement that they purchase the basic cable tier was not hidden and plaintiffs admitted that, although they disliked the policy, they understood they had to purchase the basic cable tier, which included television cable programming, to obtain the music or FM service. (See _Wayne v. Staples, Inc._ (2006) 135 Cal.App.4th 466, 481-482, 37 Cal.Rptr.3d 544 [no surprise when terms are clearly disclosed].)

[34][35] In any event, any factual dispute about the practicability of the alternative ways of listening to FM radio or music is immaterial because the contract term must be _both_ procedurally and substantively **651 unconscionable. We are satisfied that the requirement that plaintiffs purchase the basic cable tier did not "shock the conscience" simply because it included television programming they did not want. A provision is substantively unconscionable if it " 'involves contract terms that are so one-sided as to "shock the conscience," or that impose harsh or oppressive terms.' " *1247(_Morris v. Redwood Empire Bancorp_ (2005) 128 Cal.App.4th 1305, 1322, 27 Cal.Rptr.3d 797). "The phrases 'harsh,' 'oppressive,' and 'shock the conscience' are not synonymous with 'unreasonable.' Basing an unconscionability determination on the reasonableness of a contract provision would inject an inappropriate level of judicial subjectivity into the analysis." (_Ibid._) The question instead is whether the terms of the agreement are such an extreme departure from common business practice, and so one-sided as to "shock the conscience." (_Id._ at p. 1323, 27 Cal.Rptr.3d 797; see also _American Software, Inc. v. Ali_ (1996) 46 Cal.App.4th 1386, 1391-1393, 54 Cal.Rptr.2d 477.)

Plaintiffs argue that this contract term "shocks the conscience" because music or FM services are "discrete services" and "there is no legal or technical reason" why they could not be provided separately.[FN15] In effect, they argue that if Comcast

Case 3:06-cv-01802-MHP   Document 142-2   Filed 07/30/2007   Page 20 of 20

151 Cal.App.4th 1224                                                                                              Page 19
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520
(Cite as: 151 Cal.App.4th 1224)

was legally and technically *able* to provide the service separately, it "shocks the conscience" for them not to do so. Even if we accept arguendo that it was legally and technically possible to provide these services separately, it does not "shock the conscience" for Comcast to make a business decision to package them together. It is not uncommon for businesses to package discrete goods or services together, nor is the practice necessarily undesirable from the standpoint of the consumer. (See *Jefferson Parish, supra,* 466 U.S. at pp. 11-12, 104 S.Ct. 1551 ["Buyers often find package sales attractive"].) [FN16] To hold that it is "unconscionable" for a business that has the technical and legal capability to offer a service or good separately, to instead offer it only as part of a package, would be an unwise excursion into an area of economic policy that is better left to the Legislature. (See *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 218, 27 Cal.Rptr.2d 396 [" 'It is primarily a legislative and not a judicial function to determine economic policy' "].)

> FN15. Plaintiffs' contention in their reply brief that Comcast's policy also "shocked the conscience" because it violated the law against negative option billing (47 U.S.C. § 543) and was discriminatory in violation of section 51 of the Unruh Act is disposed of by our determination that the court properly granted summary adjudication of their unfair competition cause of action based upon alleged violation of these same predicate laws.

> FN16. Indeed the Federal Communications Commission (FCC), in two separate reports, one of which was part of the record below, reached different conclusions about whether consumers would benefit from regulations requiring cable services to be provided "a la carte" In a November 18, 2004 report entitled *Report on the Packaging and Sale of Video Programming Services to the Public,* the FCC stated, among other things, that such regulation could result in less diverse preprogramming and consumers having to pay more for fewer channels. In February 2006, a second report, entitled, *Further Report on the Packaging and Sale of Video Programming Services to the Public,* however, identified substantial benefits in terms of an increase of choices. (http:// hraunfoss. fcc. gov/ edocs_ public/ attachmatch/ DOC- 263740 A 1. pdf)

*1248 For the foregoing reasons we also uphold the court's determination that plaintiffs' cause of action for violation of the CLRA should be dismissed as without merit. [FN17]

> FN17. These same reasons also support the conclusion that Comcast's practice was not "unlawful" within the meaning of Business and Professions Code section 17200, based upon a predicate violation of the CLRA.

**652 Conclusion

The judgment is affirmed. Respondent is entitled to costs on appeal.

MARCHIANO, P.J., and SWAGER, J., concur.
Cal.App. 1 Dist.,2007.
Belton v. Comcast Cable Holdings, LLC
151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631, 2007-1 Trade Cases P 75,765, 07 Cal. Daily Op. Serv. 6679, 2007 Daily Journal D.A.R. 8520

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.